```
 1                    UNITED STATES DISTRICT COURT
                       MIDDLE DISTRICT OF FLORIDA
 2                          ORLANDO DIVISION

 3               Docket No.6:06-MD-1769-Orl-22DAB

 4     . . . . . . . . . . . . . .
       IN RE:                      :
 5     SEROQUEL PRODUCTS LIABILITY  :
       LITIGATION                   :        Orlando, Florida
 6     MDL DOCKET No. 1769          :        July 28, 2009
                                    :        10:00 a.m.
 7     ALL CASES                    :
                                    :
 8     . . . . . . . . . . . . . .:

 9

          TRANSCRIPT OF TESTIMONY OF DR. LISA RARICK
10            BEFORE THE HONORABLE ANNE C. CONWAY
              CHIEF UNITED STATES DISTRICT JUDGE
11

12     APPEARANCES:

13     For the Plaintiffs:
                               Fletch Trammell
14                             Camp Bailey
                               Robert Cowan
15                             Larry Roth
                               Jennifer Kingston
16

17     For the Defendant

18     AstraZeneca:
                               Michael Brock
19                             Chris Coutroulis
                               Robert Ciotti
20                             Andrew Stillufsen
                               Fred Magaziner
21                             John Sullivan

22

23     Court Reporter:  Sandra K. Tremel, RMR/CRR

24     Proceedings recorded by mechanical stenography, transcript

25     produced by computer-aided transcription.
```

1                    P R O C E E D I N G S

2           THE COURT:  Good morning.  Case number

3    06-MD-1769, In Re Seroquel products liability litigation.

4       Could we have appearances, please.

5               MR. TRAMMELL:  Fletch Trammell for plaintiffs.

6               MR. COWAN:  Robert Cowan for plaintiffs.

7               MR. BAILEY:  Camp Bailey on behalf of

8    plaintiffs.

9               MR. ROTH:  Larry Roth for the liaison counsel

10   for plaintiffs.

11              MS. KINGSTON:  Jennifer Kingston for Jannsen

12   Pharmaceutica.

13              MR. BROCK:  Mike Brock on behalf of AstraZeneca.

14              MR. STILLUFSEN:  Andrew Stillufsen on behalf of

15   AstraZeneca.

16              MR. CIOTTI:  Robert Ciotti for AstraZeneca.

17              MR. COUTROULIS:  Chris Coutroulis for

18   AstraZeneca.

19              MR. MAGAZINER:  Fred Magaziner for AstraZeneca.

20              MR. SULLIVAN:  John Sullivan for AstraZeneca.

21              THE COURT:  Okay.  Are you ready with the

22   witness?

23              MR. BROCK:  We are, Your Honor.

24              MR. TRAMMELL:  Your Honor, may it please the

25   Court, before we start, Fletch Trammell for the

1    plaintiffs.  In reviewing Dr. Rarick's opinion, other

2    testimony she's given, including a deposition in these

3    cases as well as opinions of other courts regarding

4    Dr. Rarick, it's become clear to us that a significant

5    amount of her opinions that she -- we expect to hear today

6    is, in our opinion, inadmissible for a variety of reasons.

7          Among them are that she expects to give legal

8    conclusions about the operation, interpretation of federal

9    regulations.  We expect some speculative opinions about

10   what the FDA might have done had they been presented with

11   certain evidence.  And we expect to hear Dr. Rarick

12   testify that Seroquel's label was in fact adequate,

13   putting herself in the position of the FDA.  For several

14   reasons, we consider those opinions to be inadmissible.

15         And as a logistical matter, I had some concern about

16   whether you would rather I raise those objections every

17   time a question is asked that I think implicates them, or

18   if we can have an understanding that I've made my

19   objection, it's on the record, and that Your Honor will

20   consider -- not consider me to have waived it if I don't

21   stand up.  I'll just -- I don't know.  I know that we're

22   going to be playing this at trial.  I don't know if you

23   want to have this argument every time they ask a question

24   that I believe calls for an inappropriate opinion.

25              THE COURT:  Well, the questions are going to

1   have to be objected to in a way that they -- the

2   objections can be taken out of the videotape, which means

3   that you all need to be careful not to speak over each

4   other and the witness --

5           MR. TRAMMELL:  Yes, Your Honor.

6           THE COURT:  -- so that we can have a clean tape.

7      If you think that you can go back and identify those

8   areas of the deposition -- those areas of the testimony

9   that relate to your objections and that they can be edited

10  out, fine.  Otherwise, you need to make your objection.

11          MR. TRAMMELL:  Thank you, Your Honor.

12          THE COURT:  So I guess, in other words, if it's

13  a whole chunk of testimony that could easily be excised,

14  then I won't deem that you've waived your objection, but

15  obviously if it's an objection to the form or something

16  along those lines, you'll need to make it.

17          MR. TRAMMELL:  Okay.  And so some of them are --

18  I will have a speculation objection on the foundation

19  objection --

20          THE COURT:  Well, foundation objections you'll

21  have to make because the defense will need to have an

22  opportunity to make that foundation.

23          MR. TRAMMELL:  Yes, Your Honor.

24          MR. BROCK:  We call Dr. Lisa Rarick.

25          THE COURT:  All right.  And now does everyone

1   understand the exhibit list issue?  I mean, this is as if

2   we're in trial.  You have to be using the exhibit list

3   because the next witness we do, we're going to use the

4   exact same exhibit list.  All right.

5          MR. BROCK:  Your Honor, if I might, prior to

6   Dr. Rarick taking the stand, just a couple housekeeping

7   matters.

8      Jeff Fleming, who is operating our videotape, tells

9   me that he will need to change tapes at about 80 minutes,

10  so he's promised to give, if it's okay with Your Honor,

11  about a five-minute warning when he's coming up on --

12          THE COURT:  Okay.

13          MR. BROCK:  -- the end of the 80 minutes, but

14  obviously that will be for you to tell us what to do in

15  terms of a break.

16     And the other thing is there is a notebook there of

17  the exhibits that we will use in our direct exam.  There's

18  actually more than we will use.  There's some that we may

19  use in redirect, but I'll try to direct you to those.

20          THE COURT:  And they're numbered the same way as

21  the exhibit list?

22          MR. BROCK:  Yes, Your Honor.

23          THE COURT:  Okay.

24  BY MR. BROCK:

25  Q   Good morning, Dr. Rarick.

```
 1    A    Good morning.

 2    Q    Please introduce yourself --

 3              THE COURT REPORTER:  Excuse me.  She needs to be

 4    sworn, sir.

 5              MR. BROCK:  Pardon me.

 6              LISA RARICK, DEFENDANT'S WITNESS, SWORN

 7                         DIRECT EXAMINATION

 8    BY MR. BROCK:

 9    Q    Good morning, Dr. Rarick.

10    A    Good morning.

11    Q    Please introduce yourself to the jury, tell them who

12    you are and where you live.

13    A    My name is Lisa Rarick.  I live in the DC suburbs of

14    Gaithersburg, Maryland.

15    Q    Are you married?

16    A    I am.

17    Q    Dr. Rarick, are you licensed to practice medicine?

18    A    Yes, in the District of Columbia and Maryland.

19    Q    Did you ever work for the FDA?

20    A    Yes, I have.

21    Q    Tell the jury how long you worked for the FDA.

22    A    In total, 15 years.

23    Q    And will you share with the jury your educational

24    background, your medical training and your residency that

25    you went through in terms of your background.
```

1    A    Sure.  I'm a medical doctor.  I trained in southern

2    California at Loma Linda University School of Medicine,

3    and then I went to the District of Columbia Georgetown

4    University where I did my residency in obstetrics and

5    gynecology.

6    Q    When did you complete your residency in obstetrics

7    and gynecology?

8    A    1988.

9    Q    Is there a title on a residency program known as

10   chief resident?

11   A    Yes.  In my residency program, there were two

12   fourth-year residents chosen as what was called the chief

13   resident.

14   Q    Did you hold the position of chief resident?

15   A    Yes.

16   Q    While at Georgetown?

17   A    Yes, I did.

18   Q    Did you have any experience in serving as a clinical

19   instructor of medicine?

20   A    Yes.  When I finished my residency, I remained at

21   Georgetown on the faculty at which time I had a faculty

22   practice, and I was also an instructor for the residents

23   and medical students.

24   Q    After completing your residency, did you have an

25   active practice of medicine where you saw and treated

1    patients?

2    A      Yes.

3    Q      Would you tell the jury about that.

4    A      Yes.  On the faculty we had something called the

5    faculty practice associates, so along with our teaching

6    duties, we also had a practice of obstetrics and

7    gynecology.

8    Q      During what period of time was that?

9    A      That was for the first year and a half that I

10   finished my residency.

11   Q      And just so the jury has an understanding of where we

12   are sort of in the timeframe of your work history, when

13   was that?

14   A      That was from the -- July of 1988 until the end of

15   1989, but I continued having a clinical practice at

16   another hospital at that point.

17   Q      Can you tell the jury why you chose to go into

18   medicine?

19   A      I chose to go into medicine, certainly had an

20   interest in the subject matter from high school forward,

21   the sciences and math and human physiology.

22         My mother was in healthcare.  She was a nurse, and I

23   spent a lot of time at her clinic.  She's a nurse

24   practitioner in family practice/reproductive medicine, and

25   I think that's what encouraged me to go into medicine.

1   Q    Now I want to talk to you a little about your

2   experience at the FDA.  Would you share with the jury when

3   you began your involvement with the FDA?

4   A    Sure.  Even before I became formally employed at FDA,

5   I started there as something called a visiting scientist.

6   I was looking at drugs and fetal exposure in pregnant

7   woman in the epidemiology division, and then my formal

8   employment with the FDA began at the end of 1988.

9   Q    And when you went to work for the FDA, what did you

10  do?

11  A    I was a medical officer in the office that used to be

12  called the office of review management, now called the

13  office of new drugs, but in a particular division looking

14  at drug development and approval of new drugs.

15  Q    We're going to look at some medical officer reviews

16  today, but this is a new term for the jury.  Would you

17  describe what a medical officer at the FDA is.

18  A    Sure.  A medical officer at the Food and Drug

19  Administration, I'm talking about the Center for Drug

20  Evaluation and Research in the office of review

21  management, a medical officer is the person at the FDA

22  who's looking at what is submitted to clinical trials in

23  humans, to consider approving, or not, drugs in the U.S.

24  Q    And your first job at the FDA was as a medical

25  officer?

1    A    Yes.

2    Q    In the Center for Drug Evaluation?

3    A    Correct.

4    Q    Of the Food and Drug Administration?

5    A    Yes.

6    Q    In the Center for Drug Evaluation, is it expected

7    that companies that want to market prescription medicines

8    conduct clinical trials on patients before they can get

9    approved to sell the medicines?

10   A    Yes.

11   Q    Could you just describe briefly that process,

12   Dr. Rarick?

13   A    Sure.  A manufacturer who's interested in marketing a

14   drug in the U.S. first has to submit to the U.S. Food and

15   Drug Administration the information they have on their

16   drug and their proposals for how they want to study their

17   medicine in humans, and then all the trials that they're

18   going to do to develop that product in humans up and to

19   the point where they believe they have adequate

20   information for the FDA to consider it for approval.

21   Q    We're going to talk about this in a little more

22   detail in a few minutes, but one of the terms I want to

23   introduce is "new drug application."  Can you tell the

24   jury what a new drug application is.

25   A    The new drug application is what a manufacturer

1   submits to the FDA once it's done all the necessary

2   testing that it believes are adequate for the FDA to make

3   a decision about whether that drug can be marketed in the

4   U.S.

5   Q    While you were a medical officer at the FDA, did you

6   review new drug applications?

7   A    Yes.

8   Q    Does the FDA evaluate clinical trials before it --

9   approving a drug for sale in the United States?

10  A    Absolutely.  Along with a new drug application, the

11  FDA also gets something called an investigational new drug

12  application.  And that's from the first time a company

13  wants to study a medicine in humans in the U.S., they

14  submit to the FDA an investigational new drug application,

15  oftentimes called an IND.  And in every clinical trial

16  they do, every study they want to do in humans is provided

17  to the FDA in that IND.

18  Q    We're going to circle back to investigational new

19  drug applications in a few minutes, but I just need to ask

20  you for now, as a medical officer at the FDA, did you

21  review clinical trial information regarding safety testing

22  on patients?

23  A    Absolutely.  In IND and in the NDA, we'll stick with

24  the NDA for now, the information from the clinical trials

25  done on the medicine are submitted with both the

1    effectiveness information and the safety information for

2    the clinical trials.  And then, of course, safety

3    information is also found in other ways, too.

4    Q    All right.  We're going to talk about the rest of

5    your experience with the FDA, but just to stop here for a

6    moment.  During your entire time with the FDA, how many

7    new drug applications did you review?

8    A    Well, if you're thinking of when I was the primary

9    reviewer, the person doing that primary medical clinical

10   review, probably 20 to 25.

11   Q    And then for the term "investigational new drug

12   applications," which you introduced just a moment ago, how

13   many of those would you have reviewed during your tenure

14   at the Food and Drug Administration?

15   A    Well, again, we're thinking of INDs.  They can be the

16   first time a product is used in humans or every other

17   trial that's submitted.  And probably under my

18   responsibility as a primary reviewer, I would think that

19   hundreds of INDs.

20   Q    Now, you've used the term a couple of times "primary

21   medical reviewer."  Tell the jury what that means.

22   A    What I'm trying to clarify is that medical officers

23   can be the primary reviewer who's looking at all the data

24   and the trials and writing reviews and recommendations.

25   And then there's a -- something called a team leader who's

1    also looking at those recommendations and making

2    decisions.  And I wouldn't call them the primary reviewer.

3    And then there's people like division directors who are

4    actually making decisions, and they're not the primary

5    reviewer.

6    Q    Thank you.

7         I want to introduce a different term now, and that is

8    the term "clinical protocol."  Can you tell the jury what

9    a clinical protocol is in the context of what the Food and

10   Drug Administration does?

11   A    Sure.  For a study that's going to be done in humans,

12   a plan is submitted to the FDA, and that's called a

13   clinical protocol.  It's essentially a description of the

14   plan for the study in humans.

15   Q    Okay.  So before a company conducts a clinical trial,

16   does the company submit a study plan or a clinical

17   protocol to the FDA?

18   A    Exactly.  They submit the clinical protocol that they

19   propose to do and work with the FDA about whether that's

20   an adequate protocol or study plan to proceed with.

21   Q    In your experience in the FDA, did you have

22   experience working with companies in the design of

23   clinical protocols?

24   A    Absolutely.  That's part of a medical officer's job

25   is to review clinical protocols that are proposed, make

1    comments, suggest modifications, even suggest that it's

2    not safe to proceed, and work with companies about how to

3    modify or redesign a plan to make it safe to proceed.

4    Q    As a medical officer at the FDA, if you're looking at

5    a clinical protocol and you think improvement needs on the

6    design -- is needed on the design, what can you do?

7    A    Well, you can look at the clinical protocol and

8    provide modifications that have to be done about how to

9    better look at effectiveness, better look at safety, and

10   so you have those discussions or communications with the

11   manufacturer and come to a new plan.

12        If you believe that a study is not safe to proceed,

13   you can actually recommend and your division can place a

14   trial on what's called clinical hold, which means they

15   can't proceed until further modifications are done.

16   Q    For the record, in terms of your background and

17   experience, is this process something you were involved

18   with in your career at FDA, that is, sitting down with

19   companies and discussing ways to design clinical

20   protocols?

21   A    Yes.  It's either by sitting down with companies or

22   having telephone conferences with companies or even with

23   written comments back and forth.

24   Q    All right.  New term, "product label."  Would you

25   describe for the members of the jury what a product label

1   is in the context of the work that the Food and Drug

2   Administration does.

3   A    A product label is what's also -- I think you're

4   thinking of prescribing information for prescription

5   products, and that is oftentimes called a label, that

6   prescribing information, and that's the result of when a

7   drug is approved by the FDA.  At that time of a decision

8   of approval, the FDA also approves a final printed or

9   final product label.

10   Q    Now, we've asked you to look at this case in the

11   context of the work that AstraZeneca did in terms of its

12   submissions to the FDA as well as the FDA reviews of

13   material received from AstraZeneca, correct?

14   A    Correct.

15   Q    All right.  What is the role of the FDA in terms of

16   evaluating information submitted by a medicine company, as

17   in this case, AstraZeneca, and the development of the

18   initial label?

19   A    And you're talking from initial IND through NDA here?

20   Q    Correct, just in general terms.

21   A    The role is, as I described in terms of the clinical

22   input, when a manufacturer submits their plans for how to

23   develop their product, the FDA then has correspondence and

24   communications with the company about the kinds of trials

25   that would be needed to establish effectiveness and

1  necessary safety information.  Eventually the company can

2  submit the new drug application.

3       And again, the FDA's role is to review that

4  information and make a decision about whether that product

5  can be approved and make a decision about how that final

6  label will appear.

7  Q    Just so we have things in context, why is it that

8  there are product labels that go with prescription

9  medicines?

10  A    Product labels are intended for the prescriber to

11  have the information that the FDA deems is relevant for

12  them to have when making individual decisions about

13  prescribing.

14  Q    I think the jury will have heard this by the time

15  they see your tape, but do all medicines have risks?

16  A    Yes.

17  Q    And is one of the functions of the label to

18  characterize the potential risk of medicines?

19  A    Correct.  The label is intended to provide the

20  prescriber with the information both about the benefits

21  and the risks that are known or potential for that

22  product.

23  Q    While you worked at the FDA, did you -- did you gain

24  experience in the development of prescription medicine

25  labeling?

1   A     Yes.

2   Q     Did you draft labels?

3   A     Yes.  In the sense that sometimes there's class

4   labeling, and the FDA will actually draft proposed

5   labeling.  But I think when you're thinking of draft, the

6   FDA generally seeks proposed labeling in a new drug

7   application and each supplement and the FDA then comments

8   back.  Sometimes they'll start over, but generally,

9   they're able to use the manufacturer's proposed label,

10  make appropriate modifications and come to agreement for

11  approval.

12  Q     In terms of the process that you just described, you

13  had personal experience doing that?

14  A     Definitely.

15  Q     Dr. Rarick, while you were a medical officer, did you

16  continue to practice medicine as well?

17  A     Yes.  I continued to practice at a hospital called

18  Columbia Hospital for Women and also at a volunteer

19  clinic.

20  Q     How long did you hold the position of medical

21  officer?

22  A     Seven to eight years.

23  Q     Tell the jury what position you held at the FDA after

24  you were a review officer.

25  A     After being a medical officer, a new division was

```
 1    created called the division of reproductive and urologic

 2    drug products.  And as that division was being created, I

 3    became its division director.

 4    Q    Were you in charge of the whole division?

 5    A    Yes.

 6    Q    And tell the jury a little bit about your

 7    responsibility as division director.

 8    A    Division directors are responsible for making the

 9    decisions and signing the letters for most of the products

10    under their management.  So you look at the team's

11    recommendations.  And the team includes the clinical, the

12    people who review the animal studies, the chemistry

13    manufacturing, the statisticians' comments -- I don't know

14    if I got everybody there -- oh, the pharmacokineticist, in

15    terms of looking at an IND or and NDA and making a

16    decision or looking at new labeling that comes out after

17    something's approved and making a decision about approval

18    or not.

19    Q    With the medical officers and the chief medical

20    officers who reviewed products like Seroquel, would they

21    be under your supervision as division director?

22    A    I'm not specifically --

23            MR. TRAMMELL:  Objection, Your Honor.

24    Foundation.  The Doctor never reviewed Seroquel, never had

25    any participation in Seroquel's review, doesn't know
```

1    anybody that did and has no idea what the FDA did

2    internally in reviewing Seroquel, doesn't speak for them.

3            THE COURT:  Sustained.  Why don't you lay a

4    foundation.

5            MR. BROCK:  I think my question was not clear.

6    I said "like Seroquel," but I'll rephrase.

7            THE COURT:  All right.  Go ahead.

8    BY MR. BROCK:

9    Q    Medical officers and chief medical officers who

10   reviewed products would be under your supervision as

11   division director, correct?

12   A    I think you're thinking of medical officers and their

13   team leaders or supervisors.  The chief is a different

14   title.

15   Q    Okay.  Let me rephrase it one more time.

16        Would medical officers be under your supervision as

17   division director?

18   A    Yes.

19   Q    Thank you.

20        As division director, approximately how many

21   employees worked under your supervision?

22   A    When I was a division director, I believe there were

23   approximately 30 employees in my direct line, and then

24   there were members of other teams like the chemists who

25   had different management chains but worked in my division,

1    so 40 folks.

2    Q    Now, did you have what is known as approval or

3    signatory authority for medicines as a division director?

4    A    Yes, for most.  There are a specific type of

5    medication or NDA that's for something called a new

6    molecular entity that goes to the next level, but the

7    general new drug application activity, INDs, updated

8    labeling, supplemental applications, that would have been

9    the division director's responsibility for signatory

10   authority.

11   Q    In terms of your background and experience as

12   division director, did you continue to meet with companies

13   about product labeling for prescription medicines?

14   A    Yes.

15   Q    Would you also make decisions on the appropriate

16   information to put in product labeling for prescription

17   medicines?

18   A    Yes.

19   Q    Did you have any involvement in developing training

20   programs for the FDA while division director?

21   A    Yes.  Probably around 1995 or '96, I was asked to

22   join a large center-wide group called good review

23   practices, and my role in that was to develop training

24   across the center regarding good review practices.

25   Q    Were you then promoted within the FDA to a new

1  position?

2  A    Yes.

3  Q    Tell the members of the jury what you were promoted

4  to and what your job responsibilities were.

5  A    Yes.  After about three years as a division director,

6  I then moved to be a deputy director of an Office of Drug

7  Evaluation -- the Office of Drug Evaluation II.

8  Q    What were your responsibilities there?

9  A    There the divisions are organized -- at that time,

10  they were 15 divisions and every three had an office.  And

11  so as a deputy director, I worked with my office director

12  managing three divisions.

13  Q    While at the FDA during these periods of time that

14  we've talked about, did you have extensive experience

15  reviewing safety data and clinical trial data for

16  medicines?

17  A    Yes.

18  Q    Were you promoted again after being in the Office of

19  Drug Evaluation?

20  A    Yes.  After that position, I moved to the immediate

21  office of the center director as something called the

22  associate director for quality assurance.

23  Q    In that position, did you continue to be involved in

24  labeling decisions, labeling discussions?

25  A    Yes.  In that position, it was a center-wide role to

1   assist in implementing good review practices across the

2   center which would have included appropriate review of

3   NDAs and of labeling and of communications between the

4   various offices.

5   Q    So in that capacity, you would be making sure that

6   folks were trained to make appropriate decisions on what

7   information should go in labels or not go in labels?

8   A    Correct.

9   Q    And then tell the jury what happened next in your

10  career at FDA.  Were you promoted again?

11  A    Well, I went to the office of the commissioner of the

12  Food and Drug Administration in something called the

13  Office of Women's Health.

14  Q    And how long did you do that?

15  A    That was for one year.

16  Q    What were your job responsibilities there?

17  A    In the Office of Women's Health, since it's over the

18  entire FDA, their issues are the engagement of women in

19  clinical trials, for example, looking at women's health

20  issues across the centers.  So that would be foods or

21  devices, mammography certification, things like that.

22  Q    Were you employed at the FDA when Seroquel safety

23  information was reviewed by the Food and Drug

24  Administration?

25  A    Yes.

```
 1   Q     Were you at the FDA when Seroquel was approved by the

 2   FDA?

 3   A     Yes.

 4   Q     So were you familiar with the review process that the

 5   FDA would have utilized and actually did utilize for

 6   prescription medicines like Seroquel during that time?

 7            MR. TRAMMELL:  Objection, Your Honor.  To the

 8   extent he's asking her about her familiarity with the

 9   Seroquel review process, she's already testified as to

10   what the review process is for drugs in general.  That

11   kind of question and answer would indicate to the jury

12   that she has some knowledge of what actually happened with

13   the Seroquel review which she doesn't.

14            THE COURT:  Overruled.  You can bring that out

15   on cross-examination.

16            THE WITNESS:  I can answer?

17       Yes.  I was familiar -- I'm familiar with the process

18   and I know most of the folks who were involved in the

19   Seroquel review.

20   BY MR. BROCK:

21   Q     While at the FDA, did you receive any awards of note?

22   A     I don't know if you have my CV in front of you, but I

23   received several awards.  I believe the good review

24   practices resulted in an award, I think the Viagra team

25   resulted in an award.  And there may have been a
```

1    management award, too.  I can't remember them all.  Sorry.

2    Q    And you left the FDA after working there for about 15

3    years?

4    A    Yes.

5    Q    Could you tell the jury why you left the FDA.

6    A    I enjoyed my work at the FDA.  I was ready to not

7    work full-time any longer.  I'd also moved away from the

8    review work which is what I probably enjoyed the most when

9    I was at the FDA.

10   Q    One more question quickly on general qualifications.

11   While at the FDA, did you serve on any committees?

12   A    Yes.

13   Q    Would you just list those for the benefit of the

14   jury, those that you can remember.

15   A    Those that I can remember, I'm sure that there are

16   more, but I was on the good review practices committee and

17   several subcommittees of that.  I was on a committee

18   regarding class labeling.  I'm sure there was a committee

19   for reviewer education.  I was on a committee regarding

20   the international conference for harmonization, and I

21   can't remember others.

22   Q    That's plenty.  Thank you.

23        I want to walk through just a few things that we've

24   talked about with regard to your experience with the FDA

25   and make sure that these are clear for the record.

```
 1        While at the FDA, you met with drug companies to

 2   discuss clinical trials protocols?

 3   A    Yes.

 4   Q    You reviewed investigational new drug applications

 5   and new drug applications and supplemental new drug

 6   applications?

 7   A    Yes.

 8   Q    Supplemental drug applications we haven't talked

 9   about.  What is that?

10   A    That is the kind of application that is submitted

11   once a company has a new drug application and they want to

12   add a new indication or change labeling, things like that.

13   Q    You reviewed and interpreted safety data from

14   clinical trials on patients taking prescription medicines?

15   A    Yes.

16   Q    You drafted medical officer reviews to summarize data

17   for division directors while you were a medical officer?

18   A    Yes.

19   Q    You set up training programs for other medical

20   reviewers on good practices for reviewing safety

21   information?

22   A    Yes.

23   Q    You were involved in product labeling for

24   prescription medicines including reviewing and

25   interpreting clinical trial data and approval of labeling?
```

1   A    Yes.

2   Q    Now, since you left the FDA, have you continued to

3   work in the field of prescription medicines?

4   A    Yes, I have.

5   Q    Can you tell the jury what kind of work you've been

6   doing in the field of prescription medicines since leaving

7   the FDA?

8   A    Sure.  I have worked with drug companies, small and

9   large, regarding those same kinds of issues, submitting

10  investigational new drugs, NDAs, supplements, labelings to

11  the FDA, the kinds of communications companies would have

12  with the FDA, assisting companies in their drug

13  development programs, the clinical trials they've planned,

14  the communications they've planned with the FDA, assisting

15  them with the kinds of background packages that are

16  necessary to have a good discussion with FDA, et cetera,

17  and I've also assisted in litigation work.

18  Q    So since leaving the FDA, you've been involved in

19  direct relationships with medicine companies with regard

20  to their dealings with the FDA, correct?

21  A    Correct.

22  Q    As well as serving as a consultant in litigation such

23  as this one?

24  A    Yes.

25  Q    Can you give the jury the benefit of sort of a time

1  split that you would view as reasonable in terms of the

2  time you spend helping medicine companies with labeling

3  and clinical trials versus testifying in legal matters,

4  working on legal matters?

5  A    Sure.  I've looked back at the last six years and I

6  think it averages out to about a 50/50 split between

7  general drug development and FDA regulatory issues and

8  litigation work.

9  Q    Now, at our request and at our expense, have you

10 looked at documents relating to Seroquel prior to reaching

11 your opinions in this case?

12 A    Yes.  Seroquel and Seroquel XR.

13 Q    Have you looked at documents from the FDA relating

14 specifically to Seroquel submissions as well as FDA

15 evaluations of those submissions?

16 A    Yes.

17 Q    Could you give the jury just sort of a list of the

18 kinds of documents you looked at before reaching your

19 opinions in this case?

20 A    Sure.  I would have looked at the same types of

21 things that I looked at as a reviewer at the FDA or as a

22 manager at the FDA.  I looked at the original IND,

23 communications with the FDA regarding protocols and

24 clinical plans in the development of Seroquel and

25 Seroquel XR.

1    I would have looked at the FDA's reviews and comments

2 and correspondence about that, clinical trials and

3 protocols as they were provided to the FDA, the new drug

4 application itself, FDA's reviews of that new drug

5 application, although I don't know that I looked at the

6 chemistry review closely.

7    And then the draft labeling that was originally

8 proposed, the eventual regulatory actions or letters that

9 were communicated with AstraZeneca, the approval letters,

10 supplemental new drug applications that were then

11 submitted by AstraZeneca to that NDA, new NDAs for the

12 Seroquel XR.

13    Again, more and more about the labels, each of the

14 proposed labels, the approved labels, the new indication

15 information, would have looked at background materials for

16 advisory committee meetings.  I can't think of everything

17 else.  I believe I looked at generally the FDA reviews.

18 I'll have to -- if there's something missing, let me know.

19 Q    That's a pretty good list.

20    In terms of the time that you spent in reviewing the

21 matters that you have described, can you share with the

22 jury the number of hours that you have spent working on

23 this case.

24 A    On the review of Seroquel and Seroquel XR, I think

25 the total hours to date is somewhere around 280, maybe a

1    little more now.

2    Q    Hours?

3    A    Yes.

4    Q    Dr. Rarick, that seems like a lot of time to look at

5    material related to medicine submission.  Can you share

6    with the jury why you've spent so much time looking at the

7    material?

8    A    Well, I think as we'll discuss throughout today,

9    there is a lot of material to review.  It's important to

10   see that material and look at the source documents to look

11   at it as I would have if I were at the FDA.  It's simply a

12   lot of material.

13   Q    You have charged us for your time in this work,

14   correct?

15   A    I have.

16   Q    And your hourly rate, would you state that for the

17   jury, please.

18   A    My standard hourly rate is $500 an hour.

19   Q    I want to ask you now to take a look at the screen.

20   I'm going to put up a document which is RD.7.  If you

21   would take a look at that on your screen there.

22            THE COURT:  What is the exhibit number?

23            MR. BROCK:  It's a demonstrative, Your Honor.

24   I'll introduce it and describe it with the RD.7.

25            THE COURT:  But what's the number on the exhibit

1   list?

2           MR. BROCK:  I don't know that I can cite that

3   number for you on the exhibit list.

4           THE COURT:  Okay.  Well, you're going to need to

5   do that.

6           MR. BROCK:  I'll look for it, and hopefully we

7   can locate it.  I know we filed an exhibit list, we filed

8   a list of our graphics.

9           THE COURT:  All right.  Well, all of -- anything

10  that you're going to show to the jury needs to be on the

11  exhibit list.  And it should be on the exhibit list so

12  that the plaintiffs had an opportunity to make objections

13  to it.

14          MR. BROCK:  Okay.

15          MR. TRAMMELL:  Just for the record, Your Honor,

16  I'm seeing this for the first time.  Obviously I would

17  like to reserve whatever objections I might have made,

18  I'll hope to make in the course of the proceedings, but

19  just when it flashed up on my screen is the first time I

20  saw it.

21          THE COURT:  Okay.

22  BY MR. BROCK:

23  Q    All right.  So I think you probably need to pull that

24  down and we'll circle back to it.

25      Dr. Rarick, just sort of walking through this, the

1    medicine Seroquel was approved for marketing in the United

2    States in September of 1997, correct?

3    A    That's correct.

4    Q    And I want to walk through sort of the steps that

5    lead to the approval of a prescription drug in the United

6    States, and specifically I want to talk some about

7    Seroquel.

8         So if you would, just for the jury describe what are

9    the first steps leading to the discovery of a medicine.

10   And then for Seroquel we can talk about when that occurred

11   and leading up, right up to the IND.

12   A    Sure.  Well, even before the FDA receives specific

13   information about a plan for a new drug, a company does

14   basic science research.  They look at lots of different

15   candidates.  They do lots of studies in a laboratory about

16   receptors, and then they can choose a particular product

17   or molecule and do studies in animals to assess basic

18   safety questions, about, you know, basic things like heart

19   rate changes or respiratory rate changes or liver failure

20   in an animal that might make them not choose that

21   particular candidate.

22        They do animal studies.  And once they've picked the

23   product they want, they do the -- there is a guidance

24   document from the FDA that tells them the kind of animal

25   studies they need to do to support human trials.  That's

1    usually when the FDA gets involved.

2        Sometimes you'll have a meeting even during the

3    animal studies to make sure that they're doing all the

4    animal studies needed to get into humans.  But generally,

5    the first time the FDA gets involved is when they think

6    they have enough information to support safety to start a

7    study in humans, and that's called the IND.

8    Q    So there is a stage of preclinical research where it

9    begins with molecule discovery and proceeds to animal

10   discovery?

11   A    Correct.

12   Q    I say animal discovery.  It should be research in

13   animals.

14   A    Right.

15   Q    And before a medicine can ever be tested in humans,

16   what must a medicine company do?

17   A    Well, they have to provide to the FDA the information

18   they know so far about the product, how they're going to

19   make it, so it's called chemistry manufacturing, to assure

20   that it's a quality product that's not going to have

21   something about the chemistry itself that's dangerous.

22   And then they're going to be doing the necessary animal

23   studies, the non-human studies to support whatever they

24   plan in humans.

25            MR. BROCK:  Do we have exhibit number --

```
 1              MR. STILLUFSEN:  DX1553.

 2   BY MR. BROCK:

 3   Q    So if you would pull 1553, please.

 4              MR. TRAMMELL:  Well, before we show it to the

 5   jury, I haven't seen it.  I'm not sure I was given a copy

 6   of this exhibit, Your Honor.  I need to be able to put my

 7   objection on the record before we flash it up in front of

 8   the jury.  I don't know if there are other copies.

 9              THE COURT:  Exhibit 1553 is product information

10   for Ezetimbe Simvastin.

11              MR. BROCK:  Simvastin?

12              THE COURT:  That's what the exhibit list says.

13              MR. BROCK:  Your Honor, in the run-up to the

14   Guinn trial, which was the first case set for trial, we

15   exchanged exhibit lists and lists of demonstratives that

16   we intended to use at trial.  I'm not sure what number

17   you're looking at there, but we identified it as 15 --

18              THE COURT:  Well, did you use a different

19   exhibit list for Haller than for Guinn?

20              MR. BROCK:  May have.

21              THE COURT:  Well, that makes no sense.

22              MR. BROCK:  I can't explain it.  And I'm happy

23   just to proceed on -- I'll have to straighten it out at

24   the break.  I thought we had the exhibit list.

25        I know that we did workups of these slides in
```

1   anticipation of the -- trying the Guinn case which was the

2   one we were preparing for trial.

