```
 1                    UNITED STATES DISTRICT COURT
                       MIDDLE DISTRICT OF FLORIDA
 2                          ORLANDO DIVISION

 3                 Docket No.6:06-MD-1769-Orl-22DAB

 4   . . . . . . . . . . . . . . .
     IN RE:                       :
 5   SEROQUEL PRODUCTS LIABILITY  :
     LITIGATION                   :          Orlando, Florida
 6   MDL DOCKET No. 1769          :          October 5, 2009
                                  :          10:00 a.m.
 7   ALL CASES                    :
                                  :
 8   . . . . . . . . . . . . . . .:

 9

         TRANSCRIPT OF TESTIMONY OF DR. JOHN S. PATTERSON
10            BEFORE THE HONORABLE ANNE C. CONWAY
              CHIEF UNITED STATES DISTRICT JUDGE
11

12   APPEARANCES:

13   For the Plaintiffs:
                                  Ed Blizzard
14                                Holly Gibson

15

16   For the Defendant

17   AstraZeneca:
                                  Michael Brock
18                                Chris Coutroulis
                                  Robert Ciotti
19                                Andrew Stillufsen
                                  Fred Magaziner
20

21

22

23   Court Reporter:  Sandra K. Tremel, RMR/CRR

24   Proceedings recorded by mechanical stenography, transcript

25   produced by computer-aided transcription.
```

```
1                    P R O C E E D I N G S

2            THE COURT:  Good morning.

3        Counsel, appearances please.

4            MR. BLIZZARD:  Your Honor, Ed Blizzard and Holly

5    Gibson on behalf of plaintiffs.

6            MR. BROCK:  Mike Brock on behalf of AstraZeneca.

7            MR. STILLUFSEN:  Andrew Stillufsen on behalf of

8    AstraZeneca.

9            MR. COUTROULIS:  Chris Coutroulis on behalf of

10   AstraZeneca.

11           MR. CIOTTI:  Robert Ciotti on behalf of

12   AstraZeneca.

13           THE COURT:  All right.  Is the witness ready?

14   Are we ready to go?

15           MR. BROCK:  Yes, Your Honor.  All right.  Let's

16   go.

17           THE COURT:  Good morning.

18       JOHN SIMON PATTERSON, DEFENDANT'S WITNESS, SWORN

19           THE WITNESS:  I do.

20           THE DEPUTY CLERK:  Thank you.

21                   DIRECT EXAMINATION

22   BY MR. BROCK:

23   Q    Good morning.  Would you introduce yourself to the

24   jury and tell them where you live.

25   A    My name is Dr. John Simon Patterson, and I live in
```

```
 1   the United Kingdom.

 2   Q     What is your employment status at the present time?

 3   A     I am retired from my full-time job, and I work as a

 4   non-executive director in companies.

 5   Q     Prior to your retirement, were you employed with

 6   AstraZeneca and its predecessor companies?

 7   A     I was.

 8   Q     Would you describe for the members of the jury the

 9   period of time that you were employed with AstraZeneca.

10   A     I joined the company in 1975 and I retired on the

11   first of April this year.

12   Q     Dr. Patterson, are you generally familiar with the

13   development history of Seroquel?

14   A     Yes, I am generally familiar with it.

15   Q     As well as the regulatory history?

16   A     Yes.

17   Q     When you retired for the company, what was your

18   position?

19   A     I was a member of the board of directors of the

20   company.  My title was executive director of development.

21   Q     What were your job responsibilities in that regard?

22   A     I was responsible for the development of all of our

23   medicines and for life cycle management of all those

24   medicines that were in the marketplace.  I also

25   represented R&D on the board.
```

1   Q    Dr. Patterson, do you have a family?

2   A    Yes, I do.

3   Q    Tell the jury about your wife and your children.

4   A    My wife is a family physician who retired one year

5   ago.  My children -- hardly children anymore -- age 29 and

6   30, both got married this year, and the older one works

7   for the National Gallery in the United Kingdom in London

8   and the other one is a lawyer.

9   Q    You're a medical doctor?

10  A    I am.

11  Q    Let's talk just for a minute about your medical

12  education.  Tell the jury where you went to medical school

13  and describe your training, please.

14  A    I went to medical school in Manchester, UK.  I went

15  through the normal undergraduate training.  I then went

16  through a process of graduate training, what you would

17  call a residency program, I think, in the United States,

18  and then became a member of the Royal College of

19  Physicians which is equivalent to, I think board

20  certification in internal medicine.

21  Q    After completing your medical education and training,

22  did you have a chance to see and take care of patients?

23  A    Yes, indeed.  I spent a number of years seeing and

24  taking care of patients in a hospital environment.  That

25  was the way the medicine was practiced in the UK.

Direct Examination – Dr. John S. Patterson                    5

1    Q    Would you describe your medical practice for the

2    members of the jury, please.

3    A    Yes.  I was looking after acute medicine.  And also

4    the training process rotates you through a series of

5    subspecialties, so I worked in cardiology, endocrinology,

6    respiratory medicine, and a number of other fields.

7    Q    And for how long did you do that?

8    A    I did that from 1971 until I joined the company in

9    1974.

10   Q    I noticed on your resume that you list the Academy of

11   Medical Sciences as one of the organizations that you are

12   a member of.  Would you describe what that is, how you

13   become a member and what its function is?

14   A    The Academy is an association of academics within

15   medicine.  And you join it by invitation, you don't apply.

16   And I have been lucky enough to be invited to become a

17   fellow of that academy.

18   Q    Just so the jury has the frame of reference, during

19   what years were you in the active practice of medicine?

20   A    I actively practiced medicine from 1971 to 1974

21   full-time, and then all the way up to 1975 full-time.  And

22   then all the way through to 1980, I continued to undertake

23   outpatient clinic work in the teaching hospitals in

24   Manchester while working for another company.

25   Q    In the period of time from 1971 to 1975 when you were

1  in the active practice of medicine, can you describe the

2  patients that you were seeing and in what setting you

3  would be seeing those patients?

4  A    The setting was the hospital setting primarily, and

5  the kind of patients -- the way the system works in the UK

6  national health system, is that each unit within the

7  hospital has an acute medical take day, so you see

8  everybody that comes through the door with a medical

9  problem.  That can range from heart attacks all the way

10  through to psychiatric problems, et cetera.

11       The individual clinics then are again different to

12  the United States system.  Patients referred by their

13  family practitioner to the hospital for specialist care

14  will come as outpatient clinics or polyclinics that we

15  undertake at the hospital.

16       So two or three days a week we would see a

17  significant number of people in the particular

18  subspeciality that I was working in at the time, so it

19  might be a respiratory clinic or it might be an

20  endocrinology clinic.  And then we would then admit those

21  people as appropriate into the hospital and deal with

22  their problems.

23  Q    Then for that period 1975 to 1980 when you continued

24  to see patients, describe the patients that you were

25  seeing and in what setting.

1    A    This was in an outpatient setting in one of the

2    university teaching hospitals in Manchester in two areas.

3    One was in general medicine which is a broad spectrum of

4    internal medicine activities, and the other one was a

5    specific infertility clinic which was a mixed medical and

6    gynecological clinic.

7    Q    Now going back to 1975, did you come to join a

8    company that was involved in the development of medicines?

9    A    Yes, I did.

10   Q    Would you describe the company that you joined and

11   give the jury some background on what that company was and

12   what it did.

13   A    My intention was to do some research.  And at that

14   time, in order to become what you call an attending

15   physician or even a professor in a teaching hospital, you

16   had to undertake a period of time doing research.  And the

17   national health system had just been completely

18   reorganized and there was no money there to do research,

19   so I looked outside.  And a company called ICI, which was

20   the biggest company in the UK, a chemical company with a

21   pharmaceuticals business, was actually advertising for

22   someone to come and do clinical research in their

23   laboratories, on my birthday, the day I happened to be the

24   age that they said the minimum age.  And it gave me the

25   idea that I could do a couple of years learning

Direct Examination – Dr. John S. Patterson                    8

```
 1   therapeutics, learning how to use medicines, because as an
 2   internist, you actually spend most of your life
 3   prescribing medicines, and then go back to what I thought
 4   was going to be my lifetime occupation as a clinician.
 5   Q    And you ended up staying with ICI and subsequent
 6   companies that were related to ICI until your retirement
 7   recently?
 8   A    Thirty-four years.
 9   Q    Did you enjoy your time in terms of the work that you
10   did with ICI and AstraZeneca?
11   A    The company I joined was a very small pharmaceutical
12   company as part of a big chemical company.  I was given an
13   amazing amount of freedom and training as to how to
14   develop medicines, and I was lucky enough to become
15   involved with some very successful and very useful
16   medicines.  And that's why I never went back.
17   Q    Just so the jury has this for frame of reference,
18   would you walk through the -- briefly, the corporate
19   history of ICI and how that company that you joined
20   eventually became the company that we refer to as
21   AstraZeneca?
22   A    ICI was formed in 1926 as a -- joining together of
23   five different chemical companies.  By the time I joined
24   it, it was employing 140,000 people in the UK.  It did
25   everything from manufacturing paints through heavy
```

1  chemicals activities, and it had a small pharmaceutical

2  business.  It was about seven percent of its capital base.

3  That business was called ICI Pharmaceuticals, and it

4  invented the beta blockers.  And in fact, we got the Nobel

5  Prize for that.

6           MR. BLIZZARD:  Your Honor, I'm going to object

7  to them going into other medicines beside Seroquel that

8  the company sells or sold at one point in time.

9           THE COURT:  Well, it's overruled.  He's just

10  getting background information.

11           THE WITNESS:  The company then grew on the back

12  of the number of medicines that it developed until by the

13  early 1990s, it was actually 50 percent of the turnover of

14  this chemical company as part of being a relatively small

15  part of it.

16       And at that point, the chemical company decided to

17  break itself up.  And in 1993, three parts of the company,

18  the agrochemicals business, the pharmaceuticals business,

19  and some specialty chemicals, were separated out into a

20  company that was called Zeneca.  So the same company from

21  ICI Pharmaceuticals became Zeneca.

22  BY MR. BROCK:

23  Q    And you then became an active employee in the Zeneca

24  company?

25  A    That's correct.

1  Q    And then what occurred to have that company evolve to

2  the company that we know as AstraZeneca?

3  A    Two things happened.  The company divested its

4  agrochemicals and specialty chemicals business and just

5  became a pure-play research-based pharmaceutical company.

6       And in 1999, there was a merger between a Swedish

7  company called Astra and then Zeneca.  We became

8  AstraZeneca.

9  Q    What year was that?

10  A    1999.

11  Q    Now, you mentioned a moment ago that you were given a

12  good deal of freedom in terms of working with the medicine

13  when you joined the company in 1975.  From your early work

14  with the company, were you able to learn about clinical

15  trial design, the interpretation of clinical trials, the

16  writing of clinical study reports, submission to --

17  submissions to the United States Food and Drug

18  Administration?

19  A    Yes, I was.  The company trained me, sent me over

20  here on a training course in pharmaceutical medicine.  And

21  I had a mentor within the company.  And I spent the first

22  five years in developing a drug called Tamoxifen for use

23  in breast cancer, during which time I designed trials, I

24  ran trials, I interpreted the results of trials, and I

25  learned about -- I put the NDA together with some

```
 1   colleagues over here in the United States.  I learned

 2   about most of the aspects of running clinical development

 3   programs.

 4   Q    Just so the jury has the benefit of what you were

 5   doing in the early years, just briefly describe what

 6   Tamoxifen is and your work was in that area.

 7          MR. BLIZZARD:  Your Honor, I have a lot of

 8   questions I can ask about Tamoxifen if he starts getting

 9   into Tamoxifen, and so I'm going to object to him talking

10   about Tamoxifen and its successes or failures.

11          THE COURT:  What's the purpose of this?

12          MR. BROCK:  I just want to establish the point

13   of time in which he learned about clinical trials,

14   interpretation of clinical trials, how he learned that,

15   and giving some background about his work in that.  We're

16   not going to -- we're not going get into details about

17   what the -- you know, what all the successes of the

18   medicine were.  I'm just going to use it by way of

19   background.

20          THE COURT:  All right.  Just go into it briefly.

21   BY MR. BROCK:

22   Q    Go ahead.

23   A    During my -- those five years, my role was to

24   interface with the discovery people in terms of mechanism

25   of action, pharmacokinetics.  One of my colleagues
```

1    developed the methodology and I did the studies that

2    actually showed what it did in man.

3        It was a marketed product over that period of time in

4    a number of countries, and I was supporting that product

5    in terms of looking at the adverse reactions, interacting

6    with regulatory authorities having to deal with the

7    toxicology that we then undertook with it looking at new

8    indications and formulations.

9    Q    Okay.  Good.  Thank you.

10       Now, let's walk through some of the things that --

11   some of the positions that you held with AstraZeneca.  If

12   you would just walk us through your employment history and

13   the different things that you did with the company and the

14   job responsibilities that you would have at various points

15   along the way.

16   A    I just think I've described the first five years.  As

17   a clinical research physician, I spent some four months

18   over here as part of that time.

19       From 1980, I was given responsibility as head of

20   clinical research in the company, and I ran all of the

21   clinical research for the company for another five years.

22       I was then asked to go to Germany for a year to learn

23   about working in a subsidiary company as their medical

24   director.

25       I came back to the UK, took on extra responsibilities

1    in terms of medical affairs and marketed products.

2         And then in 1988, I was asked to come here to the

3    United States, and I spent a period of time running

4    clinical research and medical affairs for the company here

5    in the United States before returning at the beginning of

6    1990 to join the board of the company as its medical

7    director.

8    Q    So let's take 1990 as a stopping place.  In 1990 you

9    joined the board of the company?

10   A    It was the board of the pharmaceuticals business.

11   Q    Right.  So would you describe what that means in

12   terms of your job duties and responsibilities and then

13   talk to us a little bit about what you did.

14   A    I oversaw all of the doctors in the company and all

15   of the support staff in the technical area.  And I was

16   specifically responsible for ensuring that we ran our

17   clinical programs correctly, for collecting the adverse

18   reactions both in the clinical trials and in the

19   marketplace, and ensuring that there was an appropriate

20   interpretation and that we made sure that we had correct

21   licenses for our products in terms of the right wording.

22   Q    What was your next job after worldwide medical

23   director?

24   A    In 1994 I moved out of the R&D side and became

25   responsible for running our European businesses, which was

1    with sales and marketing organizations throughout Europe.

2    Eighteen months later I was also given, in addition to

3    that, responsibility for all the countries outside the

4    United States.

5    Q    What did you do next?

6    A    That's the point at which we merged with Astra.  And

7    at the merger I was asked to form a strategic marketing

8    organization, which actually sat between R&D and the

9    commercial, trying to make sure we got feedback from the

10   marketplace as to what was happening with our products and

11   also trying to direct the R&D organization as to what

12   direction to go with our products in the optimum way.

13   Q    How long did you hold that position?

14   A    I held that position from 1999, beginning of 2000

15   through to the end of 2004.

16   Q    And then in 2005 you became the executive director

17   for product development?

18   A    Yeah.  That was the point at which I came back into

19   R&D and joined the board.

20   Q    I want to talk to you a little bit about the drug

21   development process, and I'm going to hand up to you a

22   graphic number 1543 -- 1553, I'm sorry.

23        Now, do you see, Dr. Patterson, that I've placed in

24   front of you a document that covers several of the areas

25   of medicine development?

1   A    I do, yes.

2   Q    And would this document be useful and helpful to you

3   in explaining to the jury the drug development process in

4   general, as well as the development of Seroquel?

5   A    I believe it would.

6            MR. BROCK:  If you would put 1553 on the screen

7   now, please.

8            THE COURT:  What exhibit number?

9            MR. BROCK:  It's 1553, Your Honor.

10           THE COURT:  And how do you expect me to find

11  that when these are not in order?  You want me to page

12  through 175 pages to find it?

13           MR. BROCK:  I was thinking we had furnished you

14  with a copy of the ones we're using.

15           THE COURT:  Well, you know, the reason that I

16  asked you to do the joint deposition exhibit list was so

17  that any judge trying one of these cases could go through

18  it and easily find -- and the juries -- easily find the

19  exhibits.

20       Well, no.  It's got to be on this exhibit list.  I've

21  got to be able to find it quickly, like that.

22           MR. COUTROULIS:  Your Honor, if I may, the

23  demonstrative exhibits that -- the defendant's

24  demonstrative exhibits are in the 1500 range on the joint

25  exhibits.

1           THE COURT:  But they're not in numerical order.

2           MR. COUTROULIS:  They should be.

3           THE COURT:  We're using the trial exhibit list?

4           MR. COUTROULIS:  Your Honor, if I may, there

5    were two submissions that we made pursuant to your order.

6    One was a cross-reference index for deposition designation

7    exhibits, and the other was the joint exhibit list.  This

8    would be on the joint exhibit list, and in the 1500s are

9    all the defendant's demonstratives.  I think there are a

10   couple of copies on the table right here.

11          MR. BROCK:  Your Honor, that is the joint trial

12   exhibit list.  It's on page 269.

13          THE COURT:  Okay.  Thank you.

14       All right.  Go ahead.

15   BY MR. BROCK:

16   Q    Dr. Patterson, you have the copy of the document in

17   front of you, and it's also on the screen there to your

18   right, if you need to refer to it.

19       Do you see here that in the middle of the graphic

20   there is a number of steps that are -- that take place

21   along the way to the approval of a medicine?

22   A    I do, yes.

23   Q    Are you familiar with drug development generally, and

24   can you discuss with the jury the steps that a medicine

25   company must take before obtaining approval from the FDA

1    to market its medicine in the United States?

2    A    Yes, I am familiar with that process, and I'd be

3    happy to try and describe it.

4         If you look across the middle of the graphic in the

5    colored boxes, you can see starting from the left dark

6    blue, which is basic scientific research, that can be as

7    many years as it takes to find a potential medicine.

8         Having found something that looks interesting that

9    may potentially become a medicine, we then declare it a

10   development candidate.  And only about one in 10,000 of

11   those that we've synthesized gets to becoming a medicine

12   from there.

13        The preclinical research is then work that we do to

14   evaluate both the pharmacology, which is the properties of

15   the molecule, but also the toxicology, which is trying to

16   assess how safe it's going to be and to make sure that it

17   is actually safe enough to give to man.  So there's a

18   period of two to three years when that is undertaken.

19        Then we go through what is one of the major steps or

20   milestones for the company, which is the first human

21   exposure, and that's the yellow box here.  And those

22   clinical studies go on over a long period of time.  The

23   average time for development in our industry is between 11

24   and 12 years.  We put nine years here, which was the

25   Seroquel time scale, and that fits quite well.

1    When those clinical studies have reached a point

2 where there is enough evidence to meet the criteria for

3 life application, at that point we would, in the United

4 States, submit an NDA.  And that contains data on three

5 things:  Safety and efficacy and quality.  And safety and

6 efficacy can be in animals as well in man.  And the

7 quality is about making sure that what's in the tablet is

8 actually what we say it is and is stable and will be --

9 remain so under extremes of temperature, for instance.

10    NDA review can take a period of time, depending on

11 how successful it is, a minimum of six to nine months,

12 usually one to two years.

13    And after that, the product is then hopefully

14 approved and in the marketplace.  And at that point we

15 continue to study the drug.  New indications, new

16 formulations, we continue to collect adverse event data

17 and to monitor the product's progress throughout the life

18 cycle of the product.

19 Q    Now, if we think about that process as it applies to

20 Seroquel specifically, do you see at the bottom that we

21 have a number of the stages of research including basic

22 science, animal tests, and then the phases of trials?

23 A    I do.

24 Q    Okay.  So what I'd like to do is take basic science

25 first and talk about that in a little more detail.

1      So at the basic science phase of the testing of

2   medicine, what's the goal of the company and what's going

3   on during that phase?

4   A    The first thing we start with is some concept of

5   unmet medical need.  So although we talk about basic

6   science, it actually comes backwards from the clinic in

7   terms of patients who are not being treated well or there

8   are issues with what they're getting today, if there is

9   anything at all.

10      The second thing is, is some kind of break in science

11   the -- that gives us an ability to do something new or

12   different that allows us a new approach to a particular

13   disease.

14      And the third element of that is actually having

15   scientists with the right background and training who are

16   able to not only recognize that but actually generate what

17   we call animal models of the disease in order to be able

18   to try and mimic it in the laboratory, to be able to then

19   synthesize medicines that may be active in that area.

20   Q    And did AstraZeneca undertake a basic science phase

21   of testing as described in our graphic here?

22   A    Very much so.  And this was a product that was

23   synthesized and discovered in our laboratories, and will

24   have had all of the testing to try and see if it could be

25   differentiated.  Well, many, many compounds will have been

1    synthesized for the one that eventually became Seroquel.

2    Q    And if you achieve the milestones that you're

3    helping -- that you're hoping for in basic science, then

4    do you move to testing the medicine in animals?

5    A    Yes.  There's always some testing in animals to begin

6    with, but we move into a phase of what's called more

7    formal testing.  So these would be good laboratory

8    practice, toxicology studies, that's studies mandated by

9    the regulatory authorities to look at the effects of large

10   doses for periods of time on animals.

11        And the second is more general pharmacology to find

12   out whether it has unwanted effects in other systems of

13   the body that we're not -- that we've not been testing in

14   our particular very focused research.

15   Q    Now, you see at the top of the graphic we have a date

16   and some letters there, it says, "IND 9-20-88."

17        Do you see that?

18   A    I do.

19   Q    So what -- and then below that it says,

20   "Investigational new drug," correct?

21   A    Yes.

22   Q    What is the investigational new drug application and

23   how does it apply to the development of a medicine like

24   Seroquel?

25   A    That's the point at which we wish to start human

1    testing, where we've gained enough information, we hope,

2    on all of the key elements that would be required to

3    support that.  And it's an application to the Food and

4    Drug Administration which will tell them, "Here's all the

5    information we have on this chemical, here's the potential

6    usage, here's what we propose to do in man."  And we'll

7    share with them the first protocol or protocols, which

8    will say usually "single dose" starting at such a level,

9    "in healthy volunteers or in patients," and what we

10   propose to do.

11   Q    So before the medicine is ever tested in human

12   beings, you have to file everything you know with the FDA

13   and seek permission to do that?

14   A    We do.  And they have a period of time which they can

15   respond to us and put on what's called a clinical hold and

16   stop us if they're uncomfortable with that, or allow us to

17   go forward.

18   Q    What is a clinical hold?

19   A    A clinical hold is something that the FDA can impose

20   upon a pharmaceutical company or an investigator generally

21   to say, "We're not happy with the safety of this product

22   at this point in time or with the information we have

23   about it."  Or even sometimes about other products in the

24   same class.  "We don't want you to continue to dose human

25   beings at this point."

1    Q    Did you secure permission from the FDA to begin

2    testing in humans?

3    A    Yes, we did.

4    Q    And you see there that we have on the graphic,

5    "Phase I trials."

6         Do you see that?

7    A    I do.

8    Q    And is that the first time the medicine is tested in

9    human beings?

10   A    Yes, it is.

11   Q    Describe how those tests are set up and what the

12   company is looking for in the Phase I of the trials.

13             MR. BLIZZARD:  Your Honor, the question is

14   vague.  Are we talking about Seroquel here?  So my

15   objection is if we're not talking about Seroquel, I object

16   to the relation.

17             THE COURT:  Counsel, are you directing your

18   question --

19             MR. BROCK:  I am directing my questions to

20   Seroquel.

21             THE COURT:  -- generally to Seroquel?  Okay.

22   Why don't you rephrase the question then.

23   BY MR. BROCK:

24   Q    In terms of the early phases of the testing with

25   regard to Seroquel, in general terms, how would the trials

1    be set up and what would the company be looking for in

2    terms of the early trials, the Phase I trials?

3    A    Phase I trials began in a specialized clinical

4    pharmacology unit in normal, healthy male volunteers.  And

5    they began with very low single doses, well below what we

6    believed would be a therapeutic dose, and they gradually

7    increased as we get comfort and information back that

8    there are no significant issues and adverse effects.

9         At the same time -- before we even start that,

10   generally speaking, we would provide the investigators in

11   the clinical pharmacology unit with a full set of

12   information on the drugs, so-called data of the clinical

13   investigators, and we would also have gone through an

14   ethics committee approval of an independent ethics

15   committee.

16   Q    You mentioned a few minutes ago that in the early

17   phases of testing, that you would be looking to developing

18   a medicine for an unmet medical need.

19        Do you recall saying that?

20   A    I do.

21   Q    What was the unmet medical need that AstraZeneca

22   sought to address in its development program for Seroquel?

23   A    It was to try and improve upon the first generation

24   antipsychotics that had been out in the marketplace, and

25   to improve upon the early second generation of products of

1   which clozapine was the one that we were particularly

2   interested in.

3        Clozapine was a very novel agent that had managed to

4   combine the efficacy of the first generation with less of

5   the side effects in terms of movement disorders, or

6   extrapyramidal side effects as they're called, but had

7   unfortunately also shown that it caused significant

8   problems in terms of white cell counts, what's called

9   agranulocytosis, reduction of white cells.

10  Q    And in thinking about the tests that were done in

11  animals, did AstraZeneca have special tests to see if the

12  medicine affected, at least in the animal model, the

13  movement issue, the movement disorder issue?

14  A    Yes, it did.  One of the key tests or key animal

15  models was something called a rotating rod model, and that

16  was where potential new medicines from which Seroquel came

17  were dosed to rodents, and their agility or their ability

18  to move normally was tested by them having to cross a

19  rotating glass rod.

20       And essentially agents which were going to cause

21  movement disorders potentially, the animal would not be

22  able to do that at different speeds.  Those agents, where

23  the animal was able to move normally, would not.  And that

24  was one of the attempts to differentiate for something in

25  particular we believe that was relevant for was something

1    called tardive dyskinesia.

2    Q    And we'll get to the details of some of these

3    movement disorders in a few minutes, but my question at

4    this point is, were the tests successful in animals in

5    terms of what you were seeing with regard to the movement

6    disorder?

7    A    That was the differentiator in animals, yes, that

8    allowed us to think this was worth taking forward towards

9    man.

10   Q    I'm going to hand up to you now Exhibit 1531.

11        Do you have that in front of you now?

12   A    I do.

13   Q    And in talking about the unmet medical need that

14   AstraZeneca sought to address with the development of

15   Seroquel, will this graphic help you to explain to the

16   jury the therapies that were available over time and what

17   you hoped to be able to do with Seroquel in the

18   development phase?

19   A    Yes, it would.  It probably would be worthwhile just

20   briefly mentioning something about the disease we were

21   trying to treat because schizophrenia and related

22   psychosis up to the 1950s is a disease where people have

23   delusions, hallucinations, and cannot function within

24   society.  And generally speaking, starting at a relatively

25   young age, they gradually slip down through society and

1    many of them end up institutionalized or homeless.  Some

2    of them become violent due to the hallucinations that

3    they're having and can cause a serious problem within

4    society.  So that's a very serious illness against which,

5    then, up to the 1950s there were no active medications.

6    So the kind of thing --

7    Q    Let me stop you right there.  Thank you.

8         So if we could put up Exhibit 1531, which I think is

9    our slide 6.

10        Now do you have that on the screen in front of you

11   now?

12   A    No, I don't.  I still have the original.  I still

13   have this.

14   Q    Yeah, that's the same thing.

15   A    That's the same thing.  Sorry.

16   Q    So you talked about a period up to the 1950s.  So

17   what therapies were available to this severely affected

18   population up to that point of time?

19   A    Well, as you can see from the slide, very little.

20   Essentially people were incarcerated, and the kind of

21   things that were done were pretty brutal, not particularly

22   successful.

23   Q    And then there was a development in the early 1960s

24   with the advent of the first antipsychotic medications.

25   A    Yeah.  These were absolutely revolutionary and they

1    transformed these people's lives.  And for many of them,

2    it was an opportunity for them to start to be able to

3    function successfully.  So a number of those agents are

4    listed there.

5    Q    If you would hand up now our side effects slide --

6    side effects slide, yes.

7         So your comment was that these first generation

8    antipsychotics that we have listed here, some of which we

9    have listed here, Thorazine, Stelazine, Mellaril, Haldol,

10   you made the comment that they were revolutionary in terms

11   of therapeutic option that was available to patients.

12   A    Absolutely.

13   Q    Why is that?

14   A    Because there's -- as I tried to indicate, if you

15   look at the first column in the previous slide, the kind

16   of things that were being given were both traumatic to the

17   patient and frankly not very useful in terms of

18   controlling the psychosis.

19        These agents were able to control acute psychosis and

20   could also be given in a number of occasions -- a number

21   of incidences chronically to help control the disease over

22   a period of time.

23   Q    Over time, was it learned about these first

24   generation antipsychotics that they had a significant side

25   effect profile?

1   A     Yes, indeed.

2   Q     Now, if you will look at Exhibit 1532, do you see

3   there that we have a slide that says "First generation

4   antipsychotic, severe neurological side effects"?

