```
 1                UNITED STATES DISTRICT COURT
                  MIDDLE DISTRICT OF FLORIDA
 2                     ORLANDO DIVISION

 3            Docket No.6:06-MD-1769-Orl-22DAB

 4    . . . . . . . . . . . . . ..
      IN RE:                        :
 5    SEROQUEL PRODUCTS LIABILITY   :
      LITIGATION                    :        Orlando, Florida
 6    MDL DOCKET No. 1769           :        November 18, 2009
                                    :        1:20 p.m.
 7    ALL CASES                     :
                                    :
 8    . . . . . . . . . . . . . .:

 9

                  TRANSCRIPT OF PRETRIAL CONFERENCE
10         BEFORE THE HONORABLE ANNE C. CONWAY
                  UNITED STATES DISTRICT JUDGE
11

12    APPEARANCES:

13    For The Plaintiffs:          Larry M. Roth

14                                 Camp Bailey

15                                 Paul Pennock

16    For the Defendant

17    AstraZeneca:                 Fred Magaziner

18                                 Stephen J. McConnell

19                                 Robert Ciotti

20                                 Chris Coutroulis

21                                 Mike Brock

22    Court Reporter:  Sandra K. Tremel

23

24    Proceedings recorded by mechanical stenography, transcript

25    produced by computer-aided transcription.
```

```
 1                    P R O C E E D I N G S
 2          THE COURT:  Case number 06-MD-1769, In Re:
 3  Seroquel Products Liability Litigation.
 4      Could we have appearances, please?
 5          MR. PENNOCK:  Paul Pennock, Weitz and Luxemberg
 6  for the plaintiffs.
 7          MR. ROTH:  Larry Roth for plaintiffs.
 8          MR. BAILEY:  Camp Bailey for the plaintiffs.
 9          MR. COUTROULIS:  Chris Coutroulis for the
10  defendants.
11          MR. MAGAZINER:  Fred Magaziner for AstraZeneca.
12          MR. CIOTTI:  Robert Ciotti for AstraZeneca.
13          MR. MCCONNELL:  Steve McConnell for AstraZeneca.
14          MR. BROCK:  Mike Brock for AstraZeneca.
15          THE COURT:  All right.  Who's going to speak for
16  AstraZeneca?
17          MR. BROCK:  I will.
18          THE COURT:  All right.  You filed the motion.
19  You can talk first.
20          MR. BROCK:  May it please the Court.
21  AstraZeneca appreciates the opportunity to discuss the
22  remand issues that are before us today.
23      What AstraZeneca is interested in is an orderly
24  remand that allows for some bellwether trials from a pool
25  of cases that would be randomly selected.  It would occur
```

1   in federal District Courts that we feel matter most to the

2   litigation.  That's sort of the criteria around which we

3   have organized what we hope Your Honor will consider in

4   terms of her remand plan.

5        The matters that we think are important in terms of

6   what happens from this point of time we think needs to be

7   considered in light of what has occurred to date.  And as

8   we stand here today talking about remand, I think it's

9   important to understand that this litigation is a little

10  different than other cases that we've seen in MDL

11  litigation in the sense that in this litigation, we have

12  vigorously litigated a number of specific cases but we've

13  yet to have a bellwether trial in the federal system or in

14  the -- any of the state courts where we are actively

15  litigating cases.

16       And so we feel like that in the coming months as

17  remands occur, what is really important is that bellwether

18  trials take place in venues that will matter to the

19  overall litigation.  And we have sought, Your Honor, to

20  develop a plan for Your Honor's consideration that would

21  help us to achieve that.

22       And so if I could, I'd like to just walk through some

23  of the things that we think would be important in a remand

24  plan as well as the reason that we think that this would

25  be a good way to proceed.

1       I might say at the outset that I think that we have

2   the rare circumstances here where the plaintiffs and

3   AstraZeneca agree on one common principle and that is that

4   the number of cases that we should be actively litigating

5   after remand should be in the range of 50 to 60 cases.

6       Their plan contemplates litigating 52 cases, one each

7   in the districts where they have filed cases.  Our plan

8   is, we'll talk about it in a few minutes, that we would

9   suggest to Your Honor, contemplates litigating in four

10  federal districts by randomly selecting 15 cases for each

11  district.

