## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | | |
|---|---|---|---|
| **LYNN  MARIE MALONE** | ) | | |
| | ) | | |
| **Plaintiff,** | ) | | |
| | ) | | |
| **v.** | ) | **Case No.:** _____ |
| | ) | | |
| 1) **ASTRAZENECA** | ) | | |
| **PHARMACEUTICALS, LP.,** | ) | | |
| 2) **ASTRA USA, INC.,** | ) | | |
| 3) **KBI SUB INC.,** | ) | | |
| 4) **ASTRAZENECA, AB,** | ) | | |
| 5) **ASTRAZENECA, PLC,** | ) | | |
| 6) And **ASTRAZENECA,** | ) | | |
| **UK LIMITED;** | ) | | |
| | ) | | |
| **Defendants,** | ) | **JURY TRIAL DEMANDED** |

## <u>COMPLAINT</u>

COMES NOW the Plaintiff, Lynn Malone, through her undersigned attorneys, complains of the above-named Defendants, and each of them.  This complaint is for personal injury of LYNN MALONE, (hereinafter, "Plaintiff") due to ingestion of the medication Seroquel which was manufactured by the Defendants. Plaintiff alleges as follows:

### PARTIES

1. Plaintiff is an individual who ingested Seroquel, suffered injuries as a result thereof and currently resides in, and is a citizen of the state of Oklahoma.

2. Defendant AstraZeneca Pharmaceuticals LP, is a Delaware limited partnership doing business in the State of Delaware, and the United States.  AstraZeneca Pharmaceuticals LP, is the United States subsidiary of AstraZeneca PLC, and was created as a result of the union of Zeneca Pharmaceuticals and Astra Pharmaceuticals LP in the U.S. after the 1999 merger.  AstraZeneca Pharmaceuticals LP's principal place of business is in Delaware, 1800 Concord Pike, PO Box

15437, Wilmington, DE 19850. Upon information and belief AstraZeneca Pharmaceuticals LP's general and limited partners are: AstraZeneca AB, a Swedish corporation with its principal place of business Sweden; Zeneca Inc., a Delaware corporation with its principal place of business in Delaware; and Astra US Inc., a New York corporation with its principal place of business in Delaware; and Astra US holdings Corporation, a Delaware corporation with its principal place of business in Delaware. Therefore AstraZeneca Pharmaceuticals LP is a citizen of Delaware, New York, and Sweden.

3. Defendant AstraZeneca LP, is a Delaware limited partnership doing business in the State of Delaware, and the United States. AstraZeneca LP's principal place of business is in Delaware. Upon information and belief AstraZeneca LP's general partner is AstraZeneca Pharmaceuticals LP; which as stated above is a citizen of Delaware, New York, and Sweden. AstraZeneca LP's sole limited partner, KBI Sub Inc., is incorporated in the state of Delaware and its principal place of business is in New Jersey. Therefore, AstraZeneca LP is a citizen of Delaware, New York, New Jersey, and Sweden.

4. Defendant Astra USA, Inc. is a New York corporation duly organized and existing under the laws of New York, doing business in the State of New York and the United States. Astra USA, Inc.'s principal place of business is in Delaware. Astra USA, Inc. is a limited partner of AstraZeneca Pharmaceuticals LP. Therefore, Defendant, Astra USA Inc. is a citizen of the State of New York and Delaware.

5. Defendant KBI Sub Inc., is incorporated in the state of Delaware and its principal place of business is in New Jersey. KBI Sub Inc. is AstraZeneca LP's sole limited partner. Therefore, Defendant KBI Sub Inc. is a citizen of the State of Delaware and New Jersey.

6. Defendant AstraZeneca AB, is the general partner of AstraZeneca Pharmaceuticals LP, and is a foreign corporation with its principal place of business as SE-151 85, Sodertalje, Sweden. Lacking an agreed appearance, this Defendant may be served with process via Registered, Return Receipt Requested, International Mail to its principal place of business pursuant to Articles 10(a) and 15 of the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters.

7. Defendant AstraZeneca PLC, is the ultimate parent company of all Defendants, and is a foreign company with its principal place of business at 15 Stanhope Gate, London, W1K 1LN, England, United Kingdom. Lacking an agreed appearance, this Defendant may be served with process via Registered, Return Receipt Requested, International Mail to its principal place of business pursuant to Articles 10(a) and 15 of the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters.

8. Defendant AstraZeneca UK Limited is a company incorporated under the laws of England and Wales and has a registered office in London, England. Defendant AstraZenenca UK Limited is the holder of the New Drug Application by which the U.S. Food and Drug Administration first granted approval for Seroquel. Lacking an agreed appearance, this Defendant may be served with process via Registered, Return Receipt Requested, International Mail to its principal place of business pursuant to Articles 10(a) and 15 of the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters.

9. AstraZeneca Pharmaceuticals LP, AstraZeneca LP, Astra USA, KBI Sub Inc., AstraZeneca AB, AstraZeneca PLC AND AstraZeneca UK Limited shall be collectively referred to as "AstraZeneca" or the "Seroquel Defendants" or "Defendants". At all times relevant herein, the Seroquel Defendants were in the business of designing, testing, monitoring, manufacturing,

labeling, advertising, marketing, promoting, selling, and distributing pharmaceuticals, including

Seroquel, for use by the mainstream public, including Plaintiff.

## JURISDICTION

10. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the

case is between citizens of different states and the amount in controversy exceeds $75,000,

exclusive of interest and costs.

11. This Court has jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

This Court has authority to grant declaratory, injunctive, and monetary relief pursuant to 28

U.S.C. §§ 1343, 2201, and 2202, and to award costs and attorneys' fees under 28 U.S.C. § 2412.

12.  This Court has personal jurisdiction over Defendants because they at all times

relevant, conducted substantial and continuous business in the State of Oklahoma designing,

manufacturing, and/or distributing the defective product that is the subject of this action.

