United States District Court
Middle District of Florida
Orlando Division

**In Re: Seroquel Products Liability Litigation**

                              Case No. 6:06-md-1769-Orl-22DAB

_____

**This Document Relates to ALL CASES**

_____

**MEDIATOR'S REPORT**

**Date: January 26, 2010**

## Table of Contents

| | | |
|---|---|---|
| I. | Introduction | 3 |
| II. | Pre-Mediation | 4 |
| III. | Organizing the Mediation | 5 |
| IV. | The Mediation | 6 |
| V. | Assessing the Success of the Mediation | 9 |
| VI. | Moving Forward | 10 |
| VII. | Conclusion | 11 |
| | Certificate of Service | 12 |

## I. INTRODUCTION

Providing a Report to the Court on the recently held mediation is a delicate task. I promised the parties confidentiality as to what was said during the mediation, and I believe it is important to protect that confidentiality to assure that no party is prejudiced or benefitted by disclosure of communications that occurred during the mediation. Notwithstanding the concern about confidentiality, I endeavor in this Report to inform the Court as to my judgment of the extent of success achieved in the mediation. In order to set the stage for the mediation, I describe the events leading up to it in this Introduction.

Shortly after being appointed Mediator in this Multi-District Litigation ("MDL"), I contacted counsel for AstraZenica ("AZ") and liaison counsel for the plaintiffs and invited both sides to submit a confidential mediation statement for my eyes only. I received a confidential AZ statement in January 2009 and carefully reviewed it. I had several conversations with plaintiffs' counsel that same month and agreed that their submission could await some developments in the case. In March 2009, I received a confidential submission from some plaintiffs' counsel which I also reviewed with care. It was my determination that additional developments in court – both in the MDL and in other courts – would be useful before settlement discussions were likely to be fruitful.

In November 2009, this Court issued an order requiring the parties to agree to mediation on one of three sets of dates. The parties chose January 19-20, 2010 for the mediation. Based on what I had learned from the parties, it became clear to me that settlement of the MDL cases was highly improbable, if not impossible, without a more global settlement. I was aware that some counsel had most of their cases in the MDL while many counsel had some MDL cases and other

cases that were pending in other courts. I indicated, therefore, to both plaintiffs and AZ that plaintiffs' counsel were welcome at the mediation regardless of whether most or any of their cases were in the MDL.

Once the dates were set for the mediation, I invited the parties' suggestions as to the place of the mediation and the process that we might use given the large number of lawyers who might attend the mediation. Ultimately, I suggested that the mediation be held in New York where the conference space provided by the law firm Kaye Scholer seemed sufficient to accommodate all counsel who would appear in the mediation. I received some suggestions from plaintiffs' counsel and some from AZ counsel as to the process that might be employed during the mediation.

I suggested to plaintiffs' counsel who had a large number of cases that it would be extremely useful if they could provide medical records to AZ counsel prior to the mediation. Some counsel did that, and it helped a great deal once the mediation began.

## II. Pre-Mediation

My experience has been that some parties like to meet the mediator before the mediation begins – to get a sense of who he or she is, to make last minute suggestions, to warn about hot button issues, or simply to get comfortable before the mediation starts. Thus, I indicated to the parties that I would be available all day Monday, January 18, 2010 in New York to meet with anyone who wanted to meet for any reason. I did meet with different groups of plaintiffs' counsel that day.[1] Although I did not meet with AZ counsel on Monday, I kept time open in the

---

[1] I also used some of the time on Monday to review medical records shared with me by plaintiffs' counsel. This proved to be useful when the mediation actually began.

event that they desired a meeting, even at the last minute. Instead of a meeting, I was in regular e-mail contact with AZ counsel. I was also in e-mail contact with some plaintiffs' counsel.

### III. Organizing the Mediation

In preparing for the mediation, I learned what many of the lawyers involved in the litigation already knew: i.e., some firms had thousands of Seroquel cases while others had a handful or a single case. I also learned that some demands had been made by some plaintiffs' counsel who had been in contact with AZ counsel while many plaintiffs' counsel had never even met AZ counsel. So, I had to make a choice as to how to organize the mediation with an eye to making as much progress as possible.

Considering the suggestions made by the parties, I determined that three groups of plaintiffs' counsel who had large inventories of Seroquel cases and who had made demands upon AZ should meet with AZ counsel separately from each other and from other plaintiffs' counsel.[2] AZ counsel agreed with me that it made sense for them to meet with each of these groups separately. This obviously complicated the mediation process because the negotiators for AZ were unavailable to meet with other plaintiffs' counsel while they were meeting with these groups. Approximately 20 plaintiffs' firms were present who were not part of the three groups with large inventories. My recollection is that I provided to liaison counsel via e-mail a tentative schedule of the mediation before it started so that there would be few surprises.

