G. All pending Requests for Production, Requests for Admission, Interrogatories, and deposition notices directed to AstraZeneca are deemed withdrawn. AstraZeneca shall not be required to respond to these previously-served written discovery requests or deposition notices.

H. Once plaintiffs have collectively served AstraZeneca with at least 2,500 completed PFSs, plaintiffs shall be permitted to serve discovery requests and deposition notices other than as set forth herein. AstraZeneca reserves the right to object to any such future discovery requests on any basis contemplated by the Federal Rules of Civil Procedure, by the Local Rules, or by case law.

## III.    Format of Production of Custodial Files

A.    Format of Production

1.    AstraZeneca shall produce all responsive hard copy and electronic documents in single-page Tagged Image File Format ("TIFF") with an accompanying load file, an extracted text file of electronic documents that are unredacted, and an Optical Character Recognition ("OCR") text file of unredacted portions of redacted documents and hard copy documents.

2.    Documents that present imaging or formatting problems shall be promptly identified and the Parties shall meet and confer to attempt to resolve the

problems. The Parties are not required to produce exact duplicates of electronic documents stored in different electronic locations. The metadata for documents which have been "de-duplicated" across custodial files will indicate the names of the custodians in whose files the documents are located. The Plaintiffs shall produce documents on either DVD or CD and may produce fact sheets by email in ".pdf" format. AstraZeneca will produce documents on DVD or hard drives.

3.   Each page of a produced document shall have a legible, unique page identifier ("Bates Number") and confidentiality legend (where applicable) on the face of the image at a location that does not obliterate, conceal, or interfere with any information from the source document. No other legend or stamp will be placed on the document image other than the Bates Number, confidentiality legend (where applicable), and redactions addressed above.

4.   For redacted documents not yet reviewed by AstraZeneca as of the date of this order, the metadata for each document will indicate the basis for the redaction (e.g., "other AstraZeneca product," "privacy," or "privilege") at the time the redacted document is produced.

B.      Metadata

To the extent possible and practicable, AstraZeneca will provide the following metadata fields:

(a) Electronic document type;

(b) Create date;

(c) File name

(d) File location;

(e) Source location;

(f) Starting production number;

(g) Ending production number;

(h) Custodian;

(I) Last date modified;

(j) Author;

(k) Recipient(s);

(l) Document date (if different from create date);

(m) cc(s);

(n) bcc(s);

(o) Subject;

(p) Title; and

(q) Attachment information (for e-mails).

If AstraZeneca determines that it is impossible to produce certain metadata fields for a type or types of documents, AstraZeneca shall so inform plaintiffs.  If AstraZeneca determines that the production of certain metadata fields for a type or types of documents would be impracticable, unduly burdensome or unduly expensive, AstraZeneca shall so inform plaintiffs, and the parties shall promptly meet and confer on what should be done, without prejudice to AstraZeneca's right to object to production of such metadata fields or plaintiffs' right to move to compel such production.

C.      Databases

1.  AstraZeneca's identification of databases and its permitting plaintiffs to interview a person or persons who can speak knowledgeably and informatively about said databases as set forth in paragraph II.F. above may not be construed as an agreement to produce such databases.  After plaintiffs have collectively served AstraZeneca with at least 2,500 completed PFSs, the Parties will confer regarding the discoverability and feasibility of any request for production of a database, including the form and scope of any such production.

2. The Court's assistance may be sought only after the Parties have failed to reach agreement after good faith discussions.

D.   Costs

1. <u>Documents and readily accessible electronically stored information ("ESI")</u>:   While each Party expressly reserves its rights to seek costs relating to this litigation, including the costs of producing documents and readily accessible ESI, initially each Party will bear the costs to process and review its own documents and readily accessible ESI.

2. <u>Inaccessible and/or legacy ESI</u>: To the extent that any Party requests data that is not readily accessible, the Parties shall comply with the Federal Rules of Civil Procedure in determining whether the inaccessible data is to be produced and which Party will bear what portion of the costs of production, if any, including the costs to process or review unique or non-standard data.  The Parties shall confer concerning inaccessible ESI prior to seeking the Court's assistance.

E.   Privilege Log

AstraZeneca will provide a privilege log in compliance with the Federal Rules of Civil Procedure as soon as practicable, but in no event more than 120 days after its first production of documents for which privilege is asserted to apply and then continuing on a

11

rolling basis thereafter. The privilege log will indicate the custodian from whom the privileged document was collected.

## IV.    Preservation of Documents

All parties and their counsel shall preserve evidence that may be relevant to his action. The duty extends to document, data, and tangible things in possession, custody and control of the parties to this action, and any employees, agents, contractors, carriers bailees, or other non-parties who possess materials reasonably anticipated to be subject to discovery in this action. "Documents, data, and tangible things" is to be interpreted broadly to include writings, records, files, correspondence, reports, memoranda, calendars, diaries, minutes, electronic messages, voice mail (for AstraZeneca only, to the extent practicable and to the extent a custodian utilized a program that allowed maintenance of such voicemail), E-mail, telephone message records or logs, computer and network activity logs, hard drives, backup data (excluding duplicative data maintained for purposes of disaster recovery), removable computer storage media such as tapes, discs and cards, printouts, document image files, Web pages, databases, spreadsheets, software, books, ledgers, journals, orders, invoices, bills, vouchers, checks statements, worksheets, summaries, compilations, computations, diagrams, graphic presentation, drawings, films, charts, digital or chemical process photographs, video, phonographic, tape or digital recordings or transcripts thereof, drafts, jottings and notes, studies or drafts of studies or other similar such material. Information that serves to identify, locate, or link such material, such as file inventories, filed folders, indices, and metadata, is also included in this definition. Each party shall take reasonable steps to preserve all

documents, data and tangible things containing information potentially relevant to the subject matter of this litigation.   Counsel is under an obligation to the Court to exercise all reasonable efforts to identify and notify parties and nonparties, including employees of corporate or institutional parties.  The definition and scope of the term "nonparties" will be defined later.

The failure of any party to have preserved in the past every potentially relevant "document, data and tangible thing," as defined above, shall not in and of itself mean that said party has engaged in spoliation of evidence. Any party who believes that another party has engaged in spoliation may move for any relief he/she/it thinks appropriate and the opposing party may respond to said motion on any basis that he/she/it thinks appropriate.

## V.   Amendment of Previous Orders

This Order supersedes any prior orders of this Court to the extent that it is inconsistent with such Orders.

