# Exhibit 2

Page 1

```
        UNITED STATES DISTRICT COURT
         MIDDLE DISTRICT OF FLORIDA
             ORLANDO DIVISION
                                        X
IN RE: SEROQUEL PRODUCTS LIABILITY
LITIGATION

MDL DOCKET NO. 1769
                                        X
Harper-Howell v. AstraZeneca LP, et al.
[Kendra G. Harper-Howell 6:08-cv-06622]
                                        X
```

- - -

TUESDAY, FEBRUARY 23, 2010

- - -

Oral deposition of PRAVEEN MOOLAMALLA, M.D., held in the offices of Praveen Moolamalla, 1575 Heritage Drive, Suite 203, McKinney, Texas 75069, commencing at 8:58 a.m., on the above date, before Amanda J. Leigh, Certified Shorthand Reporter.

- - -

GOLKOW TECHNOLOGIES, INC.
deps@golkow.com
877.370.DEPS

8e7eaf97-e04b-4a79-84d1-d48c68011f44

Page 6

1  A. Sure.
2  Q. -- and make us come out with a
3  clean record. Okay?
4  A. Yeah.
5  Q. One of them is that I need for
6  you to avoid uh-huhs and huh-uhs.
7  A. Okay.
8  Q. This is going to feel like a
9  conversation; but if you can avoid that, that
10 will keep our record clean. Okay?
11 A. All right.
12 Q. The next thing that's going to
13 be important is for you to wait for me to
14 finish my question before you give your
15 response, and I'll try to do -- we're going
16 to mess up with that occasionally; but I'll
17 try to do the same thing, and that will also
18 help us keep it clear.
19 A. Got it.
20     MR. DAVIDSON: But he's closer
21 to the court reporter, so she can kick
22 him.
23     MR. BRUDNER: Yeah. Yeah, I
24 did move over one seat.

Page 7

1  BY MR. BRUDNER:
2  Q. In your prior deposition, what
3  was it about? Do you remember?
4  A. I think it was like more for a
5  divorce, family case, yeah.
6  Q. All right.
7      I'm going to show you what I'll
8  mark as Exhibit 1 to your deposition.
9      (Whereupon, Deposition Exhibit
10     Moolamalla-1, Notice of Deposition,
11     was marked for identification.)
12 BY MR. BRUDNER:
13 Q. Ask you if you recognize that
14 document.
15 A. Notice of deposition. I think
16 my office manager has seen this.
17 Q. Right. It's just the notice of
18 your --
19 A. Right, right.
20 Q. -- deposition that set up your
21 deposition.
22 A. Okay, yeah.
23 Q. Okay? I don't really have any
24 more questions about that.

Page 8

1      Let me ask you a little bit
2  about your education. Where did you do your
3  undergrad work?
4  A. I do it in India.
5  Q. In India?
6  A. Yes, what's called University
7  of Health Sciences.
8  Q. Okay. And then where did you
9  go to medical school?
10 A. In India.
11 Q. All right. What was that
12 called?
13 A. University of Health Sciences
14 Medical School.
15 Q. All right. And when did you
16 finish up?
17 A. 1989.
18 Q. Okay. And when did you come to
19 America?
20 A. 1989, December.
21 Q. Okay. And where did you start
22 practicing medicine in the United States?
23 A. Actually, I did my residency in
24 Chicago, 1993 to '97, and I came down here

Page 9

1  and start practice.
2  Q. What was the focus of your
3  residency in Chicago?
4  A. Psychiatry.
5  Q. Okay. And what was the
6  institution in Chicago?
7  A. University of Illinois in
8  Chicago.
9  Q. Okay.
10     Do you hold any board
11 certifications?
12 A. No.
13 Q. Okay. That's all I'm going to
14 ask you about your background. Maybe some
15 more questions will come up about it --
16 A. Sure.
17 Q. -- but I want to get into
18 Ms. Kendra Howell's case. Okay?
19 A. Okay.
20 Q. Do you see people at the
21 University of Behavioral Health?
22 A. Uh-huh, yes.
23 Q. Okay. And did -- let me ask
24 you this. Do you remember Ms. Kendra --

Praveen Moolamalla, M.D.

