# Exhibit 9

Page 1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

IN RE:  Seroquel Products         *
Liability Litigation, MDL         *
DOCKET NO. 1769                   *
                                  *

This document relates to:

Harper-Howell v. AstraZeneca,
LP, et al.
[Kendra G. Harper-Howell 6:08-cv-00622]

**********************************************************

ORAL DEPOSITION OF

DANIEL LENNARD CRESON, M.D.

**********************************************************

ANSWERS AND DEPOSITION OF DANIEL CRESON, M.D., produced as a witness at the instance of the Defendants AstraZeneca Pharmaceuticals, LP and AstraZeneca, LP in Coordinated Discovery, taken in the above-styled and -numbered cause on the 20th day of March, 2010, A.D., beginning at 8:15 a.m., before Kelly Hassell, a Certified Shorthand Reporter in and for the State of Texas, in the offices of North Texas Psychiatry, located at 914 North Locust Street, Denton, Texas, in accordance with the Federal Rules of Civil Procedure and the agreement hereinafter set forth.

Daniel Lennard Creson, M.D.                                    March 20, 2010

**Page 22**

1  Q  Okay. And what is bipolar disorder?
2  A  Bipolar disorder is a diagnosis which has
3  supplanted the old diagnosis of manic depressive disorder.
4  When bipolar -- when bipolar disorder was included in the
5  place of manic depressive disorder, the definition for
6  bipolar disorder was expanded rather dramatically.
7         Bipolar disorder is now represented in the
8  diagnostic nomenclature as a metabolic disease in which
9  people have affective or emotional changes that may either
10 be recurrently one type or another or may represent both an
11 elevated affective state and a depressed affective state.
12 It can be one -- it can be one way or the other way or both
13 ways, and as a result, it becomes harder and harder to
14 really define exactly what it is.
15 Q  I believe she also had a diagnosis for PTSD, at
16 least for a period of time. Did you see that in the
17 records?
18 A  I did see that in the records.
19 Q  And can you just tell us briefly what PTSD is.
20 A  Post-traumatic stress disorder is a condition
21 which is defined as a change in emotion and cognition that
22 is the direct result of a traumatic event, a traumatic --
23 and it has extended over a certain period of time. A
24 traumatic event may vary from individual to individual and
25 is not well-defined in the nomenclature.

**Page 23**

1  Q  I also saw a diagnosis for mixed personality
2  disorder or personality disorder not otherwise specified.
3  Did you see that in the records?
4  A  I did.
5  Q  And what does that mean?
6  A  There are a variety of personality disorders.
7  When you put NOS after it, you're saying you can't decide
8  which category it goes in. It ranges everything from
9  paranoid to sociopathic to withdrawal, social isolation.
10 There's all kinds of different categories of personality
11 disorders.
12 Q  Okay. In your review of the records, did you
13 have a sense for which category you were considering her
14 for or did you have a sense for that at all?
15 A  No.
16 Q  Okay. Doctor, you're aware in this lawsuit that
17 Ms. Harper-Howell is claiming that she developed diabetes
18 as a result of taking Seroquel; did you have an
19 understanding of that?
20 A  I have been told that. I have no firsthand --
21 Q  Sure?
22 A  -- information about it.
23 Q  She never talked about that with you?
24 A  I've never -- I haven't seen the lady since I saw
25 her then and she certainly didn't talk about it to me at

**Page 24**

1  that time.
2  Q  You don't know when she was diagnosed with
3  diabetes?
4  A  No, I don't.
5  Q  Do you know if she was taking Seroquel at the
6  time she was diagnosed with diabetes?
7  A  No, I don't.
8  Q  You don't have any opinion about whether Seroquel
9  did or didn't cause her diabetes; is that correct?
10 A  I have no way to know.
11 Q  Okay. Doctor, it looks like you started seeing
12 Ms. Harper-Howell in about August of 2004. Before that,
13 she had been seen by a Dr. Meena Vyas?
14 A  Okay.
15 Q  Do you recall why you would have started seeing
16 Ms. Harper-Howell instead of her staying with Dr. Vyas?
17 A  I don't know the answer to that question. I
18 know that Dr. Vyas took over the ACT team at one time and I
19 don't know -- I'm purely speculating that that might have
20 been the reason.
21 Q  Okay. And Dr. Vyas had been prescribing Seroquel
22 to Ms. Harper-Howell since April of 2002; did you see that
23 in the records?
24 A  I saw that she had in the past been prescribed
25 it. I don't know the dates.