3          THE COURT:  Celeste, do you have the -- Kate, do

4   you have the -- it was my understanding they were all the

5   same, but they're not.

6          MR. BROCK:  I think Your Honor is probably

7   correct about that.  So I don't know why this shows 1553,

8   but I did see the slide and it has "Guinn 1553" on it.

9   That's as far as I can go with it.

10     I do know that we exchanged these exhibits with

11  plaintiff's counsel.  This one would have been included in

12  that set that we would have exchanged.  I feel sure of

13  that.

14         Your Honor, the only thing I can say to the Court

15  is this is a demonstrative that we prepared in

16  anticipation of the first trials.  I feel certain --

17         THE COURT:  Well, that should have --

18         MR. BROCK:  -- it was disclosed to the other

19  side as part of the pretrial process.

20     We spent days working on these pretrial matters in

21  Atlanta.

22         THE COURT:  Well, did you go through it for

23  Haller as well as for Guinn, or just for Guinn?

24         MR. BROCK:  We were actually working them up for

25  both cases at that time.  We were --

```
1              THE DEPUTY CLERK:  There's a list of what is
2    numbered with a "D" in the front and then three zeros and
3    then numbers.  And I'm not sure if that's what he means by
4    the demonstrative --
5              THE LAW CLERK:  I have demonstrative for
6    Mr. Guinn.  There's an objection here on that list.
7              THE COURT:  Okay.  Well, all right.  We're going
8    to take a recess.  I'll have to print out the Guinn.
9              MR. BROCK:  I think that the numbers are going
10   to be the same.  I think you may have identified the issue
11   in that it is a "D" which is a demonstrative, which may be
12   in a different place on that list.
13             THE DEPUTY CLERK:  This one just has numbers.
14   This one doesn't have --
15             THE COURT:  Is there a separate list of
16   demonstratives?
17             THE LAW CLERK:  The Guinn exhibit list for 1553
18   is a demonstrative, D53 as provided to plaintiffs.
19             MR. BROCK:  It could be that because we were
20   trying Guinn first that we just filed one set of
21   demonstratives.  As I think about that, that's probably
22   what we did, thinking we would use this set for all cases,
23   Your Honor.  I apologize for this, but I think that's
24   probably how this unfolded.
25             THE COURT:  Okay.  Well, I need to have a copy
```

1  of that.  Can you print that to chambers because that

2  would take too long to print it here.

3        THE DEPUTY CLERK:  Yeah, I can try.  I'm trying

4  to find that one part she's on and I can't find it.

5        THE COURT:  Just -- I need you to print the

6  whole thing.

7        THE DEPUTY CLERK:  The whole thing?

8        THE COURT:  Right.  We'll use that instead of

9  this one.

10       THE DEPUTY CLERK:  Kate, is that in the Guinn

11 case?  What document number is it because I must be

12 looking at a different one.

13       THE COURT:  Can you print it to chambers?  I

14 don't know if you can do that.

15       THE DEPUTY CLERK:  That's 22, right?

16       THE LAW CLERK:  Document 30.  The amended

17 Exhibit B.

18       THE DEPUTY CLERK:  Got it.

19       THE COURT:  So what's the objection that you

20 listed?

21       MR. TRAMMELL:  Well, here's my problem.  We

22 didn't bring every single exhibit here today that's been

23 recorded in the case.  We didn't exchange exhibits for

24 this hearing.  And so I don't have -- I can't put my hands

25 on it before we flash it in front of jury, and I'd like to

1    be able to do so to be able to make whatever prejudice

2    objections I can make or any documents or any objections

3    based on the nature of the --

4             THE COURT:  My question to you was what

5    exhibit -- what objection did you list to the exhibit?

6             MR. TRAMMELL:  I'm not sure, Your Honor.

7             THE COURT:  All right.  Well, we'll be in recess

8    until I get a copy of that.

9                     (Recess taken.)

10            THE COURT:  We're going to use the exhibit lists

11   in the Guinn case since they're not the same.

12      This exhibit list is going to be used in all 6,000

13   cases if they all go to trial.

14            MR. TRAMMELL:  Yes, Your Honor.

15            THE COURT:  So is this testimony.

16            MR. TRAMMELL:  Just to be clear, we had exhibits

17   that -- we had an exhibit list we submitted today for

18   purposes of the hearing.  We were adding those exhibits to

19   that list and we would submit that to the Court.

20            THE COURT:  Those are new exhibits that were

21   never on the list?

22            MR. TRAMMELL:  Well, they're exhibits -- I don't

23   know where they're from.  They may -- some of them were on

24   the list.

25            THE COURT:  Okay.  I need to know the exhibit --

1    the number on the exhibit list because I need to know what

2    the objections to them are.

3            MR. TRAMMELL:  We will get you all that

4    information before we start using it.

5            THE COURT:  All right.  Your objections to 1553

6    which is demonstrative 53 -- I can only assume that since

7    they seem to be numbered -- is hearsay, speculation,

8    assumes facts not in evidence, mischaracterizes evidence.

9            MR. TRAMMELL:  I think what I'll say is he's not

10   going to offer it into evidence.  I don't have any

11   objection to him using it as a demonstrative.

12           THE COURT:  Okay.

13           MR. BROCK:  All right.  If we could pull up

14   slide RD.7.

15   BY MR. BROCK:

16   Q    We were talking before the break, Dr. Rarick, about a

17   period of time in medicine development that would include

18   that column on the left that says, "AZ's basic scientific

19   research."

20        Do you see that?

21   A    Yes.

22   Q    And just briefly for the record, since we have the

23   demonstrative up now, what is the -- what goes on during

24   the period of basic scientific research?

25   A    Well, you have to talk to AZ about their specific

1    activities during that time, but the general development

2    of a product includes that multiple molecules are being

3    looked at, product is being chosen to take forward into

4    animals, they're doing research in a laboratory, receptor

5    research, things like that.

6    Q    And if you look at the bottom column, do you see

7    there's a column for "Basic Science" on the far left

8    there?

9    A    Yes.

10   Q    Does that take you in the period of time where the

11   basic science research is being done with regard to the

12   medicine?

13   A    Correct.

14   Q    All right.  In carrying forward --

15         MR. TRAMMELL:  Your Honor, just briefly, this

16   line of questioning is kind of confusing in that it's

17   confusing to me because he's talking about generic

18   compliance with FDA regulations versus what AZ did.

19      If we could just clarify for the jury that while

20   there is a period of basic science research, the doctor's

21   not currently talking about AZ's basic science research in

22   researching Seroquel.

23         THE COURT:  Why don't you ask her questions to

24   make that clear.

25

1  BY MR. BROCK:

2  Q    Dr. Rarick, did AstraZeneca engage in basic science

3  research before it began its preclinical testing?

4  A    Yes.

5             MR. TRAMMELL:  Objection, vague.

6             THE COURT:  Overruled.

7  BY MR. BROCK:

8  Q    Do you know that from your review of the documents?

9  A    Well, certainly from my review of the documents,

10 while they had to choose a molecule with which to proceed,

11 I did not go back and look at that screening process

12 myself.

13 Q    Let's do it this way then:  In general terms, before

14 a medicine is taken for testing into animals, is basic

15 science research conducted where molecules are identified

16 that might treat a disease state?

17 A    Correct.

18 Q    All right.  Now, we talked about, then, the

19 preclinical research period.  And can you tell the members

20 of the jury, for Seroquel, sort of when that commenced and

21 when AstraZeneca was ready to file the investigational new

22 drug application.

23 A    Yes.  For that, the investigational new drug

24 application does contain that information which is about

25 the molecule they chose, which in this case is quetiapine,

1    and the animal research that they would have done as well

2    as any other preclinical research laboratory information

3    that they were gathering during that time.  And that was

4    about two years before they submitted to the FDA to start

5    studying in humans.

6    Q    In terms of your review of the extensive AstraZeneca

7    materials that you looked at, did you confirm that the

8    preclinical research was conducted?

9    A    Yes.

10   Q    Now, the IND is the application you discussed earlier

11   which a medicine company must file before it tests the

12   drug in humans, correct?

13   A    Correct.

14   Q    All right.  Describe briefly, since we have the slide

15   here now to look at it, what the IND is and what occurred

16   after AstraZeneca filed the IND for Seroquel.

17   A    Sure.  The investigational new drug application

18   includes all the information that AstraZeneca knew about

19   quetiapine, so the animal information, the laboratory

20   information and how they were going to be manufacturing it

21   and making the actual tablet information.  And then it

22   included a proposal for what they wanted to do for their

23   first clinical study, and then that proposal was submitted

24   to the FDA.  The FDA allowed that to proceed.

25        As I recall, it was a proposal that we would call

1    Phase I, which was a safety study.  They're actually using

2    normal human volunteers, not humans with a disease, to try

3    to look at basic safety information before taking it

4    forward.

5    Q    So I want to stop and talk about that just a moment.

6         Do you see in our demonstrative here at the bottom,

7    we have Phase I, Phase II and Phase III trials there above

8    the "Animal Test Tube Studies" line.

9         Do you see that?

10   A    Yes.

11   Q    Now, talk to the jury a little bit about Phase I,

12   Phase II and Phase III trials and what is accomplished at

13   those steps of medicine development.

14   A    Sure.  A Phase I is what we usually think of as the

15   first trial in humans.  And the reason that bar continues

16   is because a lot of information is continued to be

17   gathered in Phase I-type trials.

18        Phase I trials are generally the first studies that

19   look at safety and then later on, in development or even

20   after development, looking at continued basic safety

21   information in small numbers of patients.

22        The later studies would be things like looking at

23   patients with kidney disease and trying to understand

24   safety in different populations, but generally small

25   studies for basic safety information.

1  Q    All right.  Can those trials commence prior to giving

2  the Food and Drug Administration notice through the IND

3  that the company is ready to begin testing in humans?

4  A    Not in the U.S.

5  Q    Now, looking at Phase II, what goes on in Phase II,

6  generally?

7  A    Phase II is generally studies that are looking at the

8  actual population that might benefit from the drug, and

9  you're starting to look in Phase II to establish what's

10  the right dose for this medication, what's the right way

11  to give it once, twice, three times a day, what's the

12  continued safety profile that we can get from these

13  studies, and start getting an idea of the benefits.

14  Q    And then what happens next once you get to a place

15  where you're -- you completed Phase II or you're nearing

16  completion of your initial Phase II trials, what happens

17  then?

18  A    Well, generally, and in this case, you would meet

19  with the Food and Drug Administration at something called

20  the end-of-Phase II meeting where you give the FDA a

21  background package reminding them of everything you've

22  done so far.

23      Remember, you have submitted to the FDA each of these

24  trials, the plans as well as the data from these trials.

25  But at the end-of-Phase II meeting, a company puts

1    together that information again and proposes that they're

2    ready to proceed to something called Phase III.

3    Q    And did you look at the FDA filings of AstraZeneca to

4    confirm that end-of-Phase II meetings took place?

5    A    Yes.  I confirmed that there was communication during

6    Phase I and II, and that there was an end-of-Phase II

7    meeting.

8    Q    Mr. Stillufsen is going to bring up to you now,

9    Doctor, Exhibit 44.

10        And could you just take a look at Exhibit 44 and

11   confirm for the Court what that is.

12   A    Sure.  And can we agree when we talk about

13   AstraZeneca, we're including its older names, ICI

14   Pharmaceuticals or Zeneca?

15   Q    Yes.

16   A    Thank you.

17        This is a document submitted at the end of 1992 with

18   a background document and information for the planned

19   end-of-Phase II conference with the FDA.

20   Q    Let me direct your attention to page 2512.  If you

21   look at -- the Bates number is on the bottom right-hand

22   corner, it's about the third page in.

23   A    Yes.

24   Q    And do you see that that is a letter directed to Paul

25   Leber?

1   A     Yes.

2   Q     From ICI Pharmaceuticals Group?

3   A     Yes.

4         MR. BROCK:  And if we could see the treatment

5   that we have on that document RD.1, please.

6   BY MR. BROCK:

7   Q    And do you see that it says there, "The purpose of

8   this submission is to provide the FDA with the

9   end-of-Phase II conference background document for

10  ICI204636"?

11       Do you see that?

12  A    I do.

13  Q    "We appreciate the opportunity to meet with you and

14  your staff to agree on a Phase III clinical program which

15  will generate clinical data to adequately support the

16  therapeutic claim being pursued by ICI, namely as a

17  treatment for schizophrenia and other psychotic

18  disorders."

19  A    Yes, that's what it says.

20  Q    So describe what this represents here, Dr. Rarick, in

21  the context of the timeline we were looking at a few

22  minutes ago.

23  A    Exactly.  This is when the company believes that

24  they're ready to proceed with Phase III.  And I'm sure

25  we'll get to that, but Phase III is the time when they do

1    their large confirmatory trials which establish benefit as

2    well as gather more safety information for their product.

3          And as you'll see from this submission, it describes,

4    as I said, the information that they've gathered thus far

5    in a summary form.

6          The FDA already has the specific information for each

7    of these sections, but it includes chemistry, the animal

8    studies, pharmacology and toxicology, the animal

9    pharmacokinetics.  We haven't described that yet, but

10   that's the study of what's the drug level in the body, be

11   it animal or humans.

12         And then it includes human pharmacokinetics and then

13   a clinical section about the studies they've done so far

14   to support what they plan to do in Phase III.

15   Q    And in the context of issues in this case where we're

16   talking about the issues of weight gain, hyperglycemia and

17   diabetes, did you look at the Phase II minutes to confirm

18   that clinical laboratories were being collected by the

19   company during the phases of trials?

20   A    Yes.  I confirmed that clinical laboratories

21   including glucose information, weight gain information,

22   had been gathered in their Phase II studies, and that they

23   were planning to continue to gather that information in

24   Phase III.

25   Q    Thank you.

1          Mr. Stillufsen will hand you Exhibit 46 now.

2               MR. BROCK:  Your Honor, we would offer 44 at

3     this time.

4               THE COURT:  44 will be received.  There's no

5     objection listed.

6               MR. TRAMMELL:  No objection, Your Honor.

7     BY MR. BROCK:

8     Q    Did a meeting, in fact, take place between

9     AstraZeneca and the Food and Drug Administration with

10    regard to the plans for the Phase III trials?

11    A    Yes.  They had their end-of-Phase II meeting in

12    February of 1993.

13               MR. BROCK:  If we could see treatment RD.3,

14    please.

15    BY MR. BROCK:

16    Q    And does this show that these are the meeting minutes

17    dated February the 8th, 1993?

18    A    Exactly.

19    Q    Now, look at the next page.  RD.4 is going to be the

20    treatment, and it shows FDA staff present.

21    A    Yes.

22    Q    I see there that there are a number of specialties

23    represented at the end-of-Phase II meeting, correct?

24    A    Yes.

25    Q    Would you talk about who those people are and what

1  their purpose is in attending an end-of-Phase II meeting

2  with representatives of the company?

3  A    Sure.  This sort of displays what I was talking

4  about, about the team that reviews the IND and then the

5  team that then reviews the NDA.

6        So we have here listed a biopharmaceutics reviewer.

7  That's an expert in how a drug is absorbed in the body and

8  distributed and metabolized and excreted.

9        And if you see at the bottom -- it doesn't say here,

10  but that Shandra is actually her supervisor, the

11  biopharmaceutics reviewer at the bottom.  Then the next

12  two are the reviewers for the pharmacology, and that would

13  be the animal data, Lois Freed being the primary reviewer

14  and her supervisor, Glenna Fitzgerald.

15       There's a chemist listed here who was at this

16  meeting, a statistician who's listed as a biometrics

17  reviewer, he's a Ph.D. statistician.

18       And then you'll see the next three, those are all

19  psychiatry experts.  Dr. Knudsen is a psychiatric clinical

20  reviewer.  He's the primary medical officer, the kind of

21  job we talked about before.  Tom Laughren is his group

22  leader, so doing the review above him about his

23  recommendations.

24       And then you'll see the name Paul Leber, there.  And

25  he's what we described before as the division director for

1   this group of drugs, and he is the one who would be taking

2   the recommendations of these team members and making

3   decisions about both the IND, the NDA and the label.

4   Q    Why are there so many folks from the FDA present at

5   an end-of-Phase II meeting?

6   A    The end of Phase II is a very important milestone in

7   the timeline of drug development.  It's important to

8   communicate clearly with a manufacturer about what would

9   be needed to even proceed to the new drug application

10  state.

11  Q    I want to ask you about a couple of comments that

12  were made that are recorded in the minutes.  If you would

13  look over at page 939 of that document.  If you just look

14  at the Bates numbers in the bottom right-hand corner, and

15  this will be treatment RD.5 that will come up on your

16  screen there.

17  A    I have it.

18  Q    Do you see there that Dr. Laughren -- tell the jury

19  again what his role is here.

20  A    He's the supervisory team leader for the clinical

21  review.

22  Q    "Suggested that systematic studies in

23  schizo-affective disorders would be difficult.

24  Dr. Leber" -- and tell the jury who he is again.

25  A    He's the division director in charge of this team.

1   Q    -- "then suggested that all subjects be categorized

2   as schizophrenic, and that schizo-affective subjects would

3   be accepted in that subject population."

4        Do you see that?

5   A    I do.

6   Q    From your review of the records of AstraZeneca as

7   well as the FDA records, do you have an understanding as

8   to what issue this speaks to?

9   A    This speaks to how they were thinking about the

10  indication for these types of products at the time -- this

11  was 1993 -- where they were discussing that they were

12  looking at schizophrenia but they had a thinking that was

13  a broad indication which would include schizo-affective

14  subjects.

15  Q    Okay.  Do you have a general understanding from your

16  review of the materials as to what was hoped for in terms

17  of the safety profile of the second-generation

18  antipsychotics?

19  A    Yes.  There -- there are antipsychotics that have

20  been approved prior to the second-generation

21  antipsychotics, and their risk benefit profile had some

22  certain side effects that the second-generation

23  antipsychotics were hoped to overcome.

24       So, for example, the biggest example is something

25  called extrapyramidal syndrome and tardive dyskinesia

1   movement disorder that occur with the antipsychotics first

2   generation, I guess you would call them.

3        And it was hoped that the second-generation atypical

4   antipsychotics would not have some of the same side

5   effects.

6   Q    All right.  So then if you'll look at this next

7   statement that we've put on the screen, it says,

8   "Dr. Leber rejected the idea of removing tardive

9   dyskinesia from the section on potential adverse events."

10       So in terms of the FDA's interaction with

11   AstraZeneca, what does that signify?

12            MR. TRAMMELL:  Objection, Your Honor.

13   Dr. Rarick has not been offered to comment on the evidence

14   here as an expert and what AstraZeneca did to comply with

15   FDA regulations.  She's allowed to testify as to what

16   sorts of tests that they did, and that's my understanding

17   of the opinions she's given so far.

18       Now she's going to comment on the significance of the

19   inclusion of an adverse event in product labeling from the

20   perspective of the FDA for whom she had no involvement in

21   this review or from the perspective of AstraZeneca which

22   would be nothing but speculation.

23            THE COURT:  Counsel, what is your response?

24            MR. BROCK:  Your Honor, I'm asking Dr. Rarick to

25   put in context the FDA's rejection of the idea of removing

1    tardive dyskinesia.  One of the allegations made by the

2    plaintiff is that the FDA didn't have the ability to

3    influence labeling language or testing or anything like

4    that, and this makes the point that AstraZeneca had an

5    idea and it was rejected by the FDA.  I would like to make

6    that point.

7           MR. TRAMMELL:  She's got no experience in

8    regulating antipsychotics, nothing to do with development

9    of Seroquel.  This is a comment on the evidence.  She

10   can't say what it means that tardive dyskinesia was kept

11   in the label.  She has no experience in that regard.  And

12   it would be speculation to testify as to what it meant to

13   AstraZeneca or what it meant to the FDA.

14     What she can do is say why there are adverse events

15   in the label or what an adverse event section is, but she

16   can't comment from the perspective of the parties what the

17   significance of this inclusion was.

18           MR. BROCK:  Your Honor, she can -- she can look

19   at the documents and see what AstraZeneca was advancing,

20   she can see what the FDA said about that and can give that

21   history.  I don't see why she can't give that testimony.

22           THE COURT:  Well, the objection is overruled to

23   the extent that you're asking her what the documents say

24   without asking her to explain what it means.  So rephrase

25   your question.

1            MR. BROCK:  All right.

2    BY MR. BROCK:

3    Q    So do you see here that Dr. Leber rejected the idea

4    of removing tardive dyskinesia from the section on

5    potential adverse events?

6    A    Yes.

7            MR. TRAMMELL:  Isn't that the objection -- isn't

8    that what you said she couldn't do?

9            THE COURT:  No.  I said she couldn't go on to

10   explain why he did that.

11   BY MR. BROCK:

12   Q    And is it correct that AstraZeneca in its proposals

13   to the FDA -- well, can you put in -- can you put in

14   context in terms of what AstraZeneca was advancing at the

15   end of Phase II in terms of what they would like to see in

16   the label from your review of the documents?

17           MR. TRAMMELL:  Objection, foundation and

18   speculation.

19           THE COURT:  Overruled.

20           THE WITNESS:  Yes.  This is a response to the

21   background package and meeting where the suggestion was

22   that if the Phase III trials for Seroquel did not show

23   this side effect called tardive dyskinesia, that

24   AstraZeneca would be able to remove that warning from

25   their label.

1      But Dr. Leber here, the division director, was

2  saying, "No, even if your trials don't show it, we reject

3  the idea of removing it from the section of potential

4  adverse events."

5  BY MR. BROCK:

6  Q      Thank you.

7      Go to page 939 in the Bates numbers, and that will be

8  treatment RD.6.

9      And do you see there that the minutes read, "In

10  conclusion, the FDA confirmed that Zeneca Pharmaceuticals

11  must study pharmacokinetics a pharmacodynamics prior to

12  the NDA but would not be held up from entering Phase III"?

13      Do you see that?

14  A      Yes.

15  Q      "Zeneca Pharmaceuticals agreed to redesign the

16  protocols and seek FDA's concurrent prior to

17  implementation."

18      Did I read that right?

19  A      Correct.

20  Q      "Mr. Steven Hardeman, divisional regulatory

21  management officer, confirmed that Zeneca's

22  Pharmaceuticals Seroquel program was officially in

23  Phase III."

24      Do you see that?

25  A      Yes.

1   Q    Now, being officially in Phase III, is that a term of

2   art at the FDA?

3   A    Yes.

4   Q    What does it mean?

5   A    Well, companies have end-of-Phase II meetings, and

6   one of the main goals of that meeting is to get agreement

7   from the FDA that they can enter Phase III, that they're

8   officially in Phase III, which means they've done the

9   necessary work to go ahead and do their large confirmatory

10  Phase III trials.

11       Many companies who meet, who believe they're at end

12  of Phase II and are ready to enter Phase III are

13  determined not to be.  So it's an important determination

14  for a company to hear from the FDA that they agree that

15  they're now in Phase III.

16  Q    Does this document speak to whether or not the FDA

17  was suggesting redesign of protocols?

18  A    Yes.  It's clear from this.

19            MR. TRAMMELL:  Objection, Your Honor.  This is

20  commenting on the evidence.  It either says that or it

21  doesn't.

22            THE COURT:  Overruled.

23            THE WITNESS:  Yes.  This paragraph specifically

24  describes that as part of this meeting, Zeneca agreed to

25  redesign the protocols.  Clearly there was discussion in

56

1    these minutes about the protocols, and that they agreed

2    that they would provide their new protocols with the

3    revisions and seek FDA's concurrence before they began.

4    BY MR. BROCK:

5    Q    This is an area in which you had experience from your

6    employment at FDA?

7    A    Yes.

8    Q    And is it typical of what -- well, that's okay.

9         It is an area in which you have experience?

10   A    Yes.  In the end of Phase II, either meetings or in

11   written correspondence, the design of the Phase III

12   clinical trials are always a major point of discussion and

13   correspondence and communication, and the designs --

14   modifications by the FDA are considered at that point and

15   beyond.

16   Q    Did you look at the files to confirm that AstraZeneca

17   went forward with the Phase III of trials?

18   A    Yes, they did proceed.

19        MR. BROCK:  If you could put up RD.7 again

20   briefly, please.

21   BY MR. BROCK:

22   Q    And do you see there on our timeline that we are

23   showing that an NDA, or new drug application, was filed on

24   9-24-96?

25   A    Yes.

1    Q    And I'd like for you to describe for the jury how the

2    new drug application is organized and presented to the

3    FDA.

4    A    Sure.  Well, first, there's generally a pre-NDA

5    meeting and discussion with the company to get

6    clarification, but the NDA itself has specific regulations

7    around it, at 3-14, about the various sections that it

8    required to be provided and how they are organized and

9    provided to the FDA.

10       As I mentioned, there's generally also pre-NDA

11   discussions, which did occur in this case, about

12   clarifying each of those sections, making sure it's going

13   to be as smooth as possible for the reviewers to see and

14   review that information.

15   Q    You referenced a pre-NDA meeting.  We're going to

16   hand to you now Defendant's Exhibit 55.

17       And is this document an executive summary of the

18   pre-NDA meeting?

19   A    Yes.

20   Q    And if you look at RD.8, which is the pullout on this

21   document, do you see, "The sponsor" -- that would be

22   AstraZeneca, correct?

23   A    Yes.

24   Q    -- "would like to thank the agency for your

25   assistance and input during the June 26 meeting, and it

58

```
 1   would appreciate your review and comment on the text of

 2   the enclosed summary"?

 3   A    Yes.

 4   Q    So does that reflect that the pre-NDA meeting did in

 5   fact occur between AstraZeneca and the FDA?

 6   A    Yes.

 7   Q    Now, how is the FDA -- the NDA is a very large body

 8   of evidence, correct?

 9   A    It is.

10   Q    And in what format is it presented to the FDA?

11   A    It's presented in very defined, standard format.  And

12   as again, it was a meeting, you can clarify that even

13   further.  And again, it's provided with all the individual

14   studies that the FDA, if they're done in the U.S. and

15   through the IND, have seen already, the study plans,

16   protocols and data.  They're put together in final format

17   to submitted to the FDA.

18        And then in the clinical section, there's also

19   something that's required called the integrated summary of

20   safety, and it integrates summary of efficacy in which

21   those trials are looked at in a more comprehensive way.

22   Q    Do -- did different specialists at the FDA look at,

23   study, and comment on the AstraZeneca NDA for Seroquel?

24             MR. TRAMMELL:  Objection, foundation.

25
```

1    BY MR. BROCK:

2    Q    From your review of records, do you know if --

3         THE COURT:  Why don't you rephrase the question.

4    BY MR. BROCK:

5    Q    From your review of the records, do you know whether

6    or not the FDA reviewed the Seroquel NDA?

7    A    Yes.  Various members of the team, similar to the

8    team we talked about before for the IND, would have looked

9    at the relevant sections of the NDA.

10   Q    Thank you.

11        Now, I want to direct your attention now to the

12   Exhibit 111.  Exhibit 111.  If you look at page 366 there,

13   do you see that this records the filing of the original

14   new drug application?

15   A    Yes, that's what this is, the cover letter for the

16   original NDA.

17   Q    Now, you mentioned a moment ago a document that you

18   referred to as the integrated summary of safety.  Do you

19   remember that?

20   A    Yes.

21   Q    Is this integrated summary of safety a portion of the

22   new drug application?

23   A    Yes.

24   Q    And what is the purpose of requiring an integrated

25   summary of safety as part of a new drug application?

1    A     The integrated summary of safety is the

2    manufacturer's review of the entire database regarding

3    safety for the reviewers' benefit.  The reviewers can, of

4    course, do their own reviews and data audits and look at

5    the data for that whole comprehensive review.  But as part

6    of an NDA, companies are expected to also provide a

7    comprehensive look at their database, a safety database

8    and an efficacy database.

9    Q     One term we haven't talked about yet is "adverse

10   events."  Is that a term that you know about?

11   A     Yes.

12   Q     What is an adverse event?

13   A     An adverse event is pretty much, in a clinical trial

14   setting, anything that's reported during the clinical

15   trial is recorded by the investigator and then submitted

16   to the FDA, and there's various types of adverse events,

17   serious and nonserious.  And then once a product's

18   approved, adverse events continue to be reported.

19   Q     Are things like glucose changes the type of

20   information that you would expect to see in an integrated

21   summary of safety?

22   A     Yes.  Laboratory changes, or not, laboratory values

23   are part of an integrated safety summary.

24   Q     Are changes in weight something you would expect to

25   see in an integrated summary of safety?

1    A    Right.  Weight, whether changes or not, would be

2    included in the integrated summary of safety.

3    Q    Thank you.

4         Did you look at the integrated summary of safety to

5    see if AstraZeneca presented information with respect to

6    glucose and weight in the filing that it made with the FDA

7    wherein it was asking for permission to market the

8    medicine in the United States?

9    A    Yes, I did.

10   Q    Let's look at a few of those if we could.

11        MR. BROCK:  If she could have Exhibit 113,

12   please.

13   BY MR. BROCK:

14   Q    Do you have exhibit 113 in front of you?

15   A    Yes.

16   Q    And do you see that it says, "International" -- I

17   guess -- "approval for integrated summary of safety."

18        Do you see that?

19   A    Yes.

20   Q    It's dated 7-2 of '96?

21   A    Yes.

22   Q    And signed by Lisa Arvanitis and Mark Scott.

23   A    Yes.

24   Q    Now, if you look over at the next page which is going

25   to be treatment RD.11, it's table T8.2.10.

1       Do you have that?

2   A   Yes.

3   Q   And do you see on that sheet that there is "Adverse

4   events by body system and costart term uncontrolled

5   trials," it lists some things and then says "Open-label

6   extension."

7       Do you see that?

8   A   Yes.

9   Q   What's the purpose of having the descriptor?

10  A   The title or the descriptor?

11  Q   The title at the top.  So what is that?

12  A   This is a table provided to the FDA in the integrated

13  summary describing the adverse events that were seen in

14  all the uncontrolled trials as well as in the open-label

15  extension trials.

16  Q   And is there a section there represented as

17  "endocrine system"?

18  A   Yes.

19  Q   And is there a section there for "diabetes mellitus"?

20  A   Yes.  It shows the adverse events reported during

21  those trials of diabetes.

22  Q   What is that number?

23  A   Three.

24  Q   So one of the tables submitted in the integrated

25  summary of safety reported three cases by body system in

1    the uncontrolled trials as described in the title?

2    A    Correct.

3    Q    Is this the kind of disclosure you would expect a

4    medicine company to make to the FDA?

5    A    Yes.

6    Q    Now if you turn to RD -- if you turn the page, the

7    treatment is going to be RD.12, and it's metabolic and

8    nutritional.  It's just a different section of the ISS,

9    correct?

10   A    Correct.

11   Q    And do you see under that section there is reference

12   to two cases of hyperglycemia, and one is case number

13   939304 and one is case number 010109.

14        Do you see that?

15   A    Yes.

16   Q    What section of the ISS is this information in?

17   A    This is in a section called "Other Serious Adverse

18   Events Unlikely to be Related to Quetiapine Treatment."

19   Q    And is it correct that AstraZeneca, in its submission

20   in the ISS, is reporting all events that have been

21   reported within the categories that we're talking about?

22             MR. TRAMMELL:  Objection, foundation.

23             THE WITNESS:  Yes.

24             THE COURT:  Sustained.

25

1   BY MR. BROCK:

2   Q    What's reflected there in "Metabolic and

3   Nutritional"?

4   A    It's the adverse events that were reported during

5   clinical trials for hyperglycemia.

6   Q    And if you would turn the page, it's treatment RD.13,

7   and do you see that there are descriptions there of

8   patient 9304 and 0109?

9   A    Yes.  Those are the same patients that were listed in

10  that last table.

11  Q    Right.  And does that show that of those cases of

12  hyperglycemia, one was a known diabetic and the other had

13  a history of borderline elevated glucose levels?

14  A    Yes.  That's what that describes.

15  Q    What does that convey?

16  A    That conveys that they looked --

17         MR. TRAMMELL:  Objection, Your Honor.

18  Foundation.

19         THE COURT:  Overruled.

20         THE WITNESS:  What that's describing is they are

21  aware of these two patients with the reported adverse

22  events, and they looked into those medical records and saw

23  that one was a known diabetic and the other had a history

24  of borderline elevated glucose levels.

25

BY MR. BROCK:

Q    Did you look at the ISS to see if there were tables

that showed mean and mean-changed values for serum

chemistry parameters?

A    Yes.

Q    If you would look at the next table which is 11.1.1,

it will be treatment RD.14 will come up on your screen.

A    Yes.

Q    And tell the members of the jury what that table is

and why that would be included in the ISS.

A    This is a mean and mean-change values for the various

serum chemistry parameters assessed at baseline and end of

treatment.  And this particular table includes those that

were in short-term, or less than six weeks or less or

equal to six weeks, placebo-controlled trials.

     And you can see the types of chemistries that were

being assessed, and you'll see here that on the second

line glucose values were assessed.

Q    For that category of placebo-controlled trials, what

kind of change was being reported to the FDA in the

integrated summary of safety?

A    Again, this is showing mean at baseline to end of

treatment with a change in the Seroquel group of .18, and

then in the placebo group also showing baseline mean and

end of treatment with a mean change of .02.

1    Q    Can you look at those values and share with the jury

2    what that's conveying?

3                MR. TRAMMELL:  Objection, Your Honor.

4    Foundation.  The Doctor's not an epidemiologist, she's not

5    a clinician, she's not qualified to give the jury

6    testimony as to what clinical values from clinical trials

7    convey.

8                THE COURT:  Overruled.

9                THE WITNESS:  That's showing a small change, and

10   it's in millimoles per liter.  I think that equates in the

11   Seroquel group to a, I think, two to three milligrams per

12   deciliter change.

13   BY MR. BROCK:

14   Q    Thank you.

15        If you look at table 11.1.3 which is treatment RD.15,

16   and to try to keep this moving, Dr. Rarick, if you would

17   just describe that table and what -- and summarize what

18   the -- AstraZeneca is reporting to the FDA in that table.