5   A     Yes, I do.

6   Q     And then there are a number of things described down

7   there below.

8         Do you see that?

9   A     I do.

10  Q     Would that chart be helpful to you in explaining to

11  the jury some of the side effects that were seen in the

12  first generation antipsychotics?

13  A     This chart describes a number of the different

14  movement disorders that occurred as a result of these

15  agents.

16  Q     Would you put that up, please.

17  A     The first one, tardive dyskinesia, is the kind of

18  movements I described.  There are things like putting the

19  tongue out, pursing the lips, rapid finger movement as if

20  playing the piano, those kinds of things, and essentially

21  uncontrolled, involuntary movements that were purposeless

22  and uncontrolled.

23        And the issue about tardive dyskinesia was it would

24  develop during the course of giving these drugs.  Then it

25  would potentially stay after you stopped treating them

1   with the drug and, in fact, could even get worse.  So you

2   then ended up in this horrible Catch-22 situation where

3   you had to keep giving the drug to try and control the

4   tardive dyskinesia, but my understanding is it was causing

5   the problem and it could be irreversible.

6        The other agents, something like Parkinsonism, that's

7   a different kind of movement disorder.  It can be caused

8   in a number of different ways.  I'm sure in this country

9   you all know Muhammed Ali.  He has Parkinson's as a result

10  of repeated blows to the head from boxing.  You can get it

11  also from these typical antipsychotics.  Some people get

12  so-called tremor, intention tremor and cogwheel spasticity

13  of the arms.

14  Q    Can you describe in just a little more detail what

15  symptoms you have if you have Parkinson's?

16       MR. BLIZZARD:  Your Honor, I don't have an

17  objection for the general background, but now we're

18  getting into -- the witness is not a psychiatrist.  And

19  going into the level of detail they're now covering with

20  this, I object to this, and foundation.

21       MR. BROCK:  Your Honor, I think he's qualified

22  to testify to it.  He's speaking to the reason for the

23  development of the medicine which he has personal

24  knowledge about.

25       THE COURT:  The objection is overruled.

```
 1              THE WITNESS:  Parkinsonism is –– can occur
 2   normally or it can occur as a result of one of these first
 3   generation antipsychotics you asked me to describe.
 4   BY MR. BROCK:
 5   Q    So if you have Parkinson's, what are your symptoms?
 6   A    These are people who tend to lose mobility, facial
 7   expression goes, they're quite rigid, and when they try
 8   and do something, they have a tremor.
 9   Q    We've listed three others there, akathisia, dystonia,
10   and neuroleptic malignant syndrome.  Can you describe
11   those, please.
12   A    Akathisia and dystonia are different varieties of
13   movement disorders as well.  Neuroleptic malignant
14   syndrome is something very different.  The patient
15   actually seizes up, goes rigid, develops a high
16   temperature, and as it says here, it can potentially be
17   fatal.
18   Q    And then neuroleptic malignant syndrome?
19   A    That's what I just described.
20   Q    That was last one you gave me.  Thank you.
21        So the goal of the medicine was to have one that was
22   effective in treating individuals with severe mental
23   illness while not causing some of these movement disorders
24   and other side effects that were seen with the first
25   generation antipsychotics?
```

1    A     Yes.

2    Q     And as you proceeded through the phases of clinical

3    trials, did you successfully complete the Phase I portion

4    of your testing?

5    A     Yes, we did.

6    Q     If we could go back to 1553, please.

7          You see we have 1553 back in front of you now?

8    A     Yes, I do.

9    Q     When you began to test the medicine in the Phase I

10   segment of your clinical trials, are those tests done in a

11   controlled setting?

12   A     If you mean a controlled environment --

13   Q     Correct.

14   A     -- the answer is absolutely yes.

15   Q     Why is that?

16   A     Because no matter how much work you do in the

17   laboratories, ultimately everything starts again in man.

18   You try to rule out any of the obvious problems, but you

19   want to be in a situation where, if something untoward

20   happens, you can deal with it appropriately.

21   Q     And do you have systems and protocols in place for

22   recording all adverse events that may occur while someone

23   is taking a medicine?

24   A     They are present, as they were with Seroquel, from

25   the day the first patient or first volunteer takes the

1    study through to the day the product stops being used.

2    Q    Now, did AstraZeneca successfully undertake the

3    Phase I of the trials so that it was appropriate to move

4    to Phase II?

5    A    Yes, we did.

6    Q    Describe for the jury what occurs in the Phase II

7    segment of trials.  And just so that the jury has a point

8    of reference in terms of time, where are we now in the

9    time sequence?

10   A    Now we're entering into about 1989, and in terms of

11   Phase I, with single doses or short multiple doses.  By

12   that I mean, generally speaking, seven to ten days is the

13   maximum you will do in Phase I dosing, to look at kinetics

14   and metabolism, how the drug's absorbed and excreted, as

15   well as any obvious toxicology.  And you build up the dose

16   to the point where you think you've reached what might be

17   a therapeutical lethal dose.

18       At that point, Phase II is where you start to go into

19   patients.  And the first part of Phase II, which we now

20   call Phase II-A, is the -- has the object, really, of

21   trying to show efficacy in the disease area in which you

22   are trying to treat patients.

23   Q    When you get to the end of Phase II, if you think

24   your testing program has been successful, do you then have

25   the opportunity to sit down with the FDA and tell them

1    where you are in your development program and talk to them

2    about whether you will go to the next phase?

3    A    You not only have the opportunity, it's part of the

4    process.  So at the end of Phase II, we have what is

5    called the End-of-Phase-II-Meeting.  We submit all of our

6    data to the FDA, which will be on dose ranging as well,

7    which is something that we spend a lot on in Phase II-B,

8    and we present that to them as a key step to moving

9    forward with the development.  And we have a big tollgate

10   within the company as well.

11   Q    You say a big tollgate within the company at that

12   point.  What are you referring to, Dr. Patterson?

13   A    Well, that is a point in the company when potentially

14   you're now going into very large studies, you're probably

15   going to have to start manufacturing at a site which could

16   ultimately become the supplying site for the marketed

17   product.  And so it's a significant investment in time and

18   effort for the company, and therefore it becomes a senior

19   management decision point within the company.

20   Q    When you get to the end of Phase II, if the FDA is

21   not satisfied with your progress in terms of what you've

22   done to that point in time, can they put a hold on your

23   program?

24   A    Yes, they can.  They can do everything from asking

25   you to generate more data and they can send you back to

1    the laboratory, or they can agree that you've come through

2    and you can enter Phase III.

3    Q    Dr. Patterson, I'm going to hand now Exhibit 46.

4         MR. BROCK:   This document, Your Honor, was

5    admitted in Dr. Rarick's exam.

6    BY MR. BROCK:

7    Q    Do you have Exhibit 46 there?

8    A    I do.

9    Q    And is that the minutes of the End-of-Phase-II

10   Meeting that took place between AstraZeneca and the FDA?

11   A    That appears to be the case, yes.

12   Q    If we could see slide 3, please, out of that

13   document.

14        Do you see there I have on the screen End of Phase II

15   Minutes, February 8th, 1993?

16   A    I do.

17   Q    And does that help refresh you as to the time frame

18   in which AstraZeneca was talking to the FDA about going

19   forward to Phase III?

20   A    Yes.

21   Q    If you look at slide 4, do you see there that we have

22   the FDA staff that is present?

23   A    I do.

24   Q    And are there a number of different specialties

25   represented there in the FDA staff?

1   A    Both specialties and levels of management within the

2   organization.

3   Q    And if you turn to slide 5, which will be page 4 in

4   your exhibit, do you see there at the bottom where it says

5   "In conclusion, the FDA confirmed that Zeneca

6   Pharmaceuticals must study pharmacokinetics and

7   pharmacodynamics prior to the NDA but would not be held up

8   from entering Phase III.  Zeneca Pharmaceuticals agreed to

9   redesign the protocols and seek FDA's concurrence prior to

10  implementation."

11       What does that mean?

12  A    It means that the FDA had reviewed the protocols and

13  had some suggestions as to what we should do differently

14  in order to be successful through the Phase III process or

15  to get the right information.

16  Q    Does this reflect that AstraZeneca is in agreement

17  with the FDA's suggestions?

18  A    It does.

19  Q    And then the last sentence there says, "Mr. Steven

20  Hardeman confirmed that Zeneca Pharmaceuticals' Seroquel

21  program was officially in Phase III."

22  A    Yes.

23  Q    Now, if we go back to our timeline, 1553, do you see

24  we have a time point there where Phase III trials are

25  undertaken?

1    A    I do.

2    Q    And corresponding with the letter here, that's going

3    to be in the 1993 time frame.

4    A    Yes.

5    Q    All right.  Describe for the members of the jury the

6    purpose of the Phase III trials, what you're seeking to

7    learn about the safety and the efficacy of the medicine.

8    A    There are a number of purposes for the Phase III

9    trials.  One is to expand the safety database

10   significantly both in terms of numbers of patients treated

11   to meet the guidelines to get an adequate picture of the

12   safety for a license.  The second is to expand the

13   efficacy either in placebo-controlled studies or in

14   positive-controlled studies depending on the medicine and

15   the area of medicine that you're in.

16        With this drug, it was primarily short-term

17   placebo-controlled studies with the objective of

18   delivering adequate and well-controlled studies to the FDA

19   for a license.

20   Q    Are you familiar generally with the results of the

21   Phase III trials?

22   A    In general, yes.

23   Q    All right.  Would you describe for the jury whether

24   or not you were successful in terms of meeting your study

25   objection -- objectives in Phase III?

1            MR. BLIZZARD:  Your Honor, I have objection to

2    the foundation.  Can I take the witness on voir dire?

3            THE COURT:  No.  Objection is overruled.  He's

4    obviously qualified to answer this general question.  If

5    he gets into specifics, you can cover it later.

6            THE WITNESS:  The program included

7    placebo-controlled studies which in short-term showed that

8    the drug was effective in the treatment of schizophrenia.

9    And there was also I think one positive-controlled study

10   as well.  That program was -- or met the criteria that we

11   had set out and that the FDA set out for achieving a

12   license.

13   BY MR. BROCK:

14   Q    At the completion of your Phase III segment of the

15   study of the medicine, did you then apply to the FDA for

16   permission to market Seroquel in the United States?

17   A    It shows that at the top of the graph there, the

18   exhibit, that that new drug application was submitted on

19   the 24th of September 1996.

20   Q    Do you see there -- I think what you're referring to

21   is the NDA 9-24-96 new drug application line on the graph

22   is what you're referring to?

23   A    Yes.

24   Q    Now, describe for the members of the jury what is

25   contained in the new drug application.

1   A    New drug application is a very large, it used to be a

2   document and now is electronic, but it consisted of

3   everything that the company has done with the product in

4   the clinic and all of the background information to

5   support its use.

6        So the clinical section of the NDA contains as its

7   base information on every single volunteer and patient

8   who's actually ingested the medicine and those that have

9   been on the comparators as well.

10       Then at the next level up, there are individual study

11  reports which are the, as it says, the individual studies

12  and the NDA, and then the next level up is something

13  called the Integrated Summary of Safety and the Integrated

14  Summary of Efficacy.  They are two mandated documents that

15  we produce that take all of the information and summate it

16  and pool it and try to look at it from every direction and

17  produce an overview as to what the product has done in

18  that group of people.  And then on top of that sits

19  proposed wording for a package insert.  So that's the

20  clinical information.

21       In parallel with that is all the preclinical

22  information which covers both pharmacology, it covers

23  toxicology, and it will also cover all of the

24  manufacturing information on what's the so-called pharmacy

25  or quality activity.

1    Q    So there's a section of the NDA that speaks to the

2    issue of whether the medicine works?

3    A    Yes.

4    Q    And that's -- one of the sections of the document is

5    the Integrated Summary of Efficacy?

6    A    That's the section that's speaks to that, to whether

7    the product works.

8    Q    I'm going to bring up to you now Exhibit 116.

9         Dr. Patterson, is 116 a number of excerpts from the

10   Integrated Summary of Efficacy?

11   A    That's the title on the front page, so that's what I

12   assume it is.

13   Q    All right.  If you turn to the second page of that

14   document, our slide 11, do you see there that it says

15   "Integrated Summary of Efficacy," and it has a date down

16   below of May 9, 1996?

17   A    I do.

18   Q    And then it's signed by Lisa Arvanitis, Mark Scott,

19   and Christopher Griffett?

20   A    That's correct.

21   Q    Now, just a couple of points out of this document if

22   I could, please.

23        If you turn to page 110 of that document, which is

24   our page 14, do you see there there's a section 3.4.9?

25   A    I do.

1    Q    And does it say, "The efficacy of quetiapine in the

2    treatment of hospitalized mild to moderately ill patients

3    with schizophrenia was demonstrated in the analyses of the

4    BPRS total score and the CGI severity of illness score,

5    the primary efficacy variables."

6         Do you see that?

7    A    I do.

8    Q    Now, I want to take just a step back to the period of

9    time that you were testing the medicine.  So can you

10   describe for the jury the tests that you set up for

11   Seroquel to see if it was working in the patient

12   population that we're talking about here today?

13   A    The studies, which I wasn't directly involved in

14   running but was aware of, were short-term, four- to

15   six-week placebo-controlled studies in patients with

16   diagnoses of schizophrenia, with the objective of looking

17   through these ratings scales at control or improvement of

18   the disease.

19   Q    Just in general terms, how do you tell if a patient

20   is doing better on a medicine versus a placebo?

21   A    Well, in many areas of medicine, you have something

22   very simple to measure, so if you have high blood

23   pressure, I can measure your blood pressure.  If you have

24   a tumor, I can often measure the size of the tumor.  In

25   psychiatry, you are in a very different situation because

1   there is no objective measure.

2       So what is used are a series of so-called rating

3   scales, and they are administered by people who are

4   trained raters who've gone through some kind of process

5   where they will have been shown films of various patients

6   and have to get the scores right.  They have validated

7   over -- most of them are validated over a period of time.

8   And you use changes in those rating scales, which is what

9   is described here, as the right way of deciding whether

10  the medicine is working.

11  Q    This document goes on to say, "Quetiapine was

12  superior to placebo in the treatment of positive

13  symptoms."

14      What are positive symptoms in the context of this

15  patient population?

16  A    They would be things like delusions or

17  hallucinations.  They are visible signs of the illness.

18  The patient is doing something or feeling something.

19  Q    Now, just to take one short step back, you mentioned

20  that the trials that were submitted in support of the

21  application for approval to the FDA were

22  placebo-controlled.

23      Why do you use a placebo control when you're testing

24  a medicine for efficacy?

25  A    Because in a number of circumstances in medicine,

1   patients can improve spontaneously or there can be

2   significant variability, and therefore it is standard

3   practice, wherever possible, to put in a blinded placebo

4   comparison.  By "blinded," that means that the person in

5   this case doing the rating scales doesn't know who is

6   getting the real drug and who's getting the comparative of

7   the placebo.

8        And that allows you to make sure that the changes --

9   or to try to make sure that the changes you see are those

10  in -- that actually happened as a result of the taking of

11  the medicine rather than what is happening spontaneously.

12  Q    Thank you.

13       If you would turn now to page 110, which is section

14  3.5.  And do you see there there's a section "Overall

15  Conclusions for Short-Term Placebo-Controlled Trials"?

16  A    I do.

17  Q    All right.  Take a quick look at that, and then if

18  you would just describe quickly in a narrative way what

19  the overall conclusions were for the short-term

20  placebo-controlled trials.

21  A    The conclusions there were that the efficacy of

22  quetiapine was demonstrated in four double-blind

23  placebo-controlled studies.  And the first line then goes

24  on to detail as to what the tests were, and I'm not an

25  expert in those tests, that were used to come to that

1    conclusion.

2    Q    Okay.  Language is there that, "Quetiapine was

3    consistently superior to placebo in all trials and its

4    effect on positive symptoms."

5         So that positive symptoms that is referred to there

6    are those items that you described just a few minutes ago?

7              MR. BLIZZARD:  Objection, leading.

8              THE COURT:  Sustained.

9    BY MR. BROCK:

10   Q    When the document says, "Quetiapine was also

11   consistently superior to placebo at all trials in its

12   effect on positive symptoms," what's that referring to?

13   A    That would be referring to the kind of positive

14   symptoms like hallucinations and delusions that I referred

15   to earlier.

16   Q    Is there a section of the NDA that's referred to as

17   the Integrated Summary of Safety?

18   A    Yes, there is.

19   Q    And what is the Integrated Summary of Safety and what

20   information does it contain?

21   A    It's pretty well what it says on the box.  It is

22   every piece of safety information that has been generated

23   on the product, looked at in a whole series of different

24   ways, analyzed to try and see whether there are obvious

25   safety changes, whether there are things going on within

Direct Examination - Dr. John S. Patterson          44

1   the patient population that are significant for the

2   potential license of the product.  Really to try and get

3   at the benefit-risk ratio.

4   Q    Good.  Thank you.  Now, I'm going to hand up to you

5   Exhibit 113 and ask you if this is a document that

6   contains a few excerpts from the Integrated Summary of

7   Safety?

8   A    The cover is entitled "Integrated Summary of Safety,"

9   so while it would be a huge, thick document, that must be

10  extracts.

11  Q    Right.  If you turn --

12        MR. BROCK:  Your Honor, could I approach the

13  witness just for one second?

14        THE COURT:  Yes.

15  BY MR. BROCK:

16  Q    So if you turn to the first page, do you have

17  Table 11.1.1 there in front of you?

18  A    I do.

19  Q    And would you describe for the members of the jury

20  what that table represents.

21  A    It is the "mean and mean change values for serum

22  chemistry parameters at baseline and end of treatment,

23  short-term," bracket, "six weeks, placebo-controlled

24  trials."

25  Q    Is this AstraZeneca conveying to the FDA before the

1    approval of the medicine what it knows about various

2    laboratory parameters?

3    A    Yes, it is.

4    Q    Is there a section there for glucose?

5    A    It's the second line.

6    Q    So what does the line for glucose convey to the FDA

7    and what's the significance of that?

8    A    It shows the total number of patients exposed where

9    glucose was measured.  It shows the baseline mean and SD,

10   which is the variability, the end of treatment values and

11   the change for that.  And then across the graph, the

12   table, it shows similar information for the placebo

13   patients.

14   Q    Does AstraZeneca also convey to the FDA in the

15   Integrated Summary of Safety information about changes in

16   weight?

17   A    Yes, it does.

18   Q    If you will look at the next table, I think it's

19   14.1.1; do you have that there?

20   A    I do.

21   Q    And is this again AstraZeneca conveying to the FDA

22   what it has learned about changes in weight in the

23   short-term placebo-controlled trials?

24   A    Yes.  This is a summation of all the information

25   across the patients where that was measured.

1   Q     And what is conveyed in the section under weight in

2   Table 14.1.1?

3   A     This is not split out by prior body weight.  It

4   simply gives the number of patients treated, their

5   baseline weight, end of treatment, the change which is

6   2.3 kilos, and the variability on that which is plus or

7   minus 3.9.  It does the same for placebo where the change

8   was 0.1 mean with variability of 3.1.

9   Q     Now, you mentioned a few minutes ago there was also a

10  trial involving an active comparator in the period of time

11  that AstraZeneca was testing the medicine before approval,

12  correct?

13  A     Yes.

14  Q     If you will turn to the next table, 14.1.3, do you

15  see that there is reference there to a trial number 15

16  which is a haloperidol control trial?

17  A     I do.

18  Q     And is there information in the Integrated Summary of

19  Safety about trial 15 there at Table 14.1.3?

20  A     This table seems to refer exclusively to trial 15.

21  Q     And does AstraZeneca convey a change in weight in the

22  Seroquel-treated patients of 1.6 kilograms?

23  A     Yes, it does.

24  Q     And then looking over at the average change for

25  haloperidol is the number minus 1.4?

1    A    Yes.

2    Q    So in this Integrated Summary of Safety was

3    information about trial 15?

4    A    Yes, indeed.

5    Q    Now, if you look at pages 298 and 299, which I think

6    are the next two pages that you have there, do you see

7    that there is a narrative summary about weight changes in

8    trial 15?  It would be the bottom of 298, the top of 299.

9    A    Yes, I do.

10   Q    And do you see that AstraZeneca has reported to the

11   FDA, "For trial 15, quetiapine-treated subjects had a

12   greater weight increase, 1.6 kilograms, compared with the

13   haloperidol-treated group minus 1.4."

14        Do you see that?

15   A    I do.

16   Q    And then it goes on to say, "In general, mean weight

17   increases from baseline for quetiapine-treated subjects

18   were greater at week 52 for subjects completing the

19   trial."

20        Do you see that?

21   A    Yes, I do.

22   Q    And then it gives a range of .2 -- of 2.05 kilograms

23   to 8.52 kilograms.  Right?

24   A    Yes.

25   Q    Just so the jury, later, if they want to -- wants to

Direct Examination – Dr. John S. Patterson                    48

1    do a calculation, how many pounds to a kilogram?

2    A    2.2.

3    Q    "Suggesting a trend for subjects to continue gaining

4    weight overtime."

5         Do you see that?

6    A    Yes.

7    Q    So AstraZeneca is conveying in the Integrated Summary

8    of Safety its findings with regard to weight in trial 15?

9              MR. BLIZZARD:  Objection.  Leading, Your Honor.

10             THE COURT:  Sustained.

11   BY MR. BROCK:

12   Q    Did AstraZeneca convey its finding with regard to

13   trial 15 in the Integrated Summary of Safety?

14             MR. BLIZZARD:  Your Honor, same question.

15             THE COURT:  Sustained.

16   BY MR. BROCK:

17   Q    Will you state whether or not AstraZeneca conveyed to

18   the FDA its findings with regard to trial 15?

19             MR. BLIZZARD:  I don't want to be difficult

20   about this, but that's exactly what he just suggested to

21   the witness.

22             THE COURT:  Sustained.

23   BY MR. BROCK:

24   Q    What is reflected in the Integrated Summary of Safety

25   with regard to trial 15?

1    A    From the abstracts that I could see here, there's

2    some narrative that states in trial 15 there was a greater

3    weight gain increase compared to haloperidol, and the

4    numbers are there, as I think you read early, and also

5    that over a period of time, by week 52, there was a

6    greater increase in weight than there had been at the

7    earlier stages.

8    Q    Now, would AstraZeneca also submit a clinical study

9    report for trial 15?

10   A    It would submit clinical study reports for all the

11   studies that were undertaken prior to the NDA being

12   submitted.

13   Q    Thank you.

14        I'm going to hand up to you now Exhibit 128.  If you

15   look at the first page of that, is it titled "Clinical

16   Trial Report for Trial Number," there's some numbers there

17   and then there's the 0015?

18   A    Yes.

19   Q    And that document is dated April 23rd of 1996?

20   A    It is.

21   Q    If you look over at Table 19.3 which I think is on

22   page 2284; do you have that?

23   A    I do.

24   Q    Do you see that this is a table that reflects

25   proportion of patients with clinically significant values

1   for vital signs by week?

2   A    Yes, I do.

3   Q    And then is there a section for weight, it says

4   "Abnormal Weight"?

5   A    Yes, there is.

6   Q    All right.  Now, what percentage of patients is

7   AstraZeneca reporting to the FDA have clinically

8   significant values for weight in the trial?

9   A    It is looking at two different doses, TID and BID,

10  and total.  If I just take the "Total" column, then the

11  numbers are pretty small at 75 milligrams.  There are

12  eight patients and the percentage increase in weight is

13  ten percent of those.  So eight out of 81 got the

14  increase.

15       If you go across to the 300 milligram into the bottom

16  right-hand corner of this tabulation, you're looking at 13

17  out of 87 or a total of 15 percent.

18  Q    Is there also a calculation made for what has

19  occurred at week 52?

20  A    Yes, there is.

21  Q    And is that showing 20 percent in the 75-milligram

22  category --

23            MR. BROCK:  Could you-all put that on the

24  screen, please?  It's number 22.

25

1    BY MR. BROCK:

2    Q    You see it's 20 percent in the 52-week category?

3    A    Yes, indeed, at 75 milligrams.

4    Q    And at 52 weeks with 300 milligrams, what has

5    AstraZeneca reported to the FDA?

6    A    Seven out of nine patients, or 78 percent.

7    Q    Did the FDA approve Seroquel as a medicine that was

8    safe and effective based on the information that was

9    submitted in the NDA?

10   A    Yes, it did.

11   Q    I'd like to direct your attention now, please, sir,

12   to Defendant's Exhibit 100.  Do you have that letter dated

13   September 26, 1997?

14   A    Yes, I do.

15   Q    If you look at the second page, do you see that it's

16   signed by Bob Temple, officer of drug evaluation 1?

17   A    Yes.

18   Q    Doctor, if you look at the first page of the

19   document, do you see the paragraph that says, "The new

20   drug application provides for a new chemical entity

21   indicated for the treatment of the manifestations of

22   psychotic disorders"?

23   A    Yes, I do.

24   Q    All right.  Is that the indication for the medicine

25   when we hear what's the medicine indicated for, is this

1    the indication for the medicine that was initially

2    approved by the FDA?

3    A    Yes, it was.

4    Q    Now, would you describe for the members of the jury

5    what "manifestations of psychotic disorders" means?

6    A    It means the symptoms that patients are exhibiting in

7    terms of psychosis.  It is not specific to schizophrenia.

8    This seems to be a broader indication which could include

9    a whole series of psychotic disorders beyond

10   schizophrenia.

11   Q    Now, if you look at the next paragraph, do you see

12   that, "The FDA has completed its review of the application

13   including the submitted draft labeling and has concluded

14   that adequate information has been presented to

15   demonstrate that the drug product is safe and effective

16   for use as recommended in the enclosed marked-up draft

17   labeling"?

18        Do you see that?

19   A    Yes, I do.

20   Q    Then if you look at the next paragraph --

21        If we could pull the next paragraph up.

22        "The final printed labeling must be identical to the

23   enclosed marked-up labeling.  Marketing the product with

24   FPL that is not identical to this draft labeling may

25   render the product misbranded an unapproved new drug."

1      Do you see that?

2   A    I do.

3   Q    Now, what -- from AstraZeneca's perspective, what

4   does that mean?

5   A    That means that the FDA has said, "Here are the rules

6   essentially from which you can -- under which you can

7   market this product.  Here is your license under these

8   indications and you must not vary.  You must not vary from

9   it."

10  Q    Now, if we could look quickly, do you have the

11  label -- the actual product label that's attached there to

12  the letter approving the medicine?

13  A    Yes, I do.

14  Q    If you turn to page 5, which is our slide 25, do you

15  see there's a section in the label "Indications and

16  Usage," and that refers to the manifestations of psychotic

17  disorders that we just discussed?

18  A    Yes, it does.

19  Q    Then if you turn to page 17, is there a section there

20  where AstraZeneca is disclosing to the prescribing

21  community what it has learned about weight gain in the

22  three- to six-week placebo-controlled trials?

23  A    Yes, there is.

24  Q    What do you tell the prescribing community in the

25  official label?

1    A    Under the heading "Weight Gain," "The proportion of

2    patients meeting the weight gain criteria of greater than

3    seven percent of body weight, compared in a pool of four,

4    three- to six-week placebo-controlled clinical trials,

5    revealing a statistically significantly greater incidence

6    of weight gain for Seroquel," brackets, "23 percent,

7    compared to placebo," brackets, "six percent."

8    Q    If you look at the section "Dose-Related Events,"

9    which is page 16 and 17 of the label, does AstraZeneca

10   tell the prescribing community that "logistic regression

11   analyses reveal positive dose response for the following

12   adverse events," and then does it list weight gain?

13   A    It lists three things including weight gain.

14   Q    And the other two are?

15   A    Dyspepsia and abdominal pain.

16   Q    Now, did AstraZeneca also tell the prescribing

17   community what it had learned, if anything, about

18   metabolic and nutritional system adverse events as well as

19   endocrine system adverse events in a clinical trial

20   program?

21   A    Yes, it did.

22   Q    We've used the term now "adverse events."  So would

23   you describe for the jury what an adverse event is in the

24   context of a clinical trial and how that relates to

25   information you disclosed to the prescribing community.

1    A    When we're collecting information on our clinical

2    trials, we have the ability -- or we request the clinician

3    conducting the study to tell us of any adverse event that

4    may have occurred to the patients during the course of

5    that study.

6         They are often given a very open opportunity to say

7    what that might be.  So it's a broad attempt to try and

8    capture anything that might relate to a specific system or

9    might be changed that they had feel has happened to the

10   patient during the course of the program.

11   Q    Okay.  Now, are there disclosure made to the

12   prescribing community about hyperglycemia and diabetes

13   mellitus in the product label?

14   A    My understanding is that both of those were listed in

15   the adverse event section.  Diabetes was under the

16   endocrine system as infrequent.

17   Q    Do you have that on page 19 -- are you on page 19

18   now?

19   A    I am, yes.

20   Q    So under "Metabolic and nutritional system

21   infrequent," hyperglycemia is listed, correct?