12      And what we've done, Your Honor, is gone into the

13  database and identified the four venues where the most

14  cases are pending.  So our plan is objective.  It allows

15  for the random selection of cases.  And as I'll discuss in

16  just a second, I think it gives us the best opportunity to

17  have some bellwether trials in the federal system that

18  will help us understand the inventory of cases that we're

19  working with at this stage of the litigation.

20      To the point of sort of the remand being orderly and

21  being in a few jurisdictions where we would concentrate on

22  a larger number of cases as opposed to a single case in

23  each jurisdiction where a case has been filed, I think

24  it's important to keep in mind how the litigation has

25  developed to date.  There are things about these cases

1    that are unique in terms of the profiles of the cases.

2         We see time after time when we take discovery that

3    really start drilling deep on the cases, we see many cases

4    where there's been an extreme amount of weight gain before

5    the plaintiff ever took the medicine; we see cases where

6    plaintiffs have all of the risk factors for the

7    development of diabetes before they ever took the

8    medicine; we see cases where patients have cycled, their

9    weight goes up and down before Seroquel, during Seroquel,

10   and after Seroquel.

11        We see cases, usually the case if the plaintiff was

12   on the medicine long enough to have a change in his

13   condition, that is, from being a nondiabetic to being

14   diabetic, if there's a temporal association between

15   ingestion and the development of diabetes, the plaintiff

16   has usually been on the drug for a good period of time.

17        And the reason that occurs is that the treating

18   physicians, when we depose them, say, "Well, the patient

19   was on the medicine for a long time because it was

20   working.  I stand behind the decision that I made in terms

21   of prescribing the medicine.  The risk benefit analysis

22   indicated that the medicine should be continued."

23        I mention these factors just to make the point that

24   what we know now from litigating a lot of the cases is

25   that a good number of the cases will fall by the wayside

1  as we litigate vigorously the cases.

2     And so to follow the plaintiffs' plan, which would

3  involve picking one case per jurisdiction, I don't think

4  helps us move cases to trial as our plan would which

5  involves selecting 15 cases in the four jurisdictions that

6  the most cases are pending in because we know many of the

7  cases are going to fall to the wayside.

8     So if we start out with some number, and Your Honor

9  may say, "Well, given the history of the litigation, I

10  don't think 15 is enough, I don't think we can get a case

11  to trial if we randomly pick 15," if Your Honor feels like

12  it should be more than that, then I think that's perfectly

13  appropriate to select a number that's more than 15.

14  Fifteen is the -- sort of the number that we suggest.

15     But the point would be to randomly pick these cases,

16  to put them in a trial pool, to send them to the

17  jurisdictions where the most cases are pending in the

18  federal jurisdiction.

19     And I just wanted to -- just as I walk through this,

20  just hand up sort of a handout.  May I approach?

21          THE COURT:  Yes.

22          MR. BROCK:  I think Judge Baker's in the back.

23  I'd hand one for him, too.

24     So Your Honor, as we --

25          THE COURT:  Celeste, I think he wanted that to

1    go back to Judge Baker.

2             MR. BROCK:  Your Honor, one thing I would say is

3    that as you look at the plan that we propose and if you

4    were to say, "Well I don't like the idea of four

5    districts, but I might be willing to consider something

6    more than that," five or six or seven, or whatever number

7    you thought was appropriate, we have the ability to pretty

8    quickly generate from the database the number of cases in

9    the various federal District Courts as the cases exist

10   today.  So we'd be happy to get, you know, any further

11   information to you that you might need to think about a

12   plan like this.

13        But the four District Courts with the largest number

14   of cases, if Your Honor were to do what you've indicated

15   before which would be to effect a remand with a

16   recommendation that the cases be sent to the venue where

17   they should have been filed, the four cases -- the four

18   districts where the most cases would reside would be the

19   District of South Carolina, the Southern District of Ohio,

20   the Southern District of Mississippi, and the Central

21   District of California.

22        And in the handout that I've handed up to Your Honor,

23   you can see the number of cases that are pending in each

24   of those federal districts; 376 in the District of South

25   Carolina, 318 in the Southern District of Ohio, 253 in the

1    Southern District of Mississippi, and 244 in the Central

2    District of California.

3         Now, I might add that not only are these the

4    districts where the most cases are pending, these

5    districts also represent venues that are in the circuits

6    where the most cases are pending.  So if you look

7    circuitwide at where are the cases pending, then these

8    venues represent the four circuits where the most cases

9    are -- for the four cases -- the most cases are pending.