## FACTUAL BAKCGROUND

13. Seroquel (chemically referred to by its active ingredient, quetiapine fumarate) is

among a group of drugs known as "atypical antipsychotics" or "second generation

antipsychotics". Seroquel was initially approved in September 1997 by the U.S. Food and Drug

Administration (hereinafter "FDA").  Both first and second generation antipsychotics are often

referred to as *neuroleptic drugs* as they are believed to produce a sedating or tranquilizing effect,

decreased delusions, hallucinations and psychomotor agitation.  They are also sometimes

referred to as *major tranquilizers*.

14. Other second generation antipsychotics include:

- Clozapine (Clozaril) – Novartis – approved 9/89;

- Risperidone (Risperdal) – Janssen – approved 12/93;

- Olanzapine (Zyprexa) – Eli Lilly – approved 9/96;

- Ziprasidone (Geodon) – Pfizer – approved 2/01; and

- Aripiprazole (Abilify) – Ortho McNeil – approved 11/02.

Accordingly, Seroquel was at least the fourth "me too", "copy cat" atypical antipsychotic on the market.

15. "First generation", "conventional" or "typical antipsychotics" (another subclass of neuroleptic drugs) include chlorpromazine (Thorazine), fluphenazine (Prolixin), haloperidol (Haldol, Halperson), mesoridazine (Serentil), pherphenazine (Trilafon), thioridazine, and trifluoperazine (Stelazine). They also produce significant extrapyramidal symptoms such as dystonic reactions, Parkinsonism, akathisia (restlessness and agitation), and tardive dyskinesia. Further, they have been associated to a lesser degree than the second generation drugs with the development of metabolic side effects like diabetes.

16. The initial indication for Seroquel approved by the FDA was solely for treatment of adults with schizophrenia, a relatively rare condition that affects less than one percent of the population of the United States.

17. The pharmacologic action of Seroquel is thought to be dependent on its ability to block or moderate the level of dopamine, a chemical found in the brain that in excessive amounts is believed to cause abnormal thinking and hallucinations. Likewise, all neuroleptic drugs act as inhibitors of the dopamine-2 (D2) receptor. Typical drugs bind tightly to the receptor to produce a prolonged duration of effect but also increased side effects. Atypical medications, it is originally theorized would bind more loosely producing less side effects. It appears to work primarily by blocking neurotransmitter sites of serotonin and dopamine, as well as muscarinic and alpha-adrenergic, and H1-histamine receptors.

18. Medical literature dating back as far as the 1950s, demonstrated that Seroquel, like other atypical antipsychotics had the potential to cause diabetes, diabetes-related injuries (e.g. severe weight gain, hyperglycemia, diabetic ketoacidosis), pancreatitis, cardiovascular complications, and other severe adverse effects. The medical reports describe cases of sudden onset hyperglycemia after the initiation of chlorpromazine treatment which resolved upon withdrawal of the drug. Additionally, patients with existing diabetes had a notable worsening of symptoms with antipsychotic treatment. Hiles BW, *Hyperglycemia and Glycosuria Following Chlorpromazine Therapy*. JAMA 1956;162:1651.

19. In another 1950's study, glucose tolerance tests were markedly reduced when pretreatment with chlorpromazine occurred. Charatan, FBF, *The effect of Chlorpromazine ("Largactil") on Glucose Tolerance*, J. Ment. Sci. 1956; 101: 351-3. Because of this, the use of typical antipsychotics has been listed as a diabetic risk factor by the National Diabetes Data Group since at least 1979. National Diabetes Data Group; *Classification and diagnosis of diabetes mellitus and other categories of glucose intolerance*. Diabetes 1979; 28:1039-57.

20. Seroquel, upon information and belief, was promoted, off-label, for the treatment of depression, anxiety, childhood Tourette's Syndrome, autism, obsessive compulsive disorder (OCD), alcoholism, treatment of tardive dyskinesia, treatment-resistant major depressive disorder, Parkinson's disease symptoms and/or insomnia.

21. AstraZeneca's own pre-clinical studies regarding Seroquel confirmed its propensity to cause diabetes and related life threatening and deadly conditions. Despite this knowledge, AstraZeneca never attempted to provide an adequate warning label – at least to Americans - until they were ultimately forced to do so by the FDA.

22.  The marketing and promotion efforts of AstraZeneca, through its advertisers and sales force, overstated the benefits of Seroquel and minimized and downplayed the risks associated with this drug.  These promotional efforts were made, while fraudulently, willfully and wantonly withholding important safety information from the physicians, the FDA, and the public, specifically, that AstraZeneca was aware of numerous reports of diabetes associated with the use of these drugs, well beyond the background rate and well beyond the rate for other antipsychotic agents.

23.  Shortly after Defendant AstraZeneca began selling Seroquel, reports of U. S. consumers who were using Seroquel suffering from hyperglycemia, acute weight gain, diabetes mellitus, pancreatitis, and other severe diseases and conditions associated began to surface.  Defendant AstraZeneca knew, or was reckless in not knowing, of these reports.  Furthermore, Defendant AstraZeneca was aware of studies and journal articles linking use of Seroquel with these and other severe and permanent hyperglycemia-related adverse events and diseases prior to and during the time that Plaintiff ingested Seroquel.

24.  In December 2000, an article published in the *British Medical Journal* concluded that "[t]here is no clear evidence that [Risperdal or other atypical anti-psychotics like Seroquel] are more effective or are better tolerated than conventional antipsychotics [including Haldol and Thorazine]".  Geddes, J, et al., *Atypical antipsychotics in the treatment of schizophrenia: systematic overview and meta-regression analysis*. Br. Med. J., 2002; 321:1371-76.