In an effort to assure that all plaintiffs' counsel who attended the mediation were kept abreast of what the mediation would look like, early in the morning of the 19th, I informed them of what the schedule for the day would be. Specifically, I told all counsel from the

---

[2] I don't identify the groups by name in this Report.

approximately 20 firms that were not part of the three groups with large inventories that there would be some meetings between groups of plaintiffs' lawyers with large inventories and AZ counsel, and that there would be one session in which all plaintiffs' counsel who were not part of these groups would meet with AZ counsel to talk about moving forward with negotiations.  I also informed the plaintiffs' counsel in these approximately 20 law firms that it was virtually certain that they could rely on the fact that they would not have to return on the 20th because it was highly doubtful that the mediation would move forward so quickly that claims could finally be resolved – especially in light of the fact that many plaintiffs' counsel had provided no medical records to AZ counsel.

Because I believed it was important that all plaintiffs' counsel have a chance to meet with AZ counsel either individually or in small groups, two of the AZ counsel who were not needed in the negotiations with the three groups of lawyers with large numbers of cases met throughout the day seriatim with plaintiffs' counsel.  These meetings enabled plaintiffs' counsel actually to meet the lawyers on the other side and AZ counsel to get a sense of the size and nature of each counsel's set of cases.

### IV. THE MEDIATION

AZ counsel met separately with counsel from two of the groups with large inventories early in the mediation on the 19th.[3]  While these meetings occurred, the two additional AZ counsel began to meet with the 20 law firms who were not part of these groups.  One of the two groups met with AZ counsel on the 19th and then met only with me on the morning of the 20th.

---

[3] I was present at all of the meetings between the groups with large caseloads and AZ counsel.  As a result, I was not present when the two additional AZ counsel met with the 20 plaintiff firms who were not part of these groups.

The other group met with AZ counsel both on the 19th and the 20th. I asked the third group with a large inventory not to attend the mediation on the 19th and to wait to hear from me about when they would meet with AZ counsel. They met with AZ counsel on the 20th as I requested.

AZ counsel met with the approximately 20 firms outside these groups in the afternoon of the 19th and provided them with much the same information as they had provided to the three groups with large caseloads.

I had asked AZ counsel to be prepared to make offers in response to the demands that had been made and to as specific as possible in presentations to all of the lawyers who attended the mediation. I asked the plaintiffs' lawyers who had made demands to have some patience with the mediation process and warned all counsel that mediation is a process and likely to be somewhat cumbersome when 26,000 cases are potentially involved in any settlement.

Both AZ counsel and almost all of the plaintiffs' lawyers demonstrated not only good faith, but also an appreciation for the efforts that were being made to get a handle on 26,000 cases.

I was not familiar with all of the plaintiffs' firms who attended the mediation. But, I either knew or learned that the plaintiffs' lawyers with the large inventories of Seroquel cases are all savvy, experienced, tough negotiators, and veterans of mass tort litigation. I also either knew or learned that the defense counsel can be similarly described. This was a mediation among lawyers who appreciate their adversaries.

AZ counsel did everything that I asked of them and more. Unlike some mediations in which a party arrives with a position that is chiseled in granite but seems totally arbitrary, AZ counsel made presentations to each group of plaintiffs' counsel with whom they met that set forth

AZ's analysis of factors that separate worthless or weak claims from those that might have merit. AZ counsel also did an impressive amount of work in analyzing medical records that were submitted only shortly before the mediation began. AZ had in-house counsel (Deputy General Counsel, Litigation Legal Department), who had settlement authority, available at all times. I met with him when I wanted, and we met both on the 19th and 20th. In addition, he participated in one of the meetings with one of the groups of plaintiffs' lawyers with a large number of Seroquel cases. One could reasonably say that AZ counsel was as forthcoming as to how they are going to approach negotiations and trial as they possibly could be. AZ then invited each group of plaintiffs' counsel to respond with an alternative analysis of how to rate or value cases.

     Plaintiffs' counsel in the three groups with large numbers of Seroquel cases also did everything I asked of them and more. They patiently listened to AZ's presentation, indicated that they did not agree with some of the factors that AZ employed or the manner in which AZ employed them, and that they would be inclined to make a counter-presentation to AZ. Some of these counsel had made impressive efforts to begin the process of providing medical records to AZ so that they might provide some fodder for discussion during the mediation.

     For those plaintiffs' counsel having their first meeting with AZ counsel, there was a benefit in learning early on how AZ would approach both settlement discussions and litigation. They also benefitted from learning that provision of medical records was critical to moving the process forward.

## V. Assessing the Success of the Mediation[4]

I had no illusions of reaching a final settlement in any or all of the cases in this first mediation session. My goal was to put a process in motion that provides the best chance of success in reaching settlement. I believe that this was achieved because the following things happened:

1. AZ made clear its approach to the cases, and plaintiffs' counsel now have every opportunity to respond with their approach. I expect that the plaintiffs will respond with their own specific ideas that will generate a conversation among the parties.