**DONE** and **ORDERED** in Orlando, Florida on January 26, 2007.

ANNE C. CONWAY
United States District Judge

<u>Exhibit A</u>

**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF FLORIDA**

**ORLANDO DIVISION**

**IN RE:  Seroquel Products Liability Litigation,**

**MDL DOCKET NO. 1769**

**This document relates to:**

**INSERT CASE INFORMATION**

_____

      **IT IS ON THIS** ___ day of _____, 200__ **ORDERED** as follows:

      1.   All of the claims of following Plaintiffs only are **DISMISSED WITHOUT PREJUDICE** from the above-captioned cases for failure to timely serve upon Defendants a completed PFS with all requested information, documents, and authorizations:

Plaintiff X (Case Name, Case No.),

Plaintiff Y (Case Name, Case No.)

      2.   Plaintiffs may reinstate their claims upon motion to this Court to vacate the Dismissal Without Prejudice provided that Plaintiffs serve Defendants with a substantially complete PFS, responsive documents and authorizations.  If such dismissal is vacated, the claims of those plaintiffs shall relate back to the date of original filing and will be treated for all purposes as if they had never been dismissed in the first place.

DATED: _____        _____

                                    **ORDERED BY THE COURT**

                                      **EXHIBIT A**

1

RECEIVED
CLERK'S OFFICE

2010 FEB 16   P 1: 11

JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

# Exhibit E

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

IN RE: Seroquel Products Liability
Litigation

Case No.  6:06-md-1769-Orl-22DAB

---

## CASE MANAGEMENT ORDER NO. 5

### General Discovery and Motion Practice - All Cases

1.      All case-specific discovery shall be considered terminated as of November 30, 2007 (allowing spillover into December 2007 to complete matters that could not be accommodated in November).[1]

2.      All pending Motions to Dismiss filed pursuant to Case Management Order No. 2, and based on a Plaintiff's failure to provide a Plaintiff Fact Sheet or verification, shall be denied without prejudice.  Due to the repeated failures of AstraZeneca to timely complete its own discovery obligations (as most recently reflected in its plan to produce all electronic documents in native format because of technical failures in previous productions), it would be unfair to dismiss cases based on a Plaintiff's dilatory discovery responses.  No additional such motions directed to Plaintiffs shall be permitted without leave of Court.  In this regard, the Court notes that Plaintiffs have been on notice since the Magistrate Judge's issuance of his initial recommendations (Doc. 695) on November 16, 2007, that all Florida Plaintiffs would be required to provide any missing

---

[1] The parties have already complied with this section in anticipation of the Court's entry of this Order adopting the Magistrate Judge's recommendations.

Plaintiff Fact Sheets and verifications no later than January 15, 2008. Therefore, AstraZeneca may seek leave of Court to file motions to dismiss, with regard to the Florida Plaintiffs, for any failure to provide Plaintiff Fact Sheets or verifications, after the January 15, 2008 deadline has passed.

3.      Based on AstraZeneca's representation (Doc. 680) as to its ability to certify substantial completion of its production of documents (ESI and paper), a new schedule for completing all general discovery and the filing of motions is established as follows:

A.      By March 14, 2008, AstraZeneca shall certify complete production of documents called for in its custodial collections, Plaintiffs' Requests for Production (subject to objections and rulings by the Court), the results of use of additional search terms, and the results of appropriate database queries. AstraZeneca shall make these materials available on a rolling basis (the progress of which is to be supervised and directed by the SM-ESI) in native (or other appropriate agreed or directed) format. **Unexcused failure of AstraZeneca to meet this deadline (or its failure to make reasonable progress on the rolling production) may result in the striking of the Answer or particular defenses or other sanctions.**

B.      Following certification of substantial completion of AstraZeneca's document production, Plaintiffs may complete depositions of corporate witnesses, third parties and limited additional Requests for Production. The scope of, and limits on, this additional discovery are subject to Court review, and all such fact discovery should be

completed by May 30, 2008. AstraZeneca may complete depositions of third parties by May 30, 2008.

      C.     Plaintiffs shall identify and provide reports for all general experts expected to testify at trials of cases selected for the Initial Trial Pool by August 8, 2008. AstraZeneca shall identify and provide reports for all general experts expected to testify at trials of cases selected for the Initial Trial Pool by September 12, 2008. Depositions of general experts shall occur between September 15 and October 15, 2008. As to MDL cases not selected for the Initial Trial Pool, the Parties shall be permitted, on dates that may be set by agreement of the Parties or by later orders of this Court or transferor courts, to identify additional general experts not previously identified for Initial Trial Pool cases.

      D.     The deadline for non-expert based dispositive motions shall be October 31, 2008, with Responses due by November 24, 2008. By October 31, 2008, the parties shall file any *Daubert* motions related to general or case-specific experts. Responses to *Daubert* motions shall be filed no later than November 24, 2008. If such motions are filed, the parties shall indicate whether an evidentiary hearing is requested, the basis for such request and its anticipated duration. If either party anticipates filing more than one dispositive motion or *Daubert* motion, it shall file a motion, complying with local Rule 3.01(g), seeking leave to do so at least 30 days in advance. Any such motion shall provide a specific rationale for filing multiple motions and shall include pertinent information such as the anticipated timing of the motions, and the length and the nature of the supporting record.

## Case Management and Trial of Florida Cases

A.      By November 30, 2007, the parties shall submit to the Court a list of all Plaintiffs who reside in Florida or who ingested, obtained, or were prescribed Seroquel in Florida (hereinafter "Florida Plaintiffs").  The parties shall submit an appropriate stipulation or other pleading to allow venue of these cases to be fixed in this Court.[2]

B.      By December 15, 2007, AstraZeneca will identify all Florida Plaintiffs who (1) have not already submitted a materially complete PFS or (2) have not produced responsive documents requested in the PFS.  This list shall specify any alleged deficiencies for each Florida Plaintiff.[3]

C.      All Florida Plaintiffs who have not already submitted materially complete Plaintiff Fact Sheets consistent with Case Management Order No. 2 shall do so by January 15, 2008.

D.      All Florida Plaintiffs who have not already produced to AstraZeneca all documents in their possession responsive to the document requests set forth in the PFS shall do so by January 15, 2008.

E.      Seventy-five cases of Florida Plaintiffs shall be selected for limited case-specific discovery, subject to the same procedures and rules that govern the current Limited Case-Specific Discovery Program except that depositions of doctors shall last 4 hours (2 hours per side).  Plaintiffs shall select 25 cases by January 15, 2008, and AstraZeneca and the Court shall each select 25 cases by January 25, 2008.  These 75 cases shall hereafter be referred to as the

---

[2] The parties have already complied with this section in anticipation of the Court's entry of this Order adopting the Magistrate Judge's recommendations.