Page 10

1    A.   I do.
2    Q.   -- Harper-Howell?
3         You do? Okay. You have an
4    independent memory of her?
5    A.   Actually, I see her in my
6    office still.
7    Q.   Oh, still --
8    A.   Yeah.
9    Q.   -- okay. Excellent, excellent.
10   Well, that may make things easier as well.
11        Let me show you what I'm going
12   to mark as Exhibit 2 to your deposition.
13        (Whereupon, Deposition Exhibit
14        Moolamalla-2, Partial University of
15        Behavioral Health Chart, was marked
16        for identification.)
17   BY MR. BRUDNER:
18   Q.   And I'll tell you, the
19   University of Behavioral Health chart was
20   almost 300 pages, and so I've just pulled --
21   A.   Is that right?
22   Q.   -- I've just pulled some pages
23   out of it.
24   A.   Okay.

Page 11

1    Q.   And I apologize if
2    that's going to create any problem, but it
3    was just unmanageable.
4         Do you recognize this document,
5    doctor?
6    A.   Yes.
7    Q.   Okay. And it's labeled the
8    "UBH Interdisciplinary Treatment Plan,"
9    right?
10   A.   Right.
11   Q.   What does that mean?
12   A.   It's -- any patient that comes
13   into the hospital is -- a frequent flow plan
14   is formulated, so they're given what they're
15   here for, what the diagnosis is, what they're
16   trying to accomplish.
17   Q.   Okay. And that's what this is
18   for Ms. Harper-Howell, right?
19   A.   Yes.
20   Q.   Okay.
21        And do you see on the first
22   page, down towards the middle, it has a
23   problem list?
24   A.   Uh-huh.

Page 12

1    Q.   Is that a yes?
2    A.   Yes.
3    Q.   Okay. And is it accurate to
4    say that Ms. Harper-Howell's main health
5    issues on the date of her admission included
6    bipolar disorder and diabetes?
7         MR. DAVIDSON: Objection, form.
8    A.   And hypertension, yes.
9    BY MR. BRUDNER:
10   Q.   Okay.
11        Why was Ms. Harper-Howell
12   actually admitted?
13   A.   I believe it was for
14   depression, anxiety, and suicidal thoughts.
15   Q.   What does it mean under Axis V
16   that Ms. Harper-Howell's current GAF was 25?
17   A.   GAF is a global assessment of
18   functioning. It relates to the level of
19   functionality --
20   Q.   Uh-huh.
21   A.   -- like taking care of her
22   day-to-day activities, daily living, personal
23   hygiene, grooming. I guess in a way it's a
24   sense of functionality, you know. It's a

Page 13

1    rate scaling from 0 to 99. And when people
2    come, typically they're in the lower 20s, low
3    30s, I mean, they're not functioning very
4    well, and they're having trouble with their
5    symptoms --
6    Q.   Okay.
7    A.   -- or family issues that are
8    hampering their progress.
9    Q.   So the fact that
10   Ms. Harper-Howell's global -- I'm sorry, what
11   was that?
12   A.   Assessment of functioning.
13   Q.   -- global assessment of
14   functioning score was 25 means that she
15   wasn't functioning very well, right?
16   A.   That's right.
17   Q.   Okay.
18        Do you see that the pages are
19   numbered at the -- at the bottom?
20   A.   Yes.
21   Q.   Will you turn to page 59,
22   Bates -- Bates page 59?
23   A.   Fifty-nine. Oh, this number?
24   Q.   Yes, sir.

Praveen Moolamalla, M.D.