**Page 25**

1  Q  Okay. And do you recall your first visit with
2  Ms. Harper-Howell?
3  A  I don't recall any of my visits.
4  Q  Okay. Let me go ahead and show you what I'll
5  mark as Exhibit 2.
6     (Exhibit Number 2 was marked.)
7  Q  (BY MR. DAVIDSON) Okay. Doctor, looking at this
8  record, what's this -- what's this form called? What's
9  the --
10 A  There's a form?
11 Q  Yeah.
12 A  Which form? There are two forms here.
13 Q  Oh, there are two forms? Okay.
14 A  One of them looked -- I'm reading from the top of
15 the list -- "Texas Implementation of Medication Algorithms,
16 Outpatient Clinic Visit" --
17 Q  Okay.
18 A  -- "Clinical Record Form."
19 Q  Are these forms you would fill out while you were
20 seeing a patient or shortly after?
21 A  Yes.
22 Q  Okay. And on the very first page, it's got the
23 date there, August 25th, 2004. Is this your handwriting?
24 A  Yes.
25 Q  And it says, "Current diagnosis, diagnosis is

Page 58

1  A  I do not.
2  Q  Okay. And this information in that subjective
3  section, that's information she was reporting to you,
4  right?
5  A  That was information she was reporting to me or
6  someone else was, but it seems in this case she was.
7  Q  Okay. And you didn't have any way to verify
8  whether this was true with regard to the issues she had
9  with the police?
10 A  No.
11 Q  So you don't know, for example, if she was the
12 one who was actually shoplifting?
13 A  I don't.
14 Q  The next scheduled appointment date was
15 December 22nd, 2005; is that right?
16 A  Yes.
17    (Exhibit Number 15 was marked.)
18 Q  (BY MR. DAVIDSON) Okay. Doctor, it appears the
19 last time you saw her was actually in January of '06. I'll
20 hand you what I've marked there as Exhibit 15.
21 A  Yes.
22 Q  Okay. On this visit, what was the
23 medication that she was taking?
24 A  The same, 200 milligrams of Seroquel, three a
25 day, and Paxil, 20 milligrams, one in the morning.

Page 59

1  Q  Okay. Now, this one has the number assignment
2  100 next to Seroquel. What does that mean?
3  A  There was 100 tablets dispensed.
4  Q  Okay.
5  A  And the four does appear to be the number of
6  refills.
7  Q  And how many pills was she taking a day? Just
8  three?
9  A  Three.
10 Q  Okay. It says, "Client in much better
11 spirits" -- "much better spirits. She has not heard from
12 police. Ex-husband is out of the picture at present. She
13 has also been able to obtain a car and this will resolve
14 her transportation issues"; do you see that?
15 A  I do.
16 Q  Okay. It indicates, "Compliant with meds."
17 Does that mean that she was reporting to you that she was
18 taking her medications?
19 A  That's what it means.
20 Q  Okay. What does it say after that, "Compliant
21 with meds"?
22 A  "Father has become her payee."
23 Q  Okay. Do you have a sense of what that means?
24 A  Yeah, the Social Security check goes to her
25 father.

Page 60

1  Q  Okay. Do you have any sense for why somebody
2  would do that?
3  A  Because they were felt to be incompetent to
4  handle their money themselves.
5  Q  In the O section, it says, "Appears happy and
6  pleased with current situation." It also says, "No
7  psychotic signs, well-oriented"; do you see that?
8  A  I do.
9  Q  And I read that right?
10    Let me ask you this: Why would you put
11 down, "No psychotic signs"?
12 A  Because she was, at that point in time, not
13 overtly psychotic.
14 Q  Okay. Did that give you a sense that the
15 medication she was taking was effective for her?
16    MR. BLIZZARD: Object to form.
17 A  That would be my opinion, yes.
18 Q  (BY MR. DAVIDSON) Okay. The P section, what did
19 you write there?
20 A  "Discontinue the med box. Continue her current
21 meds. Med check, four weeks. Follow up, 12 weeks or
22 before."
23 Q  Why would you discontinue the med box?
24 A  Because it -- I mean, I don't know why in this
25 case, but -- but the usual reason would be because you felt