19   A    In this table, similar to the last one was in

20   placebo-controlled trials, this table is about trials

21   where they were comparing to another atypical

22   antipsychotic called Haloperidol, and again showing

23   glucose with a mean change from baseline to end of .27 in

24   Seroquel, .14 for Haloperidol.

25   Q    Small changes again?

1    A     Exactly.

2    Q     Turn to 11.1.4 which is treatment RD.16, and briefly

3    describe what is being reported to the FDA with regard to

4    glucose in that table.

5    A     This is another similar table, but instead of

6    placebo-controlled trials or Haloperidol-controlled

7    trials, another antipsychotic called Chlorpromazine, and

8    these are the trials comparing to Chlorpromazine or

9    Thorazine, showing a change in the Seroquel group of minus

10   .04, meaning the glucose levels went down, and the

11   Chlorpromazine, minus .10.

12   Q     So essentially no change for either group there?

13   A     Correct.

14          MR. TRAMMELL:  Again, Your Honor, I object to

15   her characterizations as to what the data shows.

16          THE COURT:  Overruled.

17   BY MR. BROCK:

18   Q     Now, did you also look at the integrated summary of

19   safety to see if AstraZeneca was reporting weight change

20   in the clinical trials?

21   A     Yes.  And they reported similarly both by placebo,

22   Haloperidol and Chlorpromazine controls.

23   Q     If you look quickly at 14.1.1, is that mean and mean

24   change values for weight in the short-term

25   placebo-controlled trials?

A Yes.

Q And what does it show?

A It shows a mean change in the Seroquel group of 2.3, and this is in kilograms, and a mean change in placebo of 0.1 in those up to six-week trials.

Q It's the kind of thing you would expect a medicine company to report in integrated summary of safety?

A Exactly.

Q Let's go to table 14.1.2 which is RD.18. Is this the Haloperidol comparison looking at weight?

A Yes. And again, this is the comparison to Haloperidol, or Haldol, and the change for Seroquel is 1.7 kilograms in these studies, and for Haloperidol is 0.

Q And look at 14.1.3, and tell the jury what that is, quickly.

A Let me make sure.

Q Long-term, I think.

A These are the trials that went longer than six weeks comparing to Haloperidol showing a mean change for Seroquel of 1.6 and for Haloperidol of minus 1.4.

Q And just for reference purposes, when you see a change in kilograms of 1.6, how many pounds is that?

A There's 2.2 pounds in every kilogram, so what is that, four pounds approximately? Three and a half to four.

1  Q    Table 14.1.4 is additional weight change data, and
2  this relates to Chlorpromazine, correct?
3  A    Right.  This is the comparison again to
4  Chlorpromazine in up to six-week trials of 1.6 for
5  Seroquel, 1.3 kilograms for Chlorpromazine.
6  Q    Now, did AstraZeneca also report the number and
7  percentage of patients with a significantly low or high
8  values for weight in the short-term placebo-controlled
9  trials?
10  A    Yes.
11  Q    If you would look at the next table, T14.4.1, which
12  is RD.21, does that show those percentages?
13  A    Yes.  It shows the percentage of patients who gained
14  more than, I think it was seven percent.  We can look at
15  the label to be sure.
16      But it shows that in the Seroquel group, 22.8 percent
17  of patients had a change from baseline to end of study
18  that was over seven percent of their weight compared to
19  the placebo group at 6.2 percent.
20  Q    Look at the next page, if you would, it's 19.1.7, and
21  do you see that it's a section "Metabolic and
22  Nutritional"?
23  A    Yes.
24  Q    And do you see that "AstraZeneca is reporting to the
25  FDA before approval of the product a statistically

1   significant greater proportion of subjects treated with

2   quetiapine compared with subjects treated with a placebo

3   developed clinically significant weight gain"?

4   A    Yes.  They're pointing that out in this integrated

5   summary.

6   Q    Is that the kind of thing that you would expect a

7   medicine company to report?

8   A    Yes.

9   Q    Now, I want to ask you a few questions about the

10  integrated summary of safety as it relates to trial number

11  15.

12  A    Okay.

13  Q    All right.  Are you familiar with trial number 15?

14  A    Yes, I am.

15  Q    All right.  If you look at the next page, there's a

16  section called "Adverse Events in the Long-Term

17  Comparator-Controlled Trial 15."

18       Do you see that?

19  A    I do.

20  Q    And do you see that specific information is being

21  reported about trial 15 within the integrated summary of

22  safety?

23  A    Yes.

24  Q    If you look over at the next slide which is RD.24.

25  A    Yes.

1    Q    Do you see there's a section, "Adverse Events By Body

2    System and Co-Start Term, Long-Term Haloperidol-Controlled

3    Trial," there's some numbers there and at the end is

4    "0015"?

5    A    Yes.  This is from clinical study 15.

6    Q    So there are tables being presented to the FDA about

7    trial 15?

8    A    Yes.

9    Q    To be clear?

10   A    Yes.

11   Q    And if you look at the next page which is table

12   11.2.3, RD.25, do you see that glucose values for trial 15

13   are also being reported?

14   A    Yes.

15   Q    And what finding is made there?

16   A    They're showing patients with at least one clinically

17   significant value during treatment for glucose at

18   2.3 percent of the Seroquel patients in this study, and

19   11.1 percent in the comparator which was Haloperidol.

20   Q    And is weight gain information reported in trial 15

21   also?

22   A    Yes.

23   Q    And if you look at the next slide which is

24   table 8.11, RD.26, the pullout, do you see that the weight

25   gain information out of trial 15 is being reported to the

1    FDA in the integrated summary of safety?

2    A    Yes, it is.

3    Q    What are the findings there?

4    A    Here, as you may recall, trial 15 did not have a

5    placebo group so these are the quetiapine or Seroquel

6    doses and their findings at the various doses.

7         And you can see weight gain is reported at -- I

8    believe it's -- I'm trying to make sure -- 1.2 percent in

9    the 75 milligram group, 5.7 percent in the 300 milligram

10   group, and again 5.7 in the 600 milligram group.

11   Q    So that's different dosages of the medicine being

12   taken within the trial?

13   A    Right.  And the P value, it signifies at least a

14   trend, if not a significance, between the doses there.

15   Q    Okay.  Now, if within a trial a medicine company sees

16   a trend for a dose relationship between a medicine and an

17   outcome, is that one of the kinds of things you would

18   expect to see in an integrated summary of safety?

19   A    Yes.

20             MR. TRAMMELL:  Objection, foundation.

21             THE COURT:  Overruled.

22   BY MR. BROCK:

23   Q    The next page, if you would --

24             THE COURT:  You need to get her to answer the

25   question because you answered it while he was --

```
 1              THE WITNESS:  Sorry.  I thought I said yes.

 2              MR. BROCK:  My apologies.

 3   BY MR. BROCK:

 4   Q    If you look at the next page in the trial -- is there

 5   the report that in trial 15 with increasing doses of

 6   quetiapine, there were statistically significant increases

 7   in the incidences of weight gain and nervousness?

 8   A    Yes.  That's what these tables reveal.

 9   Q    And so AstraZeneca is conveying that to the FDA

10   before approval of medicine?

11   A    Yes.

12   Q    The FDA is aware of that?

13   A    Yes.

14   Q    And then they also make that similar report with

15   regard to trial 13, don't they?

16   A    Right.  They also describe trial 13 showing dose

17   responsiveness for several adverse events.

18   Q    Now, does the FDA undertake a review of the

19   integrated summary of safety and the other data that is

20   presented by AstraZeneca as part of the NDA?

21   A    Yes.  The FDA reviewers in this case reviewed both

22   the individual studies as well as the integrated summaries

23   in doing their reviews.

24   Q    Do you remember that Dr. Mosholder was a clinical

25   reviewer for the FDA of the Seroquel NDA?
```

```
 1   A     Yes.  Andy Mosholder was the primary medical officer

 2   reviewing the clinical section of the NDA.

 3   Q     I'm going to put before you now Defendant's

 4   Exhibit 16, and I would ask you to identify --

 5               THE COURT:  Counsel, before we get into that

 6   group, we're going to break for lunch.

 7               MR. BROCK:  Okay.

 8               THE COURT:  All right.  We'll be at recess until

 9   1:00.

10                       (Recess taken.)

11   BY MR. BROCK:

12   Q     Dr. Rarick, before the break, we had introduced

13   Dr. Mosholder.  And I would ask you, do you have

14   Exhibit 16 there?

15   A     I do.

16   Q     And is that Dr. Mosholder's review and evaluation of

17   clinical data?

18   A     Yes.

19   Q     Can you tell the jury what this review and evaluation

20   of clinical data performed by Dr. Mosholder of the FDA

21   relates to?

22   A     This is the review and evaluation of an NDA submitted

23   by Zeneca Pharmaceuticals for quetiapine, or Seroquel, for

24   the management of the manifestations of psychotic

25   disorders, and it describes the dosage forms that were
```

1  submitted with this NDA.  And it describes Dr. Mosholder

2  as the clinical reviewer with his review completed in June

3  of '97.

4  Q    And does that contain his summary of the clinical

5  data that he has reviewed?

6  A    Yes, it does.

7          MR. BROCK:  Your Honor, at this point, we would

8  offer into evidence Exhibit 16.

9          MR. TRAMMELL:  No objection, Your Honor.

10          THE COURT:  Exhibit 16 will be received.

11          MR. BROCK:  And as a housekeeping matter, I

12  would like to go ahead also and offer Defendant's

13  Exhibit 46, the end-of-Phase II meetings minutes;

14  Exhibit 55, the pre-NDA meeting summary; Exhibit 111, the

15  NDA cover page transmitting the NDA; and Exhibit 113,

16  which is excerpts from the integrated summary of safety.

17          MR. TRAMMELL:  My issue with some of these

18  exhibits, Your Honor, is that some of them are a

19  collection of pages out of sequence, the numbering doesn't

20  match up, and the exhibit, to each other.

21          THE COURT:  Counsel?

22          MR. BROCK:  Well, for instance, the integrated

23  summary of safety, I am offering today excerpts from that

24  document.  It's a document that is several hundred pages,

25  maybe over 1,000 pages long, so I was not intending to put

1    that entire exhibit into evidence, though, if required to

2    do so, we'll be happy to haul it up here and put it in

3    evidence.  But it's a very lengthy document.

4              MR. TRAMMELL:  Well, without --

5              THE COURT:  Mr. Trammell, you don't have any

6    objections listed to any of those exhibits, number one.

7         Number two, if there's going to be excerpts, then you

8    need to show the excerpts to Mr. Trammell because maybe

9    that will solve his problem.

10             MR. BROCK:  I've furnished them to him as part

11   of examination.

12             MR. TRAMMELL:  Right.  I don't have objections

13   to the entire document.  My objection is that these are

14   excerpts, and without having the document at hand, I can't

15   confirm that they are in fact from the same document or

16   out of context, or however they were put together.

17             THE COURT:  Well, how many pages is Exhibit 55,

18   for example?

19             MR. BROCK:  55 --

20             THE COURT:  Is there a particular one you're

21   objecting to, Mr. Trammell?  Or --

22             MR. BROCK:  55 is just a letter confirming -- or

23   talking about a pre-NDA meeting.  I'll put that entire

24   document into evidence.

25             THE COURT:  All right --

1          MR. BROCK:  111 is an NDA cover page.  It's

2    transmitting the NDA.  And I'm doing that to show the date

3    of that.  I'll put the entire exhibit in evidence.

4        46, which is the end-of-Phase II meeting minutes,

5    I'll put the entire exhibit into evidence.

6          THE COURT:  All right.

7          MR. BROCK:  Where I've used excerpts is

8    integrated summary of safety, and it's 4,000 pages?

9          MR. TRAMMELL:  Four thousand five --

10          MR. BROCK:  Four thousand pages.  So I've used

11    excerpts there.

12          MR. TRAMMELL:  So that's in the 713 in which the

13    pages jump back and forth.  It starts on 846 and goes to

14    335 and then goes to 23, and so on.

15          THE COURT:  All right.  We'll reserve on 113

16    until you get an opportunity to review those pages.

17          MR. TRAMMELL:  Thank you, Your Honor.

18    BY MR. BROCK:

19    Q    All right.  Continuing with Exhibit 16, if you would

20    turn, please, to page 8819, which is pullout 29, do you

21    see there where it says, "By convention, the efficacy of

22    these drugs has been shown primarily in acutely psychotic

23    schizophrenic patients on the basis that drugs shown to be

24    effective in such patients also are effective in other

25    forms of psychosis such as mania, psychotic depression,

1    and the like"?

2         Do you see that?

3    A    Yes.

4    Q    Now, are you familiar with the final labeling

5    language that was approved by the FDA that we will discuss

6    in a few minutes?

7    A    Yes.

8    Q    How does that language relate to the final labeling

9    language?

10   A    This is for Dr. Mosholder, is speaking about the

11   actual indication requested.  The indication that was

12   approved in the final label is the manifestations of

13   psychotic disorders.  Here he's describing that as, "By

14   convention, the efficacy has been shown in the primarily

15   schizophrenic patients, but that the indication for

16   psychotic disorders also includes others such as," and he

17   goes on to describe mania, psychotic depression and the

18   like.

19   Q    Thank you.

20        Now, if you will turn over to page 8841, which is

21   RD.30 on the screen.  And do you see there in the middle

22   of the page that there is a discussion by the FDA about

23   study 15?

24   A    Yes.

25   Q    And tell the jury what that says.

1    A    Dr. Mosholder here is describing studies that he's

2    reviewing in this review of the NDA, including a study

3    number 15, which was a one-year multi-sender randomized

4    trial, and he describes the doses and how many patients

5    were included.

6        And he says, "Although the hypothesis was that a dose

7    effect would be found, this is about effectiveness, no

8    treatment differences in rate of relapse were observed."

9        And he goes on to say, "Without a placebo group per

10   determination of assay sensitivity, results from this

11   trial are inconclusive."

12   Q    When the FDA says that the hypothesis was a dose

13   effect and -- that a dose effect would be found and no

14   difference -- no treatment differences in rate of relapse

15   were observed, what does that mean?

16        MR. TRAMMELL:  Objection, Your Honor.  She's not

17   an FDA specialist.  Foundation.

18        THE COURT:  Sustained.

19   BY MR. BROCK:

20   Q    In terms of your background at the FDA, did you have

21   experience in reviewing submissions by pharmaceutical

22   companies to understand the results of their clinical

23   trials?

24   A    Yes.

25   Q    Have you in this litigation taken in part an approach

1   similar to that to look at the data and try to understand

2   the data and how the FDA is reflecting on that data?

3   A    Yes.

4   Q    Do you feel that you have information that you could

5   share with the jury that would be helpful in the sense of

6   understanding the language here in this document?

7   A    Yes.

8   Q    Given that, could you tell the members of the jury

9   then where it says, "Although the hypothesis was that a

10  dose effect would be found, no treatment differences in

11  rate of relapse were observed," what does that refer to?

12            MR. TRAMMELL:  Your Honor, I object to

13  foundation.  This is the kind of opinion that Dr. Rarick

14  rendered in the Vioxx litigation in New Jersey that was

15  excluded.  She's not allowed to testify and give an

16  opinion as to what the FDA's conclusions were, what their

17  interpretations were.  And it's improper for her to

18  testify about this particular interaction because she has

19  no firsthand experience.

20            THE COURT:  The objection is overruled as to

21  what the words mean.

22            THE WITNESS:  That means I can answer?

23            THE COURT:  Yes.

24            THE WITNESS:  Okay.  The issue here is that in

25  the clinical trial without a placebo group, when all the

1    groups that are being studied are on a drug, the hope is

2    from a trial like this that they would be able to show at

3    these various doses a difference than the approved drug,

4    in this case Haloperidol.

5        What Dr. Mosholder is describing here and further in

6    his review also is that in this particular trial, they

7    could not show any difference from the approved low dose

8    of Haldol for any of the doses that they saw of

9    quetiapine.

10       So he's explaining that without a placebo group, you

11   really couldn't say whether there was a difference from

12   placebo, and they're not showing that the different doses

13   show improved effectiveness over the act of control.

14   That's what he's describing.

15   BY MR. BROCK:

16   Q    So the FDA was aware of study 15 and the outcome of

17   study 15 and the sense that no treatment differences in

18   rate of relapse were observed?

19           MR. TRAMMELL:  Objection, Your Honor.  Question

20   calls for speculation.

21           THE COURT:  Overruled.

22           THE WITNESS:  Again, yes, that's what I'm

23   describing is that the intent of the study or the original

24   aim for effectiveness was to show that there would be a

25   difference for some of these doses, especially the higher

1    doses, compared to the Haloperidol, and they didn't see

2    such differences.

3    BY MR. BROCK:

4    Q    Thank you.

5         Now if you look over at page 8871 which is RD.31 on

6    your screen, I'll ask you if the FDA was aware of the

7    statements by AstraZeneca in the integrated summary of

8    safety with regard to the issue of weight gain?

9              MR. TRAMMELL:  Again, objection, foundation.

10   Calls for speculation.

11             THE COURT:  Sustained.

12   BY MR. BROCK:

13   Q    Do you have there in front of you page 8871?

14   A    Yes.

15   Q    Is there a section on weight gain in the document

16   written by Dr. Mosholder of the FDA?

17   A    Yes.

18   Q    Does he write to the issue of the short-term

19   placebo-controlled trials?

20   A    Yes, regarding weight gain.

21   Q    Did you look at the integrated summary of safety to

22   see what AstraZeneca was reporting to the FDA about weight

23   gain in the short-term placebo-controlled trials?

24   A    Yes.

25   Q    And what does Dr. Mosholder record here?

1    A    He records those same results as provided in that

2    integrated summary of safety.  And he describes this as,

3    "In short-term placebo-controlled trials, roughly

4    23 percent of quetiapine patients experienced clinically

5    significant weight gain, an increase of seven percent or

6    more, compared to approximately six percent of placebo

7    patients, a statistically significant difference."

8    Q    The -- AstraZeneca had reported that difference in

9    weight gain in the short-term placebo-controlled trials,

10   and Dr. Mosholder noted that in his review?

11   A    Yes, sir.

12   Q    Now, if you will turn to page 8871, I'll ask you if

13   Dr. Mosholder evaluated the issue of cholesterol and

14   triglycerides in his review?

15   A    Yes, he does.

16   Q    Tell the jury what he said.

17   A    He describes cholesterol and triglycerides in this

18   section and he describes that they were obtained in

19   certain as a placebo-controlled trials and he describes

20   this further as, "Expressed as percent change from

21   baseline, the results show a mean increase from baseline

22   of 11 percent for cholesterol and 17 percent for

23   triglycerides with quetiapine treatment without similar

24   increases in the placebo group."

25   Q    Is this information that had been reported by

1   AstraZeneca in the integrated summary of safety?

2   A    Yes.  And he even describes which table they're in.

3   Q    Thank you.

4        Now, if you look at page 8873, do you remember

5   earlier in the day we discussed hyperglycemia in the

6   adverse metabolic and endocrine system?

7   A    Yes.

8   Q    And does Dr. Mosholder take note of three events

9   involving glucose disregulation?

10  A    Yes, he does.

11  Q    Do you see there the first one, if you look at

12  pullout RD.33, is a case of hypoglycemia?

13  A    Yes.  That means a low blood sugar.

14  Q    And two cases of hyperglycemia?

15  A    Correct.

16  Q    Now, did Dr. Mosholder reach certain conclusions

17  about Seroquel from his review of the NDA materials?

18  A    Yes, he does.

19  Q    Would you turn to page 8891 which is treatment RD.34,

20  and share with the jury if the conclusions are stated

21  there.

22  A    As he describes in his review, "The sponsor has

23  provided evidence from adequate and well-controlled

24  studies establishing the efficacy of quetiapine in the

25  treatment of acutely ill schizophrenic patients."

1        Shall I go on?

2    Q    Please.

3    A    "There are no safety issues that cannot be addressed

4    with appropriate labeling or that would adversely affect

5    the risk benefit assessment for quetiapine."

6    Q    Based on your review of the data and the documents

7    that were filed with the FDA, do you agree with

8    Dr. Mosholder's conclusion?

9    A    Yes, I do.

10            MR. TRAMMELL:  Objection, Your Honor.

11    Foundation.  She's not allowed to -- or she's not -- it's

12    improper for her to express an opinion as to whether

13    AstraZeneca's submissions were appropriate or whether the

14    FDA acted appropriately in approving those submissions or

15    the conclusions that they reached.

16            THE COURT:  Well, that wasn't his question.  His

17    question was whether she agreed with his conclusion based

18    on her reviews.  So I'll overrule the objection.

19    BY MR. BROCK:

20    Q    Now, there were additional reviews of the NDA by

21    representatives of the Food and Drug Administration,

22    correct?

23    A    Yes.

24    Q    We're going to hand you now Exhibit 18.

25            And while he's doing that, if we would just pull up

1    treatment RD.35.

2        Do you see there that's a document dated August 21st,

3    1997, and it's from Thomas P. Laughren; do you see that?

4    A    Yes, I do.

5    Q    And we talked about Dr. Laughren earlier, did we not?

6    A    Yes.

7    Q    That shows that he is team leader psychiatric drug

8    products, division of neuropharmacological drug products.

9        In the chain of command at the FDA with regard to

10   review of this medicine, where does that put Dr. Laughren?

11   A    That means he's essentially the supervisor for

12   Dr. Mosholder.  He's the next level in the chain of

13   command.

14   Q    And did he reach certain conclusions and make

15   recommendations based on his review?

16   A    Yes, he does.

17   Q    And if you look at page 8730 which is RD.36, do you

18   see that his conclusions and recommendations are there?

19   A    Yes, they are.

20   Q    And does he say that he believes that Zeneca has

21   submitted sufficient data to support the conclusion that

22   Seroquel is effective and acceptably safe in the treatment

23   of psychosis?

24   A    That is his conclusion, yes.

25   Q    Did you find that this was an appropriate review?

1    A    Yes.

2    Q    And did you agree with his conclusions?

3    A    Yes.

4    Q    Now, there was one more review by folks at the FDA in

5    addition to the review by Dr. Laughren and the review by

6    Dr. Mosholder, correct?

7    A    Well, I would say there were two, but I know there

8    was one more written review by Dr. Leber.

9    Q    Right.  And so if we turn to Exhibit 19, now --

10           MR. BROCK:  And if you would go ahead and pull

11   up RD.37.

12   BY MR. BROCK:

13   Q    We'll look at Dr. Leber's recommendation.

14          First of all, where is Dr. Leber in the FDA chain of

15   command as relates to neuropharmacological drug products?

16   A    He's the division director for that division.  So

17   he's making a recommendation here to his office director.

18   Q    All right.  And if we look at the next page, RD.38,

19   does he conclude that the NDA shows quetiapine to be both

20   safe and effective as an antipsychotic?

21   A    Yes, that's what his conclusion is.

22          MR. BROCK:  Your Honor, we would offer at this

23   time Exhibits 16 and 19.

24          MR. TRAMMELL:  No objection.

25          THE COURT:  18?  16 and 18?

```
1              MR. TRAMMELL:  18 and 19.

2              MR. BROCK:  16 and 18.

3              MR. TRAMMELL:  I think 16 is already in.

4              THE WITNESS:  And 19.

5              THE COURT:  So, 18 and 19?

6              MR. BROCK:  18 and 19.  Thank you, Judge.

7    BY MR. BROCK:

8    Q    Now --

9              THE COURT:  18 and 19 will be received.

10             MR. BROCK:  Thank you.

11   BY MR. BROCK:

12   Q    Doctor, does the FDA have standards for the number of

13   patients that it would be expected -- strike that.

14        Does the FDA have standards for the number of

15   patients that should be studied on a medicine before it

16   will approve the medicine for sale in the United States?

17   A    Yes.  The FDA has published guidance to industry

18   several times describing the expectation for how many

19   people would be on a drug before they would consider it

20   for approval.

21   Q    Did you review the AstraZeneca submission asking for

22   permission to market the medicine in the United States to

23   see if AstraZeneca met the requirements of the FDA in that

24   regard?

25   A    Yes, I did.
```

1   Q    I'm going to ask you to look at RD.39, if you would

2   pull that up.

3          MR. BROCK:  This is, Your Honor, Guinn

4   demonstrative Exhibit 1550, it may be marked as D50.

5   BY MR. BROCK:

6   Q    Do you see that there?

7   A    Yes, I do.

8   Q    All right.  Do you see on the left-hand side there's

9   a document, it's a little bit difficult to read, but do

10  you see it's a guidance for industry?

11  A    Yes.

12  Q    So talk to the jury a little bit about the standards

13  for the number of patients that should be treated with the

14  medicine before the FDA will approve the medicine for sale

15  in the United States.

16  A    Sure.  Yes, this guidance for industry is intended to

17  assist manufacturers with understanding how many people

18  need to be exposed to be considered for approval.  This

19  guidance is called the extent of population exposure to

20  assess clinical safety for drugs intended for long-term

21  treatment of nonlife-threatening conditions.

22        This particular guidance, I believe, is from 1995,

23  and they reiterate the fact again more recently.  Again,

24  it describes in this document that to be considered for

25  filing and review and possible approval, that there should

1   be at least 1,500 patients exposed to the product and at

2   least 100 of those for a year.

3   Q    And do you know the number of patients who were

4   exposed to the drug at the time of the filing of the NDA?

5   A    At the time of the filing of the new drug

6   application, you can see that there were about 2,714

7   patients that had been exposed to quetiapine.

8   Q    What about by the time of approval?

9   A    By the time of approval, they had submitted safety

10  updates as well as a response to a reprovable letter and

11  that added up to 2815 subjects that had been exposed to

12  quetiapine.

13  Q    Did AstraZeneca exceed the requirements of the FDA in

14  terms of the number of patients that it tested in its

15  clinical trial program?

16  A    Yes.

17  Q    Now, during this period of time that we're talking

18  about, 1997, while the NDA is being considered by the FDA,

19  was the FDA aware of other antipsychotic medications that

20  were on the market?

21          MR. TRAMMELL:  Objection, Your Honor.  That's

22  speculation.

23          THE COURT:  Sustained.

24  BY MR. BROCK:

25  Q    Have you researched the issue of whether or not the

1    FDA was aware of any other antipsychotic medicines that

2    were on the market in the 1997 timeframe?

3    A    Yes.

4    Q    Can you tell the jury whether or not there were other

5    antipsychotics on the market in the 1997 time period that

6    the FDA was aware of?

7    A    Yes.  You can find that information in several

8    places.  But there were other antipsychotics approved

9    prior to 1997.

10        Did you ask me about atypical or the whole class?

11   Q    We'll stick with atypicals for now.

12   A    For atypical antipsychotics, they had reviewed and

13   approved Clozaril, or Clozapine, prior to the Seroquel

14   review.  And they also reviewed, I believe, Rispiridol was

15   prior to their approval of this one, as was Zyprexa.

16        MR. BROCK:  Please bring to Dr. Rarick

17   Exhibit 30 -- Exhibit 30 and Exhibit 68.  So this will be

18   30 and 68, please.

19   BY MR. BROCK:

20   Q    Do you have Exhibits 30 and 68 in front of you?

21   A    Yes, I do.

22   Q    Would you describe, first of all, what Exhibit 30 is.

23   A    Exhibit 30 is an e-mail chain by FDA folks.  It

24   starts with a question to Scott Gottlieb and Peter Pitts,

25   folks in the office of the commissioner at the FDA.  And

92

1    then it goes to Steven Galson, the center director for the

2    Center for Drug Evaluation and Research at the time.

3    Steven Galson asks several people in the office of new

4    drugs about the question.

5         And then it goes from Bob Temple, who's an office

6    director of the Office of Drug Evaluation I, to several

7    people asking to answer the question.  And then the final

8    message is from Dr. Racoosin who is the --

9    Q    That's the one I want to focus on.

10   A    Okay.  Sorry.

11              MR. BROCK:  If we could pull up -- thank you for

12   that.  Pull up RD.60.

13   BY MR. BROCK:

14   Q    And do you see that that's a message from

15   Dr. Racoosin?

16   A    Yes.  It's Dr. Racoosin who is the safety reviewer in

17   the division of now called psychiatric drug products to

18   the folks asking the question about a presentation she

19   made at a public meeting of the -- actually it was the

20   American Psychiatric Association and the American Diabetes

21   Association consensus conference.

22   Q    And does she say, "I attended and presented the FDA's

23   analysis of this issue at the public meeting that was part

24   of ADA's consensus development conference in 11/03"?

25   A    Yes.

93

1   Q    And then it says, "See attached slides in PDF

2   format."  Do you see that?

3   A    Yes.

4   Q    All right.  And then if you look at the next exhibit

5   which is 68, is that the slides that she's referring to

6   there?

7   A    These are the slide sets that she presented at that

8   meeting.

9   Q    So I was asking you about sort of history of the

10  antipsychotics.  I want to get you to turn over to the

11  page there, it's on the second or third page, a reference

12  to the history of antipsychotics.

13  A    Yes.

14  Q    I think there's a title page that says "Regulatory

15  History" --

16  A    Correct.

17  Q    -- that is on page 811.

18       And then if you turn the page, it says "Regulatory

19  History Drug Approval Dates," and that's the next page,

20  right?

21  A    Correct.

22  Q    And then it records Clozaril, Risperidone, Olanzapine

23  as occurring in 1989, 1993, and 1996.  Do you see that?

24  A    Yes.

25  Q    And then quetiapine is approved in September of '97?

94

1    A      Correct.

2    Q      So when I asked you a few minutes ago if the FDA was

3    aware of other antipsychotics, does this document here

4    help you to understand that?

5    A      Yes.  This is one of the places where you can see the

6    lists, as well as the FDA's website, of prior approvals of

7    the antipsychotic.

8              MR. BROCK:  Your Honor, we offer Exhibits 30 and

9    68 at this time.

10             MR. TRAMMELL:  Your Honor, just depends on the

11   purpose of offering Exhibit 30 whether I have a hearsay

12   objection.  I'll state a hearsay objection.  I don't know

13   for what purpose he's offering it.

14             THE COURT:  All right.

15             MR. BROCK:  I'm offering it to show her

16   awareness as well as the FDA's awareness of other

17   antipsychotics at the time of Seroquel's approval.

18        It is a government record.  We have it certified by

19   the FDA that it is a government record.  I think it

20   overcomes the hearsay objection.

21             MR. TRAMMELL:  Well, my concern is that it's the

22   slides that show that.  And so this document doesn't say

23   anything about the FDA's awareness and there's been no

24   foundation for overcoming the hearsay objection.

25             THE COURT:  You're not objecting to Exhibit 68,

1    just to Exhibit 30?

2              MR. TRAMMELL:  Right.

3              MR. BROCK:  With that, I'll withdraw 30.  My

4    purpose in using that was to show the slides were

5    attached.  So I don't have a purpose in 30.  If there's no

6    objection to the slides, we're good to go.

7              MR. TRAMMELL:  I'll tell you what, Your Honor, I

8    misspoke.  I apologize.  I don't believe there was a

9    foundation laid for Exhibit 68.

10             MR. BROCK:  Is the objection authenticity?

11             THE COURT:  He's objecting to lack of

12   foundation.

13             MR. BROCK:  Can I ask a couple of questions?

14   Maybe I clean this up.

15             THE COURT:  Yes.

16   BY MR. BROCK:

17   Q   Dr. Rarick, is this the kind of document that you

18   would rely on to understand the FDA's knowledge base about

19   this issue?

20             MR. TRAMMELL:  Object, speculation.

21             THE COURT:  Overruled.

22             THE WITNESS:  Yes.  I think as the first slide

23   in this slide set reveals, Dr. Racoosin was providing the

24   FDA perspective at a meeting of late 2003 on this very

25   topic, so I would have relied on it.

1          MR. BROCK:  Your Honor, in addition to that, on

2    the foundation issue, we have here a certificate from

3    Nancy Sager of the division of information disclosure

4    policy in the Center of Drug Evaluation and Research, and

5    she talks about her job title and says in this affidavit

6    each of the documents described on the attached

7    Affidavit A is a true copy of the official record of the

8    United States Food and Drug Administration, and she says

9    that each of the documents described on the attached

10   Exhibit A is part of the official records of the United

11   States Food and Drug Administration, and Exhibit 65 to

12   attachment A is the documents that we are talking about.

13          THE COURT:  The objection is overruled.  68 will

14   be received.

15   BY MR. BROCK:

16   Q    Now, I want to go back to the 1997 timeframe, and now

17   that we have this in context, talk for just a moment about

18   the FDA's knowledge of Clozaril and the work that he had

19   done on Clozaril.

20        Do you have Exhibit 80 in front of you now?

21   A    Yes.

22   Q    Do you see that this is dated September 19, 1997?

23   A    Yes.

24   Q    I probably just need you to describe for the record

25   what this document is.

1    A    This is a September 1997 letter from the director of

2    division of neuropharmacological drug products, that would

3    be Paul Leber, approving to Novartis Pharmaceuticals

4    Corporation a supplemental application for the addition of

5    a statement in labeling for patients who are on Clozaril

6    therapy, and it's about hyperglycemia and the precaution

7    section of the labeling.

8    Q    If you'd look at the screen, and you see RD.40, do

9    you see where the FDA is conveying to Novartis the

10   supplemental application provides the -- for the addition

11   of a statement in labeling for patients who are on

12   Clozaril therapy and develop symptoms of hyperglycemia,

13   "The statement added to precautions is as follows."

14        Do you see that?

15   A    Yes, sir.

16   Q    And then if you look at RD.41 on the next page, is

17   there in fact a precaution in the Clozaril label for

18   hyperglycemia?

19   A    Yes.  This is the additional precaution added to the

20   Clozaril label in September of '97.

21   Q    Now tell the jury how long after September 19, 1997

22   was it that the FDA approved Seroquel for sale in the

23   United States?

24   A    One week.

25   Q    Did the FDA require a precautionary statement for

1    hyperglycemia in the Seroquel label?

2    A    No.

3    Q    Now let me ask you now to turn to Exhibit 100.  Can

4    you just describe in general terms what Exhibit 100 is.

5    A    This is the approval letter from September 26th,

6    1997, for the new drug application for quetiapine and

7    several doses.

8    Q    Is this the initial approval of the medicine?

9    A    Yes, it is.  It's the initial approval for marketing

10   in the U.S.