22   A    Correct.

23   Q    And then is there a section for infrequent in the

24   endocrine system?

25   A    Yes, there is.

1    Q    And is diabetes reported there?

2    A    Yes, it is.

3    Q    By listing these items in the adverse event section,

4    are you conveying to the physicians that you think that

5    Seroquel causes diabetes?

6    A    No, we're not.  I think as I tried to describe

7    earlier, in describing adverse events that have occurred

8    during our trials programs, we don't attach a causation to

9    that.  We collect all the information and then try and

10   assess it afterwards.

11   Q    One more section of the initial label.  If you will

12   look at page 7 and 8, is there information in the

13   precautions section that is conveyed to physicians about

14   cholesterol and triglyceride elevations?

15   A    Yes, there is.

16   Q    And in summary terms, what's conveyed to the

17   prescribing community about what AstraZeneca has learned

18   about cholesterol and triglycerides in the clinical trial

19   program?

20   A    It describes the pooled results of the

21   placebo-controlled studies where cholesterol and

22   triglycerides were elevated by 11 to 17 percent

23   respectively.

24   Q    Thank you.

25        Could we go back to our slide, timeline slide,

1    please.

2         Dr. Patterson, do you see that we have on the slide

3    there the date for the initial approval of the medicine?

4    A    Yes, I do.

5    Q    I want to ask you about the number of patients that

6    were in your clinical trials.

7         Are you familiar with the International Conference of

8    Harmonization Standards with regard to the conduct of

9    clinical trials?

10   A    Yes, I am.

11   Q    I'll ask you what those standards say about the

12   number of patients that should be included in clinical

13   trials prior to approval and if AstraZeneca met or

14   exceeded those standards before the approval?

15   A    The standards that were a joint activity between

16   regulatory authorities throughout the world laid down a

17   number of guidelines and they were not absolutes, but

18   generally speaking, the guideline was that for a medicine

19   treated for short period of time, around 1,500 patients

20   should be included or studied on that medicine prior to

21   applying for license.

22   Q    And how did AstraZeneca's testing program look in

23   comparison to that standard?

24   A    It's my understanding that when the NDA was

25   submitted, there were about 2,200 patients in the programs

1    that were described, and then with the safety update that

2    would have been submitted during the course of review by

3    the FDA, a further 600 were added.  So compared to the

4    1,500, some 2,800 patients had been studied by the time

5    the NDA was approved.

6    Q    Thank you.

7             MR. BROCK:  This would be a good stopping point.

8             THE COURT:  Okay.

9                  (Pause in the proceedings.)

10            MR. BROCK:  While he's doing that, I'd like to

11   offer Exhibit 116 which is the excerpts from the

12   Integrated Summary of Efficacy, as well as Exhibit 128

13   which is the excerpts of study 15.

14            THE COURT:  They'll be received.  There's no

15   objections listed.

16            (Exhibits 116 and 128 received in evidence.)

17            THE COURT:  Go ahead, counsel.

18   BY MR. BROCK:

19   Q    Dr. Patterson, I want to talk now about the period of

20   time from 1997 to 2000 with regard to the medicine

21   Seroquel.  I want to just ask you some general questions

22   about AstraZeneca's protocols for watching over the safety

23   of medicines once they're on the market.

24        So first of all, by way of background, do medicine

25   companies like AstraZeneca learn things about the safety

1    profile of its medicines after the regulatory authority

2    approves the medicine for sale and distribution in the

3    United States?

4    A    Very much so.  Generally speaking, as we've already

5    discussed, at the time that the medicine is licensed, we

6    will have studied 2- or 3,000 patients in very great

7    depth.

8         But once the product gets into the marketplace, it's

9    now going to be used, we hope widely and effectively, and

10   that results in a series of things happening.

11        Firstly, there are spontaneous reports of potential

12   adverse events that come to the company.  There are some

13   that come to the regulatory authorities.  We continue to

14   develop our medicines, and we look at new indications, new

15   formulations for a product like Seroquel, with the idea of

16   learning on the feedback that we get from the marketplace

17   but also our understanding of the science as to where the

18   product might go in terms of potential other uses.

19        So we continue to study a product such as Seroquel

20   both from an efficacy perspective but also in collecting

21   safety information.  And we endeavor to collect and review

22   as comprehensive a safety database as we can achieve.

23   Q    You used the term "spontaneous adverse event report."

24   Would you define that for the jury and then just share

25   with the jury in general terms how spontaneous adverse

1   event reports are utilized by the company in understanding

2   the safety profile of the medicine.

3   A    Spontaneous adverse event reports, generally

4   speaking, come from healthcare professionals, but not

5   always.  They are somebody reporting that something

6   happened on a patient taking our drug.  So it's as simple

7   as that.  It's a very broad, wide category aimed at trying

8   to capture everything that comes in.

9        What you then do with it is dependent upon the

10   severity and whether it's known previously.  There are

11   rules for reporting severe events to the regulatory

12   authorities promptly.

13       We also, within the company, have rules for

14   evaluating those activities, in other words, that piece of

15   information, and doing that in a number of different ways.

16   So we have in place, and have had since the earlier 1990s,

17   a safety or event review or a signal event and review

18   monitoring process that looks at periodically all of the

19   products in the marketplace and tries to assess whether

20   there are signals emerging that we have some issues that

21   we need to look at.

22   Q    When you-all use the term "signals" -- let me reask

23   that.

24       When you use the term "signal," what are you

25   referring to?

1   A    Signal can be an event or cluster of events that say

2   to us potentially there's a correlation between giving

3   this drug and something happened to the patients, which

4   could be good or bad, by the way.   It doesn't necessarily

5   mean an adverse event.   So signal identification is an

6   absolute key activity that we undertake as a company.

7        Same thing happens within the regulatory authorities.

8   They reassess their databases.   We also produce what are

9   called periodic safety update reviews.

10        So again, the rules of our license state that at time

11   periods of decreasing frequency, as the product is in the

12   marketplace for longer, we have to review and submit all

13   our adverse events on our products to the regulatory

14   authorities.

15   Q    So these are activities that would be routinely going

16   on at the company, I'll just take for now the period of

17   1997 to 2000?

18   A    Yes, they would.   And we have a series of -- a large

19   number of people involved in that activity.

20   Q    Now, I want to direct your attention at this point to

21   an event that occurred in the year 2000, and that was an

22   FDA request for information that was directed to

23   AstraZeneca.

24        Do you recall in general terms those events?

25   A    I was aware of the event because FDA asking us for

1    specific information on one of our projects is something

2    that makes you sit up and take note.

3    Q    Good.  Let me hand to you now Exhibit 40.

4         Do you have Exhibit 40 in front of you now?

5    A    I do.

6    Q    And do you see that that is a May 1, 2000, letter

7    from the FDA to Zeneca Pharmaceuticals?

8    A    I do.

9    Q    Now, if you direct your attention to the second

10   paragraph, you see that there's reference to the "FDA

11   having recently examined postmarketing surveillance data

12   from FDA adverse event reporting system for Seroquel."

13   That's the first part of that -- the first sentence of

14   that second paragraph.

15   A    Yes, it is.

16   Q    So the FDA adverse event reporting system, is that

17   what you were describing a few minutes ago?

18   A    It's one of the systems, yes.

19   Q    And it says, "For Seroquel as well as for other

20   atypical antipsychotics with respect to spontaneous

21   reports of new onset diabetes, nonketonic hyperosmolar

22   coma, and diabetic ketoacidosis."

23   A    Yes, it does.

24   Q    It goes on to say, "Although this examination reveal

25   few of these adverse experiences in association with

1   Seroquel, a larger number of cases with similar agents

2   that have longer periods of postmarketing exposure raises

3   the possibility that more cases associated with Seroquel

4   will emerge as experience accumulates."

5       Do you see that?

6   A    I do.

7   Q    Does this document demonstrate to you that the FDA is

8   looking at and has knowledge not only of your medicine but

9   of other medicines in the class?

10          MR. BLIZZARD:  Objection.  Leading.

11          THE COURT:  Sustained.

12  BY MR. BROCK:

13  Q    What does this paragraph reveal to you, sir?

14  A    From the wording that the FDA have put in this

15  letter, it says that they've been examining postmarketing

16  surveillance data not just from our agent but from other

17  atypical antipsychotics.  And that's one of the things

18  when I described adverse reactions, we can only look at

19  what we can see, and we receive adverse reactions down

20  through our products, we don't receive adverse reactions

21  down through Lilly's products or other people's products.

22  So the FDA has a much bigger data set than we have.

23  Q    And then does the FDA go on to ask for certain

24  information from the company?

25  A    Yes, it does.

1   Q    If you look at the bottom of the page, which is our

2   slide 32, have we pulled out the things that the FDA is

3   asking the company for?

4   A    It gives five paragraphs which you pulled out and

5   some further requests at the bottom of the page.

6   Q    Let's direct our attention now to Exhibit 42.  And do

7   you see that this is an August 31, 2000, letter from

8   AstraZeneca to Russell Katz, the division director for

9   Neuropharmacological Drug Products Center for Drug

10  Evaluation and Research?

11  A    Yes, I do.

12  Q    If you look at the first paragraph, does AstraZeneca

13  convey that it is transmitting a response to the FDA's

14  May 1, 2000, letter?

15  A    Yes, it does.

16  Q    Let me ask you to turn quickly to page 5 of the

17  document.

18       First of all, let me ask you to go back, if I could.

19  If you look at the bottom of the first page, do you see

20  that AstraZeneca is providing, in response to the inquiry,

21  comprehensive review of the preclinical data?

22  A    I believe that that's what it says when you go on to

23  page 2.

24  Q    And there's an assessment of the Phase I, II and III

25  study in Seroquel?

1    A    Yes.

2    Q    Review of the spontaneous postmarketing reports?

3    A    That's correct.

4    Q    Testament of patient exposure?

5    A    Yes.

6    Q    Correspondence with foreign regulatory agencies?

7    A    Yes, there is.

8    Q    Then there's number 6, possibility of collaborating

9    organization having large pools of treated patients,

10   that's number 6?

11   A    Yes.

12   Q    Now, based on AstraZeneca's review of the data at

13   this point of time, did it give to the FDA the benefit of

14   its conclusion on page 5?

15            MR. BLIZZARD:  Your Honor, I object to

16   foundation.  There's been no showing that this witness had

17   anything to do with this process.

18            THE COURT:  Sustained.  Why don't you go ahead

19   and lay a better foundation as to that specific objection.

20   BY MR. BROCK:

21   Q    Dr. Patterson, were you generally familiar with the

22   fact that the FDA made an inquiry to AstraZeneca and other

23   pharmaceutical companies with regard to putting together

24   some information on hyperglycemia, new onset diabetes, and

25   other conditions?

1    A    At the time of this request, my responsibilities were

2    the strategic marketing area.  As such, I had a team --

3    several teams reporting to me, one of which was the

4    neuropharmacology team or neurology team, and within that,

5    I had people sitting on the Seroquel global product team.

6    And those people were part of the group of people who

7    received this information and will have put together that

8    submission.

9         I did not personally put this together, but I was

10   very much aware of it from the teams that I sat on and

11   from the reporting arrangements I had.

12   Q    So would it be correct that you were familiar with

13   the fact that the FDA had made the inquiry as well as the

14   fact that AstraZeneca responded and then would you have

15   also known the conclusions that were reached as a result

16   of the response?

17             MR. BLIZZARD:  Your Honor, before he answers,

18   there's been no showing that a marketing team was involved

19   in evaluating the science on safety or that he had any

20   responsibility for the safety group which was the group

21   that did this analysis.

22             THE COURT:  The objection is overruled.  You can

23   go into that on cross-examination.

24   BY MR. BROCK:

25   Q    So would you turn to page 5 of the conclusions, and

1    there in the last sentence does AstraZeneca state,

2    "Following extensive reviews of all the preclinical and

3    clinical and postmarketing data, AstraZeneca believes that

4    a diabetogenic potential for Seroquel is unlikely?

5    A    It does.

6    Q    Did you have the understanding personally that that

7    was the understanding of the company at that point in

8    time?

9              MR. BLIZZARD:  Objection.  Hearsay.

10             THE COURT:  Overruled.

11             THE WITNESS:  I would not have seen this

12   document per se, but I would have been briefed.  And this

13   was an important product within the company.  We'd

14   received an important request from the Food and Drug

15   Administration, and it was also incredibly important from

16   the product's perspective generally to understand what the

17   safety profile of the product was.

18        So I would have been briefed on what this said

19   without actually participating in the development of it or

20   seeing the document itself.

21   BY MR. BROCK:

22   Q    Do you know if the FDA required a label change in the

23   year 2000 to include a warning for hyperglycemia or

24   diabetes?

25   A    I'm not aware that any label change was required at

1   that time.

2   Q    In 2002, did the FDA request that AstraZeneca change

3   its label to include a warning for hyperglycemia or

4   diabetes?

5   A    Not that I'm aware of.

6   Q    Now, I want to address your attention to the events

7   of 2003.  I'll hand up to you exhibit 62.

8        Do you have 62 in front of you?

9   A    I do.

10  Q    In September of 2003, did the FDA make a request of

11  AstraZeneca that it change its label to include a warning

12  for hyperglycemia and diabetes?

13  A    My understanding at that time was there was a class

14  warning for all atypical antipsychotics, and, as such, we

15  were asked to make the change as well.

16  Q    If you look at the first page of Exhibit 62, which is

17  our slide 37, do you see that it says, "After reviewing

18  the available data pertaining to the use of atypical

19  antipsychotic medications and diabetes mellitus adverse

20  events, we have concluded that the product labeling for

21  all atypical antipsychotics should be updated to include

22  information about these events"?

23  A    I do.

24  Q    Does that reflect what you just said, that this was

25  directed to manufacturers of all atypical antipsychotics?

1   A    Yes, it does.

2   Q    And then does the FDA go on to say, "While we

3   acknowledge that the relationship between atypical

4   antipsychotic use and diabetes mellitus adverse events has

5   not been completely described, we believe the safe use of

6   Seroquel can be enhanced by informing prescribers and

7   patients about these events"?

8   A    Yes, it does.

9   Q    I'd ask you, sir, if AstraZeneca, in January of 2004,

10  updated its label to include information about

11  hyperglycemia and diabetes in the warning section of the

12  label.

13  A    I believe we inserted the FDA-mandated warnings at

14  that time.

15  Q    Now if you look at the Defendant's Exhibit 1, which

16  I'll hand up to you, I'd ask you a few questions about

17  that.

18       Turn over to pages -- well, first of all, if you look

19  at the first page, does it show in the top left-hand

20  corner a date of January of '04, and then it says below it

21  "Seroquel Tablets" showing that this is the Seroquel

22  product label?

23  A    Yes, it does.

24  Q    Then turn over to pages 11 and 12, is there language

25  there relating to hyperglycemia and diabetes mellitus?

1   A     Yes, there is.

2   Q     And beginning in 19 -- excuse me -- strike that.

3         Beginning in January of 2004, is this what

4   AstraZeneca is conveying to the prescribing community

5   about hyperglycemia and diabetes in the warning section of

6   the label?

7   A     Yes, I believe it is.

8   Q     And do you see that AstraZeneca conveys to the

9   prescribing community, "Assessment of the relationship

10  between atypical antipsychotic use and glucose

11  abnormalities is complicated by the possibility of an

12  increased background risk of diabetes in patients with

13  schizophrenia and the increasing incidence of diabetes

14  mellitus in the general population"?

15  A     Yes, it does.

16  Q     When we talk about increased background risk of

17  patients in -- let me start over.

18        When we talk about increased background risks of

19  diabetes in patients with schizophrenia, what is that

20  referring to, sir?

21  A     It's referring to the medical literature, I believe,

22  which has shown on many occasions that was the incidence

23  of diabetes in the population as a whole is around

24  seven percent or less on a lifetime basis, that in these

25  patients, while the numbers vary, it's approximately twice

1    that at about 15 percent.

2    Q    And how does that complicate the evaluation of the

3    issues as reflected in the label?

4    A    It's a big issue in terms of how a pharmaceutical

5    company can with evaluate associations between its

6    products and adverse events.  Perhaps I'll try and

7    exemplify that, if I may.

8         In a 3,000-patient clinical trial database of the

9    kind of size that we had for Seroquel -- the license, if

10   there's a one-in-a-thousand incidence of something unique,

11   you know, just an absurd example, it turns your ears

12   green, and you've got three patients out of those 3,000

13   with green ears, and nobody in the population gets green

14   ears, then you would have a pretty good idea that

15   something going on here that suggests the drug may be

16   causing that particular problem.

17        The issue is, however, if the population as a whole

18   has 15 percent of them have green ears with varying

19   different shades of green, and then you saw maybe

20   16 percent or 14 percent of the population in your trials,

21   you wouldn't know as to whether that was caused by your

22   drug or in fact just simply the normal variability in the

23   population that you're looking at.

24        So that's one example of the difficulty of ascribing

25   causality in an adverse event.  If I could go to a less

1    absurd example, if you like, any illness that occurs

2    spontaneously or normally in a population can give you the

3    difficulty that requires large numbers of patients studied

4    for long periods of time before you can say yes or no that

5    there's a causative relationship.

6    Q    Despite the confounders that we've talked about here,

7    does AstraZeneca convey to the prescribing community in

8    the first sentence, "Hyperglycemia and some cases extreme

9    and associated with ketoacidosis or hyperosmolar coma or

10   death has been reported in patients treated with atypical

11   antipsychotics including Seroquel"?

12   A    Yes, it does.

13   Q    And if we go down to the second paragraph, do you see

14   that it says, "Patients with an established diagnosis of

15   diabetes mellitus who are started on atypical

16   antipsychotics should be monitored regularly for worsening

17   of glucose control"?

18   A    Yes, it does.

19   Q    "Patients with risk factors for diabetes who are

20   starting treatment with atypical antipsychotics should

21   undergo fasting blood glucose testing at the beginning of

22   treatment and periodically during treatment"?

23   A    Yes, it does.

24   Q    And, "Any patient treated with atypical

25   antipsychotics should be monitored for symptoms of

1    hyperglycemia," and then some are listed?

2    A    Yes, it does.

3    Q    This is what's been conveyed to the prescribing

4    community since 2004?

5              MR. BLIZZARD:  Objection.  Leading.

6              THE COURT:  Sustained.

7    BY MR. BROCK:

8    Q    Just for the record, the effective date of this label

9    is what, please, sir?

10   A    It's January 2004.

11   Q    Now, you described a few minutes ago AstraZeneca's

12   protocols and procedures for monitoring the safety of its

13   medicines.  We'll speak specifically to Seroquel.

14        Do you have general knowledge that those activities

15   that you described continued in the 2004 to 2007 time

16   frame?

17   A    I have more than general knowledge because from the

18   beginning of January 2005 when I came back into R&D, one

19   of the groups of people responsible to me was the safety

20   evaluation group.  And therefore I knew that what I'd set

21   up in the early '90s when I was medical director was still

22   continuing over that time period.

23   Q    You mentioned earlier in your exam the safety

24   evaluation review process?

25   A    Yes.

1   Q    Did you have a personal involvement in establishing

2   that process?

3   A    Yes, I did.  When I took over as medical director of

4   the company in the early 1990s, I gave -- I appointed a

5   new head of safety, and I gave them a challenge which was

6   I want us to be in the position where we're the world

7   experts on all of our products and where any changes or

8   90 percent of the changes that occur to our packaging

9   inserts are changes that we have found through our

10  endeavors and we've proposed to the regulatory

11  authorities.  As a result of that, he set up the safety

12  evaluation review monitoring process which he has run

13  pretty well to this day.

14  Q    Who is the person that was charged with that

15  responsibility?

16  A    Dr. Barry Arnold.

17  Q    If we think about the data set through 2007, was

18  there evidence from which AstraZeneca concluded that

19  Seroquel causes diabetes?

20  A    No, there was not.  It's my understanding that

21  through to 2007 and even beyond, the company does not

22  believe there's a clear or possible association between

23  diabetes and the drug.

24  Q    Okay.  I just want to take you to 2007 because I want

25  to talk about some study results that became known to

1    AstraZeneca in the 2006/2007 timeframe.  So thank you for

2    your answer.  You were taking me beyond even that time

3    period.  All right.

4         In the period of time 2006 and 2007, did AstraZeneca

5    become aware of results from a trial known as 126/127?

6    A    Yes, AstraZeneca conducted that trial, those two

7    trials in fact, and the results of that -- of those

8    studies became available to us over that time period.

9    Q    I've used the term "126/127," but just so that the

10   jury understands, could you describe for the benefit of

11   the jury the trial design of 126/127, the patient

12   population, and then after you've done that we'll talk

13   about the study results a little bit.

14   A    Okay.  These are two, what I'll call mirror image

15   studies.  And to obtain a license, either initial license

16   or a subsequent supplemental license, the company is

17   required to do adequate and well-controlled studies with

18   an "S" on the end, so those were the two studies that were

19   set up in what's called bipolar 1 disease which is --

20   bipolar disease is people who cycle between mania and

21   depression.  And those people, we were looking in those

22   two studies to look at the long-term control of their

23   disease.  And the design of the study was that patients

24   entered into a 12-week run-in on a mood stabilizer, and

25   that could either be lithium or sodium valproate to --

1    Q    Let me stop you right there just so the jury can

2    follow the design of the trial.

3         When you talk about the run-in period, so what is

4    that and why do you do that in the context of the disease

5    state that you're looking at and what you're trying to

6    test for?

7    A    As with all psychiatric trials, it's very hard to

8    simply do a placebo control over any period of time.

9    Q    Why is that?

10   A    Because these patients can be dangerous both to

11   themselves and to others, if uncontrolled.  And we know

12   that over the significant period of time, quite a few

13   people on a placebo will lose control, and that's not

14   something that's good for them or good for society.

15        So you have to find ways in which you can look to the

16   long-term effects of a drug in the least dangerous way, if

17   you like, or the most effective way for the patients, and

18   at the same time generate data that is meaningful for the

19   clinical assessment.

20   Q    Okay.  So what happens in the run-in period?

21   A    Well, in that run-in period for this particular

22   trial, they were given both Seroquel and one of these two

23   mood stabilizers, the two that are well-known in the

24   marketplace, with the objective of making sure that these

25   were patients who were not in a psychotic state, who were

1    well-controlled, and on the measures that the doctors

2    treating them could make didn't require any change of

3    treatment, they were okay to be able to function.  And

4    people with bipolar disease are out in the community, many

5    of them very normal in other ways.

6        At the end of the 12-week run-in with these -- those

7    who were controlled were then randomized, half of them to

8    receive the same treatment continuing with the mood

9    stabilizer plus Seroquel, the other half had the Seroquel

10   withdrawn, continued on the mood stabilizer but had a

11   placebo instead of the Seroquel.

12       And the idea was to see that over a period of time,

13   would the Seroquel group remain better controlled and not

14   relapse compared to the placebo group.

15       So the design of the study is a double-blind parallel

16   group study comparing Seroquel on a background of mood

17   stabilizer versus placebo on a background of mood

18   stabilizer so they went completely untreated and to see

19   what happened.

20   Q    And what was the outcome of the trial in terms of the

21   measures for efficacy during the maintenance period?

22   A    The outcome was very positive for the drug.  Those

23   who continued on the Seroquel remained controlled for a

24   significantly longer period of time than those who had the

25   mood stabilizer alone.

1   Q    Did AstraZeneca submit the study results from 126 and

2   127 to the FDA with the request that the FDA approve the

3   medicine for this indication?

4   A    Yes, indeed.  Their request was a supplemental NDA

5   for the approval of the medicine in the long-term control

6   of bipolar 1 disease.

7   Q    And what decision was reached by the FDA on the

8   application based on studies 126 and 127?

9            MR. BLIZZARD:  Your Honor, I object to that

10  because it's vague because it doesn't take into account

11  the label change that was associated with that approval.

12           THE COURT:  Overruled.

13           THE WITNESS:  The company received approval to

14  include that indication in the license for the product.

15  BY MR. BROCK:

16  Q    Now, also in connection with study 126 and 127, did

17  AstraZeneca look at glucose results out of that trial?

18  A    Yes, it did.

19  Q    And could you summarize, for the benefit of the jury,

20  the glucose findings that AstraZeneca learned from the

21  results of 126 and 127?

22  A    In that study, we set out to measure as a secondary

23  end point, fasting blood glucose.  So the patients were

24  supposed to have had no food for eight hours, and then

25  they had a blood sample taken at the time they visited the

1    clinic.

2        And they were taken at intervals throughout the

3    course of the study, as incidentally, at that time point,

4    we were trying to do for every clinical trial that we were

5    running with the product.

6    Q    Let me stop you right there.  You've introduced a new

7    concept.  You've talked about fasting blood glucose?

8    A    Yes.

9    Q    If you could describe for the members of the jury

10   what fasting blood glucose is and compare that to

11   information that's obtained when you have non-fasting

12   blood glucose readings.

13   A    When you take a meal, generally speaking, that meal

14   will contain substances as sugars that will put up your

15   blood glucose, and then your pancreas responds by

16   secreting insulin and the sugar goes down.

17       It's very common in our clinical trials to do blood

18   sugar measurements as part of the overall biochemical

19   profile, and we do that for all our products in all of our

20   clinical trials.

21       But the sugar mean is relatively limited in terms of

22   its -- our ability to interpret it because unless you know

23   when the patient last ate, you can get a high blood sugar

24   because they've simply been eating something as they

25   walked into the clinic.

1        So the next step from that is to move to taking a

2   fasting blood sugar.  And the American Diabetes

3   Association has set out a series of criteria, but

4   essentially a subject shouldn't have eaten for eight hours

5   prior to that blood sample being taken.

6        And then that fasting sugar is a more meaningful

7   indicator that they may have a propensity for diabetes or

8   an indicator that further testing is required in order to

9   diagnose diabetes.

10  Q    So the goal of 126 and 127 was to have fasting blood

11  sugars?

12  A    The goal of 126 and 127 was to look at the

13  maintenance in bipolar disease from an efficacy

14  perspective, but within that one of the safety goals was

15  to get fasting blood sugars.

16  Q    The primary issue being studied in the trial was the

17  efficacy measures that we've talked about, but in terms of

18  safety data that was being collected as part of a

19  secondary end point, you were trying to look at fasting

20  blood sugars?

21  A    Yes.

22  Q    Fair enough?

23  A    Yes.

24  Q    Okay.  Now in terms of the results of the trial, what

25  were the results of the trial and the significance of

1    those results to the company?

2    A    Well, for the first time in all of our trial

3    programs, in that trial we saw some changes in the blood

4    sugar that we felt were indicative of change associated

5    with the use of the drug that we hadn't seen before.  And

6    in particular, we saw a five-milligrams per deciliter

7    increase in the average blood sugar between pretreatment

8    and the end of treatment.

9        We also saw an increased number of people, relatively

10   small numbers, I think six versus one, that had a

11   diagnosis of diabetes as per an increase in blood sugar

12   above 126 milligrams on a couple of occasions.

13       Again just the criteria are not just one single

14   raised blood sugar but actually more than one raised

15   sugar.  But even that's difficult because the ADA, say on

16   a subsequent day, and these were samples that had been

17   taken just periodically throughout the course of the

18   clinical trial.

19       So with those plus with a lot of work that went into

20   look at the exposure time, because again we had this

21   problem in the study that the placebo patients were coming

22   out of trial faster than the treated patients so there

23   wasn't equal exposure, so when we did some kind of

24   statistical calculation to bring the exposure back, there

25   seemed to be an increased incidence.

1      So for the first time we actually had a

2  placebo-controlled clinical trial where we were seeing an

3  increased incidence of raised sugar and a numerical

4  increase that was statistically significant of five

5  milligrams across the population.

6  Q    I'm going to hand up to you now Exhibit 221.

7          MR. BROCK:  Your Honor, when I finish this

8  exhibit, I had something I wanted the witness to be able

9  to do in terms of a diagram, and I haven't been able to

10 talk to him about the use of the screen yet.

11     I was going to ask if it would be possible to bring a

12 flip chart in, but I think he would be more comfortable

13 with that.  But if not, I was going to ask if we -- if

14 we're going to go through the lunch hour, if I could just

15 have five minutes so I can see if we can manage --

16          THE COURT:  We'll break for lunch when you

17 finish this exhibit.

18          MR. BROCK:  Okay.

19 BY MR. BROCK:

20 Q    All right.  Do you have Exhibit 41 in front of you,

21 Doctor?  Excuse me, Exhibit 221.

22 A    Yes, I do.

23 Q    Okay.  And do you see that this is a discussion

24 document, "Seroquel and Glucose Disregulation"?

25 A    Yes, it is.

1   Q    Could you just describe in general terms what this

2   document is.

3   A    This document is a document prepared within the

4   company with the intention of reviewing it at the SERM, a

5   committee that I've already described to you, covering all

6   of the information the company had both from the

7   literature, from controlled and uncontrolled clinical

8   trials, and from the new studies that you just described,

9   studies 126 and 127, but also another study that was

10  completed around the same time which was study 125.