10   So it also has the advantage appellatewise of capturing

11   something that I think will be meaningful to the parties

12   if there are appealed cases.

13        So, step one, I guess, in our plan would be for Your

14   Honor to look at this list or to look objectively at some

15   method to identify districts that would be meaningful to

16   the overall litigation.

17        Our second step would be for Your Honor to select

18   15 cases in each of the four districts to create an

19   initial trial pool which would constitute 60 bellwether

20   non-Florida cases.

21        And the idea would be to recommend to the federal

22   District Courts where these cases would ultimately be sent

23   to incorporate a protocol system similar to what we have

24   utilized here in Florida.  We would work those cases up,

25   we would move them through the system.  I have no doubt

1    that some will fall to the wayside as we move through the

2    process.

3         We think 15 would give us a chance to have at least a

4    few remaining by the time we got to motion practice.  We

5    would have the opportunity within these districts and

6    these states to test, as we've done here, case-specific

7    causation with a local judge sitting in the state where he

8    will be making the decision knowing that state law, and

9    we'll see what occurs with that.

10        If we're successful with all of those motions as we

11   have been so far in the MDL proceeding, as well as in

12   Delaware, and I'll get to that in just a minute, that

13   tells us something, I think, about the litigation, about

14   the -- about the inventory of cases that we're working

15   with.

16        On the other hand, if some of those cases survive

17   motion practice and move to trial, then we will have trial

18   results in a limited number of venues, but we'll have the

19   trial results, we'll have the benefit of knowing what

20   juries think about these cases.

21        We think it's really important that the selection of

22   the cases, whatever number it is -- and like I said, if

23   Your Honor feels like 15 cases is not enough, we ought to

24   put 20 or 25 in there if we're going to try to make sure

25   that we can move these cases to have a chance to get

1    through motion practice and trial, that would be fine with

2    us.  But it's a much better approach, we think, to pick a

3    larger number of cases in limited venues so that we can

4    move the cases to trial -- to motion practice and trial.

5          I contrast that with the plaintiffs' plan.  The

6    plaintiffs' plan is for them to unilaterally pick a case

7    in the 52 districts where cases are filed.  So, for

8    instance, as Your Honor knows, there are roughly 5,000

9    cases in Massachusetts.  Only four or five of those

10   plaintiffs actually reside in Massachusetts.  And their

11   idea would be they would pick one case in Massachusetts,

12   either one of those Massachusetts residents or someone

13   from Wyoming, and we would start working on that case.

14         Their program further contemplates that if for some

15   reason they didn't like the case, they didn't think the

16   case was going to survive motion practice, they could

17   dismiss it.  And at that point, we would have the ability

18   to advance a defense case in its place.  We would then

19   start over working up case number two in Massachusetts.

20         That case might -- that plaintiff might reside in

21   Wyoming or Hawaii or Washington state, but the idea that

22   they have would be to have the Massachusetts judge just

23   sit and decide the case.

24         Our experience tells us that if we do that, Your

25   Honor, it's not an objective way of selecting cases.  And

1   it's going to lead to all forms of mischief in terms of

2   attempts to venue shop, attempts to advance cases over

3   others.  The plaintiffs will be interested in what venues

4   are favorable to plaintiffs.  The defense side will be

5   interested in what venues are favorable to us.

6       These -- this bellwether trial system that I've

7   talked about is still sort of the most important issue in

8   the litigation at this point in moving these cases so that

9   we can have some trials.

10      And if you use a nonobjective system where the

11  plaintiffs just pick whoever they want to, and then we'll

12  later have to pick blind, and if it's a good case they can

13  dismiss that, and then we go to a third case, we could be

14  two or three years out before we ever get the first case

15  to trial in a particular district.

16      And our plan, which we think is objective and is fair

17  because it's based on the criteria of where the most cases

18  and what will have the most impact of the litigation, if

19  they dismiss cases 15, 14, 13, and 10, we're still, in a

20  simultaneous way, moving 10 cases forward on the docket so

21  that we can test those cases by summary judgment motions,

22  by *Daubert* proceedings, the different things that need to

23  be done in a case-specific way.

24      So we feel like if you look at their plan and you

25  look at our plan, ours is clearly the superior way to

1   proceed.