25.  By July 2001, Defendant AstraZeneca had received at least 46 reports of diabetes mellitus in patients taking Seroquel, including reports in the medical literature, and including at least 21 cases of ketoacidosis or acidosis and 11 deaths, and, by the end of 2003, AstraZeneca

had received at least 23 more. Most cases appeared within 6 months of initiating Seroquel therapy.

26. Based on the foregoing, the manufacturers of atypical antipsychotics had every reason to be vigilant in identifying a signal and an association that atypicals would result in diabetes just like typical antipsychotics. They do. In 2002 a population of over 20,000 neuroleptic drug users from the U.K. General Practice Research database were followed (19,102 using atypicals and 958,453 using conventional). 424 cases of new onset diabetes we identified and matched to 1,522 controls (about 4 per case) by age, gender, general practice and index date. The adjusted OR for current use of any antipsychotic was 1.7 (95% CI = 1.3-2.3) and for current use of atypical antipsychotic was 4.7 (95% CI = 1.5-14.9). Korngay CJ, Vasilakis-Scarmozza C, Jick H; *Incident Diabetes Associated with Antipsychotic use in the United Kingdom General Practice Research Database*. J Clin Psychiatry 2002; 63:758-62.

27. Seroquel may be the least potent atypical antipsychotic – from an efficacy standpoint but not a risk standpoint – in this subclass. Seroquel likely requires more milligrams to be effective than more potent drugs like risperidone or ziprasidone despite its relatively low receptor affinity. Seroquel is available in 25mg, 100mg, 200mg, and 300mg dosages. The total daily dose for the first four days of therapy is 50 mg (Day 1), 100 mg (Day 2), 200 mg (Day 3) and 300 mg (Day 4). From Day 4 onwards, the dose should be titrated to an effective dose in the range of 300-450 mg/day or less. That is, Seroquel is usually given once daily, with the dose often adjusted upward until an optimal dose is found.

28. In a case-control study of 13,611 inpatients in facilities operated by the New York State Office of Mental Hygiene, rates of diabetes were compared in patients taking first and second generation antipsychotics. New cases of diabetes were identified by a new prescription

for an anti-diabetic medication. 8,461 patients met the inclusion criteria of being hospitalized for more than 60 days and not using antidiabetic medications in the past. 1,539 of these patients received a prescription for antidiabetic medication for a prevalence rate of 11.31%. Of these, 181 were new prescriptions. Eight controls were matched to each case by year, length of observation period, race, age, and diagnosis for a total of 1,448 controls. Of the 24 cases and 112 controls who took Seroquel, the odds ratio (OR) of developing diabetes was 3.09 (95% Cl = 1.59-6.03) compared to taking a first generation antipsychotic. There was also a statistically significant elevation in risk for those patients taking more than one second generation antipsychotic (OR = 2.86, 95% CI = 1.57-5.2). 42 of the 181 cases of treatment emergent diabetes developed in the group taking more than one second generation antipsychotic. 20 of those 42 cases of new onset diabetes (47%) were taking Seroquel as one of two atypicals. Citrome L, Jaffe A, Levine J, Allingham B, Robinson J; *Relationship between antipsychotic medication treatment and new cases of diabetes among psychiatric inpatients*. Psychiatric Services 2004; 55:1006-13.

29. Upon information and belief, prior to and during the time most Plaintiff ingested Seroquel, the Japanese label for Seroquel provided a detailed warning regarding the risks of diabetes associated with Seroquel, and specifically informed physicians regarding the necessity of medical monitoring of patients on Seroquel. At the time the Plaintiff ingested Seroquel, Defendant AstraZeneca had not adopted this safer, more accurate label for the U.S. distribution of Seroquel.

30. Upon information and belief, prior to and during the time of use of Seroquel by most Plaintiff, the Japanese label warned specifically of the diabetes risk, prominently in the beginning of the package label stating:

Case 6:06-md-01769-ACC-DAB   Document 1600-1   Filed 01/28/10   Page 10 of 29 PageID
129830
Case 6:06-cv-01206-HE   Document 11   Filed 10/30/2009   Page 10 of 29

      a.      Quetiapine fumarate is contraindicated for use in patients with diabetes or a history of diabetes.

      b.      Quetiapine fumarate should be used with caution in patients with risk factors for diabetes, including hyperglycemia, obesity or a family history of diabetes.

      c.      Patients receiving quetiapine fumarate should be carefully monitored for symptoms of hyperglycemia, and the drug should be discontinued if such symptoms occur. The symptoms of severe hyperglycemia include weakness, excessive eating, excessive thirst, and excessive urination.

      d.      Physicians should educate patients and their family members about the risk of serious hyperglycemia associated with quetiapine fumarate and how to identify the symptoms of hyperglycemia.

31.    In April 2002, the Japanese Health & Welfare Ministry issued emergency safety information regarding the risk of diabetes, diabetic ketoacidosis, and hyperosmolar coma for patients prescribed Seroquel. On information and belief, prior to that time, Defendant AstraZeneca was involved in discussions with the Japanese agency regarding labeling changes for Seroquel and other atypicals.

32.    While warning of the association of Seroquel with diabetes, glucose dysregulation, ketoacidosis, weight gain and the need for medical monitoring in Japan, AstraZeneca failed to provide the same or similar warnings to the public and prescribing physicians in the United States.

33.    In April 2002, the British Medicines Control Agency warned about the risk of diabetes for patients prescribed the atypical antipsychotic Zyprexa in its newsletter *Current Problems in Pharmacovigilance*. This newsletter reported forty (40) reports of diabetes, hyperglycemia, diabetic ketoacidosis, diabetic coma, and one death among users of Zyprexa. Subsequently, the British government required Lilly to warn consumers about the risk of diabetes and diabetic ketoacidosis, and further required Lilly to instruct patients who were using Zyprexa to monitor their blood sugar levels. AstraZeneca knew

or should have known that these dangerous side effects were common to all drugs of the class known as atypical antipsychotics.