2. AZ made clear the importance of receiving medical records, and plaintiffs' counsel appeared to agree that submission of medical records was important. Without being able to analyze these records, both sides cannot have conduct an intelligent negotiation.

3. It seems clear that AZ is not seeking to burden the plaintiffs' counsel with producing all medical records for all cases and bearing the considerable expense that might entail. My judgment was that a sampling should be sufficient for negotiation purposes, and I have suggested that AZ propose a template for sampling that I would consider recommending to the plaintiffs. I

---

[4] I have read Mr. Menser's motion for sanctions and his claim that there was no mediation. Of course, I do now want to do anything that would frustrate a settlement between his client and AZ. But, his description of events is inaccurate. I never said that there would not be a mediation. Instead, I explained how the mediation would proceed. It was possible, but unlikely in my view, that settlement with groups with large numbers of cases actually would occur and lead to actual offers to all plaintiffs. Nothing was ruled out in this mediation. The decision on how best to proceed and how best to deal with a large number of plaintiffs' counsel was largely mine, and I am satisfied that the plain moved as many plaintiffs forward as was possible under the circumstances. I was concerned before the mediation began about the possible undue cost and burden on plaintiffs' counsel with only one or several cases. Thus, I suggested that they might choose to participate by phone. That suggestion is set forth in an e-mail from me to Larry Roth and Arthur Brown and is Exhibit C to Mr. Menser's motion. I did in fact participate with two different plaintiffs' lawyers by phone.

expect AZ to make a proposal to me without much delay.

4. I indicated to all plaintiffs' counsel that I doubt it will ever be necessary to bring them together for a joint negotiation. With the initial session(s) completed, I believe that negotiations can actually move forward between each firm and AZ – once sufficient medical records are submitted and analyzed by both sides.

5. The experienced lawyers who attended the mediation know that it is likely that judges throughout the country will put enormous pressure on them to settle these 26,000 cases lest they clog the judicial system to an unprecedented degree.

In sum, I conclude that the mediation achieved what I believed was possible given all the circumstances. This is largely attributable to the skill of the lawyers on both sides.

### VI. Moving Forward

There is no doubt in anyone's mind that the substance of the discussions was greatly affected by this Court's summary judgment decisions as well as this Court's decisions with respect to expert witnesses; the summary judgment decisions in Delaware; judicial action in New Jersey; and potential judicial action in New York. This Court's order indicating it will consider a trial on pre-emption also had an impact on discussions.

At this point, AZ has achieved considerable success on the merits of decided cases. Plaintiffs have had some success in terms of this Court's rulings on certain evidentiary issues, and AZ also has won some. It is inevitable, I believe, and not undesirable that as I seek to continue mediation of the Seroquel cases both plaintiffs and AZ will seek to aggressively pursue litigation success in this Court and in other courts.

Just as I waited for a number of months to initiate an actual mediation while some

judicial rulings were handed down, the parties have an incentive to push and prod each other through litigation to help make their cases in settlement discussions. From my vantage point, the lawyers are professional and able to pursue vigorous litigation while also energetically seeking settlement.

It is not simply the optimist in me that believes there will be a settlement at some point; it is also the realist. 26,000 cases cry out for settlement. The question is what is fair for plaintiffs and what is fair for AZ. The parties are far apart at the moment on resolving that question. With more discussions and especially with opportunities for plaintiffs' counsel to respond fully and completely to AZ's analysis of strength and weakness of cases, progress will be made.

### VII. Conclusion

Aware as I am of the burden that handling thousands of cases in this MDL has placed on this Court, of the potential burden that a remand of cases would place on federal judges throughout the country, and of the burden some state judges already share as a result of heavy Seroquel caseloads, I wish there were a magic wand that could be waived to settle all Seroquel cases instantly. Such wand does not exist, however.

Yet, I believe that the talented lawyering available on both sides of this litigation can and will find a way to achieve justice for plaintiffs and AZ and simultaneously to spare federal and state courts the necessity of thousands of Seroquel trials.

                          RESPECTFULLY SUBMITTED,

                          **s/ Stephen A. Saltzburg**
                          Stephen A. Saltzburg
                          George Washington University Law School
                          2000 H Street, NW
                          Washington, D.C. 20052
                          Tel: 202.994.7089
                          Fax: 202.994.7143
                          E-Mail: ssaltz@law.gwu.edu

**Certificate of Service**

I certify that on this 26th day of January 2010, I electronically filed the foregoing with the Clerk of the court by using the CM?ECF system. I futher certify that I have served an electronic copy of the forgoing on Plaintiff's Liaison Counsel, Larry Roth, Esquire, and on Defendant's Liaison Counsel, Chris Coutroulis.

                          **s/ Stephen A. Saltzburg**
                          Stephen A. Saltzburg
                          George Washington University Law School
                          2000 H Street, NW
                          Washington, D.C. 20052
                          Tel: 202.994.7089
                          Fax: 202.994.7143
                          E-Mail: ssaltz@law.gwu.edu