[3] AstraZeneca has already complied with this section in anticipation of the Court's entry of this Order adopting the Magistrate Judge's recommendations.

"Discovery Pool." AstraZeneca shall produce discovery materials relating to sales representatives

and prescribing physicians consistent with CMO 4 two weeks after selection, and plaintiffs shall

have one week after production to identify one sales representative to depose.

  F. Limited Case-Specific Discovery of the Discovery Pool cases shall be completed

    by

April 15, 2008. The parties shall make appropriate use of the SM-PMO to carry out all of the

Florida case discovery. As noted above, the existing case-specific discovery program ended

November 30, 2007.

  G. Out of the cases in the Discovery Pool, 30 cases shall be selected for full discovery.

Plaintiffs shall select 15 cases by April 22, 2008; and AstraZeneca shall select 15 cases by April

25, 2008. These 30 cases shall hereafter be referred to as the "Initial Trial Pool."

  H. Full case-specific fact discovery in the Initial Trial Pool shall commence on April

28, 2008 and shall end on July 31, 2008.

  I. Subject to further consideration by the Court as to scope and limitations, all further

case-specific discovery in the Initial Trial Pool shall be conducted in accordance with the Federal

Rules of Civil Procedure, except that any Party may re-depose a witness who has already given a

limited case specific deposition, notwithstanding FRCP 30(a)(2)(B). Limited case-specific

depositions and any depositions repeated in the full discovery program shall count against the

limitation on the number (10 per side) of depositions included in FRCP 30(a)(2)(A).

  J. Depositions of sales representatives shall be limited to 5 hours.

  K. Either party may re-depose any witness who has already been deposed during

Limited Case-Specific Discovery.  Such a re-deposition will count against the noticing party's total limit.  The second deposition of a witness may be used as a *de bene esse* or trial deposition if noticed as such.

      L.     Except as set forth in this Order, all full case-specific discovery in the Initial Trial Pool shall be governed by the Federal Rules of Civil Procedure.  The parties will use their best efforts to accommodate the schedules of lawyers assigned to specific cases and/or expert fields.

      M.    By August 15, 2008, each plaintiff in the Initial Trial Pool shall identify and provide reports for all case-specific experts expected to testify at trial.  AstraZeneca shall be entitled to depose all such experts between September 15 and October 15, 2008.

      N.    By September 12, 2008, AstraZeneca shall identify and provide reports for all case-specific experts expected to testify at trials of cases in the Initial Trial Pool.  Plaintiffs shall be entitled to depose all such experts between September 15 and October 15, 2008.

      O.    Depositions of AstraZeneca's experts may occur before all depositions of plaintiffs'

experts are complete.  However, to the extent plaintiffs and AstraZeneca designate a general expert in the same field (*e.g.*, endocrinology), or a case-specific expert in the same field and in the same case (*e.g.*, a case-specific endocrinology expert for plaintiff John Doe), plaintiffs' expert shall be deposed before AstraZeneca's.

      P.    By October 31, 2008, the Parties shall file any *Daubert* motions related to general or case-specific experts in the cases selected for the Initial Trial Pool.  Responses to *Daubert* motions shall be filed November 24, 2008.  If such motions are filed, the Parties should indicate

whether an evidentiary hearing is requested, the basis for such request, and its anticipated duration.

Q.     Following completion of discovery in the Initial Trial Pool cases, the Court, after consultation with the parties, will determine how and before whom the cases should be scheduled for trial.

R.     Dispositive motions shall be filed by October 31, 2008.  Responses shall be filed by November 24, 2008.  If such motions are filed, the parties should indicate whether an evidentiary hearing is requested, the basis for such request and its anticipated duration.  If either party anticipates filing more than one dispositive motion or *Daubert* motion, it shall file a motion, complying with local Rule 3.01(g), seeking leave to do so at least 30 days in advance.  Any such motion shall provide a specific rationale for filing multiple motions and shall include pertinent information such as the anticipated timing of the motions, and the length and the nature of the supporting record.

S.     The Court shall hereafter establish a schedule for motions in limine, other pretrial requirements and trials.  The Court anticipates starting trials in February, 2009.

T.     All dates provided herein are subject to change by further Order of the Court; however, it would be an understatement to say that the Court is deeply distressed by the pace of this MDL to date.  Accordingly, the Court will look with great disfavor on any motions seeking to extend the deadlines established in this Order.

**DONE** and **ORDERED** in Chambers, in Orlando, Florida on January 11, 2008.

ANNE C. CONWAY
United States District Judge

Copies furnished to:

Counsel of Record
Unrepresented Parties

RECEIVED
CLERK'S OFFICE

2010 FEB 16  P 1: 11

JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

# Exhibit F

1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

Docket No.6:06-MD-1769-Orl-22DAB

. . . . . . . . . . . . ..
IN RE:                                    :
SEROQUEL PRODUCTS LIABILITY               :
LITIGATION                                :          Orlando, Florida
MDL DOCKET No. 1769                       :          November 18, 2009
                                          :          1:20 p.m.
ALL CASES                                 :
                                          :
. . . . . . . . . . . . ..:


TRANSCRIPT OF PRETRIAL CONFERENCE
BEFORE THE HONORABLE ANNE C. CONWAY
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For The Plaintiffs:              Larry M. Roth

                                 Camp Bailey

                                 Paul Pennock

For the Defendant

AstraZeneca:                     Fred Magaziner

                                 Stephen J. McConnell

                                 Robert Ciotti

                                 Chris Coutroulis

                                 Mike Brock

Court Reporter:  Sandra K. Tremel


Proceedings recorded by mechanical stenography, transcript

produced by computer-aided transcription.