Page 14

1   A.  Okay, okay. I'm like....
2   Q.  At the top, the "Patient
3  Reported/Perceived Problems" --
4   A.  Yes.
5   Q.  -- do you see that?
6   A.  Yes, yes.
7   Q.  It includes Seroquel addiction,
8  right?
9   A.  Yes.
10  Q.  Do you recall what that was
11 about?
12  A.  That's the patient's perception
13 of what she's doing with the medication.  She
14 believed, I believe, at that time that she
15 was addicted to Seroquel, based on how it was
16 prescribed to her.
17  Q.  Okay.
18  A.  So that was a perception.
19  Q.  I see.
20      Now, when you say "based on how
21 it was prescribed to her," what -- what do
22 you mean by that?
23  A.  She felt that -- because this
24 was prescribed -- the Seroquel was prescribed

Page 15

1  to the patient by another physician, by her
2  family physician, and she had been on it for
3  a while, if I'm not mistaken, because that
4  was the first time I saw her in the hospital,
5  and she had mentioned that she was having a
6  very difficult time trying to get off the
7  Seroquel, because of -- her statement was
8  that she was told by her doctor she was
9  diabetic --
10  Q.  Okay.
11  A.  -- the primary care physician.
12 And one of the goals was, as we -- if I
13 remember correctly, we had talked about
14 tapering her off the Seroquel.
15  Q.  And what was the purpose of
16 tapering her off the --
17  A.  Because I believe her blood
18 sugars were uncontrollable, according to her,
19 and that she knew the risk with diabetes with
20 Seroquel, from what her family physician told
21 her.  So that's why she wanted to stop the
22 medication.
23  Q.  Okay.  So it's your
24 understanding that at the time she was

Page 16

1  admitted, she understood that Seroquel had
2  risks associated with diabetes.
3   A.  That's right.
4       MR. DAVIDSON:  Objection, form,
5   leading.
6  BY MR. BRUDNER:
7   Q.  But at any rate, when she was
8  admitted, Ms. Harper-Howell had a poor GAF
9  score and was on Seroquel, right?
10  A.  Well, the Seroquel is not
11 necessarily used for poor GAF.  It's used for
12 multiple reasons.  Bipolar disorders,
13 schizophrenia, those are the main two
14 indications --
15  Q.  Okay.
16  A.  -- yeah.
17  Q.  But the fact remains that when
18 she was checked into the hospital, she had a
19 low GAF --
20  A.  Oh, absolutely.
21  Q.  -- and she was on Seroquel.
22  A.  Right.
23  Q.  Okay.
24      Let's look at what I'm going to

Page 17

1  mark as Exhibit 3.
2       (Whereupon, Deposition Exhibit
3       Moolamalla-3, University of Behavioral
4       Health Progress Notes, was marked for
5       identification.)
6  BY MR. BRUDNER:
7   Q.  I'm handing you what I've
8  marked as Exhibit 3.
9   A.  Okay.
10  Q.  And these, I believe, are the
11 progress notes from the University of
12 Behavioral Health --
13  A.  Yes.
14  Q.  -- is that accurate?
15  A.  Yes, it is.
16  Q.  Okay.  Let's go back and do
17 these in date order, so we're going to have
18 to kind of go from the back --
19  A.  Back, okay.
20  Q.  -- to -- back to the front.
21  A.  All right.
22  Q.  Do you see that the last page,
23 the page with the Bates stamp number 15 --
24  A.  Fifteen, yes.

Praveen Moolamalla, M.D.

Page 18

1  Q. -- is from February 29th, 2008?
2  A. (Nods head.)
3  Q. Is that correct?
4  A. Yeah.
5  Q. And it --
6  A. Yes.
7  Q. -- has a stamped admit date of
8  February 26th, 2008, right?
9  A. Uh-huh.
10 Q. Okay. So Ms. Harper-Howell was
11 was admitted three days prior to this note
12 being taken; is that accurate?
13 A. That's right.
14 Q. Okay.
15     Let's look at the note. Is
16 this your handwriting?
17 A. It is.
18 Q. Okay. And can you tell me what
19 the objective report says?
20 A. It says that she is very
21 anxious and one of the visits we had was we
22 talked about medications and it was decided
23 to start reducing the Seroquel and substitute
24 that with Geodon.