Page 61

1  somebody can now handle their own medicines in an
2  appropriate way without being so closely monitored.
3  Q  Okay. And there's a weight reading at the bottom
4  of this; is that right?
5  A  Yes.
6  Q  Okay. Would you actually weigh patients or is
7  that somebody on the --
8  A  I would ask a nurse to do it.
9  Q  It indicates there's also blood pressure taken
10 and pulse?
11 A  That's correct.
12 Q  Okay. Was that a part of -- a part of your
13 practice, at least during this time period, to monitor
14 patients for those kind of vital signs?
15 A  The vital signs were usually done by the nurses
16 when the patients came in, as I recall, where they
17 recorded that or, you know, they have nurses' notes and so
18 forth.
19 Q  Okay. Doctor, it appears the next visit
20 scheduled was for April of 2006; do you see that?
21 A  Yes.
22 Q  Okay. Doctor, I actually think that was the last
23 time you saw Ms. Harper-Howell.
24    (Exhibit Number 16 was marked.)
25 Q  (BY MR. DAVIDSON) Let me just hand you what I've

Page 62

1  marked as Exhibit 16.
2     A   Okay.
3     Q   And again, none of these are your notes, are
4  they?
5     A   They are not.
6     Q   Okay. Those -- these are notes by the nursing
7  staff?
8     A   It appears so.
9     Q   Okay. You see the middle of this -- I
10 apologize -- is a difficult to read. Do you see February,
11 I believe, 15th, '06?
12    A   February 15th, '06, yes.
13    Q   It says, "NCNS." What does that stand for?
14    A   I have no idea. No show, I guess, would be the
15 NS. NC --
16    Q   No call, no show?
17    A   No call, no show.
18    Q   And then on April 19th, '06, it says, "NCNS for
19 appointment with Dr. Creson"?
20    A   Which date? Oh, yes. Okay.
21    Q   And that was the date that you had been scheduled
22 to see her on that last record, right?
23    A   Right.
24    Q   Okay. Then the next line is July 24th, '06?
25    A   Yes, it is.

Page 63

1     Q   "Client hasn't seen doctor in six months. PCP
2  Perry has prescribed meds until now." Do you know a
3  Dr. Perry?
4     A   No.
5     Q   It says, "But," and there's a, "decreased
6  Seroquel to" --
7     A   "One at night."
8     Q   -- "one at night." It says, "Client not
9  sleeping, anxious, irritable. Made appointment to see
10 Dr. Creson July 26th, '06." Do you see the next line says,
11 "July 26th, '06, no call, no show doctor appointment.
12 Letter mailed"? Do you have a recollection of what the
13 practice was or is at the MHMR about sending a letter to
14 patients if they don't appear?
15    A   I don't recall the specifics, but I know if they
16 miss so much time before they came in, they would be sent a
17 letter telling them they were being dropped.
18    Q   And what does it mean to be dropped?
19    A   That they would no longer be an active case.
20    Q   Let me ask you this: You were the psychiatrist
21 at MHMR who was seeing Ms. Harper-Howell in January of '06,
22 right?
23    A   Was it January of '06?
24    Q   As of that last record.
25    A   As of the last record, yes.

Page 64

1     Q   Okay. And then judging from this progress note,
2  she wasn't seeing anybody at MHMR, right?
3     A   That's the way it appears, yes.
4     Q   Okay. In fact, I'll just -- do you know a
5  Dr. Patel at MHMR --
6     A   I do.
7     Q   -- a psychiatrist? I believe there's actually
8  two.
9     A   There are.
10    Q   And we'll call this --
11    A   Actually, there used to be three.
12    Q   All right.
13    A   It says B. Patel?
14    Q   Yeah, Dr. B. Patel.
15        And he has testified in this case. This is
16 his evaluation performed on Ms. Harper-Howell in December
17 of '06?
18    A   Uh-huh.
19    Q   It indicates here that she has not seen anybody
20 at MHMR since your last visit there in January of '06,
21 okay?
22    A   Yes, sir.
23    Q   Dr. Vyas was a doctor at MHMR?
24    A   Dr. Vyas was and is.
25    Q   And she had been the psychiatrist who had seen