11   Q    If you would look at your screen there at RD.43, do

12   you see that we have pulled out the language from the FDA

13   to AstraZeneca, "We have completed the review of this

14   application including the submitted draft labeling and

15   have concluded that adequate information has been

16   presented to demonstrate that the drug product is safe and

17   effective for use as recommended in the enclosed marked-up

18   draft labeling.  Accordingly, the application is approved

19   effective on the date of this letter"?

20   A    Yes, that's what it says.

21   Q    Now, from your experience when the FDA says that a

22   medicine is approved as safe and effective for use as

23   recommended in accordance with the labeling, what does

24   that mean?

25            MR. TRAMMELL:  Objection, foundation.

1              THE COURT:  Overruled.

2              THE WITNESS:  That's the language that's used

3    when the FDA CDER reviewers and team and division

4    director, in this case office director, have concluded

5    that adequate information has been provided to make that

6    statement according to the final printed labeling and the

7    labeling is intended to include information about both

8    risks and benefits.

9    BY MR. BROCK:

10   Q    All right.  I'm going to ask you some questions about

11   the initial label now.

12   A    Okay.

13   Q    If you would turn to page 88116, I'll put it on your

14   screen as RD.44, do you see that there is a section there

15   Indications and Usage?

16   A    Yes.  This is the labeling as included with that

17   approval letter telling them how the final printed

18   labeling should appear, and this is the indication

19   statement indicated for the management of the

20   manifestations of psychotic disorders.

21   Q    So that's what it's initially indicated for?

22   A    Correct.

23   Q    Now, if you look at RD.45 on your screen, which is

24   page 130, if you want to refer to it, are there references

25   to metabolic and nutritional system and endocrine system

1   in that section of the label?

2   A    Yes.  This is under "Other Adverse Events."  It

3   includes information about metabolic and nutritional

4   system adverse events and endocrine system adverse events.

5   Q    And is AstraZeneca conveying by this label that there

6   have been cases of hyperglycemia in the clinical trial

7   program?

8   A    Yes.

9   Q    And are they conveying that with regard to the

10  endocrine system, that there have been cases reported of

11  diabetes mellitus?

12  A    Yes.  That's what this is describing.

13  Q    And that information is being made available to the

14  prescribing community?

15  A    Correct.

16  Q    Now, is there a specific section in this label

17  relating to weight gain?

18  A    Yes, there is, several.  There's a couple of places

19  where weight gain is described.

20  Q    If you look at page 128, which would be RD 46 on your

21  screen, do you see that there is a section for weight

22  gain?

23  A    Yes.

24  Q    And does it say that, "The proportions of patients

25  meeting the weight gain criteria of greater than or equal

1    to seven percent of body weight were compared in a pool of

2    four, three- to six-week placebo-controlled trials

3    revealing a statistically significantly greater increase

4    by incidence of weight gain for Seroquel, 23 percent,

5    compared to placebo, six percent."

6         Do you see that?

7    A    Yes, I do.

8    Q    And is that the information that was reported by

9    AstraZeneca in the integrated summary of safety and noted

10   by Dr. Mosholder in his review of the data?

11   A    Yes.  Those are exactly the numbers that were

12   reported and part of Dr. Mosholder's review.

13   Q    All right.  Thank you.

14        If you look at pages 126 and 127 of that document, is

15   there a table for treatment emergent adverse experiences?

16   A    Yes, there is.

17   Q    Is there a section under Metabolic and Nutritional

18   Disorders?

19   A    Yes.

20   Q    Can you describe for the members of the jury what

21   data is included in that table?  That's Table 1, which if

22   you look at your screen it will be RD.47.

23   A    Correct.  This is a table of treatment emergent

24   adverse experiences from the three- to six-week

25   placebo-controlled clinical trials, and it describes that

 1    in the Seroquel group, there were two percent of this

 2    report and in the placebo group zero.

 3    Q    By the way, Doctor, the fact that a medicine company

 4    reports an adverse experience in a label, does that mean

 5    that the medicine is causing the adverse event?

 6              MR. TRAMMELL:  Objection, foundation.

 7              THE COURT:  Overruled.

 8              THE WITNESS:  No.  Causation has not been

 9    determined by making this sort of a list.

10    BY MR. BROCK:

11    Q    Now was there further information about the dose

12    relationship of the medicine to certain outcomes?

13    A    Yes.  There is a comment, part of the label, about

14    dose-relatedness for certain adverse events.

15    Q    If you look at pages 127 and 128 which would be your

16    pullout RD.48, do you see that there is a statement that,

17    "One of the analyses revealed a positive dose response for

18    the following adverse events"?

19         Do you see that?

20    A    Yes, I do.

21    Q    And is weight gain listed as one of those adverse

22    events where a positive dose response was seen?

23    A    Yes.

24    Q    And that information was conveyed to physicians

25    through the label?

1    A    Correct.

2    Q    Was there information about what AstraZeneca had

3    learned in its clinical trials about cholesterol and

4    triglyceride evaluations?

5    A    Yes, there was.

6    Q    If you look at pages 118 and 119, do you see that

7    there's a section under precautions for cholesterol and

8    triglyceride evaluations?

9    A    Yes.

10   Q    And did AstraZeneca report what it had learned in its

11   clinical trials about cholesterol and triglycerides?

12   A    Yes.  This is from AstraZeneca's submission and

13   Dr. Mosholder's review, and it's reflected under the

14   precaution section about cholesterol and triglyceride

15   evaluations.

16   Q    Doctor, based on your review of the clinical trial

17   data, the submissions made by AstraZeneca to the FDA, the

18   FDA evaluations of the data, calling on your many years of

19   experience with the FDA reviewing clinical trial data,

20   commenting on protocols, crafting labeling language, do

21   you have an opinion as to whether or not the initial label

22   for Seroquel that was approved in 1997 appropriately

23   characterized the medicine in terms of its risk benefit

24   profile?

25            MR. TRAMMELL:  Objection, Your Honor.

1    Foundation.  This is exactly the opinion Dr. Rarick's been

2    previously barred from giving.  She's not an FDA

3    spokesperson.  She's had no firsthand experience in the

4    review of the Seroquel application.  She's not an

5    epidemiologist, she's not a clinician.

6         Despite the fact that she's been speaking for those

7    people at the FDA all day, she's not allowed under the

8    rules to say what AstraZeneca did was appropriate or not

9    because she can't speak for the FDA, and she can't

10   speculate as to interactions between the agency and the

11   company because she has no firsthand experience.

12        If it would please the Court, I'd be happy to read

13   the paragraph of the opinion dealing with this opinion

14   exactly if that would be helpful to you.

15             THE COURT:  Opinion by whom?

16             MR. TRAMMELL:  By the New Jersey Appellate Court

17   in the Vioxx litigation.

18             THE COURT:  Well, that's really not relevant.

19        But I think you should rephrase the question to see

20   if you can overcome the foundation objection.

21   BY MR. BROCK:

22   Q    Let's go back to a few things that you have done

23   in -- from the litigation, Dr. Rarick.

24        You have reviewed the clinical study reports for the

25   trials conducted by AstraZeneca?

```
 1    A     Yes.

 2    Q     You have looked at the safety data in those clinical

 3    trials, correct?

 4    A     Correct.

 5    Q     You have reviewed information from the integrated

 6    summaries of safety like we've looked at today?

 7    A     Correct.

 8    Q     You are knowledgeable about the requirements for

 9    posting precautions and warnings about medicines and are

10    familiar with those standards as they existed at the time

11    of the approval of Seroquel?

12    A     Yes.

13    Q     You have a lot of experience in terms of reviewing

14    trial data and crafting language for labels?

15    A     Yes.

16    Q     Based on that, Dr. Rarick, do you have an opinion as

17    to whether or not the initial label for Seroquel

18    adequately characterized the risk benefit profile of the

19    medicine?

20          MR. TRAMMELL:  Again, Your Honor, I'll object to

21    foundation.  Not only is she attempting to speak for the

22    FDA about whether what AstraZeneca did was appropriate,

23    which no foundation can or has been laid, but she's also

24    giving a legal conclusion now.

25      Now she's saying AstraZeneca complied with the law
```

1   when they submitted this label based on the data that they

2   had.  That is a terribly prejudicial opinion for an expert

3   as credentialed as Dr. Rarick to be giving to the jury.

4   We object to it.  It is entirely inappropriate.

5           THE COURT:  Well, first of all, you haven't

6   offered her as an expert, so I don't know exactly what

7   you're contending she's an expert in.  That's the first

8   step.

9           MR. BROCK:  Okay.  Let me do this, then, at this

10  point, Your Honor, and that would be to offer Dr. Rarick

11  as an expert --

12          THE COURT:  Hold on one second.

13      Sandy, can you mark that -- the question which would

14  be the -- I can't mark it on here.

15      (Discussion held off the record.)

16          MR. TRAMMELL:  And just to add for the record,

17  Your Honor, part of what she's been asked to do and part

18  of what that question entails is giving her opinion to the

19  jury about whether the Seroquel -- the initial Seroquel

20  label was appropriate, whether AstraZeneca followed the

21  law.

22      It's important and I think critical to point out she

23  has no experience analyzing applications for approval for

24  antipsychotic drugs, didn't do it at the FDA, and the

25  first time she even looked at the issue was when she was

1    hired in this case.

2        And that's an important factor to consider, I think,

3    Your Honor, when you're asking an expert who has been

4    offered as the authority on what the FDA should or should

5    not have done to talk about whether what AstraZeneca did

6    in this case was appropriate.

7            MR. BROCK:  One thing I'll respond to, Your

8    Honor, is that plaintiffs have come forward with experts

9    who have no personal experience in terms of working with

10   the FDA to advance the opinion that at various points in

11   time the label was inadequate.  So they've offered from

12   witnesses the very opinion that we are seeking to respond

13   to with this witness.

14           THE COURT:  Well, as I understand the question,

15   you're asking her to testify as to whether she thinks the

16   initial label adequately characterizes the risk benefit

17   profile of the medicine as found in the FDA's files.

18           MR. BROCK:  Correct.

19           MR. TRAMMELL:  Right.  And there's a -- there

20   are several important stations, of course, one of which is

21   what our experts do is they evaluate the data and give

22   their interpretation of the data after they've been

23   qualified to do so, and those interpretations can be

24   compared to what the FDA said.

25       This is different.  She's saying based on what

1    AstraZeneca gave to the FDA, that AstraZeneca acted

2    appropriately and that the initial label --

3            THE COURT:  That's not his question.  His

4    question was based upon the information AstraZeneca gave

5    to the FDA, was the FDA -- was the labeling that the FDA

6    approved adequate.  That's different than what you just

7    said.

8            MR. TRAMMELL:  Which, of course, is a legal

9    conclusion.

10           THE COURT:  Well, it's not a legal question.

11   You can still attack what AstraZeneca -- what information

12   AstraZeneca gave to the FDA.

13           MR. TRAMMELL:  Whether the warnings act was a

14   matter of law -- whether the warnings act is a legal

15   conclusion, Your Honor has addressed that in this case

16   already.  And if she's allowed to give that opinion to the

17   jury, that is a dispositive question in terms of the

18   placement of the warnings -- the placement of the

19   information in the label.  There's been no foundation laid

20   for her to give that opinion.

21           THE COURT:  All right.  You need to rephrase the

22   question so that it's not a legal conclusion.  She can

23   give her opinion as to whether she thought the label was

24   appropriate based on the -- appropriate, not adequate.

25

1    BY MR. BROCK:

2    Q    Dr. Rarick, do you have an opinion as to --

3              THE COURT:  Well, you first have to get her

4    qualified as an expert.

5              MR. BROCK:  All right.  So, Your Honor, we are

6    offering Dr. Rarick as an expert in the areas of FDA

7    regulations and guidances, FDA practices, procedures and

8    policies, labeling relating to prescription medicines

9    including procedures for labeling approvals and labeling

10   changes.  We're offering her as an expert in the

11   interpretation and design of clinical trials at this

12   point.

13             MR. TRAMMELL:  Well, we certainly object to

14   Dr. Rarick's qualifications to talk about several things

15   that I think are inherent in that offer.

16        One is what the regulations actually require of

17   companies.  The other is under circumstances in which she

18   has no firsthand involvement, whether the company complied

19   with those regulations.

20        Another is to discuss what the FDA would or would not

21   have done under circumstances which she's talked about

22   here today.

23        Another is to act as a de facto spokesman for the FDA

24   and say that the things that the FDA did were appropriate

25   or the things that AstraZeneca did were appropriate.

1          I think it really is a fine line, Your Honor.  I

2     don't object and I haven't tried to object today about

3     whether Dr. Rarick can talk about what the qualifications

4     are for getting a drug approved and what AstraZeneca did

5     to attempt to comply with those qualifications.

6          What I don't think she can do is talk about -- give

7     an opinion that they did or give an opinion that the FDA's

8     approval of an application was appropriate.  I think

9     that's -- it's an inappropriate conclusion of law, it's an

10    inappropriate conclusion of the facts, and it's an

11    inappropriate supposition of herself and her judgment for

12    the FDA's.

13         That's the type of opinion that is routinely excluded

14    and ought to be in this case.  I just want to make sure

15    the distinction I'm trying to make is clear for the Court.

16              THE COURT:  All right.  Well, she certainly is

17    qualified to give an expert opinion on procedures and

18    labeling and approvals and designs of clinical trials, so

19    I'll accept her for that.

20         But you need to phrase a question that fits within

21    that qualification and doesn't ask for a legal opinion.

22              MR. TRAMMELL:  And just to be clear, to the

23    extent they've offered her as an epidemiological expert,

24    which I thought I understood Mr. Brock to say, she's not

25    been qualified in that regard.

1          THE COURT:  I -- I didn't take him to say that

2     she was an epidemiological expert.

3     BY MR. BROCK:

4     Q    Do you have an opinion as to the appropriateness of

5     the initial label?

6     A    Yes.

7     Q    Would you give the Court the benefit of that opinion

8     and the reasons for the opinion.

9     A    From my review of the information submitted and the

10    FDA's review of that information, I believe that the

11    original label had the appropriate information in the

12    appropriate sections of the label.

13    Q    Thank you.

14          MR. TRAMMELL:  Again, Your Honor, maybe I didn't

15    understand your instruction.  That seems to me to have

16    been her opinion about the merits of AstraZeneca's conduct

17    which I understood was going to be out of bounds.

18          THE COURT:  No.  I understood her answer to be

19    based upon the information that AstraZeneca submitted,

20    that the FDA looked at that information on the original

21    label and found it to be appropriate.  But it's based

22    on -- just based on what they were given, not -- you can

23    put holes in it all you want as to what they were given.

24    BY MR. BROCK:

25    Q    Okay.  Dr. Rarick, we're going to move to the next

1    subject.

2        Did the FDA continue to look at Seroquel and issues

3    related to weight gain and possible glucose disregulation

4    after the approval of the medicine?

5    A    Yes, they did.

6    Q    I'm going to ask you now to look at Exhibit 23.  And

7    would you describe for the benefit of the Court what this

8    document is.

9    A    This is a May 2001 document written by Dr. Racoosin,

10   a safety team leader in the division of now what's called

11   the division of psychiatric drug products, and she has in

12   this document a review of various activities going on at

13   the FDA regarding metabolic and other parameters with the

14   atypical antipsychotics.

15   Q    If you look at page 613 which is RD.50, do you see

16   that it refers to Dr. Koller, a medical officer in the

17   division of metabolic and endocrine drug products, along

18   with others, presented a poster on this topic at the

19   annual meeting of the Endocrine Society in June of 1999?

20   A    Right.  And this poster was about Clozapine, so

21   Clozaril and issues related to nuance at diabetes and

22   exacerbation of preexisting diabetes.  She's describing

23   the history that Dr. Koller had a poster on that topic in

24   1999.

25   Q    And then if you look at the next page or actually

1    page 614 which is RD.51, do you see that the division is

2    requesting information from Novartis?

3    A    Correct.  After that publication by Dr. Koller, she

4    describes that they asked for a comprehensive review from

5    Novartis about Clozaril in these issues.

6    Q    And did the FDA's work with Clozaril lead to a

7    request of AstraZeneca for additional information?

8    A    Yes.

9         MR. BROCK:  If we could look at Exhibit 40,

10   please.

11   BY MR. BROCK:

12   Q    And if you look at pullout RD.52, do you see that the

13   document bears a date of May 1st, 2000?

14   A    Yes, it does.

15   Q    And do you see there in the slide that we've

16   presented that it says, "We have recently examined

17   postmarketing surveillance data from the FDA adverse event

18   reporting system for Seroquel as well as other atypical

19   antipsychotics with respect to spontaneous reports of new

20   onset diabetes mellitus, nonketotic hyperosmolar coma and

21   diabetic ketoacidosis"?

22   A    That's what it says.

23   Q    Now, let me just see if we can break that down just a

24   little bit.

25        What is the FDA adverse event reporting system for

1    Seroquel?

2    A    Well, the FDA adverse event reporting system is for

3    all drugs, and it's the system that the FDA uses to keep

4    track of adverse event reports for approved drugs.  It's a

5    large database that includes adverse event reporting for

6    all drugs.

7         And here, they're describing that they've looked at

8    it for all of the atypical antipsychotics, postmarketing

9    adverse event reports for these particular events

10   including Seroquel.

11   Q    And it says "spontaneous reports."  What is a

12   spontaneous report?

13   A    That indicates that these are voluntary reports, that

14   these are reports that are provided to FDA spontaneously.

15   They're not requested specifically or mandated.

16   Q    Does the FDA go on to say that, "Although this

17   examination revealed few of these adverse experiences in

18   association with Seroquel treatment, a larger number of

19   cases with similar agents that have longer periods of

20   postmarketing exposure raises the possibility that more

21   cases associated with Seroquel will emerge as experience

22   accumulates"?

23   A    That's exactly what it says.

24   Q    Does this letter and this activity reflect that the

25   FDA is being proactive in its monitoring of this issue?

```
 1              MR. TRAMMELL:  Objection, Your Honor.  Again,
 2   mischaracterizes the document and calls for speculation.
 3              THE COURT:  Sustained.
 4   BY MR. BROCK:
 5   Q    What does this document say to you about the FDA's
 6   attention to the issue of antipsychotics and their
 7   potential relationship with diabetes in the year -- in the
 8   month and year May 2000?
 9              MR. TRAMMELL:  Objection, speculation.
10              THE COURT:  Overruled.
11              THE WITNESS:  As we said, this shows that the
12   FDA had been examining their own database regarding
13   postmarketing surveillance for the atypical
14   antipsychotics, and they are now asking the atypical
15   antipsychotic manufacturers to provide information to them
16   to further that review.
17   BY MR. BROCK:
18   Q    And did AstraZeneca respond to this?
19   A    Yes.
20              MR. BROCK:  If we could see Exhibit 42, please.
21   BY MR. BROCK:
22   Q    If you look at pullout RD.53, do you see that there's
23   a letter to Russell Katz dated August 31, 2000?
24   A    Correct.  This is the new division director, at the
25   time was Dr. Katz, this year, the division director for
```

1    the division of neuropharmacological drug products, and

2    it's responding to his May 1st of 2000 letter.

3    Q    And so AstraZeneca is now furnishing the information

4    that's been requested?

5    A    Yes.

6    Q    And does AstraZeneca also state its evaluation of the

7    medicine Seroquel and any possible relationship to

8    diabetic diabetogenic potential at this point.

9            THE COURT REPORTER:  Wait a minute. Diabetic say

10   it again.

11           MR. BROCK:  Yeah. I'm sorry.

12   D-I-A-B-E-T-O-G-E-N-I-C.

13           THE COURT REPORTER:  Thank you.

14   A    Yes.  This is their comprehensive review of

15   preclinical information, information from the original

16   NDA, their review of spontaneous postmarketing reports, an

17   estimate of patient exposure, et cetera, just as

18   requested, and they make their conclusions.

19   Q    And then if you look at page 1461, which is document

20   RD.54, does AstraZeneca state its conclusion with regard

21   to Seroquel and its possible or potential association with

22   diabetes?

23   A    Yes.  This is a conclusion statement that looking at

24   their preclinical, clinical and postmarketing data, they

25   come to their conclusion that they believe that a

1    diabetogenic potential for Seroquel is unlikely.

2    Q    I want to ask you quickly about a couple of

3    additional reviews with regard to this issue.  We're going

4    to present to you now Exhibit 21.

5         And would you describe for the benefit of the Court

6    what Exhibit 21 is?

7    A    This is a reviewer, Gerard Boehm, and also signed by

8    Dr. Racoosin's review of the responses to FDA's request.

9    This is his review of the response for AstraZeneca's

10   submission for Seroquel.

11   Q    So this is Dr. Boehm looking at what AstraZeneca

12   filed in August in response to a May request?

13   A    Correct.

14   Q    And is there a summary of his findings there that you

15   can see at RD.55?

16   A    Yes.  The first page includes a summary of his

17   findings.

18   Q    All right.  And does it say, "The sponsor submission

19   describing glucose-related abnormalities associated with

20   quetiapine did not provide affirmative proof of a

21   drug-related effect but did include several interesting

22   findings"?

23   A    Yes, that was his conclusion.

24   Q    If you now will look at Exhibit 22.

25        Is this document likewise titled "Review and

1   Evaluation of Clinical Data"?

2   A    Yes.

3   Q    And is this reviewed by Gerard Boehm?

4   A    Let me make sure who signs this.  I believe it's

5   signed by both Dr. Boehm and Dr. Racoosin.

6        This is actually Dr. Racoosin's review.  My

7   apologies.  This is Dr. Racoosin.

8   Q    Okay, thank you.

9        And does it show a date review completed 1-26-01?

10  A    Yes -- no, I'm sorry.  The date review completed is

11  5-17-01.

12  Q    I'm sorry.  I'm sorry.  I apologize.

13  A    Which document are you looking at?

14  Q    I had -- I've got two copies of the same thing.

15  Okay.  I apologize.

16       All right.  We're on Exhibit 22.

17  A    Yes.

18  Q    "Review and Evaluation of Clinical Data"?

19  A    Correct.

20  Q    Within that document, is there a table on 1633 that

21  refers to a March 2001 update?

22  A    Yes.

23  Q    And does it report adverse event reports for

24  Clozapine, Risperidone, Olanzapine and quetiapine in that

25  table?

1   A    Yes, it does, for a certain number of years.

2   Q    All right.  Now, was there a label change that was

3   made with regard to the medicine Seroquel in March of

4   2001?

5   A    Yes.  On the indication statement, there was approval

6   of a label change in March of 2001.

7   Q    Right.  Had the FDA concluded by March of 2001 when a

8   label change was made that there was a need for a

9   precaution or a warning in the label for diabetes or

10  hyperglycemia?

11          MR. TRAMMELL:  Objection, Your Honor.

12  Speculation.

13          THE COURT:  Rephrase the question.

14  BY MR. BROCK:

15  Q    In your review of the FDA files, did you find any

16  indication that by March of 2001, the FDA believed or had

17  concluded that the AstraZeneca label for Seroquel needed

18  to be changed to include a warning for diabetes or

19  hyperglycemia?

20          MR. TRAMMELL:  Same objection.

21          THE COURT:  Overruled.

22          THE WITNESS:  No.  There's no evidence that they

23  had come to the conclusion that a labeling change related

24  to diabetes or related issues was needed.

25

1   BY MR. BROCK:

2   Q     Look at Exhibit 101, please.

3           THE COURT:  Counsel, are you going to introduce

4   the documents that you've discussed?

5           MR. BROCK:  I am.  I was just going to clean

6   them up and offer them later.

7           THE COURT:  Okay.

8   BY MR. BROCK:

9   Q     Do you see that that document -- if you pull up -- I

10  apologize.  If you pull up RD.58.  Do you see that on the

11  screen?

12  A     Yes.

13  Q     And do you see that that's signed by Russell Katz on

14  3-27 of '01?

15  A     Correct.

16  Q     And you see the pullout there that begins, "We have

17  completed"?

18  A     Yes.

19  Q     All right.  Read that for the benefit the jury.

20  A     "We have completed the review of this supplemental

21  application and have concluded that adequate information

22  has been presented to demonstrate that the drug product is

23  safe and effective for years as recommended in the

24  submitted final printed labeling."

25  Q     At this point of time, based on your education,

121

1  training and experience, if the FDA had concluded that a

2  warning or a precaution for diabetes or hyperglycemia were

3  indicated, could the FDA have imposed it at this point in

4  time?

5          MR. TRAMMELL:  Objection, Your Honor.

6  Speculation.

7          THE COURT:  Overruled.

8          THE WITNESS:  Yes.  This is exactly the kind of

9  time when any labeling changes the FDA would want would

10  have been communicated.  And this wouldn't have been

11  approved without appropriate labeling that the FDA agreed

12  upon.

13 BY MR. BROCK:

14 Q    Thank you.

15      Now there had been discussion within the FDA prior to

16 this point in time about the issue of second-generation

17 antipsychotics and the possible need for an update in the

18 label, correct?

19 A    Yes, there had.

20 Q    And did your review of the records reveal to you who

21 the person was at the FDA that felt that that should be

22 considered?

23 A    There was a review in 1999 by the division of, I

24 think they call it risk evaluation 1, a Diane Wysowski and

25 Katherine Bennett who did a review of the atypical

1    antipsychotics, also as a result of Dr. Koller's findings

2    on Clozaril, and looked at Clozaril as well as the entire

3    class to make their suggestions back to the division of

4    neuropharmacologic drug products.

5    Q    And did your review of the records reveal to you what

6    the FDA decided to do with regard to those

7    recommendations?

8    A    And then I think I should add there was another

9    review from 2001 by Dr. Racoosin who also made some

10   suggestions for considerations of labeling.

11        But it's clear from Dr. Racoosin's further

12   discussions and reviews that the 2000 request had been

13   requested of all the makers who had looked at the

14   information, and then they were aware of some other

15   studies that were being done that would be subsequently

16   submitted.

17        And as the record then shows, it wasn't until late

18   2003 that a decision was made that the class would have a

19   change in the labeling.

20   Q    Let me direct your attention back to Exhibit 68, if

21   you could find that.  That's Dr. Racoosin's slide set that

22   she presented to the consensus conference.

23   A    Yes, I have it here.

24   Q    Do you see on the RD.62 which is page 822 --

25   A    Yes.

1    Q    -- do you see there where she records "additional

2    data needed"?

3    A    Yes.

4    Q    And it says Spring 2001 DNDP.  Who is that?

5    A    That's the division of neuropharmacologic drug

6    products.

7    Q    "Internally decides to pursue additional

8    observational studies as clinical trial data not

9    informative and reporting rates difficult to interpret."

10   A    Correct.

11   Q    So does that expressly reflect that the FDA had

12   decided to pursue additional observational studies of the

13   issue in spring of 2001?

14   A    Exactly.

15   Q    Look at the next page.  I believe it is 825 which is

16   RD.63.

17   A    Yes.

18   Q    Do you see there, there's a slide "VA study

19   findings"?

20   A    Yes.

21   Q    Do you know what that is?

22   A    Yes.  She talks in her previous slides about a VA

23   study that was being performed for which they had data,

24   and that she's talking about the results regarding

25   diabetes.

1  Q    And is there then a table there that has Olanzapine,

2  Risperidone and quetiapine?

3  A    Yes.

4  Q    And there are adjusted relative risks stated below

5  that, correct?

6  A    Exactly.

7  Q    So just taking Olanzapine first, it says "1.5

8  adjusted."  What is that?

9  A    That's a relative risk or hazard ratio for the

10  findings of diabetes in that group.

11  Q    Now, are you familiar with the concepts of

12  statistical significance?

13  A    Yes.

14  Q    Would you share with the jury what it means when we

15  talk about the concept of statistical significance?

16  A    In this case, we're looking at hazard ratios, and

17  things that are above 1 means there may be an increased

18  risk, but if the confidence intervals, that's what's in

19  the parentheses, cross 1, that means it's not

20  statistically significant.

21  Q    The medicine quetiapine, which we're primarily

22  talking about here today, are the findings in the VA

23  studies statistically significant?

24  A    No.  The other two show confidence intervals above 1

25  for quetiapine that crosses 1, which means it's not

1   statistically significant.

2   Q    Okay.  Let's go now to Exhibit 24.

3        Would you describe for the benefit of the jury the

4   title of this document.

5   A    This is a document written by Andy Mosholder, but I

6   want to point out he's now moved from the office of drug

7   review -- the office of new drugs to the division of drug

8   risk evaluation in the office of drug safety, as he's also

9   an epidemiologist MD.

10       And he is performing a literature review considering

11  the issue of diabetes mellitus and hyperglycemia

12  associated with the atypical antipsychotic drugs as a

13  consult back to his old division, the division of

14  neuropharmacological drug products.

15  Q    Okay.  Now, do you have an understanding generally of

16  the events that led to a class label change with regard to

17  the second-generation antipsychotics?

18  A    I think so, yes.

19  Q    Would you just walk the jury through the events, as

20  you understand them, that led to a change in the Seroquel

21  label relating to the issue of hyperglycemia and diabetes?

22  A    And you want me to start in 1999 or 2001, or where do

23  you want to start?

24  Q    I think probably it would be okay to pick up in 2000

25  beginning with the FDA's inquiry to AstraZeneca for

1   additional data.

2   A     Sure.  So in May of 2000, there was a request to all

3   the holders of atypical antipsychotics for a review, as we

4   discussed before, of all the information from their

5   original NDAs, postmarketing experience and animal

6   studies, to be submitted to the FDA.

7        Those were reviewed, as we saw, both in the winter

8   and the spring of 2001.  As we saw from Dr. Racoosin's

9   slides, it was felt that that data did not warrant a

10  labeling change.  They internally decided to wait for some

11  epidemiological data that they knew was forthcoming.  They

12  then reviewed that.

13       In the meantime, they continued to ask for adverse

14  event report reviews from the division of drug risk

15  evaluation, as well as publications and literature reviews

16  from that division.  And they continued to do their own

17  reviews of the topic up until 2003 when they decided to go

18  ahead and ask for a class warning on hyperglycemia and

19  diabetes.

20            THE COURT:  All right, Counsel.  You need to

21  change the tape now?

22            MR. BROCK:  Your Honor, while I'm setting up,

23  just a housekeeping matter, we would offer at this point

24  Exhibits 100, 23, 40, 42, 21, 22, 24 and 101.

25            MR. TRAMMELL:  No objection.

1          THE COURT:  100, 23, 40, 42, 21, 22, 24 and 101

2    will be received.

3    BY MR. BROCK:

4    Q    Dr. Rarick, we're now to the point of the FDA sending

5    a letter to AstraZeneca with regard to its Seroquel label.

6    And I'll ask you if you have Exhibit 62 in front of you?

7    A    Yes, I do.

8    Q    And if you look at your screen, RD.68, do you see

9    that the FDA communicates to AstraZeneca, "After reviewing

10   the available data pertaining to the use of atypical

11   antipsychotic medications and diabetes mellitus adverse

12   events, we have concluded that the product labeling for

13   all atypical antipsychotics should be updated to include

14   information about these events"?

15   A    Correct.

16   Q    Now, when the FDA sends out a letter that says "for

17   all atypical antipsychotics," is there a term of art that

18   the FDA has to characterize that?

19   A    It's generally called a class labeling request.

20   Q    And what is class labeling?

21   A    Class labeling indicates that there is a certain

22   class of drugs, either -- the class can either be defined

23   by the type of medication it is or by the indication it's

24   approved for.

25   Q    Does the FDA convey to AstraZeneca and other

 1   manufacturers, "While we acknowledge that the relationship

 2   between atypical antipsychotics use and diabetes mellitus

 3   adverse events has not been completely described, we

 4   believe the safe use of Seroquel can be enhanced by

 5   informing prescribers and patients about these events"?

 6   A    That's exactly what the letter describes.

 7   Q    And at this point, do you agree with what the FDA is

 8   conveying to AstraZeneca?

 9   A    Yes.

10   Q    If you look at the requested labeling information,

11   and we've got a document we can put on the screen for you,

12   RD.69, do you see that at the end of that label there's

13   the sentence, "The available data are insufficient to

14   provide reliable estimates of differences in

15   hyperglycemia-related adverse event risks among the

16   marketed atypical antipsychotics"?

17   A    Yes.  This is part of the labeling language that the

18   FDA is describing.

19   Q    Now, did AstraZeneca change its label in response to

20   the FDA request for class labeling?

21   A    Yes.

22   Q    And were there any changes made to the suggested

23   language of the FDA after FDA proposed the language?

24   A    Yes.  There was some discussion by AstraZeneca, and

25   the record shows some changes for the Rispiridol label

1   also where this last sentence in this part of the warning

2   was removed.

3   Q    What's the significance of that to you?

4   A    From my review of AstraZeneca's communications with

5   FDA and FDA's communications back, there was some debate

6   about whether there was a difference amongst the atypicals

7   regarding this risk, and AstraZeneca, as well as some

8   other sponsors, wanted to remove that sentence as they

9   believed there could be differences.

10       I don't believe the differences were described in the

11  labeling until probably 2007 or '8.  But at the time, in

12  2003 or '4, they wanted to keep that sentence out of there

13  because there might be differences, even though they

14  hadn't been particularly established by FDA.

15  Q    What happened in 2007/2008 that changed that picture?

16  A    You can see labeling for another atypical

17  antipsychotic, Zyprexa, where the FDA has approved the

18  labeling which states that there may be a continuum on

19  this risk and that Zyprexa may actually be -- have a

20  higher risk than the others in the class for this

21  particular warning.

22  Q    Now, if you'll now look at Exhibit 1.  Can you

23  describe for the members of the jury what Exhibit 1 is?

24  A    Exhibit 1 is the labeling as approved in January of

25  2004.

1    Q    And do you see -- if you look at the big screen,

2    RD.70, it is a label for Seroquel, quetiapine --

3    A    Yes.

4    Q    -- tablets?

5    A    Yes, it is.

6    Q    All right.  And then if you look over to pages 8 --

7    781 and 782, is the language with regard to hyperglycemia

8    and diabetes set out there?

9    A    Yes, it is.

10   Q    And is this label conveying to physicians as of

11   January 2000 -- what's the date?  I'm sorry.

12   A    2004.

13   Q    January -- let me start over.

14        Is the label conveying by its express words "in

15   January of 2004 to the prescribing community,

16   hyperglycemia, in some cases extreme and associated with

17   ketoacidosis or hyperosmolar coma or death, has been

18   reported in patients treated with atypical antipsychotics

19   including Seroquel"?