11  Q    Thank you.

12       So if you will turn just very quickly to the table of

13  contents, do you see about halfway down on the left on the

14  first page, it says, "The Literature," at Section 3.

15  A    Yes, I do.

16  Q    And then if you look over to page 3, do you see

17  there's a Section 4 for preclinical data?

18  A    Yes, I do.

19  Q    This will be page 3.  And then there is a Section 5

20  is clinical study data?

21  A    Yes.

22  Q    If you come down just a little more you see there's

23  a 5.2 which is trials 126 and 127?

24  A    Yes, I do.

25  Q    And then if you turn the page to page 4, do you see

1    that there is a discussion there of trial 125?

2    A    Yes, I do.

3    Q    And that's the one you referenced just a moment ago?

4    A    It is.

5    Q    Okay.

6         MR. BROCK:  We will talk about trial 125, if

7    it's okay with Your Honor, after the lunch break.

8         THE COURT:  Yes.

9    All right.  We'll be in recess until 1:15.

10                        (Lunch Recess.)

11        THE COURT:  Go ahead.

12        MR. BROCK:  Your Honor, I was going to ask if

13   it's okay if we could start the next portion of the

14   examination with the witness standing at the ELMO.  I'm

15   going have him do a diagram and explain it.  The camera is

16   able to turn and focus on him while he's doing it.

17        THE COURT:  Can he do it on that monitor?

18        MR. BROCK:  It's just very difficult.  We tried

19   it with a monitor and it's just not very practical.

20        THE COURT:  All right.  That's fine.

21                DIRECT EXAMINATION (Resumed)

22   BY MR. BROCK:

23   Q   Dr. Patterson, before the break, we had introduced

24   the topic of trial 125, and I'll ask you, first of all,

25   are you familiar with the study design and the primary

1  outcome measure of study 125?

2  A    Yes, I am.

3  Q    Would you briefly describe that for the members of

4  the jury, please.

5  A    Study 125 was a study in schizophrenic patients who

6  were treated for 24 weeks with either Seroquel or two

7  other active atypical antipsychotics, olanzapine and

8  Risperdal.  The primary end point was to measure oral

9  glucose tolerance which is the most specific test to try

10  and look at diabetes or incipient diabetes.

11  Q    What are the advantages of that trial design to

12  understanding a medicine's effect on glucose tolerance?

13  A    Well, compared with either random blood sugars or

14  even fasting blood sugars during the course of studies,

15  this actually tests the ability of the pancreas to secrete

16  insulin, which is the problem facing diabetes, in a very

17  controlled manner with essentially a test meal,

18  75 milligrams –– 75 grams, sorry, of sugar given as a

19  single drink in a fasted state, and the patients are

20  hospitalized for this particular event, very closely

21  controlled.

22      And then we monitor the blood sugar over a period of

23  two hours, 120 minutes, after the ingestion of the sugar,

24  and from that, you can tell whether the insulin is being

25  secreted and is being effective in actually lowering the

1    blood sugar on that period of time.

2    Q    Now, you're standing at the ELMO in Judge Conway's

3    court now.  Can you use the overhead device to explain to

4    the jury the study design setup in terms of how this trial

5    is designed to address Seroquel's effect, if any, on

6    glucose?

7    A    Let me briefly describe the study a little bit more

8    and then show you something about the oral glucose

9    tolerance test.

10        The study itself, a round of 24 weeks, the patients

11   were all previously diagnosed schizophrenics but without

12   known diabetes.  They were given one of these oral glucose

13   tolerance tests at the beginning of the study on -- on day

14   naught.  Then they were treated for 24 weeks with one of

15   the three study medications, and at the end of that

16   period, the oral glucose tolerance test was repeated.

17        And the object of the exercise was to see whether

18   taking any of these medicines impaired the handling of

19   glucose after that six-month period of time.

20        And this was an attempt by the company -- and I'm not

21   aware of anybody having done a similar study anywhere

22   else -- to try and really get to grips with this question

23   of is there a causal effect between the ingestion of this

24   drug over a reasonable period of time and the development

25   of diabetes.

1    Q    So when you look at these various glucose measures

2    that take place after the glucose load, do you then plot a

3    curve that allows you to show what's happening in response

4    to the glucose load?

5    A    Yes.  Perhaps I can actually demonstrate that, if I

6    may.

7    Q    Please do.

8    A    So if I -- and please tell me if you can't see this.

9    This is definitely not coming through.  There we go.

10        If you take on the vertical part of the curve, blood

11   sugar, so that's blood sugar, and the maximum here of 200

12   which is the level at which either on a random sample or

13   after two hours from one of these oral glucose tolerance

14   tests, the ADA would tell you that the patient has a

15   presumptive diagnosis of diabetes.  And you take down at

16   the bottom here 100 as being a normal kind of blood sugar

17   that you'd see prior to entering the study.

18        And then on the horizontal access, if I could draw

19   that across there, apologies for my drawing, this is time.

20   So time on the horizontal access.  And it's 120 which is

21   120 minutes, and the middle is 60, and there's 90, there's

22   30, 60, 90, 120.  And those are the four time points at

23   which the investigator draws blood.

24   Q    The 30, 60, 90 and 120 represent minutes?

25   A    They do.

1      If I could then show you that if we take -- that's

2   fantastic, thank you, whoever's zoomed out for me -- if I

3   can take what might happen with a diabetic in a fasting

4   state, they might have a blood sugar of around 100.  By

5   the time you get to 30 minutes, they will have gone well

6   over the 200 level.  And then over the two-hour time

7   period, the blood sugar will come down minimally.

8      And the point is, therefore, that by two hours out

9   here, they'll be above 200 which shows that they have an

10  impaired ability of the pancreas to secrete insulin, and a

11  presumptive diagnosis of diabetes.

12     If you then take the Seroquel population, what we saw

13  pretreatment, because these were not people with

14  diabetics, blood sugar rose to around 160 mark.  By 60

15  minutes, it had started to come down a little bit.  By 90,

16  coming down more.  By 120, it's not back down to the

17  normal pretreatment level, but it's getting close.  And

18  that's normal for such a meal, it wouldn't have come down

19  to absolutely pretreatment levels by then.

20     And what we do is we join up the time points on the

21  blood sugar measures.  And then because this is a moving

22  target because blood sugar is going up and down during the

23  course of this, if the -- if the blood sample is a couple

24  of minutes out, you might just miss a peak.  So instead of

25  measuring just simply the blood samples, what we do is we

1    measure the area under the curve, and that is the standard

2    test.  That area under that series of points joined

3    together as a curve is essentially the measure of the oral

4    glucose tolerance test.

5    Q    Now the pink one that you have just put up for the

6    jury, would that be representative of the glucose

7    tolerance test that would be conducted, say, at the

8    beginning of the study?

9    A    Yes, it would.  And I've tried schematically to show

10   what actually happened.  And that was the same for all

11   three extremities for Seroquel, Risperdal and olanzapine.

12   Q    And then during the period of time that the patients

13   are testing -- during the period of time that the medicine

14   is being tested, what -- what happens then?

15   A    Well, the medicines were tested for 24 weeks, and

16   then the same study was repeated in hospital, fasting

17   overnight, all glucose tolerance tests.  And what we saw

18   was -- if I can use the same color -- similar kind of

19   levels, but it came down below the value.

20        So during a dotted line, you can see that it's a

21   little bit above, and it comes down below.  Essentially

22   the two curves are the same.  There was no difference

23   statistically between those two curves.  The area was, to

24   all intents and purposes, the same.  And that demonstrates

25   no evidence of a diabetogenic effect over that time

1    period.

2    Q    When you talk about measuring the area under the

3    curve, what is that, Dr. Patterson?

4    A    That is this whole area here that I've just covered

5    with my pen in terms of a calculation of the amount of

6    space underneath those individual blood samples.

7    Q    And the result in terms of the primary outcome of the

8    study was what?

9    A    The result was no evidence at all that Seroquel, in

10   this situation, which is one of the most important tests,

11   no evidence at all of causation of an alteration of

12   glucose tolerance or a move towards diabetes.

13   Q    Thank you very much.  You can return to the witness

14   stand, please.

15        I'm going to show you now exhibit or graphic 1566.

16   And does this demonstrate the results of study 155 in

17   terms of measuring what you described now as the area

18   under the curve?

19   A    This is a rather better drawing than mine of the

20   Seroquel curves from that study.

21   Q    And for completeness of the record, what does this

22   diagram show, please, sir?

23   A    This diagram shows, on the red curve, the blood sugar

24   profile for the oral glucose tolerance test at

25   pretreatment for the quetiapine group.  And the blue line

1    on the curve shows the same patient population 24 weeks

2    later having taken quetiapine continuously over that time

3    period.

4    Q    Now, were the results of study 125 published?

5    A    I believe they have been, yes.

6    Q    I'm going to show you now Defendant's Exhibit 699.

7    And I'd like to direct your attention to page 493.  And do

8    you see there on the -- first of all, is that the

9    published paper for study 125?

10   A    Yes, it is.

11   Q    Authored by Drs. Newcomer, Ratner, Eriksson, and

12   others?

13   A    Yes.

14   Q    Now, if you look at figure 3, if we could pull that

15   out, please.

16        Do you see that there are plots for quetiapine,

17   olanzapine and Risperidone?

18   A    Yes, I do.

19   Q    Talk briefly with the jury about the findings for

20   olanzapine and Risperidone as reflected in figure 3B and

21   C.

22   A    There's a difference in the curves from the one that

23   we've described previously in that the blood sugar remains

24   higher for the duration of the 120 minutes than the curve

25   that occurred prior to the treatment and was statistically

1   significantly different at the 120-minute time point.

2   Q    Do the figures B and C with regard to olanzapine and

3   Risperidone tell you anything about the sensitivity of the

4   test?

5   A    I believe that they do because it says that you can

6   show that in this population there is a change on insulin

7   sensitivity, which is what this is measuring indirectly,

8   albeit small, and still within the normal range for these

9   other two agents.

10  Q    Thank you.

11       Now, based on the work that AstraZeneca did in

12  reviewing the results of study 126, 127, 125, and the

13  result of a review of the placebo-controlled trials, did

14  AstraZeneca update the label through a process known as

15  "changes being effected" in 2007?

16  A    Yes, I believe we did.

17  Q    We're going to hand you now Exhibit 85 which is a

18  June 22nd, 2007, letter to the FDA.

19       I'll ask you first, I used the term "changes being

20  effected."  Do you know what that is?

21  A    Yes.  It's the pharmaceutical company notifying the

22  regulator that we propose to make some changes to the

23  label.  It's a particular device that's -- administrative

24  device that's open to us.  We have to give them 30 days

25  notice of proposed changes to give them an opportunity to

1    review or object to the changes that we're making.

2    Q    And do you see on the first page of Exhibit 85 that

3    there is a date there for -- of June 22nd, 2007?

4    A    Yes, I do.

5    Q    All right.  And if you come down to the second

6    paragraph, do you see what we've pulled out there?  The

7    data included in the updated label provide new

8    information?

9    A    Yes, I do.

10   Q    All right.  So describe for the members of the jury

11   what we're reporting to the FDA in the rest of that

12   sentence, please.

13   A    We are -- do you want me to read the sentence,

14   Mr. Brock?

15   Q    You may read it, or if you want to give just sort of

16   a quick summary of it, that will be fine also.

17   A    We are providing to them data from essentially

18   studies 126 and 127 which is point 1; and point 2 is study

19   125 that I've just described to you; together with an

20   overview or pooling of all of our placebo-controlled

21   studies for less than 12 weeks, so a significant package

22   of information.

23   Q    If you look at page 2 which is our call-out 51, do

24   you see that you tell the FDA where the changes in the

25   labeling appear?

1    A     Yes, we do.

2    Q     And do you see that in the warning section under

3    hyperglycemia and diabetes that you are giving a

4    cross-reference to the adverse reaction section of the

5    label?

6    A     That's correct.

7    Q     And then in the adverse reaction section, you are

8    adding some information to the label?

9    A     Yes.  Under a new subsection heading.

10   Q     And in fact, in July of 2007, was the label changed?

11   A     I believe so.

12   Q     So I want to show you now Exhibit 7.  I'd like to ask

13   you, this label that we're looking at, is this a change

14   that was imposed by the FDA or a change that was

15   voluntarily undertaken by the company?

16   A     Under CBE or "changes being effected," this is a

17   voluntary change initiated by the company.

18   Q     Thank you.

19         Now if we look at page 15 of the label.  And could

20   you pull out page 14 and 15 side by side, please.

21         Doctor, do you see at the bottom of page 14, under

22   the warning section, hyperglycemia and diabetes mellitus?

23   A     Yes, I do.

24   Q     And then does that discussion continue over to the

25   next page, page 15?

1   A    Yes, it does.

2   Q    So in the warning section of the label where

3   hyperglycemia and adverse -- and diabetes are discussed,

4   is there a reference to seeing adverse reactions?

5   A    Yes.  It cross-references adverse reactions,

6   hyperglycemia at the top of the page 15.

7   Q    And then if you look over at page 35, does

8   AstraZeneca convey to the prescribing community new

9   information that it's learned from its clinical trials --

10  let me rephrase that.

11       Does AstraZeneca convey to the prescribing community

12  new information that it has learned from two clinical

13  trials as well as a summary of a 24-week active-controlled

14  information?

15  A    I think it, in the three paragraphs, covers the three

16  points that were in the covering letter which relate to

17  the two placebo-controlled trials, the 126 and 127 --

18  Q    Let me --

19  A    -- and the study 125 under a 12-week duration.

20  Q    This was my fault.  Let me -- let me start over.

21       Describe for the jury what AstraZeneca is conveying

22  to the prescribing community in this section.

23  A    AstraZeneca is describing the results of studies 126

24  and 127 which was the long-term placebo-controlled studies

25  in bipolar disease.  It's conveying the results of study

1    125 which is the comparative study with the oral glucose

2    tolerance tests for six months of treatment.  And it's

3    also putting in a paragraph on placebo-controlled studies

4    of 12 weeks' duration or less.

5    Q    The paragraph in the middle which starts "In

6    short-term, 12 weeks' duration or less," do you see that

7    paragraph?

8    A    I do.

9    Q    If you come down to the bottom, is AstraZeneca

10   reporting a difference in percentages for quetiapine

11   versus placebo for patients who had a fasting blood

12   glucose of over 126?

13   A    Yes.

14   Q    And what is being reported there?

15   A    It reports that in this fairly large patient group,

16   there was a 3.5 percent incidence for quetiapine and

17   2.1 percent for placebo.

18   Q    Thank you.

19        Now, did the FDA continue to interact with

20   AstraZeneca with regard to data on glucose after the label

21   change was made in July of 2007?

22   A    I believe that that was the case.

23   Q    I want to show you now Exhibit 98, and if we could

24   see our treatment 56.

25        Do you see this is a letter from Tom Laughren to

1    AstraZeneca where it informs AstraZeneca that it's

2    evaluating the effects of atypical antipsychotic drugs on

3    metabolic parameters and then goes on to list some things,

4    weight, lipids, and glucose?

5    A    Yes, I do see that.

6    Q    And the FDA goes on in this letter in a very detailed

7    way to describe the way they want the data organized and

8    presented to them, correct?

9    A    Yes.  It's a very detailed letter.

10   Q    And did AstraZeneca reply to this letter in answer to

11   the FDA's inquiry?

12   A    My understanding is the company did what it always

13   does, which is to respond to this letter, and provided all

14   the information that was requested around the middle of

15   the year of the request.

16   Q    I'll show you now Exhibit 99 which is a June 26,

17   2008, letter from AstraZeneca to the FDA.

18        And you have some excerpts from some tables there, do

19   you not?

20   A    Yes, I do.

21   Q    Just in the interest of time, I want to ask you just

22   about a couple of these.

23        First of all, if you look over at Table 339 which is

24   on page 948.

25   A    I have it.

1   Q    All right.  Just to orient the jury to what we're

2   looking at, do you see there is an indication at the top,

3   "Glucose Fasting, TE Shifts, Adult Subjects

4   Placebo-controlled Trials."

5   A    Uh-huh.

6   Q    And then on the left column there is glucose fasting,

7   there's a category for less than 100, a category for

8   greater than 100 but less than 126, and a category for

9   less than 126.

10  A    Yes, I see that.

11  Q    Now, would you describe for the members of the jury

12  what is being looked at in these measures?

13  A    My understanding is that this is fasting blood

14  glucose, and the numbers in the left-hand column refer to

15  the measured glucose:  Less than 100 being regarded as

16  normal, 100 to 126 being regarded as borderline, and

17  greater than 126 being regarded as above the normal range.

18  Q    Now, if you look at the column related to less than

19  100, do you see that there are percentages stated for

20  those that went to over 126?

21  A    Yes, I do.

22  Q    All right.  And what's the percentage that went from

23  less than 100 to over 126?

24  A    It's 71 patients in all with a percentage of

25  2.4 percent.

1    Q    And is there a value there also for those that were

2    on placebo that started at less than 100 and had a reading

3    of over 126?

4    A    There were 19 of those, which makes a percentage of

5    1.4 percent.

6    Q    Okay.  And is that the only value that's listed

7    there?

8    A    No.  The values are also listed across to the right.

9    All the way across -- am I reading the wrong thing?

10   Q    All right.  So, is there a category, as we mentioned,

11   for folks that are in the 100 to 126 range at the

12   beginning of study?

13   A    Yes, there is.

14   Q    Okay.

15   A    On the second line.

16   Q    Yeah.  Focusing on those, what are the percentages

17   that shifted to over 126?

18   A    It's 11.7 percent on the quetiapine group and

19   11.8 percent on the placebo group.

20   Q    And what would your view of that data be?

21   A    It's -- as with all of this data, it was interesting

22   data, and you'd expect if there were a diabetogenic effect

23   occurring, that those who were in the borderline blood

24   sugar would have a greater frequency of going into the

25   abnormal range than those that were below 100, and yet

Direct Examination – Dr. John S. Patterson          100

1    what you see is actually the opposite.

2        And then if you go down to the next line which is the

3    study as a totality, which is without splitting it by the

4    borderline numbers and the low numbers, you can see that

5    the numbers are 3.2 versus 4 percent with no statistical

6    significance.

7    Q    Thank you.

8    A    It's hard to interpret these data.

9    Q    Now, going back to the label change that was made in

10   2007, I'm going to just ask for completeness, there were

11   changes made to the warning section as well as the adverse

12   reaction section of the label, correct?

13   A    I believe so, yes.

14   Q    Since 2007, has AstraZeneca made a change to the

15   product label yet again?

16   A    Yes.  AstraZeneca is in continuous dialogue with the

17   FDA, and there have been changes made subsequently.

18   Q    Okay.  And could you just describe those changes

19   briefly.

20   A    The company's been submitting further data in

21   relation to new potential indications and uses of the

22   product, and has received from the FDA a request to make

23   some changes in relation to the warnings and adverse

24   events.

25   Q    Okay.  Thank you.

1          Is the term "life cycle of the product" one that is

2    familiar to you?

3    A     Very familiar to me.

4    Q     Would you talk to the jury a little bit about what

5    the life cycle of a medicine is as you would see it from

6    the perspective of someone at AstraZeneca.

7    A     The way I describe it outside, and I hope it's a

8    relevant description here, is we find the medicine,

9    hopefully in our labs, we develop it, and then by the time

10   it gets to the marketplace or to a license, an NDA for its

11   first usage, that's probably adolescence in terms of a

12   human life cycle.  And then after that, there's still a

13   lot of work to be done until you know what the final adult

14   medicine is going to look like.

15         And the life cycle activities that we undertake are

16   clinical trials to evaluate potential signals that come

17   out of the efficacy or safety databases.  There are new

18   indications, new uses for the drug.  There may be

19   combinations with other agents or new formulations, a lot

20   of which is based on feedback from doctors who use the

21   medicine and not only in terms of spontaneous adverse

22   reaction reporting, but also how they see it affects their

23   patients.

24         And as we grow our knowledge of the product over

25   those years, that allows us to then potentially undertake

Direct Examination – Dr. John S. Patterson         102

1   further clinical trials to exemplify any signals that may

2   occur to actually, if necessary, obtain a license or

3   change our labeling in line with the developing profile of

4   the product.

5   Q     Thank you.

6         I want to ask you to look at a graphic that we've

7   prepared of work that AstraZeneca has done with Seroquel

8   since its initial approval.  It's graphic number 1638.

9         Do you have graphic 1638 in front of you?

10  A     Yes, I do.

11  Q     And would that be helpful to you in explaining to the

12  jury some of the features of the life cycle of the -- of

13  Seroquel?

14  A     Yes.  It shows what we described earlier.  On the

15  left-hand side of it, we choose the original IND followed

16  by the NDA in 1996.  And then each of the lines going

17  across that says "FDA" and "Approved" is a piece of life

18  cycle management activity in terms of a clinical trial

19  program that the company undertook to further exemplify

20  the properties of this compound ranging from bipolar,

21  which we've heard about already today, through to an

22  extended release formulation which reduced the need to

23  titrate in dosing over 48 hours on starting the drug,

24  which was quite important in acute psychoses, through to

25  various maintenance studies like bipolar maintenance, and

Direct Examination - Dr. John S. Patterson          103

1   is ongoing today.

2        We still have pending submissions with the FDA, so

3   we've continued to develop this product throughout the

4   whole of its life cycle.

5   Q    Let me walk you briefly through a few of these

6   events.

7        You see that we have September of 1997 manifestations

8   of psychotic disorders, and that's the initial approval

9   that we talked about earlier today.

10  A    Yes.

11  Q    You see that we have there "March 2001, indication

12  statement change."

13       Do you know what that refers to?

14  A    I believe I do.  As we discussed earlier, Mr. Brock,

15  the license that the FDA gave us for this drug was pretty

16  broad.  Although the actual trial program at the time had

17  been short-term studies in schizophrenia, that was

18  standard in those days and it allowed the company to

19  promote and doctors to use on label the product across

20  many different psychotic situations.

21       In 2001, the FDA decided that it should narrow the

22  indication, not just for Seroquel, but I believe for all

23  of the atypical antipsychotics.  And therefore, at that

24  point, we were told that our indication on our label

25  should be schizophrenia and short-term usage in

Direct Examination - Dr. John S. Patterson                104

1    schizophrenia.

2    Q    Okay.  And so was the label changed at that time

3    point to comply with the FDA requests?

4    A    I believe it was.

5    Q    Now, let me just take January of '04, bipolar mania

6    as a -- as an indication for purposes of talking through

7    what happens.  In order to obtain an approval from the FDA

8    to market the medicine for a new indication such as

9    bipolar mania, what does the company have to do?

10   A    The company has to submit evidence to support such a

11   claim which is very similar in the requirements to the

12   initial NDA in that, for that indication, it has to show

13   from adequate and well-controlled studies that there is

14   efficacy.  It has to show that, in those adequate and

15   well-controlled studies, the drug is well tolerated and

16   that the benefit-risk ratio is appropriate.

17        But it also has to, as part of these submissions,

18   submit an updated database that covers all of the

19   information available on the product from all other

20   indications as well.  So it is a fairly major package of

21   work that doesn't just cover the two or three studies that

22   may have been done in the new indication.

23   Q    To be clear, in order to obtain approval for bipolar

24   mania, does the company have to conduct additional

25   clinical trials?

Direct Examination – Dr. John S. Patterson          105

1    A     Yes, it does.

2    Q     Could you describe that, please.

3    A     The clinical trials will have to have, as the

4    indication for participation in the study, patients with

5    bipolar mania.  They will be obviously more clearly

6    defined than just a statement I've made, and then the

7    protocols have to have addressed those patients in a

8    controlled manner to show that the drug, either compared

9    to standard therapies or placebo, has actually given some

10   beneficial effect.

11   Q     So when the FDA approves the medicine for the

12   indication of bipolar mania in January of 2004, does it

13   look at the clinical trials that you submit in support of

14   that as well as everything that has gone before?

15   A     I believe it does.

16   Q     And then as we look at these other indications that

17   the medicine is approved for as safe and effective,

18   bipolar depression in October of 2006, acute schizophrenia

19   in May of 2007, XR schizophrenia maintenance in November

20   of 2007, bipolar maintenance in May of 2008, and bipolar

21   mania depression and maintenance in October of 2008, does

22   the company present clinical trial data for each of those

23   indications?

24   A     Yes, it does.

25   Q     And each time the FDA approves the medicine for a new

Direct Examination – Dr. John S. Patterson          106

1    indication, it looks back on the history of the medicine

2    at that time point?

3    A    I believe so, and we submit all the updated

4    information.

5    Q    And as recently as October of 2008, the FDA approved

6    Seroquel as a medicine that was safe and effective in the

7    bipolar mania depression and maintenance indication?

8    A    That is correct.

9    Q    As you mentioned, additional trials have been

10   conducted for indications where approval has not yet been

11   attained -- obtained, correct?

12   A    That's right.

13   Q    Now, just briefly, what are the indications that

14   AstraZeneca has applied for and what's the status of those

15   applications?

16   A    The applications are for major depressive disorder,

17   to be used when patients either are failing to respond to

18   standard treatments or as an adjunct to standard

19   treatments or the severe end of the disease, global

20   anxiety, again, the severe end of disease, and also

21   pediatrics above the age of ten, I believe.

22   Q    And have clinical trials been conducted for each of

23   those indications in support of the request for permission

24   to market the medicine for those?

25   A    Yes, they have.

1           MR. BROCK:  Thank you very much.

2       Answer their questions, please.

3           MR. BROCK:  Your Honor, the only two exhibits

4   that I discussed that have not previously been admitted

5   are 221 and 699.  We would offer those in evidence at this

6   time.

7           THE COURT:  They will be received.

8       (Exhibits 221 and 699 received in evidence.)

9           MR. BLIZZARD:  Your Honor, one more second, if I

10  could get some water?

11          THE COURT:  Sure, take your time.

12          MR. BLIZZARD:  May it please the Court.  May I

13  proceed?

14          THE COURT:  Yes.

15                      CROSS-EXAMINATION

16  BY MR. BLIZZARD:

17  Q    Dr. Patterson, Good afternoon.

18  A    Afternoon.

19  Q    My name is Ed Blizzard, and I represent the

20  plaintiffs in this proceeding.

21      We've not had the opportunity to meet before, have

22  we?

23  A    No, we have not.

24  Q    But did you give a deposition in Manchester, England

25  back in July of 2008 that lasted all day, right?

Cross-examination – Dr. John S. Patterson

1    A     Some 13 hours, I believe.

2    Q     Right.  Long day, wasn't it?

3    A     It was.

4    Q     And at that time, you were questioned by counsel for

5    AZ for several hours, weren't you?

6    A     I recall being questioned by your counsel for

7    significantly more hours than AZ.

8    Q     Right.  But in fact, you also gave a videotaped

9    direct examination where you were questioned by counsel

10   for AZ at that time as well, weren't you?

11   A     Yes, I did.

12   Q     Now, you were not heavily involved in Seroquel, were

13   you?  I mean, you were involved in some of the big picture

14   stuff, but the detail, the day-to-day stuff, was

15   absolutely not your area, was it?

16   A     During the course of my career, I was involved at

17   various times more or less closely with the drug, but

18   you're right, the day-to-day running of the studies and

19   running of the work was not my responsibility.

20   Q     Right.  And at your deposition, you said you were not

21   heavily involved in Seroquel, didn't you?

22   A     I said -- well, I can't quote the exact words from my

23   deposition.  You may have them in front of you --

24   Q     I do.

25   A     -- but I was not heavily involved in Seroquel in

Cross-examination – Dr. John S. Patterson                    109

1    running the studies.

2        It's quite clear that at various times, I had direct

3    line responsibility for those who were.

4    Q    Okay.  You have today talked about the details of a

5    number of studies, haven't you?

6    A    I don't believe I have.  I've talked in general about

7    the studies and given some information but not the

8    absolute detail.

9    Q    Are you suggesting that drawing the area under the

10   curve for study 125 is not providing details?

11   A    That certainly, I agree, detail for study 125.

12   Q    Right.  And you've also outlined the actual design

13   protocol for studies 126 and 127, haven't you?

14   A    And I would have been expected to know that in my

15   role in the company.

16   Q    Okay.  But you were not involved in the design of any

17   of the clinical trials for Seroquel, were you?

18   A    I suspect that in the period around 1990 when I was

19   VP Clinical Research of Medical Affairs here in the United

20   States, I will have had some involvement with the people

21   designing the studies, but other than that, no, I was not

22   involved firsthand.

23   Q    Maybe I didn't make myself clear.  You personally

24   were not involved in the design of any of the clinical

25   studies on Seroquel, were you?