2       There's also something that's just basically unfair,

3   I think, Your Honor, about asking us to -- asking

4   AstraZeneca, my client, to litigate in 52 jurisdictions

5   when in many cases those 52 jurisdictions bear no relation

6   to where the plaintiffs live, where his physicians are,

7   where his family members are.  It's just go to the 52

8   where they filed and let them pick a case, and if they

9   don't like that case, they can dismiss it.  If we bring

10  one forward, you know, four or five months in discovery,

11  they can dismiss that, and, you know, here we go starting

12  over again.

13      Our plan will get us to the litigation of the issues

14  in the case in several federal District Courts I think in

15  the shortest -- in the shortest period of time.

16      The other thing is about 52 jurisdictions.  I mean,

17  here we are in a litigation where we have, as I've said,

18  vigorously litigated in the MDL proceedings in Orlando as

19  well as in Delaware, and not a single case has been

20  brought forward that can survive motion practice.  The two

21  cases where summary judgment's been entered here, and in

22  Delaware there were four cases put into the trial pool, a

23  summary judgment was entered on the first case that was

24  set for trial in Delaware and the other three have been

25  dismissed with no trial date forthcoming.

1        The other litigation that is very active right now is

2   New Jersey.  And in New Jersey we started with 18 cases.

3   Several of those were dismissed by the plaintiff.  We did

4   some substituting.  The bottom line is we looked at about

5   22 cases.  There are three left, and they're subject to

6   motion practice at the present time.

7        So we see what happens when we start testing these

8   cases one by one.  To think that we'll go out now with

9   that history and say, "Okay, we'll litigate one case here,

10  one case here, one case here" is just not going to be a

11  very efficient way of getting the cases decided.

12       Now one thing I think they'll probably say about

13  their system is, "Well, it's 52 jurisdictions, we'll get

14  more -- we'll get more looks at what's going on, we'll

15  have -- our clients will have the opportunity to get to

16  trial."  And they're entitled to that.

17       Your Honor, I would just remind you respectfully that

18  this is not like an individual case filed over a truck

19  wreck where someone has been injured and a plaintiff is

20  trying to get that case to trial.  The plaintiffs have

21  thrown in together, they've organized a mass tort.  And,

22  you know, if you think about this just in day-to-day

23  terms, if we were to have 50 trials a year starting today,

24  the New Jersey -- the case -- the cases that were filed in

25  Boston would take 100 years to try.  We're not -- you

1   know, it's unrealistic to think that all of these cases

2   and all these plaintiffs are going to get to trial in the

3   short-term.

4        The important thing is to focus on understanding the

5   litigation, litigating vigorously a few that will allow us

6   to get to a place where we have a better understanding of

7   the litigation than we do today.

8        So our plan in terms of step two is to select

9   15 cases in each of four districts and create the initial

10   trial pool.

11        And then step three just follows form on that, is

12   that we would ask Your Honor to instead of remanding

13   52 cases to individual venues, to send the 60 bellwether

14   cases to the transferor courts with a recommendation that

15   each case be transferred to the district in which the

16   plaintiff resides.  And then the transfers would result in

17   each of the four selected districts having 15 cases in

18   front of them.

19        And from there the -- I think it would be helpful if

20   as part of the remand order Your Honor would think about

21   including the procedures, the processes that have been

22   used in this Court that have been successful to bring

23   cases to resolution and have an understanding of the

24   litigation here.

25        Our step four, I think are a couple of ways of

1   looking at what to do in terms of our step four.  And I

2   guess the one thing I would like to say on behalf of

3   AstraZeneca, going back to what I started with, we are

4   interested, Your Honor, in a remand system that is orderly

5   and does not result in lawyers running from court to court

6   trying to manipulate which cases get to trial first,

7   trying to venue shop, trying to do things that are just

8   going to make the litigation much more difficult.

9        And so our suggestion is to consider a couple of

10   steps that I think would be helpful in ensuring not only

11   to the parties but to the judiciary that this occurs in an

12   orderly fashion, understanding that what -- we understand

13   that what you can do is make a suggestion about, you know,

14   about what to do in the future.

15        But our feeling is, is that if a remand of 52 cases

16   occurs all at once, that chaos is going to ensue, there's

17   going to be a lot of competition about, you know, where

18   the case is going to be tried, what judges, what state

19   laws, as opposed to this plan which will be more orderly.