34.  Despite the fact that AstraZeneca knew or should have known that Seroquel was associated with the aforesaid adverse effects, including diabetes mellitus, it recklessly, negligently, and with willful and wanton indifference to the health and safety of consumers, failed to include any warning regarding hyperglycemia, diabetes mellitus, or related conditions until on or after January 2004.  Prior to that time, the label was defective in that it failed to advise prescribing doctors or the public of the need to conduct fasting blood sugar tests before and during treatment and that treatment should be stopped if symptoms of hyperglycemia or diabetes mellitus appeared.  In fact, the January 2004 label is still defective in that it does not contain a black box warning for diabetes mellitus or hyperglycemia and only recommends blood glucose testing for patients with "risk factors" and those who develop "symptoms" of hyperglycemia.

35.  Recently, researchers at the National Institute of Mental Health published a report on atypical antipsychotics, including Seroquel, which found that the majority of patients in each group discontinued their assigned treatment owing to inefficacy or intolerable side effects or for other reasons and that the atypicals, including Seroquel, were no more effective than the older, cheaper, and still available conventional antipsychotic perphenazine.

36.  In January 2004, AstraZeneca received FDA approval to market Seroquel for the short-term treatment of acute manic episodes associated with bipolar I disorder.  Like schizophrenia, bipolar 1 disorder is relatively rare, also affecting less than one percent of the population of the United States.

37.  Despite its limited approval, and relatively small indicated target population, in 2005, Seroquel had become the thirteenth-best selling drug in the United States, and has passed Zyprexa and Risperdal as the highest selling antipsychotic in the United States.  Seroquel's worldwide sales in 1998, its first full year on the market were a modest $63 million.  According to AstraZeneca's 2005 Annual Report, worldwide Seroquel sales exceeded $2.76 billion, which made Seroquel AstraZeneca's second highest selling drug behind only Nexium at $4.63 billion.

38.  Critical to this blockbuster success was AstraZeneca's aggressive marketing of Seroquel, which consisted chiefly of overstating the drug's uses (including massive off-label promotion), while understating and consciously concealing its life-threatening side effects.

39.  Critical to this blockbuster success was AstraZeneca's aggressive marketing of Seroquel, which consisted chiefly of overstating the drug's uses (including massive off-label promotion), while understating and consciously concealing its life-threatening side effects.

40.  On September 11, 2003, the FDA informed all manufacturers of atypical antipsychotic drugs, including AstraZeneca, that due to an increasing prevalence of diabetes-related illnesses associated with this class of drugs, all labeling must bear the following language in the Warnings section:

> Hyperglycemia, in some cases extreme and associated with ketoacidosis or hyperosmolar coma or death, has been reported in patients treated with atypical antipsychotics. Assessment of the relationship between atypical antipsychotic use and glucose abnormalities is complicated by the possibility of an increased background risk of diabetes mellitus in patients with schizophrenia and the increasing incidence of diabetes mellitus in the general

population. Given these confounders, the relationship between atypical antipsychotic use and hyperglycemia-related adverse events is not completely understood. However, epidemiologic studies suggest an increased risk of treatment emergent hyperglycemia-related adverse events in patients treated with atypical antipsychotics. Precise risk estimates for hyperglycemia-related adverse events in patients treated with atypical antipsychotics are not available.

Patients with an established diagnosis of diabetes mellitus who are started on atypical antipsychotics should be monitored regularly for worsening of glucose control. Patients with risk factors for diabetes mellitus (e.g., obesity, family history of diabetes) who are starting treatment with atypical antipsychotics should undergo fasting blood glucose testing at the beginning of treatment and periodically during treatment. Any patient treated with atypical antipsychotics should be monitored for symptoms of hyperglycemia including polydipsia, polyuria, polyphagia, and weakness. Patients who develop symptoms of hyperglycemia during treatment with atypical antipsychotics should undergo fasting blood glucose testing. In some cases, hyperglycemia has resolved when the atypical antipsychotic was discontinued; however, some patients required continuation of anti-diabetic treatment despite discontinuation of the suspect drug.

41.  Despite the FDA action, AstraZeneca waited until January 30, 2004 to send out a "Dear Doctor" letter attempting to advise treating physicians of the new warnings.  On April 22, 2004 AstraZeneca was forced to send out a revised "Dear Doctor" letter due to the fact that the first one was misleading, as it potentially downplayed the need to continually monitor a patient's blood sugar levels while on the drug.  This critical information did not make it into the *Physicians' Desk Reference* until the 2005 edition.

**FRAUDULENT CONCEALMENT AND APPLICATION OF THE DISCOVERY RULE**

Case 6:06-md-01769-ACC-DAB   Document 1600-1   Filed 01/28/10   Page 14 of 29 PageID
129834
Case 6:09-cv-01266-ME   Document 1600-1   Filed 10/30/2009   Page 14 of 29

42.  The nature of Plaintiff injuries and her relationship to Seroquel use were inherently undiscoverable, and, consequently, the discovery rule should be applied to toll the running of the statue of limitations until Plaintiff knew or through the exercise of reasonable care and diligence should have known of the existence of her claim against AstraZeneca. Plaintiff did not discover, and through the exercise of reasonable care and due diligence, could not have discovered, her injuries earlier.

43.  Further, Plaintiff did not have knowledge of facts that would lead a reasonable, prudent person to make inquiry to discover Defendants' tortuous conduct. Under appropriate application of the "discovery rule." Plaintiff suit was filed well within the applicable statutory limitations period.