2

```
 1                P R O C E E D I N G S
 2          THE COURT:  Case number 06-MD-1769, In Re:
 3    Seroquel Products Liability Litigation.
 4          Could we have appearances, please?
 5          MR. PENNOCK:  Paul Pennock, Weitz and Luxemberg
 6    for the plaintiffs.
 7          MR. ROTH:  Larry Roth for plaintiffs.
 8          MR. BAILEY:  Camp Bailey for the plaintiffs.
 9          MR. COUTROULIS:  Chris Coutroulis for the
10    defendants.
11          MR. MAGAZINER:  Fred Magaziner for AstraZeneca.
12          MR. CIOTTI:  Robert Ciotti for AstraZeneca.
13          MR. MCCONNELL:  Steve McConnell for AstraZeneca.
14          MR. BROCK:  Mike Brock for AstraZeneca.
15          THE COURT:  All right.  Who's going to speak for
16    AstraZeneca?
17          MR. BROCK:  I will.
18          THE COURT:  All right.  You filed the motion.
19    You can talk first.
20          MR. BROCK:  May it please the Court.
21    AstraZeneca appreciates the opportunity to discuss the
22    remand issues that are before us today.
23          What AstraZeneca is interested in is an orderly
24    remand that allows for some bellwether trials from a pool
25    of cases that would be randomly selected.  It would occur
```

3

1    in federal District Courts that we feel matter most to the

2    litigation.   That's sort of the criteria around which we

3    have organized what we hope Your Honor will consider in

4    terms of her remand plan.

5         The matters that we think are important in terms of

6    what happens from this point of time we think needs to be

7    considered in light of what has occurred to date.   And as

8    we stand here today talking about remand, I think it's

9    important to understand that this litigation is a little

10   different than other cases that we've seen in MDL

11   litigation in the sense that in this litigation, we have

12   vigorously litigated a number of specific cases but we've

13   yet to have a bellwether trial in the federal system or in

14   the -- any of the state courts where we are actively

15   litigating cases.

16        And so we feel like that in the coming months as

17   remands occur, what is really important is that bellwether

18   trials take place in venues that will matter to the

19   overall litigation.  And we have sought, Your Honor, to

20   develop a plan for Your Honor's consideration that would

21   help us to achieve that.

22        And so if I could, I'd like to just walk through some

23   of the things that we think would be important in a remand

24   plan as well as the reason that we think that this would

25   be a good way to proceed.

4

```
1        I might say at the outset that I think that we have

2   the rare circumstances here where the plaintiffs and

3   AstraZeneca agree on one common principle and that is that

4   the number of cases that we should be actively litigating

5   after remand should be in the range of 50 to 60 cases.

6        Their plan contemplates litigating 52 cases, one each

7   in the districts where they have filed cases.  Our plan

8   is, we'll talk about it in a few minutes, that we would

9   suggest to Your Honor, contemplates litigating in four

10  federal districts by randomly selecting 15 cases for each

11  district.

12       And what we've done, Your Honor, is gone into the

13  database and identified the four venues where the most

14  cases are pending.  So our plan is objective.  It allows

15  for the random selection of cases.  And as I'll discuss in

16  just a second, I think it gives us the best opportunity to

17  have some bellwether trials in the federal system that

18  will help us understand the inventory of cases that we're

19  working with at this stage of the litigation.

20       To the point of sort of the remand being orderly and

21  being in a few jurisdictions where we would concentrate on

22  a larger number of cases as opposed to a single case in

23  each jurisdiction where a case has been filed, I think

24  it's important to keep in mind how the litigation has

25  developed to date.  There are things about these cases
```

5

1    that are unique in terms of the profiles of the cases.

2        We see time after time when we take discovery that

3    really start drilling deep on the cases, we see many cases

4    where there's been an extreme amount of weight gain before

5    the plaintiff ever took the medicine; we see cases where

6    plaintiffs have all of the risk factors for the

7    development of diabetes before they ever took the

8    medicine; we see cases where patients have cycled, their

9    weight goes up and down before Seroquel, during Seroquel,

10   and after Seroquel.

11       We see cases, usually the case if the plaintiff was

12   on the medicine long enough to have a change in his

13   condition, that is, from being a nondiabetic to being

14   diabetic, if there's a temporal association between

15   ingestion and the development of diabetes, the plaintiff

16   has usually been on the drug for a good period of time.

17       And the reason that occurs is that the treating

18   physicians, when we depose them, say, "Well, the patient

19   was on the medicine for a long time because it was

20   working.  I stand behind the decision that I made in terms

21   of prescribing the medicine.  The risk benefit analysis

22   indicated that the medicine should be continued."

23       I mention these factors just to make the point that

24   what we know now from litigating a lot of the cases is

25   that a good number of the cases will fall by the wayside

6

1    as we litigate vigorously the cases.

2        And so to follow the plaintiffs' plan, which would

3    involve picking one case per jurisdiction, I don't think

4    helps us move cases to trial as our plan would which

5    involves selecting 15 cases in the four jurisdictions that

6    the most cases are pending in because we know many of the

7    cases are going to fall to the wayside.

8        So if we start out with some number, and Your Honor

9    may say, "Well, given the history of the litigation, I

10   don't think 15 is enough, I don't think we can get a case

11   to trial if we randomly pick 15," if Your Honor feels like

12   it should be more than that, then I think that's perfectly

13   appropriate to select a number that's more than 15.

14   Fifteen is the -- sort of the number that we suggest.

15       But the point would be to randomly pick these cases,

16   to put them in a trial pool, to send them to the

17   jurisdictions where the most cases are pending in the

18   federal jurisdiction.

19       And I just wanted to -- just as I walk through this,

20   just hand up sort of a handout.  May I approach?

21           THE COURT:  Yes.

22           MR. BROCK:  I think Judge Baker's in the back.

23   I'd hand one for him, too.

24       So Your Honor, as we --

25           THE COURT:  Celeste, I think he wanted that to

1    go back to Judge Baker.

2         MR. BROCK:  Your Honor, one thing I would say is

3    that as you look at the plan that we propose and if you

4    were to say, "Well I don't like the idea of four

5    districts, but I might be willing to consider something

6    more than that," five or six or seven, or whatever number

7    you thought was appropriate, we have the ability to pretty

8    quickly generate from the database the number of cases in

9    the various federal District Courts as the cases exist

10   today.  So we'd be happy to get, you know, any further

11   information to you that you might need to think about a

12   plan like this.

13        But the four District Courts with the largest number

14   of cases, if Your Honor were to do what you've indicated

15   before which would be to effect a remand with a

16   recommendation that the cases be sent to the venue where

17   they should have been filed, the four cases -- the four

18   districts where the most cases would reside would be the

19   District of South Carolina, the Southern District of Ohio,

20   the Southern District of Mississippi, and the Central

21   District of California.

22        And in the handout that I've handed up to Your Honor,

23   you can see the number of cases that are pending in each

24   of those federal districts; 376 in the District of South

25   Carolina, 318 in the Southern District of Ohio, 253 in the

1   Southern District of Mississippi, and 244 in the Central

2   District of California.

3       Now, I might add that not only are these the

4   districts where the most cases are pending, these

5   districts also represent venues that are in the circuits

6   where the most cases are pending.  So if you look

7   circuitwide at where are the cases pending, then these

8   venues represent the four circuits where the most cases

9   are -- for the four cases -- the most cases are pending.