Page 19

1  Q. Okay. Why did you decide to
2  reduce the Seroquel and substitute it with
3  Geodon?
4  A. Because I have to use something
5  different to treat her bipolar disorder, and
6  it's not good to just stop the medications.
7  It's good to ease in something and
8  cross-taper on something else.
9  Q. Why was Geodon the more
10 appropriate choice in your mind at that time?
11 A. At that time, I --
12     MR. DAVIDSON: Objection, form.
13 A. Can I --
14 BY MR. BRUDNER:
15 Q. Yes, you can answer.
16     MR. DAVIDSON: Sometimes I'll
17 make an objection --
18     THE WITNESS: Oh, okay.
19     MR. DAVIDSON: -- but you can
20 answer.
21     THE WITNESS: Okay.
22 A. At that time, I -- my thought
23 process was, since -- she had mentioned with
24 the diabetes and the risk of diabetes, and I

Page 20

1  was trying to taper her off the Seroquel, but
2  I had to use something else to get her mood
3  in control, rather, keep her stable. So my
4  thought process was let's try Geodon in
5  place of Seroquel eventually.
6  BY MR. BRUDNER:
7  Q. Okay. So is it fair to say
8  that, from your point of view, that Geodon
9  has a lower association with diabetes than
10 Seroquel?
11     MR. DAVIDSON: Objection, form.
12 A. I would say at this point, yes.
13 BY MR. BRUDNER:
14 Q. Okay. And that explains --
15 since Ms. Harper-Howell was admitted in a
16 condition where she had diabetes, that
17 explains the change from Seroquel to Geodon,
18 right?
19 A. That was --
20     MR. DAVIDSON: Objection, form.
21 A. -- the thought process at that
22 time, right.
23 BY MR. BRUDNER:
24 Q. All right.

Page 21

1     Let's move on through these to
2  the next page, which is a March 1st, 2008,
3  note; is that correct?
4  A. Uh-huh.
5  Q. Okay.
6  A. Yes.
7  Q. And will you tell me the
8  objective report portion of it?
9  A. Again, we talked about
10 medication. She was having withdrawal
11 symptoms, per her perception, you know. She
12 wouldn't be very specific, but I believe she
13 was still very anxious. But then we went
14 on -- I don't think we had anything different
15 with the medication --
16 Q. Okay.
17 A. -- yeah. We, I believe,
18 maintained the medication, if I'm not
19 mistaken.
20 Q. So is that what the --
21 A. Yeah --
22 Q. -- assessment/plan indicates?
23 A. Right.
24 Q. Okay.

Golkow Technologies, Inc. - 1.877.370.DEPS

8e7eaf97-e04b-4a79-84d1-d48c68011f44

Praveen Moolamalla, M.D.

Page 30

1    MR. DAVIDSON: Objection, form.
2    A.   If I could help it? Again, it
3  depends on -- again, it's a relative thing.
4  We have to weigh the benefits and risks of
5  medication and see if the benefits of
6  medicating somebody with a known risk of
7  diabetes with a drug is better off, in the
8  long-term, to control the symptoms.
9         So the answer to your question
10 is: in a perfect world, yes.
11 BY MR. BRUDNER:
12   Q.   Okay. And what you
13 described is a risk benefit analysis when
14 you -- when you go to prescribe a drug,
15 right?
16   A.   Yes.
17   Q.   Okay. And when you perform
18 such a risk benefit analysis, it's very
19 important for you to have accurate
20 information about the risks, right?
21       MR. DAVIDSON: Objection, form.
22   A.   It would definitely help.
23 BY MR. BRUDNER:
24   Q.   Certainly if there's an

Page 31

1  understated description of the risk with a
2  particular drug, that could put your patient
3  in danger, right?
4         MR. DAVIDSON: Objection, form.
5    A.   For information that we don't
6  know, yes.
7  BY MR. BRUDNER:
8    Q.   Okay.
9         I'm going to show you another
10 chart. Let me see what I got here. Oh. I
11 have the discharge summary. Let me show you
12 that.
13       (Whereupon, Deposition Exhibit
14       Moolamalla-4, Discharge Summary, was
15       marked for identification.)
16 BY MR. BRUDNER:
17   Q.   I'm going to show you what's
18 been marked as Exhibit 4 to your deposition,
19 doctor. Do you see that this is the
20 discharge summary from the University of --
21   A.   Yes.
22   Q.   -- Behavioral Health? Okay.
23       And the discharge date it shows
24 is March 6th, 2008, right?