Page 65

1  Ms. Harper-Howell before you began seeing her, right?
2     A   Yes.
3        (Exhibit Number 17 was marked.)
4     Q   (BY MR. DAVIDSON) Doctor, do you have a sense
5  where patients were able to get prescriptions filled that
6  were written at MHMR?
7     A   The prescriptions are filled by a state pharmacy,
8  which is -- where is it? Is it in Terrell? I think it may
9  be in Terrell.
10    Q   So they should be getting their medication at
11 MHMR?
12    A   Yes.
13    Q   Okay.
14    A   Now, at times when there seems to be some reason
15 for it because of the time lag or whatever, MHMR would
16 authorize a prescription for a limited amount of medicine
17 at a local pharmacy.
18    Q   Okay. During the 2006 time period, should it
19 have been -- you should have been the doctor who would be
20 authorizing those prescriptions, right?
21        MR. BLIZZARD: Object to form.
22    A   All the ones I know of, yeah.
23    Q   (BY MR. DAVIDSON) Okay. I'll just hand you what
24 I've marked as Exhibit 18. It's prescription records we
25 received from a CVS Pharmacy.

Page 66

1  A  Uh-huh.
2  Q  Do you see the Seroquel prescription there in the
3  2006 time period?
4  A  Yes.
5  Q  And --
6  A  Let me see the dates on this thing.
7  Q  Where it says, "Date filled" --
8  A  Oh, I see it over there. Yes.
9  Q  And the prescribed listed there is Dr. Nina Vyas,
10 right?
11 A  It is.
12 Q  But you were seeing Ms. Harper-Howell during that
13 time period, not Dr. Vyas?
14 A  Dr. Vyas? Well, during -- in part of that time
15 period, that first one.
16 Q  Okay. Right.
17 A  I didn't see her these other times later.
18 Q  Right.
19    In looking at the MHMR records, it doesn't
20 appear she was going to MHMR at all during this time
21 period, does it?
22 A  No.
23 Q  Do you have any idea for how she would be able to
24 fill prescriptions with Dr. Vyas?
25 A  I have no idea.

Page 67

1  Q  Okay. And underneath Dr. Vyas' prescriptions,
2  there is a reference there to Dr. Perry, R.J. I asked you
3  before if you knew Dr. Perry. Seeing the first name there,
4  does that help you at all?
5  A  Well, Dr. Perry, I presume, is a primary care
6  physician.
7  Q  You don't know him at all?
8  A  Not a psychiatrist in this town that I know of.
9  He may be outside -- I mean, I don't know -- in Lewisville
10 or something, but he's not a psychiatrist in this town.
11 Q  Okay. Got you.
12    Doctor, do you know a Dr. Ramon Cruz?
13 A  No.
14    MR. DAVIDSON: You know what? Let's take a
15 short break.
16    (Break taken from 9:34 a.m. to 9:43 a.m.)
17    (Exhibit Number 18 was marked.)
18 Q  (BY MR. DAVIDSON) All right. Doctor, we're back
19 on the record after a short break.
20 A  Yes.
21 Q  Having looked at the medical records to prepare
22 for the deposition and then looking at them here during the
23 deposition, does it appear to you that Seroquel was
24 effective for treating Ms. Harper-Howell's mental illness?
25 A  It does appear to me that that's correct.

Page 68

1  Q  And do you have a sense in what way it was
2  effective?
3  A  In my opinion, this lady, in reviewing the
4  records, had such a high level of anxiety and ambivalence
5  at times related both to the circumstances she was in and
6  the depression and anxiety which she suffered as a result
7  of that that she could possibly have -- that the medication
8  was effective in terms of helping her to control that. The
9  choice of the medication in that regard was probably in
10 part the result of her history of self-medication and the
11 reluctance on my part and perhaps others' parts to
12 prescribe controlled substances to help regulate her -- her
13 ambivalence and anxiety.
14 Q  When you say her self-medication, what are you
15 referring to?
16 A  The fact that she did use street drugs at times.
17 Q  Okay. She was using marijuana?
18 A  Marijuana is documented.
19 Q  Were you aware or suspicious of other drugs that
20 she was using?
21 A  One has to be concerned when someone lives in a
22 household with people that are using other drugs such as
23 crystal meth or whatever.
24 Q  Had you ever heard of Seroquel having any sort of
25 street value or abuse potential?