20   A    Yes, sir.

21        MR. TRAMMELL:  Objection, Your Honor.  The

22   Doctor can't testify as to prescribing physicians'

23   perception of the labeling information.  In other words,

24   the question is, is this conveying the risk information to

25   the doctor, and the Doctor is attempting to testify as to

1    what prescribing doctors would have understood based on

2    this change in the labeling.

3              THE COURT:  Sustained.

4    BY MR. BROCK:

5    Q    Would you read the first sentence of the

6    hyperglycemia and diabetes mellitus label as of

7    January 2004 -- let me reask that question.

8         The January 2004 label has a section for

9    hyperglycemia and diabetes mellitus, correct?

10   A    Correct.

11   Q    Would you read the first sentence for the benefit of

12   the jury, please.

13   A    Sure.

14        The first sentence of this warning states,

15   "Hyperglycemia, in some cases extreme and associated with

16   ketoacidosis or hyperosmolar coma or death, has been

17   reported in patients treated with atypical antipsychotics

18   including Seroquel."

19   Q    Are you aware of the fact that AstraZeneca sent out

20   "Dear Healthcare Provider" letters to physicians in the

21   United States enclosing this label?

22   A    Yes.

23   Q    Are you aware that in fact that letter went out

24   twice?

25   A    Yes.  There was an addition of a phrase that was not

1  in the first letter and so it was sent out once in January

2  and again in April.

3  Q    So based on your knowledge and experience, was the

4  precautions language contained in the hyperglycemia and

5  diabetes mellitus section of the label conveyed to

6  physicians through the product insert as well as the "Dear

7  Healthcare Provider" letters?

8  A    Right.  It's a warning, but, yes, it was provided in

9  those "Dear Healthcare Provider" letters, both in the

10 language of the letters themselves as well as the attached

11 labeling that was included.

12 Q    Did I say "precaution"?

13 A    Yes, you did.

14 Q    I apologize.  All right.  So let me -- let me reask

15 it.

16     Was a hyperglycemia and diabetes warning conveyed to

17 physicians in the United States through the package insert

18 as well as "Dear Healthcare Provider" letters?

19 A    Yes.  Twice in '04.

20 Q    Would you read the second sentence of the warning,

21 please?

22 A    Sure.

23     "Assessment of relationship between atypical

24 antipsychotic use and glucose abnormalities is complicated

25 by the possibility of an increased background risk of

1   diabetes mellitus in patients with schizophrenia and the

2   increasing incidence of diabetes mellitus in the general

3   population."

4   Q    When we say that there's an increase background risk

5   of diabetes mellitus in patients with schizophrenia and

6   the increasing incidence of diabetes mellitus in the

7   general population, why are those complicating factors to

8   this issue?

9           MR. TRAMMELL:  Objection, Your Honor.

10  Foundation.  She's not offered as an expert on this

11  subject.

12          THE COURT:  Sustained.

13  BY MR. BROCK:

14  Q    Doctor, go back to the Racoosin slides, if you don't

15  mind.

16  A    Yes, I have them.

17  Q    Will you turn to page 826.

18          MR. TRAMMELL:  Which exhibit is that?

19          MR. BROCK:  This is Exhibit No. 68.

20          THE WITNESS:  I have it here.

21  BY MR. BROCK:

22  Q    Okay.  And it should be up on the screen as RD.64.

23  A    Okay.

24  Q    And did you learn from your review of the records in

25  the case, including the FDA records, that schizophrenic

134

1    patients appear to have a higher prevalence of diabetes

2    compared to the general population with evidence that this

3    higher prevalence predated the availability of atypical

4    and typical antipsychotics?

5    A    Yes.  This appears here, as well in several of the

6    medical officer reviews and the statisticians' reviews of

7    the NDA and supplements.

8    Q    Okay.  In terms of your experience at the FDA when

9    you were thinking about adverse event reporting, was it

10   important to understand the background rate of the disease

11   state when you were thinking about the number of adverse

12   event reports?

13   A    Yes.

14   Q    Is this statement relevant to that analysis?

15   A    Yes.

16   Q    Okay.  And so tell the members of the jury, if you

17   would, when you say that the assessment between atypical

18   antipsychotic use and glucose abnormalities is complicated

19   by the possibility of an increased background risk of

20   diabetes mellitus, does that refer to the FDA's evaluation

21   of this increased risk in the -- in the -- as a background

22   rate?

23              MR. TRAMMELL:  Objection.  Two grounds, Your

24   Honor.  One, it's one thing for her to say what a

25   background rate is, how that affects the warning.  It's

1    another thing for her to talk about a background rate in

2    the context with the diabetes warning in this case when

3    she hasn't been offered as an expert on that subject, and

4    has acknowledged that she's not a psychiatrist nor a

5    clinician and has no expertise on causation issues per se.

6        This is a nuance of the theory of causation in this

7    case, what role the background rate plays in determining

8    whether the drug was involved in causing injury.  She

9    can't testify on that.  She can testify about what a

10   background rate is and what the FDA looked at.

11       In testifying about conclusions derived from those

12   two things when she's got no basis of expertise to do so,

13   it's prejudicial to -- for the jury to hear.

14            THE COURT:  Sustained.

15   BY MR. BROCK:

16   Q    Why would the FDA want to convey to the prescribing

17   community issues about the background rate of the disease

18   state that's being discussed here in the label?

19   A    Just as --

20            MR. TRAMMELL:  Objection.  Speculation.

21            THE COURT:  Overruled.

22            THE WITNESS:  Well, as they're describing here,

23   they're reminding the prescriber that this issue is

24   complicated by the fact that the schizophrenic population

25   has a high risk of diabetes simply because of their actual

1   disease.  So it's hard to make determinations about the

2   contribution of product -- or contribution at all of a --

3   of a drug product in that case.

4   BY MR. BROCK:

5   Q    Thank you.

6          MR. TRAMMELL:  Your Honor, I move to strike that

7   answer.  That's exactly the answer that I was objecting

8   to.

9          THE COURT:  Overruled.

10  BY MR. BROCK:

11  Q    Okay.  Tell me if I read this right.

12       "Given these confounders, the relationship between

13  atypical antipsychotic use in hyperglycemia adverse events

14  is not completely understood."

15  A    Right.  It's "hyperglycemia-related adverse events,"

16  just in case you wanted to correct that.  Yes.

17  Q    So the next sentence, "Given these confounders, the

18  relationship between atypical antipsychotic use in

19  hyperglycemia-related adverse events is not completely

20  understood"?

21  A    Yes, that's what it says.

22  Q    All right.  Now, we talked about the -- well, let

23  me -- let me cover this also.

24       If you look down to the last paragraph, do you see

25  that the FDA is conveying to physicians, "Patients with an

1    established diagnosis of diabetes mellitus who are started

2    on atypical antipsychotics should be monitored regularly

3    for worsening of glucose control.  Patients with risk

4    factors for diabetes mellitus, obesity, family history of

5    diabetes who are starting treatment with atypical

6    antipsychotics should undergo fasting blood glucose

7    testing at the beginning of treatment and periodically

8    during treatment"?

9    A    Yes.

10   Q    Correct?

11   A    That's what it says, yes.

12   Q    Do you agree with that language?

13   A    Yes.

14         MR. TRAMMELL:  Object, Your Honor.  It's

15   foundation to the extent she's being offered -- to the

16   extent that was a medical opinion.

17         THE COURT:  Sustained.

18   BY MR. BROCK:

19   Q   Let me ask you just in overall terms:  Based on your

20   review of the data, do you think that this is an

21   appropriate label in January of 2004 based on the data

22   set?

23         MR. TRAMMELL:  I renew my objection to

24   foundation, Your Honor.  Again, she's being asked to give

25   a conclusion from the FDA's perspective about whether a

1    label was appropriate or not and whether AstraZeneca

2    followed the law in submitting this label and distributing

3    it to doctors.  It's the ultimate question in this case.

4    I think it's an improper subject of expert testimony,

5    particularly for Dr. Rarick.

6              THE COURT:  Overruled.

7              THE WITNESS:  Can you ask that question again?

8    BY MR. BROCK:

9    Q    Yes.  Based on your review of the AstraZeneca

10   information as well as the materials in the FDA file, was

11   the label that we have been discussing -- it was published

12   in January 2004 -- an appropriate label, in your opinion?

13             MR. TRAMMELL:  Just renew my objection.

14             THE WITNESS:  Objection sustained.

15   BY MR. BROCK:

16   Q    Was the 2004 label an appropriate label?

17   A    Yes.

18   Q    And can you tell the members of the jury why you feel

19   that way?

20   A    By looking at the AstraZeneca submission of

21   information regarding this topic as well as the FDA's

22   review of the information regarding this topic, and the

23   FDA's then letters and requests and correspondence, as

24   well as the FDA's approval of this language, and based on

25   my understanding of the information, I agree that this was

1   a reasonable label.

2   Q    Now, we talked some about the letters that were sent

3   to the prescribing community.  We'll hand to you now

4   Exhibits 302 and 304.

5        And Dr. Rarick, in the interest of time, if you would

6   just describe for the members of the jury collectively

7   what those letters represent.

8   A    These are the "Dear Healthcare Provider" letters that

9   went out regarding this new warning on hyperglycemia and

10  diabetes first in January of 2004.

11       And again, as I mentioned, a phrase from that warning

12  was left out of the first one.  I think it was "and

13  periodically during therapy" in terms of assessing blood

14  glucose, and so they sent out the letter again in April of

15  2004.

16  Q    By exhibit number, is 302 the January 30th, 2004

17  letter?

18  A    Yes.

19            MR. BROCK:  We offer 302.

20            MR. TRAMMELL:  No objection.

21            THE COURT:  302 will be received.

22  BY MR. BROCK:

23  Q    Is 304 the April 22nd, 2004 "Dear Healthcare

24  Provider" letter?

25  A    Yes, it is.

```
 1              THE COURT:  Are you moving 304 in?

 2              MR. BROCK:  Please.  Yes, ma'am.

 3              MR. TRAMMELL:  No objection, Your Honor.

 4              MR. BROCK:  Offer 304.

 5              THE COURT:  304 will be received.

 6              MR. BROCK:  Thank you.

 7  BY MR. BROCK:

 8  Q    We're going to bring you now Exhibit 500.

 9       Is Exhibit 500 the consensus development conference

10  on atypical antipsychotics drugs and obesity and diabetes?

11  A    Yes.  This is a report about the consensus

12  development conference on antipsychotic drugs and obesity

13  and diabetes.

14  Q    And what is a consensus development conference?

15  A    This is a conference where they list the

16  organizations involved in this consensus, the American

17  Diabetes Association, the American Psychiatric

18  Association, the American Association of Clinical

19  Endocrinologists, and the North American Association for

20  the Study of Obesity.  This goes on to describe that there

21  was a conference and this is the -- essentially summary of

22  that conference.

23  Q    You remember we looked at the slides of Dr. Racoosin?

24  A    Yes.

25  Q    Did Dr. Racoosin present at this conference?
```

1    A    This is exactly the conference she refers to as where

2    these slides came from in her presentation of FDA's

3    perspective to this conference.

4    Q    Now, I'll ask you to look at your monitor, RD.74.  Do

5    you see that that bears a date of February 2004?

6    A    Yes.

7    Q    And it shows the American Diabetes Association, the

8    American Psychiatric Association and the American

9    Association of Clinical Endocrinologists and North

10   American Association for the Study of Obesity?

11   A    Yes.  This was published in February of 2004.  The

12   meeting was in November of 2003.

13   Q    And do you see Table 2 that we've pulled out, SGAs.

14   Is that "second-generation antipsychotics"?

15   A    Probably "second-generation atypicals."

16   Q    "Atypicals"?

17   A    Uh-huh.

18   Q    Thank you.

19   A    You're right.  I'm sorry.  It makes it "atypicals."

20   So second-generation antipsychotics, you're correct.

21   Q    And metabolic abnormalities?

22   A    Yes.

23   Q    All righty.  And do you see that there is a column

24   there for risk of diabetes?  Do you see that?

25   A    Yes.

1   Q    And do you see that for quetiapine there is the

2   letter "D"?

3   A    Correct.

4   Q    And if you come down on the box it says, "D equals

5   discrepant results."

6   A    Correct.

7   Q    What does that -- what does that mean?

8   A    That means in this table and in their findings from

9   this conference that looking at the information for

10  quetiapine, you could find some information that would say

11  there is possibly a higher risk and then some information

12  that would say there's a lower risk.  So it's discrepant.

13  Q    Now, did the FDA put in a reply to the consensus

14  development conference paper?

15  A    Yes.  The FDA reviewers submitted a letter to the

16  editor to describe some of the findings from the consensus

17  development that they agreed with and that they disagreed

18  with.

19  Q    I'm going to show you now Exhibit No. 72.  And if you

20  look at your screen RD.75, you see I've pulled out some

21  language there?

22  A    Yes, you have.

23  Q    First of all, tell the members of the jury who is

24  replying from the FDA.

25  A    This is the clinical group from the division of

1   neuropharmacological drug products, so it would be Gerry

2   Boehm, who's name we've seen before in reviewing this

3   topic, Judith Racoosin, the safety team leader from that

4   division looking at this topic, Thomas Laughren, the man

5   we described before as a supervisory medical officer, and

6   Dr. Russell Katz, who now is the division director for

7   that division.

8   Q    And does this express that, "We must point out that

9   the clinical trial data have not provided strong evidence

10   of a diabetes risk for any of the SGAs"?

11   A    Yes, that's exactly what they're stating here.

12   Q    When we talk about the clinical trial data, what does

13   that refer to?

14   A    They're saying that in all of their reviews of the

15   second-generation antipsychotics, they haven't seen in the

16   clinical trial data a clear evidence of diabetes risk in

17   their reviews.

18   Q    And then we have also set out below "DNDP."  Tell the

19   jury who that is.

20   A    That's again the division of neuropharmacologic drug

21   products.

22   Q    -- "is not aware of evidence proving that treatment

23   emergent diabetes risk for these drugs is wholly or in

24   part due to treatment emergent weight gain."

25   A    Yes, that's exactly what they're stating.  As when

1    you see the consensus development there's some confusion,

2    rather the weight gain can be correlated with a risk of

3    diabetes.  And they're pointing out that they're not aware

4    of the evidence proving that the treatment emergent

5    diabetes risk for these drugs is wholly or in part due to

6    treatment emergent weight gain.

7    Q    I want to show you now Exhibit No. 35.  I'll ask you,

8    first of all, to just describe this by topic.  The top

9    e-mail, the one from Tom Laughren to Crystal Rice, just to

10   and from, and then just a general statement of the

11   subject.  I'm going to ask you few questions about it.

12   A    Right.  This is from Dr. Laughren, the supervisory

13   medical officer, to Crystal Rice, who works in the Center

14   for Drug Evaluation and Research division that looks at --

15   does the office of the public affairs sort of activities,

16   so talking to the media.

17        The subject is -- she's responding to Crystal's

18   question about a media inquiry about drugs from Suzanne

19   Morphet, that's the media inquiry, and that she needs to

20   respond by a certain date.

21   Q    Okay.  Now, remind the jury, who is Tom Laughren as

22   of -- or what position does Tom Laughren hold as of

23   April 2007?

24   A    I am not sure if he's still a supervisory medical

25   officer.  I think he has now become the division director

1    for the new division of psychiatric drug products.

2    Q    And in April of 2007, does he say that, "We think the

3    warning was sufficient" --

4    A    Correct.

5    Q    -- "but it's important to note that we are

6    continuously evaluating emerging information on all of our

7    drugs, and if at some point we feel additional changes to

8    labeling are needed, then we will request them."

9    A    Exactly.  And the warning he's talking about is about

10   the increased risk of diabetes from January of 2004.

11   Q    And then does he convey in the last sentence, "We

12   continue to feel that the benefits of taking Seroquel

13   outweigh the risk, thus it remains on the market"?

14   A    Yes.  That is his last statement.

15   Q    And that's a true statement, Seroquel was still on

16   the market in April of 2007, wasn't it?

17   A    Correct.  It still is.

18   Q    It's still on the market today, isn't it?

19   A    Yes, sir.

20          MR. BROCK:  Your Honor, at this time, we would

21   offer Exhibit 1, Exhibit 302, 304, 500, 72 and 35.

22          THE COURT:  Exhibits 302 and 304 are already in

23   evidence.

24          MR. BROCK:  Okay.  62.

25          MR. TRAMMELL:  Your Honor, the only objection I

1    have, is this e-mail 35 or 325?

2              MR. BROCK:  35.

3              MR. TRAMMELL:  I have a hearsay objection to 35.

4              MR. BROCK:  Your Honor, this document falls into

5    the same category that I referenced earlier.  We obtained

6    this as a result of a freedom of information request from

7    the FDA.

8        We have an affidavit here, this one from Howard

9    Phillips, who confirms that's this is a true copy of an

10   official record of the United States Food and Drug

11   Administration and that it is a part of the official

12   records of the United States Food and Drug Administration.

13       So based on that, I think it is admissible.

14             MR. TRAMMELL:  I guess I'd like to see -- I

15   guess I'd like to see the affidavit.  Does it cover this

16   Bates range?

17             MR. BROCK:  Yes.

18             MR. TRAMMELL:  I think it's clear, Your Honor,

19   if you look at the document, it's a personal e-mail about

20   a media inquiry.  There's -- this is not an official FDA

21   review of the drug.  It's a personal commentary about the

22   risk and benefits of the drug outside the context of

23   official FDA's view.

24       I don't think it satisfies the public records

25   exception.  I think a business records exception is

1   overbroad as it applies to this.

2          THE COURT:  Well, I'm going to sustain the

3   objection as to the document itself.  You've read the

4   pertinent portions into the record --

5          MR. BROCK:  Okay.

6          THE COURT:  Maybe I should say the witness has

7   testified to the pertinent portions.  The rest of it is

8   hearsay.

9          MR. BROCK:  Okay.

10          THE COURT:  So Exhibit 1, 500, 72, and 62 will

11   be received.

12   BY MR. BROCK:

13   Q    Does the record that we just looked at, the e-mail,

14   help to inform your opinion about the FDA view of the

15   label in 2007?

16   A    Yes.

17          MR. BROCK:  Your Honor, based on that answer, we

18   would reoffer the exhibit as one in which the --

19   Dr. Rarick relies on for her opinions to understand the

20   FDA point of view about the label.

21          MR. TRAMMELL:  That doesn't make it admissible,

22   Your Honor.  I still maintain my hearsay objection.

23          THE COURT:  I'm going to sustain your objection.

24   BY MR. BROCK:

25   Q    Dr. Rarick, did AstraZeneca change its label through

1    the method of a CBE in June of 2007?

2    A    They submitted a CBE in 2007, yes.

3    Q    Let me reask the question because my terminology was

4    obviously not very precise.

5         What happened in June of 2007 as relates to the

6    AstraZeneca label for Seroquel?

7    A    AstraZeneca submitted a CBE, which is called a change

8    is being effected supplement, to add information to their

9    label which included glucose information.

10   Q    And we're going to hand you now Exhibit 85.  And

11   would you tell the jury what Exhibit 85 is.

12   A    This is what I was describing as the cover letter

13   from AstraZeneca to the Food and Drug Administration

14   division of psychiatry, they're called at this point, and

15   it provides for data to be included in the label on

16   information regarding Seroquel and hyperglycemia, and

17   essentially three paragraphs of information were being

18   added.

19   Q    Would you turn over to page 002 where it says,

20   "Changes to the labeling appear in the following

21   sections."

22   A    Yes.

23   Q    And do you see there's a statement there, warnings,

24   hyperglycemia and diabetes, a cross-reference to the

25   adverse reactions hyperglycemia subsection has been added?

1   A      Correct.

2   Q      And then there is also language in the adverse

3   reaction section with respect to laboratory changes.

4          Do you see that?

5   A      Correct.

6   Q      Now, if you will turn over to page 35, and you might

7   want to look at your monitor at RD.82.

8   A      Uh-huh.

9   Q      Do you see that there is a section there for

10  hyperglycemia?

11  A      Yes.  This is that subsection of the adverse reaction

12  section referred to in the warnings regarding

13  hyperglycemia.

14  Q      And could you just describe in a narrative way what

15  is being relayed here?

16  A      Here there are three paragraphs added for this

17  section.  The first is information from two long-term

18  placebo-controlled trials that included information on

19  glucose, and that is provided here at the data; then

20  there's, in the middle paragraph, a review of all

21  placebo-controlled clinical trials for Seroquel with

22  glucose information; and then the final paragraph is the

23  results of a glucose regulation trial, a 24-week trial of

24  Seroquel compared to some others, but the Seroquel

25  information is provided here.

1    Q    Now, you mentioned that this was done through a

2    methodology called CBE.

3    A    Yes.

4    Q    What is CBE in the world of label changes?

5    A    Labeling changes can be made one of two ways:  A

6    supplement, which is called a prior approval supplement or

7    a supplement called changes being effected.

8         Prior approval supplements indicate that the changes

9    aren't going to happen until there is agreement with the

10   FDA.  A changes being effected indicates that the company

11   plans to go ahead with those changes and they may or may

12   not eventually be approved by the FDA, but they can

13   implement those changes within 30 days -- or in 30 days.

14   Q    Is a CBE an appropriate vehicle for changing a label

15   to add the information in this hyperglycemia section that

16   we're looking at here?

17   A    Yes.  The CBE is the routine way of adding

18   information, especially about a warning or precaution or

19   adverse event that's already on the label and you're

20   simply supplementing the information that's there.

21   Q    Now, what is the status of this label?

22   A    This CBE was submitted -- I believe the company

23   implemented it, and approximately one year later received

24   a letter from the Food and Drug Administration that it was

25   something called approvable or complete response needed,

1   forget the name of this letter, but essentially comments

2   back from the FDA that they understood it had been

3   implemented but there were some changes that they wanted

4   to this information -- to this CBE.

5   Q    We're going to show you now Exhibit No. 89, I

6   believe.  And is this the FDA's reply to AstraZeneca's

7   CBE?

8   A    Yes.  This is a letter from the division director,

9   Tom Laughren of the division of psychiatry drugs, from

10  June of 2008, and it describes the changes that they want

11  to make.

12  Q    If you look at page 2, RD.85, do you see that we've

13  pulled out there the changes that the FDA is suggesting?

14  A    Yes.  They reiterate the paragraphs that have been

15  proposed as a CBE by AstraZeneca, and they show them the

16  changes that they're now proposing back.

17  Q    And there's language here, "The mean-change in

18  glucose from baseline was plus point -- plus 5.0 for

19  Seroquel and minus .05 for placebo.  Because of the

20  limitations in the study design for these long-term

21  trials, as well as lack of confirmed fasting glucose data,

22  the effects of Seroquel on blood glucose may be

23  underestimated."

24       Do you see that?

25  A    Yes.  This is language that the FDA is proposing to

```
 1    add to that first paragraph.

 2    Q     Now, did AstraZeneca reply to that?

 3    A     Yes, they have.

 4    Q     And I'm going to show you now Exhibit 90.

 5          Is that a letter dated September 18, 2008, from the

 6    FDA to AstraZeneca?

 7    A     Yes.

 8    Q     And if you look at RD.87, do you see references made?

 9    A     I'm sorry.  We said that wrong.  It's from

10    AstraZeneca to the FDA.  I'm sorry.

11    Q     All right.  Let me start over.

12          Is that a letter from AstraZeneca to the Food and

13    Drug Administration?

14    A     Yes, it is.

15    Q     You can actually see that on the pullout there that

16    we made for you, correct?

17    A     Yes.

18    Q     And it says, "AstraZeneca LP is submitting modified

19    text to provide additional clarity regarding the

20    hyperglycemia text."

21          Do you see that?

22    A     Yes.

23    Q     Now, if you look over at page 26, it would be RD.88

24    pullout, do you see number 4?

25    A     Yes.
```

1    Q    And is this AstraZeneca's specific response to the

2    FDA's suggested changes to the CBE label?

3    A    Yes.

4    Q    And does it say, "AstraZeneca believes it is

5    inaccurate to suggest that the fasting requirements and

6    study design would only lead to an underestimation of

7    potential effects of Seroquel on blood glucose levels.

8    Indeed, potential discrepancies in the glucose values

9    would be as likely in either arm, Seroquel or placebo, and

10   should not be used as an argument for inflation or

11   deflation of the effects displayed in the proposed

12   labeling.  Therefore, AstraZeneca proposes to delete the

13   last sentence"?

14        Did I read that right?

15   A    Yes, you did.

16   Q    So AstraZeneca is responding to the FDA and says that

17   "With regard to your suggested changes, we'd like to be

18   heard on that and here's our position"?

19   A    That's exactly what this says.

20   Q    By the way, in the time frame of January of 2008, did

21   the FDA write to AstraZeneca and ask for additional

22   analysis of the data?

23   A    Yes.

24   Q    I'm going to show you Exhibit 98 now.

25        Is this a letter to AstraZeneca from Tom Laughren at

1    the FDA?

2    A    Yes.  Again, the division director to AstraZeneca.

3    Q    He says, "We are requesting -- we are writing to

4    request analysis from your clinical development program."

5         Do you see that?

6    A    Yes.

7    Q    Look at RD.83, I think you'll see it blown up there.

8         Do you see it?

9    A    Yes.

10   Q    And that's January 8th of 2008?

11   A    Correct.

12   Q    And did AstraZeneca furnish the information that was

13   requested?

14   A    Yes.  I believe that was in a submission in June.

15   Q    I'll show you now Exhibit 99.

16        And do you see that's a June 26, 2008, letter from

17   AstraZeneca to the FDA where AstraZeneca says it is

18   pleased to provide our response to this request titled

19   "Changes in Metabolic Parameters of Body Weight, Lipids

20   and Glucose"?

21        Do you see that?

22   A    Correct.  In patients receiving quetiapine.

23   Q    And we're not attaching here to this letter the

24   response, but that's actually a big stack of tables,

25   correct?

1  A    Yes.  It's information as well as tables and

2  discussion.

3  Q    And how is it that the FDA can request from a sponsor

4  additional analyses of the data?

5  A    How is that done?

6  Q    Yes.

7  A    Again, by -- in this case, this is a good example of

8  a letter, a correspondence to the sponsor.  It's not that

9  they don't have this information in their files, but they

10 can oftentimes and will do ask for further analysis of the

11 data done by a sponsor which they then also recheck when

12 they receive these submissions.

13 Q    And did AstraZeneca reply in a fashion consistent

14 with the FDA requests for additional tables in 2008?

15 A    Yes.

16 Q    Now, I want to close out now the CBE issue, and I'll

17 put in front of you Exhibit 91.

18        MR. BROCK:  Your Honor, I need to mention one

19 issue to you here.

20     This document is dated January 7th --

21        THE COURT:  You don't have -- you have reserved

22 on Exhibit 91?

23        MR. BROCK:  Right.  I don't have an exhibit

24 there.  So this is an exhibit that was created after the

25 closeout for the filing of the exhibit list in Guinn and

 1    Haller in late 2008.  So this document didn't exist until

 2    the closeout of that.  Or if it did exist, I didn't have

 3    it or know about it.  I mean, let me put it this way.

 4            THE COURT:  When did you first give it to

 5    Mr. Trammell?

 6            MR. BROCK:  It was produced, I think, in March

 7    as part of an update to sort of the rolling productions

 8    that we do.

 9       I can conduct this exam without this exhibit, but it

10    would be helpful to be able to use it here.

11            THE COURT:  Mr. Trammell, do you have an

12    objection to 91?

13            MR. TRAMMELL:  Is he offering it?

14            MR. BROCK:  I will.

15            MR. TRAMMELL:  It just depends on what he's

16    going to use it for.  I almost certainly have a hearsay

17    objection, I think.

18            MR. BROCK:  I guess we have this issue, and that

19    is are they -- if they are contesting the authenticity of

20    the AstraZeneca documents, you know, we probably should

21    have a conversation about that.

22       This is a document that explains the label change,

23    and it's correspondence between AstraZeneca and the FDA

24    explaining what AstraZeneca does with the CBE language.

25            THE COURT:  I need to know the basis of his

1    objection first.

2              MR. TRAMMELL:  I'm trying to read the document

3    as fast as I can.

4              THE COURT:  Why don't we take a recess.

5         We'll be in recess until 3:25.

6                        (Recess)

7              MR. BROCK:  I have been appointed group

8    spokesman for those of us returning to raise the question

9    of how late you thought we might go today?

10             THE COURT:  Well, how late is it?  How long is

11   it going to take you to finish?

12             MR. BROCK:  I hope I'll finish in the next 15 to

13   20 minutes.

14             THE COURT:  All right.

15        Well, Mr. Trammell, how long do you think you'll

16   take?

17             MR. TRAMMELL:  It's difficult to say, Your

18   Honor.  I would hope to take no longer than an hour.

19             THE COURT:  All right.  Well --

20             MR. TRAMMELL:  That leaves potential --

21             THE COURT:  I'd like to finish by 6:00 if we

22   can.

23             MR. BROCK:  We can do that.

24             THE COURT:  It's hard to go much past that.

25

1    BY MR. BROCK:

2    Q    Dr. Rarick, has the AstraZeneca label for Seroquel

3    ever included language that Seroquel causes diabetes?

4    A    No.

5    Q    Do you know of examples with regard to drug product

6    labeling where the label reflects the medicine has been

7    shown to be causative with regard to adverse events?

8    A    Yes.

9    Q    Could you give the jury the benefit of a couple of

10   examples of that?

11   A    Well, you can look at drugs that cause birth defects,

12   and those labels will include that information such as

13   "Accutane causes birth defects" is the first line of an

14   Accutane label.

15        There's other products like thalidomide that have

16   causal language, as well as Finasteride which is used in

17   prostate management, and it has causal language in it.

18   Those are the ones I can think of off the top of my head.

19   I'm sure there's many more.

20   Q    I want to come back to Exhibit 91 now.  Do you have

21   that in front of you?

22   A    I do.

23             MR. BROCK:  I guess, do you have an objection to

24   91?

25             MR. TRAMMELL:  To the e-mail?

```
 1              MR. BROCK:  Correct.

 2              MR. TRAMMELL:  Not knowing for what purpose

 3    you're going to offer it, I have no objection.

 4         I'd like to reserve my right to raise it after he's

 5    done questioning the witness on it.

 6              THE COURT:  All right.

 7    BY MR. BROCK:

 8    Q    Dr. Rarick, can you describe what Exhibit 91 is and

 9    how it helps to inform you with regard to recent labeling

10    activity?

11    A    Certainly.  Exhibit 91 is an e-mail discussion or

12    communication between the FDA and AstraZeneca about a

13    couple of pending CBE changes for their label and

14    clarifications between the FDA and AstraZeneca about how

15    to proceed with the language in those CBEs.

16    Q    And is there interaction between the FDA and

17    AstraZeneca that's reflected in the e-mail change where

18    AstraZeneca is asking the FDA what it desired in terms of

19    the labeling?

20    A    Yes.  As we just previously described, there had been

21    a CBE from 2007 regarding glucose changes to be added to

22    the label.  And then there was a response from the FDA.

23    And then there was an AstraZeneca response from September

24    about, as we just described it, the language that where we

25    removed that last sentence as proposed by the FDA.
```

 1      And now in this e-mail communication they're

 2   discussing what is another CBE that was submitted with

 3   both adult and pediatric information.  And they're

 4   clarifying as to how to proceed with which version of the

 5   label, should they proceed in January of '09.

 6      And this discussion concludes that they should start

 7   with their September 2008 submission which is the label we

 8   discussed where that last sentence had been removed from

 9   the glucose changes to respond to the CBE response for all

10   of these pending submissions.

11   Q    If I could get you to do this in a narrative form is

12   probably the quickest way to do it, but if you see the

13   note that says, "Hi, Kathy," and it's to Kathy Bradley

14   from Kimberly Updegraff with the FDA, and she says, "Your

15   submissions should include the response from

16   September 2008, not the text from July of 2007."

17      So first of all, what's the text of July 2007?

18   A    This was a question that AstraZeneca was asking

19   should they work with the text they submitted with their

20   CBE from July of 2007 or with the response to the FDA's

21   comments that they submitted in September of 2008.

22   Q    Okay.  So we looked at the AstraZeneca response of

23   September of 2008, and the note number 4 where AstraZeneca

24   explained that it thought that there should be changes

25   made to the FDA suggested language?

1   A    Right.  And here's the FDA responding back to

2   AstraZeneca, "To continue or proceed with your pending

3   submission, your submission should include the response

4   from September 2008, not the earlier text."

5   Q    So there was that language from the FDA in 2008 --

6   A    Correct.

7   Q    -- that referred to underestimation of risk?

8   A    Correct.

9   Q    And AstraZeneca disagreed with that language, filed a

10  substantive response, and the FDA is now saying, "Go with

11  what you suggested in September of 2008"?

12  A    That's what this communication is about, yes.

13  Q    And did in fact AstraZeneca change its label in

14  January of 2009 to comply with the FDA suggestions about

15  label change?

16  A    I believe they did.  Do you have that exhibit?

17  Q    Yes.  It will be exhibit -- is it 92?  92.

18          MR. BROCK:  This is another one, Your Honor,

19  that this document was first, I think, implemented in late

20  January 2009, so this is another exhibit that was not

21  listed on our exhibit list.  It has been produced to the

22  plaintiffs.

23  BY MR. BROCK:

24  Q    Dr. Rarick, in the interest of time, could I get you

25  to describe for the members of the jury what changes were

1   made to the format of the label there in Exhibit 92?

2   A    This describes, "The prescribing information for

3   Seroquel has been revised as follows," and did you want me

4   to speak specifically to glucose?

5   Q    Yes.

6   A    The second one is, "FDA's directed the information

7   from the adverse reaction section of hyperlipidemia,

8   weight gain and hyperglycemia for adult and pediatrics has

9   been moved to the warnings and precautions section."

10  Q    If we look at RD.90, do you see that there on the

11  screen?

12  A    Yes.

13  Q    And AstraZeneca is conveying to the FDA that, "As

14  directed, the information from the adverse reaction

15  section on hyperlipidemia, weight gain and hyperglycemia

16  for adults and pediatrics has been moved to the warnings

17  and precaution section."

18       Do you see that?

19  A    Correct.

20  Q    All right.  And can you give the jury the benefit of

21  the background on how this came to be?

22  A    Certainly.  I'm just trying to make sure I know the

23  date.  AstraZeneca had submitted yet another change as

24  being affected supplement to include safety information

25  for adults and pediatrics.

1      The FDA responded to that CBE on December 18th, 2008,

2  and directed AstraZeneca to reformat certain sections of

3  that label, and they gave suggestions for some other

4  subsequent wording, and this again is then AstraZeneca's

5  response back.