Cross-examination – Dr. John S. Patterson          110

```
 1   A     Not to the best of my knowledge directly, no.

 2   Q     You were not personally involved in the data analysis

 3   for any of the studies in Seroquel, were you?

 4   A     No, I was not.

 5   Q     You were not -- it was not part of your regular job

 6   to draft the clinical study reports for the clinical

 7   studies that were done on Seroquel, was it?

 8   A     It was not.

 9   Q     As a matter of fact, those studies -- those clinical

10   study reports sometimes contain thousands of pages of

11   description and tables and data analysis, correct?

12   A     That's correct.

13   Q     And we've seen some of that in the excerpts that have

14   been presented here this morning and early this afternoon

15   that some these excerpted documents -- we'll get to them

16   later -- are thousands of pages long, aren't they?

17   A     Certainly hundreds of pages long.

18   Q     Right.  And there's a lot of information that can be

19   buried in there, isn't there?

20   A     There's a lot of information contained in them.

21   Q     Right.  Or buried, right?

22   A     Insofar as the data is available in the studies and

23   presented, I don't know what you mean by "buried."

24   Q     Well, you've heard about the needle in the haystack,

25   haven't you?
```

Cross-examination - Dr. John S. Patterson            111

 1   A    Yes, I have.

 2   Q    And when it comes to data supplied to the FDA, you

 3   can put a needle in the haystack, can't you?

 4   A    The FDA is, in my experience, the most thorough

 5   regulatory authority, and we give them everything on our

 6   studies including individual case reports to allow them to

 7   build up their own view as to how the product is

 8   operating.

 9   Q    Let me ask you this one thing.  Have you read

10   anything recently, in the last couple of years, about the

11   limited resources that the FDA has?

12   A    Yes, I have.

13   Q    Now, going back to the clinical studies, were you

14   personally involved in any decisions about whether to

15   publish or not publish any of those studies?

16   A    I was involved in some discussions about how far back

17   at some stage one would go in publishing studies, yes.

18   Q    Okay.  Which studies?

19   A    They would have been -- I think I need to take a step

20   back in answering your question, if I may.

21   Q    My question is which studies?  You said that you were

22   involved in some studies in the decision whether to

23   publish or not.  I'm asking which ones?

24   A    I think it was on a date basis.  I believe that our

25   initial discussion within the company related to studies

Cross-examination – Dr. John S. Patterson

1    prior to 2002 at the time when we were starting to publish

2    all studies on the Internet.

3    Q    Hmm.  So were you involved in the decision about

4    whether or not to put the clinical study report or

5    clinical study summary for study 15 on the Internet?

6    A    I would have been part of the discussion.  I set the

7    policy for the company in relation to studies.

8    Q    Right.

9    A    And I had some discussions with the study team, I

10   believe, about how far back to go because we're now

11   talking about activity that was taking place in 2005 to '7

12   with the study reports.

13   Q    Okay.  Did the subject of study 15 come up in this

14   discussion you're recalling?

15   A    I can't recall whether study 15 -- to say it was

16   brought up with me, but certainly there was a question

17   about how much resource we had to go back to put in some

18   of the older studies on a number of products, but Seroquel

19   in particular.

20   Q    Okay.  So do you -- do you know whether study 15 was

21   put on the Internet and made available to scientists to

22   review?

23   A    I believe that today --

24   Q    I'm sorry.

25   A    -- every study is available.

Cross-examination – Dr. John S. Patterson          113

1   Q    I'm not asking you about today.  I'm asking you do

2   you know when you were discussing the project whether

3   study 15 was actually put on the Internet?

4           MR. BROCK:  Your Honor, I would ask that he not

5   be cut off when he is in the midst of answering.

6           THE COURT:  Okay.  Let's try not to step on each

7   other.

8           MR. BLIZZARD:  I'll do that, Your Honor.  Thank

9   you.

10          THE WITNESS:  At the time that the discussion

11  was ongoing in 2006, I believe that a decision was made

12  that we had the resources to go back and put onto the

13  Internet studies as far back as 2002.  Because study 15

14  predates 2002, I suspect at that time it wasn't put on the

15  Internet.  But I would also just say to you that at the

16  time, 1997, when this program was run, nobody was putting

17  studies on the Internet.

18  BY MR. BLIZZARD:

19  Q    Well, thank you for that explanation.  Doctor, I

20  didn't ask for it.  And in the interest of time, I would

21  ask you to do your very best to try to directly answer my

22  questions, and I'll try my best to make my questions

23  simple, okay?

24  A    Okay.

25  Q    Now, when you were asked about the specifics of

Cross-examination – Dr. John S. Patterson                114

1    study 41, 135, 49, 43, when you were asked about the

2    specifics of those studies back at the time of your

3    deposition, you indicated you didn't have those specifics

4    in mind, did you -- didn't you?

5    A    I believe that was the case, yes.

6    Q    Right.  In fact, didn't you tell counsel for

7    plaintiff at that deposition that he was probably more

8    familiar with the details of studies than you?

9    A    I think I did.

10   Q    Okay.  And when you were specifically asked about

11   studies 125, 126, and 127, didn't you give sworn testimony

12   that you were not familiar with the details?

13   A    Insofar as the absolute details of the study, that's

14   absolutely correct.

15   Q    Okay.  Now you've also testified here about some

16   safety issues.  There is a safety department at AZ,

17   correct?

18   A    Yes, there is.

19   Q    Okay.  And between the years of 1999 and 2005, were

20   you in the safety department?

21   A    Between those years, I was on the senior executive

22   team with the company, and the safety department did not

23   report to me, but as a senior executive of the company, I

24   knew of significant safety issues.

25   Q    Okay.  You also mentioned the SERM process, which is

Cross-examination – Dr. John S. Patterson                 115

1    Safety Evaluation and Review Meetings, correct?

2    A    That's correct.

3    Q    There were a number of those Safety Evaluation and

4    Review Meetings on Seroquel, correct?

5    A    I believe.

6    Q    There were a couple on weight gain, correct?

7    A    I have never attended a SERM meeting.  I'm not aware

8    of each and every one of them, but I'm aware there were

9    quite a number of SERM meetings.

10   Q    Okay.  So the -- quite a number of SERM meetings that

11   occurred on Seroquel, did you attend any of them?

12   A    No, sir, I did not.

13   Q    Was it a regular part of your job to receive the

14   minutes of those meetings?

15   A    No, it was not.

16   Q    Did you personally ever participate in analyzing the

17   safety data on Seroquel to determine whether a signal

18   existed for diabetes or hyperglycemia?

19   A    That was always the role of others.

20   Q    Okay.  Or whether there was a reasonable evidence of

21   an association between Seroquel and diabetes or

22   hyperglycemia; was that also the role of others?

23   A    And my role as part of the senior management of the

24   organization was to receive their conclusions.

25   Q    Okay.  Were these sort of executive summaries?

Cross-examination - Dr. John S. Patterson                116

1    A    They could be.  Or they could be verbal

2    presentations, depending on what was happening.

3    Q    What do you remember?  Do you have in mind a specific

4    presentation that you remember today?

5    A    I would not remember a specific presentation today.

6    I've, over the years, have multiple presentations on these

7    products.

8    Q    Now you talked about the FDA a number of times in the

9    questioning this morning and this afternoon, didn't you?

10   A    Yes, I did.

11   Q    Was it ever part of your job to interact with the FDA

12   on Seroquel?

13   A    I don't think I ever interacted directly with the FDA

14   on Seroquel.

15   Q    Did you ever talk to them on the phone about

16   Seroquel?

17   A    No, I did not.

18   Q    Make any presentations to them about Seroquel?

19   A    No, I did not.

20   Q    Write a letter to them about Seroquel?

21   A    No, I did not.

22   Q    Have a letter written to you about Seroquel?

23   A    Nor would I expect them to.

24   Q    Were you involved in any way in the labeling

25   decisions that you've discussed here today about Seroquel?

Cross-examination – Dr. John S. Patterson                117

```
 1   A    I would not have been involved in the discussion that
 2   went on regarding the label of the drug.  But I will have
 3   been involved or informed as to what was being proposed
 4   and the implication of that proposal, the data that was
 5   supporting that proposal.
 6   Q    Maybe I didn't make my question clear.
 7        Were you involved in any of the labeling decisions
 8   about Seroquel?
 9   A    And I tried to answer it.  I'm sorry if I didn't.
10   Let me clarify.  The SERM committee, which were the experts
11   in the field in the products, would have sat down to
12   discuss labeling changes and made some decisions and
13   proposals.  As a senior member of management, I will then,
14   on important decisions, have been informed as what was
15   proposed that the company was going to do.
16   Q    Okay.  So tell me which were the important decisions
17   that you were informed on that you discussed here today.
18   A    I was informed on the findings on studies 126 and 127
19   and the changes that were proposed under the CBE.
20   Q    Okay.  And that was in June of 2007, correct?
21   A    That will have been sometime in early 2007, yes.
22   Q    June 22nd, 2007, remember the document from a minute
23   ago?
24   A    I remember that document, yes.
25   Q    It's the CBE change --
```

Cross-examination – Dr. John S. Patterson                118

1   A    That's the point at which it was sent to the FDA.

2   Q    Right.

3   A    My memory was not of the date after, I think of the

4   date when somebody would have come and spoken to me whilst

5   that was being prepared.

6   Q    Okay.  Whatever the date turns out to be, the only

7   decision that you can remember being involved in about

8   labeling and Seroquel was the one that made the changes

9   after the results of 126, 127, and 125?

10  A    On those that came from the company, I was also very

11  aware of the FDA-mandated warnings that came, 2003.

12  Q    Okay.  Have you now covered them all?

13  A    Those that were significant changes, yes.  I will

14  always have been aware of the NDA being granted and the

15  labeling that came with that.  I will have been aware of

16  any other significant submissions that we made and the

17  input or the data that was in those in the claim that we

18  were going to make as a result of those submissions.

19  Q    Okay.  While we're talking about labeling, between

20  1997 when the product first came on the market here in the

21  United States and 2005, there was no warning in the

22  warning section of the label about diabetes or

23  hyperglycemia or weight gain, was there?

24  A    I don't believe that's a correct statement.  I

25  believe there was a warning that came as a class warning

Cross-examination - Dr. John S. Patterson                    119

1   in the beginning of 2004.

2   Q    I'm sorry.  You're correct.

3        Between 1997 and the first part of 2004, there was no

4   warning in the warning section of the Seroquel label about

5   diabetes, hyperglycemia, or weight gain, was there?

6   A    They were all in the adverse reaction section of

7   that.

8   Q    In the adverse section -- we'll get to it in a

9   minute -- but there was nothing in the warning section,

10  was there?

11  A    No, there was not.

12  Q    And the warning section of a label has a special

13  meaning within the U.S. regulatory scheme, doesn't it?

14  A    I believe so.

15  Q    And it tends to get more attention from doctors,

16  doesn't it?

17  A    Well, at the end of the day, the label is the whole

18  label.

19  Q    I understand.  But when a doctor's reading the label,

20  the warning section comes first, the precaution sections

21  come after that, and the adverse reaction sections come

22  after that, don't they?

23  A    That's correct.

24  Q    And there's -- you were asked a number of questions

25  about communications to the prescribing community.

Cross-examination – Dr. John S. Patterson                    120

1         Do you remember that?

2    A    I do.

3    Q    It's much more effective to and much more likely to

4    get through to the prescribing community if the

5    information is in the warning section, isn't it?

6    A    Whenever, certainly, the company interacts with the

7    prescribing community, it provides the whole label to the

8    doctor.  And actually to go past even the adverse reaction

9    section, you have to go past that to get to the dosing

10   section of the label.

11   Q    Okay.  Well, maybe we can put the adverse reaction

12   section up.

13        Are you saying that the adverse reaction section is a

14   warning to doctors?

15   A    No.  I'm saying it's part of the total label.

16   Q    Okay.

17        So if we can put the adverse reaction section up, I

18   would --

19   A    Is there a paper copy of this?

20   Q    I do.  Is that the PDR -- it's P36, it's the 2000

21   label that we have in front of you.

22        Do you have it in front of you, Doctor?

23   A    I do, yes.

24   Q    Okay.  Do you see the adverse reaction section?

25   A    Yes, I do.

Cross-examination – Dr. John S. Patterson          121

1   Q     It's little tiny print, isn't it?

2   A     It's all tiny print.

3   Q     I'm struggling with it.  I was hoping I had a screen.

4   You have a screen there.  I think we're going to enlarge

5   it.

6   A     It's no better on the screen.

7   Q     Well, we're going to enlarge it for you.

8         Is there a section that's entitled "Digestive

9   System"?

10  A     Yes, there is.

11  Q     Okay.  And, for example, is there a number of things

12  listed there in the digestive section as adverse

13  reactions?

14  A     Yes, there are.

15  Q     Okay.  Under "Frequent," what does it list first?

16  A     Anorexia.

17  Q     Anorexia.  That's severe weight loss, right?

18  A     That's a loss of appetite.

19  Q     All right.  And right beneath that, almost directly

20  beneath that, does it say "increased appetite"?

21  A     That's correct.

22  Q     Okay.  So you've listed in adverse reactions for the

23  prescribing community both anorexia and an increase in

24  appetite, correct?

25  A     That's correct.

Cross-examination - Dr. John S. Patterson                122

1   Q     Okay.  And then there's hemorrhoids listed there?

2   A     Yes.

3   Q     Tooth caries?

4   A     Yes.

5   Q     You're not suggesting that you're warning doctors

6   that Seroquel causes tooth caries or hemorrhoids, are you?

7   A     What I think I said on the direct examination is the

8   adverse reactions section collects all the information

9   that doctors have informed us about, adverse events that

10  have happened on our studies or in real life, I was going

11  to say, outside the trials, and this is a compilation of

12  those.

13  Q     If you look under the metabolic and nutritional

14  systems, do you see that?

15  A     I do.

16  Q     Okay.  You mentioned earlier in direct examination

17  that it was contained in the -- that weight gain was

18  actually listed in the adverse reaction section, right?

19  A     I'm not sure whether I said it was in the adverse

20  reaction section.  I know that weight gain is also listed

21  under the clinical trials that were performed with the

22  drug.

23  Q     Okay.  Do you know where it's listed in this label?

24  A     I would have to go and look.

25  Q     Do you know where it is?

Cross-examination – Dr. John S. Patterson        123

1   A    I'm struggling to read this.  I believe it was in

2   here somewhere.

3   Q    Okay.  Well, we'll come back to that later.

4        Is weight loss also listed in the adverse reaction --

5   A    Yes, it is.

6   Q    -- section?

7        So there's weight gain listed somewhere and weight

8   loss, correct?

9   A    Correct.

10  Q    And there's hyperglycemia listed, right?

11  A    Yes.

12  Q    And hypoglycemia listed, correct?

13  A    That's correct.

14  Q    Would you blame the doctor for being confused?

15  A    You would -- if you were a doctor reading this, you

16  would think that either of these things could happen

17  whilst the drug was being taken.

18  Q    Okay.  So if you're a member of the prescribing

19  community, you're being told there's adverse reactions:

20  Weight loss, weight gain, hyperglycemia, and hypoglycemia,

21  among lots of other things, right?

22  A    That's right.

23  Q    But when we go to the warning section, is there

24  anything there?

25  A    No, there isn't.

Cross-examination – Dr. John S. Patterson                    124

1    Q    2000, there's nothing there?

2    A    No.

3    Q    2001, there's nothing there?

4    A    No.

5    Q    2002, there's nothing there?

6    A    Because there was no data for the company to put in

7    it.

8    Q    We're going to get to that in a minute.

9         2003, there's nothing in the warning section?

10   A    No, there isn't.

11   Q    Okay.  Now, we talked about your involvement, or lack

12   thereof, in clinical studies.  We've talked about your

13   involvement or not with the FDA.

14        Between 1997 and 2005, you were involved in the

15   marketing part of the company, weren't you?

16   A    I was responsible for the global strategic market and

17   organization, yes.

18   Q    Okay.  And so you were involved in coming up with

19   global marketing strategic initiatives; is that correct?

20   A    That was part of my role.

21   Q    Okay.  Were you involved in deciding how to promote

22   Seroquel in the United States?

23   A    No.  The role of the U.S. organization was such that

24   they were entitled to decide how to promote Seroquel in

25   the States.  They were responsible also at an operational

Cross-examination – Dr. John S. Patterson                125

```
1    level for deciding what was in the marketing information
2    that they put out in the United States, and also for
3    undertaking a review process to ensure that it was
4    appropriate within the label.
5    Q    Okay.  So you were not responsible for how to promote
6    in the United States.  Were you responsible for what to
7    promote in the United States?
8    A    I was responsible for ensuring that we had a stream
9    of indications and pieces of data through clinical trials
10   performed by the clinical organization and others to
11   deliver messages to the market, so we provided them with
12   the raw material and the direction of travel, yes.
13   Q    Okay.  So you gave them the roadmap?
14   A    Yes.
15   Q    And it was their job to execute it?
16   A    Or on occasions not to follow the roadmap, but to
17   deliver their own sales and marketing activity.
18   Q    Okay.  So if you actually came up with a roadmap for
19   all of the marketing companies around the world, they were
20   free to disregard it?
21   A    The United States often was because it was such a
22   large market in 50 percent of the world, they had to have
23   a good reason for doing so, Mr. Blizzard, and on the whole
24   they would follow the roadmap.
25   Q    Okay.  But 50 percent of the worldwide sales for
```

1    Seroquel gave them a lot of clout, didn't it?

2    A    The 50 percent of worldwide sales for all of our

3    products always gives you a lot of clout.

4    Q    Okay.  Now to summarize then, you no longer work for

5    the company at this point?

6    A    That's correct.

7    Q    We didn't cover this, but when did you retire?

8    A    On the 1st of April of this year.

9    Q    Was it because you reached retirement age?

10   A    Retirement age for the company is 62.  I reached 61

11   in January, so I would have to retire in January 2010 and

12   chose to go a few months early.

13   Q    Okay.  But when you were actively working for the

14   company, you were not day-to-day directly involved in the

15   clinical trials, correct?

16   A    When I was working for the company for the first

17   significant number of years with the company, I was very

18   day-to-day involved in running clinical trials.

19   Q    I'm sorry, that was a bad question.

20        You weren't day-to-day involved in the Seroquel

21   clinical trials?

22   A    No, I was not.

23   Q    And you were not day-to-day involved in the Seroquel

24   safety issues, were you?

25   A    No, I was not involved in the assessment of those,

Cross-examination - Dr. John S. Patterson                127

```
 1   but from time to time, when there were significant issues
 2   to be discussed, I was involved.
 3   Q    And you weren't involved in the interaction with FDA
 4   on Seroquel, correct?
 5   A    I was not involved directly with the FDA.
 6   Q    Okay.  So you're here today to cover the mountaintops
 7   but not the valleys?
 8   A    Those are your words, not mine, Mr. Blizzard.
 9   Q    Are they accurate?
10   A    I don't know what you mean by that, but I believe
11   that in my time with the company, I've been significantly
12   involved in our processes, our activities, and, through
13   others, in the development of this product.
14   Q    You talked about a number of these details today.
15   Have you spent some time since your last deposition boning
16   up on the details?
17   A    I spent some time looking at some of the paperwork,
18   yes, certainly, and -- but "some time" will be too strong
19   a word.  I spent a few days.
20   Q    Okay.  Before your last deposition, you spent, I
21   think you testified, four to five days with the lawyers
22   for AstraZeneca, correct?
23   A    Yes.
24   Q    And there were several lawyers involved in preparing
25   you, right?
```

Cross-examination – Dr. John S. Patterson                    128

1    A    There were, yes.

2    Q    How many days did you spend this time?

3    A    I spent Monday, Tuesday of this week, and I came over

4    this weekend.  So I came over Friday night.  So that's

5    four days this week.  And then because I thought we were

6    going to trial -- they thought we were going to trial

7    earlier in the summer, I had a couple of days of

8    preparation earlier in the summer.  I can't remember

9    exactly when.

10   Q    So in total you've had about ten days of preparation

11   with the lawyers for AstraZeneca?

12   A    Over a significant period of time, yes.

13   Q    And about how many lawyers have been involved in

14   preparing you?

15   A    At any one time, usually two or three.

16   Q    Okay.  Now, I just mentioned mountaintops a moment

17   ago.  When it comes to the executive ladder at AstraZeneca

18   when you were working there, you were close to the

19   mountaintop, weren't you?

20   A    By the end, yes.

21   Q    And you reported directly to the CEO of the company?

22   A    I did.

23   Q    And that's David Brennan, currently?

24   A    It is.

25   Q    He has given his deposition; do you understand that?

1   A     I understand that.

2   Q     And you were paid a generous compensation package for

3   your position, weren't you?

4   A     I believe I was paid an appropriate compensation

5   package.

6   Q     Okay.  Your base salary was in U.S. dollars somewhere

7   in excess of a million dollars?

8             MR. BROCK:  Your Honor, I'm going to object to

9   the -- I'm going to object to the interjection of his

10  personal income in the case.  I don't think it's relevant

11  to the proceeding, and the prejudicial effect of talking

12  about amounts of compensation I think has the potential to

13  distract from -- the jury's attention away from the real

14  issues of case.  So I object to testimony about his

15  compensation.

16            THE COURT:  What is the relevance as to the

17  exact amount of his compensation?

18            MR. BLIZZARD:  It goes to bias, Your Honor, that

19  his interest in the success of the company.

20            THE COURT:  The objection is sustained.

21            MR. BLIZZARD:  Okay.  Your Honor, may I ask --

22            THE COURT:  But that is just as to the --

23            MR. BLIZZARD:  -- salary.

24            THE COURT:  -- amount of the salary.

25

1   BY MR. BLIZZARD:

2   Q    Did you also have a bonus plan?

3   A    Yes, we did.

4   Q    And could you earn in your bonus plan up to

5   100 percent of your base salary?

6   A    I think that was the case in the most -- when I got

7   to the most senior roles, yes.

8   Q    Okay.  Did you have a -- did you also receive stock

9   grants or grants of stock in the company?

10  A    Yes, I did.

11  Q    Did you also receive stock options?

12  A    Yes, I did.

13  Q    So that during the time that you were working for the

14  company, you had a personal incentive for the company to

15  succeed that was a financial incentive?

16  A    That's the way companies normally work.

17  Q    Okay.  Did you also sit on the compensation committee

18  for a period of time that decided what the executive

19  compensation scheme would be?

20  A    No, I didn't.

21  Q    Okay.

22  A    I sat on a compensation committee for people junior

23  to me in different roles.

24  Q    Okay.

25  A    Non-executive directors decide the remuneration of

Cross-examination – Dr. John S. Patterson                131

1    the executive team.

2    Q    Do you still have stock in the company?

3    A    Yes, I do.

4    Q    Are you still being paid by the company?

5    A    No, I'm not.

6    Q    Do you receive a pension from the company?

7    A    Yes, I do.

8    Q    Okay.  I want to talk to you about three specific

9    subjects -- if I could get a little bit of water.

10        First, I'd like to talk to you about weight gain,

11   secondly about diabetes and hyperglycemia, and third about

12   off-label use of Seroquel.  Okay?

13        Do you think you could answer some questions on those

14   subject matters, Doctor?

15   A    I'll try my best.

16   Q    Okay.  Let's talk about weight gain first.

17        You mentioned that Seroquel was first approved for

18   marketing here in the United States in 1997; is that

19   correct?

20   A    That's correct.

21   Q    Even from the first time the drug was approved, did

22   the company have substantial scientific evidence that

23   Seroquel could cause clinically significant weight gain in

24   some people?

25   A    My understanding is that from the beginning, we had

1    results of our clinical trials where we took greater than

2    seven percent increase as being significant, and we showed

3    the data in relation to significant weight gain in the

4    label and in those studies.

5    Q    So there's -- clinically significant weight gain is

6    set by the FDA regulations at seven percent or greater

7    body weight, correct?

8    A    I'm not sure whether it's a regulation or whether

9    it's by practice, but that's how we looked at it.

10   Q    Okay.  So on a 200-pound man, seven percent is

11   14 pounds?

12   A    Yes.

13   Q    On a 150-pound man or woman, that's about ten pounds

14   weight gain?

15   A    Yes.

16   Q    As a doctor, would you say that can be clinically

17   significant?

18   A    Well, I think what you've done is you've taken a

19   couple of examples.  On an individual patient, it depends

20   entirely on the patient, and I'm not going to try and

21   comment on individual patients.

22   Q    Right.  I'm talking about as a rule of thumb, do you

23   agree that the FDA setting clinically significant at

24   seven percent of body weight is a reasonable figure?

25   A    What we haven't discussed is that the mean increase

Cross-examination - Dr. John S. Patterson          133

1   in weight across the trial program and across the data was

2   actually about two kilograms or one to two kilograms,

3   not -- and it's only when you take the significant

4   increases that you get to that kind of level.

5   Q    Okay.  Doctor, I'm sorry, I didn't ask you about the

6   mean increases, okay?  I asked you -- the question was:

7   Do you agree that seven percent of body weight is a good

8   rule of thumb for clinical significance of the weight

9   gain?

10  A    I think it's a reasonable starting point from which

11  individual patients should then be judged.

12  Q    Okay.  And what you said that from the time the drug

13  was first sold, it was indicated that 23 percent of the

14  people who had taken the drug in the clinical trials had

15  seven percent or greater weight gain, correct?

16  A    That was in our label from the first day.

17  Q    That was in short-term trials, wasn't it?

18  A    That was from -- yes, the short-term

19  placebo-controlled clinical trials.

20  Q    So in 12 weeks or less, right?

21  A    Yes.

22  Q    So in three months or less, 23 percent of the people

23  who took it gained more than seven percent of their body

24  weight, right?

25  A    But the overall increase across the whole population

Cross-examination – Dr. John S. Patterson                134

1    was only two kilograms.

2    Q    Okay.  Well, whether -- as we spread it across a

3    bunch of people, whether that's significant or not, to the

4    person, the individual, the part of the 23 percent who

5    actually gains more than seven percent of their body

6    weight, that could matter to them, couldn't it?

7    A    It could be a good thing as well, Mr. Blizzard.  If

8    they're actually psychotic, not eating, underweight, then

9    actually gaining significant percentage of their body

10   weight is a good thing.  So all I'm trying to say to you

11   is it depends on the individual, and you have to look at

12   the individual rather than generalizing.

13   Q    Okay.  So when you put it in the label that seven

14   percent -- or 23 percent of the people in the clinical

15   trials had gained more than seven percent of their body

16   weight, did you put it in there as a warning that this is

17   a potential problem, or did you say this is an advantage?

18   Was it put in there for both?

19   A    It was put in there as part of the information for

20   the doctors treating the patients, and I believe it was

21   not in the warning section.  It was in the clinical trials

22   section.

23   Q    Okay.  So it wasn't a warning then, was it?

24   A    No.

25   Q    Okay.  So, now, do you know who Lisa Arvanitis is?

Cross-examination - Dr. John S. Patterson          135

1  A    Yes, I do.

2  Q    Now, Lisa Arvanitis was the international

3  physician -- or international product physician for

4  Seroquel, wasn't she?

5  A    She was.

6  Q    We saw a few of her documents earlier today where she

7  signed off on some clinical study reports and also the

8  Integrated Summary of Safety that was filed with the NDA,

9  correct?

10  A    Yes.

11  Q    She was the chief physician in charge of Seroquel

12  back in 1997, wasn't she?

13  A    I believe she was, yes.

14  Q    Okay.  Can you take a look at Exhibit P1, please?

15  Have you seen that document before, Dr. Patterson?

16  A    Yes, I have.

17  Q    If you -- does this appear to be an e-mail from

18  Lisa Arvanitis dated August 13, 1997?

19  A    Yes, it does.

20  Q    Was this around the time that Seroquel was first

21  approved for use in the United States?

22  A    Yes, it was.

23  Q    Okay.  And she's writing to John, Barbara and Mark.

24  Mark Scott is listed there, Barbara Kowalcyk and John

25  Monyak, correct?

Cross-examination – Dr. John S. Patterson                    136

1    A    Correct.

2    Q    Do you know those individuals?

3    A    I know Mark Scott very well.  The other two, I don't

4    know.

5    Q    Okay.  Is this e-mail discussing the weight gain that

6    was found in the clinical trials that were done on

7    Seroquel as part of the NDA?

8    A    Yes, it is.

9    Q    Okay.  If you look at the third paragraph, do you see

10   the paragraph that -- actually it's the fourth paragraph,

11   do you see where it starts, "I recognize"?

12   A    Yes, I do.

13   Q    See where it says, "I recognize there are a number of

14   interactions/confounds in the analysis John did, but

15   despite this, I was really struck by how consistent the

16   data was across pools, all trials, 15 alone" -- that's

17   study 15, isn't it?

18   A    I believe so.

19   Q    "All trials, with -15, across parameter/measures,

20   mean change from baseline, percent change from baseline,

21   proportion with clinically significant weight gain, and

22   across cohorts, various durations of treatment, the

23   results seem to be consistent and show," and then it says,

24   "weight gain is more rapid initially," right?

25   A    Correct.

Cross-examination – Dr. John S. Patterson                137

1    Q    Then it says, "While weight gain slows over the

2    longer term, I only consider 52 weeks, there still is

3    weight gain, it doesn't stop.  The slope just appears to

4    change."