20        And I think there are a couple of approaches Your

21   Honor could take to accomplish this and help the parties

22   and the judicial system.  One would be to take the

23   non-Florida cases and put them in an inactive status while

24   the trial pool cases are litigated.  That would be -- that

25   would be one option.  That would ensure that Your Honor

 1   could address any issues that came up with regard to the

 2   litigation at the conclusion of that series of trials.

 3          A second option that we have thought about that would

 4   be helpful and that we would suggest to the Court is that

 5   the remaining cases could be stayed by this Court, that

 6   is, other than the 60 that are randomly selected, and

 7   remanded with the recommendation that the stays be

 8   continued while the 60 bellwether cases are litigated, or

 9   whatever number Your Honor feels would be the appropriate

10   number to litigate.

11          The second plan would have the effect of moving the

12   cases out of your court.  I think it has the disadvantage

13   probably of undermining the consistent and efficient

14   decision-making in the remaining cases by decentralizing

15   their administration, which we would much, much prefer

16   that this be done in a centralized orderly fashion.

17          So I guess just what I would say to Your Honor in sum

18   is that if we look at sort of remand plans and what is to

19   be done, the most important thing at this point in terms

20   of the litigation is to move some cases to trial, in the

21   direction of trial.  If the plaintiffs come forward with

22   cases are that trial-worthy and we try them and they don't

23   go well for us, that will tell us one thing about the

24   litigation.

25          If we get summary judgments in all, that will tell us

1   something else.  If we get summary judgments in some but

2   not all, and we go to trial and we do very well at trial

3   in terms of litigating the cases, that helps us to inform

4   us about the status of the litigation.

5          But one thing is very, very clear, that is, if we're

6   going to move these in an efficient way to move them to

7   trial in a reasonable period of time, we can't start with

8   one case in each jurisdiction.  We need to narrow the

9   field to a limited number of jurisdictions, litigate a

10  good number of cases, whether it be 15 or 20, or whatever

11  Your Honor feels is reasonable to litigate those cases,

12  bring them to a conclusion whether by summary judgment or

13  trial, and I think at that point, Your Honor, we'll be in

14  a place where we have a much better understanding of the

15  litigation.

16              THE COURT:  All right.

17              MR. BROCK:  Thank you.

18              THE COURT:  Mr. Pennock?

19              MR. PENNOCK:  Good afternoon, Your Honor.

20      May I proceed?

21              THE COURT:  Yes.

22              MR. PENNOCK:  Your Honor, the -- throughout the

23  papers that were filed on this motion and Mr. Brock's

24  discussion of defendant's position over the last

25  10 minutes or so, I found that there was one thing which

1  was strikingly missing, and that was the core issue that

2  really needs to be analyzed and the core question that

3  needs to be answered in this situation in an MDL, and that

4  is whether or not the work of the MDL has concluded.

5       I stood before Your Honor on April 22nd, a little

6  less than seven months ago, and indicated to the Court

7  that I believe that that work had concluded.  I believe

8  that Your Honor's -- with Your Honor's orders and the work

9  that has been done on the last seven months getting things

10 ready for remand, we are at the absolute cusp of finishing

11 anything that needs to be done in this MDL.

12      So it was a little surprising to me that that issue

13 was not addressed by the defendants because the MDL

14 procedure I think is very clear, and that is that once the

15 work of the MDL is concluded, and even perhaps beforehand,

16 the language as cited in our papers indicates even before

17 all pretrial proceedings are completed, if appropriate,

18 that remand of the cases shall occur.

19      I'm sure there are -- and I would suggest to the

20 Judge that there are two fundamental reasons for that.

21 The first one is a very practical but nevertheless very

22 important one, and that is that the -- in MDL procedure or

23 those that the structure that has been set up must take

24 into account that the court that is assigned the MDL, that

25 is saddled with an MDL, particularly one of this

1   complexity and enormity, should not be bound to that MDL

2   indefinitely, that that court should be not only allowed

3   but should in fact be directed to remand the cases when

4   that MDL is done, as cited in our papers.  I believe it's

5   the 7th Circuit that noted that the MDL procedures and

6   structures are not about attorneys continuing with full

7   employment indefinitely.

8       And I don't mean that in any disparaging facetious

9   way.  I think the court of the 7th Circuit was noting the

10  absolute fact that MDLs have a very important purpose.