44.  AstraZeneca affirmatively and intentionally lulled, induced, and otherwise prevented Plaintiff from discovering the existence of her various causes of action against AstraZeneca through its fraudulent acts, omissions, concealments, and suppression of the dangers associated with its drug and other information necessary to put Plaintiff on notice. Plaintiff has therefore been kept in ignorance of vital information essential to the pursuit of her claims, without any fault or lack of diligence on her part. Plaintiff could not reasonable have discovered the fraudulent nature of AstraZeneca's conduct. Accordingly, AstraZeneca is stopped from relying on any statute of limitations to defeat any of Plaintiff claims.

## CAUSES OF ACTION FIRST CLAIM FOR RELIEF NEGLIGENCE

45.  Plaintiff hereby incorporate by this reference all other paragraphs of this Complaint as if fully set forth herein at length.

46.  AstraZeneca is the designer, manufacturer, and seller of the drug Seroquel.

47.  When placed in the stream of commerce in 1997, Seroquel was not accompanied by adequate warnings regarding the significant blood sugar related risks associated with the ingestion of Seroquel, particularly diabetes mellitus. The warnings given by the Seroquel Defendants' did not accurately reflect the existence of the risk, let alone the incidence, symptoms, scope, or severity of such injuries.

48.  AstraZeneca failed to perform adequate testing concerning the safety of the drug Seroquel in that adequate testing would have shown that Seroquel poses serious risk of blood sugar related problems which would have permitted adequate and appropriate warnings to have been given by AstraZeneca to prescribing physicians, health insurance companies, the various states' formularies, and the consuming public.

49.  AstraZeneca had a duty to exercise reasonable care in the design, manufacture, sale, and distribution of the drug, Seroquel, including a duty to assure that the product did not cause users to suffer from unreasonable, dangerous side effects when used alone or in foreseeable combination with other drugs.

50.  AstraZeneca was negligent in the design, manufacturing, testing, advertising, marketing, promotion, labeling, warnings given, and sale of Seroquel in that, among other things, the Seroquel Defendants:

a.    failed to provide Americans a warning for diabetes that AstraZeneca concluded the Japanese were entitled to;

b.    failed to use reasonable care to design an atypical anit-psychotic that was safe for its intended and foreseeable uses, not defective, and not unreasonably dangerous;

c.    failed to use reasonable care in designing and manufacturing Seroquel as to make it safe for its intended uses, not defective, and not unreasonably dangerous;

d.    recklessly, falsely, and deceptively represented or knowingly omitted, suppressed, and/or concealed material facts regarding the safety and efficacy of Seroquel from prescribing physicians, the medical community at large, health insures and state formularies;

e.    negligently marketed Seroquel despite the fact that risks of the drug were so high and the benefits of the drug were so speculative that no reasonable pharmaceutical company, exercising due care, would have done so;

f.    failed to use reasonable care to make reasonable tests, inspections, drug trials, and/or evaluations necessary to discover such defects and unreasonably dangerous conditions associated with AstraZeneca's drug, Seroquel;

g.      failed to use reasonable care to investigate and/or use known and/or knowable reasable alternative designs, manufacturing processes, and/or materials for Seroquel;

h.      failed to use reasonable care to warn plaintiff of dangers known and/or reasonably suspected by AstraZeneca to be associated with Seroquel;

i.      failed to timely use reasonable care to discover the dangerous conditions or character or AstraZeneca's drug, Seroquel;

j.      failed to use due care in the design, testing and manufacturing of Seroquel so as to prevent the aforementioned risks, including, inter alia, diabetes mellitus, and the serious complications stemming there from including seizures, coma, death, liver disease, kidney disease, blindness, and other serious side effects including rapid weight gain, pancreatitis, urinary frequency and hyperglycemia;

## NEGLIGENCE *PER SE*

51.  Plaintiff hereby incorporate by this reference all other paragraphs of this Complaint as if fully set forth herein at length.

### 1.  JAPANESE DIABETES WARNING

52.  Americans are more prone to diabetes than Japanese.  Accordingly, if AstraZeneca was choosing who to warn of diabetes first; it should have been Americans.  However, AstraZeneca, upon information and belief, warned the Japanese of diabetes by 2002 and did not warn Americans until 2004.  AstraZeneca's failure to provide all countries with the benefit of equally strong warnings constitutes negligence *per se* and Plaintiff who suffered injury from Seroquel after the AstraZeneca drafted, issued or disseminated its Japanese diabetes warning have a right to a judgment of liability as a matter of law and an instruction advising the jury of AstraZeneca's violation of the law and consequent liability.

Case 6:06-md-01769-ACC-DAB   Document 1600-1   Filed 01/28/10   Page 17 of 29 PageID
129837
Case 6:05-cv-01266-ME   Document 1600-1   Filed 10/30/2009   Page 17 of 29

53.  Upon information and belief, AstraZeneca knowingly promoted the use of Seroquel for maladies, diseases and/or syndromes which had not been approved by the FDA.  Such "off-label" promotion of a prescription drug is illegal and constitutes negligence *per se*.

## 2. OFF-LABEL PROMOTION

54.  Seroquel, upon information and belief, was promoted, off-label, for the treatment of depression, anxiety, childhood Tourette's Syndrome, autism, obsessive compulsive disorder (OCD), alcoholism, treatment of tardive dyskinesia, treatment-resistant major depressive disorder, Parkinson's disease symptoms and/or insomnia.

55.  AstraZeneca owes the public and the Plaintiff the minimal obligation to not commit unlawful acts.  Plaintiff who suffered injury from Seroquel as a result of such illegal conduct are the persons designed to be protected by the regulations making said conduct unlawful.  Such Plaintiff has a right to a judgment of liability as a matter of law and an instruction advising the jury of AstraZeneca's violation of the law and consequent liability.

### STRICT PRODUCTS LIABILITY – FAILURE TO WARN

56.  Plaintiff hereby incorporates by this reference all other paragraphs of this Complaint as if fully set forth herein at length.