10  So it also has the advantage appellatewise of capturing

11  something that I think will be meaningful to the parties

12  if there are appealed cases.

13      So, step one, I guess, in our plan would be for Your

14  Honor to look at this list or to look objectively at some

15  method to identify districts that would be meaningful to

16  the overall litigation.

17      Our second step would be for Your Honor to select

18  15 cases in each of the four districts to create an

19  initial trial pool which would constitute 60 bellwether

20  non-Florida cases.

21      And the idea would be to recommend to the federal

22  District Courts where these cases would ultimately be sent

23  to incorporate a protocol system similar to what we have

24  utilized here in Florida.  We would work those cases up,

25  we would move them through the system.  I have no doubt

9

1   that some will fall to the wayside as we move through the

2   process.

3       We think 15 would give us a chance to have at least a

4   few remaining by the time we got to motion practice.  We

5   would have the opportunity within these districts and

6   these states to test, as we've done here, case-specific

7   causation with a local judge sitting in the state where he

8   will be making the decision knowing that state law, and

9   we'll see what occurs with that.

10       If we're successful with all of those motions as we

11  have been so far in the MDL proceeding, as well as in

12  Delaware, and I'll get to that in just a minute, that

13  tells us something, I think, about the litigation, about

14  the -- about the inventory of cases that we're working

15  with.

16       On the other hand, if some of those cases survive

17  motion practice and move to trial, then we will have trial

18  results in a limited number of venues, but we'll have the

19  trial results, we'll have the benefit of knowing what

20  juries think about these cases.

21       We think it's really important that the selection of

22  the cases, whatever number it is -- and like I said, if

23  Your Honor feels like 15 cases is not enough, we ought to

24  put 20 or 25 in there if we're going to try to make sure

25  that we can move these cases to have a chance to get

10

1   through motion practice and trial, that would be fine with

2   us.  But it's a much better approach, we think, to pick a

3   larger number of cases in limited venues so that we can

4   move the cases to trial -- to motion practice and trial.

5        I contrast that with the plaintiffs' plan.  The

6   plaintiffs' plan is for them to unilaterally pick a case

7   in the 52 districts where cases are filed.  So, for

8   instance, as Your Honor knows, there are roughly 5,000

9   cases in Massachusetts.  Only four or five of those

10  plaintiffs actually reside in Massachusetts.  And their

11  idea would be they would pick one case in Massachusetts,

12  either one of those Massachusetts residents or someone

13  from Wyoming, and we would start working on that case.

14       Their program further contemplates that if for some

15  reason they didn't like the case, they didn't think the

16  case was going to survive motion practice, they could

17  dismiss it.  And at that point, we would have the ability

18  to advance a defense case in its place.  We would then

19  start over working up case number two in Massachusetts.

20       That case might -- that plaintiff might reside in

21  Wyoming or Hawaii or Washington state, but the idea that

22  they have would be to have the Massachusetts judge just

23  sit and decide the case.

24       Our experience tells us that if we do that, Your

25  Honor, it's not an objective way of selecting cases.  And

11

1   it's going to lead to all forms of mischief in terms of

2   attempts to venue shop, attempts to advance cases over

3   others.   The plaintiffs will be interested in what venues

4   are favorable to plaintiffs.   The defense side will be

5   interested in what venues are favorable to us.

6          These -- this bellwether trial system that I've

7   talked about is still sort of the most important issue in

8   the litigation at this point in moving these cases so that

9   we can have some trials.

10          And if you use a nonobjective system where the

11   plaintiffs just pick whoever they want to, and then we'll

12   later have to pick blind, and if it's a good case they can

13   dismiss that, and then we go to a third case, we could be

14   two or three years out before we ever get the first case

15   to trial in a particular district.

16          And our plan, which we think is objective and is fair

17   because it's based on the criteria of where the most cases

18   and what will have the most impact of the litigation, if

19   they dismiss cases 15, 14, 13, and 10, we're still, in a

20   simultaneous way, moving 10 cases forward on the docket so

21   that we can test those cases by summary judgment motions,

22   by *Daubert* proceedings, the different things that need to

23   be done in a case-specific way.

24          So we feel like if you look at their plan and you

25   look at our plan, ours is clearly the superior way to

1    proceed.

2        There's also something that's just basically unfair,

3    I think, Your Honor, about asking us to -- asking

4    AstraZeneca, my client, to litigate in 52 jurisdictions

5    when in many cases those 52 jurisdictions bear no relation

6    to where the plaintiffs live, where his physicians are,

7    where his family members are.  It's just go to the 52

8    where they filed and let them pick a case, and if they

9    don't like that case, they can dismiss it.  If we bring

10   one forward, you know, four or five months in discovery,

11   they can dismiss that, and, you know, here we go starting

12   over again.

13       Our plan will get us to the litigation of the issues

14   in the case in several federal District Courts I think in

15   the shortest -- in the shortest period of time.

16       The other thing is about 52 jurisdictions.  I mean,

17   here we are in a litigation where we have, as I've said,

18   vigorously litigated in the MDL proceedings in Orlando as

19   well as in Delaware, and not a single case has been

20   brought forward that can survive motion practice.  The two

21   cases where summary judgment's been entered here, and in

22   Delaware there were four cases put into the trial pool, a

23   summary judgment was entered on the first case that was

24   set for trial in Delaware and the other three have been

25   dismissed with no trial date forthcoming.

13

1      The other litigation that is very active right now is

2  New Jersey.  And in New Jersey we started with 18 cases.

3  Several of those were dismissed by the plaintiff.  We did

4  some substituting.  The bottom line is we looked at about

5  22 cases.  There are three left, and they're subject to

6  motion practice at the present time.

7      So we see what happens when we start testing these

8  cases one by one.  To think that we'll go out now with

9  that history and say, "Okay, we'll litigate one case here,

10 one case here, one case here" is just not going to be a

11 very efficient way of getting the cases decided.

12     Now one thing I think they'll probably say about

13 their system is, "Well, it's 52 jurisdictions, we'll get

14 more -- we'll get more looks at what's going on, we'll

15 have -- our clients will have the opportunity to get to

16 trial."  And they're entitled to that.