Page 32

1    A.   Right.
2    Q.   And the final diagnosis, your
3  Axis I, is bipolar disorder --
4    A.   -- mixed.
5    Q.   -- mixed. What does that mean?
6    A.   Mixed meaning -- bipolar is
7  different kinds. There's a bipolar disorder,
8  depressed; there's a bipolar disorder, manic;
9  there's a bipolar disorder, mixed. And any
10 of these could be with psychotic features.
11       Mixed is where a person is
12 having severe mood instability. They go from
13 depression to anger to mania, hypomania.
14 They just can't seem to get their mood
15 straightened out.
16   Q.   Okay.
17       And then I notice your Axis III
18 note says stable. Is that accurate?
19   A.   Stable from a medical
20 standpoint, to be discharged home.
21   Q.   Okay.
22   A.   So she is not having any major
23 medical crisis at this time --
24   Q.   Okay.

Page 33

1    A.   -- that should warrant any
2  other hospitalization.
3    Q.   Okay. So could we gather from
4  that note that her blood sugar was under
5  control at the time of her --
6    A.   Not --
7         MR. DAVIDSON: Objection, form.
8    A.   -- necessarily.
9  BY MR. BRUDNER:
10   Q.   Okay.
11   A.   Not necessarily.
12   Q.   All right.
13   A.   But she's stable from a
14 psychiatric-medical standpoint to go home and
15 pursue her treatment goals.
16   Q.   Okay.
17       And then the Axis IV it says
18 moderate. What does that --
19   A.   Moderate stressors, family
20 stressors, financial stressors. That's her
21 perception of what her stress level is.
22   Q.   Okay. And then the Axis V is
23 that GAF --
24   A.   GAF.

Page 78

1  A. I believe, like I had mentioned
2  before, she was referred by her family
3  doctor, who apparently was the one who
4  prescribed her the Seroquel.
5  Q. Did you know how long she'd
6  been taking Seroquel?
7  A. No, I really don't know the
8  answer.
9  Q. Okay. And you don't know
10 whether Seroquel was effective for her in
11 treating her bipolar disorder?
12 A. I don't know because I've never
13 seen her prior to that.
14 Q. Did you ever prescribe her
15 Abilify?
16 A. No, not from my notes, I'm not
17 sure.
18 Q. Okay. And I'll show you some
19 prescription records here in a minute.
20 A. Okay.
21 Q. I didn't see a note there. I
22 just -- she testified yesterday that she was
23 prescribed Abilify and not Geodon, and I
24 just --

Page 79

1  A. Oh, I see.
2    MR. BRUDNER: Objection, form.
3  BY MR. DAVIDSON:
4  Q. But you never prescribed --
5  A. Not that I can remember.
6  Q. Okay.
7  A. If I did, I would have written
8  it in my notes.
9  Q. Okay.
10    We've seen a few instances in
11 the records that we've reviewed where she
12 told you she wanted to stop the medication or
13 she discontinued it on her own; is that
14 right?
15 A. I believe she discontinued on
16 her own without my knowledge; and when she
17 came back for a subsequent visit, she would
18 say, "I stopped taking this medication."
19 Q. Okay. And when she'd tell you
20 that, would you tell her to start taking the
21 same medication, or would you try to get
22 her --
23 A. No, I would ask her why. And
24 she would have said she may have a problem

Page 80

1  with that, so we probably put her on a
2  different medication.
3  Q. And she's been on a number of
4  different medications over the two years that
5  you've been seeing her?
6  A. Yes.
7  Q. You don't have -- you're not
8  here as any kind of expert witness, right?
9  A. I don't believe so.
10 Q. Okay. I don't believe so,
11 either, so we're fair.
12    And you don't have any opinion
13 about what caused Ms. Howell's diabetes; is
14 that fair?
15 A. I would say it's fair, because,
16 like I say, I've never known her before that.
17 Q. Right. You would have to look
18 at a lot of other factors and see what her
19 blood sugars were before Sero --
20 A. Before.
21 Q. -- before Seroquel.
22 A. See if she has any other risk
23 factors.
24 Q. Okay. Are you aware of any of