Page 69

1  A  No. Seroquel is -- the only place I ever
2  know that Seroquel would be used in the streets is that --
3  is when people come down from crack cocaine or crystal meth
4  and use that to deal with some of their agitation.
5  Q  So was that a consideration for continuing
6  Ms. Harper-Howell on Seroquel?
7  A  What?
8  Q  The lack of abuse potential?
9  A  Yes, I presume so. I mean, again, I do not
10 recall this lady --
11 Q  Sure.
12 A  -- in terms of precision. I'm looking at the
13 record and presuming.
14 Q  Fair enough.
15    Having looked at the records, do you think
16 Seroquel is a good choice for Ms. Harper-Howell as far as
17 treating her mental illness?
18 A  It does appear that she was able to maintain some
19 stability through some very difficult times, and to
20 whatever the extent the Seroquel was helpful with that, I
21 would say it was helpful.
22 Q  Okay. Do you see any reference in the notes to
23 her complaining of side effects associated with Seroquel?
24 A  Not that I recall.
25 Q  Okay. She did report side effects with various

Page 86

1  Q  Okay. In fact, this form wouldn't have been the
2  first time that you'd become aware of that, right?
3  A  That's correct.
4  Q  In spite of having awareness of that potential
5  risk, you continued to prescribe Seroquel for
6  Ms. Harper-Howell?
7      MR. BLIZZARD: Object to form.
8  A  That's correct.
9  Q  (BY MR. DAVIDSON) You were asked some questions
10 about taking weight readings of patients at MHMR. Were
11 there nurses and physicians' assistants on staff who would
12 also assist in taking vital signs?
13 A  That's correct.
14 Q  So it wouldn't have fallen solely on you to take
15 those kind of vital sign readings; is that right? Is that
16 fair?
17 A  Yeah, that's fair.
18 Q  And as far as your prescribing habits now, you
19 indicated you prescribe Abilify more commonly because it
20 had the indication first; is that fair?
21 A  That's correct. Seroquel only recently got the
22 indication from --
23 Q  Right.
24     Just in December of last year?
25 A  Yeah.

Page 87

1      MR. DAVIDSON: Okay. Doctor, thanks for
2  your time.
3      THE WITNESS: Thank you.
4      (End of proceedings at 10:07 a.m.)

Page 88

1  STATE OF TEXAS )
2      I, Kelly Hassell, a Certified Shorthand Reporter in
3  and for the State of Texas, do hereby certify that,
4  pursuant to the agreement hereinbefore set forth, there
5  came before me on the 20th day of March, A.D., 2010, at
6  8:15 a.m., at the offices of North Texas Psychiatry,
7  located at 914 North Locust Street, in the City of Denton,
8  State of Texas, the following named person, to wit: DANIEL
9  LENNARD CRESON, M.D., who was by me duly cautioned and
10 sworn to testify the truth, the whole truth and nothing but
11 the truth, of his knowledge touching and concerning the
12 matters in controversy in this cause; and that he was
13 thereupon carefully examined upon his oath, and his
14 examination was reduced to writing under my supervision;
15 that the deposition is a true record of the testimony given
16 by the witness, same to be sworn to and subscribed by said
17 witness before any Notary Public, pursuant to the agreement
18 of the parties; and that the amount of time used by each
19 party at the deposition is as follows:
20     Mr. Davidson - 1 hour, 32 minutes;
21     Mr. Blizzard - 11 minutes;
22 I further certify that I am neither attorney or
23 counsel for, nor related to or employed by, any of the
24 parties to the action in which this deposition is taken,
25 and further that I am not a relative or employee of any

Page 89

1  attorney or counsel employed by the parties hereto, or
2  financially interested in the action.
3     In witness whereof, I have hereunto set my hand and
4  affixed my seal this ____ day of _____, A.D.,
5  2010.

_____
KELLY HASSELL, CSR No. 5729
Cert. Expires 12/31/11
Esquire Solutions
Firm Registration No. 286
1700 Pacific Avenue
Suite 4750
Dallas, Texas 75201
(214) 257-1436
(800) 852-9737
(214) 954-4111 (Fax)