6  Q    When you use the term "reformat," what are you

7  referring to?

8  A    There was reformatting.  They felt that all the

9  metabolic changes would now be placed together.  They had

10  done this for another label recently, and they directed

11  AstraZeneca to refer to another manufacturer's label for

12  specifics about how that reformatting should appear.

13      But they asked for the changes in metabolic

14  parameters, be that the lipids, the glucose and the weight

15  gain, to now all appear together.

16  Q    Do you have Exhibit 90 there?

17  A    Can you describe it?

18  Q    January 26, 2009, letter from the Food and Drug

19  Administration.  I think it was the one -- was that '92?

20  92.  It was 92, I'm sorry.  Exhibit 92.

21  A    Yes.

22  Q    AstraZeneca here is providing a response to the FDA,

23  correct?

24  A    Correct.

25  Q    Was AstraZeneca's response to the FDA appropriate

 1    given the communications between the FDA and AstraZeneca

 2    about the label?

 3            MR. TRAMMELL:  Objection, Your Honor.

 4    Foundation.  He's asking the witness to give an opinion as

 5    to whether AstraZeneca acted appropriately in the context

 6    of following the regulations and whether their actions

 7    satisfied the regulations that they were required to

 8    follow from the FDA's perspective.

 9        Again, this is the type of testimony that requires

10    legal conclusion, comment on the evidence, and a

11    combination of those two things that are inherently

12    prejudicial to plaintiff's case before the jury.

13            MR. BROCK:  I'm not asking for a --

14            THE COURT:  I'm going to sustain the objection

15    as to the question framed.

16    BY MR. BROCK:

17    Q    What's your opinion of the label that was implemented

18    in late January 2009 by AstraZeneca?

19    A    My opinion is that they did as directed by the FDA

20    and reformatted and referred to other labels to

21    incorporate the information that the FDA had asked them to

22    incorporate.

23    Q    Thank you.

24        Now, I want to turn your attention to a graphic on

25    the screen, Dr. Rarick.

1          MR. BROCK:  And, Your Honor, this is

2    demonstrative 138, or Guinn Exhibit 1638.

3    BY MR. BROCK:

4    Q    Do you have that in front of you now?

5    A    I do.

6    Q    Is this a demonstrative that would be useful and

7    helpful to you in describing for the jury the labeling

8    history of Seroquel since its approval in September of

9    1997?

10   A    This is helpful for the labeling regarding new

11   indications as they were approved for Seroquel.

12   Q    So if we look at September of 1997 on this chart, we

13   see that it was originally approved for manifestations of

14   psychotic disorders, correct?

15   A    Correct.

16   Q    And we have talked in detail about that label,

17   correct?

18   A    Yes.

19   Q    And then in March of 2001, there was an indication

20   statement change, and the indication from March of 2001

21   included treatment for schizophrenia?

22   A    Correct.  The indication statement changed from

23   manifestations of psychotic disorders to the management of

24   schizophrenia.

25   Q    And as we discussed in March of 2001, the FDA didn't

1    impose a label change to include any information in the

2    warnings or precautions section about diabetes or

3    hyperglycemia?

4    A    Correct.

5    Q    Now, in the life cycle of a medicine, do companies

6    sometimes continue to conduct clinical trials and seek

7    additional indications for medicines?

8    A    Yes.  There's additional trials for new indications,

9    and then there are additional formulations sometimes made

10   of a product to make compliance easier.

11   Q    And is that referred to as a supplemental NDA?

12   A    Yes.  For the original formulation, they're called

13   supplemental new drug applications.  If an entirely new

14   formulation is reviewed and approved, it's a new, new drug

15   application number.

16   Q    So for the approval of bipolar mania in January of

17   2004, is that the same formulation that was originally

18   approved in September of 1997?

19   A    Correct.

20   Q    When the FDA reviews a supplemental new drug

21   application as was done for bipolar mania in January of

22   2004, do they look at the safety data with regard to the

23   medicine to that point of time?

24   A    Definitely.

25   Q    Do they make findings about whether or not the

1    medicine is safe and effective in that indication?

2    A    Correct.  Reviews are done again by that team of

3    reviewers, including a medical officer and his or her team

4    leader and division director to assess both efficacy and

5    safety.  And new labeling is approved at the time of the

6    approval which states that it's safe and effective as

7    labeled.

8    Q    So in January of 2004 when the medicine was approved

9    for bipolar mania, would the FDA have reviewed the files

10   and concluded that the medicine was safe and effective?

11   A    Correct.

12   Q    All right.  Now, we see a new indication again in

13   October of 2006 for bipolar depression.

14        Do you see that?

15   A    Yes.

16   Q    Would the FDA go through that process again of

17   determining that the medicine was safe and effective?

18   A    Correct.  And revising the label appropriately.

19   Q    Did your review of materials reflect that the FDA did

20   in fact engage in that effort?

21   A    Yes.

22   Q    Now, in May of 2007, we have here "XR acute

23   schizophrenia" --

24   A    Yes.

25   Q    -- you see that?

1    A    Yes.

2    Q    Does "XR" refer to a different formulation than the

3    one that was approved in September of 1997?

4    A    Exactly.  It's an extended release form.

5    Q    And what process does a medicine have to go through

6    for approval if it's a new formulation that's different

7    than what it does if it's just being proposed for a new

8    indication?

9    A    It would be considered its own new drug application

10   with references to the information known about the other

11   formulation.  But in this case, again, the entire team

12   would look at again in its extended release form, the

13   chemist, the pharmacologist, the clinical folks to do that

14   both safety and effectiveness review.

15   Q    All right.  And then in November of 2007, the XR

16   medicine was approved for schizophrenia maintenance.

17        Do you see that?

18   A    Correct.

19   Q    Would the FDA have reviewed the data and concluded

20   that the medicine was safe and effective in November of

21   2007 prior to approving the medicine for schizophrenia

22   maintenance?

23   A    Correct.  And updated the label accordingly.

24   Q    In May of 2008, was the medicine approved for bipolar

25   maintenance?

1   A    Yes.  This was the immediate release formulation was

2   again approved for another indication, bipolar

3   maintenance.

4   Q    And would the FDA have concluded that the medicine

5   was safe and effective used in accordance with the label

6   in May of 2008?

7   A    Correct.

8   Q    And then in October of 2008, we list "XR, bipolar

9   mania, depression and maintenance."

10       Do you see that?

11  A    Yes.

12  Q    And describe what process the medicine would go

13  through for approval in October of 2008.

14  A    Yes.  And I think we mean to say bipolar mania and

15  bipolar depression and bipolar maintenance.  But again,

16  the information would have been provided by AstraZeneca

17  with integrated safety summaries, integrated effectiveness

18  summaries.  The FDA would have reviewed that and

19  determined that they would approve it as safe and

20  effective with appropriate label -- labeling revised

21  accordingly.

22  Q    Now, the story for Seroquel is still being written in

23  the sense of there being at the present time pending

24  applications for even more indications, correct?

25  A    Correct.

1    Q    Would you describe for the members of the jury what

2    applications are presently pending.

3    A    Well, in terms of new indications, there are

4    supplemental new drug applications pending for both

5    formulations, I believe, for major depressive disorder and

6    general anxiety disorder.

7        And then we have discussed here today some CBE

8    changes, and I believe those remain pending in terms of

9    final decisions by FDA for some of the adult and pediatric

10   information and glucose information that's been proposed.

11       And there's also a supplement in, that is a response

12   to pediatric request information and clinical studies in

13   pediatrics that's pending with the FDA.

14   Q    Since the medicine is still on the market, it's still

15   being used to help a lot of folks, is it correct that data

16   will continue to be accumulating -- accumulated over the

17   coming months and potentially years?

18   A    Yes.

19   Q    And there will be some action taken by the FDA on the

20   applications for major depressive disorder, for general

21   anxiety disorder, as well as the applications that are

22   made for pediatric indications?

23   A    Correct.

24   Q    And the FDA has received information from AstraZeneca

25   on those issues but has not yet issued its final

1    determination?

2    A    Correct.

3    Q    Dr. Rarick, in your review of the materials that were

4    furnished to you, did you find frequent and thorough

5    reviews by the FDA of glucose and weight issues?

6            MR. TRAMMELL:  Objection.  Vague.

7            THE COURT:  Overruled.

8            THE WITNESS:  Yes.  And I should clarify it's

9    not just the materials furnished to me, but also my review

10   of the CDER website and things like that.

11       But, yes, I think there is substantial information

12   regarding glucose and weight issues and the atypical

13   antipsychotics, including Seroquel and especially

14   Seroquel.

15   BY MR. BROCK:

16   Q    Right.  Would you just describe in summary form your

17   point of view in terms of the thoroughness with which the

18   FDA reviewed these issues over time, speaking specifically

19   to some of the important events along the way that you

20   noted?

21   A    Yes, sure.

22       My impression was that the team of psychiatry

23   reviewers and others at the division of neuropharm drugs,

24   before it was even approved, were well aware of issues for

25   the atypical antipsychotics including multiple types of

172

1    side effects, including a question of an increased risk of

2    hyperglycemia for drugs that they had approved in the

3    past.

4        My impression is that they had periodic adverse event

5    report summaries provided to them as well as summaries of

6    the published literature.  They certainly had ongoing and

7    completed clinical studies provided to them on Seroquel

8    and Seroquel XR.  We just described all the various

9    indications.  And at each approval, the glucose and weight

10   information was added to their reviews as well as the

11   labeling.

12       And I would -- you can see that they presented the

13   issue at a consensus conference with their perspectives,

14   and I think that discloses again a very careful and

15   comprehensive look at this situation.

16   Q    What is your opinion about the labeling of the

17   product as relates to glucose issues from 1997 to present?

18           MR. TRAMMELL:  Objection.  Vague.

19           THE COURT:  Sustained.

20   BY MR. BROCK:

21   Q    Have you looked at the issue of the adequacy of the

22   label from the time of initial approval to the present

23   time?

24   A    Yes, I have.

25   Q    Do you have an opinion as to whether the labeling for

1    Seroquel was appropriate for the period of time 1997 to

2    present?

3            MR. TRAMMELL:  Objection, Your Honor.  It's the

4    same objection I made over and over again today, as the

5    foundation that be the final judge on whether or not

6    Seroquel's labeling was appropriate for the entire time it

7    was marketed.  Certainly this is invading not only the

8    province of the Court but the province of the jury.

9        She should be able to comment on what the regulations

10   were and what AstraZeneca did, but deciding whether

11   AstraZeneca did what was appropriate is going too far.

12           THE COURT:  Sustain the objection.

13       You can ask her whether she has an opinion as to

14   whether they -- the labeling was consistent with what the

15   FDA was asking for, but to say that it's appropriate in

16   that regard is invading the province of the jury.

17   BY MR. BROCK:

18   Q    Dr. Rarick, you're familiar with the data set that

19   was presented to the FDA?

20   A    Yes.

21   Q    You're familiar with information that the FDA

22   considered?

23   A    Yes.

24   Q    Based on your review of those materials, what's your

25   opinion of the label from the period of time 1997 to the

1    present?

2    A    I believe the labeling presented the information

3    consistent with the regulations and consistent with the

4    data.

5    Q    Can you provide the jury with a summary of the basis

6    for your opinion?

7    A    The basis for my opinion would be that I understand

8    the regulations, that I understand the review of drugs,

9    and I understand the complex environment in which

10   hyperglycemia- and diabetes-related events balance with

11   the indication in this particular case.

12            MR. BROCK:  Thank you very much.  Answer their

13   questions, please.

14       Your Honor, I'd like just for housekeeping, before he

15   starts, to offer 85, 89, 90, 98, 99, 91 and 92.

16            THE COURT:  Are there any objections to those

17   exhibits?

18       91 and 92 are the only ones that you do not have --

19   well, other than 91, 92, you have not objected to any of

20   the exhibits.

21            MR. TRAMMELL:  I maintain my hearsay objection

22   to 91.  And I don't have an objection to 92.

23            THE COURT:  The objection is overruled.  85, 89,

24   90, 98, 99, 91, 92 will be received.

25            MR. TRAMMELL:  Permission to approach?

1          THE COURT:  Yes.

2          MR. TRAMMELL:  Your Honor, Mr. Cowan will be

3   working the ELMO.

4          THE COURT:  Okay.

5          MR. TRAMMELL:  We have the ELMO turned on or...

6                    CROSS-EXAMINATION

7   BY MR. TRAMMELL:

8   Q     Good afternoon, Dr. Rarick.

9   A     Good afternoon.

10  Q     You've issued an opinion in this case on behalf of

11  AstraZeneca, the defendant; is that correct?

12  A     I'm sorry.  I didn't hear that big question.

13  Q     You have issued a report, an opinion in this case on

14  behalf of AstraZeneca which is the defendant; is that

15  correct?

16  A     Correct.

17  Q     You're here on their behalf speaking for them,

18  correct?

19  A     I don't know that I can speak for them, but I am a

20  regulatory expert that's been hired to look at the case

21  and provide testimony here.

22  Q     Let's talk about who you don't speak for.  You don't

23  speak for the FDA here, do you?

24  A     I'm not employed by the FDA, no, sir.

25  Q     You're not representing them in this proceeding, are

1    you?

2    A    No, I'm not.

3    Q    They don't know you're here; is that right?

4    A    The FDA, probably not.  No.

5    Q    And nobody from the FDA asked you to come to this

6    courtroom and testify on AstraZeneca's behalf, did they?

7    A    No, they did not.

8    Q    Okay.  Have you spoken with anybody at the FDA,

9    either anybody you used to work for or anybody involved in

10   the regulation of AstraZeneca, the kinds of people that we

11   talked about in the documents today?  Have you spoken to

12   them about your testimony here today?

13   A    No.

14   Q    Have you asked them about the conclusions that you've

15   reached in this litigation and tried to interact with them

16   to verify those conclusions?

17   A    No.

18   Q    Have you gone to the FDA offices to look at their

19   files and attempt to determine whether the conclusions

20   that you've rendered were accurate?

21   A    No.

22   Q    Have you communicated with anybody in the FDA who is

23   involved in the regulation of antipsychotic drugs like

24   Seroquel?

25   A    Ever in my life or since I've left the FDA?  Or --

1    Q    No.  As it relates to your opinions here today.

2    A    No.

3    Q    Is it true that in order for the FDA to adequately do

4    its job, that the drug companies that it regulates have to

5    communicate truthfully with it?

6    A    Yes.

7    Q    And what happens if they don't do that?

8    A    That doesn't allow for an adequate review or a good

9    presentation of risk benefit information.

10   Q    Right.  If a drug company isn't honest with the FDA

11   about its experiences in testing its drugs, it's possible

12   that the information that's given to prescribers when they

13   treat patients won't be fair and balanced; isn't that

14   right?

15   A    Correct.

16   Q    Now, we talked earlier today, you spoke with

17   Mr. Brock about your career at the FDA and then what you

18   did when you resigned.  Do you recall that?

19   A    Yes.

20   Q    And what did you do right when you left FDA?

21   A    I left the FDA in July and I believe I -- the next

22   two months I wasn't employed at all.

23   Q    What were you doing?

24   A    I was traveling.  I spent some time in New Hampshire,

25   that's what I recall doing.

1    Q    Okay.  And then what did you do after that?

2    A    I started to receive calls from drug companies,

3    medium and large, as well as some nonprofit organizations,

4    regarding questions about regulatory matters, and I

5    started accepting those calls and having those discussions

6    and becoming a consultant.

7    Q    And at some point, you started the Rarick Consulting

8    Group, right?

9    A    I believe the title is RAR Consulting, yes, sir.

10   Q    What's "RAR" stand for?

11   A    "Reproductive and regulatory."

12   Q    It's your consulting group, right?

13   A    Yes.

14   Q    You own it?

15   A    Yes.

16   Q    Can you -- where's the international headquarters of

17   RAR Consulting Group?

18   A    It's not an international corporation.  It's a

19   limited liability corporation licensed in Maryland.

20   Q    Where are the headquarters?

21   A    Gaithersburg, Maryland.

22   Q    And where specifically in Gaithersburg, Maryland?

23   A    My home.

24   Q    Okay.  Your office is in your house, right?

25   A    Correct.

1    Q    That's where you run the company from?

2    A    Correct.

3    Q    Can you give me in alphabetical order a listing of

4    the names of employees of RAR Consulting?

5    A    It's just me.

6    Q    Okay.  So there's one employee, you run the company

7    out of your house?

8    A    Correct.

9    Q    It's always been that way, right?

10   A    Correct.

11   Q    And when did you start the company?

12   A    I don't know when I filed for that cer -- whatever

13   they call that certificate or license, probably a year, a

14   year and a half after I left the FDA.

15   Q    Okay.  And who have you done consulting work for?

16   A    I consult, as I mentioned, to -- generally to

17   pharmaceutical companies, and also to some nonprofit

18   organizations as -- also women's health advocacy groups.

19   Q    Okay.  What percentage of your time -- I think you

20   testified you have half of your time devoted to being an

21   expert witness like you are here today and testifying

22   before courts or giving depositions or preparing opinions,

23   and half of your time is devoted to something else, right?

24   A    Right.  Half of my time would be in looking at

25   materials, preparation and litigation issues, and then

```
 1   like, as you said, about half of my time in the other type

 2   of consulting which is general regulatory-type consulting

 3   with the kinds of groups I described.

 4   Q    Who do you do that for?

 5   A    That's who I described.  Drug companies,

 6   not-for-profit organizations, and some women's health

 7   advocacy groups.

 8   Q    What are the names of the drug companies you consult

 9   for outside the context of testifying as a witness?

10   A    In general, I have confidentiality agreements with my

11   clients except for those that have asked me to be, for

12   example, on a scientific advisory board and they might

13   post my name.  Otherwise, I understand the clause of my

14   contracts to say that I'm not to disclose my relationship

15   with them, and vice versa, they're not to disclose their

16   relationship with me.

17   Q    You can't tell us the names of companies you consult

18   for other than the companies you give trial testimony for?

19   A    Correct.  Other than those that have listed me as a

20   scientific advisory board that they may have made public.

21   Q    Aside from your confidential consulting for drug

22   companies, what else do you do other than testify?

23   A    You mean in the nonprofit organizations, the women's

24   health advocacy groups?  Again, I'm providing regulatory

25   input.  I also am on a technical advisory board to an NIH
```

1    committee, and I spend time talking with them.  And I --

2    in the women's health advocacy community, it's generally

3    about assisting them in citizens' petitions impacting

4    class labeling guidances, things like that.

5    Q    You left the FDA in 2002?

6    A    July of 2003.

7    Q    Since July of 2003, which pharmaceutical companies

8    have retained you as either a consulting or testifying

9    expert?

10   A    As I mentioned, the consulting contracts I believe

11   have clauses that would not allow me to describe those

12   relationships, but in litigation that is public, I have

13   worked as a regulatory expert reviewing cases for Merck,

14   for Wyeth, for Hoffmann-LaRoche, for GlaxoSmithKline, for

15   AstraZeneca.  I dealt with an investigator versus

16   Schering -- Schering-Plough.  And that's who I can recall

17   at the moment.  If you have my list, I can make sure I was

18   inclusive.

19   Q    And these companies hire you because they're involved

20   in litigation and want to utilize you as a witness on

21   whether or not they complied with FDA regulations, right?

22   A    Well, when I am first hired by such groups, I don't

23   know if they're planning to use me as an expert witness.

24   My original discussions are about the case that they're

25   considering.  I look at their regulatory history and

182

1   interactions and provide my opinions.  Sometimes that then

2   leads to an expert report.  Sometimes that leads to

3   testimony, deposition or a trial.

4   Q    You've never been a witness for somebody who claims

5   they were injured by a drug, have you?

6   A    I have not.

7   Q    You've only represented the people -- you've only

8   represented the drug companies that are defendants in

9   cases, right?

10  A    Right.  My expertise is in the regulatory arena.

11         MR. TRAMMELL:  Well, I'll object as

12  nonresponsive.

13  BY MR. TRAMMELL:

14  Q    You've only represented defendants in drug cases,

15  you've never represented plaintiffs or testified for

16  plaintiffs in drug cases, right?

17  A    That's correct.

18  Q    Okay.  And what do the drug companies pay you to be

19  their witness?

20  A    My standard hourly rate is $500 an hour, although you

21  may find testimony from early years where I think I

22  charged $400 an hour for a particular case.

23  Q    So it started at $400 an hour, now it's $500, right?

24  A    Correct.

25  Q    And how many hours a year do you work?

1    A    I probably work on average somewhere between -- let

2    me see if I can get this right -- in total?  You're

3    talking about consulting and litigation?

4    Q    Yes, ma'am.

5    A    In total, it would be somewhere between 500 and 600

6    hours a year.

7    Q    What do you do the rest of your time?

8    A    The rest of my nonwork time?

9    Q    Yes, ma'am.

10   A    Well, I have some medical issues I'm dealing with.  I

11   have my children, my marriage.  I have an ailing mother.

12   I have family.  I don't know what you mean.  I exercise.

13   I cook.  I eat.  I sleep.

14   Q    You have no other jobs?

15   A    Oh, yeah.  No.  I don't have other employment.

16   Q    Okay.  And you left FDA before you started a

17   consulting company; is that right?

18   A    Yes.

19   Q    And how many hours a year would you work there?

20   A    I worked full-time, and I don't know how that works

21   out in terms of their leave, but it's a 40-hour workweek.

22   Q    What kind of money do you make now per year being a

23   witness for drug companies?

24   A    A witness for drug companies is about, as I

25   mentioned, about half of my employment which works out to

184

```
1    about 125- to 150,000 a year.

2    Q    What was your salary when you were at FDA working

3    full-time?

4              MR. BROCK:  I'm going to object to that on

5    relevance, her compensation.  That is not relevant to the

6    litigation.

7              THE COURT:  Well, sustained.  Rephrase the

8    question.

9    BY MR. TRAMMELL:

10   Q    Do you recall what you made -- do you recall whether

11   you make more now as a consultant and witness for drug

12   companies than you made at the FDA?

13             MR. BROCK:  Same objection, what she made with

14   the FDA is not --

15             THE COURT:  Overruled.

16             MR. BROCK:  That's just back -- going to the

17   same issue.

18             THE WITNESS:  Was that overruled, ma'am?

19             THE COURT:  Yes, ma'am.

20             THE WITNESS:  Thank you.  I make more per hour

21   now than I made at the FDA.

22   BY MR. TRAMMELL:

23   Q    You make more annually, right?

24   A    Correct.

25   Q    Okay.  I think you testified and told Mr. Brock that
```

1    you've spent 280 hours working for AstraZeneca in this

2    case; is that right?

3    A    Correct.

4    Q    And my math has that at $140,000 --

5    A    Correct.

6    Q    -- is that about right?

7    A    Yes.

8    Q    Over what period of time is that?

9    A    That's over -- let me think.  It's now July, about 18

10   or 19 months.

11   Q    Okay.  And how many times have you -- of those 280

12   hours, how much of that has been testifying in court?

13   A    This is my first experience of testifying in court in

14   this case.

15   Q    So one day of testifying in court out of those 280

16   hours?

17   A    Correct.

18   Q    And how many days have you been deposed?

19   A    One day.

20   Q    Okay.  So one day of deposition, one day of

21   testifying in court, and the rest of it is something else,

22   right?

23   A    Correct.

24   Q    And by the way, is this your first time to testify in

25   the last couple of weeks?

1    A    In court?

2    Q    In any forum.

3    A    Well, are you considering depositions as testimony?

4    Q    I am.

5    A    No.  I was deposed on Friday of last week in this

6    case.  And I had another deposition last week also.

7    Q    In what case?

8    A    That was in a Texas versus Merck Vioxx case.

9    Q    And you represented Merck?

10   A    I was there testifying as a regulatory expert for

11   Merck.

12   Q    So in the course of the past eight days, how many

13   hours would you say you have worked for drug companies?

14   A    I haven't looked at that, but probably somewhere in

15   the range of 40 to 60 hours.

16   Q    So just in a little over a week, you made around

17   $3,000?

18   A    Probably.

19   Q    Have you ever given an opinion in a case that a drug

20   company didn't follow FDA regulations?

21   A    Yes.  I can always find in cases situations where

22   other regulations weren't met to the complete 100 percent,

23   I guess would be the right word.

24   Q    Do you say you find that in every case?

25   A    Generally, because you can find in any case that I

1    look at there may be a letter, a violation from DDMAC, the

2    drug -- the division for drug marketing advertising and

3    communication.  You may be able to find audits of

4    investigators that show actions indicated -- indicating

5    that the regulations weren't met.  You may be able to find

6    something called a Form 483 which is about actual

7    manufacturing site potential violations.  So I haven't

8    seen a perfect company yet.

9    Q    That includes AstraZeneca, right?

10   A    Correct.  I found things that would -- that would

11   confirm that they also weren't perfect.

12   Q    Have you ever -- have you prepared a publicly

13   available report that is critical of drug companies?

14   A    Publicly available, critical of drug companies, no.

15   Q    Okay.  Have you ever written an article in any

16   medical journal, period?

17   A    Period?  In any topic?

18   Q    Uh-huh.

19   A    I'm not sure if you have my CV there, but I list my

20   publishing activities including articles that I wrote.

21   Q    Are any of those articles critical of drug companies?

22   A    No.

23   Q    Have you published or sought to publish your findings

24   in this case?

25   A    No.

1    Q     Why not?

2    A     I don't know the rules and regulations around

3    publishing my type of expert report, and I haven't felt

4    the need to publish my opinions and report on this topic.

5    Q     What was the highest salary you earned at the FDA?

6          MR. BROCK:  Renew my objection on compensation

7    at the FDA on relevance.

8          THE COURT:  Overruled.

9          THE WITNESS:  If I recall correctly, I believe

10   my highest yearly salary from the FDA was $172,000 a year.

11   BY MR. TRAMMELL:

12   Q     What was it when you started?

13   A     It was lower than that.  I don't remember it exactly,

14   probably somewhere in the range of 130- to 140,000 a year.

15   Q     Okay.  So just working for AstraZeneca in the last 18

16   months, you've made more -- 280 hours you've made more

17   than you did as a full-time employee your first year at

18   the FDA, right?

19   A     Right.  In the last 18 months, correct.

20   Q     Where did you work when you were at FDA?  What was

21   the division?

22   A     Well, first I worked as a visiting science in

23   epidemiology and surveillance, but my first formal

24   position was in the division of metabolic and endocrine

25   drug products.

1  Q    Were you within the Center for Drug Evaluation and

2  Research?

3  A    Correct.  Yes.

4  Q    I want to talk about your testimony on behalf of

5  other drug companies.

6       You testified for Merck in the Vioxx litigation,

7  right?

8  A    I have.

9  Q    And did you give the opinion in that case that

10 Merck's actions were consistent with federal regulations?

11 A    Well, I think I can give a similar answer to what I

12 said about AstraZeneca, which is that I can't find a

13 perfect company either when I worked at FDA or since I've

14 left them.  But I think if you're asking me, in general,

15 did they meet the regulations as I was looking at the

16 specifics of the evidence in that case or the questions

17 that I was answering, then, yes.

18 Q    Okay.  Was that before or after Vioxx was withdrawn

19 from the market?

20          MR. BROCK:  Your Honor, I'm going to object to

21 that on relevance.  If we start going down the details of

22 individual situations, I just think that's going to be

23 distracting, it's going to lengthen the proceeding, so

24 object on relevance.  Also object on the idea that it's

25 just unduly prejudicial.

1          MR. TRAMMELL:  It's certainly important for the

2    jury to understand the nature of all of her opinions and

3    how consistent they are, the fact that she gives a

4    pro-drug company opinion no matter what the circumstances

5    are.  They need to understand the Doctor's bias in

6    appreciating the opinions that she's given about how

7    closely AstraZeneca adhered to the federal regulations.

8          THE COURT:  Well, do you have some evidence that

9    there was some relationship between the withdrawal of

10   Vioxx from the market and her comments on the FDA?

11         MR. TRAMMELL:  No.  But what I asked her is if

12   she gave that opinion before or after the drug was

13   withdrawn.

14         THE COURT:  Okay.  I'm going to sustain the

15   objection.

16   BY MR. TRAMMELL:

17   Q    You gave an opinion -- you gave an opinion in a case

18   brought by someone who took Vioxx, against Merck, right?

19   A    I provided an opinion regarding Vioxx.  I'm not sure

20   what you mean by "someone."

21   Q    Well, a person -- in fact, a person in New Jersey

22   named McDarby brought a lawsuit against Merck related to

23   his ingestion of Vioxx, right?

24   A    There was a case entitled McDarby.

25   Q    Were you hired by Merck to be a testifying witness in

```
 1   that case?

 2   A    I testified in that case.  I don't know if it was

 3   only once.  McDarby maybe twice -- I think I had a

 4   deposition and testimony.

 5   Q    But you testified in that case, right?

 6   A    Yes.

 7   Q    On Merck's behalf?

 8   A    I was a regulatory expert and I was hired by Merck.

 9   Q    Okay.  And Merck made Vioxx, and Vioxx was the

10   subject of that litigation, right?

11   A    Yes.

12   Q    Okay.  And Vioxx is no longer on the market, is it?

13   A    That is correct.

14   Q    Now, you're not a psychiatrist, are you?

15   A    I am not trained as a psychiatrist, no, sir.

16   Q    What sort of doctor are you?

17   A    I'm board certified in obstetrics and gynecology.

18   Q    And when was last time you saw a patient?

19   A    1996.

20   Q    Okay.  You're not an endocrinologist?

21   A    Well, many places would call an OB/GYN a

22   subspecialist of endocrinology, so just it depends what

23   you mean.  I'm not board certified in endocrinology,

24   that's correct.

25   Q    Right.  And you've never studied the association of
```

1    antipsychotic drugs with diabetes, have you?

2    A    Except for in my reviews for this case?

3    Q    Right.

4    A    Correct.

5    Q    Right.  And never published anything on that?

6    A    Correct.

7    Q    Have you ever initiated a prescription for an

8    antipsychotic?

9    A    Depends on what you want to term an antipsychotic.  I

10   think I discussed this on Friday with the deposition where

11   I have written prescriptions, for example, for lithium or

12   I have done physicians' orders in hospitalized obstetrical

13   patients for things like Thorazine or Haldol.  But again,

14   as I described then, my prescribing experience has always

15   been in conjunction with a psychiatrist.

16   Q    You never prescribed Seroquel?

17   A    No.

18   Q    Which is the subject of this litigation, right?

19   A    Correct.

20   Q    Have you ever prescribed Zyprexa?

21   A    No.

22   Q    Any other drugs in the atypical antipsychotic class?

23   A    No.

24   Q    Have you ever treated a patient that took Seroquel?

25   A    No.

1   Q    Now, getting to the regulations that pharmaceutical

2   companies have to follow to get FDA approval and maintain

3   it, who writes the initial draft of the labeling that

4   becomes the package insert?

5   A    The initial draft is proposed and submitted by the

6   manufacturer.

7   Q    Right.  The company that's going to sell the drug,

8   right?

9   A    Correct.

10  Q    Okay.  Who designs the clinical trials that are done

11  in preparation for marketing the drug?

12  A    Manufacturers do those initial proposals, and then

13  with discussion with the FDA, they're designed.

14  Q    Who pays for them?

15  A    I think it depends on whether there's NIH grants and

16  proposals that where the government contributes versus the

17  manufacturer.  So I don't know who pays for all clinical

18  trials.

19  Q    Well, generally, drug companies pay for their own

20  clinical trials that they're going to use to try and

21  market the drug, right?

22  A    I don't know the answer to that.

23  Q    Who is ultimately responsible for the contents of the

24  drugs' warning?

25  A    The drugs' warning, is that what you said, sir?

194

1    Q     The drugs' labeling.

2    A     Manufacturers are responsible for their drug

3    labeling, and that is in the context of the FDA having the

4    final say on the format, content and language.

5    Q     It's the drug company's responsibility to make sure

6    that the label is accurate and truthfully conveys safety

7    information, right?

8    A     Correct.

9    Q     Are you aware of an enforcement action brought by the

10   FDA ever that required a drug company to strengthen its

11   warning?

12   A     An enforcement action to strengthen, I've seen an

13   enforcement action to change, but, no, it was not to

14   strengthen.

15   Q     Are you aware of the FDA ever rejecting a proposed

16   strengthened warning submitted by AstraZeneca in this

17   case?

18   A     No.

19   Q     And just so the jury understands, you weren't

20   involved in any of these interactions between AstraZeneca

21   and the FDA, were you?

22   A     No, I was not.

23   Q     Right.  The first time you heard about it is when you

24   were hired in this case, right?

25   A     First time I heard -- the first time I looked at it

1    was when I was hired in this case, yes.

2    Q    Now, are you familiar with circumstances in which a

3    manufacturer has a supplemental new drug application on

4    file and the FDA will request a stronger warning in the

5    process of reviewing the supplemental new drug

6    application?

7    A    That can happen.

8    Q    Yeah.  Isn't that the most common way that the FDA

9    encourages a drug company to strengthen its warning?

10   A    I don't know that that's the most common way.  It's

11   certainly one way to do that.

12   Q    And the idea is that a drug company wants to get

13   approval for a new use of its drug and the FDA wants to

14   get enhanced language in labeling warning of some

15   potential adverse event and some compromise is reached,

16   right?

17   A    I would not say some compromise is reached.  But it

18   is true at the time of any approval of the original

19   indication or a supplemental NDA for an indication, that

20   is one of the times when the FDA has its most clear avenue

21   to change in the label in any way.

22   Q    Because that's when it has leverage over the drug

23   company, right?

24   A    I believe that it has leverage over the drug

25   companies throughout the drugs' life, but I would agree

1    with you that that's one of the clearest times for folks

2    to understand that the FDA has power to change the label.

3    Q    Are you aware prior to 2008 of any statutory or

4    regulatory venue by which a drug comp -- by which the FDA

5    could require a warning on a drug's label?

6    A    Well, I would just refer to the labeling requirements

7    at 201.57 that describes when changes have to be made.  I

8    would agree that the 2008 law you might be referring to

9    gives it specific statutory language.  But in my

10   experience and my own implementation of the labeling

11   regulations, the FDA had the power to make changes in the

12   labeling.

13   Q    Is that a power to require a manufacturer to add a

14   warning prior to 2008?

15   A    Not the law.  But the power.

16   Q    Okay.  Well, a lot of power is derived from law.  And

17   you don't know whether they have any legal authority to do

18   that, do you?