5         Does it say that?

6    A    It does.

7    Q    What does it mean when it says "slope changes"?

8    A    Usually the rate of change, when you graph something

9    is the slope.

10   Q    Okay.  So what this says is while the percentage by

11   which it's increasing decreases, the actual weight gain

12   itself continues, correct?

13   A    That appears to be the case, yes.

14   Q    Okay.  And then skipping down a paragraph, does it

15   say, "The proportion of patients with clinically

16   significant weight gain at 52 weeks regardless of pool or

17   cohort is about 45 percent."

18        Is that what it says?

19   A    Yes, it is.

20   Q    And this is more than the percentage at six weeks,

21   correct?

22   A    Correct.

23   Q    So what number was it that got put in the label?  Was

24   it the short-term data or the long-term data?

25   A    My understanding is that what got put into the FDA

Cross-examination – Dr. John S. Patterson          138

1    was all of the data including this information.  What went

2    into the label at the FDA's request was the data from the

3    placebo-controlled studies.

4    Q    Okay.  But the 52-week data that Dr. Arvanitis is

5    talking about here showed that 45 percent of the people

6    who took Seroquel had at least seven percent or gained at

7    least seven percent of their body weight, correct?

8    A    I'm not sure because I don't know the background --

9    all the background to this e-mail, whether "clinically

10   significant" was being used in the same terminology as you

11   just described.  If it is, then that's exactly what she's

12   saying, and you heard me read the sections from the NDA

13   submission this morning that actually covered exactly that

14   data.

15   Q    Okay.  And do you see, her next paragraph says, "This

16   was quite surprising to me, not the weight gain, but the

17   consistency," correct?

18   A    Correct.

19   Q    And then she -- over on the next page, top, I guess

20   it's the second paragraph, you see the sentence that

21   begins, "We know"?

22   A    Yes.

23   Q    What does that say?

24   A    It says, "We know that weight gain is dose-related."

25   Q    Okay.  So the study showed that it was dose-related,

Cross-examination – Dr. John S. Patterson          139

 1  correct?

 2  A    I believe there was data to show that, yes.

 3  Q    It was consistent, correct?

 4  A    Yes.

 5  Q    Those are hallmarks of -- in science for establishing

 6  causation, aren't they?

 7  A    They are some of the hallmarks for establishing

 8  causation, yes.

 9  Q    They're two of the important hallmarks of

10  establishing causation, aren't they?

11  A    Yes, but you also have to say, my understanding is

12  the amount of long-term information and the numbers of

13  patients were down to very low single digits or less than

14  20 patients.  So it was a relatively small group of

15  patients from which she was drawing this analogy.

16  Q    Well -- but it was across all cohorts, correct?

17  A    But across all cohorts, there weren't many people in

18  the cohorts, that's all I'm saying.

19                   (Pause in the proceedings.)

20  BY MR. BLIZZARD:

21  Q    Doctor, we're back on record.  Are you ready to

22  proceed?

23  A    I am.

24  Q    Okay.  We mentioned study 15 a number of times, I'm

25  not sure if this has ever been asked, it may have been.

Cross-examination – Dr. John S. Patterson                    140

```
 1   If it has, I apologize.
 2        Study 15 was one of the pivotal trials for Seroquel,
 3   wasn't it?
 4   A    Study 15 was intended to be one of the pivotal
 5   trials, but as I'm sure you know, it was a comparison
 6   between an active control and one of the first generation
 7   antipsychotics and Seroquel, and it was found that neither
 8   product had an effect in that study which is not uncommon
 9   in psychiatric studies, and therefore it was regarded not
10   as a pivotal study but as a failed study.
11   Q    Were there people within the company who called it a
12   cursed study?
13   A    I wouldn't have used those words, but I believe there
14   were.
15   Q    If you'll take a look at Plaintiffs' Exhibit No. 4
16   which is in front of you.
17        Okay.  Do you have it?
18   A    I do, yes.
19   Q    If you -- have you seen this document before?
20   A    Yes, I have.
21   Q    Is this an e-mail that's dated February 12th of 1997?
22   A    Yes, it is.
23   Q    And is it regarding study 15?
24   A    Yes, it is.
25   Q    Okay.  And it's from a Richard Lawrence to a number
```

Cross-examination – Dr. John S. Patterson                141

1    of people, correct?

2    A     That's correct.

3    Q     And included on the list are Lisa Arvanitis who is

4    the -- who we just identified as the chief physician in

5    charge of Seroquel, correct?

6    A     Correct.

7    Q     And Don Stribling?

8    A     That's correct, yes.

9    Q     Do you know who Don Stribling is?

10   A     Yes, I do.

11   Q     Who was Don Stribling?

12   A     Don Stribling was one of our scientists who became

13   the development manager for Seroquel at one stage in his

14   career.

15   Q     Did he report to you at any time in his career?

16   A     Yes, he did.

17   Q     Did he directly report to you?

18   A     On some occasions, yes.  At that particular point,

19   no.

20   Q     Okay.  This e-mail says in the first paragraph, "I am

21   not 100 percent comfortable with this data being made

22   publically available at the present time."

23         Do you see that?

24         MR. BROCK:  Your Honor, I'm going to object to

25   questions about this document unless a predicate is laid

1    to show that Dr. Patterson would have known about this at

2    the time.  He was asked if he had seen it.  He's not been

3    asked if he saw this document back in 1997.

4                MR. BLIZZARD:  Your Honor, counsel has asked the

5    witness a number of questions about documents in this same

6    time period relating to Dr. Arvanitis with Dr. Arvanitis

7    and Mr. Scott's name on them.  I'm simply asking that I be

8    allowed to do the same thing.  I mean, I can establish

9    that he was --

10   BY MR. BLIZZARD:

11   Q    Were you part of the senior executive team at the

12   time?

13   A    In 1997, we were still Zeneca and there wasn't a

14   senior executive team, but I was part of what was then

15   called the board of the pharmaceuticals business.

16   Q    Okay.  Were you -- so you were part of the board for

17   the pharmaceutical part of ICI?

18   A    Of Zeneca.

19   Q    Of Zeneca.  Okay.  So as part of the board of

20   directors and as -- you were in senior management at the

21   time, weren't you?

22   A    Yes, I was.

23   Q    And were you involved in this period of time of

24   trying to put together the global strategic marketing

25   group?

Cross-examination – Dr. John S. Patterson        143

1    A    No, I wasn't.  At that particular period of time, I

2    was responsible for running the sales and marketing

3    organizations outside the United States.

4    Q    Okay.  But were a member of the board, correct?

5    A    Correct.

6    Q    And have responsibility to shareholders, correct?

7    A    Whilst it was called a board, it wasn't actually the

8    public limited company board, but, yes, of course we had

9    responsibilities to shareholders for what we did, but

10   indirectly through the Zeneca PLC board.

11   Q    You were one of the leaders of the company, weren't

12   you?

13   A    Of the pharmaceutical business, yes.

14   Q    Okay.  As one of the leaders of the company, was it

15   appropriate or reasonable at the time for scientists

16   within the company to use smoke and mirrors in the

17   presentation of scientific articles?

18   A    My --

19         MR. BROCK:  Your Honor, I object to the

20   question.  I think the predicate is still inadequate.  We

21   have a question about the words, but he's got the document

22   on the screen, and I don't think a proper predicate has

23   been laid to ask this witness about the document.

24         MR. BLIZZARD:  I'm willing to take it down from

25   the screen at this point, Your Honor.  I'm simply asking

Cross-examination – Dr. John S. Patterson                144

```
 1   him whether as a leader of the company it was appropriate

 2   for scientists within the company to use smoke and mirrors

 3   to present scientific data?

 4           THE WITNESS:  I don't believe it's ever

 5   appropriate for the company to use smoke and mirrors, and

 6   I don't condone those words.  I don't know exactly what

 7   you meant by those words.  And of course I would again

 8   tell you all of the information on study 15 was presented

 9   to the FDA as part of the license application.

10   BY MR. BLIZZARD:

11   Q    Okay.  Well, there are presentations that are made

12   outside of the FDA that are important as well, aren't

13   there?

14   A    There can be, yes.

15   Q    A presentation to the medical community generally who

16   are prescribing these drugs such as Seroquel to their

17   patients, those are important presentations as well,

18   aren't they?

19   A    Yes, they are, or they can be.

20   Q    Presentations to scientific congresses like the

21   American Psychiatric Association, those are important,

22   aren't they?

23   A    Yes, they are.

24   Q    Publications in the medical literature that doctors

25   read and rely upon to make prescriptions of medications to
```

Cross-examination – Dr. John S. Patterson                145

1    their patients, those are important, aren't they?

2    A    Yes, they are.

3    Q    Is it appropriate to use smoke and mirrors in the

4    presentation of any of -- to any of those groups?

5    A    First of all, it's my -- I don't know what was done

6    in terms of defining that term.  Secondly, the gentleman

7    also appears to say that he understands that we have

8    little choice other than to make this data public.  And

9    thirdly, this was a failed study where neither Seroquel

10   nor the active comparator had any positive effects.  And

11   it's my understanding that the FDA reviewer, in looking at

12   the study, concurred with that judgment.

13   Q    Okay.  Well, do you know from reviewing the documents

14   that the company, through it scientists, tried to put a

15   positive spin on this study 15?

16   A    The company will always look at seeing what the data

17   showed and wherever possible will find positive

18   information in the studies.

19   Q    Did they try to put a positive spin on it?

20   A    My understanding is that some people looked at it as

21   is written here.  But my belief is that what we did tell

22   the outside world should have been, because we have

23   standards and procedures, absolutely balanced and fair,

24   and that's what we would, as a company, always strive to

25   do.

Cross-examination – Dr. John S. Patterson                146

1    Q    Okay.  Let me see if I understand.  What you should

2    do is make balanced and fair presentations, right?

3    A    Absolutely.

4    Q    What you shouldn't do is spin the data, correct?

5    A    Well, again, we need to define our terms,

6    Mr. Blizzard.  Sometimes the word "spin" is used in

7    different concepts.  If you mean pejoratively, turn the

8    data upside down in a way that's favorable when it's not,

9    I agree with you.  If you mean actually spinning out the

10   information and getting multiple publications from a major

11   study, then that form of spin in spinning out the

12   information is quite acceptable and is done by major

13   academic groups, not just the industry.

14   Q    The words that are used here, "Adopting the approach

15   Don has outlined should minimize, and dare I venture to

16   suggest, could put a positive spin in terms of safety on

17   this cursed study."

18        Now, those words, are those the kind of words you

19   expect from the scientists that you're leading at the

20   time?

21   A    They're absolutely not the words I expect from

22   anybody within AstraZeneca.  This gentleman, I believe,

23   was one of the marketing department people, he wasn't a

24   scientist.  But irrespective of which part of the company

25   he sat in, at face value, this does not look like

1    something that I would support.

2    Q    Okay.  Now if you'll take a look at Exhibit 687,

3    Defense Exhibit 687.

4         Do you have that in front of you?

5    A    Yes, I do.

6    Q    Is this a paper published under the -- by an author

7    named Velligan and others in 2002?

8    A    That appears to be the case, yes.

9    Q    Okay.  It's published in, it look likes a journal

10   entitled "Schizophrenia Research," correct?

11   A    Correct.

12   Q    Are you familiar with this paper?

13   A    No, I'm not.

14   Q    Okay.  Can you tell from looking at it whether it is

15   selective publication of the study 15 data?

16   A    I would have to spend some time reading it to try and

17   understand that.

18   Q    Okay.  Since you've never seen it before, let me just

19   ask you this:  Would you approve, as a leader of the

20   company, the selective publication of study 15 data?

21   A    It would depend, would it not, on how it had been

22   selective, what things had been added in and missed out,

23   before you could say whether that was reasonable or not.

24   Q    Okay.  It could be considered cherry-picking,

25   couldn't it, in publishing just part of data and not all

1    of it?

2    A    It could be considered cherry-picking if you publish

3    part of the data and not all of it, but equally it could

4    be a perfectly legitimate thing to do, and I just don't

5    know what was done on this occasion.

6    Q    Okay.  Let me show you -- or ask you to take a look

7    at Exhibit Plaintiffs' 414.  And specifically on page 2,

8    an e-mail from John Tumas that's dated December 6th of

9    1996 -- I'm sorry 1999.

10         Do you see that?

11   A    I do, yes.

12   Q    Do you see where it says there, "There has been a

13   precedent set regarding cherry-picking of data.  This

14   would be the recent Velligan presentations of cognitive

15   function data from trial 15, one of the buried trials."

16         Do you see that?

17             MR. BROCK:  Your Honor, again, I'm going object

18   to no predicate having been laid to ask the witness about

19   this.  I would just ask that until that's done if we could

20   not put it on the screen because I'm not sure what the

21   technology is doing with what we have.  That's all.

22             THE COURT:  Why don't you go ahead and -- is the

23   exhibit showing up on the screen?

24             DEPUTY CLERK:  I just blocked it.

25             THE COURT:  Okay.  Why don't you lay a

Cross-examination – Dr. John S. Patterson                    149

1    predicate, though, Mr. Blizzard.

2    BY MR. BLIZZARD:

3    Q    In 1999, were you one of the leaders of the company?

4    A    Yes, I was.

5    Q    Were you involved at that time in the global

6    strategic marketing issues?

7    A    At that time -- I'm trying to think exactly when we

8    became AstraZeneca.  It was on the cusp of when I was

9    moving from the sales and marketing organization to the

10   strategic marketing organization.

11   Q    Okay.  Around the same time?

12   A    Around that time, yes.

13   Q    And does strategic marketing, did it include the IIT

14   program?

15   A    Yes.  That would be part of it.

16   Q    And IIT is -- what -- what does that acronym stand

17   for?

18   A    Investigator-initiated trials.

19   Q    Okay.  And would that be sort of third-party

20   investigators like Don Velligan's paper?

21   A    I'm not sure whether that was an IIT study, but

22   certainly third-party investigators would decide they

23   wanted to do some work with our products --

24   Q    Okay.

25   A    -- and that's what happened.

Cross-examination – Dr. John S. Patterson          150

1    Q      So would it have been within your charge, when you

2    were in charge of global strategic marketing, to be

3    involved with -- down through the people working below

4    you -- with publication plans and things that would

5    publish data from clinical studies such as the Velligan

6    paper?

7    A      The people below me would certainly be involved in

8    publication plans, yes.

9    Q      Okay.  And would it ever be appropriate to bury one

10   of the clinical trials?

11   A      That's a word that, again, I wouldn't use.  It is

12   appropriate on occasions, or it has been, where you simply

13   couldn't publish clinical trials.  We didn't not submit

14   them to the FDA.  In fact the opposite.  They were all put

15   into the regulatory authorities.  But actually if they

16   were negative studies or failed studies, because of things

17   like lack of positive control working, lack of ability to

18   recruit the patients, over the years we've had many kinds

19   of failed studies, then it would be inappropriate to

20   publish them.

21          And in fact, it was almost impossible in the days of

22   paper publication to get studies that didn't show a

23   positive result published in the peer review journals.

24   Q      Well, Mr. Tumas was involved with the publication

25   plan, wasn't he?

Cross-examination – Dr. John S. Patterson          151

1    A     I believe so.

2    Q     Okay.  And so this study, Mr. Tumas describes as

3    being buried, right?

4    A     That's his description, not mine.

5    Q     And Mr. Tumas also says, "This is an example of

6    cherry-picking," correct?

7    A     That's what he says.

8    Q     As a leader of the company, do you agree with either

9    burying a study or cherry-picking the data from a study?

10   A     As a leader of the company, I believe we have to set

11   standards.  Today the standard is very clear.  We publish

12   every study that we commence whether it completes or

13   whether it gives a positive answer or not, and we put it

14   on the Internet.  It was not possible to do that in 1997.

15   The Internet was not available in that way.

16         I do not condone cherry-picking of data.  I do not

17   condone burying of trials.  And I would believe that every

18   single one of these trials and every piece of the data

19   would have been shared with the regulatory authorities.

20   Q     Okay.  Fair enough.  Would you agree it's

21   unreasonable and imprudent to do that?

22   A     It's unreasonable and imprudent to use these words.

23   Q     Okay.  Or to carry it out, if -- whether it's the

24   words or not, if you actually bury it or you actually --

25   A     If you bury --

Cross-examination – Dr. John S. Patterson          152

1   Q     -- cherry-pick the data, that's not prudent and it's

2   not reasonable, is it?

3   A     If you selectively take data for publication for the

4   wrong reasons, that is unacceptable.  If you hide a study

5   because it shows things you don't like, that is

6   unacceptable.  If you don't publish a study because it

7   didn't give useful data to the outside world, that is

8   reasonable.

9   Q     Okay.  Now, during the time that the -- Lisa

10  Arvanitis and her group had this data about in the

11  short-term trials, 23 percent of the people gaining at

12  least seven percent of their body weight, and in the

13  52-week data, 45 percent of the people gaining at least

14  seven percent of their body weight, during that same time,

15  were the marketing people within the company developing an

16  initiative to market Seroquel as being weight neutral?

17  A     My understanding is they did use that terminology for

18  a short period of time based on looking across the

19  database not only at the mean change, which I described to

20  you earlier, but also looking at what happened to those

21  people who were underweight, at weight, or above

22  acceptable weight at the time of entry into the study.

23        And they showed at that time that there was a

24  differentiation between those that were underweight and

25  those that were overweight.  They termed the term "weight

Cross-examination – Dr. John S. Patterson                153

1    neutral."  It was used for a couple of years.  And then

2    the company decided, as the data progressed and we got

3    further data, it didn't seem to be a helpful description

4    and we stopped using it.

5    Q    Okay.  Well, as the data progressed.  I mean, let me

6    ask you this:  If 45 percent of the people who take it for

7    a year have gained more than seven percent of their body

8    weight, it's never appropriate to say it's weight neutral,

9    is it?

10   A    Well, it's my understanding that in a peer-reviewed

11   publication, there was evidence presented to the outside

12   world that said if you looked at the data by the cohorts

13   of underweight, at weight, or overweight, you saw a

14   different result, and they termed the word "weight

15   neutral" in that publication and then that's what was

16   used.

17   Q    And actually, Doctor, are you familiar with this

18   issue?  The representation of Seroquel as weight neutral

19   for a number of years?

20   A    I am aware of it and in a general level, yes.

21   Q    Okay.  Actually it was part of a global initiative,

22   wasn't it?

23   A    I believe it may well have been.  As I said, for a

24   couple of years the company talked about it.

25   Q    And you were in charge of the global strategic

Cross-examination – Dr. John S. Patterson                 154

1    marketing at the time, weren't you?

2    A    Yes, I was.

3    Q    So you were personally involved in this, weren't you?

4    A    Not personally, but through others who were working

5    for me, yes.

6    Q    Okay.  If you'll take a look at P508 which should be

7    the next document in front of you.

8         Do you have it?

9    A    Yes, I do.

10   Q    Is this e-mail on this page from an Emma Westhead

11   dated March 2nd of 2000?

12   A    Yes, it is.

13   Q    Okay.  She's writing to Martin Jones, correct?

14   A    Yes, it is.

15   Q    Now I know Ms. Westhead and Mr. Jones to both be

16   statisticians within the company; do you know that as

17   well?

18   A    No, I didn't.

19   Q    Okay.  It says here, "Martin, I don't know if you've

20   had a chance to review this report yet, but just thought

21   I'd check to see what your opinion of the use of the term

22   'weight neutral' is."

23        Do you see that?

24   A    I do.

25   Q    It says, "It appears commercial."

Cross-examination – Dr. John S. Patterson          155

```
1          Now, commercial is distinguished from the scientific

2     side of the company, right?

3     A    Yes.

4     Q    It says, "It appears commercial.  Want to cut the

5     OLE3B data at 52 weeks as we can then make this claim."

6          Do you see that?

7     A    Yes, I do.

8     Q    Now, cutting OLE3B data, OLE is "open label

9     extension," isn't it?

10    A    I believe it would be, yes.

11    Q    Okay.  And the OLEB -- OLE3B data is data beyond the

12    52 weeks, right?  Or it's actually the open label

13    extension data, correct?

14    A    The short-term I think efficacy studies which were

15    the six- or 12-week studies that we talked about

16    previously from four- to six-week studies, were then run

17    on an open label for -- in order to get long-term safety

18    information.  So that's what she's describing.  They

19    weren't 52-week studies.

20    Q    Okay.  And so she's saying that, "The commercial

21    people want us to cut off the data at 52 weeks," right?

22    A    That's what she appears to be saying.

23    Q    And she then says, "I'm concerned about this for a

24    few reasons," right?

25    A    Yes, she does.
```

1    Q    She says -- her first bullet is, "We're ignoring the

2    full data out to three years.  Is this defensible?"

3         Right?

4    A    Yes.

5    Q    That's cherry-picking, isn't it?

6    A    Not necessarily.  It depends on how many people -- I

7    don't know the context of this.  It appears to be an

8    internal discussion amongst people in the company

9    challenging what the people are to do, which is actually

10   very healthy, but I don't know the basis on which it was

11   actually undertaken.

12   Q    Okay.  Her next bullet says, "A publication has gone

13   into CIMP on OLE safety which quotes data to three years.

14   Although they are different conferences, someone with a

15   sharp eye may query why the publications have different

16   cutoffs."

17        Do you see that?

18   A    I do.

19   Q    So it appears she's worried that you could get caught

20   doing it, right?

21   A    She's worried that there may be differences that will

22   appear, but I would say to you that as long as it's clear

23   what we're talking about and we actually state whether

24   we're talking about one-year or three-year data, that may

25   not have been an unreasonable thing to do.

Cross-examination – Dr. John S. Patterson                157

1          I also don't know how many people were in those

2     studies and whether there was a good reason for looking at

3     the one-year data because there were more people.

4     Q     And her last bullet says, "When we report the full

5     data from OLE at conference next year following database

6     lock in approximately June this year, I imagine we will

7     not then be able to defend weight neutral," correct?

8     A     She seems to be predating the data seeing as the

9     database hasn't been locked till June, so she's imagining

10    it.  I don't know whether that's right or wrong.

11    Q     Okay.  So did you ever make any attempt -- well,

12    first of all, did this ever come to your attention that

13    this was happening at the time?

14    A     I was not aware of this documentation at the time,

15    no.

16    Q     Were you aware that the company was marketing the

17    product as weight neutral?

18    A     I believe I was aware of that, yes.

19    Q     Okay.  And what did you do to try to find out if that

20    was an accurate representation?

21    A     At the time, I had others working for me who I

22    trusted and who I believed would deal with that

23    appropriately and would have taken the necessary steps to

24    ensure it was correct.

25          Not only that, but there are internal checks and

Cross-examination – Dr. John S. Patterson                158

1  balances within the company to ensure that any marketing

2  pieces that are actually used in the market are signed off

3  by the regulatory function as being fair and reasonable

4  representations.

5  Q    Who is the person that worked for you who was

6  responsible for making sure that when the representation

7  was made to the medical community, to the prescribing

8  community, that Seroquel was weight neutral, that that was

9  accurate and not misleading?

10  A    The head of the CNS organization within global

11  marketing would have been responsible.

12  Q    Who was that in the year 2000?

13  A    That would have been Jeff Birkett.

14  Q    Okay.  I'd like to put -- or have you take a look at

15  the next document which is Plaintiffs' Exhibit 1232.

16       Do you have that in front of you?

17  A    Yes, I do.

18  Q    Is this -- does this document reflect that this

19  weight neutral claim was part of a global strategy?

20  A    I'll have to take a moment to read it.

21  Q    Okay.  Take a look at the second paragraph under

22  "Dear Colleagues."

23  A    Okay.

24  Q    Okay.  Does it say it's a noble strategy?

25  A    Yes, it does.

Cross-examination - Dr. John S. Patterson          159

1    Q    Okay.  And you were in charge of global marketing at

2    the time?

3    A    Yes.  And what it says is the global strategy is to

4    demonstrate that as a weight neutral profile, which can

5    include, of course, generating data to support it or not

6    so, as the case may be.

7    Q    Sure.  Doctor, but you were the one in charge of it

8    at the time?

9    A    I was in charge of global marketing at the time, yes.

10   Q    Okay.

11        MR. BLIZZARD:  Can we have the document be able

12   to be put up on the screen.  I think it's still blocked.

13   BY MR. BLIZZARD:

14   Q    Does the document in the second paragraph say, "The

15   global strategy is to demonstrate to customers that

16   Seroquel has a weight neutral profile in the long term.

17   It can be argued that short-term weight data, as long as

18   it is only minimal, may not be as clinically important as

19   chronic weight gain over the long term."

20        Do you see that?

21   A    Yes, I do.

22   Q    And then it says, "The claims are clear, Seroquel has

23   a neutral effect on weight during long-term treatment.

24   Seroquel is not associated with diabetes nor its

25   exacerbations."

1        Do you see that?

2   A    Sorry.  You missed something here.  It goes on to

3   say, "It's also broad to assess weight change in the

4   context of BMI.  And Seroquel data which fulfills these

5   criteria, *i.e.*, the assessment of weight change in

6   long-term treatment of context to BMI, body mass index, is

7   strong."

8        I don't see anything about diabetes in that

9   particular --

10  Q    Okay, I'm sorry.  Maybe I didn't direct you to the

11  right place.  Below, there's a couple of icons there which

12  appear to be documents that were attached, and right below

13  that, do you see where it says, "The claims are clear"?

14  A    Yes, I see that.

15  Q    Okay.  And there are two bolded bullets under there,

16  correct?

17  A    Yes.

18  Q    Could you read the first bolded bullet?

19  A    "Seroquel has a neutral effect on weight during

20  long-term treatment."

21  Q    And what's the second bolded claim?

22  A    "Seroquel is not associated with diabetes or its

23  exacerbations."

24  Q    Okay.  And these were key global marketing

25  communications and claims during several years that you

1    were in charge of global marketing, weren't they?

2    A    That was during May 2001.

3    Q    Okay.  So what sales representatives were doing or

4    telling doctors was, "Don't pay attention to the material

5    that's in the label.  That's short-term weight gain.

6    Long-term weight gain is weight neutral," right?

7    A    No.  You've made a big jump from what the strategic

8    marketing organization is saying and trying to achieve and

9    looking to get generated to support from what a sales

10   representative says.

11        What a sales representative says is controlled by the

12   label and is controlled by the organization and trained to

13   stay within the label.

14   Q    Okay.  Well, it was part of the sales claim at the

15   time that over the long term it was weight neutral, wasn't

16   it?

17   A    And that was supported, I believe, by a published

18   paper to that effect.

19   Q    Okay.  So again -- but the doctor's getting two

20   different pieces of information, isn't he?  He's getting

21   the label that says, "Here's what happened in the

22   short-term placebo trial," and then he's getting a sale

23   rep telling him, "Long term, this is weight neutral, Doc,"

24   right?

25   A    I'm not able to say exactly what the sales force was

Cross-examination - Dr. John S. Patterson          162

1    saying because that was not my responsibility and I was

2    not involved in the process.

3    Q    They shouldn't have been telling doctors that it's

4    weight neutral, should they?

5    A    Those are your words, not mine.  I don't know what

6    the sales representatives were saying at that time.

7    Q    Today, would you tell doctors that Seroquel is weight

8    neutral?

9    A    As I said to you earlier, we continue to collect

10   data, particularly long-term data, and I believe that

11   after a couple of years, we actually stopped using that

12   phraseology in our global strategic marketing.

13       I believe that today, having gotten even more data,

14   the most recent overview suggests that some of the things

15   that we were saying there actually, on the bigger

16   databases, are being supported, i.e., "If you're

17   underweight, you'll put on weight.  If you're overweight,

18   on average you may not change your weight very much."

19   Q    So are you saying that today -- or if you were still

20   at the company, you would approve sale reps telling

21   doctors that Seroquel is weight neutral?

22   A    No, I wouldn't.

23   Q    You wouldn't because it's false, right?

24   A    I wouldn't because it's a terminology that is not

25   very helpful in terms of describing the product.

Cross-examination – Dr. John S. Patterson                 163

1   Q    Take a look at Plaintiffs' 242.

2        Do you see that this is an advertisement for

3   Seroquel?

4   A    I assume it might be, but I'm not certain that it is.

5   Q    Okay.  If you look at the bottom of the document in

6   very tiny print -- we'll try to blow it up for you on the

7   screen -- does it give a date there of 2001?

8   A    It seems to give 7-01, yes.

9   Q    Okay.  And does it appear to be a Seroquel document?

10  A    It does.

11  Q    Okay.  And was this during the time that you were in

12  charge of global marketing?

13  A    Yes, it was.

14       MR. BLIZZARD:  I'd like to have it put up on the

15  screen.

16       MR. BROCK:  Your Honor, I still don't think

17  that's an appropriate predicate.  He still has not

18  established that Dr. Patterson knows what this document is

19  or saw it at the time that it was utilized, if it was.

20       For the record, also, I would just state, I

21  understand we're doing this deposition in what potentially

22  is a large number of cases, and in addition to the

23  objection on predicate, I'd like to also state that we

24  would object to this document being used unless there is

25  some connection between the document and a prescribing

1   physician.