11  They have throughout time accomplished that purpose very

12  well, as has this Court, but once that purpose is

13  accomplished, then the cases should move back to the

14  districts from which they were transferred with whatever

15  recommendations that the MDL court may make.

16      So I think that that is the first focus.  And if this

17  work is done here, and I certainly would suggest it is,

18  highlighted and underscored by the fact that no additional

19  discovery has been going on in terms of general matters

20  and that we are simply conducting the trial preparation,

21  so with the work being done, the cases should move back to

22  the transferor districts.

23      The second component that I think was missing from

24  the defendant's position, both in the papers and stated

25  here today, is the fact that there are thousands of

1    individuals, however unmeritorious they may think their

2    claims, that have cases pending and have had cases pending

3    in this MDL for several years.

4        It is the defendant's suggestion that those cases be

5    put on some administrative back burner here in this Court

6    and that all of those plaintiffs, with the exception of a

7    lucky few dozen, be -- remain here in Florida

8    indefinitely.  They have not indicated any time frame for

9    when those cases might be released to pursue their claims,

10   however unmeritorious they may think they are.

11       So I think that that is a fundamental -- or that

12   fundamentally is part of the MDL instruction or the MDL

13   structure that cases be remanded when the general work is

14   done because there is an underlying recognition of the

15   fundamental right of these individuals to move forward

16   with their claims.  And that, I think, is -- I think

17   that's clearly undermined by the defendant's proposal.

18       Let me, for a few minutes, talk about what our

19   proposal actually is.

20       First and foremost, Your Honor, our proposal last

21   April, and remains today, is that all of the cases should

22   be remanded.  The proposal that we suggested to the Court

23   was for a method by which they could gradually be

24   remanded, but as I think the Court can see from our

25   proposal, it was something -- it was such that all cases

1   are back in the transferor districts within a relatively

2   limited period of time.  We did not suggest that a -- that

3   merely 52 cases be remanded and that's it and everything

4   else be put on hold.

5        We believe that the work is done here and that these

6   cases should go back to the transferor courts, all of

7   them.

8        While we did propose a graduated remand procedure

9   over a period of several months, it's certainly we were

10  not limiting the cases to 52 cases.  And whatever pool may

11  be exist -- may exist in the transferor courts for

12  bellwether trials that the defendants, at least in their

13  papers and their argument today, seem to be very concerned

14  about, that pool will be the entire -- entirety of their

15  remanded cases, wherever they may go to.

16       So, Your Honor, I -- I do -- I do think that when

17  listening to the defendant's position, I believe that what

18  belies their position is the inherent conflicts in what

19  they have been urging.  On the one hand, the defendants

20  have urged repeatedly that they want to litigate these

21  cases, that these cases deserve to be litigated.  We have

22  heard again, as we've heard many times, the sort of broad

23  generalizations regarding all 6- or 8,000 cases that exist

24  in this MDL in terms of how they lack merit in

25  case-specific basis and therefore the cases should be

1    litigated.  But on the other hand, "We don't want to

2    litigate them.  We want to put them on administrative

3    leave for an indefinite period of time."

4         The defendants have additionally indicated that the

5    cases ultimately should not go to the transferor districts

6    or should not remain in the transferor districts, but all

7    of these cases should go to their home districts.  And yet

8    they say, "But not now."

9         When?

10    "We don't know.  Just hold onto the cases, we don't

11    want them going to the home districts now.  We only want

12    cases going to four home districts.  So even though they

13    should all be in their home districts ultimately, that

14    would create too much havoc."

15         That particular point was a little bit disturbing to

16    me.  They have said in their papers and they said again

17    here today that they are concerned about the judiciary,

18    they're concerned about the judicial system, they're

19    concerned about this volume being foisted upon all of

20    these other judges and courts.

21         Yet in New York state, they are seeking a dismissal

22    on basis of *forum non conveniens* of 7,000 cases, Seroquel

23    cases, that will then be scattered to the state courts

24    throughout the United States.  All of them.  We are

25    opposing that.

1    But it seems to me a bit unusual that they come here

2    and try to put the brakes on what should happen in this

3    Court, which is a resolution of the MDL, on the basis of

4    concern for the judicial system and judges being burdened

5    and attorneys having to run around in some type of

6    mischievous way trying to engage in venue selection and

7    whatever other selections they were alluding to, when

8    they're doing the exact -- they are seeking that in

9    New York state.  That motion is due to be filed this year,

10   before the end of this year.