57.  Seroquel was marketed to physicians to be prescribed to their patients and was marketed and advertised directly to the consuming public.  Seroquel, as manufactured and supplied to healthcare professionals and the general public, was unaccompanied by proper warnings regarding the serious risks of ingesting the drug.  The information provided to consumers did not reflect Defendants' knowledge that Seroquel was not safe and effective as indicated in its aggressive marketing campaign, nor were consumers made aware that ingesting

Case 6:06-md-01769-ACC-DAB   Document 1600-1   Filed 01/28/10   Page 18 of 29 PageID
129838
Case 6:09-cv-01266-HE   Document 1600-1   Filed 10/30/2009   Page 18 of 29

the drug could result in serious injury, pain and diabetes and/or death.  Additionally, Defendants committed overt acts and issued doublespeak in order to downplay the truth which began to surface.  This information began to emerge in the form of adverse event reports, medical studies, and the 2003 FDA labeling change mandate.  Any attempts by Defendants to satisfy its duty to warn were compromised by the backdrop of the Seroquel Defendants' actions, including but not limited to its 2002 diabetes warning in Japan.

58.  Full and proper warnings that accurately and fully reflected the risks of serious injury and/or sudden death due to the ingestion of Seroquel should have been disclosed by Defendants.  Plaintiff was prescribed Seroquel by physicians who utilized the drug in a manner reasonably foreseeable by Defendants.  Seroquel was expected to and did reach Plaintiff without substantial change in its condition as tested, manufactured, designed, labeled, packaged, marketed and distributed.  Plaintiff was not aware of, and could not have reasonably discovered, the unreasonably dangerous nature of Seroquel.

59.  The marketing defect resulting from such inadequate and improper warning, was the producing cause and legal and direct result of the failure to warn consumers of the defective condition of Seroquel, as manufactured and/or supplied by the Seroquel Defendants and its representatives, Plaintiff has suffered severe, permanent and disabling injuries and related damages.

### STRICT PRODUCTS LIABILITY – DESIGN DEFECT

60.  Plaintiff hereby incorporates by this reference all other paragraphs of this Complaint as if fully set forth herein at length.

61.  Seroquel was defective in design and/or formulation in that, when it left the hands of the Seroquel Defendants and/or their representatives, the foreseeable risks of serious harm posed

Case 6:06-md-01769-ACC-DAB   Document 1600-1   Filed 01/18/10   Page 19 of 29 PageID
129839
Case 6:09-cv-01266-MLB   Document 1-1   Filed 10/30/2009   Page 19 of 29

by the drug outweighed its alleged benefits. The foreseeable risks of serious harm were so great that Plaintiff, and the general public, having known of such foreseeable risks and alleged benefits, would not have ingested Seroquel.

62. Seroquel was placed into the stream of commerce by the Seroquel Defendants, acting through authorized agents, servants, employees and/or representatives. Plaintiff was prescribed Seroquel by Plaintiff's physicians and used the drugs in a manner reasonably foreseeable to the Seroquel Defendants.

63. The Seroquel ingested by Plaintiff was expected to and did reach Plaintiff without substantial change in its condition as tested, manufactured, designed, labeled, packaged, marketed and distributed. As a result of her use of Seroquel, Plaintiff suffered severe, permanent and disabling injuries and related damages.

## FRAUD AND INTENTIONAL MISREPRESENTATION

64. Plaintiff hereby incorporates by this reference all other paragraphs of this Complaint as if fully set forth herein at length.

65. AstraZeneca through advertising, labeling, and other communications, made misrepresentations to physicians and the public, including Plaintiff, about the safety and efficacy of Seroqel. Physicians and their patients, including Plaintiff, justifiably relied on the AstraZeneca's misrepresentations, and Plaintiff were harmed as a result. Plaintiff is entitled to recover damages for her injuries produced by tie AstraZeneca's misrepresentations. Physicians and their patients, including the Plaintiff, relied on AstraZeneca's misrepresentations, and were harmed as a result. Plaintiff is entitled to recover actual damages for her injuries as a result of the AstraZeneca's misrepresentations and fraud.

66.  Defendants are in the business of manufacturing, marketing, distributing and/or selling these drugs.  Through their advertising and through labels on their products, Defendants made misrepresentations to the public at large and specifically to Plaintiff and her physician.

67.  Defendants breached their duty to Plaintiff under the RESTATEMENT (SECOND) OF TORTS § 402(B)(1965) regarding the misrepresentations set out above.  Defendants represented the product to be safe to use.  These were material misrepresentations of fact concerning the character, nature and dangerous propensities of the product manufactured, sold, and marketed by Defendants.

68.  Plaintiff and her physicians justifiably relied upon the misrepresentations made by the Seroquel Defendants.  Such conduct by the Seroquel Defendants proximately caused injuries and damages to Plaintiff for which Plaintiff now seeks to recover damages.

### NEGLIGENT MISREPRESENTATION

69.  Plaintiff hereby incorporates by this reference all other paragraphs of this Complaint as if fully set forth herein at length.

70.  The Seroquel Defendants, in addition to knowing misrepresentations, made misrepresentations without any reasonable grounds for believing its statements to be true to Plaintiff, other patients, and the medical and psychiatric communities.

71.  The Seroquel Defendants, through its misrepresentations, intended to induce justifiable reliance by Plaintiff, other patients, and the medical and psychiatric communities.

72.  The Seroquel Defendants, through its marketing campaign and communications with treating physicians or psychiatrists, was in a relationship so close to that of Plaintiff and other patients that it approaches and resembles privity.

73. The Seroquel Defendants owe a duty to the medical and psychiatric communities, Plaintiff, and other consumers, to conduct appropriate and adequate studies and tests for all its products, including Seroquel, and to provide appropriate and adequate information and warnings.

74. The Seroquel Defendants failed to conduct appropriate or adequate studies for Seroquel. The Seroquel Defendants failed to exercise reasonable care by failing to conduct studies and tests of Seroquel.