17     Your Honor, I would just remind you respectfully that

18 this is not like an individual case filed over a truck

19 wreck where someone has been injured and a plaintiff is

20 trying to get that case to trial.  The plaintiffs have

21 thrown in together, they've organized a mass tort.  And,

22 you know, if you think about this just in day-to-day

23 terms, if we were to have 50 trials a year starting today,

24 the New Jersey -- the case -- the cases that were filed in

25 Boston would take 100 years to try.  We're not -- you

1    know, it's unrealistic to think that all of these cases

2    and all these plaintiffs are going to get to trial in the

3    short-term.

4         The important thing is to focus on understanding the

5    litigation, litigating vigorously a few that will allow us

6    to get to a place where we have a better understanding of

7    the litigation than we do today.

8         So our plan in terms of step two is to select

9    15 cases in each of four districts and create the initial

10   trial pool.

11        And then step three just follows form on that, is

12   that we would ask Your Honor to instead of remanding

13   52 cases to individual venues, to send the 60 bellwether

14   cases to the transferor courts with a recommendation that

15   each case be transferred to the district in which the

16   plaintiff resides.  And then the transfers would result in

17   each of the four selected districts having 15 cases in

18   front of them.

19        And from there the -- I think it would be helpful if

20   as part of the remand order Your Honor would think about

21   including the procedures, the processes that have been

22   used in this Court that have been successful to bring

23   cases to resolution and have an understanding of the

24   litigation here.

25        Our step four, I think are a couple of ways of

1    looking at what to do in terms of our step four.  And I

2    guess the one thing I would like to say on behalf of

3    AstraZeneca, going back to what I started with, we are

4    interested, Your Honor, in a remand system that is orderly

5    and does not result in lawyers running from court to court

6    trying to manipulate which cases get to trial first,

7    trying to venue shop, trying to do things that are just

8    going to make the litigation much more difficult.

9        And so our suggestion is to consider a couple of

10   steps that I think would be helpful in ensuring not only

11   to the parties but to the judiciary that this occurs in an

12   orderly fashion, understanding that what -- we understand

13   that what you can do is make a suggestion about, you know,

14   about what to do in the future.

15       But our feeling is, is that if a remand of 52 cases

16   occurs all at once, that chaos is going to ensue, there's

17   going to be a lot of competition about, you know, where

18   the case is going to be tried, what judges, what state

19   laws, as opposed to this plan which will be more orderly.

20       And I think there are a couple of approaches Your

21   Honor could take to accomplish this and help the parties

22   and the judicial system.  One would be to take the

23   non-Florida cases and put them in an inactive status while

24   the trial pool cases are litigated.  That would be -- that

25   would be one option.  That would ensure that Your Honor

16

1    could address any issues that came up with regard to the

2    litigation at the conclusion of that series of trials.

3         A second option that we have thought about that would

4    be helpful and that we would suggest to the Court is that

5    the remaining cases could be stayed by this Court, that

6    is, other than the 60 that are randomly selected, and

7    remanded with the recommendation that the stays be

8    continued while the 60 bellwether cases are litigated, or

9    whatever number Your Honor feels would be the appropriate

10   number to litigate.

11        The second plan would have the effect of moving the

12   cases out of your court.  I think it has the disadvantage

13   probably of undermining the consistent and efficient

14   decision-making in the remaining cases by decentralizing

15   their administration, which we would much, much prefer

16   that this be done in a centralized orderly fashion.

17        So I guess just what I would say to Your Honor in sum

18   is that if we look at sort of remand plans and what is to

19   be done, the most important thing at this point in terms

20   of the litigation is to move some cases to trial, in the

21   direction of trial.  If the plaintiffs come forward with

22   cases are that trial-worthy and we try them and they don't

23   go well for us, that will tell us one thing about the

24   litigation.

25        If we get summary judgments in all, that will tell us

17

1    something else.  If we get summary judgments in some but

2    not all, and we go to trial and we do very well at trial

3    in terms of litigating the cases, that helps us to inform

4    us about the status of the litigation.

5          But one thing is very, very clear, that is, if we're

6    going to move these in an efficient way to move them to

7    trial in a reasonable period of time, we can't start with

8    one case in each jurisdiction.  We need to narrow the

9    field to a limited number of jurisdictions, litigate a

10   good number of cases, whether it be 15 or 20, or whatever

11   Your Honor feels is reasonable to litigate those cases,

12   bring them to a conclusion whether by summary judgment or

13   trial, and I think at that point, Your Honor, we'll be in

14   a place where we have a much better understanding of the

15   litigation.

16          THE COURT:  All right.

17          MR. BROCK:  Thank you.

18          THE COURT:  Mr. Pennock?

19          MR. PENNOCK:  Good afternoon, Your Honor.

20      May I proceed?

21          THE COURT:  Yes.

22          MR. PENNOCK:  Your Honor, the -- throughout the

23   papers that were filed on this motion and Mr. Brock's

24   discussion of defendant's position over the last

25   10 minutes or so, I found that there was one thing which

1    was strikingly missing, and that was the core issue that

2    really needs to be analyzed and the core question that

3    needs to be answered in this situation in an MDL, and that

4    is whether or not the work of the MDL has concluded.

5         I stood before Your Honor on April 22nd, a little

6    less than seven months ago, and indicated to the Court

7    that I believe that that work had concluded.  I believe

8    that Your Honor's -- with Your Honor's orders and the work

9    that has been done on the last seven months getting things

10   ready for remand, we are at the absolute cusp of finishing

11   anything that needs to be done in this MDL.

12        So it was a little surprising to me that that issue

13   was not addressed by the defendants because the MDL

14   procedure I think is very clear, and that is that once the

15   work of the MDL is concluded, and even perhaps beforehand,

16   the language as cited in our papers indicates even before

17   all pretrial proceedings are completed, if appropriate,

18   that remand of the cases shall occur.

19        I'm sure there are -- and I would suggest to the

20   Judge that there are two fundamental reasons for that.

21   The first one is a very practical but nevertheless very

22   important one, and that is that the -- in MDL procedure or

23   those that the structure that has been set up must take

24   into account that the court that is assigned the MDL, that

25   is saddled with an MDL, particularly one of this

1  complexity and enormity, should not be bound to that MDL

2  indefinitely, that that court should be not only allowed

3  but should in fact be directed to remand the cases when

4  that MDL is done, as cited in our papers.  I believe it's

5  the 7th Circuit that noted that the MDL procedures and

6  structures are not about attorneys continuing with full

7  employment indefinitely.