Page 81

1  the risk factors for diabetes?
2  A. Well, she's got hypertension,
3  so....
4  Q. Obesity is a risk factor for
5  diabetes?
6  A. Obesity, yes.
7  Q. When she came in to UBH in
8  February of 2008, did she tell you or did you
9  see in the notes anywhere that she had just
10 hired counsel and filed this lawsuit?
11 A. I have no idea. I mean, she
12 didn't tell me anything. In fact, the first
13 time I ever know is when I was asked to give
14 a deposition.
15 Q. I think you said earlier -- you
16 were asked some questions about diabetes, and
17 you said that it can be a lifelong disease if
18 it's not managed correctly. What does that
19 mean, to manage it correctly?
20 A. Well, it is a lifelong disease.
21 It's -- depending how well you control it.
22 Q. Okay.
23 A. You know, it can be controlled.
24 Not ever go away, but I think, within some

Praveen Moolamalla, M.D.

Page 178

1  BY MR. BRUDNER:
2      Q.   Okay.  Does it have anything to
3  do with the risk of diabetes associated with
4  Seroquel?
5      A.   Secondary to weight gain, yes.
6      Q.   Okay.
7          MR. BRUDNER:  I'll pass the
8  witness.
9          FURTHER EXAMINATION
10 BY MR. DAVIDSON:
11     Q.   Doctor, do you know one way or
12 the other whether Ms. Howell was actually
13 taking her Seroquel before she was admitted
14 to the hospital in February of '08?
15     A.   I would have no way of knowing
16 that.
17     Q.   Okay.  You don't know whether
18 she was compliant with her use of Seroquel
19 during the years before you began seeing her?
20     A.   I would have no information.
21     Q.   Okay.  And she's never been shy
22 about telling you when she's having
23 medication side effect or -- or stopping her
24 medication?

Page 179

1      A.   At least when she visits me,
2  yes.
3      Q.   Right.
4          She's never been somebody who's
5  been reluctant to tell you "I don't like
6  taking this medication.  I want to try
7  something new."
8      A.   Based on the history, yes.
9          MR. DAVIDSON:  Pass the
10 witness.
11         MR. BRUDNER:  No more
12 questions.
13         Thank you, Doctor, very much.
14         THE WITNESS:  Thank you very
15 much.
16         (Proceedings concluded at
17 11:37 a.m.)
18         (Per Federal Rules of Civil
19 Procedure, signature waived.)
20
21
22
23
24

Page 180

1          CERTIFICATE
2
3      I, AMANDA J. LEIGH, Certified
   Shorthand Reporter, do hereby certify that
4  prior to the commencement of the examination,
   PRAVEEN MOOLAMALLA, M.D., was duly sworn by
5  me to testify to the truth, the whole truth
   and nothing but the truth
6
       I DO FURTHER CERTIFY that the
7  foregoing is a verbatim transcript of the
   testimony as taken stenographically by and
8  before me at the time, place and on the date
   hereinbefore set forth, to the best of my
9  ability
10     I DO FURTHER CERTIFY that I am
   neither a relative nor employee nor attorney
11 nor counsel of any of the parties to this
   action, and that I am neither a relative nor
12 employee of such attorney or counsel, and
   that I am not financially interested in the
13 action
14
15
16
   _____
   AMANDA J. LEIGH, Texas CSR #3791
17 Certified Shorthand Reporter
   My Commission Expires. 12/31/2010
18 Dated. March 9, 2010
19
20
21
22
23
24

Page 181

          _ _ _ _ _ _ _ _
          LAWYER'S NOTES
          _ _ _ _ _ _ _ _
PAGE   LINE

46 (Pages 178 to 181)