19   A    I believe the authority was the regulatory practical

20   authority.  I agree that there was a new law, but I'm not

21   really here to speak to that new law, I'm here to speak to

22   how labeling changes were made before, and now, I guess,

23   after that law.

24   Q    Now, we talked about the fact that while most of what

25   you do today is in the context of evaluating

1   pharmaceutical companies' compliance with federal

2   regulations for purposes of litigation -- or at least half

3   of it is, right?

4   A    Yes.

5   Q    Okay.  And the rest of what you do in some way deals

6   with drug companies also, right?

7   A    Generally, although as I said, there's some time

8   spent with not drug companies but other organizations and

9   advocacy groups that also have regulatory issues for

10  discussion.

11  Q    And the companies that you work for, they don't make

12  just one drug -- I'm talking about the testifying here --

13  they make a variety of drugs.  Like AstraZeneca, for

14  example, makes a lot of drugs in addition to Seroquel,

15  right?

16  A    I don't know how many drugs they make, but they do

17  make other drugs.

18  Q    Sure.  And they make all kind of drugs, they make

19  antipsychotics, they make acid reflux drugs, they make

20  biologics, they make a variety of different type of drugs,

21  right?

22  A    I can't speak to their specific other portfolio, but

23  I'm aware they make other drugs.

24  Q    And the same thing with the other companies you

25  testified for, right?

```
1   A     Yes.

2   Q     Isn't it true that you have a conflict of interest in

3   testifying for these drug companies in litigation?

4   A     I'm not sure what you're speaking to.

5   Q     You testified earlier that you're married; is that

6   right?

7   A     I am.

8   Q     And what does your husband do?

9   A     My husband is a hematologist/oncologist and he works

10  as a team leader in the division of gene tissue and stem

11  cell therapy in the Center for Biologics Evaluation and

12  Research at the FDA.

13  Q     Okay.  Your husband works at the FDA, right?

14  A     He does.

15  Q     And what types of drugs does he -- is he responsible

16  for regulating?

17  A     He regulates a group of biologic products.

18  Q     And what are biologic products?

19  A     Biologics, it's an interesting regulation, they're

20  non-drugs, they are biologically derived, things like

21  blood and blood products, some vaccines, what -- as I

22  described, he works in gene therapy, tissues and stem cell

23  sorts of development.

24  Q     Do any of the companies that make drugs that you're

25  husband regulates employ you?
```

1    A    I provide to him a list of my clients that he

2    provides to the division of ethics and program integrity

3    at FDA, and he has not informed me that he has any

4    conflict of interest with any of the list of clients that

5    I provide him for his confidential filing each year.

6    Q    So the FDA requires him to get information about who

7    you're testifying for so he can disclose it to them?

8    A    Not just who I testify for, but anybody who's

9    employed me.  It would be true for any spouse.

10   Q    And does AstraZeneca, for example, make biologics?

11   A    I don't know their total portfolio.

12   Q    Do you know whether they make biologics?

13   A    I can't think of any off the top of my head.

14   Q    Do you remember whether Merck makes biologics?

15   A    I just don't know.

16   Q    Okay.  Can you say that some of the companies for

17   which you testified don't make products that your husband

18   regulates?

19   A    I can only say that I provide to him the list as

20   required by his confidential filing, and he is required to

21   assert if there's a conflict of interest.  And he has not

22   informed me of that.

23   Q    They leave it up to him; is that right?

24   A    No.  They leave it up to the division of ethics and

25   program integrity.  If an issue were raised, he would

1    inform me about what I would need to do in terms of that

2    division.

3    Q    You don't see a conflict of interest that you make

4    $500 an hour working for companies that your husband is in

5    charge of regulating on behalf of the FDA?

6    A    As I said, that issue is resolved through the process

7    that he goes through because the conflict would be for him

8    as working for the government, and so he provides the

9    appropriate information and would inform me if the

10   division of ethics and program integrity informed him of

11   such a conflict.

12   Q    You and your husband filed a joint tax return?

13   A    We do.

14   Q    Do you have a joint bank account?

15   A    No, we don't.

16   Q    Now, did you issue a written opinion in this case?

17   A    I provided an expert report first in October and then

18   an addendum in December of '08.

19           MR. TRAMMELL:  Now, regrettably, I got one copy

20   here, Your Honor.

21   BY MR. TRAMMELL:

22   Q    But maybe you'll remember and agree with me that the

23   language I reference is actually in your report.

24   A    Are you asking her Honor or me?

25   Q    One of the premises --

1          MR. BROCK:  If you don't have one, but let me

2    see if I can find a clean copy.

3          MR. TRAMMELL:  Sure.  That would be great.

4          MR. BROCK:  Is that okay, Your Honor?

5          THE COURT:  Yes.

6          MR. BROCK:  This has got a few marks on it.  For

7    convenience, can we agree that we will furnish this to

8    her?

9          THE COURT:  Yes.

10   BY MR. TRAMMELL:

11   Q    One of the -- Dr. Rarick, one of the premises of your

12   opinion is that CDER, which is the "Center for Drug

13   Evaluation and Research" within the FDA, ensures that

14   prescription and over-the-counter drugs, both brand name

15   and generic, work correctly and that the health benefits

16   outweigh known risks, right?

17   A    Yes, that's what our report says.

18   Q    And that is completely incorrect, isn't it?

19   A    That is from the Center's website.  I'm quoting their

20   own mission statement.

21   Q    That's the basis for your opinion, isn't it?

22   A    Yes.  And I agree with it.

23   Q    You agree with that statement?

24   A    Yes.

25   Q    Okay.

```
 1              MR. TRAMMELL:  Will you give the Doctor 1404,

 2    please.

 3    BY MR. TRAMMELL:

 4    Q    Are you aware there are several people that don't

 5    agree with that, right?

 6    A    There could be.

 7    Q    Doctor, 1404 is an article from the New England

 8    Journal of Medicine entitled "Why Doctors Should Worry

 9    About Preemption," dated July 3rd of 2008.

10         Do you see that?

11    A    I do.

12    Q    If you could turn to the second page.

13         First of all --

14              MR. BROCK:  Before we put that up, I'm going to

15    object to this hearsay.  It's not a peer-reviewed article.

16    It doesn't meet any of the exceptions to the hearsay rule,

17    and so we object to it.

18              MR. TRAMMELL:  It's a learned treatise, Your

19    Honor.  It's from the New England Journal of Medicine.

20              MR. BROCK:  Simply being published in the

21    New England Journal does not make it a peer-reviewed

22    article subject to the type of rigorous review that would

23    be necessary to put it into evidence.

24              MR. TRAMMELL:  Certainly makes it --

25              MR. BROCK:  No foundation laid for the article.
```

1            MR. TRAMMELL:  It certainly makes it a learned

2    treatise, suitable for the purpose for which I'm offering

3    it.

4            THE COURT:  You can ask her questions about it,

5    but the objection is sustained.  It won't come into

6    evidence.

7            MR. TRAMMELL:  Thank you, Your Honor.

8    BY MR. TRAMMELL:

9    Q    Look on the second page --

10           MR. BROCK:  I guess I would ask just to be sure,

11   this is not going to be displayed to the jury because it's

12   on the screen now.

13   BY MR. TRAMMELL:

14   Q    Look at the second page --

15           THE COURT:  I don't know what the jury's going

16   to be able to see.

17           MR. BROCK:  They would be able to see this if --

18           THE COURT:  Take it off the screen and just let

19   her look at the article.

20   BY MR. TRAMMELL:

21   Q    Are you with me, Doctor?

22   A    I am.

23   Q    Second page of this article, again from the

24   *New England Journal of Medicine*, 2008, it says -- and I'm

25   talking about the second full paragraph.  See where it

1    says:

2        "Owing in part to a lack of resources, approval of a

3    new drug by the FDA is not a guarantee of its safety as

4    the Institute of Medicine has reported FDA approval is

5    usually based on short-term efficacy studies, not

6    long-term safety studies.

7        Despite the diligent attention of the FDA, serious

8    safety issues have often come to light only after a drug

9    has entered the market.  The FDA which, unlike most other

10   federal agencies, has no subpoena power and knows only

11   what manufacturers reveal."

12       Did I read that correctly?

13           MR. BROCK:  Your Honor, I object to this.  It's

14   not only hearsay, it's double hearsay.  Now it's referring

15   to an institute of medicine report which is also not

16   admissible.  So I think -- I guess if it's going to be

17   used, I would just request that she be -- she be read a

18   statement and asked if she agrees with it, but to give it

19   reference to the *New England Journal of Medicine* --

20           THE COURT:  Well, I assume he's going to ask her

21   a question about it.  Otherwise it will be stricken.

22           MR. TRAMMELL:  Well, just to address that, the

23   Institute of Medicine report would be a public record?

24           THE COURT:  It's hearsay, Mr. Trammell.  So do

25   you have a question for her, or were you just reading it

1    in the record?

2          MR. TRAMMELL:  I was reading it in the record.

3    That's all I was doing, was reading in the records.

4          THE COURT:  All right.  It will be stricken.

5          MR. TRAMMELL:  Will you hand the Doctor

6    Exhibit 1410, please.

7    BY MR. TRAMMELL:

8    Q    Doctor, can you read the title of this document?

9    A    "FDA Science and Mission At Risk, report of the

10   subcommittee on science and technology prepared for FDA

11   science board November 2007."

12   Q    What is the subcommittee on science and technology?

13   A    As described on this page, it's a subcommittee of the

14   FDA science board.

15   Q    Okay.  It's an entity within the FDA, right?

16   A    No.  It's an expert panel reporting to the FDA.  The

17   FDA science board is not within the FDA.

18   Q    But it's a panel with responsibilities to report to

19   the FDA, right?

20   A    Yes.  The subcommittee was reporting to the FDA

21   science board which was reporting to the FDA.

22   Q    How does the panel come to exist?

23   A    It appears that this particular panel, which is an

24   advisory board to the commissioner, was something put

25   together by FDA's Commissioner Andrew von Eschenbach.

1    Q    If you turn to page -- it's actually page 2 of the

2    executive summary.

3    A    Is it page 2 on the bottom?

4    Q    Yes.

5    A    Okay.

6    Q    You see the first -- the second full paragraph, it

7    says, "The subcommittee concluded that science at the FDA

8    is in a precarious position.  The agency suffers from

9    serious scientific deficiencies and is not positioned to

10   meet the current or emerging regulatory responsibilities."

11        Do I read that correctly?

12            MR. BROCK:  Your Honor, I object to this on 803

13   hearsay.  I also would like to ask that it be pulled down

14   off of the monitor because it is going to be displayed to

15   the jury if we leave it.

16            MR. TRAMMELL:  Your Honor, this is a public

17   record.

18            MR. BROCK:  Well, it's still hearsay.

19            MR. TRAMMELL:  But it meets the hearsay

20   exception.  It meets the eighth exception to the hearsay

21   rule, Your Honor, public records in the courts.

22        It's a document created by an advisory committee

23   appointed by the FDA for purposes of reporting to the FDA.

24   It's a public record.

25            MR. BROCK:  I don't believe that this document

1    is produced by a governmental organization.  And I do

2    think it's hearsay.  I don't think a proper predicate has

3    been laid.

4              THE COURT:  Do you have some kind of predicate

5    to show that's what this is?

6              MR. TRAMMELL:  Well, only the Doctor's

7    testimony, the title of the document, the fact that the

8    FDA mission statement appears at the beginning --

9              THE COURT:  Well, you didn't ask her if she'd

10   seen it before.  I don't know if she can --

11   BY MR. TRAMMELL:

12   Q    Doctor, have you ever seen this document?

13   A    I have.

14   Q    When did you see it?

15   A    I saw it in probably sometime in 2008.

16   Q    Do you have any reason to doubt that this is the

17   report of the subcommittee on science and technology

18   prepared for the FDA science board?

19   A    Well, that's what it is.  It's prepared for the FDA

20   science board, but it is not the FDA, if that's what

21   you're asking me.

22   Q    Well, I understand.  The FDA is a large and dynamic

23   organization, is it not?

24   A    Yes.

25   Q    And the members of this subcommittee were appointed

1   by somebody at FDA, right?

2   A    They were composed of three members of the science

3   board and then other experts representing industry,

4   academia and other government agencies.

5   Q    Sure.  And they didn't get together by coincidence,

6   did they?

7   A    No.  They were requested by the Commissioner,

8   Dr. von Eschenbach at the time.

9   Q    Commissioner of the entire FDA?

10  A    Yes.

11  Q    Okay.  And reported to him, right?

12  A    They reported to the science board which then I'm

13  assuming provided this to Dr. von Eschenbach.  I don't

14  know.

15  Q    And do you see on the page right before the executive

16  summary, you tell the -- tell me what that is.

17  A    It's titled --

18           MR. BROCK:  Same objection on hearsay, Your

19  Honor.  There's not a predicate laid for this, and I would

20  ask, until Your Honor says it's appropriate, to pull down

21  off of the screen --

22           THE COURT:  All right.  It shouldn't be on the

23  screen until the exhibit is in evidence.

24           MR. TRAMMELL:  Your Honor, this is a record of a

25  public officer agency, it's a record of a committee

1    appointed by the Commissioner of the FDA to review this

2    issue reporting back into agencies within --

3              THE COURT:  Right.  But you've -- until you just

4    asked her a few questions, you hadn't established that.

5              MR. TRAMMELL:  I understand.  Your Honor, having

6    laid the predicate, we'd offer Exhibit 1410 into evidence.

7              MR. BROCK:  Object on the basis of hearsay and

8    relevancy under --

9              THE COURT:  Well, what is -- it's --

10             MR. TRAMMELL:  It's entirely relevant, Your

11   Honor, to the premise of her opinion that she agreed to

12   that CDER ensures -- I say it again -- ensures the drugs

13   work correctly and benefits outweigh known risks.

14             MR. BROCK:  Your Honor, this document does not

15   speak to the issue of Seroquel.  Dr. Rarick has not

16   testified outside of the scope of Seroquel.  So this has

17   got general statements in it.  It's hearsay.  People that

18   wrote it are not here to be cross-examined.

19        And it does not go to the point of her testimony

20   which was the relationship between -- was the regulatory

21   filings and the actions of the FDA with regard to

22   Seroquel.

23             MR. TRAMMELL:  And of course the point of

24   hearsay exceptions is that they don't need to be here.

25   The Doctor's testified as to --

1          THE COURT:  Well, I'm concerned about the

2    relevance.

3          MR. TRAMMELL:  Well, Your Honor --

4          THE COURT:  The issue of whether or not the FDA

5    is understaffed or under whatever is not relevant to the

6    issues in this case.

7          MR. TRAMMELL:  It's certainly relevant to refute

8    her opinion that the FDA ensures that doctors know that

9    risks -- that benefits outweigh known risks.

10         THE COURT:  All right.  So --

11         MR. TRAMMELL:  It's certainly relevant to that.

12         THE COURT:  I think this would be unduly

13   prejudicial and confuse the jury, so I'm going to sustain

14   the objection as to 1410 coming into evidence.

15   BY MR. TRAMMELL:

16   Q    Have you ever heard of Peter Barton Hutt?

17   A    Yes.

18   Q    Who is he?

19   A    My recollection of his employment was he was chief

20   counsel for the Food and Drug Administration for some

21   years in the '70s.  I believe he still practices law and

22   he's involved in regulatory law issues in Washington, D.C.

23   He's at Covington & Burling, as I recall.

24   Q    What's that?

25   A    His law firm that he works in I believe is

1    Covington & Burling.

2    Q    Have you ever read Mr. Hutt's testimony before the

3    Senate on Oversight and Investigations of the Committee on

4    Energy and Commerce at the House of Representatives?

5    A    No, I have not.

6    Q    Are you aware that he gave such testimony?

7    A    If somebody showed it to me Friday and asked me if

8    I'd seen it.  I don't know if that was one of the

9    documents that was handed to me Friday.  I don't recall.

10            MR. TRAMMELL:  Will you please show the Doctor

11   Exhibit 1411 and don't put it on the ELMO yet.

12            THE COURT:  Go ahead and change the tape.

13                  (Pause in the proceedings.)

14   BY MR. TRAMMELL:

15   Q    Can you read the first information from the page of

16   this exhibit with the title?

17   A    On the cover page?

18   Q    Yes, ma'am.

19   A    "Testimony of Peter Barton Hutt before the

20   Subcommittee on Oversight and Investigations of the

21   Committee on Energy and Commerce, House of

22   Representatives, on science and mission at risks -- at

23   risk," I'm sorry -- "FDA's self-assessment January 29,

24   2008."

25   Q    Can you turn over to the second page.  You see it

1    says, "Mr. Chairman and members of the subcommittee, I'm

2    Peter Barton Hutt," last sentence of the paragraph says --

3    the second to last says, "During 1971 to '75, I served as

4    chief counsel for the Food and Drug Administration.  I

5    appear before you today as my -- in my capacity as a

6    consultant to the subcommittee of the FDA science board to

7    prepare the recent report, FDA Science and Mission At

8    Risk."

9         Did I read that correctly?

10         MR. BROCK:  Your Honor, I object to anything out

11   of this document.  It is clearly hearsay, excluded by

12   Rule 803.  It is just a written statement of Peter Barton

13   Hutt, what purports to be.  There's no basis for the

14   admissibility of this document or the use of this

15   document.

16         MR. TRAMMELL:  Your Honor, this is a record of

17   proceedings before a house subcommittee.  It falls within

18   the public records and reports exception that says

19   records, reports, statements or data compilations in any

20   form of public offices or agencies setting forth the

21   activities of the offices or agency --

22         THE COURT:  There's nothing on this document

23   that supports that.

24         MR. TRAMMELL:  Your Honor, it's a recording of

25   testimony before the House of Representatives.  It's a

```
 1    matter -- it's a matter of public record.

 2              THE COURT:  Well, how do I know that?

 3              MR. TRAMMELL:  Because that's the title of the

 4    document.

 5              THE COURT:  How do you know that?

 6    BY MR. TRAMMELL:

 7    Q    Have you ever seen this --

 8              MR. TRAMMELL:  Okay.

 9    BY MR. TRAMMELL:

10    Q    Have you ever seen this document before, Dr. Rarick?

11              THE COURT:  You've already asked her that.

12              THE WITNESS:  As I said, I believe it was one of

13    several that were handed to me Friday, so I saw it at a

14    deposition on Friday.  I have never read it.

15    BY MR. TRAMMELL:

16    Q    You've never read this document?

17    A    No, I haven't.

18    Q    Do you know whether or not it actually is Mr. Hutt's

19    testimony?

20    A    I have no way of knowing that.

21    Q    Do you know whether it's not?

22    A    I have no way of knowing that.

23    Q    Do you know whether Mr. Hutt actually was the chief

24    counsel for the Food and Drug Administration?

25    A    I believe that's true.
```

1    Q    From 1971 to 1975?

2    A    I don't know what the years were, but I believe

3    that's the right range.

4    Q    Do you have any reason to believe this document is

5    not authentic?

6    A    I don't have any reason to believe one way or the

7    other.

8            MR. TRAMMELL:  It's my understanding, Your

9    Honor, there's a hearsay objection?

10           THE COURT:  Yes.  There's also a relevance

11   objection.

12           MR. TRAMMELL:  Well, the relevance -- I suppose

13   I'd like to deal with them one at a time.

14       As testimony of a former FDA official testifying in

15   his capacity as a consultant to the subcommittee on the

16   FDA's science board -- of the FDA science board that was

17   recorded by that agency, it clearly satisfies the public

18   records and reports exception to hearsay.

19       The relevance of the document is, again, one of the

20   critical bases for Dr. Rarick's report is that the FDA,

21   through its regulations, actually ensures drug safety and

22   that by following those regulations, which she repeatedly

23   testified today, all safety issues were addressed and

24   AstraZeneca's product was safe and effective.

25       It's important for the jury not to hear that

 1    testimony in a vacuum, and to understand there are

 2    actually issues with the FDA, and that people that operate

 3    within the FDA, as Dr. Rarick no longer does, bring these

 4    issues to light.  The jury needs to hear that to balance

 5    out the testimony that's already been given.

 6             THE COURT:  The objection is sustained, both as

 7    to relevance and to hearsay.  You've not presented me with

 8    anything that shows that this is in fact testimony that

 9    was given before Congress.  And even if it was, you

10    haven't shown that it's relevant to the issues relating to

11    Seroquel in this case.

12             MR. TRAMMELL:  Is the issue -- and just so I'm

13    clear, Your Honor.  Is the issue that it's not -- it

14    hasn't been authenticated?

15             THE COURT:  Right.  And the relevance.

16    There's -- it has nothing to do with Seroquel or atypical

17    antipsychotics.

18             MR. TRAMMELL:  Just so that I'm clear, Your

19    Honor, so I create my record, a significant portion of

20    Dr. Rarick's testimony today had nothing to do with

21    atypical antipsychotics.

22        In fact, because she has no background in regulating

23    atypical antipsychotics or in dealing with any regulatory

24    submission or interaction about those submissions, her

25    testimony was generic.

1    And therefore, when she says that the generic

2    regulations put in place by the FDA, when followed, as

3    they were in this case, ensure drug safety, which she

4    says, I have to show that that's not always the case.

5    That's the reason that I'm offering these documents so the

6    jury --

7              THE COURT:  These documents are not the way that

8    you should be doing that.

9    BY MR. TRAMMELL:

10   Q    Have you ever heard of the general accounting

11   office -- excuse me -- government accountability office?

12   A    Yes.

13   Q    What is it?

14   A    The government accountability office, what is it?  I

15   would have to look at a specific definition.

16   Q    Are you aware of a report by the government

17   accountability office to Congress on the need for

18   improvement in FDA's postmarket decision-making and

19   oversight process?

20   A    You have to show me the exact report you're speaking

21   to, to make sure that I know what you're talking about.

22   Q    Have you heard of such a report?

23   A    I have seen such a report.  I just need to see what

24   you're specifically referring to, to know that it's the

25   correct report that I'm thinking of.

1          MR. TRAMMELL:  Will you show the Doctor

2   Exhibit 1413.

3   BY MR. TRAMMELL:

4   Q    Doctor, can you read the title of this document?

5   A    "United States government accountability office

6   report to congressional requesters, drug safety

7   improvement needed in FDA's postmarket decision-making and

8   oversight process."

9   Q    And what's the date?

10  A    March of 2006.

11  Q    Have you ever seen this document?

12  A    Yes, I have.

13  Q    You've read it?

14  A    Yes, I have.

15  Q    As far as you know, is this the -- is this what it

16  appears to be?  Is this actually the government

17  accountability office's report to congressional

18  requesters?

19  A    Yes, it is.

20  Q    Is the government accountability office a public

21  entity?

22  A    I don't know the answer to that question.  I don't

23  know what you mean.

24  Q    Well, is the United States government a public or

25  private entity?

```
 1   A     Public.

 2   Q     Is the government accountability office within the

 3   United States government a public or private entity?

 4   A     I just don't know what you mean.  It's -- I believe

 5   it's an office that reports to Congress.  I don't know if

 6   they have some private dealings as well as public.

 7   Q     Is Congress a part of the U.S. government?

 8   A     Yes.

 9   Q     You testified earlier that one of the things the FDA

10   does is it gathers information about postmarketing adverse

11   events, right?

12   A     Yes, it does.

13   Q     And the purpose it gathers -- the purposes for which

14   it gathers that information is to form its judgment about

15   whether labeling changes ought to be made, right?

16   A     It can contribute to that, yes.

17   Q     And part of that process is controlled by the drug

18   company itself, right?

19   A     I'm not sure what you mean.

20   Q     Sure.  They have the responsibility to report adverse

21   events that they become aware of during the time that the

22   drug is marketed, right?

23   A     Yes.  There's different types of adverse event

24   reporting, some types that are about when you're doing a

25   clinical trial and the adverse events to be reported, and
```

1   then, yes, there's also regulations regarding adverse

2   event reporting for spontaneous adverse event reports.

3   Q     And are there specific regulatory guidelines that

4   you've testified to today that relate to the FDA's

5   oversight of postmarket safety?

6   A     I'm sorry.  What was the first part of that question?

7   Sure, there's regulations regarding postmarketing adverse

8   event reporting.  Is that what you asked?

9   Q     Right.

10  A     Yes.

11  Q     And you testified about those today, right?

12  A     Yes.

13  Q     Okay.  You've testified about what AstraZeneca did to

14  attempt to follow those regulations, right?

15  A     Yes.

16  Q     Okay.  Will you look at the first page.  It says,

17  "What GAO found," you see that?

18  A     Yes.

19  Q     First -- excuse me, the second paragraph -- let's go

20  up first.

21        It says, "Two organizationally distinct FDA offices,

22  the office of new drugs, OND, and the office of drug

23  safety, ODS, are involved in postmarket drug safety

24  activities."

25        Do you see that?

1   A      Yes.

2   Q      Is that accurate as far as you know?

3   A      Yes.

4   Q      If you skip ahead, it says:

5          "ODS with primary focus on postmarket safety serves

6   primarily as a consultant to OND and does not have an

7   independent decision-making responsibility.

8          "ODS has been reorganized several times over the

9   years.  There's been a high turnover of ODS directors in

10  the past 10 years with eight different directors of the

11  office and its predecessors."

12         Did I read that correctly?

13  A      You did.

14  Q      Go to the first sentence of the next paragraph.  It

15  says, "FDA lacks clear and effective processes for making

16  decisions about and providing management oversight of

17  postmarket safety issues."

18         Did I read that correctly?

19            MR. BROCK:  Your Honor, I'm going to object to

20  that one on relevance.  It's now stepping outside of the

21  Seroquel environment.

22         The document on its face says, "In the four drug

23  cases studied, GAO examined, GAO observed the postmarket

24  safety decision-making process was complex."

25         They looked at four distinct medicines.  Seroquel was

1    not included in the ones that they looked at, so on the

2    basis of relevance, we object to any of the conclusions

3    reached in this document about the --

4            MR. TRAMMELL:  That statement -- first of all,

5    Your Honor, that statement is not qualified in this

6    document.

7        Second, the Doctor just testified that part of the

8    basis of her opinion is that AstraZeneca complied with

9    postmarket safety issue or postmarket safety regulations

10   and therefore its warnings were appropriate.

11       This is stating the exact opposite, and this is an

12   office of the United States government.  And my question

13   for the Doctor was simply going to be whether she agreed

14   with that.

15           MR. BROCK:  Well, I still object to using this

16   document on the basis of relevance because it doesn't

17   speak to the issues of Seroquel.  And her testimony today

18   was about her qualifications about Seroquel and the FDA.

19       When you start going outside of that, you have -- the

20   jury is going to hear some statement about some other

21   medicine and then attribute it to AstraZeneca and its

22   medicine Seroquel and that's clearly going to be

23   prejudicial.

24           MR. TRAMMELL:  Your Honor, this statement

25   doesn't say in the four cases studied, FDA lacked clear

222

```
 1    and effective processes.  It just says FDA lacks clear and

 2    effective processes.

 3        And most of her testimony today, Your Honor, was

 4    generic, having nothing to do with Seroquel.

 5            THE COURT:  Well, are you asking her whether she

 6    agrees with that statement?

 7            MR. TRAMMELL:  I'm going to ask her that

 8    question next.

 9            THE COURT:  I'll sustain it as to the question

10    you asked.

11            MR. TRAMMELL:  As to?

12            THE COURT:  The prior question.

13            MR. TRAMMELL:  As to whether that's what it

14    says?

15            THE COURT:  Well, yes, because this document is

16    not in evidence.

17            MR. TRAMMELL:  Okay.  Well, at this time, Your

18    Honor, I'd like to offer Exhibit 1413 into evidence.

19            MR. BROCK:  Objection.  Rule 803 and also on

20    relevance and Rule 401.

21            THE COURT:  Well, I'll sustain it, 401.  It's

22    also prejudicial.  There's a lot of information in here

23    that would just confuse the jury, and it's not relevant to

24    the issues in this case.

25
```

BY MR. TRAMMELL:

Q    Were you aware, Doctor, that the government
accountability office had reached certain conclusions
about the FDA's oversight of postmarketing safety?

A    Was I aware of this report?  Or can I comment on
whether it applies to this case?

Q    No.  I guess the question I'm asking you is generally
were you aware that the government accountability office
had made findings about the FDA's processes for overseeing
postmarketing drug safety?

          MR. BROCK:  Same objection.  It's the same
question.  Just doesn't have the document out, he's just
referring to it.  So same objection.

          MR. TRAMMELL:  I'm asking whether she's aware of
those reports.

          THE COURT:  I still am having trouble with the
relevance to this case of what GAO studied on four other
drugs.

          MR. TRAMMELL:  I understand.  I'm not asking her
about that document.  I'm asking her in general has she
heard of any reports.

          THE COURT:  Well, how is that relevant to the
issues that the jury has to determine in this case?

          MR. TRAMMELL:  The reason it's relevant, Your
Honor, is because without information about the

1    government's own assessment of its agency, relying only on

2    Dr. Rarick's assurance that the regulations work and they

3    worked in this case, the jury will be left with the

4    misimpression that the FDA never makes mistakes and that

5    the FDA's oversight ensures drug safety as Dr. Rarick

6    testified in her opinion.

7            THE COURT:  All right.  Well, you can ask her

8    general questions of that nature, but whether GAO made

9    findings on other cases about other drugs has no relevance

10   to this case.

11   BY MR. TRAMMELL:

12   Q    Doctor, you testified that there are certain

13   regulations that govern the FDA's oversight of

14   postmarketing drug safety, correct?

15   A    Yes.

16   Q    And do those regulations ensure perfectly that all

17   issues that arise after a drug becomes marketed are made

18   aware -- are made public?

19   A    Well, I think the FDA CDER has stated often that all

20   risks are not known at the time the drug is approved and

21   probably can't be known even after approval, but there is

22   a process for continuing to assess risk.

23   Q    And in fact, it's -- part of that process is drug

24   companies reporting adverse events as they become aware of

25   them to the FDA, right?  I believe you testified to that

1    earlier.

2    A    Drug companies do report adverse events as per the

3    regulations to the FDA.

4    Q    And the regulations require voluntary reporting to a

5    certain extent, don't they?

6    A    Again, I think you're speaking to the spontaneous

7    adverse event reporting regulations, not the clinical

8    trial regulations.  And, yes, the current system is a

9    voluntary system.

10   Q    And inherent in that system is a reliance on drug

11   companies to be forthcoming about adverse events as they

12   become aware of them, right?

13   A    Correct.  And let me make sure I'm not

14   mischaracterizing.  It's a voluntary reporting system for

15   folks to report adverse events.  There are regulations

16   that define when a company knows about an adverse event

17   how that's to be reported.

18   Q    Right.  And when a company knows about an adverse

19   event, it's that company's responsibility to report that

20   to the FDA, right?

21   A    Yes.  Within the rules there are things called

22   serious, there's things called labeled or unlabeled, and

23   there's things called non-serious.  So there's different

24   regulations regarding how those are reported.

25   Q    And so just so the jury understands, part of the way

1   the FDA becomes aware of adverse events is because a

2   company reports them, right?

3   A    You're speaking to postmarketing adverse events, yes.

4   Q    Okay.  And if a company doesn't report them and the

5   FDA has insufficient information upon which to decide the

6   existence or non-existence of adverse events in general,

7   right?

8   A    Companies are to report adverse events.  And, yes,

9   it's important for the FDA to see that full data set.

10  Q    Does the FDA have responsibility for reviewing

11  promotional materials created by drug companies?

12  A    Yes.

13  Q    And do all promotional materials have to be submitted

14  to the FDA?

15  A    Promotional materials are submitted to the FDA, yes.

16  Q    Do you have any idea how many pieces of promotional

17  materials are submitted to the FDA every year?

18  A    No.

19  Q    Is it hundreds?

20  A    I don't know.

21  Q    Do you know whether or not the FDA's actually able to

22  review all those materials?

23  A    I do not believe that they review every piece of

24  promotional material that is submitted.

25  Q    Now, we talked this morning about the letter in

1    September of 2003 -- or excuse me -- letter in September

2    of 1997 which was Defense Exhibit 100.

3         Do you still have that?

4    A    This is September 26, 1997?

5    Q    Yes, ma'am.

6    A    I probably -- yes, here it is.

7    Q    This document is a letter from the FDA enclosing the

8    final labeling for Seroquel upon approval, right?

9    A    Correct.

10   Q    Does the final labeling for Seroquel upon approval

11   contain a warning of diabetes?

12   A    No.

13   Q    Does it contain a warning of increased weight gain?

14   A    Well, let me make sure I speak to that specifically.

15        When I say "warning," I'm speaking to a specific

16   regulatory definition.  If you mean warning as in is it in

17   the prescribing information as many prescribers read

18   warnings, yes, the information is in the label.  It's not

19   in the warning section.

20             MR. TRAMMELL:  I object as nonresponsive.

21   BY MR. TRAMMELL:

22   Q    Do you know what a warning is?

23   A    Yes.  And I just wasn't sure if you were speaking to

24   the regulatory definition or to the label which contains

25   information which is about risk.

1    Q    Are you aware, as a person who's been offered as a

2    regulatory expert in this case, that information on drug

3    labels is broken down into different sections, right?

4    A    Yes.

5    Q    And information on risks associated with drugs is

6    broken down into warnings, precautions and adverse events

7    generally, right?

8    A    Generally.  And it can also be in boxed warnings and

9    sometimes clinical pharmacology.

10   Q    Okay.  What kind of risk goes in a warning?

11   A    They're defined by the regulations.

12   Q    What's the regulations at?

13   A    The regulations are at 201.57.

14   Q    Do you recall what the regulations say should go in a

15   warning?

16   A    I don't have that memorized.

17   Q    Well, are more serious adverse events generally to be

18   placed in warnings?

19   A    Not necessarily.  You could find guidance documents

20   for the FDA's website providing information, providing

21   help to industry to determine what would go in each

22   section.

23        Sometimes a warning can be about something that's

24   simply common but not necessarily as serious as something

25   that might end up in another section of a label if it

1   were, for example, uncommon.

2       I don't know how to answer your question.  As I said,

3   it's at 201.57.

4   Q   Okay.  When a company's writing its label --

5   A   Uh-huh.

6   Q   -- when they're writing the first label and they're

7   going to submit it to the FDA and they've got all these

8   adverse events that they've had in their clinical trials,

9   how do they decide which ones to list in warnings and

10  which ones in adverse events?

11  A   They read the regulations at 201.57, and they make

12  their best draft or proposal to the FDA about what fits in

13  each section, and then the FDA, as I said, has final say

14  about format, content and language.