2        So it's difficult to look into the future and see

3   what the cases would look like, but unless this kind of

4   statement was made to a prescribing physician, it would

5   not be relevant and we would object to it.

6        MR. BLIZZARD:  Your Honor, if the predicate for

7   this witness answering questions is his personal

8   involvement with -- and familiarity with the document at

9   the time it came out, then he wouldn't have been able to

10  give any direct testimony about documents this morning.

11       He was in charge of the global marketing organization

12  at the time this marketing piece came out, and I think

13  that that's a sufficient predicate.

14       THE COURT:  The objection is overruled.

15  BY MR. BLIZZARD:

16  Q    Okay.  Doctor, does it say, "Distinct advantage of a

17  favorable weight profile" at the top of this marketing

18  piece?

19  A    Yes, it does.

20  Q    And does it say, "Weight gain commonly reported with

21  some other antipsychotics is associated with particular

22  morbidities," right?

23  A    Yes, it does.

24  Q    And is Type 2 diabetes listed as a particular

25  morbidity that weight gain is associated with?

Cross-examination - Dr. John S. Patterson                165

1    A     Yes, it is.

2    Q     Do you agree with that?

3    A     If it's significant and sustained, then it can be.

4    Q     Okay.  And then the next bullet says, "Minimal weight

5    gain may reduce the likelihood that treatment with

6    Seroquel will lead to diabetes and other morbidities

7    associated with weight gain, correct?

8    A     That's what it says.

9    Q     Okay.  Now are you familiar with a -- well, take a

10   look at Plaintiffs' Exhibit 266.

11         I believe this was a marketing piece developed by

12   AstraZeneca of a case report by -- written by Dr. Michael

13   Reinstein entitled "Managing Weight Gain and Diabetes in

14   Schizophrenia."

15         Are you familiar with Dr. Reinstein?

16   A     I know who he is, I'm not familiar with him.

17   Q     Do you know that at one point in time he was a

18   speaker on behalf of the company?

19   A     I believe so.

20   Q     Are you familiar with the fact that some of his

21   papers that he wrote got made into marketing pieces that

22   the sales rep force used?

23   A     Well, I wouldn't know what the U.S. sales force used

24   because that wasn't in my area of responsibility.

25   Q     Okay.  Was this -- do you know whether or not this

1    particular case report was prepared during the time that

2    you were in charge of global marketing?

3    A    It's hard to tell as to what the date was for this.

4    Q    Now I'm searching for a date also.  In the interest

5    of time, since I don't have time to find the date, this

6    moment I'm going to pass on this and go to the next

7    document.

8         MR. BLIZZARD:  I'm sorry, Your Honor.  I'm

9    moving on to the number two topic.  It won't be as long as

10   number one topic.  And then I have about the same time for

11   topic number 3.  If -- I don't know what the Court's

12   practice is with respect to breaks or --

13        THE COURT:  Well, I guess we should take a short

14   break, but I know that the Doctor wants to get out of

15   town.

16        MR. BLIZZARD:  I'll have him out of town.

17        THE COURT:  All right.  Well, we'll take till 20

18   after.

19                    (Recess.)

20        MR. BLIZZARD:  May it please the Court.

21        THE COURT:  Go ahead.

22   BY MR. BLIZZARD:

23   Q    Dr. Patterson, are you ready to proceed?

24   A    I am.

25   Q    Now I'd like to you talk about the second topic which

Cross-examination – Dr. John S. Patterson          167

1    is hyperglycemia and diabetes, okay?

2    A    Okay.

3    Q    I think you mentioned earlier that diabetes is

4    actually a clinical diagnosis that requires two

5    consecutive -- or to say it a different way -- involves

6    fasting blood glucose above 126 milligrams per deciliter

7    on two consecutive days.  Did I say that right?

8    A    Almost.  It's --

9    Q    I get partial credit?

10   A    Yes.  Above 126 to fairly closely approximating

11   values, that's one of the definitions.  Another is a blood

12   sugar above 200 at any time or an oral glucose tolerance

13   test above 200 at two hours.

14   Q    Okay.  And the 200 number that relates to blood

15   glucose is the non-fasting, correct?

16   A    That would be -- yes.

17   Q    Okay.  Now, you mentioned in June of 2007, there was

18   an evaluation of data that came out of the findings of

19   study 126, 127, and 125, correct?

20   A    I did.

21   Q    Do you have in front of you J4 which is a joint

22   exhibit dated June 8, 2007?

23   A    Yes, I do.

24         MR. BLIZZARD:  Can we put this up on the screen,

25   please.

1    BY MR. BLIZZARD:

2    Q    Are these the minutes of the SERM meeting that --

3    where the results of 126, 127, and 125 were discussed and

4    decisions were made?

5    A    That could be the minutes of the SERM meeting, but as

6    I've not seen them previously and don't attend them, I

7    wouldn't be absolutely certain.

8    Q    Okay.  So -- but you were in charge of development at

9    this time, weren't you?

10   A    Yes, I was.

11   Q    And life cycle management of, among other drugs,

12   Seroquel, correct?

13   A    That's correct.

14   Q    And you were familiar with these scientific findings.

15   You testified to that already, correct?

16   A    That's correct.

17   Q    Okay.  So take a look at the minutes with me.

18        Is there a section there called "Glucose

19   Disregulation"?

20   A    Yes, there is.

21   Q    That's item number 1, isn't it?

22   A    It is.

23   Q    And does it say there, "Following a review of all

24   clinical trial data"?

25   A    It does.

Cross-examination - Dr. John S. Patterson          169

1    Q    Okay.  And then it says, "Including studies 125, 126,

2    and 127 epidemiology, literature, and postmarketing data."

3         Okay, do you see that?

4    A    Yes.

5    Q    Then it says, "After review of all those things, SERM

6    recommended adding the following to section 4.4, special

7    warnings and special precautions for use."

8         Do you see that?

9    A    I do.

10   Q    And section 4.4 is part of the company's core data

11   sheet, correct?

12   A    Correct.

13   Q    The core data sheet is the company's internal

14   analysis of what should be in their labels; is that right?

15   A    That's a reasonable representation of it, yes.

16   Q    All right.  It's the company's look at its own

17   scientific data and making conclusions about that

18   scientific data, correct?

19   A    Yes, it is.

20   Q    Sometimes you have labels imposed upon you by

21   regulatory agencies, but when you make a change to your

22   core data sheet, you're saying, "This is what we believe

23   about the scientific data," correct?

24   A    That's correct.

25   Q    Okay.  So after reviewing all the clinical trial

Cross-examination – Dr. John S. Patterson          170

1    data, the epidemiology data, and the data from

2    studies 126, 127, and 125, if you look over to the second

3    page, does it say, "SERM also recommended adding the

4    following to section 4.8," and does it say, "Undesirable

5    effects" right there?

6    A    Yes, it does.

7    Q    Okay.  And over on the left-hand margin under

8    "Frequency," does it say "Common"?

9    A    Yes.

10   Q    Okay.  And the event that is an undesirable effect

11   and which is described as common here is "Blood glucose

12   increase to hyperglycemic level."

13        Do you see that?

14   A    Yes, I do.

15   Q    Okay.  And then it footnotes hyperglycemic level as,

16   "Fasting blood glucose greater than or equal to

17   126 milligrams per deciliter or a non-fasting blood

18   glucose greater than or equal to 200 milligrams per

19   deciliter on at least one occasion," correct?

20   A    That's correct.

21   Q    Okay.  So the decision was made by the scientists of

22   the company in this SERM meeting in June of 2007 that it

23   was a common undesirable effect of Seroquel for blood

24   glucose increases to hyperglycemic levels, correct?

25   A    No.  They concluded that there had been a significant

Cross-examination - Dr. John S. Patterson          171

```
 1    number of those findings, and on the previous page, they

 2    said that a lower causal relationship had not been

 3    established with diabetes, they felt that it was a

 4    appropriate to put that information in.

 5    Q    Okay.  But the company, through its scientific review

 6    process, has decided to list as a common undesirable

 7    effect of Seroquel that it produces high blood sugar,

 8    right?

 9    A    That's the section in which it put the findings, yes.

10    Q    Okay.  Now, you already indicated that there was a

11    letter that was sent to the FDA in June 22nd of 2007.  I

12    think that's Plaintiffs' 551.  It was also Defendant's 85.

13    I think you have that in front of you.

14    A    Yes, I do.

15    Q    Okay.  So after this SERM meeting on June 22nd, the

16    company wrote a letter to the FDA, correct?

17    A    Yes.

18    Q    And at the time, the company was proposing to get a

19    new indication for Seroquel, right?

20    A    I believe that there would have been a number of

21    indications under review, but this letter was not in

22    relation to a new indication.

23    Q    Well, there was a pending new indication for bipolar

24    maintenance, wasn't there?

25    A    Yes, there was.
```

Cross-examination – Dr. John S. Patterson                172

1   Q    As a matter of fact, I think you testified earlier

2   that's why studies 126 and 127 were done, correct?

3   A    Absolutely correct, yes.

4   Q    So in connection with those studies and the pendency

5   of that application for that new indication, the company

6   proposed a label change, correct?

7   A    Yes, it did.

8   Q    And the label change was done under regulations of

9   the U.S. Food and Drug Administration that allow a company

10  to voluntarily change its warning to strengthen a warning

11  at any time, right?

12  A    That's correct.

13  Q    And that's regulation 314.70, isn't it?

14  A    I'll take your word for that.

15  Q    Okay.  You're not familiar with that?

16  A    I'm not familiar with that.

17  Q    But that -- you are familiar with the fact that any

18  time a company wants to strengthen its warning, it has the

19  right to do so under FDA regulations, correct?

20  A    It has a right to do so with a caveat, and that is

21  the FDA has 30 days to respond to say whether it agrees or

22  not.

23  Q    And the FDA actually responded a number of times to

24  AstraZeneca's proposal regarding the CBE change, correct?

25  A    I believe so, although I'm not familiar with all of

1   the detail.

2   Q    Okay.  Well, the proposed CBE, as reflected in this

3   letter that's dated June of -- June 22nd of 2007 and the

4   label that you were shown a while ago -- you remember the

5   2007 label?

6   A    Yes.

7   Q    Do you remember that the hyperglycemia information

8   about studies 126 and 127 and study 125 and also the

9   short-term placebo-controlled data, you remember that all

10  got put in the adverse reaction section of the label?

11  A    Yes, indeed.

12  Q    And then in the warning section, there was this

13  cross-reference that said, "See adverse reactions,"

14  remember that?

15  A    I do.

16  Q    That was the way that the company wanted that

17  handled, correct?

18  A    That's the way the company proposed to handle it,

19  yes.

20  Q    That would make people -- doctors have to hopscotch

21  around the label to find that information about

22  hyperglycemia, wouldn't it?

23  A    That gave the doctors, in our view, I believe a

24  roadmap as to where to go for some important information

25  that we were adding to the label voluntarily and

Cross-examination – Dr. John S. Patterson                    174

1    spontaneously.

2    Q    And the FDA disagreed, didn't they?

3    A    My understanding is that those changes were effected

4    and only sometime subsequently did the FDA come back with

5    some proposals.

6    Q    The FDA, in December of 2008, sent a letter saying

7    that was not adequate, didn't they?

8    A    So the 30 days expired, the company changed the

9    label, and in December, I believe also in relation to

10   other data that was pending with the FDA, they wrote us

11   another letter, yes.

12   Q    Okay.  And if you take a look at Plaintiffs' 1420, is

13   that a copy of the letter that you're discussing -- or

14   you're referring to?

15   A    Yes, it is.

16   Q    And this is written to Catherine Bradley, director of

17   regulatory affairs in Wilmington, Delaware, correct?

18   A    That's correct.

19   Q    And in usual FDA manner, the date of the letter is on

20   the third page, correct?

21   A    It is.

22   Q    The last page says "12-18-2008"; is that right?

23   A    Yes.

24   Q    And if you look at the body of this letter, the FDA

25   tells AstraZeneca that it's not sufficient to put the

Cross-examination - Dr. John S. Patterson                    175

1   information in the adverse reaction section, it wants all

2   the data up in the warning section, correct?

3   A    The FDA is requesting that we reformat the

4   information.  It's not saying we should put in new

5   information, as I understand it.

6   Q    No.  They're saying you should put it in the warning

7   section, correct?

8   A    That's correct.

9   Q    That's not just a matter of reformatting, is it?

10  A    It's a matter of moving it across to its -- they're

11  saying that's where they want it to be.

12  Q    Right.  Because under the regulations, if you have a

13  reasonable association with a serious condition, it's

14  supposed to go in the warnings, isn't it?

15  A    My understanding is that the FDA can decide what goes

16  in the warnings, and the FDA had already said in the

17  warning they imposed on us in 2003 that in spite of there

18  not being a reasonable association, we still had to place

19  the warning.

20  Q    Well, section CFR 201.57 provides the rules for when

21  a risk is supposed to go into the warning section,

22  correct?

23  A    That's why I employ experts in that particular field

24  who would answer that question rather than me.

25  Q    Okay.  So you can't answer that question?

1   A    I cannot answer that question.

2   Q    Okay.  Well, you do know from the letter here that

3   the FDA says put the information in the warnings section,

4   right?

5   A    Yes.

6   Q    And they also say put the weight gain information in

7   the warning section, right?

8   A    Yes.

9   Q    Okay.  And the current label does that, doesn't it?

10  A    I believe we have complied with the FDA's requests as

11  we would normally do.

12  Q    Okay.  Now, you said something on direct and I wrote

13  it down, I want to make sure I have it right.  You said,

14  "When the data from 126 and 127 came in, that was the

15  first time we saw changes in blood sugar in our clinical

16  trials."  Then you specifically mentioned this five

17  milligrams per deciliter number.

18       Do you recall that?

19  A    Yeah.  I hope what I said was that it was first time

20  we'd seen changes of that magnitude.  It was an average

21  across the clinical trial program in our clinical trials.

22  Q    Okay.  So that's the first time you saw a change of

23  that magnitude in the glucose data in a clinical trial,

24  correct?

25  A    In the fasting blood glucose in a controlled clinical

Cross-examination - Dr. John S. Patterson                177

1   trial, that was my understanding.

2   Q    Well, there are a number of clinical trials that the

3   company did that found elevated fasting blood glucose,

4   didn't they?

5   A    Yes.  They will occur spontaneously and sporadically

6   across the trials in a population of patients who are

7   diabetic, prediabetic on medications, or morbidly obese.

8   Q    Okay.  Well, I'm talking about controlled clinical

9   trials here.  Is that what you're talking about?

10  A    I was talking about the placebo-controlled trials,

11  yes.

12  Q    Right.  And because they're controlled trials, the

13  scientific way that you look at it is you look to see

14  whether or not the exposed group's glucose is elevated in

15  relation to the placebo group, correct?

16  A    That's correct.

17  Q    Okay.  And if there is -- whether the people are

18  overweight or not, if they're matched appropriately, if

19  you've got elevations in the exposed group, then the

20  scientific assumption is that there's -- the reason for

21  the change is the exposure, right?

22  A    That can be the basis on which you then undertake

23  some studies prospectively to try and answer such a

24  question.  But also there's a huge difference between

25  numerical differences, numerical differences that are

Cross-examination – Dr. John S. Patterson                178

1   statistically significant, and those that are clinically

2   significant, and I would separate out all three.

3   Q    Okay.  To be fair, Doctor, have you done an

4   exhaustive look at the clinical trials, the

5   placebo-controlled clinical trials, to see which one

6   had -- which ones had abnormal blood glucose?

7   A    I have not exhaustively reviewed the programs, no.

8   Q    Are you familiar with study 43?

9   A    No, I'm not familiar with study 43.

10  Q    Okay.  So I guess you would not know whether there

11  were elevated fasting blood glucose results in study 43?

12  A    No.  What I know is the top-level findings across the

13  study program.

14  Q    Okay.  How about study 49, are you familiar with the

15  fasting blood glucose results from study 49?

16  A    No, I'm not.

17  Q    How about study 135?

18  A    No, I'm not.

19  Q    Are you familiar with the fact that study 49 is

20  BOLDER I?

21  A    If you tell me it is, then it tells me that I know a

22  little bit more about BOLDER I than just the number.

23  Q    Okay.  You know BOLDER I, don't you?

24  A    I know what it is and I understand it's important,

25  yes.

Cross-examination – Dr. John S. Patterson                179

1   Q    Yes.  That was the bipolar mania study, wasn't it?

2   A    It was, yes.

3   Q    Okay.  And actually there were some EPS findings in

4   that study that were a surprise to the company, weren't

5   they?

6   A    I'm not sure whether there were any EPS findings in

7   BOLDER I.

8   Q    Maybe it was BOLDER II.  Was it BOLDER II?

9   A    No.  I think if there was anything that came out on

10  EPS, my understanding was it was in the MDD GAD program.

11  In every other program that I'm aware of, there were no

12  signals at all to suggest that there may be EPS --

13  Q    Okay.

14  A    -- elevations, even minor ones.

15  Q    Let me ask it this way, Doctor:  Are you testifying

16  under oath that there were no EPS findings in the bipolar

17  cohorts?

18  A    I'm testifying that I'm not aware of any significant

19  change in EPS in the bipolar studies, which may just --

20  Q    How confident are you of that?

21  A    I'm not confident at all.

22  Q    Now, you are familiar with study 15, aren't you?

23  We've talked about that today.

24  A    Yes, we have.

25  Q    And I think what was handed up was study -- I mean it

Cross-examination – Dr. John S. Patterson        180

1    was an Exhibit 113, it was a defense exhibit.

2         I'll put that on the screen using the ELMO.

3         Now, study 1 -- defendant's study 113 was an excerpt

4    of the ISS; do you recall that?

5    A    Yes, I do.

6    Q    Okay.  And the ISS is the "Integrated Summary of

7    Safety," correct?

8    A    Yes.

9    Q    That's the summary of the safety studies that goes to

10   FDA at time of submission of the NDA, correct?

11   A    Yes.

12   Q    The NDA is the "New Drug Application," correct?

13   A    It is.

14   Q    So the most important safety document for submission

15   to FDA at the time of the NDA is the Integrated Safety

16   Summary, correct?

17   A    It's one of the most important documents, yes.

18   Q    Okay.  In your Exhibit 113, if you look at the

19   screen, Doctor, in front of you, did you include a table

20   of data for study 15?

21   A    My understanding from the information that I've seen

22   in the run-up to this hearing is that, yes, we did include

23   data from study 15 in those tables.

24   Q    Okay.  And if you look at the document in front of

25   you, is there any listing of glucose data in this

Cross-examination - Dr. John S. Patterson          181

1   Integrated Safety Summary in this table that was included

2   in this excerpt?

3   A    I'm struggling to read that on the screen.  Do you

4   have a paper copy of that for me?

5   Q    I think your counsel gave me the only copy and that's

6   the -- my only copy and that's what's on the screen right

7   now.

8            MR. BLIZZARD:  Counsel, do you have a copy for

9   the witness of what you previously marked as Exhibit 113?

10           MR. BROCK:  It's this one, Doctor.

11       You're asking for a table on glucose Integrated

12   Summary of Safety trial 15.

13           MR. BLIZZARD:  Actually I was looking at the

14   excerpt that was the entire exhibit.

15   BY MR. BLIZZARD:

16   Q    Is that the table that's also on the screen, Doctor?

17   A    No, it's -- it could be.  Let me just check.  Yes, it

18   is.

19   Q    Okay.  Is there any glucose data that's recorded

20   there?

21   A    No, there isn't.

22   Q    Okay.  Certainly if study 15 had recorded change in

23   median glucose numbers, it should be included in the

24   Integrated Summary of Safety, shouldn't it?

25   A    If study 15 recorded blood glucose, you would expect

Cross-examination - Dr. John S. Patterson                    182

1    it to be in the overall program, yes.

2    Q    Okay.  Now, I -- you also supplied a -- as

3    Defendant's Exhibit 128, an excerpt of the clinical study

4    report for study 15, right?

5    A    Yes.

6    Q    Do you have that in front of you?

7    A    I do.

8    Q    And what you included was the weight gain data from

9    study 15.  You took a table out of the weight gain data

10   and included it in that excerpt, didn't you?

11   A    I believe so, yes.

12   Q    And if you look at the page, what's the page number

13   on that table?

14   A    2284, I think.

15   Q    I think it's in the 2000s, isn't it, Doctor?

16   A    2284.

17   Q    2284?

18   A    2284, yes.

19   Q    So it's on page 2284 of the clinical study report

20   appears this table on weight gain, correct?

21   A    That's correct.

22   Q    Now the weight gain data from page 2284 actually did

23   make it into the Integrated Summary of Safety, didn't it?

24   A    I would expect so.

25   Q    Okay.  And you would expect any glucose data to make

1    it in, too, wouldn't you?

2    A     I would expect all the information from the study to

3    be in the report and to be in the integrated summary.

4    Q     Okay.  If you look at the next document that is in

5    front of you that I've marked as -- actually, it should

6    have D128 on it, because we have previously marked it as

7    Plaintiffs' excerpt of 2074.  This is an excerpt where I

8    have excerpted a different page that has glucose data on

9    it.  Different pages that have glucose data on it.

10         Do you have that in front of you, Doctor?

11   A     Yes, I do.

12   Q     Okay.  Do you have page 1832 in front of you?

13              THE COURT:  Mr. Blizzard, you're being gestured

14   to.

15              MR. BLIZZARD:  Can we put that up on the screen?

16              THE COURT:  In my day, we used to take stickies

17   and just sneak up behind them and slap it down behind

18   them.

19              MR. BLIZZARD:  Okay, so, can we put that up on

20   the screen.

21   BY MR. BLIZZARD:

22   Q     Is there glucose data here on page 1832 of the

23   clinical study report?

24   A     Yes, there is.

25   Q     Okay.  And 1832 has the glucose data for

Cross-examination – Dr. John S. Patterson                184

1   75 milligrams of Seroquel, correct?

2   A    Yes, it has.

3   Q    And it shows a mean change at the end of the study,

4   which is how many weeks?

5   A    Fifty-two.

6   Q    Fifty-two weeks of .30, correct?

7   A    That appears to be the case, yes.

8   Q    Now, these tables are not in the usual milligrams per

9   deciliter, are they?

10  A    No, they're on international units.

11  Q    Yeah.  These are in millimoles per liter, correct?

12  A    That's correct.

13  Q    Do you know what a conversion is of millimoles per

14  liter to milligrams per deciliter?

15  A    You multiply by 18.

16  Q    Multiply by 18.  So if we multiply 18 times .30, we

17  get what, Doctor?

18  A    Must be about 5 -- around 5.4.

19  Q    5.4 milligrams per deciliter, correct?

20  A    That's correct.

21  Q    And that is in the low-dose exposure, isn't it?

22  A    It is.  But it's not in a placebo-controlled study.

23  It's in the study against a first generation agent.

24  Q    If you look at the 300 milligram group, that's on --

25  the table there appears on page 1834, correct?

Cross-examination - Dr. John S. Patterson                185

1    A     Correct.

2    Q     And there you have additional mean changes in blood

3    glucose that are recorded in millimoles per liter,

4    correct?

5    A     That's correct.

6    Q     And we can do the conversion of that if we wanted to,

7    couldn't we?

8    A     That's .23, so that's lower.

9    Q     Then there's a 600 milligram which is .27 change on

10   page 1836, correct?

11   A     That's correct.

12   Q     Now, that data didn't make it into your excerpts

13   earlier today, did it?

14   A     It didn't mention -- it didn't make it into what

15   Mr. Brock read to me.

16   Q     Do you reckon that's because he couldn't find it?

17           MR. BROCK:  Your Honor, I object to that.

18   That's argumentative.

19           THE COURT:  Sustained.

20   BY MR. BLIZZARD:

21   Q     Well, it didn't make it into the Integrated Summary

22   of Safety that was sent to the FDA either, did it?

23   A     That, I don't know.  But this morning we were talking

24   about weight, not glucose.

25   Q     Okay.  Well, if you look at the excerpt that we just

Cross-examination - Dr. John S. Patterson                186

1    previously looked at, the excerpt of the Integrated

2    Summary of Safety that has the table listing all of the

3    lab data out of study 15, is glucose listed?

4    A    Which exhibit am I looking at now?  This other one

5    that I had before?  No, it wasn't.

6    Q    Okay.  Now I'm going go to the last topic.

7             THE COURT:  Before you get on your last topic,

8    let me make one comment.  You're going into off-label?

9             MR. BLIZZARD:  Yes.

10            THE COURT:  Some of these cases will be on-label

11   and then this part will be irrelevant.  So it will be up

12   to you-all to object -- the defense to object if it's a

13   non -- if it's an on-label case and you're asking

14   questions about off-label.

15            MR. BLIZZARD:  I understand, Your Honor.

16            THE COURT:  All right.

17            MR. BROCK:  So with that statement, we just will

18   have a standing objection that we would assert --

19            THE COURT:  Right.

20            MR. BROCK:  -- when a case --

21            THE COURT:  Yes.  This whole line of questioning

22   would not be relevant if it was -- unless it's an

23   off-label case.

24            MR. BROCK:  Correct.  Thank you.

25            MR. BLIZZARD:  I thought I lost my partially

Cross-examination – Dr. John S. Patterson          187

1    relevant documents, Your Honor.

2    BY MR. BLIZZARD:

3    Q    Final subject I'd like to talk to you about,

4    Dr. Patterson, is off-label usage of Seroquel.  Before I

5    do that, let me get a little bit more water.

6         Seroquel -- I want to make sure the jury understands

7    what off-label is.  Seroquel gets approved for an

8    indication, correct, which is usually a disease state, for

9    the treatment of a disease state, right?

10   A    All medicines get approved for some kind of treatment

11   of a disease state, yes.

12   Q    Correct.  And early on you said that it was kind of a

13   broad indication described as symptoms of psychosis?

14   A    That's correct.

15   Q    But then by 2001, it was just narrowed to

16   schizophrenia, correct?

17   A    Correct.

18   Q    And the reason the FDA did that is because the data

19   that they approved the drug on was schizophrenia data,

20   correct?

21   A    But they knew that at the time they gave us our

22   original license.  So the reason they did it, I believe,

23   is in rethink within the FDA is to how they approach

24   labeling.

25   Q    This -- this is another -- another indication that

Cross-examination – Dr. John S. Patterson          188

1   the FDA can make mistakes, right?

2   A    I don't believe that that's an indication they make

3   mistakes.  I believe that they simply changed their mind,

4   and it's something they've done with all antipsychotics up

5   till then.

6   Q    Okay.  Well, so does it make sense that you could

7   only market a drug for a treatment of a disease that you

8   have proof of both efficacy and safety on?

9   A    The safety efficacy is a more general -- safety

10  activity is a more general requirement for the drug.  The

11  marketing has to be within the label and the promotion has

12  to be within the label.  But doctors are allowed to use

13  drugs off label as and when they please.  That's part of

14  their medical license.

15  Q    Thanks for that explanation.  What I'm trying to get

16  to, maybe in a clumsy way, is there is a reason for the

17  regulations that prohibit off-label promotion, isn't

18  there?

19  A    I believe there is, yes.

20  Q    Okay.  And the FDA regulations do prohibit

21  pharmaceutical companies from promoting their drugs off

22  label, correct?

23  A    Yes.

24  Q    And the reason for that regulation is principally one

25  of safety, isn't it?

Cross-examination – Dr. John S. Patterson                189

1    A    I would hate to try and put words into the FDA's

2    mouth, but it could be -- well, that could be one of the

3    key issues, yes.

4    Q    Okay.

5    A    Or inappropriate usage, which may not be safety.

6    Q    So you really don't want to be promoting something

7    for treatment of a disease where you don't have adequate

8    safety and efficacy data, correct?

9    A    That's where, as you already said, prohibited from so

10   doing.

11   Q    And do you agree with that prohibition?

12   A    The company has very clear guidelines that it should

13   not and will not promote off label.

14   Q    Well, I understand that they have those guidelines,

15   but what I'm really asking you is, is your heart in it?

16   A    Absolutely.

17   Q    Okay.  So you can't promote off label, and you agree

18   that that's a good idea, not to do it, right?

19   A    As long as we separate promotion from use, because I

20   think there are many examples of where medicine is being

21   used off label by doctors has helped actually to gain good

22   information from which the company could then actually run

23   clinical trials programs to get the license to promote in

24   that indication.

25   Q    Okay.  So what I'm hearing you say is a doctor could

Cross-examination – Dr. John S. Patterson                190

1    on his own decide that he wants to use Seroquel to treat

2    autism?

3    A     He could possibly do that.

4    Q     And he can do it if he wants to because he's the

5    doctor, right?

6    A     And if he thinks it's in the best interest of his

7    patient, yes.

8    Q     Okay.  But the company can't encourage or promote him

9    to do it, can they?

10   A     The company sales reps absolutely cannot promote that

11   use if it's not on the label.

12   Q     And the company can't do through the back door what

13   it can't do through the front door, right?