11       And so I don't understand -- well, again, I suggest

12   to you that that conflict, like the other conflicts,

13   belies the position.  This MDL has done, as we all know,

14   an excellent job of bringing it to a conclusion.  It is at

15   a conclusion and these cases should be remanded.

16       Your Honor, upon remand of these cases to the various

17   districts in over whatever period of time that the Court

18   indicates or requires, these cases will go back to those

19   transferor courts, we will all be in front of those

20   transferor judges just as we are with many other types of

21   cases.  We will be establishing how the cases are going to

22   move case specifically.  The Court there, the transferor

23   Judge, will undoubtedly decide how he or she is going to

24   move the cases to trial, how cases are going to be

25   selected for trial.  And cases will proceed accordingly.

1        And this litigation will proceed, as the defendants

2   have asked that it proceed.  This litigation will move not

3   through any type of resolution process, and that's their

4   prerogative, but they -- this litigation will move through

5   a trial process.

6        We are ready for that.  We are prepared to move on

7   from this MDL, take all of the discovery that we've

8   conducted, take all the pretrial workup that we have done,

9   and move it out into the courts and begin to try cases.

10       I would suggest to Your Honor that what the defendant

11  is simply trying to do is keep 6,000 or more cases here in

12  Florida while it selectively litigates a very limited

13  number of cases.  And even though the defendants

14  themselves have said that the more limited number, the

15  less likely it is that anything will get to trial, they

16  nevertheless are the ones coming before the Court saying,

17  "Let's limit this number as much as we can.  Let's limit

18  it to maybe 15 cases.  Let's limit it so that we don't

19  have to fight the litigation that we have already declared

20  we want to fight."

21       So, Your Honor, as we've urged in April, and Your

22  Honor's taken the steps to conclude the MDL, plaintiffs

23  again request that all of the cases here be remanded to

24  their transferor districts so that we may move on with

25  this litigation in whatever form it may take and reach

1    trials in the cases.

2         Thank you, Judge.

3              THE COURT:  All right.  Well, this is what I'm

4    going to do.  As you know, I can only suggest to the panel

5    a remand.  I've been told that the panel does not do

6    limited remands.  They take the whole thing or nothing.

7         The suggestions that both of you have sort of ignored

8    the fact that first we have to convince the panel and then

9    a number of transferor judges, particularly Judge Gertner

10   who's going to get 5,000 of these plaintiffs.

11        So what I am going to do is suggest to the panel that

12   all the cases from outside the 11th Circuit be remanded to

13   the transferor court with a recommendation that the

14   transferor court retransfer to the districts of the

15   plaintiffs' residences those cases that are not cases in

16   their own home district.

17        The remand will include guidance to the courts which

18   eventually receive the cases, assuming Judge Gertner

19   decides that she wants to remand them since that's the

20   primary issue, at least the 5,000 she's getting.

21        But this is what I will recommend to her and all the

22   other transferor judges, that each court -- a final

23   jurisdiction be prepared for caseload management deciding

24   how the cases would be assigned within the district, how

25   many judges should be involved, whether a single

1   magistrate judge should be assigned for remaining

2   non-dispositive pretrial matters, choosing cases for final

3   trial and summary judgment preparation, and whether to

4   stay the remainder of the cases pending appeal of any

5   bellwether cases.

6       The remand will include a narrative of activity in

7   the MDL describing matters litigated and decided on a

8   global basis, general discovery, ESI issues, privilege,

9   confidentiality matters, things of that sort.

10      The remand will also include a summary of controlling

11  issues, preemption, learned intermediary, statute of

12  limitations, *Daubert*, other evidentiary rulings detailing

13  which issues have been globally decided and which require

14  application of state-by-state law.

15      The recommendation will have a recommended blueprint

16  for final pretrial discovery and motion practice for

17  individual cases selected for trial, to include suggested

18  limitations on depositions and individual discovery and

19  scheduled scope of pretrial motions, similar to how we've

20  done the Florida cases so far.

21      Some -- and the remaining cases, there are 12 cases

22  that were filed in Alabama, those cases I will ask Chief

23  Judge Dubina to designate me as the judge to handle those

24  cases.  And there are 42 cases which were filed here in

25  the Middle District of Florida that have nowhere to go but

1    to stay here.