75. As a direct and proximate result of the Seroquel Defendant's negligent misrepresentations, Plaintiff developed diabetes, pancreatitis and/or life threatening complications therefrom and were caused to suffer severe and permanent injuries, pain, and mental anguish, including diminished enjoyment of life, and fear of developing other harmful conditions including, but not limited to, pancreatitis, diabetic ketoacidosis, and diabetic coma. The Seroquel Defendants are liable to Plaintiff jointly and severally for all general, special and equitable relief to which Plaintiff is entitled by law.

## BREACH OF EXPRESS WARRANTY

76. Plaintiff hereby incorporates by this reference all other paragraphs of this Complaint as if fully set forth herein at length.

77. The Seroquel Defendants are merchants and/or sellers of Seroquel. Defendants sold Seroquel to consumers, including Plaintiff, for the ordinary purpose for which such drugs are used by consumers. The Seroquel Defendants made representations to Plaintiff about the quality or characteristics of Seroquel by affirmation of fact, promise and/or description.

78. The representations by the Seroquel Defendants became part of the basis of the bargain between Defendants and Plaintiff. Seroquel did not comport with the representations made by Defendants in that it was not safe for the use for which it was marketed. Plaintiff has

notified Defendants that Defendants has breached its express warranties. This breach of warranty by Defendants was a proximate cause of the injuries and monetary loss suffered by Plaintiff.

## BREACH OF IMPLIED WARRANTY

79. Plaintiff hereby incorporates by this reference all other paragraphs of this Complaint as if fully set forth herein at length.

### 1. WARRANTY OF MERCHANTABILITY

80. The Seroquel Defendants are merchants and/or sellers of Seroquel. Plaintiff purchased Seroquel as placed in the stream of commerce by the Seroquel Defendants and used it for the ordinary purpose for which such drugs are used by consumers. At the time it was purchased by Plaintiff, Seroquel was not fit for the ordinary purpose for which such drugs are used because it was not manufactured, designed or marketed in a manner to accomplish its purpose safely. The Seroquel Defendants' breach of its implied warranty of merchantability was a direct and proximate cause of Plaintiff' injuries, diseases, and damages complained of herein.

### 2. WARRANTY OF FITNESS

81. The Seroquel Defendants placed Seroquel into the stream of commerce with the knowledge that Plaintiff was purchasing said drugs for a particular purpose. Further, Defendants knew, or should have known, that Plaintiff was relying on Defendants' skill or judgment to select goods fit for Plaintiff' purpose.

82. The Seroquel Defendants delivered goods that were unreasonably dangerous and unfit for Plaintiff' particular purpose, in that they were defectively designed and did not come with adequate warnings.

83. The Seroquel Defendants' failure to select and sell a product which was reasonably safe for its intended use was a direct and proximate cause of Plaintiff' injuries, diseases, and damages complained of herein.

## ASSAULT AND BATTERY

84. Plaintiff hereby incorporates by this reference all other paragraphs of this Complaint as if fully set forth herein at length.

85. AstraZeneca intentionally engaged in the conduct of manufacturing, distributing and marketing Seroquel, a harmful substance, to the public, including Plaintiff.   AstraZeneca intended that Seroquel would come into contact with persons, including Plaintiff.   Plaintiff did come into contact with such harmful substances, thereby causing harm and personal injury.

86. As the proximate, producing, and legal cause of the Seroquel Defendants' intentional distribution of Seroquel and Plaintiff' consequent contact with same, Plaintiff suffered damages as described herein.

## UNJUST ENRICHMENT

87. Plaintiff hereby incorporates by this reference all other paragraphs of this Complaint as if fully set forth herein at length.

88. To the detriment of Plaintiff the Seroquel Defendants have been, and continue to be, unjustly enriched as a result of the unlawful and/or wrongful collection of, inter alia, payments for Seroquel.

89. Plaintiff was injured by the cumulative and indivisible nature of the Seroquel Defendants' conduct. The cumulative effect of the Seroquel Defendants' conduct directed at physicians and consumers was to artificially create demand for Seroquel at an artificially inflated

Case 6:06-md-01769-ACC-DAB   Document 1600-1   Filed 01/28/10   Page 24 of 29 PageID
129844
Case 6:06-cv-01266-HB   Document 1600-1   Filed 10/30/2009   Page 24 of 29

price. Each aspect of the Seroquel Defendants' conduct combined to artificially create sales of
Seroquel.

90.  The Seroquel Defendants have unjustly benefited through the unlawful and/or
wrongful collection of, inter alia, payments for Seroquel and continue to so benefit to the
detriment and at the expense of Plaintiff.

91.  Accordingly, Plaintiff seeks full disgorgement and restitution of the Seroquel
Defendants' enrichment, benefits and ill-gotten gains acquired as a result of the unlawful and/or
wrongful conduct alleged herein.

## GROSS NEGLIGENCE/MALICE

92.     Plaintiff hereby incorporates by this reference all other paragraphs of this
Complaint as if fully set forth herein at length.

93.     The wrongs done by the Seroquel Defendants were aggravated by the kind of
malice, fraud and reckless disregard for the rights of others, the public and Plaintiff for which the
law allows the imposition of exemplary damages, in that the Seroquel Defendants' conduct:

- o   Was specifically intended to cause substantial injury to Plaintiff;

- o   When viewed objectively from the Seroquel Defendant's standpoint at the time of
    the conduct, involved an extreme degree of risk, considering the probability and
    magnitude of the potential harm to others, and the Seroquel Defendants were
    actually, subjectively aware of the risk involved, but nevertheless proceeded with
    conscious indifferences to the rights, safety, or welfare of others; or

- o   Included a material representation that was false, with the Seroquel Defendants
    knowing that it was false or with reckless disregard as to its truth and as a positive

assertion, with the intent that the representation be acted on by Plaintiff. Plaintiff relied on the representation and suffered injury as a proximate result of this reliance.