8      And I don't mean that in any disparaging facetious

9  way.  I think the court of the 7th Circuit was noting the

10  absolute fact that MDLs have a very important purpose.

11  They have throughout time accomplished that purpose very

12  well, as has this Court, but once that purpose is

13  accomplished, then the cases should move back to the

14  districts from which they were transferred with whatever

15  recommendations that the MDL court may make.

16      So I think that that is the first focus.  And if this

17  work is done here, and I certainly would suggest it is,

18  highlighted and underscored by the fact that no additional

19  discovery has been going on in terms of general matters

20  and that we are simply conducting the trial preparation,

21  so with the work being done, the cases should move back to

22  the transferor districts.

23      The second component that I think was missing from

24  the defendant's position, both in the papers and stated

25  here today, is the fact that there are thousands of

1    individuals, however unmeritorious they may think their

2    claims, that have cases pending and have had cases pending

3    in this MDL for several years.

4        It is the defendant's suggestion that those cases be

5    put on some administrative back burner here in this Court

6    and that all of those plaintiffs, with the exception of a

7    lucky few dozen, be -- remain here in Florida

8    indefinitely.  They have not indicated any time frame for

9    when those cases might be released to pursue their claims,

10   however unmeritorious they may think they are.

11       So I think that that is a fundamental -- or that

12   fundamentally is part of the MDL instruction or the MDL

13   structure that cases be remanded when the general work is

14   done because there is an underlying recognition of the

15   fundamental right of these individuals to move forward

16   with their claims.  And that, I think, is -- I think

17   that's clearly undermined by the defendant's proposal.

18       Let me, for a few minutes, talk about what our

19   proposal actually is.

20       First and foremost, Your Honor, our proposal last

21   April, and remains today, is that all of the cases should

22   be remanded.  The proposal that we suggested to the Court

23   was for a method by which they could gradually be

24   remanded, but as I think the Court can see from our

25   proposal, it was something -- it was such that all cases

21

1   are back in the transferor districts within a relatively

2   limited period of time.  We did not suggest that a -- that

3   merely 52 cases be remanded and that's it and everything

4   else be put on hold.

5       We believe that the work is done here and that these

6   cases should go back to the transferor courts, all of

7   them.

8       While we did propose a graduated remand procedure

9   over a period of several months, it's certainly we were

10  not limiting the cases to 52 cases.  And whatever pool may

11  be exist -- may exist in the transferor courts for

12  bellwether trials that the defendants, at least in their

13  papers and their argument today, seem to be very concerned

14  about, that pool will be the entire -- entirety of their

15  remanded cases, wherever they may go to.

16      So, Your Honor, I -- I do -- I do think that when

17  listening to the defendant's position, I believe that what

18  belies their position is the inherent conflicts in what

19  they have been urging.  On the one hand, the defendants

20  have urged repeatedly that they want to litigate these

21  cases, that these cases deserve to be litigated.  We have

22  heard again, as we've heard many times, the sort of broad

23  generalizations regarding all 6- or 8,000 cases that exist

24  in this MDL in terms of how they lack merit in

25  case-specific basis and therefore the cases should be

22

1  litigated.  But on the other hand, "We don't want to

2  litigate them.  We want to put them on administrative

3  leave for an indefinite period of time."

4      The defendants have additionally indicated that the

5  cases ultimately should not go to the transferor districts

6  or should not remain in the transferor districts, but all

7  of these cases should go to their home districts.  And yet

8  they say, "But not now."

9      When?

10  "We don't know.  Just hold onto the cases, we don't

11  want them going to the home districts now.  We only want

12  cases going to four home districts.  So even though they

13  should all be in their home districts ultimately, that

14  would create too much havoc."

15      That particular point was a little bit disturbing to

16  me.  They have said in their papers and they said again

17  here today that they are concerned about the judiciary,

18  they're concerned about the judicial system, they're

19  concerned about this volume being foisted upon all of

20  these other judges and courts.

21      Yet in New York state, they are seeking a dismissal

22  on basis of *forum non conveniens* of 7,000 cases, Seroquel

23  cases, that will then be scattered to the state courts

24  throughout the United States.  All of them.  We are

25  opposing that.

23

1      But it seems to me a bit unusual that they come here

2  and try to put the brakes on what should happen in this

3  Court, which is a resolution of the MDL, on the basis of

4  concern for the judicial system and judges being burdened

5  and attorneys having to run around in some type of

6  mischievous way trying to engage in venue selection and

7  whatever other selections they were alluding to, when

8  they're doing the exact -- they are seeking that in

9  New York state.  That motion is due to be filed this year,

10 before the end of this year.

11     And so I don't understand -- well, again, I suggest

12 to you that that conflict, like the other conflicts,

13 belies the position.  This MDL has done, as we all know,

14 an excellent job of bringing it to a conclusion.  It is at

15 a conclusion and these cases should be remanded.

16     Your Honor, upon remand of these cases to the various

17 districts in over whatever period of time that the Court

18 indicates or requires, these cases will go back to those

19 transferor courts, we will all be in front of those

20 transferor judges just as we are with many other types of

21 cases.  We will be establishing how the cases are going to

22 move case specifically.  The Court there, the transferor

23 Judge, will undoubtedly decide how he or she is going to

24 move the cases to trial, how cases are going to be

25 selected for trial.  And cases will proceed accordingly.

24

1       And this litigation will proceed, as the defendants

2   have asked that it proceed.  This litigation will move not

3   through any type of resolution process, and that's their

4   prerogative, but they -- this litigation will move through

5   a trial process.

6       We are ready for that.  We are prepared to move on

7   from this MDL, take all of the discovery that we've

8   conducted, take all the pretrial workup that we have done,

9   and move it out into the courts and begin to try cases.

10       I would suggest to Your Honor that what the defendant

11   is simply trying to do is keep 6,000 or more cases here in

12   Florida while it selectively litigates a very limited

13   number of cases.  And even though the defendants

14   themselves have said that the more limited number, the

15   less likely it is that anything will get to trial, they

16   nevertheless are the ones coming before the Court saying,

17   "Let's limit this number as much as we can.  Let's limit

18   it to maybe 15 cases.  Let's limit it so that we don't

19   have to fight the litigation that we have already declared

20   we want to fight."

21       So, Your Honor, as we've urged in April, and Your

22   Honor's taken the steps to conclude the MDL, plaintiffs

23   again request that all of the cases here be remanded to

24   their transferor districts so that we may move on with

25   this litigation in whatever form it may take and reach

1    trials in the cases.