15  Q   You will admit, won't you, Dr. Rarick, in the initial

16  Seroquel label, there was no warning of diabetes, right?

17  A   The diabetes information was not in the warning

18  section.

19  Q   And neither was weight gain, was it?

20  A   No.

21  Q   If you could go now to Exhibit 62 which is the

22  September 15th, 2003 letter.

23  A   I have it.

24  Q   This is a letter from the FDA that includes the

25  hyperglycemia and diabetes mellitus warning that was to be

1    required in the Seroquel label, right?

2    A    Correct.  It's a request for the following changes

3    and includes a warning for hyperglycemia and diabetes

4    mellitus.

5    Q    And when did the FDA request this warning?

6    A    When --

7    Q    Yes.

8    A    -- is that the question?

9        This letter is dated -- it was received, at least by

10   AstraZeneca, it appears on September 15th, 2003.

11   Q    And when did this warning as written finally make it

12   out to doctors?

13   A    Well, this warning was modified, as we discussed this

14   morning.  The last sentence at the first paragraph was

15   removed, and I don't know if there were any other changes,

16   but the information, as agreed upon by the FDA for this

17   warning, was approved in January of 2004.

18   Q    What's the difference between the January letter and

19   the April letter?

20   A    You mean the "Dear Healthcare Provider" letters?

21   Q    Yes, ma'am.

22   A    There were two "Dear Healthcare Provider" letters

23   sent by AstraZeneca to alert prescribers of the new

24   warnings statement, and the second letter was sent because

25   of the comment in the second paragraph that states in the

1    next to the last sentence, "Patients who develop symptoms

2    of hyperglycemia during treatment" --

3        Oh, I'm sorry.  Let me find it.  Here it is.  I'm

4    sorry, it's not that sentence.  It's the second sentence

5    of that paragraph.

6        "Patients with risk factors for diabetes mellitus,

7    for example, obesity, family history of diabetes, who are

8    starting treatment with atypical antipsychotics should

9    undergo fasting, blood glucose testing at baseline and

10   periodically during treatment."

11       It was those last four words that were not contained

12   in the January "Dear Healthcare Provider" letter, and

13   AstraZeneca corrected that in their April 2004 "Dear

14   Healthcare Provider" letter.  Is that responsive?

15   Q    Maybe too responsive.  Just so the jury understands,

16   in September 15th of 2003, the FDA sends a letter to

17   AstraZeneca requesting the addition of this warning,

18   right?

19   A    Correct.

20   Q    And in April of 2004, AstraZeneca sends this warning

21   to doctors in a "Dear Healthcare Provider" letter, right?

22   A    Oh, no.  They sent the warning in January of 2004

23   when it was initially approved.  And they sent a

24   correction in April --

25   Q    When did they send this work --

232

1    A    It was a correction to the warning letter they sent

2    in January of 2004.

3    Q    Okay.  They didn't send this warning in January.

4    A    Yes, they did.

5    Q    They edited it, right?

6    A    Oh, you're right.  They left out the four words "and

7    periodically during treatment."

8    Q    When did they send that warning?

9    A    That was in April.

10   Q    We talked about a consensus conference, you recall

11   that, Doctor, as Exhibit 500?

12   A    The ADA, APA and other organizations, consensus, yes.

13   Q    Now, this group, it didn't actually conduct a study,

14   did it?

15   A    No.  It was doing a consensus conference.

16   Q    And in fact, the drug manufacturers were allowed to

17   come present to the panel their testimony related to the

18   risk, right?

19   A    I don't recall the agenda.  I know the FDA spoke

20   here.

21   Q    You don't know whether anyone from AstraZeneca spoke?

22   A    Let me read that again.  I'm sorry, I don't remember.

23   It said -- just let me go through this.

24        An eight-member panel heard presentations from 14

25   experts in the areas of psychiatry, obesity and diabetes.

233

 1    Presentations were also made by a representative from the

 2    U.S. Food and Drug Administration and by representatives

 3    from the AstraZeneca, Bristol Myers-Squibb, Janssen, Lilly

 4    and Pfizer Pharmaceutical Companies.

 5    Q    Okay.  So AstraZeneca gave a presentation to this

 6    group, right?

 7    A    Yes.

 8    Q    Now, in the letter that was written by FDA personnel

 9    to diabetes care after the publication of the consensus

10    panel, do you see that, it's Exhibit 72?

11    A    Yes, I have that.

12    Q    This isn't the opinion of the FDA, is it?

13    A    It's provided from the division of

14    neuropharmacological drug products in the Center for Drug

15    Evaluation and Research at the USFDA.

16    Q    Is it the opinion of those doctors or the opinion of

17    the FDA?

18    A    It's an opinion of those doctors who work at the FDA,

19    and I don't see a disclaimer that it's not an opinion of

20    the FDA.

21    Q    Now, we talked toward the end of your direct

22    examination about the events in 2007 and 2008.  Do you

23    recall that?

24    A    Yes.

25    Q    And in the course of the negotiations between

1    AstraZeneca and the FDA, warnings on diabetes and weight

2    gain are being enhanced; is that correct?

3    A    The information on the changes in weight gain,

4    glucose and lipids are being moved to be a part of the

5    warnings.

6    Q    Now, I forget which exhibit, which defense exhibit

7    this was --

8              MR. BROCK:  Give it to me by description, I'll

9    see if I can help you.

10   BY MR. TRAMMELL:

11   Q    Look at Exhibit 92, Doctor.

12   A    92, just give me a moment, please.

13        Found it, yes, sir.

14   Q    If you go to page 13.  First of all, this is a letter

15   from the FDA to AstraZeneca, right?

16   A    Yes.  This is a letter from FDA to AstraZeneca.

17             MR. BROCK:  I'm sorry.  Can I see what you've

18   got there?  I don't think that's the same thing.

19             THE WITNESS:  You said 92.

20             MR. BROCK:  Let's make sure it's the same.  I

21   don't think we put this in evidence.  This is your

22   exhibit.  So she'll need one of those.

23             MR. TRAMMELL:  If you could get 1421.

24   BY MR. TRAMMELL:

25   Q    Did you review this document in preparation for

1   rendering your opinion and testifying today?

2   A     Yes.  I have seen this document and reviewed it.

3   Q     What is it?

4   A     This is a letter from the FDA to AstraZeneca -- just

5   checking the date, excuse me, to be complete -- from

6   December 22nd, 2008.  It's regarding supplements, in this

7   case you're looking at supplements to Seroquel XR.

8   Q     And this is the FDA's proposed changes for labeling

9   submitted by AstraZeneca, right?

10  A     This is the FDA's action letter regarding supplements

11  for the addition of a new indication for XR.  The new

12  claims are for acute monotherapy, acute adjunctive therapy

13  and maintenance monotherapy in patients with major

14  depressive disorder.  We can simply call this the

15  supplemental NDA for the addition of major depressive

16  disorder.

17        This is a complete response letter which takes the

18  place of what used to be called approvable or non-approval

19  letters.  And so, yes, this is an action letter responding

20  to AstraZeneca's submission of a supplemental NDA for a

21  new indication called major depressive disorder.

22  Q     Can you see on page 4 there's an enclosure for

23  labeling?  You see that?

24  A     Yes.

25  Q     In the next page it begins with the label, right?

1    A    Correct.  This would be labeling.  If they were to

2    approve the new indication, this is what the labeling

3    would look like.  As can you see from that labeling, it

4    includes the new indication.

5         This is the kind of letter that a company would

6    receive with a complete response action which is, "We

7    aren't going to approve you now.  If we were to approve

8    you, here's what we're proposing your label would look

9    like."

10   Q    Right.  It's the edits to the proposed label that are

11   now being proposed by the FDA, right?

12   A    Correct.  And generally complete response letter

13   includes other information that also will need to be

14   submitted before an action would change from a complete

15   response to an approval.

16        But, yes, this is the suggested language of the

17   labeling if they were to approve major depressive disorder

18   for Seroquel XR.

19   Q    Can you go to page 13.

20   A    Yes.

21   Q    See the section that's been added by FDA here on

22   page 13?

23   A    Yes.

24   Q    It says, "The following section on hyperglycemia

25   needs to be enhanced with any information from your

1    clinical trials on hyperglycemia currently in adverse

2    reactions.  In addition, Section 5.11 of hyperlipidemia

3    needs to be moved next to Section 5.3 on the section on

4    weight gain.  And adverse reactions need to be moved to

5    warnings, precautions next to the hyperglycemia and

6    hyperlipidemia sections.  You may consider the currently

7    approved label for Zyprexa as an example of how these

8    sections should be organized.

9        "This is an important alert to prescribers of the

10   serious metabolic risks associated with the use of this

11   drug.  All the sections need to include any additional

12   findings from your overview of metabolic risks, done at

13   our request, as well as all metabolic data from the

14   pediatric trials with this drug.  Additional measures may

15   be needed as well to alert prescribers and patients of

16   these serious risks."

17       Did I read that correctly?

18   A    Yes, you did.

19   Q    Now, the Zyprexa label at this time said that there

20   was a continuum of risks associated with atypical

21   antipsychotics and that Zyprexa was toward the end of the

22   continuum that was more associated with the risk of

23   hyperglycemia and diabetes than other atypical

24   antipsychotics, right?

25   A    That's correct.

238

1   Q    Okay.  And what the FDA is saying to AstraZeneca is

2   that you can consider the approval label for Zyprexa as an

3   example of how these sections should be organized,

4   correct?

5   A    Yes.  Not for the content of the Zyprexa label but

6   for the organization of Zyprexa label.

7   Q    And also to move the weight gain section up into the

8   warnings as it is in Zyprexa, right?

9   A    Exactly.  It's about the organization of lipids,

10  weight gain and glucose information.

11  Q    And would this have been the first time when this

12  label was approved that weight gain appeared in Seroquel's

13  warning section?

14  A    Well, this label hasn't been approved.

15  Q    When it's approved?  Assuming it's approved with the

16  weight gain in the warnings section?

17  A    If they choose to approve -- I don't know what the

18  label will look like at its next approval.  This has been

19  the proposal.  And I would believe that the FDA's request

20  will be followed.

21       You can see the -- AstraZeneca's letter back in

22  January of 2009 after their clarifications of this exact

23  request where they are putting that all together in the

24  warnings, and I think if that's approved, then, yes, it

25  will appear in warnings.

1    Q    Let me ask you this:  This is a suggestion by the

2    FDA, right?

3    A    Yes.

4    Q    Does the label currently look this way?

5    A    I would have to look at the most recent CBE

6    submission, but I don't think that this was part of the

7    previous request regarding those CBEs.  Would you like me

8    to check?

9    Q    Sure.

10   A    In the most recent submission that I can recall

11   regarding their pending supplements for the CBEs that

12   they've submitted both for glucose information as well as

13   pediatric safety information from January 2009, that

14   prescribing information does show the reformatting of the

15   adult and child glucose information as well as the lipids

16   that have previously been in another section and the

17   weight gain that had previously been in another section as

18   part of the warnings.

19   Q    So now for the first time weight gain is in the

20   warnings section, right?

21   A    Yes.  The information that was previously contained

22   in other sections is now in the warnings.

23   Q    How long did it take from the launch of the drug,

24   inception of marketing the Seroquel to get weight gain

25   into the warning section?

1    A    The warnings section of the label, you'd have to look

2    at these years.  Weight gain information was always in the

3    label.

4    Q    I understand.

5              MR. TRAMMELL:  Objection.  Nonresponsive.

6    BY MR. TRAMMELL:

7    Q    How long did it take to get the weight gain

8    information into the warning section of the Seroquel

9    label?

10   A    Let me be sure I'm quoting this correctly because I

11   believe the new section is called "warnings and

12   precautions."  As you know, the 201.57 regulations changed

13   during this time, so it moved from the adverse event

14   section, weight gain, to the warnings and precaution

15   section in approximately -- what's that, '97 -- '97, is

16   it, to 2009.

17   Q    Twelve years?

18   A    Correct.

19   Q    At what point did -- at what point did AstraZeneca

20   know that long-term, 52-week data showed five kilograms of

21   weight gain with Seroquel?

22   A    I don't remember that specifically.  I know that they

23   knew about weight gain from their initial NDA submission.

24   And as you recall, they had on the label that 23 percent

25   of patients who gained more than seven percent versus

1    six percent of placebo.

2        I don't recall the 52 weeks, although I believe there

3    was data submitted in the original NDA that included, of

4    course, information, almost 300 patients that had taken

5    Seroquel for a year, so I believe they submitted that to

6    the FDA with the original NDA.

7        Then there's been subsequent trials that have also

8    had a one-year use.  I just don't remember the weight gain

9    specifically from those trials.

10   Q    Let's get it back out.  Do you have the exhibits that

11   we looked at that showed the safety report, the integrated

12   safety report?  Do you still have that?

13   A    The integrated safety summary?  I will look for that.

14   Do you remember the number?

15   Q    113.

16        MR. TRAMMELL:  Your Honor, while she's doing

17   that, we move to enter Exhibit 1421 into evidence.

18        MR. BROCK:  No objection.

19        THE COURT:  1421 will be received.

20        MR. TRAMMELL:  I believe it's on Bates page 384.

21        MR. BROCK:  I don't think she's gotten the

22   exhibit yet.

23        THE WITNESS:  I haven't found the exhibit.  I

24   apologize.  I didn't realize I needed to be that organized

25   up here.  You don't have another copy?  I can keep looking

```
 1   if you just give me a moment, please.
 2        You said 113 was at DX number?
 3   BY MR. TRAMMELL:
 4   Q    I'm actually wrong.
 5   A    Well, that's a problem.
 6   Q    It's Exhibit 113.
 7   A    And the DX is 113?
 8            MR. BROCK:  I know what it looks like if we can
 9   help.
10            THE COURT:  Okay.  Go ahead.
11            THE WITNESS:  Thank you.  I'm sorry.  Here, I
12   have it.
13            MR. BROCK:  When you've finished with that, set
14   it here so that we won't have it doubled.
15            THE WITNESS:  Okay.  My apologies, I -- go
16   ahead.  I'm ready.
17   BY MR. TRAMMELL:
18   Q    If you look at, I think the relevant chart for
19   long-term is 386.  Bates range.  Page 386.
20   A    It's long-term with the Haloperidol control,
21   study 15.
22   Q    Right.  You see the weight gain there?
23   A    Yes.
24   Q    What's it say for mean-change in weight?
25   A    1.6 for Seroquel and minus 1.4 for Haloperidol.
```

1    Q     These are kilograms, right?

2    A     Correct.

3    Q     Was this information updated annually?

4    A     I'm not sure what you mean.  For study 15?

5    Q     Did AstraZeneca provide the FDA on a regular basis

6    with comprehensive weight gain data from all of its

7    trials?

8    A     Well, that would have been in the original NDA

9    comprehensive weight gain data.  And then as clinical

10   trials were performed and reported, they would have been

11   reported with the relevant clinical study reports and then

12   with the relevant supplemental NDAs, and then, of course,

13   at the request of FDA for specific times when they were

14   looking for comprehensive review of weight gain.

15         Annually, annual reports include information about

16   ongoing trials, et cetera, but to actually get one-year

17   data for weight gain questions, that would be really in

18   the study reports.

19   Q     If AstraZeneca determined or if a drug company

20   determines in general that information in its label is

21   inaccurate or misrepresents the risks that it relates to,

22   does it have an obligation to make sure the label

23   actual -- accurately reflects the available information?

24   A     Yes.

25   Q     If AstraZeneca knew -- excuse me -- in 1997 that

1    across all cohorts and in all trials involving Seroquel,

2    that the average weight gain of the year was

3    five kilograms, should it have brought that to the

4    attention of the FDA?

5    A    It would provide information from all its clinical

6    trials to the FDA, yes.

7    Q    If AstraZeneca knew that 45 percent of people that

8    took Seroquel at 52 weeks gained a clinically significant

9    amount of weight, should it have reported that to FDA?

10   A    If that was their conclusion from the entire data set

11   they were submitting to the FDA, yes.

12   Q    Did you review all the documents that AstraZeneca

13   submitted to the FDA?

14   A    I did not review things like the chemistry,

15   manufacturing control section.  I did not review some of

16   their preclinical information.  I did not review all of

17   their clinical pharmacokinetics submissions.  I reviewed

18   the clinical studies that were provided.

19   Q    Did you review AstraZeneca's internal analyses of

20   their own clinical trials?

21   A    I saw some e-mail discussions about some analyses,

22   but I was -- I also saw the actual submissions of the data

23   and the analyses that were provided to the FDA.

24           MR. TRAMMELL:  Can I get Exhibit 1?

25

1    BY MR. TRAMMELL:

2    Q    Have you ever seen this document?

3    A    Yes, I have.

4    Q    This is one of the documents you reviewed preparing

5    to testify, correct?

6    A    I reviewed this in my review of the Seroquel and

7    regulatory issues, yes.

8    Q    It's an e-mail from Lisa Arvanitis.  Who's that?

9    A    I don't know her title.  I know she signed some of

10   these other forms so I can try to find that for you.  She,

11   I believe, is a physician at AstraZeneca.

12   Q    Actually, Lisa Arvanitis signed the integrated safety

13   summary, didn't she?

14   A    Yes, along with another person, Mark Scott.

15   Q    Sure.  She's the first person listed as an author of

16   the integrated safety -- integrated summary of safety,

17   right?

18   A    Correct.

19   Q    Submitted to the FDA, right?

20   A    Correct.

21   Q    Okay.  She works at AstraZeneca, didn't she?

22   A    Yes, she did.

23   Q    Okay.  This is dated Wednesday, August 13th, 1997.

24   How long had Seroquel been on the market at that point?

25   A    I thought the approval was in September of '97 so it

1   had not been.

2   Q    Seroquel's not yet on the market at that point; is

3   that right?

4   A    Correct.

5   Q    What's the subject?

6   A    The subject matter for this e-mail states "weight

7   gain."

8   Q    And who are these other people who are copied?  Do

9   you know John Monyak?

10  A    I do not know.

11  Q    How about Barbara Kowalcyk?

12  A    No.  I've seen the name John Monyak, and I know Mark

13  Scott also signed the integrated summary of safety, but I

14  don't know their titles at the -- at AstraZeneca.

15  Q    She also e-mailed this to Mark Scott who was an

16  author of the integrated summary of safety, right?

17  A    Correct.

18  Q    Okay.  And the subject is weight gain.  And in the

19  interest of time, I don't want to read the whole thing,

20  but it says, "The purpose of this analysis is twofold."

21       Do you see where I am?

22  A    Yes, I do.

23  Q    "Is there a competitive advantage for Seroquel re

24  weight gain which we can articulate in posters, talks,

25  visual aids?  We know we have weight gain, but it is

limited to the short-term treatment and flattens out over

time?" question mark.  "Clozapine continues to accumulate.

If not number one, then what do we tell the doctors when

they talk about long-term weight gain?

"Recognize there are a number of interactions

confounds in the analysis John did, but despite this, I

was really struck by how consistent the data was across

pools, all trials, 15 alone, all trials minus 15, across

parameter measures, mean-changes, from baseline, percent

change from baseline proportion with clinically

significant weight gain, and across cohorts, various

durations of treatment."

"The results seem to be consistent and show weight

gain is more rapid initially.  While weight gain slows

over the long-term, only consider the 52 weeks, there

still is weight gain.  It doesn't stop.  The slope just

appears to change.  The magnitude of weight gain at 52

weeks, regardless of pool or cohorts, is about five

kilograms, which is more than the short-term, six-week

weight gain."

"A proportion of patients in clinically significant

weight gain of 52 weeks, regardless of pool or cohorts, is

about 45 percent, and this is more than the percentage at

six weeks."

Did I read that correctly?

1    A    Yes, you did.

2    Q    Do you know whether this was ever submitted to the

3    FDA, this document?

4    A    This document would not have been submitted to the

5    FDA.

6              MR. TRAMMELL:  Your Honor, we'd offer

7    Plaintiff's Exhibit 1 for now.

8              MR. BROCK:  No objection.

9              THE COURT:  Exhibit 1 will be received.

10   BY MR. TRAMMELL:

11   Q    Now, is it fair to say, Doctor, that most internal

12   analysis done by AstraZeneca that you have read wasn't

13   submitted to the FDA?

14   A    I saw the analyses that were submitted to the FDA

15   along with the data that was submitted with them.

16   Q    Did you see any -- we looked particularly at study 15

17   analysis that was submitted to the FDA, right?

18   A    We looked at study 15 as submitted to the FDA and

19   analysis by the FDA.

20   Q    Okay.  And that was -- and that was part of the

21   integrated summary of safety, right?

22   A    It was both part of the integrated summary of safety

23   and it was provided as an individual study report also.

24   Q    Okay.  And that was -- and information about that

25   study was submitted to the FDA, right?

1    A    Yes, in both of those places.

2    Q    Do you know if any information about study 15 in

3    terms of internal AstraZeneca analysis was submitted to

4    the FDA?

5    A    Other than the study itself and the statistical

6    analyses that were performed on that study and then it's

7    part of the integrated safety summary, those would have

8    been the analyses submitted to the FDA.

9    Q    Is it appropriate when representing the results of a

10   study to the FDA, as a drug company trying to get approval

11   to market your drug, to attempt to deceive the FDA?

12   A    I would not agree with attempting to deceive the FDA.

13   Q    How about to spin the results of studies?

14   A    To the FDA?  No.

15   Q    You can't intentionally deceive the FDA, you

16   shouldn't when you're dealing with them trying to get a

17   drug approved, should you?

18   A    Well, your responsibility is to provide the

19   information in a way that you believe is scientifically

20   accurate.

21   Q    Right.  You've got to be honest, you've got to be

22   comprehensive, you've got to be truthful when you deal

23   with the FDA, right?

24   A    Correct.

25            MR. TRAMMELL:  Can you give the Doctor

1    Exhibit 4.  Well, just before you do that.

2    BY MR. TRAMMELL:

3    Q    If a drug company doesn't do that, is there a

4    potential that inaccurate information can get to

5    prescribers?

6    A    Are you just talking in general, or are you talking

7    did I find that in this case?

8    Q    In general.

9    A    In general, if a company is not honest and

10   misrepresents their data and doesn't provide the

11   appropriate information to the FDA, that could lead to

12   labeling that's not accurate.

13   Q    It doesn't matter how comprehensive the FDA's

14   regulations are, it doesn't matter how smart the people at

15   the FDA are, if the drug company lies to them, they can't

16   do their job adequately, can they?

17   A    Correct.

18   Q    And doctors are in danger of getting information that

19   is inaccurate, right?

20   A    Correct.

21   Q    And patient care may suffer, right?

22   A    Correct.

23            MR. TRAMMELL:  You give the Doctor Exhibit 4,

24   please.

25

1    BY MR. TRAMMELL:

2    Q    Have you ever seen this document, Doctor?

3    A    Yes, I have.

4    Q    This is --

5              THE COURT:  It's not in evidence.  It shouldn't

6    be on the screen.

7              MR. BROCK:  We don't object to it.

8              THE COURT:  All right.  Exhibit 4 will be

9    received.

10             MR. TRAMMELL:  We offer Exhibit 4, Your Honor.

11   BY MR. TRAMMELL:

12   Q    Have you seen Exhibit 4?

13   A    Yes.  It doesn't have an exhibit number on it, but I

14   have seen this before, yes.

15   Q    It says "Internal Memorandum" at the top.

16        Do you see that?

17   A    Yes.

18   Q    The date is February the 12th, 1997, right?

19   A    Correct.

20   Q    From Richard Lawrence.  You see at the distribution

21   list at the bottom, you see the first CC is?

22   A    Lisa Arvanitis.

23   Q    A signatory or an author of the integrated summary of

24   safety submitted to the FDA, right?

25   A    Correct.

1    Q     Okay.  It says "Subject Re U.S./Canada Investigator

2    Meeting and Study 15," correct?

3    A     Correct.

4    Q     Can you read the first paragraph, please?

5    A     "I am not 100 percent comfortable with this data

6    being made publicly available at the present time.

7    However, I understand that we have little choice.  Lisa

8    has done a great smoke-and-mirrors job."

9    Q     Thank you.  And that's in reference to study -- the

10   subject of the e-mails relates to study 15, right?

11   A     The subject says "U.S./Canada Investigator Meeting in

12   Study 15."

13   Q     Do you know whether this e-mail was ever submitted to

14   the FDA?

15   A     No.  The study itself was.

16   Q     Was the e-mail?

17   A     No.

18   Q     Did you ever see a letter from AstraZeneca to the FDA

19   saying, "By the way, that information we gave you about

20   study 15 was smoke and mirrors"?  Have you ever seen such

21   a document?

22   A     Well, that would not be an appropriate

23   characterization of what they submitted to the FDA.

24              MR. TRAMMELL:  Objection.  Nonresponsive.

25              THE WITNESS:  They submitted the information of

```
 1   study 15.
 2           MR. TRAMMELL:  Objection.  There's no question
 3   pending.
 4           THE WITNESS:  Oh, I'm sorry.
 5           THE COURT:  There's no question pending.
 6           THE WITNESS:  I apologize.
 7   BY MR. TRAMMELL:
 8   Q    Now we talked a little bit about CBE earlier.  Do you
 9   remember that?
10   A    Yes.
11   Q    What is that again?
12   A    Stands for "changes being effected."
13   Q    And do the CBE regulations allow a drug company to
14   change their label?
15   A    Yes, in certain circumstances.
16           MR. TRAMMELL:  And give the Doctor Exhibit 860,
17   please.
18           MR. BROCK:  I'm sorry.  I don't have that.
19   BY MR. TRAMMELL:
20   Q    Is this the CBE decision, as far as you know, Doctor?
21   A    I believe this is the specific requirements on
22   content and format of labeling.  I believe the CBE
23   provision is a different regulation, sir.
24   Q    Well, yeah, we may have -- we may have a language
25   barrier.  If you'll look -- it's the Code of Federal
```

1   Regulations, Section 201.57, right?

2   A    That's what this is, yes.

3   Q    And if you go to "E."  You see "E" there?  It's on

4   page 3.

5   A    Yes.

6   Q    Okay.  Does page 3 instruct drug makers to revise

7   their package insert to include a warning as soon as

8   there's reasonable evidence of an association with a

9   serious hazard with the drug?

10  A    It doesn't just instruct drug manufacturers, but also

11  this directs the FDA reviewers regarding what goes in what

12  section.

13          MR. TRAMMELL:  Your Honor, just so we can put it

14  on the ELMO, we're offering Exhibit 860.

15          MR. BROCK:  I don't think a Code of Federal

16  Regulations would come into evidence.

17          THE COURT:  Sustained.  It doesn't come in

18  evidence.

19  BY MR. TRAMMELL:

20  Q    Do you know when --

21          THE COURT:  You can have her read that specific

22  section but --

23          MR. TRAMMELL:  Yes, Your Honor.

24  BY MR. TRAMMELL:

25  Q    You see where it says under "warnings," you see

1    Section 8?

2    A    Yes.

3    Q    The section we were just reading from?

4    A    Yes.

5    Q    You read the sentence that begins, "Labeling shall be

6    revised"?

7    A    "The labeling shall be revised to include a warning

8    as soon as there is reasonable evidence of an association

9    of a serious hazard with the drug; a causal relationship

10   need not have been proved."

11   Q    If AstraZeneca knew -- if AstraZeneca knew that there

12   was reasonable information, reasonable evidence of an

13   association between Seroquel and diabetes regardless of

14   whether they were sure the Seroquel caused diabetes,

15   should they have added that information to their warning

16   when they knew it?

17   A    Yes.  AstraZeneca or the FDA, upon making that

18   conclusion, would need to change their labeling.

19   Q    Right.  They need to add -- and this deals

20   specifically with warnings, right?

21   A    Correct.

22   Q    Okay.  They'd need to add that information to their

23   warnings, wouldn't they?

24   A    Correct.

25   Q    Okay.  If AstraZeneca made that conclusion but

1   decided to disregard the law, would that undermine the

2   FDA's oversight of AstraZeneca?

3   A    If a company were to undermine the law?

4   Q    If AstraZeneca made the conclusion, for example, in

5   2000, that Seroquel was associated with diabetes but

6   couldn't prove that it caused it and just decided not to

7   report that to the FDA, does that undermine the FDA's

8   ability to oversee AstraZeneca?

9   A    The appropriate behavior would be to communicate that

10  to the FDA.

11  Q    Right.  And to not do so would prevent the FDA from

12  doing their job, right?

13  A    It would.

14  Q    Okay.  In addition, there's the fundamental issue of

15  the purpose of these warnings which is to communicate

16  information about risk to doctors, right?

17  A    Yes.  The prescribing information is about

18  communicating information to doctors.

19  Q    Right.  And so if AstraZeneca knows that there's an

20  association or knows that there's a causation or

21  reasonable evidence of it and just decides not to update

22  its warning, it can affect the quality of care that

23  patients taking Seroquel get, right?

24        MR. BROCK:  I object to that as a compound

25  question.  There's about four things in there.

```
 1              MR. TRAMMELL:  I'll break it up.

 2              THE COURT:  Okay.  Sustained.

 3    BY MR. TRAMMELL:

 4    Q    If AstraZeneca knows that there's a reasonable

 5    association between its drug and diabetes, Seroquel and

 6    diabetes, and just decides not to update its warning, that

 7    can compromise a doctor's ability to care for its patients

 8    that take Seroquel, right?

 9    A    Well, not just AstraZeneca but if the AstraZeneca or

10    the FDA have made that determination, then the labeling

11    should be changed appropriately.

12    Q    Right.  And to not change that labeling, it's

13    inappropriate, isn't it?

14    A    Well, you would certainly want to see that their

15    conclusions were appropriately communicated to the FDA and

16    understand FDA's subsequent conclusions about how to

17    present that information most appropriately.

18         But certainly if either FDA or AstraZeneca believed

19    in, I think you said 2000, that there was reasonable

20    evidence of this association, then, yes, that would be an

21    appropriate label change.

22    Q    Right.  And to not inform doctors through an update

23    in the labeling, an update in the warning section about an

24    association with a serious disease like diabetes has the

25    potential to compromise a doctor's ability to care for his
```

1    patients, right?

2    A    Correct.

3    Q    And it certainly can affect the warnings that a

4    doctor is able to give to a patient if a doctor doesn't

5    have that warning in the package insert, right?

6    A    If it's an appropriate warning, you're absolutely

7    right.

8         MR. TRAMMELL:   We get Plaintiff's 23.

9    BY MR. TRAMMELL:

10   Q    Doctor, have you ever seen that document?

11   A    I have.

12   Q    It says, "Discussion Document" at the top,

13   "Seroquel," right?

14   A    Correct.

15   Q    It says, "Diabetes mellitus, diabetic ketoacidosis,

16   nonketotic hyperosmolar coma and hyperglycemia," right?

17   A    Correct.

18   Q    You see who the author of this document is?

19   A    The author is Wayne Gelder, MD.

20   Q    Who is Mr. Gelder?

21   A    He, at this time, is the medical director for drug

22   safety at AstraZeneca.

23   Q    Responsible for Seroquel?

24   A    Yes.

25   Q    Okay.  Do you know when this document was created?

1    A    As far as I can tell, it was to be presented at a

2    safety evaluation review meeting, and I think that was in

3    the year 2000, but I can't find a date on this.

4    Q    That's correct.  If you go to the second page, you

5    see where it says "Summary and Conclusions"?

6    A    Yes.

7    Q    Will you please read me the last sentence.

8    A    "While there were no reports of positive D challenges

9    and rechallenges, consideration should be given to the

10   suggestion that Seroquel therapy may cause impaired

11   glucose regulation, including diabetes mellitus in certain

12   individuals."

13   Q    Doctor, do you know if this document -- this

14   document, Exhibit 23, was submitted to the FDA?

15   A    No, this would not have been submitted to the FDA.

16            MR. TRAMMELL:  Your Honor, we'd like to offer

17   Exhibit 23 into evidence.

18            THE WITNESS:  No objection.

19            THE COURT:  Exhibit 23 will be received.

20            MR. TRAMMELL:  I'll pass the witness, Your

21   Honor.

22            MR. BROCK:  Just a couple of questions.

23                      REDIRECT EXAMINATION

24   BY MR. BROCK:

25   Q    Dr. Rarick, did you see in your review of all of the

1    materials of AstraZeneca in the FDA any evidence that

2    AstraZeneca hid or expressed information that in any way

3    comprised patient care?

4    A    No, not at all.

5    Q    What did you find?

6    A    I found that the study reports were provided for all

7    the studies, the relevant statistical analyses were

8    performed, adverse events were reported appropriately in

9    all of my reviews of this case.

10   Q    You were just asked a number of questions about

11   study 15.  Do you remember this morning looking at the

12   medical officer reviews where study 15 was discussed in

13   detail?

14   A    Exactly.

15   Q    And the medical officer recorded that there was no

16   evidence from study 15 that Seroquel was superior to the

17   comparator?

18   A    Exactly.  He describes that study as not contributing

19   to an effectiveness claim for Seroquel but certainly

20   contributing safety information to his review.

21   Q    And do you recall also that we looked at tables in

22   the integrated summary of safety as well as the medical

23   officer's evaluation of those tables where they look

24   specifically at the weight gain data from study 15?

25   A    Yes, we did.

1    Q    You were asked some questions about the Arvanitis

2    document.  Did you look at the clinical trials with the

3    view to see whether or not AstraZeneca reported the weight

4    gain data from all of its clinical trials?

5    A    Yes, I did.

6    Q    And did the FDA have access to that information at

7    the time of approval?

8    A    Yes, definitely.

9             MR. BROCK:  That's all.  Thank you very much.

10            THE COURT:  Any follow-up to that?

11            MR. TRAMMELL:  No, Your Honor.

12            MR. COUTROULIS:  Your Honor, if I may, I just

13   wanted to report briefly regarding Mark Scott, the

14   testimony of Mark Scott.  This was addressed in your order

15   of July 15th.

16      We had pulled Mark Scott down for live testimony

17   today because we had offered him up for deposition.  I

18   just wanted to report that we're working with the

19   plaintiffs to get him deposed by Your Honor's deadline of

20   September 30.

21            THE COURT:  Okay.  All right.  Is there anything

22   else?

23            MR. TRAMMELL:  I don't believe, Your Honor.

24            THE COURT:  All right.

25            (Proceedings concluded at 5:55 p.m.)

1            C E R T I F I C A T E

2        I certify that the foregoing is a correct

3   transcript from the record of proceedings in the

4   above-entitled matter.

5

6   s\Sandra K. Tremel  July 30, 2009

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25