14   A     If you're referring to the company being involved in

15   scientific meetings and publishing information or

16   information being published in relation to potential new

17   indications, that happens all the time and is part of the

18   normal way in which science is generated and disseminated.

19   Q     Does the company look for loopholes to try to get

20   doctors to prescribe off label?

21   A     The company, as I said, has standards and procedures

22   to ensure that its sales reps do not promote off label.

23   Q     Now between 2000 and 2005 -- actually 2004, let me

24   amend that one more time.

25         Between 2001 and 2004, the only indication that

Cross-examination - Dr. John S. Patterson                    191

1    Seroquel was approved for was schizophrenia, correct?

2    A    That's correct.

3    Q    And there were a number of other drugs that Seroquel

4    was competing for, for that population of patients,

5    correct?

6    A    Yes.

7    Q    How many other competitors?

8    A    Well, all the first generation atypical

9    antipsychotics, of which there are probably half a dozen,

10   but the major competitors were the two other atypical

11   antipsychotics that were in the marketplace at that time.

12   Q    Okay.  You were in charge of global marketing

13   initiatives.  How much money was Seroquel generating in

14   sales selling against those competitors to this narrow

15   group of patients?

16   A    I don't know that I can answer your question as

17   phrased.  The product was beginning to be a successful

18   product for the sale under the indications that they had

19   at that time.

20   Q    The indication you had between 2001, 2004 was for

21   schizophrenia, correct?

22   A    That's correct.

23   Q    What was the company sales number for Seroquel during

24   those years?

25   A    In total, globally, it was --

Cross-examination – Dr. John S. Patterson          192

```
 1              MR. BROCK:  Your Honor, I'm going to object to

 2    the introduction of sales or profit numbers as not being

 3    relevant and as also being prejudicial in a way that

 4    outweighs any probative value.

 5              MR. BLIZZARD:  Your Honor, it's relevant to the

 6    knowledge of the company of the amount of off-label use of

 7    Seroquel.

 8              MR. BROCK:  First of all, he's asking him

 9    worldwide, so that's not relevant to this in any shape,

10    form or fashion.

11        The other thing is he could establish it by

12    percentage without introducing a number to the jury which

13    is bound to be inflammatory and bound to distract

14    attention away from the issues of the case.  It's a

15    failure to warn case.  The amount of medicine that was

16    sold is not an issue in the case.

17              THE COURT:  Well, if you can -- you can ask him

18    questions as to how much of it is off label and how much

19    is on label, if he knows that.

20              MR. BLIZZARD:  Your Honor, let me do this.  Let

21    me withdraw the question as asked, because I think there

22    are many reasons that the sales numbers should be

23    relevant, but instead of getting into it with this

24    witness, I'll -- I'll withdraw the question and ask it

25    another way.
```

Cross-examination – Dr. John S. Patterson                    193

```
 1              THE COURT:  Okay.
 2   BY MR. BLIZZARD:
 3   Q    What is the percentage of off-label use that you were
 4   aware of back in the time that you were in charge of
 5   global marketing?
 6   A    Are you now asking for the U.S. only or on a global
 7   basis?
 8   Q    Okay.  Let me break it down.  What percentage of the
 9   market for Seroquel was in the U.S. market?
10   A    My understanding is that it was -- I don't have exact
11   figures, but let's say two-thirds.
12   Q    Okay.  So about two --
13   A    Yeah, 66, 70 percent.
14   Q    Of the sales, correct?
15   A    Correct.
16   Q    And out of that two-thirds of the sales, what
17   percentage of the U.S. market was off-label use?
18   A    That's a very difficult question to answer, actually,
19   because we don't have the information directly.  We get
20   script-related information fed back to us but not
21   individually, it's collectively.
22        And a doctor can write down, for instance, that the
23   patient got a script for sedation and they got Seroquel,
24   which looks like an off-label usage, but the reality might
25   be that they were actually in a manic or in a -- in an
```

Cross-examination – Dr. John S. Patterson                194

```
 1   acute phase of the schizophrenia and he was giving it as

 2   antipsychotic to sedate them.  So taking script data and

 3   translating it into relative sales is a very imprecise

 4   science.

 5        Having given you that for the caveat, I believe that

 6   within the company, there was information to suggest that

 7   maybe 30 or 40 percent of scripts were being used outside

 8   schizophrenia at one stage.

 9   Q    Are you sure about that, Doctor?

10   A    No, I'm not absolutely sure.  That's a number that I

11   think I remember.

12   Q    I've seen numbers of documents as high as 85 percent.

13   Have you seen such numbers?

14   A    If I have, I don't remember them.

15   Q    Okay.  Regardless of what the numbers are, the

16   company sells its products through its sales force,

17   correct?

18   A    Yes.

19   Q    Okay.  And has it been part of the company's

20   strategy, part of the product plan for Seroquel to use the

21   entire selling team to broaden the use of Seroquel both on

22   and off label?

23   A    If you're referring to the U.S. sales force, then I

24   have no direct connection with that sales force.  My

25   activities were in the global strategic marketing
```

Cross-examination – Dr. John S. Patterson          195

1    organization.

2    Q    Okay.  Take a look at Plaintiffs' Exhibit 485 which

3    should be in front of you.

4    A    Yes, it is.

5    Q    Is that a Seroquel strategy summary?

6    A    It is.

7    Q    And were you involved in the process of developing

8    these strategy summaries?

9    A    The people reporting to me were, so I was involved,

10   yes.

11   Q    Okay.  And I have your name on an e-mail that we can

12   show you a little bit later about the development of this

13   one- to two-page document.

14        Were you involved in developing that?

15   A    I was the guy who said we need to have these for all

16   of our products.  The individual product wording was

17   developed by others.

18   Q    Okay.  So -- but you were involved in the process

19   that resulted in each of these products having a short

20   strategy summary, correct?

21   A    Yes.

22   Q    Okay.  If we could put this up on the screen.

23        Does this strategy summary for Seroquel have a date

24   of 12 -- or 18-12-2000?

25   A    Yes, it does.

Cross-examination - Dr. John S. Patterson                196

1    Q    And is that the usual -- is that the British way of

2    saying December the 18th?

3    A    That's the normal way, sir.

4    Q    You and I both don't have accents either.

5         So if you look over to the right-hand margin, are

6    there key success factors limited?

7    A    Yes.

8    Q    And do you see that there's listed as item number 3

9    is "broaden Seroquel use on and off label"?

10   A    It is.

11   Q    What does it say under the required actions?

12   A    "Utilize whole selling team, educational programs to

13   share off-label data."

14   Q    Okay.  So it says use the whole selling team,

15   correct?

16   A    That's what this document says, but this is -- there

17   is no global marketing selling team.  So in spite of what

18   this document says, what actually would have happened in

19   the United States should have been appropriately

20   controlled and within the label.

21   Q    But you don't know what happened in the United

22   States, do you?

23   A    No, I don't.

24   Q    And you, to this day, don't have personal knowledge

25   of what happened in the United States, do you?

Cross-examination – Dr. John S. Patterson                    197

1    A    No, I don't.  But of course also at this point in

2    time, as I understand it, the label was pretty broad, too.

3    Q    In 2000?

4    A    And I thought we agreed that the label change was in

5    2001?

6    Q    Yes, it did.  But the label was for treatment --

7    the -- within the label is for treatment of symptoms of

8    psychosis, correct?

9    A    That's true, which is a pretty broad label.

10   Q    And this strategy says broaden the use beyond the

11   label to off-label, correct?

12   A    Well, I hope that the way that we were going to do

13   that was to actually do the clinical trials, which we

14   spent a lot of money doing, to deliver indications that

15   would then broaden the use to what was at that point in

16   time off label --

17   Q    You were shown this document back in -- I'm sorry, I

18   for cutting you off.

19   A    Go ahead.

20   Q    When you were shown this document back at your

21   deposition, you said you didn't like the wording of this,

22   right?

23   A    I still don't.

24   Q    Okay.  And this was not the only brand strategy

25   summary that was worded this way, is it?

1   A    Are you telling me or asking me?

2   Q    A little bit of both.

3        Take a look at Plaintiffs' 484.  Is this a Seroquel

4   brand strategy summary dated in January of 2001?

5   A    Depending on whether that's an American date or

6   June 2001 if it's in England.

7   Q    There you go.  I think it probably is June 2001.

8   It's too soon after the previous one.

9        But be that as it may, does this strategy update also

10  have the same language, "Broaden Seroquel use on and off

11  label, utilize whole selling team, educational programs"?

12  A    It hasn't changed.

13  Q    Okay.  What's it say?

14  A    It says exactly the same as it said before.

15  Q    Okay.  And then if you look at the next exhibit which

16  is Plaintiffs' 14, is it a strategy summary February 14,

17  2002?

18  A    It is.

19  Q    And does it again have the same language?

20  A    Yes, it does.

21  Q    Okay.  If you look at the next exhibit which is

22  exhibit -- Plaintiffs' Exhibit 486, do you see that that

23  document is entitled "Seroquel Key Issues in Strategies

24  2003"?

25  A    Yes, it is.

Cross-examination – Dr. John S. Patterson          199

1   Q    If you look over at the far right column, does it

2   say, "Off-label indications, bipolar dementia, depression,

3   represent a significant proportion of atypical

4   prescriptions"?

5        Do you see that?

6   A    Yes, it does.

7   Q    And do you see where the strategies underneath that

8   column say, "Increase the use of Seroquel in key off-label

9   indications"?

10  A    Yes, I can see that.  But I don't know what this

11  document is or where it comes from or whose it is.

12  Q    It's possible that that's a U.S. document, isn't it,

13  Doctor?

14  A    It might be, but I wouldn't have seen it if it was.

15  Q    Did you ever do any investigation yourself as leader

16  of the global marketing team to determine whether there

17  was off-label promotion within the United States, of

18  Seroquel?

19  A    No, I did not.  But others had that responsibility.

20           MR. BLIZZARD:  Your Honor, I believe that's all

21  I have at this time.

22           THE COURT:  All right.

23                    REDIRECT EXAMINATION

24  BY MR. BROCK:

25  Q    Dr. Patterson, just a few questions.

Redirect Examination – Dr. John S. Patterson

1       Is one of the ways to expand the use of medicine to

2   conduct clinical trials and ask regulatory authorities for

3   approval to market the medicine based on the results of

4   those clinical trials?

5   A    It is pretty well the only way.  The alternative is

6   to take trials that others have done in the marketplace

7   and bring those in and submit them, which also happens

8   from time to time.

9   Q    Would you describe in general terms AstraZeneca's

10  efforts to characterize the risk-benefit profile of

11  Seroquel in other indications, that is, other than

12  schizophrenia, so that the medicine is available on label

13  to other populations?

14  A    Certainly.  When the drug first went into the

15  marketplace, doctors started to use it off label on their

16  own accord in a number of different areas or perhaps on

17  label in terms of the initial broad label, and they

18  provided us feedback.

19       This drug looked to be particularly good in things

20  like bipolar disease and also in more severe ends of

21  things like depression and anxiety.

22       As a result of that, the company then prospectively

23  invested in a very large and continuous trial program to

24  try and deliver information to support the labeling and

25  licensing of those indications.  And we spent in the

1    region of $750 million of our R&D expenditure in order to

2    actually deliver those programs to date.

3              MR. BLIZZARD:  Your Honor, I'm going to object

4    to responsiveness that because of the introduction of this

5    money that they spent on R&D, we were just -- it was just

6    objected to if we go into any money and sales, and now

7    they're bringing up money and R&D.  So I object to the

8    responsiveness of the answer.

9              THE COURT:  Well, are you objecting to the

10   question, or are you saying it's unresponsive?

11             MR. BLIZZARD:  I'm saying the answer is not

12   responsive.

13             THE COURT:  All right.  I'll sustain it as to

14   nonresponsive.

15   BY MR. BROCK:

16   Q    Let me reask the question if I could, Dr. Patterson.

17        We talked earlier today about characterizing the

18   risk-benefit profile of a medicine in indications after

19   its initial approval.

20        Do you recall that discussion?

21   A    Yes, I do.

22   Q    How does a medicine company like AstraZeneca learn

23   about other ways that the medicine might be helpful to

24   patients?

25   A    The company learns about it from its interaction with

Redirect Examination – Dr. John S. Patterson          202

1    doctors who are using the product in the marketplace.

2    I -- also from academics who will spontaneously do work on

3    their own, both clinical and preclinical.  And also as

4    science moves on, we begin to get new information from

5    breaking science.

6    Q    And then what does the company do with that

7    information so that information can be presented to the

8    FDA with an application for approval to market for a new

9    indication?

10   A    The company in this case invested significant time

11   and effort into delivering a large trial program of new

12   drug applications or supplementary applications across all

13   of those indications in order to be able to promote the

14   product.

15   Q    And we talked about those approvals earlier today

16   with the slide showing time after time after time the FDA

17   approving Seroquel as safe and effective.

18            MR. BLIZZARD:  Objection.  Leading.

19            THE COURT:  Sustained.

20   BY MR. BROCK:

21   Q    What was the result of the clinical trial program of

22   Seroquel?

23   A    As we discussed this morning, we've had multiple

24   submissions from that program and multiple approvals

25   throughout the time periods since the product's been in

Redirect Examination – Dr. John S. Patterson                    203

1    the marketplace.

2    Q    Thank you.

3         Let me ask you to get Exhibit J4, which is the core

4    data sheet that you were asked about earlier.

5    A    This is the one from the PDL, or is it?

6    Q    The core data sheet.  SERM minutes.

7    A    SERM minutes.  Okay.

8    Q    Now you were asked some questions earlier about

9    section 4.4 which is right there on the first page.  Do

10   you see that?

11   A    I'm sorry.  The SERM minutes.

12   Q    Says, "Number 1, glucose disregulation"?

13   A    Yes.  Yes, I do.  Thank you, yes.

14   Q    In you come down a little bit, it says that,

15   "Following a review of all clinical trial data including

16   studies 125, 126, 127, the EPI literature and

17   postmarketing data, SERM recommended adding the following

18   section 4.4 to special warnings and special precautions."

19        Do you see that?

20   A    Yes, I do.

21   Q    The process that's being described there, that is

22   reviewing clinical trial data, the new studies that we

23   talked about today, the EPI literature and the

24   postmarketing data, when you set up the SERM process

25   through Barry Arnold, is this the kind of diligence that

Redirect Examination – Dr. John S. Patterson          204

1   you hope to see by the safety department of AstraZeneca?

2   A    Yeah.  I was really very pleased to see this.  I

3   think the company was doing exactly what I wanted it to be

4   doing.

5   Q    And then if you come down a little bit, you were

6   asked about the sentence, "Increases in blood glucose and

7   hyperglycemia and occasional reports of diabetes have been

8   observed in clinical trials with quetiapine."

9        Do you see that?

10  A    Yes, I do.

11  Q    All right.  What's does the next sentence say?

12  A    It says, "Although a causal relationship with

13  diabetes has not been established, patients who are at

14  risk for developing diabetes are advised to have

15  appropriate clinical monitoring."

16  Q    Now, at the point of time that the minutes were

17  drafted in June of 2007, was there a warning in the

18  Seroquel product label that related to patient monitoring

19  for patients taking Seroquel?

20  A    And you're referring now to the U.S. label?

21  Q    Correct.

22  A    Yes, there was a warning.  It was the class warning

23  that the FDA had imposed in 2003.

24  Q    Does this document reflect that AstraZeneca had

25  concluded that Seroquel caused diabetes?

Redirect Examination – Dr. John S. Patterson      205

1    A    No.  It seems to say something very different after

2    that.  The causal relationship had not been established.

3    Q    Okay.  Thank you.

4         Now, I need to turn your attention back to the

5    Integrated Summary of Safety, and I'm going to direct your

6    attention to 113.1531, and we'll put it on the screen for

7    you there.  Table 11.

8         2.3, do you see that this is a table from the

9    Integrated Summary of Safety?

10   A    Yes, I do.

11   Q    At the top, does it refer to number and percent of

12   patients with clinically significant values for serum

13   chemistry long-term, that is, greater than six weeks,

14   Haloperidol-controlled trial?

15   A    Yes, it does.  It seems to refer to study 156789.

16   Q    Okay.  And are there then lab values stated on the

17   left-hand side there?

18   A    Yes, they're listed.

19   Q    Okay.  Come down about halfway.  Did AstraZeneca

20   report glucose information out of trial 15 to the FDA in

21   the Integrated Summary of Safety?

22   A    Glucose appears to be one of the parameters listed

23   here, so if it's part of the integrated summary, yes, they

24   did.

25   Q    We seem to have found the table, haven't we?

Redirect Examination – Dr. John S. Patterson          206

```
 1   A     Yes, we do.

 2               MR. BLIZZARD:  Object to the form.

 3               MR. BROCK:  You asked the question if I had

 4   found it.

 5   BY MR. BROCK:

 6   Q     So if you look at glucose --

 7               MR. BLIZZARD:  Objection.  It's misleading.

 8   It's not the same thing.

 9               THE COURT:  Overruled.

10   BY MR. BROCK:

11   Q     I'm sorry.  If you look at the glucose column, does

12   it show number of patients tested versus Haloperidol?

13   A     Yes, under the heading of "Patients with at least one

14   clinically significant value during the peak treatment

15   period."

16   Q     Okay.  And for Seroquel, what was the percentage of

17   patients with a clinically significant value for serum

18   chemistry?

19   A     2.3 percent.

20   Q     And what was the percentage for Haloperidol?

21   A     11.4 percent.

22   Q     So for clinically significant values, Seroquel was

23   actually less than Haloperidol?

24   A     On this particular parameter, yes.

25   Q     And I'll ask you this question:  Was study 15 a
```

1    placebo-controlled trial?

2    A    No, it was not.  It was an active-controlled trial.

3    Q    So when you look at values where there are small

4    increases of glucose in quetiapine patients or Seroquel

5    patients, you don't have a placebo comparator, do you?

6    A    No.  There was no placebo in that study.

7    Q    In the year 2000, was there evidence from the

8    clinical trial program considering the placebo-controlled

9    trials that Seroquel caused diabetes?

10   A    I do not believe there was such evidence, no.

11   Q    In 2001, did that evidence exist?

12   A    No, it did not.

13   Q    2003, did that evidence exist?

14   A    No, it did not.

15   Q    In 2004, did that evidence exist?

16   A    No.

17   Q    But despite the fact that there wasn't evidence in

18   the placebo-controlled trials, the company nonetheless

19   changed its label in January of 2004 to let physicians

20   know there had been cases seen of diabetes?

21          MR. BLIZZARD:  Objection, leading and

22   argumentative.

23          THE COURT:  Sustained.

24          MR. BROCK:  I think this is my last question so

25   I'll just -- I'll rephrase it.

Redirect Examination – Dr. John S. Patterson          208

1   BY MR. BROCK:

2   Q    What happened in January of 2004 based on the FDA

3   request?

4   A    The FDA requested AstraZeneca to put into its label

5   wording that it was requiring of the whole class of

6   atypicals to warn against possible cases *in sequelae* of

7   diabetes in that population, although recognizing that

8   there was no clear or -- association between Seroquel and

9   these changes.

10  Q    One last question.  You've been asked a good number

11  of questions about study 15.  It is true that AstraZeneca

12  submitted a complete study report -- a clinical study

13  report for trial 15, correct?

14  A    To the best of my knowledge, that is correct.

15          MR. BROCK:  Thank you.

16          THE COURT:  Do you have any followup?

17          MR. BLIZZARD:  I just -- I don't think I'd ask

18  the followup.  I only had two questions, but, yeah, let me

19  ask the question.

20          MR. BROCK:  I think he said no, Your Honor.

21          MR. BLIZZARD:  I'm conflicted.

22                    RECROSS-EXAMINATION

23  BY MR. BLIZZARD:

24  Q    Let me just hold it.  Two things, Doctor.

25          One, after 1997, Seroquel was never approved for any

Recross-examination - Dr. John S. Patterson              209

1    indication without a warning on hyperglycemia and

2    diabetes, was there?

3    A    Could you ask that question again because it sounds

4    like a double-negative to me.

5    Q    Okay.  Let me ask it a little clearer then.

6         It was approved in 1997, correct?

7    A    Correct.

8    Q    And there was no warning on diabetes or hyperglycemia

9    in that initial label, was there?

10   A    There was information in the adverse reaction section

11   but not in the warning section.

12   Q    Okay.  Now, after 2004 -- or in 2004 there was

13   approval for additional indications, correct?

14   A    There were approvals for additional indications over

15   a whole series of time points, yes.

16   Q    Right.  And none of those approvals for those

17   indications occurred without a warning for hyperglycemia

18   and diabetes, correct?  In every one of those labels,

19   there is a warning for hyperglycemia and diabetes,

20   correct?

21   A    The FDA had imposed a class warning in the end of

22   2003, and that remained in the label throughout that time

23   period.

24   Q    Right.  And so there -- it is true, isn't it, that

25   there were no approvals by FDA for new indications that

Recross-examination - Dr. John S. Patterson          210

1    didn't have a warning for hyperglycemia and diabetes?

2    A    That warning was present from the beginning of 2004

3    onwards.

4    Q    Okay.  Now with respect to this data that was -- you

5    were pointed to in the Integrated Summary of Safety in the

6    NDA for Seroquel in study 15, the actual numbers of what

7    the glucose values were, were not in that table you were

8    just shown, were they?

9    A    That table showed -- it showed the incidence of

10   abnormal values.

11   Q    Right.  It showed a percentage of the patients that

12   had abnormal values, correct?

13   A    It showed the end, and they calculated the

14   percentage, yes.

15   Q    The mean increases of various points in time were not

16   shown, were they?

17   A    Not in that table.

18   Q    Okay.

19          MR. BLIZZARD:  I don't have any additional

20   questions, Your Honor.

21          THE COURT:  All right.  That's it.  Thank you.

22   You should make your flight.

23          THE WITNESS:  Thank you.

24          THE COURT:  Anything else?

25          MR. BROCK:  No, Your Honor.

1          THE COURT:  All right.

2                    (recess)

3          THE COURT:  Mr. Blizzard, did you need

4     something?

5          MR. BLIZZARD:  Yes, Your Honor.  My mistake.  I

6     did not offer the exhibits that we had marked and I used

7     to question the witness and I would like to offer them at

8     this time.  We created a list and we were in the process

9     of going through the list with defense counsel to see if

10    they had any objections when you came back on the bench.

11         THE COURT:  Okay.  I think it's a -- if there is

12    a dispute it's going to be a short list of disputes.

13        Okay.  Well, why don't you go ahead and finish.

14         MR. BLIZZARD:  Okay.  Your Honor, finish the

15    discussion or the tender?

16         THE COURT:  Why don't you -- some of them there

17    were no objections listed on the exhibit list.

18         MR. BLIZZARD:  Right.

19         THE COURT:  So why don't we do those first.

20         MR. BLIZZARD:  Okay.  P36 is the Seroquel label.

21    I don't believe there's an objection to that.

22         THE COURT:  It will be received.

23         MR. BROCK:  No objection.

24         THE COURT:  Well, P36, P1, D687, P508, J4, P551,

25    D113, D128, had no objections.  So those will be received.

1          MR. BLIZZARD:  Judge, you went fast for me, so

2   I'll try to figure out which ones I have left.

3          THE COURT:  Well, I can tell you some of the

4   ones you have left if you want me to.

5          MR. BLIZZARD:  No, Your Honor.  We have a list

6   of the exhibits.  We're just -- if you would maybe run

7   through the list where there are no objections.

8      Your Honor, I got the list there may be objections

9   to.  The plaintiffs are offering up P4, P1420 --

10         THE COURT:  Well, wait.  Let's take them one at

11  a time.

12         MR. BROCK:  We object to P4 on the grounds

13  stated in the objections that we filed with the Court.  As

14  well, there wasn't a predicate shown with this witness for

15  the admissibility of the document.  He was basically not

16  familiar with it.  They pulled it off the screen.

17         THE COURT:  I'm going to sustain the objection

18  as to P4.

19         MR. BLIZZARD:  Okay.  P1420.

20         THE COURT:  14 what?

21         MR. BLIZZARD:  1420.  This is the letter to AZ

22  about the change being effected.

23         THE COURT:  There's no objection to 1420.

24         MR. BROCK:  We don't object.

25         MR. BLIZZARD:  P242 which is the advertisement,

1    distinctive advantages of the favorable weight profile.

2    It's one of the weight neutral documents.

3              MR. BROCK:  We object to this one, Your Honor,

4    on the basis of relevance.  It goes to marketing issues.

5    I don't think there was a predicate established for this

6    witness for admissibility of the document.

7              MR. BLIZZARD:  Your Honor, this was during the

8    time that he was in charge of global marketing and he did

9    give testimony about this document and what it said.  I

10   think whether or not it comes into an individual case,

11   they preserve their objection to that by knowing that at

12   the time, and in terms of their position that it has to be

13   seen by or the information has to be communicated to the

14   physicians.  But clearly the witness was in charge of the

15   marketing organization during the time that this marketing

16   piece was developed.

17             THE COURT:  I'm going sustain the objection

18   unless in the individual case there's predicate

19   established for it.

20             MR. BLIZZARD:  Okay.  Next exhibit is 414, Your

21   Honor.  This was the e-mail that referred to cherry

22   picking.

23             THE COURT:  As I recall he's not on this chain.

24   Is that right?

25             MR. BROCK:  Right.

1           MR. BLIZZARD:  He is not on the chain of the

2    e-mail.  He was familiar with the issue.

3           THE COURT:  Right.  He testified about the

4    issue.  So I'm going to sustain the objection.  It may be

5    in.  It may be a moot point.  Probably will be in through

6    the author or one of the recipients, but --

7           MR. BLIZZARD:  Okay.  Exhibit 1232.  This is the

8    specific document that talks about the global strategy

9    being to develop the weight neutral message, and we had a

10   significant discussion about him being in charge of global

11   organization at that time.

12          MR. BROCK:  We object on relevance.  Having the

13   motion in limine and related to being connected

14   specifically to the case, I don't think a predicate was

15   established with this witness for this document.

16          THE COURT:  Well, in the future you should raise

17   these objections at the time.  It's very difficult for me

18   to go back and -- does someone have a copy of this

19   exhibit?

20          MR. BLIZZARD:  Yes, Your Honor.  May I approach?

21          THE COURT:  Yes.

22      Well, this exhibit comes in through some other

23   witness, then it can be used in his testimony.  But he's

24   not a sponsoring witness for this exhibit, so I'll sustain

25   the objection unless it's already in evidence.  All right.

1              MR. BLIZZARD:  And then the remaining exhibits

2       are P485, P448, P486, and P14 which are all of the brand

3       strategy summaries that relate to the comment about

4       broadening use on and off label.

5              MR. BROCK:  We would object to these on the

6       basis of there being off label, so that Your Honor

7       noted --

8              THE COURT:  These were all discussed at the time

9       that you were on your third topic, right?

10             MR. BLIZZARD:  Yes.

11             THE COURT:  But the off label.

12             MR. BLIZZARD:  Yes.

13             THE COURT:  Okay.  So the testimony to get in

14      would be we have got to be in an off label case to begin

15      with.

16             MR. BLIZZARD:  Yes.

17             THE COURT:  All right.

18             MR. BROCK:  The other thing that I would ask for

19      permission to do with those documents is there are

20      references to sales numbers in the documents and I would

21      like to have those sale numbers redacted.

22             THE COURT:  Well, why don't you see if you can

23      agree on a redaction and if you can't, then submit it to

24      me.

25             MR. BLIZZARD:  Okay.  We will do that, Your

1   Honor.

2          THE COURT:  Does that take care of all of them?

3   Are you sure?

4          MR. COUTROULIS:  You said 484, 485, 486, and

5   then there's one --

6          THE COURT:  P14.

7          MR. COUTROULIS:  14 I think.

8          THE COURT:  So 14, right.

9          MR. BLIZZARD:  That's key strategies document.

10      Judge, you know better than I.  So is -- that was all

11   that we had on our list that had objections.

12          THE COURT:  All right.  Well, the objections to

13   the others are sustained with the understanding that they

14   can come in -- if they're already in evidence, then

15   there's no reason not to show it to the jury.  But they're

16   not sponsoring witnesses, so the document can't come in

17   solely on the testimony that was presented to him.

18          MR. BLIZZARD:  Your Honor, are you referring to

19   the previous rulings you made?

20          THE COURT:  I'm just summarizing.

21          MR. BLIZZARD:  Okay.

22          THE COURT:  In case you forgot already.

23          MR. BLIZZARD:  No.  No.

24          THE COURT:  Okay.  All right.  Did we forget

25   something?  All right.  Everybody sure?

Recross-examination – Dr. John S. Patterson          217

1              MR. BLIZZARD:  I'm never sure.

2              THE COURT:  Unfortunately, I can't run out the

3     door.  I'll be here if you need me.

4                     (hearing concluded)

5                   C E R T I F I C A T E

6          I certify that the foregoing is a correct

7     transcript from the record of proceedings in the

8     above-entitled matter.

9

10    s\Sandra K. Tremel  October 9, 2009

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25