2         So prior to the time that I send the suggestion of

3    remand to the panel, I'm going to require that you all

4    meet with the mediator to discuss whether there's any way

5    to settle this case because I think it will be important

6    to add in the suggestion of remand.

7         They can send it back to me and say, "You know, we

8    don't think you've done enough.  We want you to do this,

9    that, and the other thing."  Certainly MDLs are MDLs in

10   large part because they expect a settlement to come out of

11   it so I have to at least try to get you all to talk.  So

12   that would mean somebody from AstraZeneca with authority

13   to settle would have to attend the mediation.

14        So the suggestion will also probably recommend that

15   no one do anything with the other cases until I complete

16   discovery in the 42 cases -- 42 and 12 is 54 -- the 54

17   cases that I will be doing discovery on.

18        Now, in talking about those cases, I've noticed --

19   and I have a list.

20        Would you pass out the list?

21        These are cases that were filed in Alabama or

22   Florida.  These Florida cases, none of the 42 Florida

23   cases are Florida plaintiffs.  They're from all over the

24   country.  So in these cases I'm going to order that

25   answers be filed in each of these cases by December 1st.

 1   And we will have case-specific discovery completed by

 2   May 1st.  Dispositive motions by July 1st.  And then we'll

 3   come up with a trial calendar.

 4       These cases will either be tried by me, by another

 5   judge in this district, or by a visiting judge.

 6       We have a very strong history of visiting judges.  As

 7   I'm sure you can imagine, judges love to come to Florida

 8   and try cases.  I have people calling me daily asking to

 9   come down here.  So I have the capacity to try a lot of

10   cases at once.

11       So that's my plan.  Any comments or further

12   suggestions?

13           MR. PENNOCK:  No, Your Honor, from the

14   plaintiffs.  Thank you.

15           THE COURT:  Okay.  So we will be teeing up

16   54 cases.

17           MR. BROCK:  Could I ask one point of

18   clarification?  I think I heard this right, but I just was

19   kind of taking some notes for planning purposes.

20       The order will reflect that we'll finish the

21   discovery and motion practice in the remaining Alabama and

22   Florida cases before we under -- the recommendation will

23   be before we undertake active discovery in the

24   remaining --

25           THE COURT:  I will recommend that they wait and

```
 1    see what happens with these cases before.  Because we're
 2    going to have -- and I don't know what I'm going to do
 3    with them after I finish them because the summary
 4    judgments, they're not 42 different states but just about.
 5    These plaintiffs come from lots of places.  Alabama
 6    cases --
 7              MR. BROCK:  These are -- the non-Florida
 8    residents that have filed in the State of Florida,
 9    that's --
10              THE COURT:  Right.
11              MR. BROCK:  -- the group.
12              THE COURT:  Right.  And they have plaintiffs
13    from Alabama, California, Georgia, Illinois, Indiana,
14    Kansas, Maine, Massachusetts, Michigan, Minnesota, North
15    Dakota -- excuse me, North Carolina, North Dakota, Ohio,
16    Oklahoma, Pennsylvania, South Carolina, Tennessee, Texas.
17        So I will not decide whether to transfer those cases
18    to the place of the plaintiffs' residence until they're
19    all ready with summary judgments filed and everything.  No
20    sense in transferring something that isn't going anywhere.
21        All right?  And I can try those cases no matter where
22    they're from since they were filed here.
23              MR. ROTH:  Your Honor, what's the timeframe on
24    mediation?  By when?
25              THE COURT:  Well, I want you all within two
```

```
 1    weeks to give me some -- to work out some dates.  So

 2    you'll have to talk to the mediator.  And AstraZeneca will

 3    have to get -- and I'm serious about somebody with

 4    settlement authority.  And if you can't figure out who

 5    that is, I'll have whoever the head honcho is come down.

 6         All right?  Okay.  I'll see you all tomorrow.

 7         (Proceedings concluded at 2:06 p.m.)

 8                   C E R T I F I C A T E

 9         I certify that the foregoing is a correct

10    transcript from the record of proceedings in the

11    above-entitled matter.

12

13    s\Sandra K. Tremel   November 23, 2009

14

15

16

17

18

19

20

21

22

23

24

25
```