94.     Plaintiff therefore seeks exemplary damages in an amount within jurisdictional limits of the court. Plaintiff also alleges that the acts and omissions names AstraZeneca, whether taken singularly or in combination with others, constitute gross negligence which proximately caused the injuries to the Plaintiff. In that regard, Plaintiff seeks exemplary damages in an amount that would punish Defendants for their conduct and which would deter other manufacturers from engaging in such misconduct in the future.

95.     AstraZeneca's actions, described above, were performed willfully, intentionally, with malice and/or with reckless disregard for the rights of Plaintiff and the public. At a minimum, AstraZeneca's acts and omissions were (a) specifically intended to cause substantial injury to Plaintiff and/or (b) when viewed objectively from the standpoint of the Seroquel Defendants at the time of their occurrence, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others. AstraZeneca had actual and subjective awareness of the risk involved but nevertheless proceeded with conscious indifference to the rights, safety or welfare of others, including Plaintiff. As such, Plaintiff is entitled to punitive damages against AstraZeneca.

Case 6:06-md-01769-ACC-DAB   Document 1600-4   Filed 01/18/10   Page 26 of 29 PageID
129846
Case 6:09-cv-01266-HE   Document 1600-1   Filed 10/30/2009   Page 26 of 29

### VILOATION OF THE OKLAHOMA DECEPTIVE TRADE PRACTICES ACT

96.  Plaintiff incorporates by reference herein Paragraphs 1 through 19 as though fully set forth herein.

97.  The actions of Defendants constituted deceptive trade practices within the meaning of the Oklahoma Deceptive Trade Practices Act, 78 Oklahoma Statute section 51, et. Seq.

98.  Plaintiff demands judgment against Defendants for damages suffered by Plaintiff as a result of Defendant's deceptive trade practices plus attorney fees and costs incurred in brining this action.

### VIOLATIONS OF THE OKLAHOMA CONSUMER PROTECTION ACT

99.  Plaintiff incorporates by reference herein Paragraphs 1 through 19 as though fully set forth herein.

100.  Defendants engaged in the unfair trade practices set forth above and specifically declared unlawful under 15 Oklahoma Statute 753. Such practices include making false or misleading representations, knowingly or with reason to know, as to the characteristics of Kugel Mesh Hernia Patch and by committing a deception trade practice as defined by 15 Oklahoma Statute section 752.

101.  Plaintiff demands judgment against Defendants for actual damages plus costs and attorney's fees incurred in bringing this action as provided for in 15 Oklahoma Statute section 761.1(a).  In addition, Plaintiff prays for an award of a civil penalty against Defendants in the amount of $2,000.00 per violation, pursuant to 15 Oklahoma Statute section 761.1 due to Defendants' unconscionable conduct.

Case 6:06-md-01769-ACC-DAB   Document 1600-1   Filed 01/18/10   Page 27 of 29 PageID
129847
Case 6:09-cv-01266-ME   Document 1600-1   Filed 10/30/2009   Page 27 of 29

# DAMAGES

102.  By reason of the foregoing, Plaintiff, demands judgment for damages against the
Seroquel Defendants including compensatory damages, costs of the prosecution of this action,
and further, demands trial by jury of all issues so triable, and for such other and further relief as
this Court deems just and proper.

103.  As a direct and proximate result of Plaintiff's ingestion and use of AstraZeneca's
defective product, Seroquel, Plaintiff's injuries include, but are not limited to the following
damages and seek recovery thereon:

- o  Disability;

- o  Onset of Stage II Diabetes;

- o  Past and future emotional distress including, without limitation, justifiable fear of
     disease;

- o  Loss of Enjoyment of Life;

- o  Physical and Mental Pain;

- o  Inconvenience;

- o  Past and future mental anguish;

- o  Physical Pain and Suffering;

- o  Increased risk of debilitating disease;

- o  Medical Monitoring through her lifetime;

- o  Past and future medical expenses;

- o  Physical impairment; and

- o  Physical disfigurement.

## PUNTIVE DAMAGES

104.     Plaintiff hereby incorporates by this reference all other paragraphs of this Complaint as if fully set forth herein at length.

105.     At all times relevant hereto, Defendants had actual knowledge of the defective and dangerous nature of Seroquel as set forth herein and continued to design, manufacture, market, promote, distribute and sell it so as to maximize sales and profits at the expense of the public's health and safety and in conscious disregard for the foreseeable serious harm caused by the drug. The Seroquel Defendants' conduct exhibits such an entire want of care as to establish that its actions were a result of fraud, ill will, recklessness, gross negligence, malice and/or willful and intentional disregard for the safety and rights of consumers of its drugs such as Plaintiff. Plaintiff therefore seeks to recover punitive and exemplary damages to the fullest extent permitted by law.


## CONCLUSION

WHEREFORE, premises considered, Plaintiff prays for a trial by jury, and demand judgment of and from the defendant for actual and compensatory damages, and further demand judgment of and from defendant of punitive damages, together with pre-judgment interest, post-judgment interest, all costs of this proceeding and all further relief which this Court deems proper.

Respectfully submitted,


s/Matthew J. Sill _____

Matthew J. Sill, OBA#
SILL & MEDLEY
725 N.W. 11th Street
Oklahoma City, Oklahoma  73103
Phone:  (405) 604-5953
Fax:      (405) 604-9775
E-mail:  matt.sill@sillmedleylaw.com

Curtis Bruehl
BRUEHL LAW FIRM
435 N. Walker Ave.
Suite 102
Oklahoma City, OK  73102
Phone:  (405) 606-7899
Fax:      (405) 606-7029
E-mail: curtbrue@gmail.com


ATTORNEYS FOR PLAINTIFF


ATTORNEY LIEN CLAIMED
JURY TRIAL DEMANDED