2        Thank you, Judge.

3        THE COURT:  All right.  Well, this is what I'm

4    going to do.  As you know, I can only suggest to the panel

5    a remand.  I've been told that the panel does not do

6    limited remands.  They take the whole thing or nothing.

7        The suggestions that both of you have sort of ignored

8    the fact that first we have to convince the panel and then

9    a number of transferor judges, particularly Judge Gertner

10   who's going to get 5,000 of these plaintiffs.

11       So what I am going to do is suggest to the panel that

12   all the cases from outside the 11th Circuit be remanded to

13   the transferor court with a recommendation that the

14   transferor court retransfer to the districts of the

15   plaintiffs' residences those cases that are not cases in

16   their own home district.

17       The remand will include guidance to the courts which

18   eventually receive the cases, assuming Judge Gertner

19   decides that she wants to remand them since that's the

20   primary issue, at least the 5,000 she's getting.

21       But this is what I will recommend to her and all the

22   other transferor judges, that each court -- a final

23   jurisdiction be prepared for caseload management deciding

24   how the cases would be assigned within the district, how

25   many judges should be involved, whether a single

26

1    magistrate judge should be assigned for remaining

2    non-dispositive pretrial matters, choosing cases for final

3    trial and summary judgment preparation, and whether to

4    stay the remainder of the cases pending appeal of any

5    bellwether cases.

6        The remand will include a narrative of activity in

7    the MDL describing matters litigated and decided on a

8    global basis, general discovery, ESI issues, privilege,

9    confidentiality matters, things of that sort.

10       The remand will also include a summary of controlling

11   issues, preemption, learned intermediary, statute of

12   limitations, *Daubert*, other evidentiary rulings detailing

13   which issues have been globally decided and which require

14   application of state-by-state law.

15       The recommendation will have a recommended blueprint

16   for final pretrial discovery and motion practice for

17   individual cases selected for trial, to include suggested

18   limitations on depositions and individual discovery and

19   scheduled scope of pretrial motions, similar to how we've

20   done the Florida cases so far.

21       Some -- and the remaining cases, there are 12 cases

22   that were filed in Alabama, those cases I will ask Chief

23   Judge Dubina to designate me as the judge to handle those

24   cases.  And there are 42 cases which were filed here in

25   the Middle District of Florida that have nowhere to go but

27

1    to stay here.

2        So prior to the time that I send the suggestion of

3    remand to the panel, I'm going to require that you all

4    meet with the mediator to discuss whether there's any way

5    to settle this case because I think it will be important

6    to add in the suggestion of remand.

7        They can send it back to me and say, "You know, we

8    don't think you've done enough.  We want you to do this,

9    that, and the other thing."  Certainly MDLs are MDLs in

10   large part because they expect a settlement to come out of

11   it so I have to at least try to get you all to talk.  So

12   that would mean somebody from AstraZeneca with authority

13   to settle would have to attend the mediation.

14       So the suggestion will also probably recommend that

15   no one do anything with the other cases until I complete

16   discovery in the 42 cases -- 42 and 12 is 54 -- the 54

17   cases that I will be doing discovery on.

18       Now, in talking about those cases, I've noticed --

19   and I have a list.

20       Would you pass out the list?

21       These are cases that were filed in Alabama or

22   Florida.  These Florida cases, none of the 42 Florida

23   cases are Florida plaintiffs.  They're from all over the

24   country.  So in these cases I'm going to order that

25   answers be filed in each of these cases by December 1st.

28

1  And we will have case-specific discovery completed by

2  May 1st.  Dispositive motions by July 1st.  And then we'll

3  come up with a trial calendar.

4      These cases will either be tried by me, by another

5  judge in this district, or by a visiting judge.

6      We have a very strong history of visiting judges.  As

7  I'm sure you can imagine, judges love to come to Florida

8  and try cases.  I have people calling me daily asking to

9  come down here.  So I have the capacity to try a lot of

10 cases at once.

11     So that's my plan.  Any comments or further

12 suggestions?

13         MR. PENNOCK:  No, Your Honor, from the

14 plaintiffs.  Thank you.

15         THE COURT:  Okay.  So we will be teeing up

16 54 cases.

17         MR. BROCK:  Could I ask one point of

18 clarification?  I think I heard this right, but I just was

19 kind of taking some notes for planning purposes.

20     The order will reflect that we'll finish the

21 discovery and motion practice in the remaining Alabama and

22 Florida cases before we under -- the recommendation will

23 be before we undertake active discovery in the

24 remaining --

25         THE COURT:  I will recommend that they wait and

29

1    see what happens with these cases before.  Because we're

2    going to have -- and I don't know what I'm going to do

3    with them after I finish them because the summary

4    judgments, they're not 42 different states but just about.

5    These plaintiffs come from lots of places.  Alabama

6    cases --

7              MR. BROCK:  These are -- the non-Florida

8    residents that have filed in the State of Florida,

9    that's --

10             THE COURT:  Right.

11             MR. BROCK:  -- the group.

12             THE COURT:  Right.  And they have plaintiffs

13   from Alabama, California, Georgia, Illinois, Indiana,

14   Kansas, Maine, Massachusetts, Michigan, Minnesota, North

15   Dakota -- excuse me, North Carolina, North Dakota, Ohio,

16   Oklahoma, Pennsylvania, South Carolina, Tennessee, Texas.

17       So I will not decide whether to transfer those cases

18   to the place of the plaintiffs' residence until they're

19   all ready with summary judgments filed and everything.  No

20   sense in transferring something that isn't going anywhere.

21       All right?  And I can try those cases no matter where

22   they're from since they were filed here.

23             MR. ROTH:  Your Honor, what's the timeframe on

24   mediation?  By when?

25             THE COURT:  Well, I want you all within two

30

1   weeks to give me some -- to work out some dates.  So

2   you'll have to talk to the mediator.  And AstraZeneca will

3   have to get -- and I'm serious about somebody with

4   settlement authority.  And if you can't figure out who

5   that is, I'll have whoever the head honcho is come down.

6          All right?  Okay.  I'll see you all tomorrow.

7          (Proceedings concluded at 2:06 p.m.)

8                    C E R T I F I C A T E

9          I certify that the foregoing is a correct

10  transcript from the record of proceedings in the

11  above-entitled matter.

12

13  s\Sandra K. Tremel    November 23, 2009

14

15

16

17

18

19

20

21

22

23

24

25