Confidential - Mark S. Scott, Ph.D.

Page 318

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

- - -

IN RE:  SEROQUEL      : CASE NO.
PRODUCTS LIABILITY    :
LITIGATION            : 6:06-md-01769-ACC-DAB
                      :
MDL Docket No. 1769   :
ALL CASES             :

- - -

September 24, 2009

- - -

C O N F I D E N T I A L

- - -

Continued deposition of MARK S.

SCOTT, Ph.D., taken pursuant to notice,

was held at the offices of McCarter &

English, Renaissance Centre, 405 N. King

Street, Wilmington, Delaware, commencing

at 9:07 a.m., on the above date, before

Linda Rossi Rios, RPR, CCR and Notary

Public.

- - -

Golkow Technologies, Inc.
877.370.3377 ph/917.591.5672 fax
deps@golkow.com

Confidential - Mark S. Scott, Ph.D.

## Page 319

```
 1   A P P E A R A N C E S :
 2
 3       CRUSE, SCOTT, HENDERSON
         & ALLEN, LLP
 4       BY:  T. SCOTT ALLEN, JR., ESQUIRE
         7th Floor
 5       2777 Allen Parkway
         Houston, Texas 77019-2133
 6       (713) 650-6600
         sallen@crusescott.com
 7       Counsel for the Plaintiffs
 8
 9       DRINKER BIDDLE & REATH LLP
         BY:  KOOSHAN NAYERAHMADI, ESQUIRE
10       One Logan Square
         18th and Cherry Streets, Suite 2000
11       Philadelphia, Pennsylvania  19103
         (215) 988-2707
12       kooshan.nayerahmadi@dbr.com
         Counsel for Janssen
13
14
         COVINGTON & BURLING LLP
15       BY:  ROBERT C. ("MIKE") BROCK, ESQUIRE
         1201 Pennsylvania Avenue, NW
16       Washington, D.C.  20004
         (202) 662-5985
17       mbrock@cov.com
         Counsel for the Defendant, AstraZeneca
18
19
20
21
22
23
24
```

## Page 320

```
 1   A P P E A R A N C E S (cont'd.):
 2
 3       BARTLIT BECK HERMAN
         PALENCHAR & SCOTT LLP
 4       BY:  SEAN W. GALLAGHER, ESQUIRE
         Courthouse Place
 5       54 West Hubbard Street
         Chicago, Illinois  60610
 6       (312) 494-4428
         sean.gallagher@bartlit-beck.com
 7           and
         BARTLIT BECK HERMAN
 8       PALENCHAR & SCOTT LLP
         BY:  DONALD E. SCOTT, ESQUIRE
 9       1899 Wynkoop Street
         8th Floor
10       Denver, Colorado  80202
         (303) 592-3166
11       donald.scott@bartlit-beck.com
         Counsel for the Defendant, AstraZeneca
12
13
14
15
16
17
18
19
20
21
22
23
24
```

## Page 321

```
 1   A L S O  P R E S E N T :
 2
 3
         WEITZ & LUXENBERG, P.C.
 4       YOMMY CHIU
         CHELSEA DURGAN
 5       EILEEN SUGIARTO
         LAUREN TREADAWAY
 6
 7       MARIAM KOOHDARY, ESQUIRE
         mariam.koohdary@astrazeneca.com
 8       AstraZeneca
 9
10       CATHERINE SMALFUS, Videographer
11
12
                   - - -
13
14
15
16
17
18
19
20
21
22
23
24
```

## Page 322

```
 1                   - - -
 2            I N D E X
 3   WITNESS              PAGE NO.
 4   MARK S. SCOTT, Ph.D.
 5     By Mr. Brock      331, 822
 6     By Mr. Allen      461, 838
 7
 8              - - -
 9          E X H I B I T S
10   NO.     DESCRIPTION      PAGE NO.
11
12   Defendant's-132  Study 11,
                AZSER 25245598 -
13              5606, 5727 - 5730,
                7165 - 7170     331
14
     Defendant's-135  Study 135,
15              AZSER 20228435 -
                8446, 8562 - 8569,
16              9441 - 9448, 9475
                & 9476     331
17
     Defendant's-141  Clinical trial
18       report for trail  343
19   Defendant's-1059  Trial 5077IL/
                00399/8/06,
20              AZSER 17174756 -
                4774 & 4866     351
21
     Defendant's-146  9/27/05 Letter,
22              AZSER 16264039,
                4040, 4043 - 4062,
23              4217 - 4221     353
24
```

2  (Pages 319 to 322)

Confidential - Mark S. Scott, Ph.D.

---

Page 323

```
 1         E X H I B I T S (cont'd )
 2   NO        DESCRIPTION        PAGE NO
 3
     Defendant's-1060 7/20/05 Clinical
 4       Study Report,
         AZSER 18146493 -
 5       6501, 6627, 6628
         & 6631        356
 6
 7   Defendant's-1067 5/8/06 Clinical
         Study Report,
 8       AZSER 16833770 -
         3780, 3917 - 3924 374
 9
     Defendant's-1068 5/29/06 Clinical
10       Study Report,
         D339-L00719457-
11       00001 - 00010,
         00149 - 00155    377
12
     Defendant's-129 10/3/06 Clinical
13       Study Report
         Errata,
14       D339-L01035134-
         00001 - 00016,
15       00148 - 00150,
         00183 - 00187,
16       00189 - 00191 &
         00519         385
17
     Defendant's-126 6/19/07 Clinical
18       Study Report,
         AZSER 19028090 -
19       8102, 8312 - 8320 392
20   Defendant's-127 6/19/07 Clinical
         Study Report,
21       AZSER 12772674 -
         2687, 2898 - 2905 393
22
     Defendant's-1597 9/6/07 Clinical
23       Study Report
         Synopsis    405
24
```

Page 325

```
 1         E X H I B I T S (cont'd )
 2   NO        DESCRIPTION        PAGE NO
 3
     Defendant's-137 12/5/07 Clinical
 4       Study Report
         Errata List,
 5       D339-L01122418-
         00001, 00188 -
 6       00201, 00340 -
 7       00343        426
 8   Defendant's-138 1/17/08 Clinical
         Study Report
 9       Errata List,
         D339-L01122419-
10       00001, 00100 -
         00112, 00232 -
11       00235        426
12   Defendant's-139 11/20/07 Clinical
         Study Report
13       Errata List,
         D339-L01122420-
14       00001, 00164 -
         00177, 00308 -
15       00312        426
16   Defendant's-147 12/10/07 Clinical
         Study Report
17       Errata List,
         D339-L01122422-
18       00001, 00137 -
         00152, 00304 -
19       00308, 01327 -
         01336        426
20
21
22
23
24
```

Page 324

```
 1         E X H I B I T S (cont'd )
 2   NO        DESCRIPTION        PAGE NO
 3
     Defendant's-1596 2/14/08 Clinical
 4       Study Report
         Synopsis    406
 5
     Defendant's-1054 11/13/07 Clinical
 6       Study Report,
         D339-L01050706-
 7       00001 - 00013,
         00138 - 00154   411
 8
     Defendant's-1056 11/20/07 Clinical
 9       Study Report,
         AZSER 20720876 -
10       1048        411
11   Defendant's-1069 10/5/07 Clinical
         Study Report,
12       D339-L00809048-
         00001 - 00015,
13       00192 - 00212   416
14   Defendant's-1070 10/15/07 Clinical
         Study Report
15       Errata List,
         AZSER 26436260,
16       6616, 6424 - 6437,
         6614 - 6629 &
17       8528        420
18   Defendant's-145 4/1/08 Clinical
         Study Report,
19       D339-L01124072-
         00001 - 00018,
20       00211 - 00219   423
21   Defendant's-136 11/21/07 Clinical
         Study Report
22       Errata List,
         D339-L01122417-
23       00001, 00212 -
         00223, 00358 -
24       00363        425
```

Page 326

```
 1         E X H I B I T S (cont'd )
 2   NO        DESCRIPTION        PAGE NO
 3
     Defendant's-148 11/20/07 Clinical
 4       Study Report
         Errata List,
 5       D339-L01122423-
         00001, 00190 -
 6       00202, 00341 -
         00345, 01276 -
 7       01281, 01283 -
         01285        426
 8
     Defendant's-130 3/24/08 Clinical
 9       Study Report,
         AZSER 25249062 -
10       9070, 9193 - 9197,
         25251141 - 1146,
11       1167 & 1168    427
12   Defendant's-131 3/24/08 Clinical
         Study Report,
13       D339-L01124061-
         00001 - 00009,
14       00136 - 00139,
         AZSER 25247493 -
15       7576        427
16   Defendant's-133 4/9/08 Clinical
         Study Report,
17       D339-L01124830-
         00001 - 00012,
18       00153 - 00158 &
         05153        439
19
     Defendant's-140 1/29/08 Clinical
20       Study Report,
         AZSER 25196103 -
21       6120, 6242 - 6249,
         6310 - 6323 &
22       25203527    439
23
24
```

Confidential - Mark S. Scott, Ph.D.

Page 327

E X H I B I T S (cont'd)
NO.      DESCRIPTION      PAGE NO

Defendant's-1482 A 24-Week,
         Multicenter,
         Open-Label,
         Randomized Study
         to Compare Changes
         in Glucose
         Metabolism in
         Patients With
         Schizophrenia
         Receiving Treatment
         With Olanzapine,
         Quetiapine, or
         Risperidone   451

Defendant's-125  6/12/06 Clinical
         Study Report,
         AZSER 12441945 -
         2099       453
Scott-34   Handwritten notes   460
Scott-35   PowerPoint
         presentation   506

Scott-36   PowerPoint
         presentation   506
Scott-37   Letter to AstraZeneca
         from the FDA   530

Scott-38   Documents reviewed by
         Mark Scott   586
Defendant's-7   Seroquel label,
         D339-L00665059-
         00001 - 00046   617
Scott-39   6/22/07 Letter   618
Scott-40   Table 339   663

Page 328

E X H I B I T S (cont'd)
NO.      DESCRIPTION      PAGE NO

Scott-41   Integrated Summary of
         Safety,
         AZSER 10885949   721

Scott-42   FDA Science and
         Mission at Risk
         Report of the
         Subcommittee on
         Science and
         Technology   724
Scott-43   Seroquel (quetiapine)
         Clinical Trail report
         summaries   729
Scott-44   2/17/97 Memo,
         AZSER 10626743   735

Scott-45   8/13/97 Memo,
         AZSER 10612514 & 2515 740
Scott-46   (Skipped)   *
Scott-47   The long-term effect
         of quetiapine
         (SeroquelTM)
         Monotherapy on weight
         in patients with
         schizophrenia   789

Scott-48   Exhibit B   798

Scott-49   Commercial Support
         Team - Technical
         Document (TD004),
         AZSER 0747285 - 302   807

Page 329

E X H I B I T S (cont'd).
NO.      DESCRIPTION      PAGE NO.

Scott-50   A Randomized,
         Double-Blind,
         Placebo-Controlled
         Trial of Quetiapine
         in the Treatment of
         Bipolar I or II
         Depression article   812

Scott-51   12/2/02 Clinical
         Study Report   817
Defendant's-128  Clinical Trial
         Report
         International
         Approval Form,
         AZSER 16794723,
         4724, 4743 - 4748,
         4868, 7022 - 7043 832
(* - Skipped exhibits.)

- - -

Page 330

DEPOSITION SUPPORT INDEX

Direction to Witness Not To Answer

Page  Line  Page  Line

(None)

Request For Production of Documents
Page  Line  Page  Line
(None)

Stipulations
Page  Line  Page  Line
(None)

Questions Marked
Page  Line  Page  Line
(None)
- - -

4  (Pages 327 to 330)

Confidential - Mark S. Scott, Ph.D.

Page 331

1             - - -
2          VIDEOGRAPHER:  We are now
3    back on the record.  Today's date
4    is September 21 -- excuse me,
5    September 24, 2009, and the time
6    is 9:07 a.m.
7          This is day two, videotape
8    number one of the deposition of
9    Mark S. Scott, Ph.D.
10            - - -
11         (Exhibits Defendant's-132,
12    Study 11, Bates AZSER 25245598 -
13    5606, 5727 - 5730, 7165 - 7170 and
14    Defendant's-135, Study 135, Bates
15    AZSER 20228435 - 8446, 8562 -
16    8569, 9441 - 9448, 9475 & 9476,
17    were marked for identification.)
18            - - -
19         EXAMINATION
20            - - -
21    BY MR. BROCK:
22       Q.   Good morning, Dr. Scott.
23    Are you ready to proceed?
24       A.   Yes, I am.

Page 332

1       Q.   If you look at the screen
2    that you -- that we have there, do you
3    see that we have put up the pilot study
4    04 and study 06 and 08 on the slide?
5       A.   Yes, I do.
6          MR. BROCK:  And, Don, if we
7    could make those green as we
8    discussed yesterday.
9    BY MR. BROCK:
10      Q.   And you see we've now
11    changed the slide to show 04, 06 and 08
12    as green slides.  Correct?
13      A.   Yes, I do.
14      Q.   We discussed also yesterday
15    that Seroquel was approved in September
16    of 1997 for marketing in the United
17    States.  Correct?
18      A.   Correct.
19      Q.   And within the initial
20    label, there was information about weight
21    gain and cases of diabetes?
22         MR. ALLEN:  Objection.
23    Form.
24         THE WITNESS:  Yes, there

Page 333

1    were.
2    BY MR. BROCK:
3       Q.   Now, you described yesterday
4    that you have looked at the
5    placebo-controlled clinical trial data
6    with a view to whether or not there are
7    glucose changes within the trials.
8    Correct?
9       A.   Yes, I have.
10      Q.   Would you describe for the
11    jury the methodology that you utilized in
12    looking at the placebo-controlled
13    clinical trials?
14      A.   I relied on the clinical
15    trial reports for each clinical trial and
16    looked at the evidence with respect to
17    glucose that was collected in those
18    clinical trials, and there were two
19    basically pieces of information that I
20    looked at, changes from the baseline in
21    mean glucose for each of the clinical
22    trials as well as a portion of the
23    patients who shifted to a clinically
24    significant range.  So I looked at those

Page 334

1    pieces of information to make an
2    assessment about the changes in glucose
3    in that trial.
4       Q.   And then from there, what
5    did you do?
6       A.   I looked at -- in terms of
7    the means, I looked at the magnitude of
8    the changes relative to what's called the
9    standard deviation which is a measure of
10    how invariable those values are, as well
11    as proportion of patients who had shifts
12    in the clinically significant ranges.
13    And I looked at them in terms of whether
14    or not they were -- they were -- the
15    differences were the same, equal or
16    different.  And based on that, I arrived
17    at a conclusion of whether or not there
18    was statistical evidence to say that they
19    could be -- they were different or not.
20      Q.   Now, for 4, 6 and 8 we
21    talked yesterday about putting them in
22    the green category.  Correct?
23      A.   Yes, I did.
24      Q.   So what was your standard

5 (Pages 331 to 334)

Confidential - Mark S. Scott, Ph.D.

Page 335

1  for assigning a clinical trial the color
2  green?
3       A.  The standard for clinical
4  trial being green basically was that
5  there was no statistical difference in
6  terms of the means and no statistical
7  difference in terms of the shifters to
8  quote the significant ranges.
9       Q.  What was your conclusion
10  about the green trials?
11       A.  There was no evidence that
12  there was a difference between Seroquel
13  and placebo in terms of changes in
14  glucose.
15       Q.  Now, we haven't gotten yet
16  to -- strike that.
17            We've not talked yet about
18  any trials that you evaluated as yellow.
19  Correct?
20       A.  Correct.
21       Q.  But we will today talk about
22  some that you looked at where you would
23  evaluate the trial as a yellow trial?
24       A.  Correct.

Page 336

1       Q.  And then some that are
2  mixed?
3       A.  Correct.
4       Q.  So what was your standard
5  for assigning the color yellow in the
6  context of your review of the
7  placebo-controlled clinical trials?
8       A.  From a statistical
9  perspective, I wouldn't be saying they
10  were statistically different.  All I'd be
11  saying is the changes in the means were
12  larger on Seroquel than placebo and the
13  proportions of changes in terms of
14  shifters might have been higher to
15  warrant a further investigation whether
16  or not they were truly different or not.
17  So basically it was not green in terms of
18  having evidence -- potential evidence of
19  saying that one was higher in the means
20  and one was higher in the shifters.
21       Q.  Have you now given us your
22  definitions for the color green and
23  yellow as we will use them today in
24  discussing the placebo-controlled

Page 337

1  clinical trials?
2       A.  Yes, I have.
3       Q.  Briefly, could you describe
4  for the members of the jury why you
5  assessed 4, 6 and 8 as green?
6       A.  If you look at the evidence
7  from trials 4, 6 and 8 in terms of the
8  changes in means as well as the
9  proportions of patients who shifted to a
10  clinically significant range, there was
11  no indication from a statistical point of
12  view that the values that we saw in
13  Seroquel were different than what we saw
14  on placebo.
15       Q.  Now, yesterday we also
16  talked in detail from the clinical study
17  reports about studies 99, 100, 104 and
18  105.  Do you recall that?
19       A.  Yes, I do.
20       Q.  And we did not assign colors
21  to those yesterday on our timeline.
22  Could you, through your recollection or
23  through the use of your notes, tell us
24  what colors you would assign to 99, 100,

Page 338

1  104 and 105, and just briefly describe
2  the reasons for that?
3            MR. ALLEN:  Objection.
4  Form.
5            THE WITNESS:  All four of
6       those clinical trials I assigned
7       the color green principally
8       because the changes that I saw on
9       Seroquel were the same as or even
10       less than what I saw on placebo,
11       and there were very few shifters,
12       significant ranges on either
13       Seroquel or placebo across all
14       four trials.
15  BY MR. BROCK:
16       Q.  Now, do you see on our chart
17  there that we have a line through study
18  100?
19       A.  Yes, I do.
20       Q.  Was 100 a failed study?
21       A.  I believe trial 100 was one
22  of the clinical trials in that package
23  that failed to have Seroquel separate
24  from placebo in the efficacy assessments.

6 (Pages 335 to 338)

Confidential - Mark S. Scott, Ph.D.

Page 339

1    Q.   And why do clinical trials
2  sometimes fail?
3        MR. ALLEN:  Objection.
4  Form.
5        THE WITNESS:  In this
6  particular setting, especially in
7  treatment of patients with mental
8  illness, the tools that are used
9  to rate improvement are subject of
10  assessments by the clinician
11  relative to how the patient is
12  doing.  And it has been documented
13  not just by myself but FDA is
14  saying there's a large proportion
15  of clinical trials in the mental
16  health area that quite often fail
17  even with drugs that have proven
18  to be effective.
19        MR. ALLEN:  Object to
20  responsiveness.
21  BY MR. BROCK:
22    Q.   So today as we look at our
23  trials, would it be okay with you if we
24  put a line through studies that have

Page 340

1  failed?
2    A.   Studies that have failed to
3  meet their primary objectives in terms of
4  efficacy, that would be fine.
5    Q.   I want to turn your
6  attention now to trial 41.  Are you
7  familiar with that trial?
8    A.   Yes, I am.
9        MR. SCOTT:  Mike, would you
10  cover this before you move on, the
11  FDA approval?
12  BY MR. BROCK:
13    Q.   Before we go to trial 41,
14  were studies 99, 100, 104, and 105
15  submitted to the FDA as part of an
16  application for approval for bipolar
17  mania?
18    A.   Yes, they were.
19    Q.   And do we show on our screen
20  there that the FDA approved Seroquel for
21  use in bipolar mania in January of 2004?
22    A.   Correct.
23    Q.   Including that the medicine
24  was safe and effective for use in that

Page 341

1  patient population?
2    A.   Yes.  In fact, there were
3  two indications, uses in monotherapy as
4  well as an adjunct to lithium or
5  valproic.
6    Q.   Now let's turn our attention
7  to trial 41.  I would like to, if we
8  could, go back to Exhibit 335.  Can you
9  find that there?
10    A.   Exhibit 335.  Is that the
11  new stack or is that the --
12    Q.   It's in the old stack.
13    A.   I have it here.
14    Q.   That's not 335.  335 is the
15  agenda for the meeting on May 4, 2005.
16    A.   I apologize.
17        I have Exhibit 335.
18    Q.   Now, if you turn to page 11.
19  Excuse me.
20        Turn to page 10 of that
21  document.  Do you see there that it's a
22  slide that references trial 41?
23    A.   Yes, I do.
24    Q.   And to remind the jury, this

Page 342

1  is Seroquel safety review meeting that
2  took place in May of 2005.  Correct?
3    A.   Yes, it is.
4    Q.   And you attended that
5  meeting?
6    A.   Yes, I did.
7    Q.   What information is conveyed
8  in the top slide of this document with
9  regard to changes in plasma glucose?
10    A.   What I have here in terms of
11  plasma glucose is, I have the mean and
12  median changes for plasma glucose from --
13  for the various dose -- excuse me, the
14  various dose groups in trial 41.
15    Q.   And as a statistician, how
16  do you read the results?
17    A.   Well, I see -- what I would
18  need to rely on here, all I have here are
19  the mean changes.  I would want to go
20  back to the clinical trial report and
21  look at the variability that's associated
22  with these changes.  So I see the mean
23  changes, but I wouldn't be able to draw
24  any inferences on the basis of this

7 (Pages 339 to 342)

Confidential - Mark S. Scott, Ph.D.

Page 343

1  unless I had some other information which
2  is the variabilities associated with it.
3              - - -
4          (Exhibit Defendant's-141,
5          Clinical trial report for trail
6          41, was marked for
7          identification.)
8              - - -
9  BY MR. BROCK:
10     Q.   Look at Exhibit 141 which is
11  the clinical trial report for trial 41.
12  Do you have that?
13     A.   Yes, I do.
14     Q.   And would that be helpful to
15  you in answering the question about
16  changes in glucose?
17     A.   Yes, it will.
18     Q.   Please tell us what page you
19  are looking at.
20     A.   I'm looking at page -- when
21  you hold the page up, it would be on the
22  right-hand side, page 148, and it would
23  be Table 51.  And then later on it would
24  be Table 52.

Page 344

1      Q.   Do we have the right table?
2      A.   If that says Table 51 and
3  148, yes.  Again, I'm not good -- my
4  vision is not good enough to see that.  I
5  have this in front of me, though.
6      Q.   Looking at your document --
7      A.   Yes.
8      Q.   -- as a statistician, how do
9  you read the results with regard to
10  glucose changes?
11     A.   Well, I see changes in the
12  mean for each of the treatment groups,
13  placebo increases in the mean for
14  placebo, Seroquel at 300 milligrams XR,
15  Seroquel 600 milligrams XR,
16  800 milligrams of Seroquel XR.  I see a
17  decrease in the mean for 300 milligrams
18  of XR -- or IR rather, Seroquel, and an
19  increase in the mean for Seroquel
20  600 milligrams itself.  But I also see
21  very, very large variability of those
22  estimates, and I see medians which --
23  median changes which are pretty similar
24  across the treatment groups.

Page 345

1      Q.   Is there also information in
2  the clinical study report about shifters
3  on trial 41?
4      A.   Yes, there is.
5      Q.   Would you share with the
6  jury where that table is found?
7      A.   That would be on page 150
8  and Table 52.
9      Q.   As a statistician, how do
10  you read the results --
11     A.   Well, if I looked at --
12     Q.   -- with regard to shifters?
13     A.   If I looked at the placebo
14  group, 11.1 percent of patients had
15  shifts to a clinically significant range
16  across Seroquel.  The XR formulation or
17  SR formulation, there were 11 and a half
18  percent of patients who had a shift.  And
19  for Seroquel itself, there were 9 percent
20  of patients who had a shift.  So the
21  evidence there would be one where there's
22  no evidence that Seroquel is any
23  different than placebo in terms of
24  shifters in this trial.

Page 346

1      Q.   Based on your review of the
2  data in trial 41, how did you read the
3  results as a statistician from the
4  perspective of whether changes in glucose
5  were demonstrated in the trial?
6      A.   I would rate that there was
7  no difference between Seroquel and
8  placebo for either measures, so I would
9  associate that with the green.
10     Q.   Tell the members of the jury
11  why.
12     A.   That there -- in terms of
13  the shifters, there was no difference, in
14  terms of proportions of patients with
15  shifters between Seroquel and placebo.
16  And the mean changes differed among the
17  treatment group, but the variability was
18  so large that the outcome was essentially
19  the same.
20     Q.   You see that we have 41 on
21  the screen now designated as green with a
22  line through it?
23     A.   Yes.
24     Q.   Do you recall the results of

8 (Pages 343 to 346)

Confidential - Mark S. Scott, Ph.D.

Page 347

1  trial 41 from an efficacy standpoint?
2      A.   Yes, I do.
3      Q.   And what were the results?
4      A.   That this was, again, a
5  trial of the new formulation of Seroquel
6  XR versus Seroquel versus placebo in
7  schizophrenic patients.  And we failed
8  to separate -- to have consistent
9  separation between Seroquel and placebo
10  for either Seroquel XR or Seroquel in
11  this trial.
12      Q.   Was Seroquel tested in an
13  elderly population?
14      A.   Yes, we had two clinical
15  trials.  They were conducted in the early
16  2000s looking at patients with dementia
17  or dementia-related psychoses.
18      Q.   Do you see that I have put
19  on the screen now short-term ten weeks,
20  and there are two trials there, elderly
21  trial 39 and elderly trial 46?
22      A.   Yes, I do.
23      Q.   And was glucose data
24  collected from those trials?

Page 348

1      A.   Yes, it was.
2      Q.   Have you reviewed the
3  clinical trial reports for trials 39 and
4  46?
5      A.   I've looked at the glucose
6  data that was collected as well as the
7  summaries that were -- summaries that
8  were presented in those clinical trials.
9      Q.   Do you have some notes with
10  you today that might assist you in
11  testifying about the glucose values found
12  in the placebo-controlled clinical
13  trials?
14      A.   Yes, I do.
15      Q.   Would those be of assistance
16  to you in testifying today?
17      A.   Yes, they will.
18      Q.   Do you have notes about
19  trials 39 and 46?
20      A.   Yes, I do.
21      Q.   Would you share with the
22  jury what your findings were with regard
23  to glucose changes in trial 39?
24      A.   In trial 39, the glucose

Page 349

1  data that were presented in the clinical
2  trial report, you had decreases on
3  quetiapine in the trial period.  And
4  those decreases were larger than the
5  decreases that were seen on Seroquel.  I
6  didn't see any shifter's data in that
7  particular clinical trial report.
8      Q.   In terms of the changes that
9  you observed, could you just cite for the
10  jury what the changes were for Seroquel
11  versus placebo?
12          MR. ALLEN:  Let me object to
13      the form of the question under the
14      best evidence rule.  If he's going
15      to testify about what a report
16      shows, he needs the report, not
17      his notes.
18          MR. BROCK:  That's just an
19      objection to the form.
20          MR. ALLEN:  Object to the
21      form.
22          THE WITNESS:  The units were
23      millimoles per liter.  The
24      decrease in quetiapine in terms of

Page 350

1  mean decrease was a negative 0.15
2  units with a standard deviation of
3  2.29.  And the decrease on placebo
4  was minus 0.01 units, see a larger
5  decrease on the placebo.  And the
6  standard deviation for placebo was
7  2.57 units.  So on the bases of
8  that trial, there was no evidence
9  of an increase of Seroquel over
10  placebo, so give that trial a
11  green based on that evidence.
12          MR. ALLEN:  Let me object to
13      the responsiveness of the answer.
14      A continuing objection to the use
15      of the notes as form without the
16      production of the actual documents
17      on which the notes are based.
18          MR. BROCK:  Let me just
19      state for the record that we are
20      going to produce for you copies of
21      every one of these if you want
22      them, and you'll have access to
23      them.  And we will also offer them
24      into evidence.

9 (Pages 347 to 350)

Confidential - Mark S. Scott, Ph.D.

Page 351

```
1          There's your copy of the
2     clinical trial study report for
3     trial 39.
4          MR. ALLEN:  Thank you.
5     BY MR. BROCK:
6          Q.   And, Dr. Scott, I'm passing
7     it over to you, also.  Sir, I'll ask you
8     if that is the clinical trial report that
9     you reviewed in order to evaluate the
10    potential glucose changes in trial 39?
11         A.   This is obviously not the
12    complete clinical trial report, but it is
13    an excerpt that contains certain
14    information.
15              - - -
16         (Exhibit Defendant's-1059,
17    Trial 5077IL/00399/8/06, Bates
18    AZSER 17174756 - 4774 & 4866, was
19    marked for identification.)
20              - - -
21         MR. SCOTT:  Mr. Brock, it's
22    Exhibit 1059.
23         MR. ALLEN:  That's okay.  We
24    can do with this.
```

Page 353

```
1     you Exhibit 146 if you could reach that,
2     please.
3          MR. BROCK:  Pass one to Mr.
4     Allen.  Sorry about that.
5          MR. ALLEN:  That's okay.
6     That exhibit took on a life of its
7     own.
8          I hope I didn't do anything
9     to make you mad.
10         MR. BROCK:  It hydroplaned.
11         MR. ALLEN:  Thank you.
12         MR. BROCK:  Sorry about
13    that.
14         MR. ALLEN:  What is it?
15         MR. BROCK:  I'm sorry.  This
16    is Exhibit 146 that relates to
17    trial 46.
18              - - -
19         (Exhibit Defendant's-146,
20    9/27/05 Letter, Bates AZSER
21    16264039, 4040, 4043 - 4062, 4217
22    - 4221, was marked for
23    identification.)
24              - - -
```

Page 352

```
1     BY MR. BROCK:
2          Q.   Have you described for the
3     members of the jury your findings from
4     the review of the clinical study report
5     with regard to trial 39?
6          A.   Yes, I have.
7          Q.   Did trial 39 meet its
8     primary efficacy endpoint?
9          A.   This would be one -- I think
10    that both of these trials had issues in
11    terms of efficacy.  Trial 39 did not meet
12    its primary efficacy endpoint.
13         Q.   So from your perspective as
14    a statistician for AstraZeneca, would it
15    be appropriate to mark it as green and
16    draw a line through it as not meeting its
17    primary endpoint?
18         A.   Green for no evidence and
19    glucose changes between Seroquel and
20    placebo and a line through it in terms of
21    not meeting its efficacy endpoint.
22         Q.   Thank you.
23              Now, let's turn our
24    attention to trial 46.  I'm going to hand
```

Page 354

```
1     BY MR. BROCK:
2          Q.   Dr. Scott, did you review
3     excerpts from the clinical study report
4     for trial 46 to evaluate the issue of
5     glucose?
6          A.   Yes, I did.
7          Q.   And would you describe for
8     the members of the jury your findings
9     from your review of the clinical study
10    report of trial 46?  And, Dr. Scott, it's
11    fine for you to reference your notes if
12    you need to in your testimony.
13         A.   All right.  What I -- trial
14    46 had two doses of Seroquel and one
15    placebo group.  What I saw on the low
16    dose of Seroquel was a decrease in
17    glucose on Seroquel at 200 milligram --
18    200 milligram there's a slight increase
19    in glucose, and you had an increase in
20    placebo as well.  In terms of shifters,
21    you had only one shifter, and that was in
22    the 200 milligram Seroquel group.
23         Q.   As a statistician, how did
24    you evaluate the results of trial 46 with
```

Confidential - Mark S. Scott, Ph.D.

Page 355

1  regard to glucose?
2      A.   There was very little
3  evidence that there was a difference
4  between Seroquel and placebo in
5  changes -- changes in glucose in this
6  trial.  So this would be a green from a
7  point of view assistance.
8      Q.   I think you mentioned
9  earlier that trial 46 did not meet its
10 primary efficacy endpoint?
11     A.   Correct.
12     Q.   When we talk about studies
13 that didn't meet the primary endpoint,
14 are those studies nonetheless submitted
15 to the FDA?
16     A.   All of the clinical trial
17 data irrespective of all the outcome
18 are submitted to the FDA.
19     Q.   Let's turn our attention now
20 to the trial known as BOLDER I.  Are you
21 familiar with trial 49?
22     A.   Yes, I am.
23     Q.   Do you have some notes on
24 trial 49 that would be of assistance to

Page 356

1  you in discussing the issue of glucose
2  changes with the jury?
3      A.   Yes, I do.
4             - - -
5          (Exhibit Defendant's-1060,
6       7/20/05 Clinical Study Report,
7       Bates AZSER 18146493 - 6501, 6627,
8       6628 & 6631, was marked for
9       identification.)
10            - - -
11 BY MR. BROCK:
12     Q.   Do you have in front of you
13 now Exhibit 1060, which is the clinical
14 study report for trial 49?
15     A.   Yes, I do.  I have the
16 portion of clinical trial -- portions of
17 the clinical trial from study 49.
18     Q.   Have I furnished to you the
19 pages that were important to you in
20 evaluating potential glucose changes
21 within trial 49?
22     A.   Yes, you have.
23     Q.   Would you cite for the
24 members of the jury the tables that would

Page 357

1  be important to you in testifying about
2  trial 49?
3      A.   This would be Table 53 on
4  page 135 and Table 56 on page 139.
5      Q.   Describe for the jury as
6  we're pulling those up, what your
7  findings from those tables were with
8  regard to glucose.
9      A.   In this trial, you had two
10 doses of Seroquel, 300 milligrams a day,
11 600 milligrams a day, and also a placebo
12 group.  You saw a mean change of
13 3.19 milligrams per dL 300 milligrams, a
14 change of 5.9 units on 600 milligrams,
15 and a change of 3.8 units on placebo.
16 Each of them having a large degree of
17 variability attached to them.  And, in
18 fact, the mean change on placebo was
19 higher than the mean change on --
20 numerically higher than the mean change
21 on 300 milligrams.
22          In terms of shifters, there
23 were very few shifters overall.  There
24 were 2.6 percent on 300 milligrams,

Page 358

1  6.2 percent on 600 milligrams and
2  4.7 percent on placebo.  So there was a
3  rate that was higher, numerically higher
4  on placebo than 300 milligrams.
5          So looking at all of the
6  evidence from the point of view of means
7  and shifters, there wasn't any evidence
8  there with respect to the Seroquel was
9  having an effect relative to placebo.
10     Q.   So would this be in the way
11 that you have evaluated the trials for
12 our purposes today a green trial?
13     A.   I would classify this as a
14 green.
15     Q.   Now, do you see that we have
16 added to the screen BOLDER 49 and we've
17 colored it green now?  Do you see that?
18     A.   Yes.
19     Q.   Do you see just above that
20 we've labeled FDA class warning on
21 diabetes?
22     A.   Yes, you have.
23     Q.   Would you just describe in a
24 narrative way what happened with regard

11 (Pages 355 to 358)

Confidential - Mark S. Scott, Ph.D.

Page 359

1 to AstraZeneca's interaction with the FDA
2 in terms of a label change in early 2004?
3          MR. ALLEN: Objection.
4 Form.
5          THE WITNESS: The FDA asked
6 AstraZeneca, as well as other
7 sponsors of atypical
8 antipsychotics, to include as part
9 of the warning section of the
10 label a warning dealing with
11 diabetes, hyper -- and
12 hyperglycemia.
13 BY MR. BROCK:
14     Q.   Now, if you go back to
15 Exhibit 335 now.
16     A.   And this was the meeting?
17 Yes.
18     Q.   This was the meeting.
19     A.   Yes.
20     Q.   If you look at page 10, you
21 see that there's a discussion of trial
22 41?
23     A.   Yes.
24     Q.   And on page 18, there is a

Page 360

1 discussion of trial 49, the BOLDER trial
2 we were just discussing?
3     A.   Yes.
4     Q.   We discussed yesterday, did
5 we not, some of the problems with the
6 BOLDER trial in terms of evaluating
7 whether or not we were getting -- or
8 AstraZeneca was getting true fasting data
9 out of the trial?
10          MR. ALLEN: Objection.
11 Form.
12          THE WITNESS: Correct.
13 BY MR. BROCK:
14     Q.   Is there also a discussion
15 of trials 39 and 46 in this document?
16     A.   If you give me a second to
17 look, I'd have to see.
18     Q.   If look at page 14, is there
19 a description of trial 39?
20     A.   Yes, there is.
21     Q.   And then 46 is discussed on
22 page 16?
23     A.   Yes.
24     Q.   Through May of 2005,

Page 361

1 including the registration studies, the
2 studies for bipolar mania, the
3 schizophrenia XR study, the elderly
4 trials and the BOLDER trial 49, was there
5 any study where there was a difference
6 seen in your evaluation as a statistician
7 at AstraZeneca where there was a
8 difference between placebo and Seroquel?
9     A.   From my review of these data
10 up to that time, there was no evidence of
11 a difference between Seroquel and
12 placebo.
13     Q.   Now, let's move to a
14 discussion of BOLDER II, which is study
15 135. Do you have a stack of clinical
16 trials there in front of you?
17     A.   Yes, I do.
18     Q.   Is the first one the BOLDER
19 trial 135?
20     A.   I will -- if I move that, I
21 think I can see it. I might have moved
22 it, I apologize.
23     Q.   It's coming over to you.
24     A.   I got it. I got it.

Page 362

1     Q.   Dr. Scott, I want to reask
2 the question that I asked you a minute
3 ago, because I think I got lost in the
4 middle of it, just so we have a good
5 record on this.
6          Through May of 2005, was
7 there a trial conducted by AstraZeneca
8 with placebo as a control where your
9 opinion there was a difference with
10 regard to glucose between Seroquel and
11 placebo?
12     A.   No, there was not.
13     Q.   Do you have now study 135 in
14 front of you?
15     A.   Yes, I do.
16     Q.   And just so that we have a
17 frame of reference in terms of time, do
18 you see that on page 1 of that document,
19 there is a last patient completed
20 August 26, 2005?
21     A.   Yes, it is. Yes, there is.
22     Q.   Now, are you familiar with
23 the BOLDER trial?
24     A.   I'm familiar -- this is

12 (Pages 359 to 362)

Confidential - Mark S. Scott, Ph.D.

Page 363

1  BOLDER II which was a confirmatory trial
2  for the BOLDER I trial.
3      Q.   Trial 49 being BOLDER I.
4  Correct?
5      A.   Correct.
6      Q.   And now we're talking about
7  BOLDER II which is trial 135?
8      A.   Correct.
9      Q.   Are you familiar with the
10 study design of trial 135?
11     A.   Yes, I am.  The study design
12 of trial 135 was identical to the trial
13 49.
14     Q.   Just briefly, would you
15 describe that for the benefit of the
16 jury?
17     A.   The trial was two doses of
18 Seroquel versus placebo, again,
19 300 milligrams and 600 milligrams, with a
20 primary endpoint of looking at depressive
21 symptoms that are associated with bipolar
22 disorder.
23     Q.   Do you have before you now
24 the clinical study report for that trial

Page 364

1  with pages related to glucose changes
2  within the trial?
3      A.   Yes, I do.
4      Q.   So if you would, now, talk
5  to the jury about what your findings were
6  from trial 135 with regard to glucose?
7      A.   What I see here is I see
8  higher average changes on Seroquel, 300
9  milligrams which were 6.02, and for
10 Seroquel 600 milligrams it was 7.38, and
11 change on placebo of 2.9.  But, again,
12 variability, the standard deviations are
13 very, very large even though there are
14 larger mean changes, so there might be
15 some issues whether they're significant
16 or not.
17     Q.   So that the jury understands
18 what you're referring to there when you
19 say there's a large amount of
20 variability, what significance does that
21 have to you as a statistician looking at
22 this dataset?
23     A.   The importance of the
24 variants is it gives you a sense of how

Page 365

1  variable those averages are.  And if you
2  have a variance which is large relative
3  to the mean, that would mean that that
4  particular value could be any number of
5  values, depending on a variety of
6  circumstances.  So here for Seroquel,
7  300 milligrams, you have a mean change of
8  6.02, but you have a standard deviation
9  which is 22.35.  That's relatively large
10 relative to the mean change.
11     Q.   What is standard deviation?
12     A.   It is the, in mathematical
13 terms, it's the square root of the
14 variance.
15     Q.   I don't think the jury is
16 going to understand that.  Can you -- can
17 you --
18     MR. ALLEN:  Sure, they will.
19 BY MR. BROCK:
20     Q.   Your lawyer doesn't.  If you
21 could explain that for the benefit of the
22 jury?
23     A.   The variance is -- the
24 variance in general is a measure of how

Page 366

1  distributed the values are.  That's what
2  the variance is.  The standard deviation,
3  if you take the standard deviation and
4  multiply it by itself, you get the
5  variance.  So if the standard deviation
6  is four, the standard deviation is four,
7  the variance is 16.
8      Q.   And if you have a large
9  amount of variability, what does that say
10 to you about the reliability of the data?
11     A.   From a statistical
12 perspective, you can't rely on just
13 the -- looking at the means on their own
14 to declare significance or not.  You have
15 to do a more in-depth investigation.
16     Q.   Have you taken that into
17 account in your evaluation of study 135?
18     A.   Yes, I have.
19     Q.   Is there a second table that
20 would be of benefit to you and to the
21 jury in understanding your point of view
22 about study 135?
23     A.   Yes, it would be the Table
24 53, which is the portion of -- not Table

13 (Pages 363 to 366)

Confidential - Mark S. Scott, Ph.D.

Page 367

1   53. But Table 54 which is the
2   clinically -- clinical chemistry shifts
3   to clinically important values where you
4   look at the role for glucose.  In that
5   table, I see proportions of patients
6   shifting to clinically significant ranges
7   of 3.7 on Seroquel 300 milligrams versus
8   3.7 percent on 600 milligrams for
9   Seroquel versus 2 percent on placebo.
10      Q.   As a statistician, how do
11  you read that?
12      A.   Well, as a statistician, I
13  would read -- I would read that as there
14  certainly are higher -- proportions are
15  higher on both doses of Seroquel, but
16  there are very few numbers of patients
17  who actually do shift.  So the
18  reliability of those in terms of for
19  evidence I would call into question.
20      Q.   Do you have a table there
21  for fasting confirmed glucose?
22      A.   Yes, I do.
23      Q.   Would you share with the
24  jury how looking at fasting confirmed

Page 368

1   glucose will help you understand the
2   glucose data within this trial?
3       A.   If this would be table -- on
4   the bottom of the -- page number on the
5   bottom of the page is 1039 which would be
6   Table 11.3.7.1.2.3.8.  In terms of shifts
7   to high, if you look at only those with
8   fasting confirmed, there's 1.8 percent of
9   patients on Seroquel, 300 milligrams had
10  a shift.
11         MR. SCOTT:  Hold on a
12  moment.
13         THE WITNESS:  I'm sorry.
14         MR. SCOTT:  Let me catch up
15  with you.
16         THE WITNESS:  Sorry.
17  BY MR. BROCK:
18      Q.   So you see that Mr. Scott
19  has identified at the top fasting
20  confirmed?  Do you see that?
21      A.   Yes, I do.
22      Q.   Just so the jury
23  understands, what does that refer to?
24      A.   That means that the -- from

Page 369

1   the available evidence for each
2   individual patient, that the sample that
3   was taken to assess glucose was in a
4   fasting state.
5       Q.   Then there's a term "shift
6   to high."  What does that refer to?
7       A.   Shift to clinically
8   significantly high.
9       Q.   What are your findings with
10  regard to shifting to high in the fasting
11  confirmed table?
12      A.   From the fasting confirmed
13  table, there was 1.8 percent of patients
14  on Seroquel, 300 milligrams who had a
15  shift.  So -- and also there were
16  3.8 percent of patients for Seroquel for
17  600 milligrams who had a shift and there
18  were 2.4 percent of patients on placebo
19  who had a shift.
20      Q.   Let's see if we --
21         MR. SCOTT:  Hold on.  I'm
22  trying to line these up so that we
23  can see the glucose line over
24  here.  This is the one -- Dr.

Page 370

1   Scott, is this the one you're
2   talking about?
3          THE WITNESS:  Yes, that's
4   the one I'm talking about.
5          MR. SCOTT:  I'm sorry.
6   BY MR. BROCK:
7       Q.   So we've got a table here
8   that shows shift to high.  Do you see
9   that?
10      A.   Yes.
11      Q.   Quetiapine 300, quetiapine
12  600 and placebo?
13      A.   Correct.
14      Q.   And we have columns for
15  each?
16      A.   Correct.
17      Q.   I believe you've testified
18  that for placebo it's 2.4 percent, for
19  quetiapine 600 milligrams it's 3.8, and
20  for quetiapine 300 milligrams it's 1.8?
21      A.   Correct.
22      Q.   How do you read that as a
23  statistician?
24      A.   Well, number one, there are

14 (Pages 367 to 370)

Confidential - Mark S. Scott, Ph.D.

Page 371

1  very few cases, very few observations of
2  patients shifting to a higher range and
3  you have placebo sitting in the middle of
4  Seroquel 300 milligrams and Seroquel
5  600 milligrams.
6        Q.   Now, in terms of your
7  evaluation of trial 135, based on the
8  data that we've talked about, how did you
9  evaluate this trial?
10       A.   I would say that this is --
11  in qualification, it's not entirely
12  green, so there's some yellow in there,
13  but it's mostly green.
14       Q.   And when you say it's mostly
15  green with some yellow, what's your basis
16  for that statement?
17       A.   The changes in the means
18  were slightly higher on Seroquel over
19  placebo for both doses.  When you looked
20  at the non-confirmed fasting over all the
21  data on glucose, the shifters were higher
22  on both doses.  But I would say it's more
23  than -- mostly green because if you look
24  at the fasting data for shifters, you

Page 372

1  didn't see any evidence with respect to
2  changes.
3        Q.   Do you see that we have put
4  135 up and have shaded it in mostly
5  green but with some yellow?
6        A.   Yes.
7        Q.   Would that be a fair way of
8  doing it given your evaluation of the
9  trial results?
10            MR. ALLEN:  Objection.
11  Form.
12            THE WITNESS:  Yes, it would.
13  BY MR. BROCK:
14       Q.   Now, we've talked about 135
15  being a confirmatory study to trial 49?
16       A.   Yes, it was.
17       Q.   Were the results of trial
18  135 and trial 49 filed with the FDA in
19  support of a request for permission to
20  market the medicine in the bipolar
21  depression population?
22       A.   Yes, we filed an application
23  at the end of 2005 for approval for use
24  in bipolar depression.

Page 373

1        Q.   In October of 2006, did the
2  FDA approve Seroquel as a medicine that
3  was safe and effective in the bipolar
4  depression patient population?
5        A.   Yes, it did.
6        Q.   And do you see there that we
7  have put a box for FDA, find safe and
8  effective bipolar depression
9  October 2006?
10       A.   Yes, sir.  Yes, it's up
11  there.
12       Q.   Did AstraZeneca also test
13  the XR formulation in the schizophrenia
14  population in addition to the trial that
15  was called study 41?
16       A.   Yes, we did.
17       Q.   And would that have been
18  studies 132 and 133?
19       A.   Yes, they would.
20       Q.   Let's talk first about study
21  132.  Do you have that there?
22       A.   Yes, I do.
23       Q.   Is that Exhibit 1067?
24       A.   Yes, 1067.

Page 374

1        Q.   If you turn to --
2            - - -
3            (Exhibit Defendant's-1067,
4        5/8/06 Clinical Study Report,
5        Bates AZSER 16833770 - 3780, 3917
6        - 3924, was marked for
7        identification.)
8            - - -
9            MR. ALLEN:  Do I have that?
10           MR. SCOTT:  Yes.
11           MR. ALLEN:  Was it yesterday
12  you said?
13           MR. GALLAGHER:  No, it
14  should be in the stack.
15           MR. BROCK:  Scott, do you
16  have it?
17           MR. ALLEN:  Thank you.  I'm
18  sorry.
19  BY MR. BROCK:
20       Q.   Dr. Scott, would you
21  identify the table that you are looking
22  at at the present time in Exhibit 1067?
23       A.   This would be Table 53 on
24  the bottom of page 149 in this excerpt.

15 (Pages 371 to 374)

Confidential - Mark S. Scott, Ph.D.

Page 375

1    Q.   And share with the jury how
2  that table is helpful to you in
3  understanding glucose issues within this
4  trial.
5    A.   It contains the changes from
6  baseline for placebo as well as the four
7  Seroquel treatment arms in this trial.
8  And in this trial we had three doses of
9  the extended release formulation, 400,
10  600 and 800.  And one dose of Seroquel
11  which was 400 milligrams.
12        In terms of the change from
13  baseline, what's observed, these changes
14  are in millimoles per liter, you had
15  a .02 change on placebo, a decrease
16  of .04 in the mean for 400 milligrams of
17  Seroquel, a change of .09 for
18  600 milligrams of Seroquel, a change of
19  minus .08 for 800 milligrams of Seroquel,
20  and then for Seroquel itself, not the
21  extended release 400 milligrams, you had
22  a change of minus .08.
23    Q.   Do you have in Exhibit 1067
24  a table that describes patients who

Page 376

1  shifted to high in the various dosages
2  and placebo?
3    A.   Yes, I do.
4    Q.   Would you describe your
5  findings from that table, that's Table
6  54.  Correct?
7    A.   I was going to Table 55 with
8  the document fasting.  I can do 54 as
9  well.  From my notes, I have -- my table
10  is based on Table 55.
11    Q.   All right.  Let's talk about
12  Table 55.  It's documenting fasting
13  glucose, and what are your findings
14  there?
15    A.   In terms of portions of
16  patients with shift to clinically
17  important values at any time, we had
18  5.4 percent on placebo, 4.3 percent on
19  extended release Seroquel 400 milligrams,
20  4.3 percent on 600 milligrams extended
21  release Seroquel, 3 percent on
22  800 milligrams of extended release
23  Seroquel, and 2.9 percent on the 400
24  milligram dose of Seroquel.  So you had

Page 377

1  shifts in each patient -- in each patient
2  group, but the shifts on Seroquel were --
3  for all doses were numerically less than
4  what was seen on placebo.
5    Q.   How do you read the results
6  of trial 132 from a statistical
7  standpoint?
8    A.   From trial 132, there was no
9  evidence that Seroquel produced any
10  results that were different from placebo.
11    Q.   Would that be green?
12    A.   That would be green.
13    Q.   Now let's talk about 133.
14  Do you have that in front of you?
15    A.   Yes, I do.  It should be
16  Exhibit 1068.
17            - - -
18        (Exhibit Defendant's-1068,
19        5/29/06 Clinical Study Report,
20        Bates D339-L00719457-00001 -
21        00010, 00149 - 00155, was marked
22        for identification.)
23            - - -
24        MR. ALLEN:  Correct.

Page 378

1  BY MR. BROCK:
2    Q.   And just to help us a little
3  bit, Dr. Scott, so that we don't get lost
4  in time, do you see that this is a
5  document where study dates are referenced
6  on the first page as "Last patient
7  enrolled:  3 August 2005"?
8    A.   Yes, indeed.
9    Q.   Now, would you turn to the
10  table that would be of assistance to you
11  in the talking to the jury about glucose
12  issues within trial 133, please?
13        MR. SCOTT:  Mr. Brock, the
14  "Last patient completed" on page
15  2.
16        MR. BROCK:  Thank you.
17  BY MR. BROCK:
18    Q.   If you turn to page 1068.2,
19  to be consistent with what we've done
20  with regard to other studies, would you
21  describe for the jury the date last
22  patient completed?  It's on page 2.
23    A.   Page 2.  The last patient
24  completed, the 13th of September in 2005.

16  (Pages 375 to 378)

Confidential - Mark S. Scott, Ph.D.

Page 379

1    Q.   And the other studies where
2  we've talked about our timeline, it's the
3  last patient completed date that we've
4  been using.  Right?
5    A.   Right.
6    Q.   Now, I interrupted you.  So
7  you had moved to one of the tables that
8  would be helpful to you in describing
9  glucose changes within trial 133?
10   A.   This would be Table 51, the
11 page number on the bottom would be 150
12 and in parentheses 621 after that.  This
13 represents the changes in fasting glucose
14 for placebo arm, the 400 milligrams of
15 extended release, 600 milligrams of
16 extended release and 800 milligrams of
17 extended release as well as an 800
18 milligram dose of Seroquel alone.
19   Q.   Now, is this a similar study
20 design to 132?
21   A.   It's virtually identical to
22 study 132 except that the Seroquel arm is
23 800 milligrams as opposed to
24 400 milligrams.

Page 380

1    Q.   And what are your findings
2  from Table 51, please, sir?
3    A.   Again, the units here are
4  milligrams per dL.  I see a decrease,
5  mean decrease on placebo of .24.  An
6  increase for the next three numbers would
7  be Seroquel XR for the extended release,
8  increase of 4.66 on Seroquel,
9  400 milligrams, a mean increase of 8.82
10 for 600 milligrams, an increase for 3.61
11 on 800 milligrams of extended release.
12 And for Seroquel alone an increase, a
13 mean increase of 10.8.  But I will also
14 say that the standard deviations of each
15 of those are, in fact, large relative to
16 the mean changes.
17   Q.   Would you just cite a couple
18 of the numbers that relate to standard
19 deviation on there so that we have that
20 for the record?
21   A.   Placebo standard deviation
22 is 23.72.  And the range for the Seroquel
23 arms, all the Seroquel arms is 17.72 to
24 31.71.

Page 381

1    Q.   As a statistician, what does
2  that mean to you in evaluating this
3  dataset?
4    A.   Well, it would mean that
5  before I was to offer any inferences, I'd
6  want to do something more formal to
7  address the variability before I offer
8  the comment on whether those were
9  different or not.
10   Q.   Now, did you also look at
11 the shift to high data within trial 133?
12   A.   Yes, I did.  Those would be
13 found in Table 52 and the page number
14 would be 155, in parentheses 621 after
15 that.
16   Q.   What are your findings
17 there?
18   A.   My findings there are there
19 were 4 percent on placebo with shifts to
20 high, 12.1 percent on Seroquel
21 400 milligrams extended, 13.3 percent on
22 Seroquel 600 milligrams extended,
23 10.1 percent on 800 milligrams of
24 Seroquel extended.  And 7.8 percent on

Page 382

1  Seroquel 800 milligrams.
2    Q.   In evaluating the glucose
3  data that we've talked about in trial
4  133, what was your observation?
5    A.   My observation for this
6  clinical trial is that it was definitely
7  not green.  And, in fact, it was yellow
8  principally based on the shifters that
9  were there.
10   Q.   You see that I have put 133
11 on the board and have colored it yellow?
12   A.   Yes.
13   Q.   And I have put a line
14 through it?
15   A.   Yes.
16   Q.   So did study 133 fail on its
17 primary efficacy measures?
18   A.   Yes, it did.  It failed to
19 separate all of the Seroquel doses and
20 all -- excuse me, all of the Seroquel XR
21 doses and the Seroquel itself versus
22 placebo.
23   Q.   Study 132 and 133 was for a
24 formulation of Seroquel called XR.

17 (Pages 379 to 382)

Confidential - Mark S. Scott, Ph.D.

Page 383

1  Correct?
2      A.   Correct.
3      Q.   Did AstraZeneca submit
4  studies 132 and 133 as part of an
5  application for approval to market
6  Seroquel XR in the United States?
7      A.   Yes, we did.  In fact,
8  trials 41 and 132 and 133 all featured in
9  the review of Seroquel XR in treatment of
10  schizophrenia looking at both the
11  efficacy and safety of the drug.
12      Q.   We have been talking about
13  the clinical study reports for 132 and
14  133 today.  Correct?
15      A.   Correct.
16      Q.   And these are excerpts from
17  those study reports that contain glucose
18  information.  Correct?
19      A.   Correct.
20      Q.   The actual study reports are
21  more lengthy than what we have presented
22  to you today?
23      A.   Correct.  It contains all of
24  the safety and all of the efficacy

Page 384

1  information that were conducted across
2  the clinical trial program.
3      Q.   Was Seroquel XR approved by
4  the FDA as a medicine that was safe and
5  effective for patients with schizophrenia?
6      A.   Yes, it was approved by the
7  FDA.
8      Q.   And do you see there that we
9  have a place on our timeline for extended
10  release Seroquel approved May of 2007?
11      A.   Yes, I see that.
12      Q.   Did AstraZeneca test
13  Seroquel XR as a maintenance medication
14  for the schizophrenic population?
15      A.   Yes, we did.  That would
16  have been trial 4.
17      Q.   I've seen that referred to
18  as the PRINCESS.  Is that the PRINCESS
19  trial?
20      A.   It's the PRINCESS trial but
21  I'd rather go by the numbers than the
22  name.
23      Q.   So we'll refer to it as
24  trial 4.  Do you have that in front of

Page 385

1  you, please, sir?
2      A.   Yes, I do.
3      Q.   That would be Exhibit 129?
4      A.   Yes, it is.
5          - - -
6      (Exhibit Defendant's-129,
7  10/3/06 Clinical Study Report
8  Errata, Bates D339-L01035134-00001
9  - 00016, 00148 - 00150, 00183 -
10  00187, 00189 - 00191 & 00519, was
11  marked for identification.)
12          - - -
13      MR. ALLEN:  Do I have that?
14      MR. GALLAGHER:  It should be
15  in the stack if you don't have it.
16      MR. ALLEN:  Thank you.
17  BY MR. BROCK:
18      Q.   Do you have 129 in front of
19  you now?
20      A.   Yes, I do.
21      Q.   Would you turn to the table
22  that relates to changes in mean blood
23  glucose and state for the jury the number
24  of the table, please?

Page 386

1      A.   This would be Table 60, on
2  the bottom of the page it's 182 with
3  parentheses of 665 after that.
4      Q.   All right.  Is that Table 60
5  on the screen now?
6      A.   Yes, it is.
7      Q.   Is that table helpful to you
8  in understanding the relationship between
9  Seroquel, placebo and glucose in the
10  context of trial 4?
11      A.   Yes, it is.
12      Q.   And how does Table 60 help
13  you understand glucose issues within this
14  trial?
15      A.   Well, what I can do is I can
16  look at the mean changes, and I see the
17  mean change on placebo was .34.  This is
18  in millimoles per liter.  And the mean
19  change on placebo is .15, but I also see
20  large standard deviations as well with
21  1.1 for placebo and .9 for Seroquel.
22      MR. ALLEN:  I need to object
23      to the responsiveness of the
24      answer.  And I think, Mr. Brock,

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Mark S. Scott, Ph.D.

Page 387

1     when you read the transcript,
2     you'll agree with me on that.
3          MR. BROCK:  What's your
4     objection?
5          MR. ALLEN:  He said the mean
6     change of placebo was .34 and the
7     mean change of placebo is .15.
8     What he meant to say was the mean
9     change in quetiapine and Seroquel
10    was .34.
11         THE WITNESS:  If I said
12    that, I apologize.
13         MR. ALLEN:  I'm telling you
14    that's what the record reflects.
15         MR. BROCK:  Thank you for
16    that.  I thought you were
17    objecting to my question.
18         MR. ALLEN:  No, no.  I was
19    objecting to the response.  I'm
20    sorry.  I was trying to help you
21    clear the record.
22   BY MR. BROCK:
23        Q.   So you've heard Mr. Allen's
24   comment.  Do you see that placebo is

Page 388

1    shown as .15 and quetiapine is shown
2    as .34?
3         A.   Yes, the mean change on
4    quetiapine is .34, with a standard
5    deviation of .9.  And the mean change on
6    placebo is .15 with a standard deviation
7    of 1.1.
8         Q.   Do you have Table 68 there?
9         A.   I hope so.  I have Table 62.
10   This is the clinically important value at
11   any (randomized safety population).
12        Q.   Do you have Table 38?
13        A.   Table 38.  Yes, I do.  I
14   have a table of duration of exposure,
15   yes.
16        Q.   Now, what does Table 38 show
17   with regard to duration of exposure, and
18   does that help you in understanding the
19   data within trial 4?
20        A.   Well, the duration of
21   exposure is 120 days on Seroquel versus
22   67 days on placebo.  And that's a
23   function of the success of the trial in
24   that patients on placebo were withdrawn

Page 389

1    very quickly because of a relapse of
2    their symptoms.  So I have longer
3    treatment time on Seroquel so I expect to
4    see more measurements for all laboratory
5    variables given that they've been on the
6    study for longer periods of time.
7         MR. ALLEN:  Object to
8    responsiveness.
9    BY MR. BROCK:
10        Q.   Now, are there other tables
11   within trial 4 that help inform your
12   point of view with regard to glucose
13   values within the trial?
14        A.   Yes, I would have relied on
15   Table 62 which is the clinically
16   important values at any time for the
17   placebo patients and the Seroquel
18   patients.
19        Q.   So you see that we've marked
20   there Table 62, clinically important
21   values, placebo and quetiapine?
22        A.   Correct.
23        Q.   And what are the findings
24   there?

Page 390

1         A.   The findings are for
2    clinically important shifts to a high
3    value, which is, in essence, given it's
4    millimoles per liter, a value of greater
5    or equal to 7, about 6.99426, that there
6    were 8 percent of patients on placebo
7    with clinically important shifts and
8    5.4 percent of patients on Seroquel with
9    clinically important shifts.
10        Q.   Based on your evaluation of
11   the clinical study report, how did you
12   read the values as relates to glucose
13   issues?
14        MR. ALLEN:  Objection to
15   form.
16        THE WITNESS:  The changes
17   that I saw between Seroquel and
18   placebo, there was no issue --
19   excuse me, the differences --
20   there were no differences between
21   Seroquel and placebo in trial 4
22   for measures of glucose.  So given
23   that, assignment of a label of
24   green.

19  (Pages 387 to 390)

Confidential - Mark S. Scott, Ph.D.

Page 391

1  BY MR. BROCK:
2      Q.   Let me -- let me ask the
3  question again, if I could.  As a
4  statistician, how did you read the
5  results of trial 4 with respect to
6  glucose issues?
7      A.   That there was no difference
8  between Seroquel and placebo in terms of
9  measures of glucose.
10     Q.   Would you explain to the
11 members of the jury why you arrived at
12 that conclusion?
13     A.   Well, number one, the mean
14 changes were small in terms of numbers.
15 The variability was large.  But then when
16 I looked at the shifters, the proportion
17 of shifters was actually less on Seroquel
18 than on placebo.
19     Q.   Now, did AstraZeneca submit
20 the results of trial 4 to the FDA?
21     A.   Yes, the trial was submitted
22 to the FDA to gain approval for
23 maintenance treatment -- maintenance
24 treatment of schizophrenia.

Page 392

1      Q.   Do you see that we have put
2  on the board maintenance XR schizophrenia
3  1107 FDA find safe and effective?
4      A.   Yes.
5      Q.   And is that what occurred?
6      A.   Yes, it was.
7      Q.   Let's turn our attention now
8  to trials 126 and 127.  Do you have there
9  the clinical study reports or the
10 excerpts from the clinical study reports
11 126 and 127?
12     A.   Yes, I do.
13     Q.   I think trial 126 is
14 Exhibit 126.  Correct?
15     A.   Yes.
16          - - -
17      (Exhibit Defendant's-126,
18      6/19/07 Clinical Study Report,
19      Bates AZSER 19028090 - 8102, 8312
20      - 8320, was marked for
21      identification.)
22          - - -
23 BY MR. BROCK:
24     Q.   And trial 127 -- strike

Page 393

1  that.
2          Clinical study report for
3  trial 127 is Exhibit 127?
4      A.   Correct.
5          - - -
6      (Exhibit Defendant's-127,
7      6/19/07 Clinical Study Report,
8      Bates AZSER 12772674 - 2687, 2898
9      - 2905, was marked for
10     identification.)
11          - - -
12 BY MR. BROCK:
13     Q.   Let's talk about trial 126
14 first.
15     A.   Okay.
16     Q.   If you would turn to
17 126.224.
18     A.   That would be Table 63?
19     Q.   Yes.  Does that table
20 contain information that would be helpful
21 to you in describing the results of trial
22 126 from a glucose perspective?
23     A.   Yes, it would.  It contains
24 the mean changes from baseline and from

Page 394

1  the randomized period for Seroquel.
2  Again, this was a trial looking at
3  Seroquel on top of either lithium or
4  valproic in prevention of relapses of
5  symptoms of Bipolar I disorder.  So to
6  say it was quetiapine or Seroquel versus
7  placebo on top of the mood stabilizer.
8  And in this table there was a four unit
9  change on Seroquel with a standard
10 deviation of about 18.9, and on placebo
11 plus mood stabilizer it was a mean
12 decrease of 0.35 units with a standard
13 deviation of 16.2.
14     Q.   From a statistical
15 standpoint, what does that indicate to
16 you?
17     A.   I would say the mean is
18 higher than what I saw on placebo, but
19 you have a large variability as well.  I
20 wouldn't want to rely on that as a sole
21 piece of evidence.
22     Q.   Now turn to page 229.  Is
23 there dataset out there with regard to
24 shifters in the treatment arms of the

20  (Pages 391 to 394)

Confidential - Mark S. Scott, Ph.D.

Page 395

1  trial?
2      A.   Yes, there are.
3      Q.   Is that Table 65?
4      A.   That would be Table 65.
5  What I see is a proportion of patients
6  that shift to a value of in this case
7  greater or equal to 126 milligrams per
8  dL, 8.8 percent of the Seroquel plus mood
9  stabilizer patients had that shift, while
10 5.4 percent of the placebo patients had
11 that same shift.
12     Q.   Dr. Scott, how is trial 126
13 different from the placebo-controlled
14 trials we have discussed to this point in
15 time?
16     A.   It's different in two ways.
17 Number one, it's a longer term treatment
18 period, number one.  And every patient
19 that was randomized had been on Seroquel
20 for a variable length of time before
21 either continuing on Seroquel or
22 withdrawing from Seroquel and receiving
23 placebo.
24     Q.   With regard to trial 126,

Page 396

1  what was your observation with regard to
2  glucose issues?
3      A.   My regard to glucose issues
4  it would not be green, it would be yellow
5  because of mean increase being larger and
6  also proportions of patients with
7  shifters being larger.
8      Q.   Now let's take trial 127.
9  Would you describe the study design of
10 127 and the treatment arms and then we
11 will talk about the glucose data within
12 the trial?
13     A.   Design of 127 was virtually
14 identical to the trial of 126 for
15 patients with bipolar disorder received
16 Seroquel for a variable period of time,
17 were stabilized, and then randomized to
18 continue Seroquel or be withdrawn from
19 Seroquel with the primary endpoint being
20 prevention of a relapse of their disease.
21     Q.   Now, if you will turn to
22 page 226 in Exhibit 127, does that have
23 information with regard to the treatment
24 arms and mean glucose changes?

Page 397

1      A.   Yes, it does.  Here again
2  the units are milligrams per dL with
3  change on Seroquel was 6.11 with a
4  standard deviation of 54.52.  And on
5  placebo the mean change was .29 with a
6  standard deviation of 22.6.  So the mean
7  change is numerically larger than placebo
8  but there is a lot of variability there.
9  If you look at the standard deviation
10 of -- for the Seroquel arm again, it was
11 54.52 which is very large relative to the
12 mean change.
13     Q.   What does that say about the
14 reliability of the data?
15     A.   It's that there's something
16 going on in terms of some outliers that
17 should be investigated further.  I
18 wouldn't want to rely on this as a sole
19 piece of evidence with respect to a
20 change in mean.
21     Q.   Did you also look at shift
22 to high data within trial 127 in the
23 treatment arms of the trial?
24     A.   Yes, I did.

Page 398

1      Q.   And is that on page 230 of
2  Exhibit 127?
3      A.   Yes, it is.
4      Q.   What did you find in looking
5  at the shift to high data?
6      A.   If you look at the shifts to
7  high for Seroquel, the proportion of the
8  patients was 16.2 percent and for
9  patients on placebo it was 11.2 percent.
10     Q.   How do you read that as a
11 statistician?
12     A.   Again, the numbers are
13 higher.  You have a -- from a point of
14 view of evidence, you have higher numbers
15 in the means and higher numbers in the
16 proportions, so it's not green, so I want
17 to investigate further from a statistical
18 perspective about the relevance of that
19 opposite all the other data we have as
20 well.  So I'd give that a yellow with
21 respect to an assignment.
22     Q.   Do you see that I have put
23 in the long-term maintenance box trials
24 126 and 127, and I have given them the

21 (Pages 395 to 398)

Confidential - Mark S. Scott, Ph.D.

Page 399

1  yellow designation consistent with what
2  you've just testified to?
3      A.   Yes.
4      Q.   Now, was the data from 126
5  and 127 submitted to the FDA?
6      A.   Yes, it was.  It was
7  submitted to hopefully gain claim for
8  prevention of -- reduction in symptoms in
9  patients who were receiving Seroquel for
10 bipolar disorder in the longer term.
11     Q.   And, in fact, did Seroquel
12 gain approval to market Seroquel in the
13 United States in the patient population
14 for maintenance therapy bipolar adjunct
15 in May of 2008?
16     A.   Yes, it did.  And one of the
17 remarkable things about the study was
18 that it was the first time an agent had
19 demonstrated a reduction, not just in
20 manic symptoms, but depressive symptoms
21 as well.
22     Q.   Could you explain that?
23         MR. ALLEN:  Object to the
24 responsiveness.

Page 400

1          MR. BROCK:  Wait, wait,
2  wait.  He's objecting to the
3  question.  I'm going to ask a new
4  question.
5          MR. ALLEN:  No, I'm not.  I
6  was actually objecting to the
7  responsiveness of the last answer.
8          MR. BROCK:  I know what it
9  is.  I know what your objection
10 is.  I'm going to fix it.
11 BY MR. BROCK:
12     Q.   What was being studied in
13 126 and 127?
14     A.   The patients were entered
15 with Bipolar I disorder.  And what a
16 physician, as I understand, would be
17 looking for is sometimes symptoms can
18 return, they could return either as manic
19 symptoms or depressive symptoms.
20     Q.   Did AstraZeneca view the
21 approval of Seroquel for maintenance in
22 the bipolar population as an important
23 development in terms of offering
24 treatment options to physicians for their

Page 401

1  patients?
2      A.   Yes.
3          MR. ALLEN:  Objection.
4  Doctor, I apologize.  Sorry.  I
5  may need to get objections on the
6  record.  I'm not interrupting and
7  I don't want to speak over you,
8  because I want the jury to hear
9  your answer if the judge says.  I
10 just need to object to the form of
11 the question.
12 BY MR. BROCK:
13     Q.   You may answer.
14     A.   Yes, it did.
15     Q.   Would you tell the jury why?
16         MR. ALLEN:  Same objection.
17         THE WITNESS:  It's my
18 understanding, based on the
19 evidence that had been conduct
20 in -- collected in that clinical
21 trial, that no other agent had
22 demonstrated a reduction in
23 depressive symptoms in this
24 patient population as well.

Page 402

1          MR. BROCK:  Why don't we
2  take a short break.
3          VIDEOGRAPHER:  We are now
4  going off the record.  This is the
5  end of videotape number one.  The
6  time is 10:20.
7              - - -
8          (A recess occurred.)
9              - - -
10         VIDEOGRAPHER:  We are now
11 back on the record.  This is the
12 beginning of videotape number two.
13 The time is 10:41.
14 BY MR. BROCK:
15     Q.   Dr. Scott, do you see on our
16 board that we have there in the middle of
17 the page trials 132 and 133 that we
18 discussed earlier?
19     A.   Yes, I do.
20     Q.   And those trials were for
21 the schizophrenia XR formulation.
22 Correct?
23     A.   Correct.
24     Q.   And then over on the left

22 (Pages 399 to 402)

Confidential - Mark S. Scott, Ph.D.

Page 403

1 center portion of the page, do you see we
2 have trial 41 that's also a schizophrenia
3 XR trial?
4      A.   Yes.
5      Q.   When the FDA approved
6 Seroquel as safe and effective for
7 schizophrenia XR, did it have the data
8 for trials 132, 133 and 41?
9      A.   They had that as the primary
10 placebo-controlled trials to base the
11 assessment of safety and efficacy of
12 Seroquel XR for the treatment of acute
13 schizophrenia.
14      Q.   And when it approved
15 Seroquel XR for schizophrenia, did it
16 have all of the data with regard to
17 glucose from trial 133 that we have put
18 on the board there as a yellow trial?
19      A.   It had the individual
20 clinical trial report for trial 133 as
21 well as integrated summary of safety of
22 all the data for trials 41, 132 and 133.
23      Q.   Now, you see there for
24 trials 126 and 127, as we discussed

Page 404

1 earlier, those were put in the yellow
2 category by you.  Correct?
3      A.   Correct.
4      Q.   Notwithstanding your putting
5 those in the yellow category, did the FDA
6 approve Seroquel as a maintenance therapy
7 in the bipolar population in May of 2008?
8           MR. ALLEN:  Let me object to
9      the form.
10           THE WITNESS:  Yes, it did.
11 BY MR. BROCK:
12      Q.   Prior to that approval, did
13 AstraZeneca make a label change to
14 include information from trials 126 and
15 127?
16      A.   Yes, we did.  We included
17 the data -- the shift data as well as
18 other data on placebo-controlled trials
19 in terms of change in glucose for --
20 because of the results of 126 and 127.
21      Q.   Now, I want to turn your
22 attention to trials that were conducted
23 in the pediatric population.  Do you have
24 there clinical study reports for trials

Page 405

1 149 and 112?
2      A.   I have trial 149 right here
3 and trial 112 right here.
4      Q.   What exhibit number is trial
5 149?
6      A.   That is Exhibit 1597.
7                - - -
8           (Exhibit Defendant's-1597,
9      9/6/07 Clinical Study Report
10      Synopsis, was marked for
11      identification.)
12                - - -
13 BY MR. BROCK:
14      Q.   Do you have a report there
15 with glucose information with regard to
16 study 112?
17      A.   Yes, I do.
18      Q.   What documents do you have
19 there?  Would you -- would you give the
20 description of those?
21      A.   I have Defendant's
22 Exhibit 1596 for trial 112, which is a
23 portion of the clinical trial report for
24 trial 112.

Page 406

1                - - -
2           (Exhibit Defendant's-1596,
3      2/14/08 Clinical Study Report
4      Synopsis, was marked for
5      identification.)
6                - - -
7 BY MR. BROCK:
8      Q.   What document do you have
9 for 149?
10      A.   I have again Defendant's
11 Document 1597 which is a portion of the
12 clinical trial report for study 149.
13      Q.   Now, would you take trial
14 149 first and describe the trial in terms
15 of the test that AstraZeneca was
16 conducting in the pediatric population?
17      A.   Trial 149 was an examination
18 of two doses of Seroquel 400 milligrams
19 and 600 milligrams versus placebo for the
20 treatment of children and adolescents
21 with Bipolar I mania.
22      Q.   Have you reviewed the
23 glucose information for trial 149?
24      A.   Yes, I have.

23 (Pages 403 to 406)

Confidential - Mark S. Scott, Ph.D.

Page 407

1    Q.   With the benefit of your
2  notes, would you take the jury through
3  what your findings were for trial 149 and
4  how you evaluated the data?
5    A.   Yes, I will.  For the two
6  doses of Seroquel, 400 milligrams and
7  800 milligrams, the mean change over --
8  the mean change from baseline was
9  3.48 units on Seroquel, and this is in
10  milligrams per dL, with a standard
11  deviation of 11.5.  For 800 milligrams of
12  Seroquel there was a mean change of 3.76
13  with a standard deviation of 13.1.  And
14  for placebo there was a change of minus
15  1.17 units with a standard deviation,
16  from my notes here it's about 11.4 it
17  looks like.  And in terms of shifters,
18  there were -- there was one Seroquel
19  shift to a clinically significant range
20  on 400 milligrams, one Seroquel shifter
21  on 800 milligrams, and no shifters on
22  placebo.
23    Q.   How did you evaluate the
24  data from pediatric trial 149?

Page 408

1    A.   Well, there was -- the mean
2  increases which were both positive for
3  Seroquel and a slight decrease on
4  placebo, again, with wide variability.
5  And there's really not much information
6  in terms of shifters given, there's so
7  few patients who shifted.  So I gave it
8  mostly green.  There's a little bit of
9  yellow, but mostly green.
10    Q.   If I put mostly green for
11  149, would that be consistent with your
12  evaluation of the data?
13    A.   Yes, it would.
14    Q.   Now, let's go to trial 112.
15  If you would describe the -- for the jury
16  the purpose of that test, tell them
17  whether or not you looked at the
18  pertinent glucose information and then
19  describe your findings?
20    A.   This was a six-week trial in
21  adolescents with schizophrenia which was
22  longer than the three-week trial in --
23  for mania.  It had two doses of Seroquel,
24  400 milligrams and 800 milligrams versus

Page 409

1  placebo.  And from my notes, the mean
2  change of 400 milligrams for Seroquel was
3  0.8 units.  This is, again, in milligrams
4  per dL with a standard deviation of
5  10.58.  For 800 milligrams, there was a
6  mean change or a mean decrease of minus
7  1.89.  And on placebo, there was a mean
8  decrease of minus 1.49, standard
9  deviation of 10.92.  So for each of them,
10  not much change over all, some were going
11  down with a lot of variability, and there
12  were no shifters in Seroquel, either
13  Seroquel arm or the placebo arm.
14    Q.   Now, what were your findings
15  with regard to study 112 in regard to
16  glucose?
17    A.   There were no differences
18  between Seroquel and placebo on the
19  measures of glucose.
20    Q.   How would you evaluate the
21  trial?
22    A.   That would be green.
23    Q.   Did AstraZeneca test
24  Seroquel -- well, let me go back to the

Page 410

1  pediatric information.
2    Has AstraZeneca filed with
3  the FDA the results of study 149 and
4  study 112?
5    A.   Yes, we have.  We filed --
6    Q.   What is the status of that
7  filing?
8    A.   Those applications are
9  currently under review by FDA.
10    Q.   Now, has AstraZeneca studied
11  the XR formulation in the bipolar
12  population?
13    A.   Yes, we have.
14    Q.   And would that be studies 2
15  and 4?
16    A.   Yes, they are.
17    Q.   Do you have those there?
18    A.   I have my notes from those
19  two trials.  I believe I have my notes
20  for those two trials.  And --
21    Q.   That would be 1054 and 1056?
22    A.   Yes, I do.  I have both of
23  those.
24         - - -

24 (Pages 407 to 410)

Confidential - Mark S. Scott, Ph.D.

Page 411

1       (Exhibits Defendant's-1054,
2    11/13/07 Clinical Study Report,
3    Bates D339-L01050706-00001 -
4    00013, 00138 - 00154 and
5    Defendant's-1056, 11/20/07
6    Clinical Study Report, Bates AZSER
7    20720876 - 1048, were marked for
8    identification.)
9              - - -
10   BY MR. BROCK:
11      Q.   Why don't you take 1054
12   first.  Is that bipolar XR trial number
13   2?
14      A.   Yes, that's trial number 2.
15      Q.   Are you familiar with the
16   study design of that trial?
17      A.   Yes, I am.
18      Q.   Please describe that briefly
19   for the jury.  Tell them if you looked at
20   the clinical study report to examine the
21   glucose data within the report and your
22   findings?
23      A.   The study was a study of
24   Seroquel XR 300 milligrams versus

Page 412

1    placebo.  And the glucose findings were
2    -- you had a mean change on Seroquel
3    of -- this is in millimoles per liter,
4    of .34 units with a standard deviation
5    of .99, and a change on placebo of .33
6    with standard deviation of .89.  And for
7    important highs there were 5.8 percent on
8    Seroquel patients and 2.1 percent of
9    patients on placebo.
10      Q.   How did you evaluate trial
11   2?
12      A.   The means were the same
13   essentially in terms of the changes.
14   Slightly higher proportions on Seroquel
15   for 300 milligrams in terms of shifters,
16   so it was mostly green.
17      Q.   Do you see that I have trial
18   2 colored in as mostly green?
19      A.   Yes.
20      Q.   Let's go to trial 4.  If you
21   could describe briefly the study design,
22   tell the jury whether you looked at the
23   clinical study report for the pertinent
24   glucose information and then share with

Page 413

1    us, please, sir, your findings with
2    regard to study 4?
3      A.   Study 4 was a study of
4    Seroquel XR in patients with bipolar --
5    acute bipolar mania.  It was one dose of
6    Seroquel versus placebo -- or one
7    Seroquel group versus placebo.  And the
8    mean change, and again, this is in
9    millimoles per liter, was .50 for
10   Seroquel with a standard deviation of
11   2.12, a change of 0.15 with a standard
12   deviation of .90 it looks like, for
13   placebo.  And the proportion of shifters
14   was 6.9 percent on Seroquel and
15   2.4 percent on placebo.
16      Q.   How did you evaluate trial 4
17   under the standards that we've talked
18   about here today?
19      A.   Well, the mean changes were
20   higher, but you have a lot of variability
21   as well in there.  And the proportions of
22   shifters was higher on quetiapine.  So I
23   would give that a yellow.  I would want
24   to evaluate that data alongside all other

Page 414

1    data before arriving at a conclusion.
2      Q.   Now, let's go back down to
3    the long-term maintenance box.  Did
4    AstraZeneca evaluate, through clinical
5    trials, Seroquel as a medicine for
6    long-term maintenance in the bipolar
7    depression population?
8      A.   Yes, we did.
9      Q.   Let me go back to bipolar
10   depression XR.  Was that data submitted
11   to the FDA?
12      A.   You're talking about for the
13   acute bipolar -- yes, the acute studies
14   for bipolar depression for XR in both
15   depression and mania were submitted to
16   the FDA.
17      Q.   And that was trials 2 and 4?
18      A.   Correct.
19      Q.   And did the FDA approve XR,
20   the XR formulation for bipolar mania and
21   depression as recently as October
22   of 2008?
23      A.   Yes, they did.
24      Q.   Did they do that with the

25 (Pages 411 to 414)

Confidential - Mark S. Scott, Ph.D.

Page 415

1  benefit of the glucose information from
2  trials 2 and 4?
3         MR. ALLEN:  Objection.  Let
4  me object to form.
5         MR. BROCK:  Sir?
6         MR. ALLEN:  I just didn't
7  want to speak over him.  Objection
8  to form.
9         THE WITNESS:  They had all
10 the data from both of those
11 clinical trials in their
12 evaluation.
13 BY MR. BROCK:
14    Q.   As well as the information
15 from trials 126, 127, 133, and BOLDER II
16 135?
17    A.   Correct.
18    Q.   Let's talk about now the
19 bipolar depression trials for long-term
20 maintenance.  Do you see we have there
21 trial 134?
22    A.   Yes.
23    Q.   Can you find trial 134 in
24 your group, the Exhibit 1069?

Page 416

1             - - -
2         (Exhibit Defendant's-1069,
3  10/5/07 Clinical Study Report,
4  Bates D339-L00809048-00001 -
5  00015, 00192 - 00212, was marked
6  for identification.)
7             - - -
8         MR. ALLEN:  Unless I
9  misplaced it, I don't think I have
10 it here.  I don't see it here.  As
11 a matter of fact, I confirm I do
12 not have a copy.
13        MR. BROCK:  I want to make
14 sure he gets trial 134.
15        VIDEOGRAPHER:  Do you want
16 to go off the record for a moment?
17        MR. BROCK:  No.
18        MR. ALLEN:  Mike, you can
19 continue.  What page of the notes
20 are we on?  I see the doctor is
21 using his notes.  Maybe that will
22 help me.
23        MR. BROCK:  I'll get him to
24 reference it.

Page 417

1         MR. ALLEN:  Okay.
2  BY MR. BROCK:
3     Q.   Let's talk about long-term
4  maintenance for bipolar depression.  One
5  of those trials was trial 134.  Correct?
6     A.   Correct.
7     Q.   What was the study design
8  for trial 134?
9     A.   The study design for 134 had
10 two parts to it.  One was a short-term
11 phase examining the short-term effects in
12 bipolar depression population of Seroquel
13 300 milligrams versus Seroquel
14 600 milligrams versus placebo.  And then
15 there was a continuation phase for
16 patients to be re-randomized to continue
17 300 milligrams or receive placebo
18 continuing 600 milligrams or placebo in
19 the longer term to prevent relapses of
20 the -- prevent relapse of the depressive
21 episode.
22     Q.   Did you look at the glucose
23 data out of trial 134?
24     A.   Yes, I did.

Page 418

1         MR. ALLEN:  Michael, can I
2  get a reference here to the notes?
3  I see you're referring to the
4  notes, what page?
5         THE WITNESS:  This would
6  be -- the way I've ordered it,
7  there's a --
8         MR. ALLEN:  What page is it?
9         THE WITNESS:  Okay.  It
10 would be on page -- excuse me.
11 It's on my second page, there's a
12 line that says bipolar depression
13 and maintenance in trial 134.
14        MR. ALLEN:  Thank you, sir.
15        THE WITNESS:  Okay.
16        MR. ALLEN:  Thank you.
17        THE WITNESS:  Okay.
18 BY MR. BROCK:
19    Q.   Do you have your notes on
20 134, Dr. Scott?
21    A.   Yes, I do.
22    Q.   Tell the members of the jury
23 what your findings were from a glucose
24 perspective with regard to trial 134?

26 (Pages 415 to 418)

Confidential - Mark S. Scott, Ph.D.

Page 419

1      A.   Well, focus in on the longer
2  term findings because I think the
3  short-term findings are very similar to
4  what we've seen in other short-term
5  trials of bipolar depression.  In the
6  longer term data, you had a mean increase
7  from -- for Seroquel 300 milligrams at
8  4.85 units and a decrease on Seroquel
9  600 milligrams of minus .39 units and a
10  mean increase on placebo of .16 units.
11  And in terms of shifters, there were
12  12.2 percent of patients on
13  300 milligrams who shifted.  There were
14  6 percent of 600 milligram patients who
15  shifted and there were no patients on
16  placebo who shifted.
17      Q.   How did you evaluate trial
18  134?
19      A.   I would say mostly yellow on
20  the basis of you have no information on
21  the mean, you have a higher value,
22  obviously you have 300 milligrams, a
23  decrease of 600, but you had more
24  shifters on 300 milligrams and

Page 420

1  600 milligrams of Seroquel than placebo.
2  And, again, I would want to evaluate this
3  data alongside other data before arriving
4  at a conclusion.
5      Q.   Did you also test Seroquel
6  in a clinical trial called 001/151?
7      A.   Yes, I did.
8      Q.   Did you evaluate from the
9  clinical study reports the glucose data
10  from trial 001/151?
11      A.   Yes, I did.
12      Q.   I'm going to hand you
13  Exhibit 1070.
14           -  -  -
15           (Exhibit Defendant's-1070,
16           10/15/07 Clinical Study Report
17           Errata List, Bates AZSER 26436260,
18           6616, 6424 - 6437, 6614 - 6629 &
19           8528, was marked for
20           identification.)
21           -  -  -
22  BY MR. BROCK:
23      Q.   Is that the clinical study
24  report -- strike that.

Page 421

1      I've handed you
2  Exhibit 1070.  Does that contain excerpts
3  from the clinical study report with
4  regard to pertinent glucose information?
5      A.   Yes, it does.
6      Q.   Did you review the clinical
7  study report?
8      A.   I reviewed the clinical
9  study report for the glucose data that
10  were contained in that.
11      Q.   Describe for the members of
12  the jury briefly your findings from
13  001/151, please, sir.
14      A.   Again, I focused in on the
15  longer term information because the
16  short-term information was very similar
17  to what we've seen in the past bipolar
18  depressive trials.  In the longer term,
19  this trial, again, was a similar design
20  to what we saw in trial 134.  For the 300
21  milligram dose of Seroquel there was a
22  change of 4.83 units, it was milligrams
23  per dL.  For 600 milligrams there was a
24  change of 4.85 units.  And for placebo

Page 422

1  there was a change of 3.82 units in the
2  maintenance phase.  And in terms of the
3  proportions of shifters, there was
4  7.4 percent 300 milligrams, 4.4 percent
5  at 600 milligrams of Seroquel, and
6  placebo was in the middle with a 5.1
7  percent proportion of patients with
8  shifts.
9      Q.   How did you read that?
10      A.   By given all the evidence
11  that's there, you had little difference
12  in terms of the means and you had
13  proportions which were virtually
14  identical.  So I would have rated that
15  overall as agreeing with no evidence of a
16  difference between Seroquel and placebo
17  in this trial.
18      Q.   Was the study design similar
19  to the study design for 134?
20      A.   Essentially it was the same
21  design as trial 134.
22      Q.   Within the bipolar
23  depression population for long-term
24  maintenance, was the medicine also tested

Confidential - Mark S. Scott, Ph.D.

Page 423

1    in a trial called 144?
2        A.   Yes, it was.
3        Q.   Do you have the clinical
4    study report there for trial 144?
5        A.   Yes, I do.
6        Q.   That would be Exhibit 145.
7                 - - -
8            (Exhibit Defendant's-145,
9        4/1/08 Clinical Study Report,
10       Bates D339-L01124072-00001 -
11       00018, 00211 - 00219, was marked
12       for identification.)
13                - - -
14   BY MR. BROCK:
15       Q.   Would you describe for the
16   members of the jury your glucose findings
17   from trial 144 that are contained in
18   Exhibit 145?
19           MR. ALLEN:  Is this -- what
20   exhibit number, number 145?
21           MR. BROCK:  It's 145.
22           MR. ALLEN:  14 --
23           MR. BROCK:  145.
24           MR. ALLEN:  Thank you.  I

Page 424

1    apologize.
2            THE WITNESS:  This trial was
3    strictly a maintenance trial where
4    individuals received Seroquel for
5    a fixed period of time.  And they
6    were randomized to continue
7    Seroquel versus having Seroquel
8    withdrawn.  And in terms of the
9    changes, this is, again,
10   milligrams per dL, you have a mean
11   change of 1.02 on Seroquel, and
12   this is up to -- I think up to at
13   least two years of therapy of 1.02
14   on Seroquel versus a mean change
15   of 2.37 on placebo.  Here the
16   units are milligrams per dL.
17           So from a mean perspective,
18   there's no indication there's a
19   difference between Seroquel and
20   placebo.  In terms of shifters,
21   there was 9.3 percent of patients
22   on Seroquel and 4.2 percent of
23   patients on placebo.  So in terms
24   of shifters, there seems to be an

Page 425

1    indication of a higher proportion
2    for the means, there was nothing
3    going on, so I would classify this
4    as half and half, half green, half
5    yellow.
6    BY MR. BROCK:
7        Q.   You see I have there now
8    144, half and half?
9        A.   Yes.
10       Q.   001/151 is green in terms of
11   having no difference?
12       A.   Yes.
13       Q.   Correct?
14       A.   Correct.
15       Q.   And 134 is mostly yellow?
16       A.   Correct.
17       Q.   Were these studies filed --
18   these study results filed with the FDA.
19       A.   The clinical trial reports
20   are all with the FDA.
21                - - -
22           (Exhibits Defendant's-136,
23       11/21/07 Clinical Study Report
24       Errata List, Bates

Page 426

1        D339-L01122417-00001, 00212 -
2        00223, 00358 - 00363;
3        Defendant's-137, 12/5/07 Clinical
4        Study Report Errata List, Bates
5        D339-L01122418-00001, 00188 -
6        00201, 00340 - 00343;
7        Defendant's-138, 1/17/08 Clinical
8        Study Report Errata List, Bates
9        D339-L01122419-00001, 00100 -
10       00112, 00232 - 00235;
11       Defendant's-139, 11/20/07 Clinical
12       Study Report Errata List, Bates
13       D339-L01122420-00001, 00164 -
14       00177, 00308 - 00312;
15       Defendant's-147, 12/10/07 Clinical
16       Study Report Errata List, Bates
17       D339-L01122422-00001, 00137 -
18       00152, 00304 - 00308, 01327 -
19       01336; and Defendant's-148,
20       11/20/07 Clinical Study Report
21       Errata List, Bates
22       D339-L01122423-00001, 00190 -
23       00202, 00341 - 00345, 01276 -
24       01281, 01283 - 01285;

28 (Pages 423 to 426)

Confidential - Mark S. Scott, Ph.D.

Page 427

1   Defendant's-130, 3/24/08 Clinical
2   Study Report, Bates AZSER 25249062
3   - 9070, 9193 - 9197, 25251141 -
4   1146, 1167 & 1168; and
5   Defendant's-131, 3/24/08 Clinical
6   Study Report, Bates
7   D339-L01124061-00001 - 00009,
8   00136 - 00139, AZSER 25247493 -
9   7576, were marked for
10  identification.)
11          - - -
12  BY MR. BROCK:
13      Q.   I want to turn our attention
14  now to low-dose short-term studies for
15  depression and anxiety.  The depression
16  trials are referred to as MDD trials.
17  Correct?
18      A.   Correct.
19      Q.   And the anxiety trials are
20  referred to as the GAD trials.
21      A.   Yes, they are.
22      Q.   So if you look at our board,
23  we have in white MDD 1, 2, 3, 4, 6, and
24  7.  Do you see that?

Page 428

1       A.   Correct.
2       Q.   And for general anxiety
3   disorder or anxiety, we have studies 9,
4   10 and 11?
5       A.   Correct.
6       Q.   Dr. Scott, in the interest
7   of time, what I would like for you to do
8   is to confirm by exhibit number first the
9   MDD trials that you have there in front
10  of you, 1, 2, 3, 4, 6 and 7.
11      A.   The trials themselves?  Do I
12  have the trials themselves?
13      Q.   The clinical study reports.
14  Do you have the clinical study reports in
15  front of you for MDD 1, 2, 3, 4, 6 and 7?
16      A.   Yes, I have excerpts from
17  the clinical trial reports in front of
18  me.
19      Q.   Have you reviewed the
20  clinical study reports with a view to the
21  glucose findings within each of the
22  reports?
23      A.   Yes, I have.
24      Q.   Are you prepared to discuss

Page 429

1   the glucose findings from the MDD
2   low-dose short-term studies?
3       A.   Yes, I am.
4       Q.   What I'd like for you to do
5   then is take these one by one, and I'll
6   give you another question after you've
7   done MDD 1, but start with MDD 1,
8   describe for the jury the study design
9   and then proceed to discuss your glucose
10  findings and how you evaluated the
11  glucose findings under the standards that
12  we've been talking about today.
13      A.   Study design of 1 was a four
14  arm study, three doses of Seroquel, one
15  dose of placebo.  The doses of Seroquel
16  were 50, 150, and 300 milligrams a day
17  versus placebo.  The mean change from
18  baseline for 50 milligrams was 2.3 units,
19  for 150 milligrams it was 3.76 units, for
20  300 milligrams it was 4.32 units, and for
21  placebo it was 2.25 units.  And you had
22  standard deviations ranging from about 10
23  to 20 for the Seroquel doses and the
24  standard deviation of placebo was 12.4,

Page 430

1   so you had large variance relative to the
2   mean.
3           In terms of shifters, there
4   were no shifters at 50 milligrams of
5   Seroquel.  There were 3.2 percent of
6   shifters on 150, 4.8 percent of shifters
7   on 300 milligrams, and there were
8   2 percent of shifters on placebo.  So on
9   this evidence, there's a little bit of
10  yellow in terms of higher on
11  300 milligrams than placebo, but it's
12  more green than yellow.
13      Q.   Please proceed to MDD 2.
14      A.   For MDD 2, this was a four
15  arm study with two doses of Seroquel at
16  150 and 300 milligrams, a dose of placebo
17  and a positive controlled called
18  duloxetine.  In this study, the units
19  were milligrams per dL.  The mean change
20  on 150 of Seroquel was 3.29.
21  300 milligrams of Seroquel was 3.87.  And
22  on placebo, I'll focus on placebo, it was
23  1.61.  And the availability in terms of
24  standard deviation was large relative to

Confidential - Mark S. Scott, Ph.D.

Page 431

1    mean in 14.9 to 17 for Seroquel and about
2    12 for placebo.
3         In terms of shifters, there
4    were 3 percent on 150, 6 percent on 300
5    for Seroquel and 1.4 percent on placebo.
6    So although it's most -- it's yellow,
7    there's some green with respect to the
8    means being about the same based on the
9    variability.
10        Q.   You see that I have there,
11   MDD 2 is mostly yellow?
12        A.   Mostly yellow.
13        Q.   Proceed to MDD 3, please.
14        A.   MDD 3 was a trial which was
15   a trial in MDD population where patients
16   after two weeks' time, the physicians
17   could adjust the Seroquel dose. They
18   started at 150. If they felt they
19   weren't doing well in a blinded way, they
20   could give them a higher dose of 300
21   versus placebo. And in that trial, the
22   mean change on Seroquel was 5.41 units
23   and on placebo was 3.62 with a
24   variability for both of those measures as

Page 432

1    high and 23.4 for Seroquel and 18.3 for
2    placebo.
3         In terms of proportion of
4    shifters, there was 4 percent on Seroquel
5    and 5.6 percent on placebo so the
6    proportion of shifters was numerically
7    lower on Seroquel than placebo.
8         So in my assessment here,
9    there's little evidence to see there's a
10   difference between Seroquel and placebo
11   so I've assigned that a green.
12        Q.   Did you find any difference
13   between placebo and Seroquel in MDD 4?
14        A.   MDD 4, no, there was no
15   difference between Seroquel and placebo.
16   The means were essentially the same and
17   the proportion of shifters was .7 percent
18   on Seroquel and 2.2 percent on placebo.
19        Q.   What was the study design of
20   MDD 4?
21        A.   MDD 4 was of exactly the
22   same design as MDD 3.
23        Q.   What were your findings for
24   MDD 6?

Page 433

1         A.   MDD 6, this was -- it was
2    called an adjunctive study in patients
3    that were receiving an antidepressant and
4    weren't doing well. Either Seroquel was
5    added to them or a placebo was added in.
6    In this trial -- excuse me, I'm sorry,
7    there were two doses of Seroquel, 150 and
8    300 milligrams. The mean change on
9    Seroquel for 150 was 4.81. The mean
10   change on 300 milligrams was 5.86, and on
11   placebo it was 2.46. Again, you have a
12   lot of variability because the standard
13   deviations are 21, 22 for Seroquel and 18
14   for placebo. And the shifters were
15   6.4 percent at 150, 8.7 percent for 300,
16   4.8 percent for placebo. So the mean
17   shift -- proportions of shifters was
18   slightly higher on both doses of Seroquel
19   so I've given this more yellow than
20   green. I'd have to look at other data
21   together with this to arrive at a
22   decision.
23        Q.   Going back to MDD 4, you
24   indicated that there was no difference.

Page 434

1    Would that be a green?
2         A.   That would be a green, yes.
3         Q.   And your final evaluation of
4    MDD 6 was what?
5         A.   Would be more yellow than
6    green.
7         Q.   Now, did you look at the
8    glucose data within the clinical study
9    report for MDD 7?
10        A.   Yes. Study 7 was an
11   identical design to study 6 with adding
12   in either Seroquel at 150 or 300 in the
13   background of antidepressant. And in
14   that trial, there was a mean decrease on
15   Seroquel at 150 in terms of the mean of
16   minus .19 or -- minus .19. At
17   300 milligrams there was a mean increase
18   of 2.05. And on placebo there was a mean
19   increase of 1.89. And in terms of the
20   shifters, there was 3.2 percent at 150
21   for Seroquel, 3.3 percent for Seroquel
22   300 milligrams and 6.3 percent for
23   placebo. So the proportions of patients
24   were numerically lower on Seroquel and

30 (Pages 431 to 434)

Confidential - Mark S. Scott, Ph.D.

Page 435

1  placebo in this trial, so I would assign
2  that a green based on those data that
3  there's no evidence there's a difference
4  between Seroquel and placebo and glucose
5  in that trial.
6      Q.   Have we now talked about the
7  low-dose short-term trials for
8  depression?
9      A.   Yes, we have.
10     Q.   Let's now talk about the
11 anxiety trials.  We referenced that there
12 are three of those, GAD 9, 10 and 11.
13 Would you first take trial 9?
14     A.   Trial 9 was a trial looking
15 at three doses of Seroquel in patients
16 with generalized anxiety disorder versus
17 placebo.  The doses of Seroquel were 50,
18 150 and 300 with placebo.  The mean
19 changes in glucose, and again, this is in
20 milligrams per dL, was minus .173 for
21 50 milligrams, 2.76 for 150, 5.36 for
22 300 milligrams, and a mean change of 2.64
23 for placebo.  And, again, you've got wide
24 amount of variability with variances --

Page 436

1  standard deviations running about 22 for
2  the 300 milligram group.
3          In terms of shifters, there
4  was 3.3 percent for 50 milligrams,
5  0 percent for 150, 6.6 percent for
6  300 milligrams and 1.3 percent for
7  placebo.  So it's -- there's some
8  indication for yellow but there's small
9  numbers of shifters and the means are
10 essentially the same based on the
11 standard deviation.  So it's more green
12 than yellow.  Again, I would want to use
13 other data alongside this to arrive at a
14 conclusion about doses of Seroquel in
15 this patient population.
16     Q.   Now, did GAD 10 and 11 have
17 similar study design?
18     A.   Yes, GAD 10 and 11, although
19 they used different doses of Seroquel,
20 they were all -- both placebo controlled
21 and both of those trials used what's
22 called an active control.
23     Q.   Did you find a difference
24 between Seroquel and placebo in GAD 10?

Page 437

1      A.   No.  The mean changes were
2  virtually the same between Seroquel and
3  placebo.  There was actually a decrease
4  from the 300 milligram arm of Seroquel in
5  terms of the mean.  And the shifters were
6  3.7 percent if 150, 3.2 -- 1.6 percent
7  for 300, and 3.2 percent for placebo.  So
8  the evidence there would be that the
9  means were about the same and the
10 shifters were basically the same as well.
11 So I would give that a green.
12     Q.   What about trial GAD 11?
13     A.   For GAD 11 you had two doses
14 of Seroquel, 50 and 150.  You had a
15 decrease in the mean at 50 milligrams.
16 At 150 you had an increase of .9.  For
17 placebo you had an increase of .68.  And
18 shifters were 1.2 percent for
19 50 milligrams, .6 percent for 150, and
20 placebo was 1.8 percent.  So here the
21 proportion of shifters were numerically
22 lower on both Seroquel arms than placebo.
23 So here there's really no evidence that
24 Seroquel is behaving any differently than

Page 438

1  placebo in this trial so I've assigned
2  that a green.
3      Q.   Have the low-dose short-term
4  clinical study reports for MDD and GAD
5  been submitted to the FDA?
6      A.   Yes, they were submitted to
7  the FDA in 2008.
8      Q.   What is the status of the
9  MDD and GAD submissions?
10     A.   Both of those applications
11 are still under review by FDA.
12     Q.   Now, I want to talk to you
13 just for a minute about MDD 5 and MDD
14 12 -- GAD 12, my apologies.  Let me
15 restate that.
16         I want to talk to you
17 briefly about MDD 5 and GAD 12.  Do you
18 see that I have those on the board under
19 the long-term maintenance section?
20     A.   Yes, I do.
21     Q.   So how is MDD 5 different
22 from the other MDD trials that we have
23 discussed this morning?
24     A.   This trial is a maintenance

31 (Pages 435 to 438)

Confidential - Mark S. Scott, Ph.D.

Page 439

1  trial, meaning patients are stabilized on
2  Seroquel for a fixed period of time and
3  then to see whether or not their
4  depressive symptoms come back, quetiapine
5  is maintained or they receive placebo.
6  So it was a maintenance trial.
7      Q.  I'm bringing to you
8  Exhibit 133, and I want to talk to you
9  about just a couple details of this
10  trial.
11          - - -
12      (Exhibit Defendant's-133,
13      4/9/08 Clinical Study Report,
14      Bates D339-L01124830-00001 -
15      00012, 00153 - 00158 & 05153, was
16      marked for identification.)
17          - - -
18      MR. GALLAGHER:  133 is GAD
19  12.  So 140.
20          - - -
21      (Exhibit Defendant's-140,
22      1/29/08 Clinical Study Report,
23      Bates AZSER 25196103 - 6120, 6242
24      - 6249, 6310 - 6323 & 25203527,

Page 440

1  was marked for identification.)
2          - - -
3  BY MR. BROCK:
4      Q.  Let me start over.  I want
5  to talk to you about Exhibit 140.  Do you
6  have excerpts there from the clinical
7  study report?
8      A.  Yes, I do.
9      Q.  That's Exhibit 140?
10      A.  Correct.
11      Q.  If you look at the second
12  page of the document, do you see that the
13  last patient completed the trial on
14  August the 1st, 2007?
15      A.  Yes.
16      Q.  Is there information in
17  Defendant's Exhibit 140 that will assist
18  you in commenting on glucose issues
19  within this clinical trial?
20      A.  Yes, there are.  There are
21  glucose data from the randomized portion
22  of the clinical trial.
23      Q.  Would you point us to the
24  table that would assist you in discussing

Page 441

1  glucose issues in this trial?
2      A.  This would be Table 77.
3  This would be on page 209.
4      Q.  We see that that's glucose
5  regulation laboratory data with columns
6  for placebo and for quetiapine XR?
7      A.  Yes.
8      Q.  And then there are numbers
9  of patients in each arm that are listed
10  just below that?
11      A.  Yes.
12      Q.  And would you describe for
13  us what information is contained in Table
14  77 that assists you in evaluating glucose
15  issues within this clinical trial?
16      A.  I've taken the data from the
17  randomized phase to compare what happens
18  with continuation of Seroquel versus
19  withdrawing Seroquel.  So I look in the
20  randomization phase and look at change
21  for end of phase.  I look at the mean
22  changes for Seroquel versus the mean
23  change for placebo during that period.
24      Q.  And do you show there 2.76

Page 442

1  versus 2.73?
2      A.  Yes, I do.  With standard
3  deviations of 18.5 and 23.2.
4      Q.  2.76 for placebo and 2.73
5  for quetiapine XR?
6      A.  2.76 for placebo, yes.
7      Q.  2.73 for quetiapine XR?
8      A.  Correct.
9      Q.  What does that say to you as
10  a statistician?
11      A.  For those mean changes
12  there's no difference between quetiapine
13  and placebo.
14      Q.  Is there anything else that
15  we need to look at within this clinical
16  study report?
17      A.  I would look at the shifts
18  to clinically significant ranges.
19      Q.  Would you point that table
20  to us, please?
21      A.  This would be Table 81 on
22  the bottom of page 217.
23      Q.  Describe your finding there.
24      A.  My finding there is that for

32 (Pages 439 to 442)

Confidential - Mark S. Scott, Ph.D.

Page 443

1  quetiapine, there were 7.1 percent of
2  patients that were shift to high and
3  7.5 percent of patients on placebo.  So
4  they were numerically less patients on
5  quetiapine shifting to high,
6  proportionally less patients shifting to
7  high.
8      Q.   What's the significance of
9  that to you as a statistician?
10     A.   To me there would be no
11 indication that there was a difference
12 between Seroquel and placebo in this
13 trial.
14         For the records, my notes, I
15 switched the columns of this on my notes
16 but the inferences are the same.
17     Q.   You're talking about just in
18 terms of how you wrote it out?
19     A.   Quetiapine switched with
20 placebo, but my inferences are exactly
21 the same.
22     Q.   So based on the glucose data
23 that you considered out of MDD 5, what
24 was your conclusion?

Page 444

1      A.   I would assign that a green
2  based on that evidence, that there's no
3  difference between Seroquel and placebo
4  in that setting.
5      Q.   Quickly let's move to GAD
6  12.  Would you describe GAD 12 in terms
7  of study design and the findings that you
8  made from GAD 12 with regard to glucose?
9      A.   It's a similar design to
10 that of MDD except that it's in a patient
11 population with generalized anxiety
12 disorder, Seroquel versus placebo,
13 placebo being withdrawn after Seroquel
14 has been given for a fixed period of
15 time.
16         In terms of glucose, this
17 would be on Table 51, on page 154 of this
18 document, where randomization, the change
19 for Seroquel XR was 0.44 with a standard
20 deviation of 10.45.  On placebo the
21 change was 1.49 and the units are
22 milligrams per dL.  So there's no
23 indication in terms of the change in the
24 means that quetiapine is different than

Page 445

1  placebo.
2          Now, in terms of if I want
3  to look at shifters as well in the same
4  trial, and I would go to Table 53 which
5  is on page 158, and a portion of shifters
6  on Seroquel was 3.7 percent versus
7  2.8 percent on placebo, so the quetiapine
8  group is numerically higher, however,
9  there are small number of patients.  So
10 my overall assessment on this trial would
11 be green as well.  There's no evidence to
12 suggest that Seroquel is behaving any
13 differently than placebo.
14     Q.   Are there tables for
15 incidence densities there?
16     A.   Yes, there are.
17     Q.   What table is that?
18     A.   This is the table at the
19 bottom of page 5153, the table on page
20 5153, the very last page of the document
21 that I have which is Table 11.3.7.1.8.1.
22     Q.   This is a new term,
23 incidence density.  Would you define that
24 for the benefit of the jury, please?

Page 446

1      A.   The incidence density is --
2  because the way this trial was conducted,
3  the amount of follow up on quetiapine or
4  Seroquel is longer than what's on
5  placebo.  And the result of that, the
6  likelihood is that more tests would be
7  given for any laboratory value.  So as a
8  result, you want to adjust the
9  percentages that you have for the amount
10 of follow-up time that you have.  And a
11 common way of doing that is to adjust by
12 the length of follow up.  And so a more
13 appropriate measure in this setting would
14 be to look at the incidence relative to
15 the follow-up time for Seroquel versus
16 placebo.  And in this case, in terms of
17 the shifters, in terms of incidence
18 densities, you have an incidence density
19 of 12.9 on placebo and incidence density
20 of 11.3 on Seroquel.  So it doesn't say
21 anything more than the percentages.  It
22 says that because of the follow-up time,
23 you're bringing those numbers closer to
24 together which is an appropriate way to

33 (Pages 443 to 446)

Confidential - Mark S. Scott, Ph.D.

Page 447

1    adjust for what is called differential
2    follow up.
3        Q.   What's the significance to
4    you as a statistician of the 12.9 and
5    11 -- what was the other number?
6        A.   11.3.
7        Q.   11.3 numbers.  Let me reask
8    the question.
9            What's the significance to
10   you as a statistician of an incidence
11   density of 12.9 for placebo versus 11.3
12   for quetiapine?
13       A.   Well, in this instance, I'd
14   be saying that there wasn't any
15   difference between Seroquel and placebo
16   on that measure.  I would also say it
17   supports the observation from the
18   proportions themselves.
19       Q.   Based on your evaluation of
20   glucose information in the clinical study
21   report of GAD 12, what was your
22   conclusion?
23       A.   That would be a green study
24   as well.

Page 448

1        Q.   And the basis of that?
2        A.   There's no evidence to
3    suggest that Seroquel is behaving any
4    different than placebo in that setting.
5        Q.   Dr. Scott, I have one more
6    trial I need to talk to you about, and
7    that's study 125.  Are you familiar with
8    the study design of trial 125?
9        A.   Yes, I am.
10       Q.   Would you briefly describe
11   for the benefit of the jury the study
12   design of 125?
13       A.   The study design of 125 was
14   to examine a very -- to examine glucose
15   changes as measured by a very sensitive
16   measure of glucose in patients with
17   schizophrenia treated for six months of
18   time.  So it was a randomized active
19   control trial looking at measure -- a
20   measure of glucose function over a
21   six-month period in patients with
22   schizophrenia.
23       Q.   What were the study design
24   strengths of study 125 in terms of

Page 449

1    answering the question of whether
2    Seroquel has an effect on glucose?
3        A.   The study design features --
4    there are a number of study design
5    features, the first of which was it was
6    using a very sensitive measure of glucose
7    function in what is called the oral
8    glucose tolerance test.  And I'm not an
9    expert in that test, but in my
10   conversations with individuals who are,
11   they say it's a very effective measure in
12   assessing glucose.
13           MR. ALLEN:  Object to the
14       responsiveness of the answer.  And
15       now based on the answer, I need to
16       object to the form of the
17       question.  The witness is not
18       qualified to answer this.
19   BY MR. BROCK:
20       Q.   You may continue.
21       A.   The other aspect -- there
22   are other aspects as well.  Given that
23   fasting status is a very important
24   consideration, as I understand, in terms

Page 450

1    of assessing glucose data, ensuring
2    fasting -- we ensured fasting in this
3    trial by patients being hospitalized for
4    their assessments of the oral glucose
5    tolerance test.  Another feature was that
6    we wanted to make sure that individuals
7    given -- the treatment arms were the
8    atypical antipsychotics of Seroquel,
9    olanzapine and risperidone.  We wanted to
10   make sure that that patient population
11   received very little of those treatments
12   prior to being in this trial.  So very
13   few of the patients had exposures to
14   those agents prior to entering this
15   trial.  So we had individuals that hadn't
16   been treated with these drugs before.  We
17   had assured fasting status by
18   hospitalization and using a very
19   sensitive measure of glucose function in
20   this clinical trial.
21           MR. ALLEN:  I apologize, I
22       need to object to the
23       nonresponsive.  When I objected
24       the first time I thought he was

34  (Pages 447 to 450)

Confidential - Mark S. Scott, Ph.D.

Page 451

1  through with his answer.
2         - - -
3         (Exhibit Defendant's-1482, A
4  24-Week, Multicenter, Open-Label,
5  Randomized Study to Compare
6  Changes in Glucose Metabolism in
7  Patients With Schizophrenia
8  Receiving Treatment With
9  Olanzapine, Quetiapine, or
10  Risperidone, was marked for
11  identification.)
12         - - -
13  BY MR. BROCK:
14     Q.   I'm going to hand you
15  Exhibit 1482.  And while that's being
16  walked around, would you just identify
17  briefly for the members of the jury what
18  Exhibit 1482 is?
19     A.   Exhibit 1482 is a
20  peer-reviewed publication of the results
21  of trial 125.
22     Q.   And then is there a table
23  within that document that would assist
24  you in describing the clinical trial

Page 452

1  design?  I believe it's Table 3A.  Figure
2  3A.
3     A.   Figure 3A.  Figure 3A in
4  terms of -- this assists me in part for
5  looking at what the results of the trial
6  were with respect to the primary endpoint
7  of the trial.  Now, what this represents
8  is this trial was designed to look at
9  what happens after six months of therapy
10  or 24 weeks of the oral glucose tolerance
11  test prior to receiving either Seroquel,
12  risperidone or olanzapine, and then what
13  happens after 24 weeks using that same
14  test.  And what is here as Figure 3 are
15  the data from the oral glucose tolerance
16  test for quetiapine.
17     Q.   If we look on the left-hand
18  side at the place where there is a zero,
19  do you see that?
20     A.   Yes, I do.
21     Q.   And then there are two boxes
22  there?
23     A.   Yes.
24     Q.   So what time point is that

Page 453

1  and what do those boxes represent?
2     A.   The zero time in the box
3  which is lightly shaded, which is
4  baseline, is the time before receiving
5  any Seroquel at all.  And the darker box
6  is what happens after 24 weeks of
7  Seroquel or quetiapine prior to the
8  initiation of the oral glucose tolerance
9  test.
10     Q.   And if we move out to the
11  two boxes at 120, what do those
12  represent?
13     A.   Those represent the changes
14  that are seen in glucose at the end of
15  the oral glucose tolerance test for
16  Seroquel at baseline and at week 24.
17         - - -
18         (Exhibit Defendant's-125,
19  6/12/06 Clinical Study Report,
20  Bates AZSER 12441945 - 2099, was
21  marked for identification.)
22         - - -
23  BY MR. BROCK:
24     Q.   Let me ask you to look at

Page 454

1  study 125, the clinical study report
2  which is Exhibit 125.  Do you have that
3  there?
4     A.   Yes, I do.
5     Q.   And if you would turn to
6  page 156.
7         MR. ALLEN:  Are you talking
8  about Exhibit 125?
9         MR. BROCK:  Yes.
10  BY MR. BROCK:
11     Q.   Does this Table 58 help us
12  understand the figure that we were just
13  talking about?
14     A.   Well, it helps us
15  understand.  This doesn't contain the
16  primary analysis using the -- all of the
17  data that are there, but this represents
18  the zero time point which is fasting
19  plasma glucose in the two-hour glucose
20  concentration.  So this is two points
21  that are part of the primary efficacy
22  analysis or the primary analysis in this
23  clinical trial.
24     Q.   So what does this table tell

35 (Pages 451 to 454)

Confidential - Mark S. Scott, Ph.D.

Page 455

1  us, Table 58?
2      A.   Well, from my perspective,
3  what I would interpret this, is that
4  there's a change, a rise in fasting
5  plasma glucose at week 24 at the zero
6  hour and that there's a change in the
7  mean, decrease in the change of mean at
8  two hours.  But, again, my observations
9  rely on the oral glucose tolerance test
10 as a whole which is all four of those
11 values in terms of assessing what the
12 effect of quetiapine was over the
13 baseline value.
14     Q.   So if we go back to the
15 table in the Newcomer paper, can you use
16 this to describe for the jury the outcome
17 of the test in terms of the primary
18 measure that was being considered?
19     A.   The primary measure was a
20 change from baseline in the oral glucose
21 tolerance test.  And although it's not
22 shown on there, in the Newcomer paper
23 which is in Figure 2, there was a
24 nonspecific significant change in all

Page 456

1  glucose tolerance from week zero to week
2  24 for quetiapine in this study.  And
3  that uses all of the data that are on
4  those two curves to compare the changes
5  in glucose.
6      Q.   Can you find in study 125
7  the place where the outcome of the
8  primary analysis is reported, please?
9      A.   Yes, I can.
10     MR. ALLEN:  Again, I would
11 note for the record, it's now
12 approximately 11:40.  You thought
13 we were going to be through by
14 11:00, 11:30.  We need time to
15 conduct our cross.  I hope we're
16 coming to a conclusion.
17     MR. BROCK:  I have 11:34.
18     MR. ALLEN:  Are we getting
19 close to conclusion, that's my
20 point?  If you'd like, you can go
21 to 2:00 or 3:00 provided I get my
22 adequate time to cross.
23     MR. BROCK:  If you'll be
24 quiet, I can concentrate, we'll

Page 457

1  finish up.
2      MR. ALLEN:  I think the
3  record will reflect I've been
4  extremely quiet.
5      THE WITNESS:  I would go to
6  the synopsis because that contains
7  a summary of what's in the
8  clinical trial report.  And this
9  would be on page 9 of the synopsis
10 which is Table S4.  Table S4
11 contains the analysis of what's
12 called area under the curve.  It
13 took those four -- those values
14 for the oral glucose tolerance
15 test for that two period -- that
16 period of time and compares them.
17 And for quetiapine there's a
18 nonstatistically significant
19 change in what the results from
20 the oral glucose tolerance test at
21 week 24, and that's evidenced by
22 the least square mean being .5 and
23 the confidence interval
24 being minus 1 -- minus .13 to

Page 458

1  1.14, approximately, meaning
2  covering zero.  And in statistical
3  terms, that's a nonsignificant
4  change from baseline.
5  BY MR. BROCK:
6      Q.   So in terms of the primary
7  endpoint of the trial, what was the
8  finding, please, sir?
9      A.   The primary endpoint of the
10 trial, that there was no significant
11 change for quetiapine and there was
12 another endpoint with respect to change
13 from olanzapine.  And the changes on
14 Seroquel were different, were less than
15 the changes seen on olanzapine.
16     MR. ALLEN:  Do you want to
17 go off the record while y'all
18 talk?  Let's go off the record.
19     VIDEOGRAPHER:  Off the
20 record.  11:38.
21         - - -
22     (A recess occurred.)
23         - - -
24     VIDEOGRAPHER:  Back on the

36 (Pages 455 to 458)

Confidential - Mark S. Scott, Ph.D.

Page 459

1     record. 11:39.
2  BY MR. BROCK:
3     Q.   Dr. Scott, the trial that we
4  just discussed, study 125, is not a
5  placebo-controlled trial.  Correct?
6     A.   Correct.
7     Q.   And trial 125 is not on the
8  board that we have here.  Correct?
9     A.   Correct.
10    Q.   Is it correct that there are
11 clinical trials that have been conducted
12 by AstraZeneca with regard to the
13 medicine Seroquel that are not placebo
14 controlled?
15    A.   Yes, there are.
16    Q.   Why do you do tests of
17 Seroquel against medicines that are not
18 placebo controlled?
19    A.   Well, in the example of 125,
20 you had schizophrenic patients, and
21 there'd be -- my understanding, there'd
22 be some very large ethical considerations
23 to exposing patients to placebo on
24 schizophrenic population for long periods

Page 460

1  of time.  So you'd want to make sure that
2  those individuals were, in fact,
3  receiving appropriate therapy for the
4  treatment of their symptoms.
5         MR. BROCK:  Thank you very
6     much.
7         Pass the witness.
8         VIDEOGRAPHER:  We are now
9     going off the record.  This is the
10    end of videotape number two.  The
11    time is 11:40.
12         - - -
13         (A recess occurred.)
14         - - -
15         (Exhibits Scott-34,
16    Handwritten notes, were marked for
17    identification.)
18         - - -
19         VIDEOGRAPHER:  We are now
20 back on the record.  This is the
21 beginning of videotape number
22 three.  The time is 11:50.
23
24

Page 461

1         - - -
2            EXAMINATION
3         - - -
4  BY MR. ALLEN:
5     Q.   Good afternoon.  I guess
6  it's still good morning, Doctor.  How are
7  you?
8     A.   Good morning.
9     Q.   Dr. Scott, my name is Scott
10 Allen.  I'm from Houston, Texas.  I
11 represent the plaintiffs in the Seroquel
12 litigation, and I'm here to ask you
13 questions in follow up to Mr. Brock.  Do
14 you understand?
15    A.   Yes, I do.
16    Q.   Do you recall yesterday you
17 made agreement with Mr. Pennock, and he
18 explained what a deposition was and he
19 explained about if you don't understand a
20 question, let me know?  Do you recall
21 that?
22    A.   I recall that.
23    Q.   Do you understand that
24 you're still under oath and the same

Page 462

1  rules still apply?  Do you understand
2  that?
3     A.   Yes, I do.
4     Q.   Now, do you recall telling
5  Mr. Pennock at several points yesterday
6  in answer to his questions, you would say
7  things to Mr. Pennock, and I'm
8  paraphrasing, like I really can't render
9  clinical judgments, I'm not a doctor,
10 that calls for a clinical judgment, I'm
11 not a physician.  Do you recall that?
12         MR. BROCK:  Object to form.
13    You may answer.
14         THE WITNESS:  What I recall
15    is we had discussions about
16    clinical relevance of statistical
17    results, that I can speak to the
18    results from a statistical
19    perspective, but the actual
20    clinical interpretation of them, I
21    have to leave to others with that
22    judgment.
23 BY MR. ALLEN:
24    Q.   And I want to break that

37 (Pages 459 to 462)

Confidential - Mark S. Scott, Ph.D.

Page 463

1  answer down and make sure you and I are
2  communicating and the jury understands
3  your answer.  You can talk about
4  statistical values of numbers from a
5  statistician's point of view, but
6  concerning the clinical relevance of
7  those numbers to doctors and the practice
8  of medicine, you have to leave that to
9  doctors.  Right?
10        MR. BROCK:  Object to form.
11        THE WITNESS:  Again, talking
12     about the results in a clinical
13     trial, I can speak to whether the
14     results that are there are -- in
15     the examples we've been talking
16     about are consistent with placebo
17     or whether they're statistically
18     different.  The interpretation of
19     any results have to be ultimately
20     guided by the clinician who has
21     more experience in what those data
22     might be in that context.
23  BY MR. ALLEN:
24     Q.   So the interpretation of the

Page 464

1  significance of the results needs to be
2  left to clinicians.  Is that your
3  testimony?
4     A.   The interpretation -- the
5  interpretation from a statistical
6  perspective, I believe I can provide
7  based on my qualifications, but the
8  interpretations of the results from a
9  clinical perspective, that would be in
10  the clinical camp.
11     Q.   You used the term "from a
12  clinical perspective."  Tell the jury
13  what that means.
14     A.   My understanding of what a
15  clinical interpretation was, a clinician
16  would look at the results of a clinical
17  trial, and based on the evidence there
18  from a statistical point of view and a
19  clinical point of view arrive at a
20  decision about what that might mean.
21     Q.   And that's something you're
22  not qualified to do?
23     A.   I am qualified to render a
24  judgment with respect to the statistical

Page 465

1  significance of the results and help the
2  clinician try to understand the results
3  in the context of the clinical trial that
4  was conducted.  But ultimately I would
5  defer to their judgment about what those
6  data might mean.
7     Q.   And you said I would defer
8  to their judgment on what that -- those
9  data might mean.  Why would you defer to
10  their judgment on what the data might
11  mean?
12     A.   In the conduct of a clinical
13  experiment, we have a placebo-controlled
14  trial as an example, you'll have results
15  in front of you in terms of the outcome
16  of the clinical trial, and if you have
17  differences which are statistically
18  significant, I would want to have a
19  clinician to under -- tell me whether or
20  not they're clinically relevant or not
21  clinically relevant depending on the
22  nature of the differences in the patient
23  population that was being looked at.
24     Q.   Why do you need the

Page 466

1  physician there to tell you whether the
2  results are clinically relevant or
3  whether they're clinically not relevant?
4     A.   My belief is that they
5  have -- they have the clinical experience
6  and the background to understand what
7  they might mean in the context of that
8  patient and the context of what other
9  might be going on with a variety of
10  patients under their experience.
11     Q.   And you do -- sorry.  And
12  you do not have that background, training
13  and experience.  Is that correct?
14     A.   I am a -- I am not a
15  clinician.  I am a statistician.  I'm
16  sorry.
17     Q.   You're not a clinician,
18  you're a statistician.  Correct?
19     A.   Yes, I am.
20     Q.   Concerning, for example,
21  fasting versus nonfasting glucose levels,
22  you don't know the clinical significance
23  of the numbers used, do you?
24        MR. BROCK:  Object to form.

38 (Pages 463 to 466)

Confidential - Mark S. Scott, Ph.D.

Page 467

1    THE WITNESS:  What I do know
2  is that fasting is an important
3  component assessing the
4  reliability of the glucose
5  measures.  And I have some
6  knowledge that if you obtain
7  values which are in a nonfasting
8  state, they could be more variable
9  than that which is seen under
10  fasting conditions.  That's just
11  from experience of looking at data
12  and talking to clinicians about
13  that's what happens.
14  BY MR. ALLEN:
15    Q.   Is that the general state of
16  your knowledge concerning the differences
17  between fasting and nonfasting glucose,
18  you just explained it to the jury?
19    A.   Could you be more specific
20  about the question?
21    Q.   Yes, sir.  Can you tell us
22  the clinical significance or your
23  understanding of the clinical
24  significance in detail, please, between

Page 468

1  the clinical significant differences
2  between fasting and nonfasting glucose,
3  tell us what you know about that?
4    A.   I know it is important to
5  have reliable values for glucose is to
6  take them under fasted conditions.
7    Q.   Anything else you know about
8  that topic?
9    A.   Like I said, we've used that
10  as -- in trial 125 to make sure that they
11  were fasted.  To have them in the
12  hospital overnight to assure that no --
13  there was no caloric intake.
14    Q.   Yes, sir.
15    A.   So I believe it is an
16  important component of assessing the
17  reliability of the measures of glucose
18  that you have in a clinical trial.
19    Q.   In a clinical trial.  But
20  I'm talking about the clinical setting
21  for patients, actual care and treatment
22  of patients with hyperglycemia or a
23  pre-hyperglycemic state, do you
24  understand the significance of the

Page 469

1  measurements of glucose fasting and
2  nonfasting and what those various levels
3  of measurements are or should be for
4  patients?
5    A.   We switched from clinical
6  trials to patient care, so could you
7  please explain the question, I'm not
8  understanding it?
9    Q.   Yes, sir.  You just
10  understand these glucose measurements you
11  talked about for four or five hours with
12  Mr. Brock, you just understand those as a
13  statistician, and not a doctor who sees,
14  cares and treats for patients.  Correct?
15    A.   I understand them in terms
16  of the evidence that's there in terms of
17  what happens on Seroquel versus what
18  happens on placebo in the same patient
19  population.  So I could render a judgment
20  with respect to whether or not those are
21  statistically different or not in that
22  same patient population.
23    Q.   Can you render clinical
24  judgments based upon the statistical

Page 470

1  analysis that you did?
2    A.   What happens in an
3  individual patient I cannot speak to
4  because I'm not -- I don't treat
5  patients.
6    Q.   And so rendering a clinical
7  judgment based upon these statistics
8  concerning how it affects individual
9  patients, you're not qualified to tell us
10  about.  True?
11    A.   As I said, what I can do is
12  I can -- in the presentation of clinical
13  trial data to physicians, to describe the
14  results as they were collected, the
15  differences that we see and whether or
16  not those differences are potentially
17  significant or not.  And the clinician
18  would have to understand or decide
19  whether or not there is clinical
20  relevance attached to those results.
21    MR. ALLEN:  Objection.
22  Nonresponsive.
23  BY MR. ALLEN:
24    Q.   I didn't ask you what you

39 (Pages 467 to 470)

Confidential - Mark S. Scott, Ph.D.

Page 471

1  can do, I'm trying to establish for the
2  jury what you can't do.  Okay.
3         My question to you was:  You
4  can't use these statistics that you have
5  come up with with Mr. Brock for four or
6  five hours and tell us the clinical
7  relevance of those statistics to an
8  individual patient, can you, sir?
9         MR. BROCK:  Object and move
10        to strike the argument.  There is
11        a question at the end that you
12        should answer.
13        THE WITNESS:  So could you
14        repeat the question at the end,
15        please?
16 BY MR. ALLEN:
17    Q.   You don't understand my
18 question?
19    A.   I believe I thought I was
20 answering your question.  I apologize if
21 I'm not.
22    Q.   You have told the jury what
23 you can do as a statistician, have you
24 not?  Have you not?

Page 472

1    A.   Yes, I have told the jury
2  what I can do in terms of context of a
3  clinical trial, yes.
4    Q.   And I'm not -- my question,
5  next question is not directed to that
6  point as a statistician.  My question is,
7  what you cannot do with these numbers.
8  Do you understand what I just said?
9    A.   That -- what I cannot do
10 with these numbers is a very large -- is
11 something which is too ill-defined for me
12 to understand right now.
13    Q.   Let me see if I can define
14 it for you very clearly and very
15 succinctly so the jury can understand it.
16 You can't take these statistics that you
17 talked with Mr. Brock about for four of
18 five hours and apply them to individual
19 patients to make decisions concerning, A,
20 patient care, you can't do that, can you?
21    A.   I do not see patients so I
22 can't render a judgment about what values
23 mean for individual patients.
24    Q.   Right.  You can't then take

Page 473

1  these values or these statistics that you
2  discussed with Mr. Brock for four and
3  five hours and tell this jury how these
4  will affect the individual patient
5  physically or physiologically.  Is that
6  correct?
7         MR. BROCK:  Object to form.
8         THE WITNESS:  Again, what I
9  can do is the following:  I would
10 hope that through the analysis of
11 data from the clinical trials, the
12 clinician and I would agree on the
13 relevance of those from a
14 statistical perspective and then
15 he or she could use them in
16 determining whether or not in a
17 Seroquel has an effect or not in a
18 particular patient population.  I
19 think that's what the results of
20 clinical trials do.  They tell you
21 about generally what happens
22 versus what doesn't happen.
23        I don't think you can take
24 the results from one clinical

Page 474

1  trial and then say what's going to
2  happen in an individual patient.
3  I think this is just general
4  results and how that information
5  then gets in this case translated
6  into patient labeling about what
7  might happen with one drug versus
8  the other.
9         MR. ALLEN:  I need to object
10        to that as nonresponsive, although
11        I'll review it prior to trial.
12 BY MR. ALLEN:
13    Q.   Do you often -- do you
14 consult with any physicians currently or
15 have you in the last 26 years concerning
16 the care and treatment of patients with
17 diabetes and hyperglycemia?
18    A.   That's not my role.
19    Q.   So have you done that in the
20 last 26 years?
21    A.   No, I have not.
22    Q.   Had you drawn blood or
23 ordered blood to be drawn, either fasting
24 or nonfasting, in the last 26 years?

40 (Pages 471 to 474)

Confidential - Mark S. Scott, Ph.D.

Page 475

1      A.   Again, my role is a -- part
2   of the clinical trial process where there
3   were clinicians with respect to the
4   design, analysis, interpretation of
5   experiment, so I don't draw blood, that's
6   not my role.
7      Q.   Nor do you order it drawn?
8      A.   No, but I work with
9   clinicians on the appropriate design of
10  experiments where those activities are
11  taken on.
12     Q.   So you don't order blood
13  drawn, you don't then take the blood
14  drawn from patients and do any analysis
15  on that blood in treating patients, and
16  you haven't done that in the 26 or 7
17  years you've been at AZ.  Is that
18  correct?
19     A.   Again, what I do do is I
20  work with clinicians on the appropriate
21  design of experiment so that they can
22  assess whether or not the results that
23  they've seen for all of those things are
24  relevant in the context of that

Page 476

1   experiment.
2           MR. ALLEN:  I need to object
3       to that as nonresponsive.
4   BY MR. ALLEN:
5      Q.   Sir, I handed you before we
6   went on the record what I marked as
7   defendants -- excuse me, Scott Exhibit
8   Number 34.  If you want it again, you can
9   certainly get it.  Those are the notes
10  that you -- what are those notes?  I
11  think what I saw today, that you were
12  using with Mr. Brock, these are where
13  your calculations were made concerning
14  the various studies that Mr. Brock asked
15  you to testify about?
16     A.   These were taken directly
17  from the clinical trial reports that were
18  conducted by AstraZeneca in support of
19  various applications for the use of
20  Seroquel in a variety of mental disorders
21  and I've just taken -- extracted those
22  results.  This was for convenience.
23     Q.   I just asked, so are those
24  just numeric values on Exhibit 34?

Page 477

1      A.   Those are the numeric
2   changes on -- numeric changes in terms of
3   the means versus placebo, yes.
4      Q.   And you have not done a
5   statistical analysis of those numeric
6   changes that you've used in your notes on
7   Exhibit 34.  Is that correct?
8      A.   Well, these don't -- some of
9   these had statistics applied to them that
10  were part of the clinical trial report.
11  So all I've done is I've extracted the
12  means themselves.
13     Q.   And my question --
14         MR. ALLEN:  Objection.
15         Nonresponsive.
16  BY MR. ALLEN:
17     Q.   My question to you is, you
18  utilized Exhibit 34, you have the
19  original notes right there next to it, do
20  you not?
21     A.   Yes, I do.
22     Q.   And you utilized those
23  numbers in answering questions that Mr.
24  Brock asked you today, September 24,

Page 478

1   2009, when he was asking questions,
2   didn't you?
3      A.   Yes, I did.
4      Q.   Now, you did not do a
5   statistical analysis of those numbers,
6   did you?
7      A.   Well, again, the statistical
8   analysis would have been done as part of
9   the clinical trials themselves.  And I
10  did some statistical analysis in terms of
11  if you have values which are close to
12  each other with large standard deviations
13  and sample sizes, that you're going to
14  not have a statistically significant
15  difference just based on those
16  observations.  So I don't necessarily
17  need to do a formal evaluation to see
18  whether or not they're statistically
19  significant or not because for the vast
20  majority of these, they're not
21  statistically significant in terms of the
22  changes in means.
23     Q.   Well, did you do relative
24  risk calculations for those numbers that

41 (Pages 475 to 478)

Confidential - Mark S. Scott, Ph.D.

Page 479

1  you testified to Mr. Brock about?
2      A.  Well, we have -- in each of
3  these clinical trials, we have shifters
4  and the shifters can be used to calculate
5  relative risks, but to me it's the same
6  test as a test for proportions in this
7  setting.
8          MR. ALLEN:  Objection.
9      Nonresponsive.
10 BY MR. ALLEN:
11     Q.  I'm asking you in your
12 calculations on Exhibit 34, did you
13 calculate a relative risk?
14     A.  No.  As I said, I had --
15 what I did is I looked at the
16 proportions between Seroquel and placebo
17 for shifters, and you can make a
18 calculation of a relative risk.  It's the
19 same thing as, you know, taking the
20 fractions and dividing them into each
21 other.  But this, from an inference point
22 of view, you would look at that and say
23 is there something going on that's worth
24 even testing.

Page 480

1      Q.  So you can calculate a
2  relative risk but you did not do so.  Is
3  that correct?
4      A.  Like I said, what I did do
5  was have the proportions of patients with
6  these various shifters and looking at
7  them between Seroquel and placebo.  So to
8  calculate a relative risk, to be honest
9  with you, doesn't make any difference
10 because you're looking at the same set of
11 data just in a different way.
12     Q.  Did you calculate hazard
13 ratios?
14     A.  Well, hazard ratios wouldn't
15 be applicable to this particular setting.
16 These are just observations of shifts,
17 and hazard ratios are used in a different
18 context.
19     Q.  So these were just
20 observations, you conducted a
21 quantitative -- excuse me, a qualitative
22 analysis?
23     A.  No, I believe it was a
24 quantitative analysis in the sense of

Page 481

1  looking at the means, looking at the
2  variance, determining the difference in
3  the means and saying the variance is
4  relatively large so the significance
5  level in terms of, from my experience,
6  would be that if you were to do one test
7  after another, you'd get a nonsignificant
8  difference.
9      Q.  So you didn't do relative
10 risk, you said hazard ratios weren't done
11 because you didn't believe they applied.
12 Did you do p-values in your calculations
13 for the numbers you talked to Mr. Brock
14 about?
15         MR. BROCK:  Object to form.
16         THE WITNESS:  Again, I'll go
17     back to the relative risk.
18     Looking at proportions you can
19     either look at a difference in
20     proportions or you can look at it
21     as if you would like to look at
22     relative risks.  Hazard ratios, I
23     think you need to understand, I
24     need to understand what you mean

Page 482

1      by hazard ratios in this context,
2      because not doing hazard ratios
3      is, to me, is not appropriate for
4      this because these trials were --
5      these weren't designed to look at
6      hazard ratios in terms of glucose
7      values.  These were -- glucose
8      values were all part of the safety
9      evaluation along with other safety
10     evaluations.
11 BY MR. ALLEN:
12     Q.  So you didn't do relative
13 risks, you didn't do hazard ratios.  Did
14 you do p-values is my question?
15     A.  There were some p-values
16 that were actually calculated as part of
17 the clinical trials for submissions for
18 each of these submissions as well as
19 p-values were done in other settings for
20 FDA with respect to changes in these
21 values.  But again, from my experience,
22 as a statistician, it's very simple to
23 look at these values and say, you know,
24 there wouldn't be a significance there

42 (Pages 479 to 482)

Confidential - Mark S. Scott, Ph.D.

Page 483

1   just on the virtue of the size of the
2   change and difference in means as well as
3   the variability that's attached to them.
4       Q.   So in your calculations and
5   your numbers listed on Exhibit 34, the
6   notes utilized with Mr. Brock, you did
7   utilize those notes when you answered Mr.
8   Brock's questions, didn't you?
9       A.   Yes, I did.
10      Q.   Are there any p-values
11  calculated, yes or no?
12      A.   As I said, that this was an
13  inspection of the data from my point of
14  view with respect to the magnitude of the
15  effect in terms of changes in glucose as
16  well as in the proportions of shifters
17  and given the changes in being very
18  similar for a lot of the clinical trials
19  as well as the proportions of shifters
20  being the same, the likelihood of any
21  p-value being significant would be very
22  small, so in my experience those p-values
23  would be all nonsignificant.
24          Now, I need to couch this in

Page 484

1   terms of these data were collected as
2   part of an overall safety profile for the
3   drug.  So we routinely wouldn't do
4   p-values as part of our investigation
5   unless there was something that was, as I
6   said yesterday, unexpected as a result of
7   an observation in the clinical trial
8   program or something that could have been
9   determined in advance due to the
10  pre-clinical pharmacology.  So even if I
11  calculated p-values on the basis of this,
12  I'd want to look at what they actually
13  meant in terms of all the tests that
14  could have been done on data like this.
15          MR. ALLEN:  I need to object
16      to that as nonresponsive.
17  BY MR. ALLEN:
18      Q.   But let's pick up where --
19  your last part of your answer.  Even if I
20  had done p-values.  Do you remember
21  saying that?
22      A.   Yes.
23      Q.   My only question to you is,
24  on the notes that you utilized in

Page 485

1   answering Mr. Brock's questions,
2   Exhibit 34, did you calculate p-values,
3   yes or no?
4       A.   Like I said, if I give you
5   an example for one of the clinical trials
6   where you have a decrease on Seroquel
7   which is smaller than the decrease on --
8   smaller than the change on placebo, that
9   by definition you wouldn't have -- you
10  wouldn't be able to say statistically as
11  Seroquel being significantly worse than
12  placebo.  That's by definition.  So
13  that's my -- my statistical experience
14  would tell me that I don't need to
15  calculate a p-value in these settings
16  because the numbers are very close and
17  the variability is very large.
18          MR. ALLEN:  Objection.
19          Nonresponsive.
20  BY MR. ALLEN:
21      Q.   Have you just testified, Mr.
22  Allen, members of the jury, I did not
23  calculate p-values in Exhibit 34 that I
24  utilized in answering Mr. Brock's

Page 486

1   question?  Is that your testimony?
2           MR. BROCK:  Object to the
3       form.  You can answer.
4           THE WITNESS:  Again, the
5       p-values don't need to be
6       calculated, I mean, on the basis
7       of an observation where you have
8       less of an effect of Seroquel than
9       placebo if you're asking the
10      question of is Seroquel doing
11      work.  All these are, are just I
12      would want to use, not just in a
13      clinical trial setting, but I
14      would want to use all of the
15      evidence from the clinical trials
16      to arrive at a decision.  That's
17      done as part of the integrated
18      summaries for safety and efficacy
19      that go into the FDA as part of
20      the approval process.
21          So all of that work is done
22      as part of the integrated
23      summaries of safety and arrived at
24      a conclusion about what changes

43  (Pages 483 to 486)

Confidential - Mark S. Scott, Ph.D.

Page 487

1    that we've seen in these clinical
2    trial program.
3        MR. ALLEN:  Objection.
4    Nonresponsive.
5    BY MR. ALLEN:
6        Q.   Just asked you a simple
7    question.  In Exhibit 34, did you
8    calculate p-values in the numbers that
9    you used in answering Mr. Brock's
10   question?  Did you calculate them or not,
11   yes or no?
12       A.   I used the p-values from
13   some of the summaries of integrated
14   summaries of safety for the integrated
15   summary in the original submission 1996,
16   1997 as well as the bipolar depression.
17   But again, for here I was looking at it
18   from the point of view as a statistician,
19   I can tell whether or not, on the basis
20   of this, whether it's even worth doing.
21   But, again, I would say that I wouldn't
22   want to be arriving at a judgment about
23   any one clinical trial.  I would want to
24   use the evidence in like trials to arrive

Page 488

1    at a decision in the formal analysis than
2    from this exercise.
3        Q.   Is that in a way of
4    answering my question is, no, Mr. Allen,
5    I did not conduct p-values for my
6    calculations?  Is that just your answer?
7        A.   I would then question the
8    worth of p-values in the setting because
9    of the nature of the way data are
10   collected.  So the exercise was to -- I
11   was asked the question of what do I see
12   from a statistical perspective in terms
13   of differences going on.  Because of my
14   background in statistics, I see changes
15   which are very similar to placebo.  I see
16   large variances.  And in situations where
17   Seroquel is doing the same as placebo, to
18   me it's asking the question what's
19   worthwhile of calculating a p-value in
20   that setting, I'd rather rely on the
21   integration of that data to form a
22   judgment.
23       Q.   So you didn't find it
24   worthwhile to conduct p-values, is that

Page 489

1    what you're telling this jury?
2        A.   I don't think I said that at
3    all.
4        Q.   Did you conduct p-values,
5    the jury wants to know, had -- did you
6    conduct p-values in the calculations in
7    Exhibit 34?
8        MR. BROCK:  Object to form.
9        THE WITNESS:  Again, what's
10   been done in trial -- excuse me.
11   What's been done for each of the
12   clinical trials is an inspection
13   of the results in context of the
14   trial being conducted.  Some
15   p-values do appear in the clinical
16   trial reports as well as the
17   integrated summaries, but for this
18   exercise, using my statistical
19   expertise, to see the changes
20   there in whether from a
21   statistical perspective on each
22   clinical trial, whether there's
23   evidence there to suggest that
24   there's a difference between

Page 490

1    Seroquel and placebo.
2    BY MR. ALLEN:
3        Q.   Did you conduct p-values?
4        A.   What I conducted was an
5    inspection of the data based on the
6    observations that were there to see
7    whether or not there was significant
8    difference.
9        Q.   Is that your answer to my
10   question whether you conducted p-values?
11       A.   That's my answer to the
12   question.
13       Q.   Thank you, sir.
14           Did you do confidence
15   intervals in the calculations utilized in
16   Exhibit 34 for all the questions you
17   answered for Mr. Brock?
18       A.   What I've done here is I've
19   given an inspection of --
20       MR. ALLEN:  I need to object
21   as nonresponsive.
22   BY MR. ALLEN:
23       Q.   My only question to you is,
24   sir, did you calculate confidence

44 (Pages 487 to 490)

Confidential - Mark S. Scott, Ph.D.

Page 491

1  intervals for the values in all the
2  questions you answered for Mr. Brock as
3  reflected in your calculations in
4  Exhibit 34?  Did you do confidence
5  intervals or not?
6        MR. BROCK:  Please don't cut
7  him off.  Answer that question.
8  But please don't cut him off.
9        THE WITNESS:  If I go back
10      to -- the purpose of this exercise
11      was to look at the glucose
12      findings from each of the clinical
13      trials through time.  And asking
14      the question of looking at those
15      values in terms of the mean values
16      in terms of the variance of
17      whether or not there would be
18      evidence there to suggest that
19      there is a difference and based on
20      my statistical observations and my
21      statistical expertise saying there
22      isn't much information there to
23      suggest that there's a difference.
24  BY MR. ALLEN:

Page 492

1        Q.   So you didn't do confidence
2  intervals in the calculations contained
3  in Exhibit 34 when you were answering the
4  questions for Mr. Brock.  Correct?
5        A.   Confidence intervals are
6  another tool that can be used to look at
7  the variability -- it expresses the
8  variability of the results that are
9  there.  I relied on the variability in
10  front of me as well as the magnitude of
11  the difference in means to say that there
12  wasn't much going on with respect to the
13  changes in the means.  And also I've been
14  looking at the shifters and seeing the
15  proportion of shifters and seeing whether
16  or not there was evidence there to
17  suggest that there's a difference.
18      Q.   So you didn't calculate
19  confidence intervals.  Correct?
20      A.   The variance factors into --
21  if you were to do a confidence interval,
22  the variance actually factors into that.
23  And by looking at those variances and
24  looking at the magnitude of change in the

Page 493

1  means, the --
2        MR. BROCK:  Take a short
3  break.
4        MR. ALLEN:  Let him finish
5  this answer.  Go ahead.  Simple
6  question.  Go ahead.
7        THE WITNESS:  Again, looking
8  at the -- excuse me, looking at
9  the changes in means, the variance
10      that's there as well as the
11      difference in means, made a
12      judgment of whether there's
13      evidence there.
14        Again, these are one
15      clinical value out of the numerous
16      clinical chemistry values that are
17      collected in clinical trials.
18      Assigning p-values to any one of
19      these from a statistical point of
20      view needs to relegated to the
21      integrated summary of safety for
22      each of these unless it's a prior
23      hypothesis.
24        MR. BROCK:  Can we take a

Page 494

1  short break?
2        MR. ALLEN:  You want a short
3  break, Mr. Brock?
4        MR. BROCK:  I would like a
5  short break.  I would.
6        MR. ALLEN:  That's fine.
7  BY MR. ALLEN:
8        Q.   Let me ask one question.
9  Was your last answer an answer to my
10  question did you calculate confidence
11  intervals?
12      A.   I was telling you what I've
13  done for this in terms of why, why --
14  what I was -- what I was looking at with
15  respect to these changes in these
16  clinical trials.
17        MR. ALLEN:  You can take a
18      short break.  How long do you
19      want, Mr. Brock?
20        MR. BROCK:  Three or four
21      minutes.
22        MR. ALLEN:  Okay.
23        VIDEOGRAPHER:  Off the
24      record.  12:15.

45 (Pages 491 to 494)

Confidential - Mark S. Scott, Ph.D.

Page 495

```
 1            - - -
 2        (A recess occurred.)
 3            - - -
 4        VIDEOGRAPHER:  Back on the
 5     record.  12:21.
 6  BY MR. ALLEN:
 7     Q.   Dr. Scott Allen, we're back
 8  on the record.  This yellow/green --
 9  yellow/green, yellow/green, those
10  questions from Mr. Brock?
11     A.   Yes.
12     Q.    Are those statistical terms
13  that are commonly used in the practice of
14  statistics, we'll study this and apply
15  this and that's green and we'll study
16  this and we'll make that yellow?
17     A.    This nomenclature was just a
18  given.  We were going to be reviewing a
19  number of studies.  It was just an aid
20  for me in terms of being able to look at
21  it with respect to the evidence that was
22  there, that was all.  So it was more for
23  my convenience than anything else.
24     Q.   Thank you.  And I just want
```

Page 496

```
 1  to -- so for the jury, they need to
 2  understand when we here yellow/green,
 3  green/yellow, half yellow/half green,
 4  shaded part yellow/part green, those are
 5  not scientifics terms in the practice and
 6  the training of statistics, are they?
 7        MR. BROCK:  Object to form.
 8        THE WITNESS:  Again, it's
 9     for giving -- reviewing, a lot of
10     studies have an easy way to
11     describe those studies where there
12     was an evidence of a difference
13     and as well of those studies where
14     there might be evidence but other
15     work needed to get done with
16     respect to the data that were from
17     those clinical trials.
18  BY MR. ALLEN:
19     Q.   I think I understand your
20  answer.  I just want to make sure I
21  understand your answer so I can explain
22  it later on to other witnesses and the
23  jury.
24        These yellow/green
```

Page 497

```
 1  terminology and the partly yellow/partly
 2  green terminology, slightly shaded
 3  yellow, some green, those aren't
 4  statistical terms that you learn where,
 5  at Iowa State?
 6     A.   I went to Iowa State,
 7  correct.
 8     Q.   To get your Ph.D.?
 9     A.   Yes.
10     Q.   Those aren't statistical
11  terms used in the science, training and
12  background of statistics, are they?
13        MR. BROCK:  Object to form.
14        THE WITNESS:  Again, they're
15     there because if we're trying to
16     put down a high level descriptor
17     of what's going on in -- for each
18     of these clinical trials, it's a
19     way to do that.  You can call them
20     a lot of different things, but you
21     need to have some way of trying to
22     sort out the evidence at a high
23     level with respect to the
24     information that you have in front
```

Page 498

```
 1     of you.
 2  BY MR. ALLEN:
 3     Q.   I think I understand your
 4  answer.  You're saying -- are you saying
 5  that, Mr. Allen, a high level
 6  descriptor -- what does that term mean,
 7  when you use that term?
 8     A.   In the -- excuse me.  In
 9  this particular examination, as I said
10  earlier, green means from the evidence
11  that's there based on my experience, that
12  there isn't any indication that Seroquel
13  is behaving any differently than placebo.
14  That's how I would want to interpret that
15  as part of a display on any board.
16     Q.   So this green, yellow,
17  shaded green terminology is something
18  that you and the lawyers for AstraZeneca
19  developed as a means to utilize your
20  testimony in this case.  Is that correct?
21        MR. BROCK:  Object to form.
22        THE WITNESS:  No.  No.  It's
23     my -- my way of trying to sort
24     out -- you have a lot of clinical
```

46 (Pages 495 to 498)

Confidential - Mark S. Scott, Ph.D.

Page 499

1    trials there, and I'd like to be
2    able to understand in terms of the
3    information that's there what I --
4    my observations on what I've seen
5    there.
6    BY MR. ALLEN:
7        Q.    And, of course, you, prior
8    to the time of the examination by Mr.
9    Brock with the assistance of Mr. Scott --
10   by the way, you have several lawyers here
11   with you today?
12       A.    Yes.  Mr. Brock, Mr. Scott
13   are here.
14       Q.    Well, you actually have four
15   lawyers.  You have three lawyers from two
16   different law firms, one lawyer from
17   Chicago, one lawyer from Denver, one
18   lawyer from Washington, D.C./Birmingham,
19   and then you have an in-house attorney
20   from AstraZeneca.  Is that correct?
21       A.    There are four lawyers
22   there.  All of their exact roles, you
23   know, I'm not sure of.
24       Q.    You've been meeting with

Page 500

1    them before this depo?
2        A.    As I said, I've met at times
3    with lawyers prior to this deposition,
4    yes.
5        Q.    When y'all did this
6    green/yellow color scheme thing, y'all
7    prepared that before you testified and
8    you practiced that before you testified
9    with your lawyers.  Right?
10           MR. BROCK:  Object to form.
11           THE WITNESS:  No.  As I
12       said, I was going through each of
13       the clinical trials with the
14       question of what information is
15       there for this one particular
16       laboratory value that we had
17       throughout the clinical
18       development program.  I was
19       looking at it from the point of
20       view as a statistician looking at
21       this of what evidence would be
22       there with respect to changes in
23       glucose on the basis of the data
24       that were in the clinical trial

Page 501

1    reports which included means,
2    standard deviations as well as
3    shifters.  And this was an easy
4    way for me to be able to describe
5    those outcomes.
6    BY MR. ALLEN:
7        Q.    And you practiced that color
8    scheme and you rehearsed the questions
9    before Mr. Brock did his examination of
10   approximately four hours or so today and
11   an hour and a half yesterday.  Right?
12           MR. BROCK:  Object to form.
13           THE WITNESS:  I've gone
14       through each of these on my own
15       with respect to the outcome.
16   BY MR. ALLEN:
17       Q.    Sir, did I hear you testify
18   yesterday and again today that using your
19   green terminology, that you would
20   establish something as "green" when there
21   was no evidence of differences?  Did I
22   hear you testify to that?
23       A.    No statistical evidence of a
24   difference between Seroquel and placebo.

Page 502

1        Q.    So there had to be no
2    statistical evidence of a difference for
3    you to label it green.  Is that right?
4        A.    Based on the information
5    that was in the clinical trial reports.
6        Q.    So let me -- let's refine it
7    down.  There had to be no significance
8    evidence of differences between Seroquel
9    and placebo in the clinical trial reports
10   in order for you to denominate something
11   as green.  Is that your testimony?
12           MR. BROCK:  Object to form.
13           THE WITNESS:  Well, the
14       evidence that we have is from the
15       summaries in the clinical trial
16       reports.  So that's the evidence
17       that I'm using.
18   BY MR. ALLEN:
19       Q.    So the evidence that you're
20   using, so the jury understands, because
21   I'm going to ask you about some of these
22   here in a little while after lunch, using
23   the clinical trial reports, that's what
24   you utilized to answer Mr. Brock's

47 (Pages 499 to 502)

Confidential - Mark S. Scott, Ph.D.

Page 503

1  questions.  Right?
2          MR. BROCK:  Object to form.
3          THE WITNESS:  Using the
4      summaries and using data from the
5      clinical trial reports, yes.
6  BY MR. ALLEN:
7      Q.   Well, that's -- so you used
8  data from the clinical trial reports?
9      A.   Yes, we did.
10     Q.   And there had to be no
11 statistical evidence of differences in
12 order for you to label something green.
13 Is that your testimony?
14     A.   Correct.
15         MR. BROCK:  Object to form.
16 BY MR. ALLEN:
17     Q.   Sir?
18     A.   Correct.
19     Q.   Thank you, sir.
20         By the way, just covered a
21 couple -- I've looked at my notes real
22 quickly and some issues that I wanted to
23 talk about, no particular order, but one
24 of the things I noted on this -- let me

Page 504

1  mark this PowerPoint.
2          Do you remember there was a
3  PowerPoint put up yesterday and then
4  there was one put up today, sir?  Do you
5  remember that?
6      A.   I remember a PowerPoint
7  being put up, but the exact contents of
8  it, I was looking at documents.
9      Q.   So this PowerPoint that you
10 utilized yesterday and today was of no
11 assistance or help to you, is that your
12 testimony?
13     A.   No.  I'm just saying that I
14 was looking at these documents and I was
15 looking at that, glancing up, they were
16 asking me question of whether or not I
17 see various green boxes.
18     Q.   Right.  And, in fact, the
19 lawyers for the defendants utilized these
20 PowerPoints in questioning you both
21 yesterday and today, did they not?
22     A.   Those were there yesterday
23 and today, correct.
24     Q.   Yes, sir.  Now, first of

Page 505

1  all, we may be able to just do away with
2  this conversation.  Are you telling this
3  jury that these PowerPoint presentations
4  utilized yesterday and today really are
5  of no help to you in explaining any of
6  your testimony to a jury?  Is that your
7  testimony?
8          MR. BROCK:  Object to form.
9          THE WITNESS:  I don't think
10     I said that.
11 BY MR. ALLEN:
12     Q.   So are the PowerPoints of
13 any assistance to you in explaining your
14 testimony to the jury?
15         MR. BROCK:  Object to form.
16         THE WITNESS:  The
17     PowerPoints are just a description
18     of what happened through time with
19     the various clinical trials that
20     were conducted in these various
21     settings and when things were
22     approved by the FDA.  So it's just
23     a linear description of what
24     happened in the clinical trial.

Page 506

1  BY MR. ALLEN:
2      Q.   A veneer description, what
3  does that mean?
4      A.   No.  A linear description.
5          - - -
6          (Exhibits Scott-35,
7      PowerPoint presentation and
8      Scott-36, PowerPoint presentation,
9      were marked for identification.)
10         - - -
11 BY MR. ALLEN:
12     Q.   A linear description.  So
13 Exhibit 35, which was the PowerPoint
14 utilized yesterday, it had a legend or a
15 code, do you remember that?  The
16 green/yellow legend or code, you utilized
17 it yesterday.  Do you recall that?
18     A.   I recall that it was then
19 there yesterday and then removed today.
20     Q.   Yes, sir.  But you utilized
21 it yesterday, did you not?
22     A.   Well, I mean, it's there as
23 a code, but I would say that the -- my
24 interpretation of green, there's no

48 (Pages 503 to 506)

Confidential - Mark S. Scott, Ph.D.

Page 507

1  difference between Seroquel and placebo.
2      Q.  Your interpretation -- but
3  anyhow on the PowerPoint utilized
4  yesterday and the questions by Mr. Brock
5  yesterday, he utilized this PowerPoint,
6  Exhibit 35, with the legend for glucose
7  green and yellow, did he not?
8      A.  Right.  But I would say that
9  I wasn't responsible for putting together
10  the PowerPoint.  I was being asked
11  questions on individual clinical trials
12  and what I thought.  I didn't generate
13  the PowerPoint.
14      Q.  You didn't generate these
15  PowerPoints?
16      A.  No.
17      Q.  So neither -- so these
18  PowerPoints were not your PowerPoints.
19  Is that correct?
20      A.  No.
21      Q.  Is that correct?
22      A.  They're not my PowerPoints.
23      Q.  Whose PowerPoints are they?
24      A.  I believe they were

Page 508

1  generated through the legal team with
2  respect to the information that's from
3  the clinical trials.
4      Q.  So the first thing the jury
5  needs to understand is the PowerPoints
6  that they saw yesterday and the
7  PowerPoints that they saw today were not
8  generated by you, were not created by
9  you, but were created and generated by
10  the lawyers.  Is that correct?
11          MR. BROCK:  Object to form.
12          THE WITNESS:  As I said, I
13      didn't create them.
14  BY MR. ALLEN:
15      Q.  And you believe, based upon
16  your own personal knowledge, your lawyers
17  utilizing them, the PowerPoints utilized
18  yesterday and today, since they weren't
19  created by you, were created by the
20  lawyers.  Correct?
21          MR. BROCK:  Object to form.
22          THE WITNESS:  As I said, I
23      believe they were created by the
24      lawyers.

Page 509

1  BY MR. ALLEN:
2      Q.  And yesterday the legend for
3  green with Seroquel was the same or
4  better.  Correct?
5      A.  Again, to be honest with
6  you, my interpretation of green is
7  there's no evidence there that Seroquel
8  is any different between Seroquel and
9  placebo.
10      Q.  Yes, sir.  That wasn't my
11  question.  See, my question wasn't what
12  is your definition today.  Listen to my
13  question.  Yesterday the legend for green
14  was Seroquel was same or better.
15  Correct?
16      A.  Well, again, to be honest
17  with you, I wasn't paying too much
18  attention to the legend.  I was paying
19  attention to what my observations during
20  the clinical trial said.
21      Q.  And the legend in the
22  PowerPoint utilized yesterday, yellow is
23  Seroquel worse.  Right?
24      A.  My definition of yellow is

Page 510

1  there's indications there that Seroquel
2  could be potentially worse but more work
3  would have to be done to understand what
4  those differences were.
5      Q.  Nevertheless, you utilized
6  this PowerPoint yesterday.  Green
7  yesterday was Seroquel same or better and
8  yellow yesterday was Seroquel worse.
9  Correct?
10      A.  No, I would disagree with
11  that.
12      Q.  Today you say green is no
13  evidence of any difference.  Is that your
14  testimony?
15          MR. BROCK:  Object to the
16      form.
17          THE WITNESS:  I used
18      yesterday and today green to be
19      there's no evidence of a
20      difference between Seroquel and
21      placebo and I used yesterday and
22      today, even though we didn't talk
23      about yellow yesterday, is that
24      there was some evidence there that

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Mark S. Scott, Ph.D.

Page 511

1    there might be a difference but
2    further work would need to be done
3    to determine whether a difference
4    actually existed.
5    BY MR. ALLEN:
6        Q.   Well, we'll see when we get
7    the tape, you recall this legend being
8    used and this -- code terms being used
9    yesterday in your testimony as well?
10       A.   I recall, my interpretation
11   of green was, yesterday and today, that
12   there's no difference between Seroquel
13   and placebo and we hadn't gotten to any
14   trials that had an indication that might
15   be different.
16       Q.   Thank you, sir.
17           You know, just something
18   that struck me during your testimony
19   today was testimony concerning -- let me
20   see if I can find it.  I'll zero out and
21   then I'll zero in here for the jury.
22   Short-term (10 weeks) -- whoa, whoa, look
23   here.  Hold on.  We're going to get
24   dizzy.  Let me get back.  There we are.

Page 512

1           Short-term (10 weeks)
2    elderly studies 39 and 46.  Do you see
3    that?
4        A.   Yes.
5        Q.   Both of them have a line
6    through them?
7        A.   Yes, they do.
8        Q.   That means the studies
9    failed for efficacy.  Is that correct?
10       A.   As I recall, they didn't
11   meet their primary objectives.  They did
12   not meet their primary objectives.
13       Q.   Their primary objectives
14   were what?
15       A.   To be honest with you, I
16   would have to go back through those
17   clinical trials in detail to go through
18   them in terms of their primary
19   objectives.
20       Q.   So you can first tell the
21   jury concerning the PowerPoint
22   presentation used yesterday and today,
23   you don't even know the primary
24   objectives for trials 39 and 46.  Is that

Page 513

1    true?
2        A.   The trials 39 and 46 were
3    conducted at a time where I wasn't
4    directly involved in the project.  So in
5    giving that they had turn out to not
6    allow for a submission to the FDA in
7    terms of an indication in those areas, I
8    didn't feel the need to go through those
9    in terms of efficacy.  But the safety
10   portion, given the safety portions always
11   contribute to the information that we
12   have, would only be important to review.
13          So me not knowing the
14   primary objective of the study and the
15   outcome directly, I don't find that to be
16   surprising or unsurprising.
17       Q.   I didn't ask if it was.  My
18   only question to you was, you don't know
19   the design primary outcomes of trial 39
20   and 46.  True?
21       A.   I can look at them now and
22   determine them, but for this exercise, I
23   didn't view that as being important.
24       Q.   Yes, sir.  Now, you also

Page 514

1    testified in the answer you gave me
2    previous to that nice short answer, you
3    said, Mr. Allen, 39 and 46 took place at
4    a time when I wasn't working on Seroquel.
5    Do you recall that?
6        A.   Yes.
7        Q.   But you've been testifying
8    to Mr. Brock for four hours today and two
9    hours yesterday about a lot of studies
10   that didn't take place while you were
11   working on Seroquel, didn't you?
12       A.   A lot of the clinical trials
13   that were designed when I was not working
14   on Seroquel became part of registration
15   packages to the FDA when I worked on
16   Seroquel, started back on Seroquel in
17   2005; namely the BOLDER studies and
18   namely the trials 41 as well as 132 and
19   133.  So they formed part of regulatory
20   packages where I had more detailed
21   knowledge of their conduct.
22       Q.   Back to my original
23   question.  The elderly studies on the
24   PowerPoint utilized by your lawyers

50 (Pages 511 to 514)

Confidential - Mark S. Scott, Ph.D.

Page 515

1  failed for efficacy.  Correct?
2       A.   Again, I have to go back to
3  the exact design of them and the outcome
4  of them.  But they weren't part of any
5  registration package.
6       Q.   I thought you agreed really
7  in a simple question of Mr. Brock.  He
8  said can we agree that when there's a
9  line through the study, that means it
10  failed for its primary endpoint of
11  efficacy.  Do you recall that testimony?
12       A.   I recall that.
13       Q.   So can you just tell me for
14  the jury just straight like you told Mr.
15  Brock, when I got a line through it, that
16  means it failed for its primary endpoint
17  on efficacy.  True?
18           MR. BROCK:  Object.  Move to
19       strike the argument.  You may
20       answer, though.
21           THE WITNESS:  Again, I don't
22       have detailed knowledge of the
23       design, the analysis and the
24       outcome, but I know the package of

Page 516

1       data that was intended to be used
2       for this wasn't submitted to the
3       FDA.
4  BY MR. ALLEN:
5       Q.   Wasn't?
6       A.   Was not submitted for
7  registration, but it was submitted to the
8  FDA as part of -- as part of our safety
9  updates.
10       Q.   So the package was not
11  submitted for approval to the FDA.  True?
12       A.   Correct.
13       Q.   You also can tell the jury,
14  this is my really simple point, since
15  you're here on behalf of AZ and these
16  failed studies 39 and 46, just so it's
17  clear, that Seroquel has never been
18  indicated for the treatment of the
19  elderly concerning dementia or
20  Alzheimer's disease.  Isn't that true?
21       A.   We do not have an indication
22  for the treatment of the elderly in those
23  specific disorders, no.
24       Q.   And, in fact, as your lawyer

Page 517

1  pointed out in his PowerPoint, the
2  studies you've done for the elderly
3  concerning their efficacy have failed
4  in-house.  Is that true?
5           MR. BROCK:  Object to the
6       form.  Move to strike the
7       argument.
8  BY MR. ALLEN:
9       Q.   Let me rephrase it.  In
10  fact, sir, the studies that y'all have
11  done on the elderly for efficacy have
12  failed and they have not been submitted
13  to the FDA.  Correct?
14       A.   I want to make sure I
15  understand the question.  We've done
16  studies in the elderly in these patient
17  populations.  They were not filed as part
18  of the registration package, but they
19  were filed as part of submissions to the
20  FDA.  And, in fact, portions of this were
21  submitted specifically looking at
22  mortality in the elderly as part of some
23  FDA work in 2005.  So the clinical trial
24  reports were submitted to the FDA.

Page 518

1           We have done specific
2  studies in the elderly in MDD and GAD as
3  well as well that have been submitted to
4  the FDA where Seroquel has been
5  successful.  So you characterize elderly
6  studies as all failing, I just wanted to
7  make sure that we were talking about all
8  studies as opposed to those two.
9           MR. ALLEN:  Objection.
10       Nonresponsive.
11  BY MR. ALLEN:
12       Q.   Elderly studies 39 and 41 in
13  the PowerPoints utilized by Mr. Brock
14  failed.  Correct?
15       A.   They weren't part of the
16  regulatory package for efficacy.
17       Q.   And they failed, did they
18  not?
19       A.   Again, I have to go back to
20  through the exact details of the whys,
21  but they weren't sufficient for
22  registration.
23       Q.   Didn't the line mean they
24  failed?  I thought you told Mr. Brock

Confidential - Mark S. Scott, Ph.D.

Page 519

1    that?
2        A.   Weren't sufficient for
3    registration.  Failed.  I don't want to
4    quibble on it, but they weren't
5    sufficient for registration for the
6    efficacy data was there.
7        Q.   Just so the jury
8    understands, listening to your testimony
9    all the way from Washington State to
10   Washington, D.C., Seroquel has never been
11   approved for the treatment of elderly for
12   Alzheimer's or dementia.  True?
13       MR. BROCK:  Object to the
14       form.  Object to the argument.
15       Move to strike it.  You may
16       answer.
17       THE WITNESS:  There have
18       been clinical trials conducted in
19       the elderly.  AstraZeneca felt
20       that the data weren't sufficient
21       to move forward with claims in
22       those areas so we have not applied
23       for those claims, so I would say
24       that we just don't have sufficient

Page 520

1        data there, that we do not have
2        approval for those indications.
3    BY MR. ALLEN:
4        Q.   Has the FDA ever approved
5    Seroquel for treatment of the elderly for
6    schizophrenia -- I mean, excuse me, let
7    me rephrase it.
8        Has the FDA ever approved
9    Seroquel for the treatment of the elderly
10   for Alzheimer's or dementia, yes or no?
11       A.   AstraZeneca hasn't submitted
12   a formal request to FDA asking that
13   particular question.  However, we have
14   submitted those data to FDA as part of
15   our routine practice of submitting
16   clinical trial data.
17       Q.   Thank you very much, sir,
18   but my question to you was, has the FDA
19   approved Seroquel for the treatment of
20   the elderly in dementia or Alzheimer's,
21   yes or no?
22       A.   Well, I guess my question
23   is, the FDA wouldn't approve something
24   unless they had data there that was

Page 521

1    formally submitted to ask that question.
2    And what I've said is we haven't made a
3    formal request for that so they couldn't
4    answer yes or no because they couldn't
5    answer that question.
6        Q.   So if I were just to walk up
7    to the AZ executive, I think -- let me
8    see what your title is.  You told us your
9    title.  I'm asking you as -- sir, I'm
10   asking you, Dr. Scott, as executive
11   director of development.  Is that right?
12       A.   Yes.
13       Q.   And the co-lead on Seroquel.
14   That's right?
15       A.   Co-lead of the brand team,
16   yes.
17       Q.   Who is here on behalf of
18   AstraZeneca.  I'm asking you this direct
19   question: Has Seroquel ever been
20   approved for the treatment of the elderly
21   for dementia or Alzheimer's, yes or no?
22       MR. BROCK:  Object to the
23       form.
24       THE WITNESS:  Again, the --

Page 522

1        if we had asked the question, if
2        we had submitted to the FDA an
3        application to answer that -- ask
4        that question, I could give you
5        that answer.  Given that we've
6        submitted those clinical trial
7        reports to FDA as part of our
8        routine practice of submitting
9        data, but we haven't filed a
10       formal supplemental sNDA for the
11       treatment of those disorders, so
12       the FDA hasn't been able to
13       respond because we haven't asked.
14       So you're asking me a question
15       that I think I'm trying to answer
16       as best as possible.  We haven't
17       asked that question of the FDA.
18   BY MR. ALLEN:
19       Q.   So that's the best answer
20   you can give to my question?
21       A.   Yes, it is.
22       Q.   Thank you very much, sir.
23       Well, let me go on to the
24   issue of pediatrics.  Do you remember

52 (Pages 519 to 522)

Confidential - Mark S. Scott, Ph.D.

Page 523

1   discussing Exhibit Number 1596 and 1597
2   with Mr. Brock in your examination?
3       A.   The pediatric clinical
4   trials studies, yes.
5       Q.   Yes, sir.  In fact, you have
6   them right over there in front of you.
7       A.   They're right here
8   somewhere.
9       Q.   Just so it's clear for the
10  jury, maybe -- we'll see.  Seroquel has
11  never been approved for the treatment of
12  adolescents and pediatric patients.
13  True?
14      A.   We have filed applications
15  for both use of Seroquel in mania and
16  schizophrenia, and those applications are
17  under review right now.  So to this date,
18  there has not yet been approval, but
19  we're waiting for the FDA to decide on
20  those applications right now.
21      Q.   So to this date there has
22  not been approval for the use of Seroquel
23  for the treatment of adolescent and
24  pediatric patients.  True?

Page 524

1       A.   Because those data are under
2   review right now.
3       Q.   Is what I said true?  To
4   this date, Seroquel has never, ever been
5   approved for the treatment of pediatric
6   or adolescent patients.  True?
7       A.   We've generated data right
8   now that we believe is sufficient, and
9   FDA has that data under review right now
10  and they will act on that, we hope,
11  sometime before the end of the year.
12      Q.   So what's the answer to my
13  question?
14      A.   We don't have -- we don't
15  have indications in our label right now
16  for those indications.
17      Q.   And the right now is
18  September 24, 2009?
19      A.   Correct.
20      Q.   And that's been true since
21  the product Seroquel came on the market
22  in September of 1997?
23      A.   Again, the pediatric
24  development is something which would

Page 525

1   typically occur after you get approval in
2   adults.  You wouldn't go off and
3   necessarily develop a drug for pediatric
4   populations first.  You would get all of
5   them after.  We've generated the clinical
6   trial in agreement with the FDA with
7   respect to what we call our post-approval
8   commitments, they now have that data to
9   be able to act on it.
10          MR. ALLEN:  Nonresponsive.
11      I object.
12  BY MR. ALLEN:
13      Q.   Sir, isn't just the simple
14  straightforward answer to the jury is,
15  Mr. Allen, Seroquel has not been approved
16  with an indication to treat pediatric or
17  adolescent patients since the time it
18  came on the market in September of 1997
19  until as we sit here today on
20  September 24, 2009?  Isn't that correct?
21      A.   I guess I'm trying to
22  explain that the process for drug
23  development is one where you develop the
24  drug in indications first for adults, you

Page 526

1   agree with FDA the clinical trials that
2   would be necessary for approval and then
3   you submit those data to the FDA for
4   their review if you believe that they're
5   sufficient for approval, and that's what
6   we've done.
7       Q.   Is that an answer to my
8   question?
9       A.   Yes, it is.
10      Q.   So I'm asking you as -- what
11  is it, executive director of development
12  and co-lead, is that correct, on
13  Seroquel --
14      A.   Yes.
15      Q.   -- simple question, on
16  September 24, 2009, sir, in your capacity
17  as a representative of AstraZeneca, is
18  Seroquel currently approved and has it
19  ever been approved for the treatment of
20  pediatric and adolescent patients, is the
21  answer yes or no?
22      A.   We currently have a package
23  down at FDA for review of those
24  indications and we're hoping for

53 (Pages 523 to 526)

Confidential - Mark S. Scott, Ph.D.

Page 527

```
1   approval.  We do not have approval as of
2   yet for those indications.
3        Q.    Therefore, it would have
4   been improper, illegal for your company
5   to ever have promoted Seroquel for the
6   use in adolescent or pediatric patients.
7   Right?
8            MR. BROCK:  Object to form.
9            THE WITNESS:  I know that --
10  we don't promote off label, number
11  one.  I don't think that's our
12  policy.  We don't do that as a
13  company.  So I know that
14  clinicians are allowed to use
15  drugs as they see fit for their
16  patients, but we don't promote off
17  label.
18  BY MR. ALLEN:
19       Q.    You know that as a fact?
20       A.    That is not our policy.
21       Q.    But did you testify to the
22  jury just a minute ago, you know that
23  your company doesn't promote off label?
24  Did I hear you testify to that?
```

Page 528

```
1        A.    I said our policy is that we
2   do not promote off label.
3        Q.    So your company may actually
4   do it regardless of the policy.  Is that
5   your testimony?
6            MR. BROCK:  Object to form.
7            THE WITNESS:  I said our
8   policy is that we do not promote
9   off label.
10  BY MR. ALLEN:
11       Q.    Do you know whether your --
12  despite your policy, your company is
13  engaged in those activities?
14       A.    I am not in charge of sales
15  and marketing.  I don't know what exactly
16  happens in the field, but we do not
17  promote off label.
18       Q.    Yes, sir.  But you said
19  you're executive director and co-lead for
20  the brand team on Seroquel.  Is that
21  correct?
22       A.    Yes, I am.
23  REDACTED
24
```

Page 529

```
1   REDACTED
2
3
4
5
6
7
8
9   BY MR. ALLEN:
10       Q.    Yes, sir.  But we see here
11  throughout your performance planning that
12  you had a lot of business goals, did you
13  not?
14       A.    If I could see the document
15  you have in front of you.  Is it here
16  somewhere in this stack?
17       Q.    I'll tell you what, sir,
18  we'll come back to that.  I'm not going
19  to quibble with you.  Let's get on to
20  science or statistics.  This is simple.
21          MR. BROCK:  I think you're
22  on a subject and so I'm -- I'm in
23  agreement to finish the subject,
24  but I'm ready for a lunch break.
```

Page 530

```
1           MR. ALLEN:  Let's go to
2   lunch.  Let's go to lunch.  And
3   what, about 30 minutes?
4           MR. BROCK:  30 is good.
5           MR. ALLEN:  It's ten till
6   1:00, we'll come back -- what time
7   is it?
8           MR. BROCK:  I got quarter
9   to.
10          MR. ALLEN:  Okay.  That's
11  okay.
12          MR. BROCK:  1:15?
13          MR. ALLEN:  Yes, sir.  Thank
14  you.
15          VIDEOGRAPHER:  Off the
16  record.  This is the end of
17  videotape number three at 12:47.
18          - - -
19  (A recess occurred.)
20          - - -
21  (Exhibit Scott-37, Letter to
22  AstraZeneca from the FDA, was
23  marked for identification.)
24          - - -
```

54 (Pages 527 to 530)

Confidential - Mark S. Scott, Ph.D.

Page 531

1     VIDEOGRAPHER:  We are now
2  back on the record.  This is the
3  beginning of videotape number
4  four.  The time is 1:22.
5  BY MR. ALLEN:
6     Q.  Dr. Scott, we're back on the
7  record.
8         When we left off, it's my
9  recollection I was asking you questions
10 concerning pediatric and adolescents, and
11 I had asked you kind of a question
12 whether or not Seroquel was approved for
13 pediatric and adolescent patients and in
14 that regard I've marked and handed you
15 Exhibit 37.  You're familiar with
16 Exhibit 37, aren't you?
17    A.  Yes, I am.
18    Q.  That's a letter from the FDA
19 to AstraZeneca that was sent about nine
20 or ten months ago, AstraZeneca on
21 December 18, 2008?
22    A.  Yes, it was.
23    Q.  And that letter -- we'll get
24 maybe back into this letter more later,

Page 532

1  depending on how far we get, but that
2  letter told AstraZeneca to change their
3  warning label on hyperglycemia, diabetes,
4  weight gain and triglycerides in the
5  metabolic syndrome.  Correct?
6         MR. BROCK:  Object to the
7     form.
8         THE WITNESS:  This letter
9     was in response to our request to
10    include information on -- our
11    request to include information as
12    part of what's called changes
13    being effected.  And I think part
14    of it was they wanted us -- we
15    wanted to change information with
16    respect to pediatric populations
17    to include the information on
18    safety from pediatric data which
19    formed a part of the letter.  And
20    the FDA responded to us, and what
21    they said was they would want us
22    to -- they had no issue with our
23    inclusion of the information, but
24    they wanted us to reformat the

Page 533

1     information that were in other
2     parts of label and include it as
3     part of the warnings and
4     precaution section.
5  BY MR. ALLEN:
6     Q.  Didn't the FDA, in this
7  letter, ask AstraZeneca to change its
8  warning label?
9     A.  Including additional
10 information in the warning section,
11 information that appeared in other places
12 in the label.  So they asked us to change
13 information, putting it -- take it from
14 one part of the label and put it
15 somewhere else.
16    Q.  They asked you to take it
17 from the adverse event section of the
18 label under laboratory changes and move
19 it to the warning section of the label.
20 Right?
21    A.  They asked us to reformat to
22 include it as part of the warning section
23 of the label, yes.
24    Q.  Just back to the question,

Page 534

1  we're going to look at the second page of
2  the letter, the top of the page, number
3  4, I've highlighted, the FDA said the
4  "'Safety and effectiveness of SEROQUEL
5  have not been established in pediatric
6  patients in SEROQUEL is not approved for
7  patients under the age of 18 years.'"  Is
8  that correct?
9     A.  Right.  They said that is in
10 terms of given that we were describing
11 the pediatric safety signals that were
12 seen in our clinical trial program, they
13 wanted to make sure the prescribers, that
14 they hadn't reviewed the data on all of
15 the safety and efficacy data.  So that
16 was to include that information given
17 that we had asked to include the safety
18 information in advance of any approval
19 for pediatric data.
20    Q.  Well, in fact, it says not
21 only must be put in your label that the
22 safety and effectiveness of Seroquel have
23 not been established in pediatric
24 patients and is not approved for patients

55 (Pages 531 to 534)

Confidential - Mark S. Scott, Ph.D.

Page 535

1  under the age of 18 years, they said you
2  needed to put that in every section of
3  the Seroquel label where you were
4  reflecting any type of pediatric safety
5  data.  Correct?
6      A.   Yeah.  They've asked us to
7  include, given we wanted to include the
8  pediatric safety data in anticipation
9  of -- excuse me, in advance of the
10  submission of our pediatric data, they
11  asked us to include this as well as part
12  of the inclusion of safety data from
13  pediatric populations.
14      Q.   And that's the way the
15  situation stands right now today as of
16  September 24, 2009, and that's the way
17  the situation has been since 1997 when
18  Seroquel came on the market, that is,
19  Seroquel has not been, never, ever
20  approved for the treatment of adolescents
21  under the age of 18.  True?
22          MR. BROCK:  Object to form.
23          THE WITNESS:  We -- again, I
24  would agree that we haven't

Page 536

1  receive approval yet for those
2  indications, so it's not part of
3  our labeling, but we've done
4  clinical trials to address
5  questions in those patient
6  populations, and those data are
7  under review at FDA at this time.
8  So it's the part of the process as
9  you do adults first.  We don't
10  have approval in children because
11  the FDA has yet to act on them.
12  BY MR. ALLEN:
13      Q.   In fact, your company has
14  known, let's say, five or six years at
15  least, that it would be reckless to make
16  a comparison between the safety of
17  Seroquel for adults with the alleged
18  safety of Seroquel in children, it would
19  be reckless to make that claim, wouldn't
20  it?
21          MR. BROCK:  Object to form.
22          THE WITNESS:  Can you be
23  more specific about -- you're
24  referring to some information, I'm

Page 537

1      trying to understand what you
2      actually mean.
3  BY MR. ALLEN:
4      Q.   Are you familiar with the
5  fact that those within AZ feel it would
6  be reckless to make a comparison between
7  the safety of Seroquel in adults with the
8  safety, alleged safety of Seroquel in
9  children?
10      A.   As part of a clinical
11  development process there might be data
12  you would look at in children to look at
13  alongside adults so I don't think it
14  would be reckless in the context of a
15  scientific investigation so I don't see
16  an issue with that as it relates to
17  trying to interpret what you see in
18  children versus what you see in adults.
19      Q.   Nevertheless, Mr. Brock used
20  Exhibit Number 1597.  You have that over
21  there, don't you?  It's Defendant's
22  Exhibit 1597, the study code is study
23  149.  Do you remember that?  You
24  discussed it with Mr. Brock.

Page 538

1      A.   Bipolar I mania.  Yes.
2      Q.   Do you remember that?
3      A.   I remember the study, yes.
4      Q.   Just for the record --
5          VIDEOGRAPHER:  I didn't get
6      that.
7          MR. ALLEN:  You didn't get
8      what?
9          VIDEOGRAPHER:  The document
10      put on the Elmo.
11          MR. BROCK:  Exhibit 1597.
12  BY MR. ALLEN:
13      Q.   I put 1597, Defendant's-1597,
14  that you used with Mr. Brock.  This would
15  be a yellow study, wouldn't it?
16      A.   I have to go back to my
17  notes.  I had this one as mostly green.
18      Q.   Mostly green.
19      A.   Yes.
20      Q.   Well, in fact, sir, on page
21  15 of Defendant's Exhibit 1597, what was
22  determined is there was a larger average
23  increase in fasting glucose for Seroquel
24  at all doses that were tested versus a

56 (Pages 535 to 538)

Confidential - Mark S. Scott, Ph.D.

Page 539

1   placebo.  Is that correct?
2       A.   I think that would reflect
3   that there are numeric increases in which
4   I reflected, too, in what I provided with
5   respect to the changes in the means.
6       Q.   Yes, sir.  And, in fact, the
7   study 149, Defendant's Exhibit 1597,
8   reflects that there was increases in
9   blood glucose for Seroquel patients,
10  pediatric and adolescent Seroquel
11  patients, while on the placebo the blood
12  glucose actually fell.  Correct?
13      A.   Well, I would characterize
14  it as you had a mean increase on Seroquel
15  both doses with large standard
16  deviations, and you had a mean decrease
17  on placebo.  And as well, if you look at
18  the proportion of patients who shift,
19  there's very few patients who shift.
20  There are only two patients who shift.
21  So the amount of information there to
22  arrive at a statistical decision is very,
23  very small.  So that's why I said it was
24  mostly green.

Page 540

1           MR. ALLEN: Objection.
2           Nonresponsive.
3   BY MR. ALLEN:
4       Q.   Sir, that wasn't my
5   question.
6       A.   Could you repeat the
7   question, please?
8       Q.   Yes.  My question was,
9   didn't this study 149 comparing Seroquel
10  with placebo in the treatment of children
11  and adolescents show mean increases in
12  the Seroquel patients tested and a mean
13  decrease in blood sugar glucose for the
14  placebo patient tested, yes or no?
15      A.   That reflects the --
16  basically a reflection of what was
17  observed in the clinical trials in terms
18  of a statement of fact.  These were the
19  mean changes that were observed in the
20  clinical trials.
21      Q.   Thank you, sir.
22           By the way, sir, I have a
23  note to myself here.  We talked about
24  variance.  Do you remember you talked

Page 541

1   about variance?
2       A.   Yes.
3       Q.   Do you recall that?
4       A.   Uh-huh.
5       Q.   By the way, when you have a
6   broad variance, do you remember talking
7   about that issue?
8       A.   Yes.
9       Q.   That means that in a broad
10  variance, you're capturing all the
11  measurements, both the high and the low,
12  are you not?
13      A.   Correct.
14      Q.   So you're getting more
15  measurements, the greater the variance,
16  the greater the number of the subjects
17  that you're capturing in the measure.
18  Correct?
19          MR. BROCK:  Object to form.
20          THE WITNESS:  I'm not
21      following that point, I apologize.
22  BY MR. ALLEN:
23      Q.   When you have a broader
24  variance, you're catching the higher and

Page 542

1   lower values, are you not?
2       A.   The broader variance means
3   that there's more spread in your data
4   with respect to your observations.
5       Q.   Right.  You're catching more
6   of the data the broader the variance, the
7   higher and the lower values.  Correct?
8           MR. BROCK:  Object to form.
9           THE WITNESS:  I don't know
10      if I would characterize it as more
11      of the data.  A higher variability
12      means that you are -- if your
13      variance is large, that means that
14      there's a lot of variability in
15      your measurements, that they're
16      not tightly compacted around one
17      value.
18  BY MR. ALLEN:
19      Q.   That's right.  And so you're
20  catching the ones at the higher end and
21  the ones at the lower end and the ones in
22  the middle, too.  Right?
23      A.   I do apologize, because I'm
24  trying to -- I'm really trying to

57 (Pages 539 to 542)

Confidential - Mark S. Scott, Ph.D.

Page 543

1  understand your question. The
2  interpretation of the variance is how far
3  on average are the variables that you
4  have from the one that's in the center.
5  And that is, you know, a measure of just
6  what we call dispersion. So it's a
7  reflection of how widely spread the data
8  are.
9       Q.   Right. On those plot
10  graphs. Isn't the dispersion usually
11  shown on the plot graphs or do you not
12  know what I'm talking about?
13      A.   I agree, we might be talking
14  about two different things. So I need to
15  have -- if you gave me an example, maybe
16  I could help.
17      Q.   I might have time today. If
18  I had more time, I'd do one. I don't
19  have time. All right, sir.
20          I had something on the tip
21  of my tongue. I don't remember what it
22  was.
23          Now, Mr. Brock also
24  introduced Exhibit 1596 dealing with

Page 544

1  study 112 and the treatment of
2  adolescents comparing Seroquel with a
3  placebo, did he not?
4       A.   Yes.
5       Q.   Show me where Seroquel's --
6  I mean, blood glucose measurements are
7  even mentioned at all in Exhibit 112.
8       A.   I have to find 112. I
9  apologize.
10      Q.   Here, I'll give it to you.
11  It's not Exhibit 112. It's actually 1596
12  dealing with study 112 that Mr. Brock
13  used for you.
14      A.   Well, this is the protocol
15  synopsis. The protocol -- let's see.
16  The protocol synopsis doesn't contain the
17  glucose data, but the clinical trial
18  report does contain the glucose data, and
19  that's where the numbers were drawn from.
20  It's not in the synopsis, but it's in the
21  clinical trial report itself.
22      Q.   In the exhibit that Mr.
23  Brock provided you when he discussed
24  number 112, study 112, did he provide you

Page 545

1  any exhibit other than 1596?
2       MR. BROCK:  Object to the
3  form.
4       THE WITNESS:  Well, he
5  provided me that, and I didn't
6  check the synopsis. But I checked
7  the individual clinical trial
8  reports for each of the data,
9  so -- I'm sorry. I apologize.
10      I checked the individual
11  clinical trial reports for the
12  data, but the synopsis, I didn't
13  go through them to see whether the
14  same data was in there.
15  BY MR. ALLEN:
16      Q.   Well, in the exhibit he gave
17  you, Exhibit 1596, is blood glucose
18  measurements measured or discussed
19  anywhere, in the synopsis, in any of that
20  document that Mr. Brock utilized in
21  discussing study 112 with you does the
22  word "glucose" appear?
23      A.   I can go through it line by
24  line to see whether glucose appears.

Page 546

1  What I was looking for was the table with
2  respect to glucose. The table for
3  changes in glucose as well as the
4  shifters is in the clinical trial report,
5  and that's where I made my notes from.
6  So it is part of the clinical trial
7  report.
8       Q.   So in the exhibit that Mr.
9  Brock utilized with you, 1596, concerning
10  112, there's no table on glucose, no
11  discussion on glucose, there's no
12  synopsis on glucose. Correct?
13      A.   Again, it does not appear in
14  the synopsis, and my understanding would
15  be given that from the results of 112
16  being what they were in terms of glucose,
17  they were raising to the synopsis the
18  information that was worthy of comment on
19  given that there wasn't a change in
20  glucose from trial 112 that was of
21  import.
22      Q.   Thank you, sir. Can you
23  hand that back to me, please?
24      A.   112?

58 (Pages 543 to 546)

Page 547

1      Q.   Well, 1596 concerning study
2  112, can you hand that back to me,
3  please?
4        Thank you, sir.
5        You made a statement there
6  in answer to your question, that you said
7  in the synopsis they tried to raise
8  things that may be of importance in the
9  synopsis, is that what you just testified
10  to?
11     A.   The synopsis forms to the
12  top level piece of the clinical trial
13  report.  The synopsis is intended to
14  highlight the key findings from the
15  clinical trial with respect to all that's
16  measured which includes the efficacy data
17  and the safety data.  And given that in
18  trial 1 -- the 149 -- or 112 rather,
19  there weren't any differences of note in
20  glucose made in the clinical trial report
21  itself, it wouldn't have been raised to
22  the high -- it wouldn't have been raised
23  to the level of synopsis.  But all of
24  that data do appear, are examined,

Page 548

1  summarized and interpreted as part of the
2  clinical trial report.
3      Q.   So 1596 that was used during
4  your direct examination, the synopsis of
5  112, what you've told this jury is when
6  we at AstraZeneca prepare a synopsis on
7  the high level data, we want to highlight
8  and note in our synopsis those important
9  findings in the clinical trial?
10     A.   Correct.
11     Q.   How long has that been the
12  case?
13     A.   Given that glucose was one
14  of, you know, many laboratory values that
15  were there, the synopsis is there not to
16  repeat the entire contents of the
17  clinical trial report.  So from a
18  clinical point of view, the clinicians
19  decided on the basis of the results that
20  they found of what are the most important
21  findings from the clinical trial.  All
22  the other data there were commented on --
23  I'm sorry -- were commented on as part of
24  the clinical trial reporting process.

Page 549

1      MR. ALLEN:  Objection.
2      Nonresponsive.
3  BY MR. ALLEN:
4      Q.   I just asked you how long
5  has it been the case in the synopsis
6  prepared on clinical trial reports that
7  the important data that AZ wants to
8  highlight on the high level is contained
9  in the synopsis?  How long has that been
10  the practice at AZ?
11     A.   It's been the practice at AZ
12  in terms of writing clinical trial
13  reports, it's the way the clinical trial
14  reports get written in general.  It's
15  also the way the scientific reports get
16  reported out.  You have abstracts of
17  data.  Well, the abstracts of data may
18  not contain all the information, but it
19  contains the key findings from the
20  clinical trial.
21     Q.   How long has that been the
22  case at AZ?
23     A.   It's been the way we've been
24  doing -- writing clinical trials since

Page 550

1  I've been working at AZ.
2      Q.   So at least since '83?
3      A.   Since 1983.
4      Q.   Thank you, sir.  All right.
5  Sir, going through my notes, there are
6  some things I wanted to cover today based
7  on the questions of Mr. Brock.  I think I
8  heard you say that 49 -- study 49, that's
9  BOLDER, right?
10     A.   Again, 49, BOLDER, again, I
11  don't go back to -- the numbers resonate
12  more.  It's for bipolar depression, so
13  that's BOLDER -- that would have been
14  BOLDER I, yes.
15     Q.   I thought I heard you
16  testify, I just want to verify for myself
17  an understanding, 49 and 135, those
18  trials were designed to be identical,
19  didn't you say that?
20     A.   They had -- they had
21  identical designs.  There might have been
22  minor prohibitions in the measurements,
23  but the intent from an efficacy point of
24  view was to assess the effect of Seroquel

59 (Pages 547 to 550)

Confidential - Mark S. Scott, Ph.D.

Page 551

1  in treatment of systematic episodes
2  associated with bipolar depression. They
3  used the same doses of Seroquel and they
4  had the same patient population intent
5  for -- intent for treatments. But in
6  terms of -- there might be minor
7  differences, but in terms of that's what
8  I mean by identical. Same doses, same
9  patient population, same duration.
10      Q.  Same type of protocol?
11      A.  Same type of protocol, yes.
12      Q.  And a protocol is what, sir?
13      A.  A protocol is the document
14  which describes the rationale for doing
15  the study, the treatments and procedures
16  that are used for measurement in the
17  study. It contains the analysis plan and
18  it contains other information that are
19  relevant to conducting a study under an
20  IND or not under an IND.
21      Q.  And the protocol is carried
22  out by medical experts and healthcare
23  professionals. Correct?
24      A.  It's carried out by

Page 552

1  individuals capable of conducting that
2  research, yes.
3      Q.  In fact, AstraZeneca pays
4  these people?
5      A.  We pay for the services that
6  the physicians do -- physicians in terms
7  of their time, yes.
8      Q.  AstraZeneca has to approve
9  the protocol?
10      A.  Yes, we do.
11      Q.  And AstraZeneca, did y'all
12  find any problems with the fasting or
13  versus -- alleged problems with fasting
14  versus nonfasting glucose measurements in
15  study 135?
16      A.  I recall -- I recall that
17  there were some issues with respect to
18  fasting data because of the timing of the
19  measurements and we routinely look at the
20  way the protocol was conducted to see
21  whether or not there were any what were
22  called deviations from the conduct of the
23  protocol and try to explain those in
24  terms of writing up a report to give a

Page 553

1  fulsome discussion of what actually
2  happened.
3      Q.  So you recall in study 135
4  there were some questions concerning
5  whether the glucose measurements were
6  fasting or nonfasting?
7      A.  That's what I recall, yes.
8      Q.  Thank you, sir.
9          By the way, when you were
10  discussing -- we may have time for this,
11  do you recall skipping a table when you
12  were discussing study 135 with Mr. Brock?
13      A.  If I do, I don't remember
14  it, I apologize.
15      Q.  We may get to that later.
16          Sir, I have written down
17  that you, using your vernacular or your
18  lawyer's vernacular, said studies 126 and
19  127 were yellow. Right?
20      A.  Yes.
21      Q.  No question about it, right?
22      A.  Well, as I said, my
23  vernacular, my use of the term in terms
24  of describing it was there were changes

Page 554

1  in the mean that were larger than placebo
2  and also changes in shifters that were
3  larger than placebo, and then to do a
4  formal analysis of that I'd want to take
5  126 and 127 together to arrive at a
6  decision about what happens with glucose
7  in that patient population.
8      Q.  They were yellow?
9      A.  They were yellow, yes.
10      Q.  Thank you, sir.
11          Now, you also made an
12  observation that these were long-term
13  studies?
14      A.  They were trials that were
15  designed to assess the longer term
16  effects of Seroquel. Now, longer term is
17  maybe in the eyes of the treating
18  physician but was intended to be up to
19  two years of therapy.
20      Q.  Thank you, sir.
21          And, of course, they would
22  better reflect the way Seroquel is
23  utilized in the patient population that
24  Seroquel is intended to treat. Correct?

60 (Pages 551 to 554)

Confidential - Mark S. Scott, Ph.D.

Page 555

1       A.   Could you explain that?  I'm
2   not understanding your point.
3       Q.   Well, let me back up real
4   quickly.
5           Seroquel, does it cure
6   anything?
7       A.   Seroquel looks at reductions
8   in symptoms associated with a disorder,
9   which is very similar to any other
10  medicine that's used in this patient
11  population.
12          MR. ALLEN:  Objection.
13  Nonresponsive.
14  BY MR. ALLEN:
15      Q.   Let me see if I can rephrase
16  it.
17          Seroquel does not cure a
18  single thing, does it, sir?
19          MR. BROCK:  Object to form.
20          THE WITNESS:  To be honest
21          with you, I have never really
22          discussed cure with any physician.
23          So my observation would be that
24          Seroquel isn't curing individuals

Page 556

1           but again, the disease order
2           under -- the disease under study,
3           I don't think cure has been
4           discussed.  It does reduce
5           symptoms.  It can reduce symptoms
6           for prolonged periods of time.
7   BY MR. ALLEN:
8       Q.   It reduces symptoms and, as
9   you said, reduces symptoms for a
10  prolonged period of time.  Correct?
11      A.   Yes, it does.
12      Q.   Okay.  And the symptoms it
13  reduces are symptoms that it's been
14  indicated for, are schizophrenia and
15  bipolar disease.  Correct?
16      A.   It's indicated for manic
17  episodes associated with bipolar
18  disorder, depressive episodes associated
19  with bipolar disorder as well as
20  schizophrenia, so yes.
21      Q.   Yes?
22      A.   Yes.
23      Q.   Are those long-term or
24  short-term conditions?

Page 557

1       A.   I know that schizophrenia
2   can be a very long-term condition, and I
3   know that manic episodes associated with
4   bipolar disorder can be lifetime as well,
5   as well as depression can be lifetime as
6   well.
7       Q.   So the medication Seroquel
8   is designed to treat the symptoms of a
9   long-term disease.  Correct?
10          MR. BROCK:  Object to form.
11  BY MR. ALLEN:
12      Q.   Or diseases?
13      A.   It's designed to treat the
14  symptoms of the disease of the patients
15  that's presenting.
16      Q.   Yes, sir.  But you as the
17  executive director -- tell us your title
18  one more time because I always have a
19  hard time with titles.
20      A.   Executive director for
21  development for Seroquel in the U.S.
22      Q.   And there's something about
23  the brand team?
24      A.   Yes, co-lead of the brand

Page 558

1   team for Seroquel.
2       Q.   The executive director of
3   Seroquel in the U.S. and co-lead of the
4   Seroquel -- is it the international brand
5   team?
6       A.   It is the U.S. brand team,
7   but I sit on the global team as well.
8       Q.   You sit on the global team,
9   you're executive director of the U.S.
10  team, you're on the U.S. brand team, you
11  can tell the jury you know
12  Seroquel is designed to treat the
13  symptoms of long-term conditions.
14  Correct?
15          MR. BROCK:  Object to the
16          argument in the question.  You can
17          answer.
18          THE WITNESS:  Well, what I
19          as a member of the brand team can
20          say is that we've done clinical
21          trials to assess the short and
22          maintenance effects of Seroquel in
23          specific patient populations and
24          we found them to be useful.

61 (Pages 555 to 558)

Confidential - Mark S. Scott, Ph.D.

Page 559

1    That's what I can say.  And so I'm
2    not -- I'm not understanding
3    necessarily the question that you
4    have in terms of what long term
5    actually means.  We have patients
6    who are coming into a study with a
7    well defined diagnosis, have
8    exhibited benefits over placebo,
9    and that's what our indications
10   are for.
11 BY MR. ALLEN:
12   Q.   As a witness on behalf of AZ
13 holding the titles that you hold, do you
14 know whether these conditions that
15 Seroquel is designed to treat the
16 symptoms of are chronic conditions or
17 not?
18   A.   I understand that they can
19 be chronic, but again, I don't see
20 patients on a regular basis.  I don't see
21 patients at all rather.  So you have to
22 talk to a clinician about the chronicity
23 and the need for extended treatment.
24   Q.   So if I'm going to treat a

Page 560

1  chronic condition, if you know, would I
2  treat that condition chronically or would
3  I just treat it acutely?
4    A.   That would be up to a
5  physician to decide what's appropriate
6  for that patient.
7    Q.   Nevertheless, studies 126
8  and 127 are studies of over the longer
9  term, are they not?
10   A.   They were studies that were
11 specifically designed to look at a
12 reduction in the risk of relapse of
13 symptoms associated with bipolar
14 disorder.  So, yes, in the longer term.
15   Q.   And the patients were taking
16 the active drug Seroquel for two years?
17   A.   Up to two years.
18   Q.   Up to two years.  And in the
19 longer term concerning whether or not
20 there was a statistical difference in the
21 increase in blood sugar glucose in the
22 patients studied in 126 and 127, the
23 answer is yes, there was, Seroquel was
24 worse than a placebo.  True?

Page 561

1    MR. BROCK:  Object to form.
2    THE WITNESS:  Well, again, I
3    would say there's a statistical
4    difference in terms of
5    characterizing worse.  I would
6    want a clinician to weigh in with
7    respect to the magnitude of the
8    effect that we saw and then have
9    to look at that alongside the
10   benefit that could be accrued by
11   giving Seroquel in that patient
12   population.
13 BY MR. ALLEN:
14   Q.   Okay, sir.  Exhibit 35 was a
15 PowerPoint of yesterday.  Yellow is
16 Seroquel is worse.  Let's go to 126 and
17 127.  If we can get down there, they're
18 yellow, right?
19   MR. BROCK:  Object to form.
20   THE WITNESS:  First off,
21   again, my characterization of 126
22   and 127 doesn't mean Seroquel is
23   worse.  My characterization is
24   that there were differences there

Page 562

1    that required further -- you know,
2    further inspection and -- so that
3    to me is what yellow actually
4    means in my context.  So I
5    don't -- I won't vow to or attest
6    to the fact that it's saying
7    Seroquel is worse.
8  BY MR. ALLEN:
9    Q.   Nevertheless, both into
10 yesterday's PowerPoint and then here's
11 today's, today is 36, do you remember
12 using the PowerPoint during your entire
13 examination with Mr. Brock?
14   A.   I remember the PowerPoint
15 being up there, yes.
16   Q.   But in both presentations,
17 study 126 and 127, the long-term
18 placebo-controlled trials with Seroquel,
19 they're denoted, using your vernacular,
20 as yellow.  True?
21   A.   Yes.
22   Q.   Thank you, sir.
23       By the way, wasn't there a
24 study conducted by the National

62 (Pages 559 to 562)

Confidential - Mark S. Scott, Ph.D.

Page 563

1    Institutes of Health on antipsychotics?
2         A.   Well, there was one called
3    CATIE, and there was CATIE AD, a number
4    of -- a number of clinical trials looking
5    at antipsychotics in patient populations.
6         Q.   There's a MacAvoy, there's a
7    Lieberman, there's a Stroup, there's the
8    Alzheimer study.  But the CATIE study, do
9    you recall that?
10            MR. BROCK:  Object to the
11       form.
12            MR. ALLEN:  Well, what's the
13       matter with the objection --
14       question?
15            MR. BROCK:  Well, you listed
16       11 studies and asked him a
17       question about it.  I think that's
18       a compound question.  I think if
19       you have a question, you should
20       ask about a study and get an
21       answer.
22            MR. ALLEN:  I thought he
23       was --
24    BY MR. ALLEN:

Page 564

1         Q.   Let me ask this.  Let me
2    rephrase it.  You heard of the CATIE
3    studies?
4            MR. BROCK:  That's a good
5       question.
6            THE WITNESS:  I've heard of
7       the CATIE studies, yes.
8            MR. BROCK:  You ask a simple
9       question, you get a good answer.
10            MR. ALLEN:  I'll just
11       refrain from commenting.
12    BY MR. ALLEN:
13         Q.   You've heard of the CATIE
14    studies that are funded by the National
15    Institutes of Health.  They were not
16    funded by the manufacturers.  Is that
17    true?
18         A.   I believe the manufacturers
19    supplied drug but they were -- we weren't
20    involved in funding the study.
21         Q.   Do you remember that there
22    was a sky high discontinuation rate of
23    the patients that took these second
24    generation antipsychotics?

Page 565

1            MR. BROCK:  Object to the
2       form.
3            THE WITNESS:  I recall the
4       outcome of the CATIE study was
5       that there was discontinuations in
6       all treatment arms, yes.
7    BY MR. ALLEN:
8         Q.   And, in fact, it was
9    described in the American Journal of
10    Psychiatry as a sky high discontinuation
11    rate, wasn't it?
12         A.   I don't recall reading that.
13         Q.   Well, Doctor, is it Carol
14    Tamminga?  Do you know Carol Tamminga?
15         A.   I know the name Carol
16    Tamminga, but I don't know Carol
17    Tamminga.
18         Q.   Hadn't she been a consultant
19    at one time to AstraZeneca?
20         A.   I didn't have any dealings
21    with Carol Tamminga, but I've known --
22    I've seen her name on some memos.
23         Q.   Right.  Memos there at AZ?
24         A.   Yes.

Page 566

1         Q.   You know Carol Tamminga, in
2    fact, Dr. Tamminga in the American
3    Journal of Psychiatry defined the
4    discontinuation rate seen in the CATIE
5    study, and in particular the report of
6    Dr. Lieberman and other authors, that
7    there were sky high discontinuation
8    rates.  Did you know that?
9            MR. BROCK:  Object to the
10       form.
11            THE WITNESS:  No, I didn't.
12    BY MR. ALLEN:
13         Q.   But you do know, well, from
14    your own personal -- have you reviewed
15    the CATIE data?
16         A.   I have reviewed -- I've read
17    the CATIE clinical trial in the New
18    England Journal back in September of
19    2005.
20         Q.   In fact, didn't y'all --
21    didn't you at AZ get kind of -- did you
22    get any information on CATIE -- I'll come
23    to that later.  Let me back up.
24            Do you recall the study

63 (Pages 563 to 566)

Confidential - Mark S. Scott, Ph.D.

Page 567

1  drugs, I think, at least included Zyprexa
2  which was olanzapine, Seroquel, which was
3  quetiapine, Risperdal, which was
4  risperidone, compared to -- is it
5  phentermine?  No, not phentermine.
6      A.   Perphenazine.
7      Q.   Perphenazine, at least those
8  second generation antipsychotics were
9  studied?
10     A.   I recall those were the four
11 treatment groups in the clinical trial,
12 yes.
13     Q.   Also clozapine was studied.
14 Right?
15     A.   I think clozapine came in
16 later on, not as the first part of CATIE.
17     Q.   Nevertheless, without -- do
18 you recall which second generation
19 antipsychotic was discontinued the
20 earliest, when measuring the study design
21 for effectiveness, which of these second
22 generation antipsychotics was -- had the
23 highest discontinuation rate?
24     A.   If you could bring up the

Page 568

1  CATIE manuscript for me, I could look at
2  it again and review the statistical
3  results.
4      Q.   Yes, sir.  Let me just say
5  this:  By the time the jury hears your
6  testimony, I think they will have seen
7  CATIE and I'm just going to ask you, do
8  you recall that Seroquel had the highest
9  discontinue rate of any of the second
10 generation antipsychotics?
11         MR. BROCK:  Object to the
12     argument.
13         THE WITNESS:  Well, again --
14 BY MR. ALLEN:
15     Q.   Well, let me strike the
16 argument.
17         But I do believe by the time
18 the jury hears this testimony, they will
19 be familiar with CATIE.
20         Now, let me ask my question.
21 Do you remember which of the second
22 generation antipsychotics, and I believe
23 it's Seroquel, had the highest
24 discontinue rate in the CATIE study?

Page 569

1          MR. BROCK:  So we do
2      definitely object to the form of
3      that one.
4          MR. ALLEN:  Let me change
5      it.  Let me change it again.  I
6      don't want to draw any objection.
7  BY MR. ALLEN:
8      Q.   Do you recall that Seroquel,
9  quetiapine, had the highest
10 discontinuation rate in the CATIE study
11 published in the New England Journal of
12 Medicine in 2005?
13     A.   My reading of CATIE, again,
14 I'd like to have a copy of it in front of
15 me, I'd like to look at it in terms of
16 the statistical results because rates
17 should be looked at in the context of the
18 way the experiment was conducted in terms
19 of the relevant rates of discontinuation.
20     Q.   Do you have criticisms with
21 the CATIE study?
22     A.   I don't have any criticism
23 with the study.  It's one study of many
24 looking at antipsychotics in the

Page 570

1  treatment of schizophrenia.
2      Q.   You have no criticisms of
3  it?
4          MR. BROCK:  Object to the
5      form.
6          THE WITNESS:  Again, it was
7      a well designed study looking at a
8      particular endpoint
9      discontinuation.  And it's one of
10     the many studies that have been
11     conducted looking at low grade
12     schizophrenia.  So it's part of
13     the evidence that goes into
14     treatment decisions with respect
15     to the use of these agents in
16     schizophrenia.
17 BY MR. ALLEN:
18     Q.   By the way, I was going
19 through my notes from this morning, do
20 you remember what CATIE said about the
21 extrapyramidal side effects in second
22 generation antipsychotics including
23 quetiapine when compared with the first
24 generation antipsychotics?

64 (Pages 567 to 570)

Confidential - Mark S. Scott, Ph.D.

Page 571

1      A.   Again, I don't have the
2  manuscript in front of me.  If you give
3  me a copy of the manuscript, I can review
4  it.  So I don't recall it.
5      Q.   Okay, sir.  Thank you.
6           Sir, Exhibit 1482, Mr. Brock
7  used it.
8      A.   Which is 1482, please?
9      Q.   Well, you should have it
10  there in front of you.  It's --
11          MR. BROCK:  What study?
12          THE WITNESS:  If it's a
13          study, let me know what the study
14          is, please, that would be more
15          helpful.  Newcomer.  So trial 125,
16          the Newcomer paper, okay.
17  BY MR. ALLEN:
18      Q.   Just real simply, I'm going
19  to just go over, you referred to this in
20  your direct examination, did you not?
21      A.   Yes, I did.
22      Q.   Every author of
23  Exhibit 1482, Defense Exhibit 1482 either
24  is employed by AstraZeneca or has had or

Page 572

1  currently has a relationship with
2  AstraZeneca, do they not?
3      A.   Well, I know that Dr.
4  Newcomer and Dr. Ratner have worked with
5  us in the past.  Jan Eriksson, I don't
6  know who Jan Eriksson is.
7      Q.   Sir, maybe let's skip ahead,
8  it may be easier, doesn't -- isn't it
9  reflected in the article itself that
10  every one of the authors is either
11  employed by or has a relationship with
12  AstraZeneca?
13      A.   Well, again, I know that
14  some of the names with respect to the
15  employees of AstraZeneca, there are some
16  individuals up there who have consulted
17  with us, so we have consulting
18  arrangements with a lot of physicians
19  with respect to the work that we do.  So
20  yes.
21      Q.   So yes is an answer.  In
22  fact, Dr. Newcomer, for example, has been
23  consultant to the litigation for
24  AstraZeneca?

Page 573

1      A.   That, I don't know.
2      Q.   Dr. Ratner has been a
3  consultant to AstraZeneca.  Correct?
4      A.   Yes, Dr. Ratner, as I
5  understand, is a well credentialed
6  endocrinologist and we like to rely on
7  his services.  It looks like he's been
8  involved with other individuals as well.
9      Q.   But just the simple fact is
10  money has been passed back and forth
11  between Dr. Newcomer and AstraZeneca, Dr.
12  Ratner and AstraZeneca and Dr. Emsley and
13  AstraZeneca.  Correct?
14      A.   I wouldn't characterize it
15  as that.  We obviously would like to
16  compensate any individuals for the time
17  that they've used, their professional
18  time with respect to the issue that we
19  have, and so I don't view that as
20  anything more than contractual services.
21      Q.   And then Drs. Eriksson --
22  excuse me for the pronunciation --
23  Meulien?
24      A.   I think it's Didier Meulien,

Page 574

1  yes.
2      Q.   I did pretty good then.
3  Miller, Leong and Ms. Leonova-Edlund are
4  employees and stockholders of
5  AstraZeneca.
6      A.   Yes.
7      Q.   Correct?
8      A.   Correct.
9      Q.   And Dr. Brecher, during
10  those -- you know Dr. Brecher, don't you?
11      A.   Yes.
12      Q.   He's on many of the
13  documents Mr. Brock gave you in the
14  clinical trial reports.  Correct?
15      A.   Dr. Brecher being the
16  medical science director, I'd expect to
17  have his name on a lot of these
18  documents, yes.
19      Q.   You know Dr. Brecher?
20      A.   Yes, I do.
21      Q.   Dr. Brecher has been a
22  professional colleague of yours?
23      A.   He was a professional
24  colleague of mine for a number of years.

65  (Pages 571 to 574)

Confidential - Mark S. Scott, Ph.D.

Page 575

1    Q.   And this, of course, is a
2  financial disclosure form that's filled
3  out on this article.  Correct?
4    A.   As I understand, it's filled
5  out on most peer-reviewed publications to
6  give readers an understanding of the
7  relationships that the authors have.
8    Q.   Why is that?
9    A.   For transparency reasons.
10   Q.   Why do you want to be
11 transparent about the financial
12 relationship or the connection between
13 the authors of articles and the articles
14 when they're published?
15   A.   I can't speak to the broad
16 terms.  I can speak to just that that's
17 my understanding as about transparency.
18   Q.   You think that's a good
19 idea?
20   A.   Yes, I do.
21   Q.   Why is that?
22   A.   Like I said, transparency is
23 a good thing to understand what
24 individual relationships they have with

Page 576

1  whatever organization they have in
2  conducting the research.
3    Q.   That's -- that kind of good
4  idea, is that a new good idea or
5  something that should have been around a
6  long time?
7        MR. BROCK:  Object to the
8        form.
9        THE WITNESS:  Well, I know
10       that publication policies are
11       publication policies and I know
12       that there's been a move by
13       journal editors to have that
14       request, that transparency.  So
15       journal editors have requested it
16       and I know that we, as well as
17       other firms who were involved in
18       the development of medicines,
19       abide by those policies.
20 BY MR. ALLEN:
21   Q.   Always have?
22   A.   Like I said, we've had
23 policies in place over this past period
24 of time and we abide by the policies that

Page 577

1  are in place during that period of time.
2    Q.   Yesterday I think I heard
3  you say it, if I mangle the words I'm
4  sure you can correct me, that you had
5  worked with a clinical trial development
6  team.  Do you recall that?  Teams, you
7  said actually I've worked with clinical
8  trial development teams.  Do you recall
9  that?
10   A.   I've worked in clinical
11 development for a number of years.  And
12 I've worked as a member of a clinical
13 development team in the past, yes.
14   Q.   Which clinical trial team
15 did you work as a member of?
16   A.   The clinical development
17 team that was associated with Seroquel,
18 that would have been one, at least
19 initially.  And then part of a number of
20 clinical teams that were associated with
21 submissions to FDA for the approvals of
22 Seroquel for bipolar depression, for
23 approvals of Seroquel XR in -- for
24 schizophrenia as well as a number of

Page 578

1  maintenance indications that we've had as
2  well.
3    Q.   Didn't some of those
4  clinical trial development teams work
5  with outside agencies such as PAREXEL?
6  Do you recall that?
7    A.   We've used PAREXEL in the
8  past as a resource to help us in our
9  clinical trial -- carrying out our
10 clinical trials, yes.
11   Q.   Yes.  In fact, you have been
12 in meetings with PAREXEL employees, have
13 you not?
14   A.   I've been in meetings with
15 PAREXEL employees, it was a long time
16 ago, it was in the mid-'90s, yes.
17   Q.   Yes, sir.  And, in fact,
18 some of the articles concerning the
19 clinical trials done at AstraZeneca were
20 actually written by PAREXEL employees
21 initially, were they not?
22   A.   Well, I think there's
23 drafting of clinical trials which gets
24 done by PAREXEL employees as well as

66 (Pages 575 to 578)

Confidential - Mark S. Scott, Ph.D.

Page 579

1    AstraZeneca employees, but ultimately the
2    authors of the articles have the
3    responsibility for review and approval of
4    those as it relates to the research
5    that's being conducted.
6         Q.   So if some of these clinical
7    trial development teams as who you've
8    worked with have had articles written and
9    drafted by AstraZeneca employees and
10   PAREXEL employees concerning those
11   clinical trials that were conducted.  Is
12   that true?
13        A.   Well, the development --
14   excuse me, the publication process is one
15   where individuals involved in the
16   clinical trials will write drafts of them
17   but ultimately to be an author of the
18   publication, one needs to have
19   involvement in editing, review, research
20   itself and a variety of other aspects and
21   to have -- to be qualified as an author,
22   you have to have a number of those or one
23   of those to be qualified as an author.
24   So we do have individuals who start

Page 580

1    drafting documents, but in the end
2    authors take accountability with respect
3    to the format and content as well as
4    approval.
5         Q.   So what you're saying is,
6    Mr. Allen, yes, the articles for our
7    clinical trials are often initially
8    drafted by AZ employees or third parties
9    such as PAREXEL, but ultimately when the
10   doctor is hired, he or she puts his or
11   her name on it, they have to vouch for
12   that article, is that what you're saying?
13        A.   No, I wouldn't characterize
14   it that way at all.  I would characterize
15   it as the authors have accountability for
16   critical review, writing it itself.  And
17   at times will have draft versions.  You
18   characterized it as always.  But I'm
19   saying that can happen in terms of
20   drafts, but authors have to have
21   significant involvement and approval for
22   the content.
23        Q.   Did the authors, when this
24   occurred, when this relationship occurred

Page 581

1    where the initial draft was done by AZ or
2    PAREXEL and the author, the doctor, he or
3    she ultimately had their name on it, did
4    the fact that the drafting was done and
5    paid for by AZ through PAREXEL or through
6    AZ employees, did that always appear in
7    the article itself much like Exhibit 1482
8    where a disclosure of the relationships
9    was made?
10        MR. BROCK:  Object to form.
11        THE WITNESS:  Well, I know
12   that with the standards that are
13   in place right now, that's part of
14   what we do, is we put in there the
15   relationships that individuals
16   have and whether editorial systems
17   has been put in place.  But it's
18   been my experience that the
19   individuals who are involved in
20   the authoring of research are the
21   ones who have had the critical
22   involvement in the design, conduct
23   or interpretation and presentation
24   of those results.

Page 582

1    BY MR. ALLEN:
2         Q.   Okay, sir.  Now, by the way,
3    it says these employees, we went through
4    the names of employees and stock
5    shareholders of AstraZeneca.  Are you a
6    shareholder in AstraZeneca?
7         A.   Yes, I am.
8         Q.   How many shares of
9    AstraZeneca stock do you own?
10        MR. BROCK:  Hang on a
11   second.  Don't answer that.  I'm
12   going to instruct him not to
13   answer that right now.  I may let
14   him answer it later.  I'll check.
15        MR. ALLEN:  That's all
16   right.
17        MR. BROCK:  Make yourself a
18   note.  I may let him answer it.
19        MR. ALLEN:  Let me say, just
20   for the same reason, article, it
21   goes to his financial interest,
22   bias and prejudice under the rules
23   of evidence.
24   BY MR. ALLEN:

67 (Pages 579 to 582)

Confidential - Mark S. Scott, Ph.D.

Page 583

1    Q.   Sir, you are a stockholder
2  in AstraZeneca.  Correct?
3    A.   Yes, I am.
4    Q.   Do you own more than 1,000
5  shares?
6         MR. BROCK:  I'm going to
7  object and instruct you not to
8  answer.
9  BY MR. ALLEN:
10   Q.   Okay.  Sir --
11        MR. BROCK:  I'll give you an
12 answer.
13        MR. ALLEN:  I got you.  Let
14 me move on.
15        MR. BROCK:  He can answer.
16        MR. ALLEN:  Okay.  Thank
17 you.
18        MR. BROCK:  I just didn't
19 know what we were doing in this
20 litigation.  I've been in
21 litigations where that question
22 was answered and I've been in them
23 when it wasn't.
24        MR. ALLEN:  I'm not arguing.

Page 584

1  I was moving on.  But thank you.
2         MR. SCOTT:  If it's been
3  objected to in the past, it's not
4  waived, but we think it may have
5  been asked and answered by other
6  people.
7         MR. ALLEN:  It has been.
8  And as we know, y'all --
9         MR. SCOTT:  You can --
10        MR. ALLEN:  I'm not
11 quibbling.  I'm sure the --
12 BY MR. ALLEN:
13 REDACTED
14
15
16
17
18
19
20
21
22
23
24

Page 585

1  REDACTED
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 586

1  REDACTED
2
3
4
5    Q.   Thank you, sir.
6         - - -
7         (Exhibit Scott-38, Documents
8  reviewed by Mark Scott, was marked
9  for identification.)
10        - - -
11 BY MR. ALLEN:
12   Q.   Sir, Exhibit 38 was provided
13 to me yesterday by your lawyers.  The
14 documents reviewed Dr. -- it says by Mark
15 Scott.  Those are the -- I just want to
16 put into the record your lawyer Mr. Brock
17 gave me those.  Those are the documents
18 you reviewed in preparation for your
19 deposition?
20   A.   Well, these are a list of
21 the numbers.  And to be honest with you,
22 you know, I can't say yes or no.  There's
23 just a list of numbers to me.
24   Q.   Sir, Mr. Brock provided

68  (Pages 583 to 586)

Confidential - Mark S. Scott, Ph.D.

Page 587

1  them, I'm going to make that a part of
2  the record.
3      A.   Okay.
4      Q.   All right, sir.
5           Sir, do you recall
6  yesterday -- where's my -- I'm bad about
7  pieces of paper, Doctor.  Let me find
8  my -- all day long I had it.  Here it is.
9  Exhibit Number 4.  If you want me to help
10 you, I will.  I'll come around --
11     A.   Can you describe what it is?
12     Q.   Yes, it's a SERM.  June 2007
13 SERM meeting.  I think our good court
14 reporter has actually -- here, sir,
15 before we mess up our stacks.  She has
16 actually done us all a favor, she has put
17 them in order.
18     A.   Even better.
19     Q.   So we can take -- Exhibit 4
20 will be at -- will be right there at the
21 top under 1 and 2.
22     A.   1, 2.
23     Q.   And probably 4 after that.
24     A.   That's 4.

Page 588

1      Q.   Thank you very much.
2      A.   That is -- yeah, all the
3  SERM minutes.
4      Q.   Yes, sir.
5      A.   Okay.  The SERM minutes,
6  okay.
7      Q.   Yes, sir.  By the way, SERM
8  stands for safety evaluation review
9  meeting?
10     A.   Yes, it does.
11     Q.   And there -- we have been
12 told in other depositions, and I'm
13 paraphrasing, but we told -- we were told
14 by other witnesses in this case this is
15 the most important safety committee and
16 meeting that takes place on a drug in
17 AstraZeneca.  Is that your understanding?
18          MR. BROCK:  Object to form.
19          THE WITNESS:  The SERM
20     meeting is there to review the
21     safety information that's from the
22     clinical trial program and make
23     recommendations to whether changes
24     are warranted as a result of that

Page 589

1      evaluation.  I don't know
2      necessarily whether we have
3      adjectives called most important
4      but it's part of the process of
5      reviewing data.
6  BY MR. ALLEN:
7      Q.   Well, let me rephrase the
8  question as necessary.
9           Is there -- within
10 AstraZeneca, to your knowledge, is there
11 a higher level of safety evaluation
12 meeting on marketed drugs than SERM
13 meetings?
14     A.   Not that I'm aware of.
15     Q.   To your knowledge, it's the
16 highest level of safety evaluation that
17 takes place on marketed products?
18     A.   Again, I'm not meaning to
19 be any -- to quibble with this.  It is
20 the meeting where safety gets discussed
21 with respect to compounds.
22     Q.   It is the meeting?
23     A.   The meeting.  Well, let
24 me -- I apologize.  It is -- as part of

Page 590

1  the -- this group has the accountability
2  for evaluating safety and making
3  recommendations to change the labeling,
4  yes.
5      Q.   This group has the
6  accountability, is that what you said?
7      A.   They have the responsibility
8  to review the safety information and then
9  suggest changes to the labeling, so yes.
10     Q.   So they have not only your
11 new answer, I appreciate it, they have
12 the responsibility and the accountability
13 to review the safety information.  Is
14 that correct?
15          MR. BROCK:  I object to the
16     comment on that.
17 BY MR. ALLEN:
18     Q.   Let me rephrase it.  The
19 SERM meeting and SERM personnel have the
20 responsibility and the accountability to
21 review the safety information on marketed
22 products.  True?
23     A.   They have the responsibility
24 of reviewing the safety information and

69 (Pages 587 to 590)

Confidential - Mark S. Scott, Ph.D.

Page 591

1  making changes to the label.  I don't
2  know what discussions go on outside of
3  SERM, if discussions go on outside of
4  SERM, in terms of that review and
5  approval process.  But this is the group
6  that are scientific experts that gets
7  together and reviews the information and
8  makes the suggested changes to the --
9  suggested changes that need to be made.
10 What happens after that, I'm not exactly
11 sure of in terms of if there's other
12 individuals who review those as well.  So
13 there may be other individuals who review
14 it, but this is the group that's charged
15 with reviewing that information.
16     Q.   They're charged with
17 reviewing the safety information on the
18 marketed drug.  True?
19     A.   And then making -- and
20 making then recommendations to change the
21 core data sheet as a result of it.
22     Q.   So SERM reviews the safety
23 information and makes recommendations
24 both on the core data sheet and the

Page 592

1  package insert?
2     A.   The core data sheet is a
3  company document.  It's then tied to
4  the -- tied to the package insert in the
5  sense that anything that's in the core
6  needs to be reflected as part of the
7  labeling.
8     Q.   Right.  Susanne Fors, you
9  know Ms. Fors, do you not?
10    A.   Yes, I do.
11    Q.   I took her deposition, I
12 guess, a couple of years ago.  Susanne
13 Fors indicated -- you testified to Mr.
14 Brock yesterday that you have a
15 regulatory oversight also?
16    A.   Yes, I do.
17    Q.   And, in fact, by the way,
18 was Mr. Limp, Gerald Limp, I took his
19 deposition, was he one of the people that
20 you had regulatory oversight over?
21    A.   Yes, I did.
22    Q.   And Susanne Fors similarly
23 at the time?
24    A.   No, Susanne Fors had the

Page 593

1  global role for -- so she was my
2  colleague sitting on the global team.
3     Q.   But you now concur, you can
4  tell the jury based upon your own role at
5  AstraZeneca working on Seroquel in
6  particular, that if the core data sheet
7  is changed for a marketed product, that
8  means the package insert must be changed.
9  True?
10         MR. BROCK:  Object to the
11    form.
12         THE WITNESS:  It's my
13    understanding about the core data
14    sheet, that it contains a summary
15    of the benefits and -- benefits
16    and risks of the drug and that
17    labels should be using the
18    information in the core to have as
19    part of the local package -- local
20    package inserts.
21 BY MR. ALLEN:
22    Q.   So the core data sheet is,
23 as you said, an internal company
24 document.  And if changes are made to the

Page 594

1  core data sheet concerning marketed
2  products, the local package inserts for
3  that marketed products need to contain
4  that information likewise?
5     A.   Well, I want to make sure
6  that I've heard your question correctly.
7  So, you know, the core is the document
8  upon which package inserts or labels are,
9  in fact, based.
10    Q.   Thank you, sir.
11    A.   So that's what I -- that's
12 what I will say.  And then if there are
13 changes to the core, they should be
14 reflected in local labeling, but I think
15 we'd have to take a look at what that
16 change was and whether it might have been
17 already reflected in the existing
18 labeling.  So there might be a change to
19 the core where the labels, local label
20 already might have some information on
21 that.
22    Q.   Okay, sir.  Thank you.
23         Why should the local label
24 reflect changes made in the core data

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Mark S. Scott, Ph.D.

Page 595

1  sheet?
2      A.   It would be my belief that
3  the core data sheet, local label should
4  reflect the most up-to-date information
5  that's reflected in the core.
6      Q.   And so the core data sheet
7  will reflect the most up-to-date
8  information?
9      A.   That is -- that is the
10  reason to have the core data sheet.
11     Q.   And therefore, the local
12  label -- if the core data sheet is
13  changed, the local labels should be
14  changed in order to reflect the most
15  up-to-date information.  True?
16         MR. BROCK:  Object to the
17     form.
18         THE WITNESS:  The local
19     label should reflect the core data
20     sheet.
21  BY MR. ALLEN:
22     Q.   Sir, now, yesterday -- it
23  didn't take me long, I've lost the same
24  sheet now twice.

Page 596

1         Do you have Exhibit 4 there
2  in front of you, sir?
3      A.   Yes.
4      Q.   And Exhibit 4 was the
5  June 8, 2007, SERM meeting minutes.  Is
6  that correct?
7      A.   Yes.
8      Q.   And as Mr. Pennock went over
9  with you, it was determined in this
10  June 8 meeting, after a review of all
11  clinical trial, and the word "all" means
12  all inclusive, does it not, sir?
13         MR. BROCK:  Object to the
14     form.
15  BY MR. ALLEN:
16     Q.   Let me ask this:  Your
17  lawyer objected.  What does the word "all
18  clinical data" mean in a clinical trial?
19     A.   I can't speak for the
20  individuals who wrote this, but it would
21  be my interpretation, if I could offer an
22  interpretation, it would be all of the
23  data that we had -- we had sponsorship of
24  in terms of our clinical trial data and

Page 597

1  any other clinical trial data that would
2  be relevant on this subject.
3      Q.   And then -- and it included
4  trials 125, 126 and 127, and then it goes
5  on to conclude that SERM recommended the
6  following to section 4.4 -- 4.4 of
7  special warnings and special precautions
8  for use, and we're talking there about
9  the core data sheet.  Correct?
10     A.   Yes.
11     Q.   And so the most up-to-date
12  and current information that should be
13  included in the Seroquel package insert
14  or the core data sheet is that increases
15  in blood glucose and hyperglycemia and
16  associated reports of diabetes have been
17  observed in clinical trials with
18  quetiapine.  Is that true?
19     A.   That's what's written there,
20  yes.
21     Q.   And that was the
22  recommendation of SERM, the high level
23  meeting with the most up-to-date
24  information to determine that, in fact,

Page 598

1  in the clinical trials on Seroquel,
2  increases in blood glucose and
3  hyperglycemia and occasional reports of
4  diabetes have been observed in the
5  clinical trials with quetiapine.  True?
6      A.   That's written -- you read
7  that correctly, rather.
8      Q.   Yes, sir.
9         Now, in addition, sir, if we
10  turn to the second page -- can you go to
11  the second page with me, sir?
12     A.   Yes.
13     Q.   Doesn't it also say that
14  blood glucose increased the
15  hyperglycemia -- excuse me, sir.  Let me
16  stop.
17         Didn't SERM also determine
18  that blood glucose increased to
19  hyperglycemic levels was, in fact, a
20  common undesirable effect of Seroquel?
21     A.   The adverse event of blood
22  glucose increased to hyperglycemic level,
23  was calculated across the clinical trial
24  program and it fell into the category of

71 (Pages 595 to 598)

Confidential - Mark S. Scott, Ph.D.

Page 599

1  between 1 and 10 percent.  So as
2  comments, so it went into section 4.8.
3      Q.   Well, sir, I couldn't -- you
4  tailed off and I apologize, I couldn't
5  hear you.
6          But the SERM recommended
7  adding to the core data sheet section
8  4.8, and you've told us this is the most
9  current up-to-date information, didn't
10  you?
11      A.   Yes, I did.
12      Q.   They recommended for the
13  undesirable effects, that's an effect you
14  don't want from Seroquel.  Correct?
15      A.   Again, I won't -- can't
16  comment on definition of undesirable,
17  it's the term "undesirable" which is 4.8.
18      Q.   Let me ask you this, sir:
19  Mr. Brock asked you about your experience
20  and your work at Seroquel and you're the
21  executive director of development and
22  co-Seroquel brand lead, can you tell the
23  jury what your understanding of an
24  undesirable effect of Seroquel is?

Page 600

1          MR. BROCK:  Object to the
2      form.
3          THE WITNESS:  These are the
4      observations from clinical trials
5      which the individuals who are
6      reviewing this data believe it
7      should be in that section.  So I'm
8      not -- I can't comment on
9      undesirable effect, what that
10      actually means because I would
11      want to look at that in terms of
12      not just the events themselves,
13      but the benefit that might be
14      accrued for patients as well.
15  BY MR. ALLEN:
16      Q.   Well, a lot of people did,
17  in fact, look at that, didn't they, the
18  SERM meeting?  Right?
19      A.   The SERM involves a lot of
20  scientists with respect to -- a lot of
21  scientists to help review the data, yes.
22      Q.   You, in fact, not only have
23  scientists, you have lawyers present, do
24  you not?

Page 601

1      A.   We had a brand team lawyer
2  on there, yes.
3      Q.   You have executives and vice
4  presidents.  Right?
5      A.   There are a lot of
6  individuals across the company with a lot
7  of experience who bring that experience
8  to bear in terms of the review of the
9  data.
10      Q.   You have the global SERM
11  manager present.  No, excuse me, those
12  are people that could not make it but
13  they're on the SERM committee.  Correct?
14      A.   To be honest with you, I
15  don't know if -- what the SERM committee
16  accounts of in terms of those people.
17  These are participants so -- you're
18  asking me to comment, these are people
19  who have been involved.  Whether they
20  form all the committee or they're invited
21  especially for this topic, I don't know.
22      Q.   Well, we have a chairman
23  listed as Vikram Dev.  Vikram Dev was in
24  charge of global safety surveillance of

Page 602

1  Seroquel, was he not?
2      A.   I don't recall if Vikram was
3  the head.  I don't recall that.  If he
4  was, I just don't remember it.
5      Q.   He's the vice president?
6      A.   He's the head of product
7  safety -- patient safety in the United
8  States.
9      Q.   He's the head of patient
10  safety on Seroquel in the United States.
11  Right?
12      A.   He's the head of patient
13  safety which covers all medicines for
14  AstraZeneca in the United States.
15      Q.   We're not going to go over
16  every name, but we have people from
17  safety surveillance.  We have Dr. Ihor
18  Rak.  We have Barry Arnold.  Tell the
19  jury who Barry Arnold is.
20      A.   Barry Arnold, I don't know
21  his role right now.  At one point he was
22  the head of global product safety, or
23  global patient safety.  He has a
24  different role right now.

72 (Pages 599 to 602)

Confidential - Mark S. Scott, Ph.D.

Page 603

1    Q.   These people with the
2    accountability and responsibility
3    concluded that the core data sheet should
4    contain as a common undesirable effect of
5    Seroquel blood glucose increased to
6    hyperglycemic level.  True?
7        A.   They concluded that this
8    information should be in the section 4.1,
9    special warnings and precautions, and the
10   section 4.8 should include this
11   particular event at a level of common, so
12   that's how I would describe it.
13       Q.   This particular event is the
14   very event that you discussed with Mr.
15   Brock yesterday and today.  True?
16       A.   Yes, we did.
17       Q.   And that would be
18   hyperglycemia elevated blood glucose.
19   True?
20            MR. BROCK:  Object to form.
21            THE WITNESS:  Well, the --
22   BY MR. ALLEN:
23       Q.   Your lawyer had an
24   objection.

Page 604

1            Didn't you discuss with Mr.
2    Brock yesterday and today the issue of
3    elevated blood glucose?
4        A.   What we discussed yesterday
5    and today was fasting blood glucose of at
6    least 126 or a nonfasting blood glucose
7    of greater or equal to -- excuse me,
8    fasting blood glucose above a clinically
9    significant level.  That's what we've
10   discussed.  They might -- here they might
11   have focused more narrowly on a specific
12   cutoff.  But we were focusing on
13   clinically significant level.
14       Q.   Of course, you don't know
15   what's clinically significant, do you,
16   because you don't have clinical practice,
17   you told Mr. Pennock that yesterday and
18   me this morning.  True?
19       A.   What I do have is I'm not a
20   clinician, but I take the advice of
21   clinicians with respect to, in the
22   dataset that's in front of me, to help
23   them characterize what are the clinical
24   significant values that I see and I help

Page 605

1    summarize them for them.
2        Q.   Nevertheless, the SERM
3    meeting as contained in their minutes
4    determined that a common undesirable
5    effect of Seroquel was blood levels
6    increased to hyperglycemic level, did
7    they not?
8            MR. BROCK:  Object to form.
9            THE WITNESS:  They've --
10   what they've done is they've --
11   based on all the data that was
12   there, to include the observation
13   that increases in blood glucose
14   and hyperglycemia and occasional
15   reports of diabetes have been
16   observed in clinical trials with
17   quetiapine.  And with that, what
18   they've chosen to do is to say --
19   to help physicians understand
20   what's occurring, is to say let's
21   look across all our clinical trial
22   program and try to quantify that
23   particular value.  So they have
24   that event and they've quantified

Page 606

1    it as common between 1 and
2    10 percent.
3    BY MR. ALLEN:
4        Q.   The second page which I'm
5    pointing to, does it or does it not state
6    following SERM that the recommendation
7    was to amend the core data sheet and
8    provide and state that a common
9    undesirable effect of Seroquel was blood
10   glucose increased to hyperglycemic level?
11       A.   That is what's written
12   there.
13       Q.   Yes, sir.
14            Now, you said with the data
15   they had in front of them they reached
16   those conclusions.  Is that correct?
17       A.   That's what the SERM process
18   is and this is what the data they have,
19   yes.
20       Q.   And part of the data that
21   they had in front of them was all
22   clinical trial data.  True?
23       A.   That is what's written
24   there, yes.

73 (Pages 603 to 606)

Confidential - Mark S. Scott, Ph.D.

Page 607

1       Q.   Yes, sir.  You keep on
2   saying that's what's written there.  Are
3   you doubting that these are accurate SERM
4   meeting minutes by the individuals who
5   participated in SERM and made these
6   recommendations?
7           MR. BROCK:  Object to the
8       form.
9           THE WITNESS:  I believe that
10      these are a complete and faithful
11      representation of the process that
12      they went through at a high level
13      and the recommendations from the
14      SERM.  But to get to all the
15      clinical trial data, I would want
16      to go back to the SERM document
17      itself, the discussion document,
18      to expand on what that -- what
19      they actually were looking at if
20      you want me to comment
21      specifically on all clinical trial
22      data.
23  BY MR. ALLEN:
24      Q.   Sir, we wouldn't have time

Page 608

1   for you to comment on every -- all
2   clinical trial data today or any other
3   day, would we?
4           MR. BROCK:  We object and
5       move to strike that, so...
6   BY MR. ALLEN:
7       Q.   Let me rephrase the
8   question.
9           Sir, did you discuss with
10  Mr. Brock yesterday and today in your
11  examination all the clinical trial data
12  on Seroquel?
13      A.   What we discussed today were
14  all of the placebo-controlled clinical
15  trials that had intent to either be part
16  of a registration package or because of
17  the outcome in the clinical trials,
18  didn't make it -- the exercise was to
19  address the changes that were observed in
20  the clinical trial program study by
21  study.
22      Q.   Of course in SERM they
23  looked at all the clinical trial data,
24  correct, as reflected in the SERM meeting

Page 609

1   minutes?
2       A.   There they have all clinical
3   trial data.  So as I said, that I would
4   like to look at all of the -- excuse me,
5   I don't want to look at necessarily, but
6   if you want me to comment on all clinical
7   trial data of what they would like to --
8   of what they were looking at, I'd like to
9   look at the SERM document.
10      Q.   Of course, sir, there was
11  people at SERM who had that ability and
12  that's why they had the SERM committee.
13  Isn't that true?
14      A.   The role of SERM is to look
15  at the evidence there and make a
16  determination of whether a change to our
17  understanding needs to be made.
18      Q.   Right.  And they don't just
19  have a statistician, for example, they
20  have people from legal department, Julia
21  Manning, they have people in
22  epidemiology, they have physicians, they
23  have a regulatory labeling personnel,
24  Kathryn Bradley.  Are you her boss -- or

Page 610

1   at that time?
2       A.   Kathryn Bradley works in
3   another area right now.  She was part
4   of -- she was part of the regulatory
5   group at the time, yes.
6       Q.   So at this time you were, in
7   fact, her superior?
8       A.   She was part of the
9   regulatory group that was deployed to
10  Seroquel.
11      Q.   Yesterday you told Mr. Brock
12  that you were responsible and oversaw
13  that.  Right?
14      A.   That's part of my
15  responsibilities, yes.
16      Q.   So, for example, Kathryn
17  Bradley was who was you -- as part of
18  your responsibility you oversaw was on
19  this SERM committee?
20      A.   She was part of the group
21  that would help me review the data for
22  SERM.
23      Q.   Surveillance -- safety
24  surveillance, they had multiple

74 (Pages 607 to 610)

Confidential - Mark S. Scott, Ph.D.

Page 611

1    personnel, they had more doctors, they
2    had a statistician there, Mikael or
3    Michael Astrom.  Is that correct?
4        A.   They had Mikael Astrom, who
5    was the head of statistics for Seroquel.
6    Also Kurt Engleman, Henrik Anderson and
7    Kevin Carroll as well.
8        Q.   They had Henrik Anderson.
9    Kevin Carroll, the chief statistical
10   expert at the whole company.  Right?
11       A.   That is his role, yes.
12       Q.   So the chief statistical
13   expert at the whole company was at the
14   SERM meeting that reached the conclusion,
15   after looking at all clinical trial data,
16   that increases in blood glucose and
17   hyperglycemia and occasional reports of
18   diabetes have been observed in clinical
19   trials with quetiapine.  True?
20       A.   They arrived at that
21   conclusion, yes.
22       Q.   And these same people
23   including the chief statistician at the
24   whole company on SERM recommended that

Page 612

1    the core data sheet which you told us is
2    the most up-to-date information.
3    Correct?
4           MR. BROCK:  Object to the
5    form.
6    BY MR. ALLEN:
7        Q.   Didn't you tell us that?
8        A.   It was intended to have the
9    most up-to-date information to make a
10   decision.
11       Q.   And the SERM committee
12   recommended that the core data sheet list
13   as a common undesirable effect of
14   Seroquel blood glucose increased to
15   hyperglycemic levels.  True?
16       A.   That was what was
17   recommended to make that change in 2007.
18       Q.   Now, there's a little
19   asterisk by this hyperglycemic level.  Do
20   you see that?
21       A.   Yes.
22       Q.   I'm sure it's just like
23   anyplace else, that's like a footnote and
24   we have a description of what

Page 613

1    hyperglycemic level means.  Do you see
2    that, sir?
3        A.   Yes.
4        Q.   And that's fasting blood
5    glucose greater than or equal to
6    126 milligrams per deciliter or a
7    nonfasting blood glucose greater than or
8    equal to 200 milligrams per deciliter on
9    at least one occasion.  Is that true,
10   sir?
11       A.   That's what's read.  That's
12   what's written, yes.
13       Q.   Do you under --
14       A.   That's what's written, yes.
15       Q.   Do you understand, and if
16   you don't, that's fine, sir, I'm asking a
17   question, do you understand the clinical
18   significance of a fasting blood glucose
19   of greater than or equal to
20   126 milligrams per deciliter or a
21   nonfasting blood glucose greater than or
22   equal to 200 milligrams per deciliter?
23       A.   I knew it -- I know it was
24   used in assessing the metabolic status of

Page 614

1    the patients, but a value like that on
2    its own, I can't tell you what it
3    actually means.
4        Q.   So you can't tell us the
5    actual clinical significance of that
6    value.  Is that correct?
7        A.   I know that it is a value
8    that has been used in our clinical trials
9    to tabulate proportions of patients with
10   clinically significant values.  But for
11   individual patient level, I have to defer
12   judgment to the clinician to decide that.
13       Q.   Other than saying it's a
14   value that has been used in our trials,
15   you can't tell the jury the clinical
16   significance of these measures, if any.
17   Is that correct?
18       A.   I would say for an
19   individual patient I can't, no.  I think
20   that's a clinician's job to decide for
21   that particular value for a patient what
22   that actually means.
23       Q.   Well, how about for a broad
24   group of patients, do you -- is there

75 (Pages 611 to 614)

Confidential - Mark S. Scott, Ph.D.

Page 615

1  anything in particular that you know of,
2  that is clinically significant about a
3  fasting blood glucose level in the broad
4  population of patients of greater than or
5  equal to 126 milligrams per deciliter?
6      A.   I would always want to look
7  at any data like this in the context of
8  the disease being studied, the treatment,
9  the benefits and risks.  So this on its
10 own is a potential outcome, it's been
11 documented as part of our labeling.  It
12 reflects our clinical trial program.  But
13 it is one part of potential outcomes with
14 Seroquel and that I would want to judge
15 what this actually means in the context
16 of risk and benefit.
17     Q.   So you could just tell us
18 that this level has been documented as
19 part of your clinical trial program?
20     A.   As we said that they have
21 been -- those events have been reported
22 in clinical trials of those types of --
23 those types of clinically significant
24 values and we report it as a common -- a

Page 616

1  common event.
2      Q.   And how long has it been --
3  how long has a fasting blood glucose
4  greater than or equal to 126 milligrams
5  per deciliter or a nonfasting blood
6  glucose greater than or equal to 200
7  milligrams per deciliter been a common
8  adverse event in the Seroquel clinical
9  trials?
10     A.   They have evidence to put
11 that in since 2007.
12     Q.   Now, do you know anything
13 else about the clinical significance, if
14 any, of either one of these measures,
15 either the fasting level or nonfasting?
16     A.   Well, I know that it's used
17 by physicians to help diagnose diabetes,
18 but I know that -- I can't go any further
19 than that.
20     Q.   What is the significance of
21 a nonfasting blood glucose of greater
22 than or equal to 230 milligrams per
23 deciliter?
24     A.   You'd have to ask a

Page 617

1  clinician that point.  I'm not qualified
2  to judge that.
3      Q.   You're not qualified.  Thank
4  you, sir.
5          Now, following --
6          MR. BROCK:  Let's take a
7  break now that we've finished that
8  document if we could.
9          MR. ALLEN:  Sure.
10         VIDEOGRAPHER:  We are now
11 going off the record.  This is the
12 end of videotape number four.  The
13 time is 2:35 -- excuse me, 2:31.
14            - - -
15         (A recess occurred.)
16            - - -
17         (Exhibit Defendant's-7,
18 Seroquel label, Bates
19 D339-L00665059-00001 - 00046, was
20 marked for identification.)
21            - - -
22         VIDEOGRAPHER:  We are now
23 back on the record.  This is the
24 beginning of videotape number

Page 618

1  five.  The time is 2:51.
2            - - -
3          (Exhibit Scott-39, 6/22/07
4  Letter, was marked for
5  identification.)
6            - - -
7  BY MR. ALLEN:
8      Q.   Dr. Scott, we're back on the
9  record after a break.
10         Following that SERM meeting
11 of June the 8th, 2007, a letter was
12 written by AstraZeneca to the FDA.  Do
13 you recall that letter about changes
14 being effected?
15     A.   Yes.  We made a -- I don't
16 have a letter right in front of me, but
17 we wanted to include information from the
18 clinical trial program as part of the
19 labeling for Seroquel.
20     Q.   So you wanted to -- and were
21 you involved in the drafting of that
22 letter?
23     A.   I know that I reviewed the
24 letter.  Whether I was drafting it, I

76 (Pages 615 to 618)

Confidential - Mark S. Scott, Ph.D.

Page 619

1  don't recall.
2      Q.   And the letter that you
3  reviewed and drafted, I believe I have
4  marked it, let's see if we're talking
5  about the same one, would be, excuse me,
6  I apologize for cut -- no, no, just sit
7  there. I'll try to get over. Let me
8  rephrase the question.
9          The letter that you recall
10  sending would have been -- and drafting
11  in part was Scott-39. Is that correct?
12         MR. BROCK:  Object to the
13  form.
14         MR. ALLEN:  Is that a -- did
15  you object to that?
16         MR. BROCK:  I did.
17         MR. ALLEN:  I didn't hear.
18         MR. BROCK:  I objected to
19  the form because I think you
20  can -- he'll tell you, but I don't
21  think he said he recalled drafting
22  it, so...
23         MR. ALLEN:  I appreciate it,
24  Mr. Brock, and I'll rephrase. But

Page 620

1      I -- if you object, I didn't hear
2      that one. So I just ask you to
3      keep your voice up. I appreciate
4      it.
5  BY MR. ALLEN:
6      Q.   Let me rephrase the
7  question.
8          The letter that you recall
9  being sent after the SERM meeting was
10  what I had marked and handed to you as
11  Scott Exhibit 39?
12      A.   This was the letter that was
13  a result of I wouldn't say just the SERM
14  meeting because there would be a U.S.
15  labeling meeting that would have occurred
16  after SERM, to take the SERM information
17  and determine whether or not any changes
18  to the U.S. label were required as a
19  result of SERM.
20      Q.   And the date of this letter
21  is June 22, 2007?
22      A.   Yes, it is.
23      Q.   14 days after the SERM
24  meeting?

Page 621

1      A.   It is after the SERM
2  meeting. The SERM meeting update was
3  June 8, 2007. Yes.
4      Q.   14 days later?
5      A.   The date of the letter is
6  June 22, yes.
7      Q.   So to get this letter out,
8  you told us not only did they have to
9  have a SERM meeting, they had to have a
10  U.S. labeling meeting and you would have
11  been involved in that?
12      A.   I was involved in some of
13  the labeling meetings and also then
14  review of the content.
15      Q.   Yes, sir. And, in fact, one
16  of the biggest challenges you had in your
17  role there, in your capacity, one of your
18  biggest challenges is trying to defend
19  and create a favorable label, isn't it?
20      A.   I would want to characterize
21  my role to make sure that the label
22  accurately reflects the information that
23  we have in the clinical trial program.
24      Q.   Accurately?

Page 622

1      A.   Yes.
2      Q.   Thank you, sir.
3          Now, as stated in this
4  letter -- now, your lawyer objected
5  earlier so I want to make sure, were you
6  involved in the drafting or preparation
7  or signoff on this letter?
8      A.   I was involved and I
9  reviewed the letter. I don't know
10  whether or not -- signing off would have
11  been done through regulatory affairs
12  through Kathryn Bradley.
13      Q.   Your subordinate?
14      A.   She was part of the
15  regulatory group, yes.
16      Q.   We don't have time to read
17  the whole letter but it says, "The data
18  included in the updated label provide new
19  information on SEROQUEL and
20  hyperglycemia." Did I read that
21  correctly?
22      A.   Yes, you did.
23      Q.   And then it lists the two
24  long-term trials, investigating treatment

77 (Pages 619 to 622)

Confidential - Mark S. Scott, Ph.D.

| Page 623 | Page 625 |
|---|---|

**Page 623**

1  with Seroquel, and that's 126 and 127.
2  Right? That's number one?
3      A.   It actually has three
4  sources of data.
5      Q.   Yes, sir.
6      A.   Yes. Okay.
7      Q.   I'm going to go -- it has
8  three sources and it lists the three
9  sources, does it not?
10      A.   Yes, it does.
11      Q.   Number 1 is trials 126 and
12  127.
13      A.   Yes, that's -- the two
14  long-term trials there reflect data from
15  trials 126 and 127.
16      Q.   Number 2 is a -- is trial
17  125?
18      A.   Yes, it is.
19      Q.   But number 3 is the pooling
20  of placebo-controlled trials where
21  Seroquel was less than 12 weeks. Is that
22  correct?
23      A.   Well, the placebo-controlled
24  trials that were the non-maintenance

**Page 624**

1  trials by definition were all less than
2  12 weeks.
3      Q.   Those would be the trials
4  that you in part discussed with Mr.
5  Brock?
6      A.   Yes, they were.
7      Q.   And so as stated here, where
8  it says, "The data included in the
9  updated label provide new information on
10  SEROQUEL and hyperglycemia." Is that
11  correct?
12      A.   Yes, it does.
13      Q.   But the pooling of
14  placebo-controlled trials less than 12
15  weeks contained a lot of old data that
16  was in your files, didn't it?
17      A.   Well, the -- it contained --
18  the data from 12 weeks were, again, the
19  pooling together of all data from the
20  12-week trial, and the information that
21  we had up until 126 and 127 was that that
22  data did not warrant a change to the core
23  data sheet with respect to hyperglycemia.
24  Only with the addition of trials 126 and

**Page 625**

1  127 was that determination made.
2          MR. ALLEN: Objection.
3      Nonresponsive.
4  BY MR. ALLEN:
5      Q.   Studies 126 and 127 were not
6  placebo-controlled trials of duration
7  less than 12 weeks, were they?
8      A.   But you were saying --
9      Q.   That's my only question to
10  you, sir. Was 126 and 127
11  placebo-controlled trials of the duration
12  of less than 12 weeks?
13      A.   No, those were longer, they
14  were up to two years.
15      Q.   As you pointed out to me
16  earlier, there was three sources, those
17  are your words, of data that the labeling
18  change was based on, and the third source
19  was the pooling of placebo-controlled
20  trials where duration of Seroquel therapy
21  was less than 12 weeks. Right?
22      A.   Well, I'd like to separate
23  out, those are, in fact -- I agree with
24  you, those are three sources of data.

**Page 626**

1  But we'd have to go into the discussion
2  of SERM about what was the driver for the
3  change to the label. And the driver for
4  the -- excuse me, the change to the core
5  data sheet. And the driver for the core
6  data sheet change was 126 and 127.
7          Prior to that, the
8  placebo-controlled trials were what they
9  were, and they looked at that throughout
10  the development of Seroquel and a
11  decision was made that no information was
12  there that would warrant a label change.
13  So I would agree that we put three pieces
14  of data into the label, and that was for
15  information that was beyond the 126 and
16  127.
17      Q.   Are you through?
18      A.   With that point, yes, I am.
19          MR. ALLEN: Objection.
20      Nonresponsive.
21  BY MR. ALLEN:
22      Q.   But you raised several
23  things in your answers. We have to go to
24  the driver at SERM. Do you recall saying

78 (Pages 623 to 626)

Confidential - Mark S. Scott, Ph.D.

Page 627

1  something like that?
2      A.  Yes, I do.
3      Q.  Were you at the June 8,
4  2000, SERM meeting?
5      A.  No, I was not.
6      Q.  Were you a participant in
7  that meeting?
8      A.  No, I was not.
9      Q.  Were you on the phone in
10  that meeting?
11      A.  No, I was not.
12      Q.  Were you invited to that
13  meeting?
14      A.  No, I was not, but I --
15      Q.  Did you prepare a memo for
16  the meeting?
17      A.  No, but I was involved in
18  some the discussions in advance in
19  preparation for the documentation for
20  SERM.
21          MR. ALLEN:  Objection.
22      Nonresponsive.
23  BY MR. ALLEN:
24      Q.  Answer my question.  Were

Page 628

1  you invited to the meeting?
2          MR. BROCK:  Object to you
3      instructing the witness.  He's
4      trying to answer your questions.
5      You've asked a question, were you
6      invited to the meeting, so I'd ask
7      you to ask another one.
8          MR. ALLEN:  Well, I didn't
9      get the answer.
10          MR. BROCK:  You did.
11          MR. ALLEN:  Well, I don't
12      recall if I got an answer.
13          MR. BROCK:  You can ask that
14      one more time.  We'll let him --
15  BY MR. ALLEN:
16      Q.  Sir, were you invited to the
17  June 8, 2007, SERM meeting?
18      A.  I am not a participant in
19  SERM, but I did work on the documentation
20  that led up to the SERM discussion that
21  featured in the SERM document where 126
22  and 127 featured prominently as new data
23  that we hadn't seen before.
24          MR. ALLEN:  Objection.

Page 629

1      Nonresponsive.
2  BY MR. ALLEN:
3      Q.  Were you invited to the
4  June 8, 2007, SERM meeting?
5          MR. BROCK:  Objection to
6      form.
7          THE WITNESS:  No, I was not.
8  BY MR. ALLEN:
9      Q.  Did you receive any minutes?
10  Let me ask you this:  Were you on the
11  telephone in a conference for the June 8,
12  2007, SERM meeting?
13      A.  I was not a participant in
14  the SERM, but I was a participant in
15  preparation for SERM.
16      Q.  Now, did you then meet with
17  the SERM participants afterwards and ask
18  them:  "What was the driver for the
19  decision to change the label"?
20      A.  I had conversations with Dr.
21  Brecher and Dr. Leong about SERM prior to
22  SERM as well as after SERM.
23      Q.  So did you have any memos
24  that you wrote to the SERM committee

Page 630

1  members prior to the meeting?
2      A.  No, I did not.
3      Q.  Did you receive any memos,
4  written documents from the SERM committee
5  members including Dr. Brecher and Dr.
6  Leong after the meeting?
7      A.  What I do have -- what I
8  have reviewed is the SERM discussion
9  document as well as the minutes from SERM
10  and then conversations before as well as
11  afterwards with respect to the SERM
12  documentation.
13          MR. ALLEN:  Objection.
14      Nonresponsive.
15  BY MR. ALLEN:
16      Q.  Did you receive any
17  memoranda from the participants of SERM
18  on June 8, 2007, about the SERM meeting
19  following the meeting, including
20  memoranda about the meeting from either
21  Dr. Leong or Dr. Brecher?
22      A.  What I have -- what I
23  received in terms of at one point
24  reviewed the SERM minutes which were a

79 (Pages 627 to 630)

Confidential - Mark S. Scott, Ph.D.

Page 631

1  result of the SERM discussion which was
2  based on work that had gone on prior to
3  SERM.
4      Q.   So the SERM minutes were
5  what we had previously -- were looking at
6  a minute ago.  Is that correct?
7      A.   The SERM minutes are, yes.
8      Q.   That was now what is on the
9  screen and we previously had on the
10  screen as Scott Number 4.  Right?
11     A.   Yes.
12     Q.   And those were the SERM
13  minutes that looked at all of the
14  clinical trial data.  Correct?
15     A.   Correct.
16     Q.   Now, let's get back to the
17  letter, Exhibit 39.  Are you with me?  39
18  was the letter that was sent to the FDA.
19  Correct?
20     A.   Yes.
21     Q.   And then there was
22  three pieces of information, and number
23  3, that's listed as number 3 by AZ.
24  Correct?

Page 632

1      A.   Yes, it was.
2      Q.   Was the pooling of
3  placebo-controlled trials where duration
4  of Seroquel therapy was less than 12
5  weeks.  Is that true?
6      A.   That's true.
7      Q.   That would include trials
8  like trial number 4.  Right?
9      A.   The pooling of data includes
10  all of the clinical trial data that we
11  had in terms of Seroquel therapy, and it
12  was there to help clinicians understand
13  what we saw in the clinical trials.
14         MR. ALLEN:  Objection.
15  Nonresponsive.
16  BY MR. ALLEN:
17     Q.   My only question is, the
18  pooling of the placebo-controlled trials
19  less than 12 weeks, do you follow me?
20     A.   Yes.
21         MR. BROCK:  Object to the
22  form.
23  BY MR. ALLEN:
24     Q.   Would have included trial

Page 633

1  number 4.  Correct?
2      A.   It includes all of the
3  clinical trials that were in the clinical
4  trials database that were placebo
5  controlled, yes.
6      Q.   Would it include trial
7  number 4?
8      A.   Yes, it would.
9      Q.   Would it include trial
10  number 6?
11     A.   Yes, it would.
12     Q.   Would it include trial
13  number 8?
14     A.   It would -- let me just add
15  that that information in terms of
16  arriving at a decision, again, glucose
17  was looked at across the clinical
18  program prior to that and the basis for
19  any decisions on SERM were based on
20  placebo-controlled trials.  The only time
21  there was new information was based on
22  126 and 127.
23         MR. ALLEN:  Objection.
24  Nonresponsive, sir.

Page 634

1  BY MR. ALLEN:
2      Q.   I'm focusing in on -- and I
3  only ask you to answer my questions.  The
4  placebo-controlled trials of less than 12
5  weeks --
6      A.   What might be --
7         MR. BROCK:  Object to the
8  commentary.
9         THE WITNESS:  What might be
10  helpful --
11         MR. BROCK:  Whoa, whoa,
12  whoa.
13         THE WITNESS:  I'm sorry.
14         MR. BROCK:  Let him ask his
15  questions and then you can give an
16  answer.
17  BY MR. ALLEN:
18     Q.   Sir, do you remember
19  PowerPoint number 36 you went over with
20  Mr. Brock yesterday and today?  Sir?
21     A.   Yes, I do.
22     Q.   You didn't have any trouble
23  referencing these studies when Mr. Brock
24  asked you questions, did you?

80  (Pages 631 to 634)

Confidential - Mark S. Scott, Ph.D.

Page 635

1     A.   What I'd like to do is, it
2  would be helpful for the jury to have the
3  actual figures that we put in the label
4  at that time with respect to the changes
5  that we saw in placebo in terms of the
6  means as well as the shifters because I
7  think that's illustrative of the data
8  that we had that were reflective of
9  those.
10         MR. ALLEN:  Objection.
11     Nonresponsive.
12  BY MR. ALLEN:
13     Q.   Sir, Mr. Brock had an
14  opportunity to examine you yesterday and
15  today, and you answered his questions.
16     A.   Yes, I did.
17     Q.   Would you please answer my
18  questions?
19     A.   I'll try to, yes.
20     Q.   Okay, sir.  And this real
21  simple question, in the pooling of
22  placebo-controlled trials of less than 12
23  weeks, would it include trial number 4?
24     A.   It would include all of the

Page 636

1  clinical trials of which trial 4 is one
2  of them as part of a placebo-controlled
3  trial pool, yes.
4     Q.   I'm going to go over the
5  numbers just like Mr. Brock did.  Would
6  it include trial 6?
7     A.   Yes, it would.
8     Q.   Would it includes trial 8?
9     A.   Yes, it would.
10     Q.   Would it include trial 99?
11     A.   Yes, it would.
12     Q.   Trial 104?
13     A.   It would include all of that
14  data, yes.
15     Q.   100?
16     A.   Yes, it would.
17     Q.   105?
18     A.   I want to make sure -- I'd
19  have to look here to see whether or not
20  we include adjunct use as part of it.
21  But I'd have to go back and look to make
22  sure.
23     Q.   41?
24     A.   41 would have been part of

Page 637

1  that as well.
2     Q.   49?
3     A.   Would have been part of that
4  as well.
5     Q.   135?
6     A.   Been part of that as well.
7     Q.   132?
8     A.   Yes, it would.
9     Q.   133?
10     A.   Yes, it would.
11     Q.   The PRINCESS study?
12     A.   No, it would not.
13     Q.   PRINCESS wouldn't be
14  covered?
15     A.   That's because PRINCESS was
16  a relapse prevention trial.
17     Q.   It sure was.  It was long
18  term.
19         Would it include 149?
20     A.   149 being BOLDER, yes, it
21  would.
22     Q.   112?
23     A.   Pediatric trial would not
24  have been done by that time.

Page 638

1     Q.   So it would include all of
2  the placebo short-term trials covered by
3  Mr. Brock in his examination of you
4  today, September 24th, 2009, as well
5  as yesterday September 23, 2009.  True?
6         MR. BROCK:  Object to form.
7         THE WITNESS:  It would
8     include the placebo-controlled
9     trials.  And the reason for
10     including it would have been to be
11     complete with respect to the data
12     that we had collected prior to 126
13     and 127 to give physicians an
14     understanding of what we saw in
15     the short term and the long term.
16     And I think the data from
17     placebo-controlled trials that we
18     included in terms of the effects
19     that were indeed consistent with
20     the information that we provided
21     this morning.
22         MR. ALLEN:  Objection.
23     Nonresponsive.
24  BY MR. ALLEN:

81 (Pages 635 to 638)

Confidential - Mark S. Scott, Ph.D.

Page 639

1    Q.   Would the information, the
2  pooling of the short-term trials less
3  than 12 weeks with Seroquel include the
4  studies that you discussed with Mr. Brock
5  in your testimony today and yesterday?
6    A.   Yes, they would.
7    Q.   Thank you, sir.
8        And then a labeling change
9  was made, was it not?
10   A.   Yes, it was.
11   Q.   Now, do you have Defendant's
12 Exhibit Number 7 in front of you?  We
13 just got it out at the break, so you
14 would have it.  Do you see it?
15   A.   The label itself, yes.
16   Q.   This is a defendant's
17 exhibit.  Correct?
18   A.   Yes.  That's what it reads.
19       MR. BROCK:  Mark, try to
20 keep your voice up just a little
21 bit.
22       THE WITNESS:  I'm sorry.
23 BY MR. ALLEN:
24   Q.   If we could turn -- I always

Page 640

1  have a hard time with pages, sir.  I
2  apologize.  I had it here a minute ago.
3  Let me find it.
4        Back on page 34, are you
5  with me?
6    A.   Yes.
7    Q.   Now, following the SERM
8  meeting, the change that was initiated
9  following SERM in that letter of June the
10 22nd was this change in the vital signs
11 and laboratory studies.  Is that true?
12   A.   It was a change to the
13 warning section as well as a change to
14 the section on vital signs and lab data.
15   Q.   Okay, sir, thank you very
16 much.
17       And, again, you were, as you
18 told Mr. Brock, part of the regulatory
19 affairs department, were involved in that
20 process.  Right?
21   A.   I was involved in the
22 process of deciding what changes to the
23 label needed to be made, if any, as a
24 result of the findings from SERM.

Page 641

1    Q.   I think you said there were
2  changes to the warning.  And if you go to
3  page 14, that's the warning section on
4  hyperglycemia and diabetes.  Correct?
5    A.   That's what the information
6  that we put into the FDA with respect to
7  the changes being effected as well as the
8  changes to the laboratory section of the
9  vital signs.
10   Q.   And you say we put in, that
11 would be AstraZeneca?
12   A.   Yes.
13   Q.   And that would be the
14 changes to the warning section, and the
15 change that was made was the addition of
16 the see adverse reactions, hyperglycemia.
17 Is that correct, sir?
18   A.   We decided that the
19 information on all the laboratory data
20 was in the label and we -- given that the
21 warning was there and had been there
22 since 2004, that we would cross-reference
23 the information that was in the warning
24 to alert physicians to go to the -- that

Page 642

1  section of the label to find other data
2  related to hyperglycemia where they would
3  find other information with respect to
4  other changes and other variables as
5  well.
6    Q.   The "we" you spoke of is
7  AstraZeneca and the regulatory affairs
8  department?
9    A.   It was not just regulatory
10 affairs, it was the scientists and the
11 clinicians that were involved in -- that
12 form the labeling committee.
13   Q.   It was the labeling
14 committee of AstraZeneca?
15   A.   Yes.  Yes.
16   Q.   And as you said, the change
17 that was made was to see adverse
18 reactions sections -- excuse me, see
19 adverse reactions, hyperglycemia.  Right?
20   A.   Well, the change that was
21 made, that we wanted to include the
22 information from 126 and 127.  For
23 transparency reasons, we wanted to
24 include information from the short-term

82  (Pages 639 to 642)

Confidential - Mark S. Scott, Ph.D.

Page 643

1  placebo-controlled trials as well as
2  trial 125 because we believed that was
3  important information.  And we sought
4  agreement with the FDA with respect to
5  the appropriate placing of that
6  information.  We submitted that and we
7  had -- that was then agreed with the FDA
8  at that time.
9          MR. ALLEN:  Objection.
10  Nonresponse.
11  BY MR. ALLEN:
12      Q.   My question to you was the
13  change that was made was the addition by
14  the labeling committee in the warning
15  section, was see adverse reactions,
16  hyperglycemia.  True?
17      A.   That was one of the changes
18  to containing new information in the
19  label.  So that part of the warning,
20  that's what we put in to reference the
21  other information that we were including.
22      Q.   Yes, sir.
23          Was there any other change
24  to the warning section of the Seroquel

Page 644

1  label other than the addition of see
2  adverse reactions, hyperglycemia?
3      A.   That was the change to the
4  warning that we put in at that time.
5      Q.   You've already told the jury
6  why you made those changes.  You just got
7  through telling them in a couple of your
8  answers.  Right?
9      A.   That it was important to
10  communicate this new information to
11  physicians and we thought it would be
12  best placed in the section where other
13  variables were listed as well in terms of
14  the changes that were seen in clinical
15  trials.
16      Q.   In fact, I think the jury
17  will recall, but let's see if you recall,
18  you said you made this change in order to
19  alert physicians to the adverse reactions
20  section on hyperglycemia and the
21  laboratory data contained therein.
22  Correct?
23      A.   Well, we already have a
24  warning for hyperglycemia and diabetes

Page 645

1  which is a strong, very strong warning.
2  This would give clinicians an
3  understanding of what might occur in
4  their patients based on the clinical
5  trial data.
6          MR. ALLEN:  Objection.
7          Nonresponsive.
8  BY MR. ALLEN:
9      Q.   My question simply was, sir,
10  didn't you tell this jury within the last
11  two minutes that you added this language,
12  see adverse reactions, hyperglycemia, to
13  the warning section, didn't you tell us
14  one of the reasons was to alert
15  physicians?  Didn't you use those words?
16      A.   Yes, I did.
17      Q.   Thank you, sir.
18          And to alert physicians, why
19  did you need to put see adverse
20  reactions, hyperglycemia, why did you
21  feel that was necessary to alert
22  physicians?
23      A.   In the review of the data,
24  in the review of the existing warning for

Page 646

1  hyperglycemia and diabetes, we believed
2  at the time that that would be the most
3  appropriate -- cross-reference that
4  information for other parts of the label
5  where similar information was contained
6  relative to other laboratory parameters
7  and other vital signs.
8      Q.   So now these are legal
9  questions you may not know the answer to.
10  I'm going to tell you and Mr. Brock I may
11  have to use these in a legal argument, I
12  may make it at a later trial.
13          MR. BROCK:  Object.
14          MR. ALLEN:  I need you to
15          know.  So if he doesn't know the
16          answer, I don't expect him to.
17  BY MR. ALLEN:
18      Q.   Sir, you're not a lawyer,
19  are you, sir?
20      A.   No, I'm not.
21      Q.   You have not read the Wyeth
22  versus Levine opinion, have you, sir, or
23  have you?
24      A.   No, I have not.

83 (Pages 643 to 646)

Confidential - Mark S. Scott, Ph.D.

Page 647

1    Q.    You're not here -- you know
2  the Wyeth versus Levine case came out in
3  the U.S. Supreme Court?
4    A.    No, I do not.
5    Q.    So you're not intending for
6  any of your testimony that you either
7  gave to Mr. Brock or myself to contradict
8  the United States Supreme Court ruling in
9  Levine, are you, sir?
10         MR. BROCK:  Object to form.
11         THE WITNESS:  I'm not a -- I
12         have no idea of the content of the
13         legal opinion for that case.
14  BY MR. ALLEN:
15    Q.    So therefore -- that's all I
16  need.
17         Let me go to the next page.
18  Not the next page, but let's go to --
19  what is it?  Where's the page that's
20  referenced, see adverse reactions,
21  hyperglycemia, is that back on page 35?
22    A.    The section on hyperglycemia
23  is -- begins in the broad heading of
24  vital signs and laboratory studies and

Page 648

1  it's the third paragraph under that
2  section.
3    Q.    By the way, if you look on
4  page 34, this vital signs and laboratory
5  study section, that's under the -- what
6  section?  What's the broad heading of
7  that section, adverse events?  Do you
8  recall?
9    A.    I can go back and I can
10  look.
11    Q.    There it is on page 28.
12  Adverse events occurring, is that it?
13    A.    Well, I would like to make
14  sure that the -- this is a mock label.
15  This isn't the final printed labeling.  I
16  have to look at the final printed
17  labeling with respect to where the
18  headers fall opposite the various
19  subsections.
20         So it's after -- it's part
21  of the section dealing with adverse
22  findings and short-term clinical trials,
23  controlled clinical trials.  So I
24  wouldn't characterize adverse events,

Page 649

1  it's adverse findings.
2    Q.    Well, what page are you
3  looking at to reach that determination?
4    A.    I'm looking at page 28 in
5  this sort of, as we say, a draft version
6  of the -- the version of the label that
7  gets ultimately printed, and then it goes
8  to page 34 for vital signs and laboratory
9  studies.
10    Q.    Okay, sir.
11    A.    And under that it is --
12  hyperglycemia is the third paragraph
13  down.
14    Q.    Thank you, sir.
15         Now, sir, I took the
16  deposition, I think it was Mr. Limp, but
17  these are three paragraphs in the
18  hyperglycemia laboratory section that
19  were added by AstraZeneca in 2007.
20  Right?
21    A.    Yes.
22    Q.    And just for ease of
23  reference, we're not going to be and we
24  don't have time, paragraph number 1 deals

Page 650

1  with 126 and 127.  Correct?
2    A.    Paragraph 1 does have the
3  clinical trial data -- excuse me, that
4  data from those trials, yes.
5    Q.    And that's what paragraph 1
6  references is studies -- trials 126 and
7  127?
8    A.    Yes.
9    Q.    And those were the studies
10  that you designated today and yesterday
11  as yellow.  Correct?
12    A.    Yes, I did.
13    Q.    Now, study -- the third
14  paragraph is study 125.  Right?
15    A.    Yes, it is.
16    Q.    The second paragraph is this
17  pooled trial data from the
18  placebo-controlled trials of less than 12
19  weeks.  Correct?
20    A.    Correct.
21    Q.    And this would then be the
22  information that was referred to in
23  Exhibit 39, the letter to the FDA under
24  number 3, the pooling of

84 (Pages 647 to 650)

Confidential - Mark S. Scott, Ph.D.

Page 651

1  placebo-controlled trials where duration
2  of Seroquel therapy was less than 12
3  weeks.  Right?
4      A.   Correct.
5      Q.   And it says, in short-term
6  12-week duration or less,
7  placebo-controlled clinical trials --
8  I'll skip the number of patients -- the
9  percent of patients who had a fasting
10  blood glucose greater than or equal to
11  126 milligrams for -- per deciliter or a
12  nonfasting blood glucose greater than or
13  equal to 200 milligrams per deciliter was
14  3.5 percent for quetiapine and
15  2.1 percent for placebo.  Is that
16  correct?
17      A.   You've read that correctly,
18  yes.
19      Q.   Yes, sir.
20      Now, back to Exhibit 35 from
21  yesterday.  The pooling of that data
22  would reflect that Seroquel was yellow?
23      A.   No, I wouldn't suggest that.
24      Q.   Well, doesn't it, in fact,

Page 652

1  say that Seroquel has a higher incidence
2  of elevated blood glucose at those levels
3  than does placebo?
4      MR. BROCK:  Object to the
5  form.
6      THE WITNESS:  No, I think
7      that the integration of these data
8      that went on prior to 126 and 127
9      being available, the information
10      that I understand is this was
11      looked at consistently in the
12      clinical trial program, and those
13      results were deemed to be -- even
14      though there was a numerical
15      difference, there was a
16      determination there was no
17      clinically relevant difference
18      between the two.  So a decision
19      had been made with respect to the
20      ongoing review prior to 126 and
21      127, that, yes, there's a
22      numerical difference but the
23      clinical relevance of it was in
24      question.

Page 653

1      MR. ALLEN:  Objection.
2      Nonresponsive.
3  BY MR. ALLEN:
4      Q.   Now, first of all,
5  concerning clinical relevance, I thought
6  you told me several times you don't know
7  the clinical reference of these numbers
8  in particular.  Right?
9      A.   I'm just reporting back what
10  I understand the decisions around glucose
11  were prior to 126 and 127.
12      MR. ALLEN:  I need to object
13      to that as nonresponsive.  That's
14      what I don't need you to do, is
15      report back on hearsay statements.
16      That's my objection.
17      MR. BROCK:  Please don't
18      instruct the witness.
19      MR. ALLEN:  That's why my
20      objections have been made clear on
21      the record.
22      MR. BROCK:  Ask a question.
23      MR. ALLEN:  Yes, sir.
24      MR. BROCK:  Please.

Page 654

1      MR. ALLEN:  Yes, sir.
2      MR. BROCK:  Thank you.
3      MR. ALLEN:  You're welcome.
4  BY MR. ALLEN:
5      Q.   Let me see where I was.
6  Didn't you tell me earlier today that
7  when you're looking at this clinical
8  trial data when I ask you about relative
9  risk, hazard ratio, p-values and
10  confidence intervals, do you remember me
11  asking you about that?
12      A.   Yes, I do.
13      Q.   And remember you told me,
14  Mr. Allen, I could look at the data and I
15  don't need to do those calculations.  I
16  just -- I was able just to determine that
17  it was statistically significant?  Do you
18  recall telling me that or words to that
19  effect?
20      A.   I believe I said something a
21  little bit different than that, whether
22  statistical tests would be useful in that
23  setting given the results themselves.
24      Q.   Now, you told me earlier

85 (Pages 651 to 654)

Confidential - Mark S. Scott, Ph.D.

Page 655

1  that the reason this whole section on
2  hyperglycemia was added was for
3  physicians, to alert them.  Didn't you
4  tell me that?
5       A.   Yes, I did.
6       Q.   And didn't you tell me
7  earlier the reason you wanted to alert
8  physicians is because they needed to make
9  clinical decisions.  Right?
10      A.   Yes, I did.  Again, the
11 alerting was based on 126 and 127.  The
12 data from the short-term
13 placebo-controlled trials was there for
14 completeness.
15      Q.   So according to you now, the
16 first paragraph, 126 and 127 is an alert
17 and a third paragraph is an alert.  Is
18 that correct?
19          MR. BROCK:  Object to form.
20          THE WITNESS:  No.  If I
21      misstated, I apologize.  Going
22      back to the reason for SERM was
23      126 and 127.  We had nothing in
24      our core data sheet about

Page 656

1      hyperglycemia prior to that.  We
2      had 126 and 127.  SERM made a
3      change to the core data sheet, and
4      we decided to include not just 126
5      and 127 but our prior experience
6      in placebo-controlled trials as
7      part of our labeling for all the
8      information.  So the alert is
9      given that we have a warning for
10     hyperglycemia, now we have
11     up-to-date information with
12     respect to that.
13 BY MR. ALLEN:
14      Q.   Well, so I want to know, is
15 this second paragraph an alert to
16 physicians using your terminology of
17 earlier?
18          MR. BROCK:  Object to the
19      form.
20          THE WITNESS:  It is
21      information for clinicians to see
22      what's occurred in our clinical
23      trial program.
24 BY MR. ALLEN:

Page 657

1       Q.   Of course that clinical
2  trial program wasn't new.  That contained
3  old data from 4, 6 and 8, right, for
4  example?
5       A.   It included all the clinical
6  trial data -- excuse me, the information
7  here contains all the clinical trial data
8  up to that time that were placebo
9  controlled.
10      Q.   Just for the record, if you
11 could take all that, which would include
12 the studies Mr. Brock went over with you,
13 correct?
14      A.   Correct.
15          MR. BROCK:  We've covered
16      that ground.  So I'm going to --
17      I'm going to ask you not to keep
18      asking the same questions over and
19      over.  You probably asked that
20      question ten times as well as
21      several of the others in this
22      area.  So I'm going to ask you to
23      ask new questions, please.
24          MR. ALLEN:  I'm asking a

Page 658

1      whole new question about a whole
2      new label.
3          MR. BROCK:  Well, you've
4      asked the same question, though,
5      several times.
6          MR. ALLEN:  We disagree.  I
7      didn't interrupt you.  Let me move
8      on.  I'm entitled to ask my
9      question.
10         MR. BROCK:  You are entitled
11     to ask them, but you're not
12     entitled to ask the same one over
13     and over.  I'm sorry.
14         MR. ALLEN:  Well, I'm not
15     going to argue with you.
16         MR. BROCK:  That's what
17     I'm -- that's what I'm noting for
18     the record at this point.
19 BY MR. ALLEN:
20     Q.   Sir, as the alert you gave
21 physicians in this hyperglycemia, second
22 paragraph, was that the percent of
23 patients with these blood glucose levels
24 was higher for quetiapine patients than

86 (Pages 655 to 658)

Confidential - Mark S. Scott, Ph.D.

Page 659

1   for placebo patients.  Correct?
2         A.   I would characterize it,
3   based on these clinical trials, there was
4   a numerical difference in the Seroquel
5   treatment group as opposed to the placebo
6   group for those clinical trials.
7         Q.   Were you giving
8   nonstatistically significant information
9   to physicians in your alert?
10        A.   There are no statistics in
11  this alert.  The clinical trial -- excuse
12  me.  The SERM process looks at glucose as
13  well as other variables all prior to
14  this.  I wasn't involved in decisions, I
15  will admit that, of SERM prior to 2007.
16  It was my understanding this information
17  was looked at and if this information had
18  been relevant with respect to making a
19  change to our core data sheet and for
20  inclusion into the labeling, it would
21  have been.  But prior to 2007, this was
22  the data that we had.
23        MR. ALLEN:  Objection.
24        Nonresponsive.

Page 660

1   BY MR. ALLEN:
2         Q.   My question to you was, in
3   this second paragraph of Exhibit 7 on
4   Defendant's Exhibit 7 under
5   hyperglycemia, was this nonstatistically
6   significant and nonclinically important
7   information for physicians?
8         MR. BROCK:  Object to form.
9         THE WITNESS:  This was
10        information that was decided to be
11        included.  I can't comment on the
12        statistics here because this
13        represents nothing with -- it does
14        have denominators to it, but I
15        would want to look at these types
16        of figures from a statistical
17        point of view, not just on the
18        basis of the pooling this way, but
19        other ways.  But this was for
20        descriptive purposes for
21        clinicians based on the
22        information from trials 126 and
23        127.
24  BY MR. ALLEN:

Page 661

1         Q.   Well, this change was made
2   in 2007, you said you were involved in
3   writing the letter.  We're sitting here
4   in September 2009, have you ever looked
5   at this data contained in the second
6   paragraph under hyperglycemia,
7   Defendant's Exhibit 7, in a statistically
8   significant way?  Have you ever done that
9   analysis?
10        MR. BROCK:  Object to form.
11        THE WITNESS:  Well, to be
12        honest with you, I know we've done
13        some of this work for the FDA in
14        terms of the metabolic response,
15        so some analyses were done on
16        that.  I don't recall the outcomes
17        of that.  But, again, we have
18        information that was based on 126
19        and 127 that was a driver for
20        change to our core data sheet, and
21        we decided to include all the data
22        from our program as part of the
23        review.
24  BY MR. ALLEN:

Page 662

1         Q.   Now, you mentioned in your
2   answer -- when I asked if you've done the
3   statistical analysis, you mentioned --
4   you used the term we looked at the issue
5   of metabolic response.  Do you recall
6   saying that in that last answer?
7         A.   The FDA in January of 2008
8   asked sponsors to provide information on
9   a variety of laboratory -- excuse me, a
10  variety of metabolic variables and look
11  at it in a variety of different ways.
12        Q.   Yes, sir.  And, in fact,
13  this increase of blood glucose is a
14  metabolic response, is it not?
15        MR. BROCK:  Object to form.
16        THE WITNESS:  It is a --
17        this is a measure of shift to
18        above 126 and the nonfasting
19        glucose of 200.
20  BY MR. ALLEN:
21        Q.   But you don't know the
22  clinical significance of those numbers.
23  Right?
24        A.   As I said earlier, I know

87 (Pages 659 to 662)

Confidential - Mark S. Scott, Ph.D.

Page 663

1  that values of 126 and glucose greater
2  than 200 is featured in helping
3  clinicians to understand the diabetic
4  status of patients, but I can't speak to
5  how they use it.
6      Q.   Yes, sir.  Now, I'm going to
7  hand you Exhibit Number -- well, let me
8  follow up.  I'm sorry, I heard that.  You
9  can't speak to how a nonfasting blood
10 glucose greater than or equal to
11 200 milligrams per deciliter or a fasting
12 glucose greater than or equal to
13 126 milligrams per deciliter is used by
14 practicing physicians, did I hear you say
15 that?
16     A.   That's correct.
17     Q.   Thank you, sir.
18            - - -
19         (Exhibit Scott-40, Table
20      339, was marked for identification.)
21            - - -
22 BY MR. ALLEN:
23     Q.   I'm going to hand you
24 Exhibit 40, Scott Exhibit 40, Table 339

Page 664

1  from AstraZeneca's reply to the FDA on
2  metabolic parameters of June the 13th,
3  2008.  Have you seen this document
4  before, this table before?
5      A.   Yes, I have.
6      Q.   When you were talking about
7  answers to the FDA concerning metabolic
8  parameters, is this one of the matters
9  you were referring to?
10     A.   Yes, it is.  But what I want
11 to make sure I see here first is there's
12 a -- there's a table that's missing.
13     Q.   Yes, sir, I can't put in
14 every table.
15     A.   No, no, no.  You've given me
16 analysis by subsets, but I'd like to look
17 at the --
18     Q.   Well, Mr. Brock can ask you
19 about other analyses.
20     A.   Okay.
21     Q.   Did Mr. Brock provide you
22 with every table from every
23 placebo-controlled trial, sir?
24     A.   I will -- I'll apologize, I

Page 665

1  see what the -- the information I was
2  expecting is, it was listed, I didn't
3  under -- I didn't see it here.  But it's
4  here right now.
5      Q.   Yes, sir.
6      A.   So I have it.
7      Q.   In fact, we have -- do you
8  see where we have fasting glucose is
9  measured as less than 100 at baseline?
10 Do you see that, sir?
11     A.   Yes, I do.
12     Q.   Do you know the clinical
13 significance of a fasting blood glucose
14 less than 100?
15     A.   For an individual patient,
16 no, I don't.
17     Q.   Then we have quetiapine post
18 baseline, do you see that, sir?
19     A.   Post baseline.  Yes.
20     Q.   And do you see that post
21 baseline with patients that had a blood
22 glucose -- what is that, is that -- what
23 is this?  Hold on a second.  Let me go
24 off the record.  I have to nail it down.

Page 666

1  I couldn't see.
2          Post baseline greater than
3  or equal to 126 milligrams per deciliter.
4  Do you see that, sir?
5      A.   Yes, I do.
6      Q.   Now, this is the -- we've
7  seen this figure now in the SERM meeting
8  minutes, we saw it in the updated package
9  insert in June of 2007, and we're seeing
10 it here in Exhibit Number 40.  Right?
11     A.   Well, we're -- now we -- the
12 data that we have in the SERM --
13     Q.   My question is --
14         MR. BROCK:  Don't cut him
15     off.  Let him finish his question.
16         THE WITNESS:  You've looked
17     at the subset of the data which is
18     less than 100, and I'm looking at
19     the row which starts off, look at
20     everybody who started below 126
21     and what's the -- that's the
22     entire dataset.  So the
23     statistician would look at the
24     entire dataset first and say is

88 (Pages 663 to 666)

Confidential - Mark S. Scott, Ph.D.

Page 667

1  there anything going on with the
2  shifts to above 126 in the entire
3  dataset.  And that proportion is
4  in the last row of that table,
5  which is 4 percent on Seroquel
6  versus 3.2 on placebo.  And the
7  p-value for that comparison is .2.
8        Now, as a statistician, that
9  tells me there's a nonsignificant
10  difference in shifts to above 126
11  for Seroquel versus placebo.  On
12  the basis of that, I might be then
13  describing to a clinician might
14  what happens in various subsets.
15  But I'd be cautioning about over
16  interpreting any of the results as
17  a result of what the effect of
18  analyzing subsets could have on
19  the -- from the overall result.
20  BY MR. ALLEN:
21     Q.   That's what you do as a
22  statistician?
23     A.   Yes, I do.
24     Q.   So you've described for me

Page 668

1  and explained to the jury is how you
2  would look at Table 339 as a
3  statistician.  Correct?
4     A.   I think that helps inform
5  clinical opinion about how reliable the
6  results are relative to any p-values that
7  are calculated.
8     Q.   Well, I appreciate your help
9  there.  And you've explained to the jury
10  how you would do it as a statistician.
11  Correct?
12     A.   I don't think it's just as
13  me as any qualified statistician would
14  approach it in the same way.
15     Q.   So any qualified
16  statistician would approach it the way
17  you described it?
18     A.   That is my belief.
19     Q.   That is your opinion?
20     A.   Yes.
21     Q.   Thank you, sir.
22        Now, I would like you to
23  look at the blood glucose data of
24  patients beginning at baseline less than

Page 669

1  100.  Okay, sir?
2     A.   Yes.
3     Q.   If we look at the patients
4  less than 100 who are on Seroquel,
5  quetiapine, and reach blood sugar levels
6  greater than or equal to 126 milligrams
7  per deciliter is 2.4 percent of the
8  patients.  Correct?
9     A.   Correct.
10     Q.   Now, how many millions of
11  patients have taken Seroquel, sir?
12     A.   As I said, I don't have a
13  figure for that.
14     Q.   Can you give the jury some
15  estimation?
16     A.   I'd rather not project,
17  please.
18     Q.   You'd rather not.  Well, let
19  me ask you this:  As executive director
20  of the Seroquel brand in the United
21  States, project -- is it project leader,
22  I'm sorry?
23     A.   I think it's project team
24  lead.  Product -- co-product team lead,

Page 670

1  yes.
2     Q.   On the global brand team,
3  can you give the jury, please, how many
4  people have taken Seroquel up to this
5  date?
6     A.   As I said, these figures are
7  what happens in clinical trials.  I would
8  rather have a clinician to try to
9  translate any sort of outcomes in these
10  clinical trials relative to these
11  observations.  So it's not my position to
12  say how this would affect patients on
13  Seroquel across the population.
14        MR. ALLEN:  I need to object
15     to that as nonresponsive.
16  BY MR. ALLEN:
17     Q.   But maybe you're making a
18  point and we can solve a lot of problems.
19  So you're meaning by any of your
20  testimony to Mr. Brock, to be testifying
21  to the jury as how this will affect the
22  patient population?
23        MR. BROCK:  Object to form.
24        THE WITNESS:  No.

89 (Pages 667 to 670)

Confidential - Mark S. Scott, Ph.D.

Page 671

1  BY MR. ALLEN:
2      Q.   Is that your testimony,
3  you're not meaning to make any judgment
4  about that?
5          MR. BROCK:  Object to form.
6  You can answer.
7          THE WITNESS:  I think
8       that -- I think that we have
9       results in these clinical trials
10      and these clinical trail -- these
11      clinical trial results need to be
12      interpreted in the context that
13      they were collected.  For me to
14      make a statement about taking a
15      difference and then multiplying it
16      across a population I think would
17      be irresponsible.
18 BY MR. ALLEN:
19     Q.   So it would be irresponsible
20 for you to do it for Mr. Brock also?
21     A.   No, it would not.  I'm not
22 saying that at all.  You're talking about
23 me taking this number and trying to
24 multiply it by the number of people who

Page 672

1  have taken Seroquel which I don't think
2  is an appropriate translation.
3      Q.   And it wouldn't be for you
4  do it with Mr. Brock either, would it?
5      A.   I don't think I've done it
6  for Mr. Brock.
7      Q.   And you wouldn't do it,
8  attempt to do that because it would be
9  inappropriate, is that your testimony?
10     A.   It's inappropriate for me to
11 be trying to describe to a clinician the
12 outcome that we've seen across our
13 clinical trial program.  We have a
14 nonsignificant difference in shifters to
15 above 126 in the placebo group.  And
16 there's been a decision by FDA to include
17 various subsets and we've analyzed those
18 and presented those results.
19         MR. ALLEN:  Objection.
20 Nonresponsive.
21 BY MR. ALLEN:
22     Q.   Sir, let's go back to 339.
23 We had 2.4 percent of the Seroquel
24 patients who were at baseline less than

Page 673

1  100 milligrams per deciliter,
2  2.4 percent, reached a blood glucose
3  level greater than or equal to 126
4  milligrams per deciliter.  Is that
5  correct?
6      A.   Based on that subset
7  analysis, correct.
8      Q.   And then we go down and we
9  only had 1.4 percent of the patients on
10 placebo that had a blood glucose level of
11 greater than or equal to 126 milligrams
12 per deciliter.  Is that correct?
13     A.   My observations are there
14 were 2.4 percent and 1.4 percent were the
15 estimates based on the subset analysis.
16     Q.   And the subset analysis was
17 the subset of patients who had started at
18 baseline less than 100 milligrams per
19 deciliter of blood glucose.  Right?
20     A.   That's what that
21 categorization was based on, yes.
22     Q.   And then we need to
23 determine whether or not that subset
24 analysis was statistically significant,

Page 674

1  do we not?
2      A.   Well, I would characterize a
3  p-value has been calculated, whether I
4  would classify that as being
5  statistically significant, I would debate
6  whether the real p-value is .03.
7      Q.   Well, sir, for the -- don't
8  you report to the FDA that the p-value
9  is, in fact, .03?
10     A.   That's the arithmetic behind
11 the calculation.  However, in statistical
12 terms, especially when you're doing
13 subset analyses, p-values that are
14 generated from subset analyses need to be
15 interpreted with caution, especially in
16 light of a situation where you have a
17 nonsignificant difference of what would
18 be called the overall group.  The overall
19 group wasn't statistically significant,
20 but you've had a p-value of -- p-values
21 that are calculated based on subsets can
22 be interpreted with caution.
23         COURT REPORTER:  Based on
24     what?

90 (Pages 671 to 674)

Confidential - Mark S. Scott, Ph.D.

Page 675

1    THE WITNESS: Can be
2  interpreted with caution.  So if I
3  can give an example.  Say we had a
4  clinical trial examining efficacy
5  where we looked at Seroquel in the
6  treatment of some disorder and the
7  clinical trial did not win on
8  efficacy, we looked at a subset
9  and said that, say, patients under
10  the age of 50 but over the age of
11  35, it was significant.  The FDA
12  wouldn't allow us to claim
13  significance on the basis of that.
14    So on the basis of the
15  information here, my inference
16  would be based on the p-value of
17  .204 which is not statistically
18  significant.  And the information
19  on .03 is an observation I'd want
20  to adjust for the multiplicity
21  that exists in looking at lots of
22  subsets of data.
23  BY MR. ALLEN:
24    Q.   Are you through?

Page 676

1    A.   For that point, yes, I am.
2    MR. ALLEN: Objection.
3  Nonresponsive.
4  BY MR. ALLEN:
5    Q.   Do you remember what my
6  question was that you just answered?
7    A.   You asked me if it was
8  statistically significant.
9    Q.   No, sir, that's not what I
10  asked you.
11    A.   I apologize.
12    Q.   Didn't I ask you, and my
13  question to you was, didn't you report to
14  the FDA that the p-value for the patients
15  who started on Seroquel with a baseline
16  value less than 100 milligrams per
17  deciliter and reached a level of greater
18  than or equal to 126 milligrams per
19  deciliter, in that analysis, didn't you
20  report that the p-value was .03?
21    A.   The information that was
22  contained there would have had that
23  calculation to the FDA, yes.
24    Q.   And can you tell the jury

Page 677

1  that a p-value of .05 or less makes the
2  calculation statistically significant?
3    A.   Not in all cases, no.
4    Q.   How about in -- not in all
5  cases?
6    A.   No.
7    Q.   Thank you very much, sir.
8    Do you know the clinical
9  reason that was -- those numbers were
10  broken out the way they were with
11  patients less than 100 and then patients
12  above 100 and not 126, and then patients
13  126 and greater at baseline, do you
14  understand why that was done?
15    A.   Typically clinicians would
16  like to look at various subsets of data
17  to see whether or not the effects that
18  they're observing in the overall
19  population are consistent across various
20  subsets, yes.
21    Q.   So you're a consultant on
22  that.  And that's why they did it,
23  because your testimony is physicians like
24  to look at that and you were consulted.

Page 678

1  Is that your testimony?
2    A.   This was a direct request
3  from the FDA to have that information
4  presented in this way.
5    Q.   So the FDA asked you to
6  present the data in this way.  Correct?
7    A.   Yes, they did.
8    Q.   And this was a request by
9  the FDA that wanted the data of patients
10  at baseline less than 100.  Is that
11  correct?
12    A.   The request was to break
13  down the data in that way, yes.
14    Q.   So this analysis that was
15  done that I just discussed with you,
16  including a statistically significant
17  p-value, was done at -- by and at the
18  request of the FDA.  True?
19    A.   The FDA asked us to present
20  the data in this way and make various
21  calculations.  But I would not
22  characterize this as a -- the value for
23  the line of less than 100 as
24  statistically significant.

91 (Pages 675 to 678)

Confidential - Mark S. Scott, Ph.D.

Page 679

1     MR. ALLEN: Objection.
2     Nonresponsive to a portion of the
3     answer.
4     BY MR. ALLEN:
5         Q.   Now, did you tell me
6     earlier -- I thought you said no
7     statistician would calculate this data
8     this way.  But are you telling us the FDA
9     asked for irrelevant data and irrelevant
10    breakdown?
11        MR. BROCK:  Object to the
12    form.  And misstates testimony.
13        THE WITNESS:  I think you're
14    talking -- I'm talking about
15    interpretation of the values
16    because this is an exploratory
17    analysis, many p-values were
18    conducted across many different
19    endpoints, and as statistician,
20    other statisticians would say that
21    one needs to make sure that you
22    adjust for either the number of
23    comparisons that you make, and
24    especially one needs to take

Page 680

1     caution with respect to looking at
2     subsets of data.
3         MR. ALLEN: Objection.
4     Nonresponsive.
5     BY MR. ALLEN:
6         Q.   Sir, I forgot to ask you
7     some questions I want to cover now before
8     we go on to the next topic.  You
9     mentioned yesterday in response to Mr.
10    Brock's question, that you work closely
11    with a clinician before you signed off on
12    the integrated safety summary back in the
13    '90s.  Do you recall that general
14    testimony?
15        A.   Yes, I was assigned -- I had
16    signoff responsibility for the integrated
17    summary of safety for Seroquel in the
18    initial submission.
19        Q.   You testified you worked
20    closely with clinician -- with a
21    clinician?
22        A.   Yes.
23        Q.   Who was that clinician?
24        A.   Lisa Arvanitis.

Page 681

1         Q.   Tell the jury -- as a matter
2     of fact, I think you testified she was
3     the international project physician?
4         A.   That was her role.
5         Q.   Explain that to the jury,
6     what an international project physician
7     was and what Dr. Arvanitis' role was and
8     why you worked with her?
9         A.   I can speak in only general
10    terms.  I don't know the job role.  I
11    know what my role was, but in general it
12    was to have clinical oversight for all
13    the clinical trial work and to be
14    responsible for the clinical
15    interpretation and the integrated summary
16    of safety as well as the integrated
17    summary of efficacy.
18        Q.   I didn't hear that last
19    part, you tailed off, responsible for the
20    what?
21        A.   I'm sorry.  The oversight of
22    the format and content of the
23    clinical summary -- the overall clinical
24    summaries of efficacy and safety.

Page 682

1         Q.   Was there anybody -- using a
2     Scott Allen's kind of Houston, Texas
3     word, if you need me to rephrase it, I
4     will.  Was there any doctor at -- was she
5     at Zeneca at the time you worked with
6     her, is that the company?
7         A.   Yes, she was.
8         Q.   Was there anybody higher or
9     more superior doctor wise or physician
10    wise on Seroquel at Zeneca than Dr.
11    Arvanitis at the time of the Seroquel
12    submission?
13        MR. BROCK:  Object to the
14    form.
15        THE WITNESS:  We had a lot
16    of individuals in the organization
17    working on Seroquel.  There are
18    individuals who were her superiors
19    in terms of her managers.  But she
20    was the project statistician.
21    BY MR. ALLEN:
22        Q.   Your lawyer -- project
23    statistician?
24        A.   I mean project physician,

92 (Pages 679 to 682)

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Mark S. Scott, Ph.D.

Page 683

1    I'm sorry.
2        Q.   Well, let me go back.  Your
3    lawyer objected to that question.
4           You were the Seroquel
5    statistician back at the time of the NDA,
6    weren't you?
7        A.   Yes, I was.
8        Q.   She was the international
9    project physician?
10       A.   Yes.
11       Q.   So what -- was there anybody
12   assigned to Seroquel and the NDA from a
13   physician's standpoint who was more
14   knowledgeable about the clinical trials
15   than Dr. Lisa Arvanitis at the time she
16   signed off on the NDA, to your knowledge?
17       A.   I can't speak to others'
18   knowledge of the NDA who else was
19   reviewing it from a medical point of
20   view.  I knew that I worked very closely
21   with Lisa with respect to the format and
22   content.  I know that she consulted
23   widely with respect to -- in her review.
24   Who she consulted with, I can't comment

Page 684

1    on because, again, that was a while ago.
2        Q.   What kind of -- did you find
3    her to be a competent international
4    project physician for Seroquel?
5        A.   I worked well with her.  She
6    was very competent in putting together
7    the information and interpreting the
8    information.
9        Q.   She was very competent in
10   putting together the information on
11   Seroquel and interpreting the information
12   on Seroquel?
13       A.   Yes, she was.
14       Q.   And you know that from your
15   own personal experience in working with
16   her on Seroquel?
17       A.   That's the experience that I
18   had with her in production of the
19   integrated summary of efficacy and the
20   integrated summary of safety.
21       Q.   Do you have any criticisms
22   as you sit here today that you can recall
23   of Dr. Arvanitis' work?
24       A.   No, I don't.

Page 685

1        Q.   Do you think she's to be
2    praised or do you have anything -- I'm
3    trying to think of a Scott Allen, some
4    kind of word.  Do you think she should be
5    applauded and lauded for her work on
6    Seroquel --
7            MR. BROCK:  Object to form.
8    BY MR. ALLEN:
9        Q.   -- in your opinion?
10       A.   I have no opinion in that
11   regard.  I worked well with her with
12   respect to the getting the clinical
13   summaries completed.
14       Q.   And your personal experience
15   is that she knew what she was doing and
16   she knew how to interpret the data, she
17   knew how to relay her interpretations.
18   She was competent, capable and qualified
19   to be the international project physician
20   on Seroquel?
21           MR. BROCK:  Object to form.
22           THE WITNESS:  Other people
23       determine those qualifications.  I
24       was talking about my working

Page 686

1        relationship with her.
2    BY MR. ALLEN:
3        Q.   That was -- was that your
4    experience in your working relationship
5    with her?
6        A.   Yes.
7        Q.   Thank you, sir.
8           Now, you said something
9    about Dr. Martin Jones yesterday.  Did
10   you -- you said I think maybe you
11   appointed Dr. Jones to something.  I
12   couldn't remember.
13       A.   Dr. Jones was appointed to
14   be the international project statistician
15   for Seroquel, yes.
16       Q.   International project
17   statistician, from when to when?
18       A.   To be honest with you, it
19   would have been in 1996 or 1997, around
20   the time that I was leaving the project,
21   and I don't know when his tenure ended.
22       Q.   Is Dr. Jones still at the
23   company, AZ?
24       A.   Yes, he is.

93 (Pages 683 to 686)

Confidential - Mark S. Scott, Ph.D.

Page 687

1    Q.   Do you still work with him?
2    A.   Yes, I do.
3    Q.   Where is he in relation to
4  you in the hierarchy now?
5    A.   I believe his role is a
6  global project manager.  He's a member of
7  the global product team with me.
8    Q.   Are you his superior, his
9  subordinate, his co-equal?
10   A.   He's my colleague on the
11 team.
12   Q.   At work, you know, when we
13 go to work, I remember I had a boss and
14 then some I have people that are equal,
15 then I have people that work for me.  We
16 all have that when we go to work.  I'm
17 just asking so you can explain it, is he
18 your boss, is he your equal or he's --
19   A.   He's my peer on the global
20 product team.
21   Q.   Where is his office?
22   A.   His office is upstairs from
23 mine.
24   Q.   Yesterday, I didn't want to

Page 688

1  ask about it, we may not have time to get
2  to it, you had listed you wanted to be a
3  corporate vice president.  Do you recall,
4  sir?
5    A.   What I wanted to be was a
6  vice president that was associated with
7  the global product team.
8    Q.   Are you currently a vice
9  president?
10   A.   No, I'm not.
11   Q.   Have you ever reached that
12 level?
13   A.   No, I have not.
14   Q.   Is Dr. Jones a vice
15 president?
16   A.   I don't know exactly what
17 his title is.  He's a global product --
18 global project manager.  That's what I
19 understand his role is.  I don't know if
20 that's his title or not.
21   Q.   On Seroquel?
22   A.   On Seroquel.
23   Q.   How is his role different
24 than yours?

Page 689

1    A.   Given that I don't know his
2  responsibilities directly, I know he's
3  involved in the clinical trial work
4  supporting a lot of European submissions.
5    Q.   Dr. Jeff Goldstein, do you
6  know Dr. Goldstein?
7    A.   Yes.  I didn't work very
8  closely with Jeff Goldstein, but I know
9  of Jeff Goldstein.
10   Q.   He was intimately involved
11 as a physician of development of Seroquel
12 at Zeneca, was he not?
13   A.   I don't recall if he was a
14 physician or not.  I think he was a
15 scientist.
16   Q.   I mean, a scientist involved
17 in clinical trials.  Right?
18   A.   I don't know if he was
19 involved in clinical trials.  He was
20 involved in the early development of
21 Seroquel.
22   Q.   The early development?
23   A.   Yes.
24   Q.   Before you?

Page 690

1    A.   I would have probably not
2  been -- he was probably -- obviously if
3  he was involved in the development of
4  Seroquel, it would have been before me
5  because he was involved in, I think, some
6  of the animal pharmacology work.
7    Q.   Where is he working today,
8  do you know?
9    A.   I don't have any idea.
10   Q.   Thank you, sir.
11     MR. BROCK:  I'd like to ask
12 you about the people he's deposed,
13 I'd like to keep up with them.
14     MR. ALLEN:  I didn't depose
15 Dr. Goldstein.  I didn't depose
16 Dr. Jones and I didn't depose Dr.
17 Arvanitis.
18     MR. BROCK:  I think it's
19 Arvanitis.  I'm sure you're not
20 mispronouncing --
21     MR. ALLEN:  I just wanted to
22 point out I didn't ask -- I didn't
23 depose any of those people.
24     MR. BROCK:  Let me get him

94 (Pages 687 to 690)

Confidential - Mark S. Scott, Ph.D.

Page 691

1     some water.
2          MR. ALLEN:  Sure.  Do you
3     want a break?
4          THE WITNESS:  No.  All I
5     need is some water, that's all.
6     My throat is getting a little dry.
7     BY MR. ALLEN:
8          Q.   Do you want to continue or
9     do you want --
10         A.   No, I can -- I just had a
11    sip.  So I just wanted to get some more
12    just in case.
13         Q.   I don't want you to be
14    uncomfortable.  Do you want to wait?
15         A.   I'm good to go.
16         Q.   Thank you, sir.
17              Sir, can you get out Exhibit
18    Number 7?
19         A.   Number 7?
20         Q.   Yes, sir.  Isn't that the
21    clinical trial report on study 15?
22         A.   Now you're going to be
23    testing me.
24         Q.   Before you -- I think

Page 692

1     they're pretty much in numerical order.
2     Our court reporter is indicating they are
3     so it's --
4          A.   So it was Exhibit?
5          Q.   7.
6          A.   7.
7          Q.   We could try to keep them in
8     order, it would be very helpful.
9          A.   I'm going to try.  Those are
10    7.  That goes up to 5, I'm sorry.
11         Q.   I'm going to have Ms.
12    Rossi -- as a matter of fact, I'm going
13    to ask Ms. Rossi to hand you --
14         A.   There it is.
15         Q.   Go ahead and get out number
16    8 while we're there.
17              Can we have those?
18              Exhibit 7 would be the
19    clinical trial report for study 15.
20              MR. BROCK:  Let's take just
21    a short break.
22              MR. ALLEN:  Okay.  What's
23    that?
24              MR. BROCK:  Just let him get

Page 693

1     a drink of water, and then we'll
2     be ready for the next question.
3          THE WITNESS:  All right.
4     BY MR. ALLEN:
5          Q.   I just want to get a frame
6     of reference here.  Exhibit 7 is the --
7     was introduced by Mr. Pennock yesterday,
8     was the international approval form
9     signed by you and Dr. Arvanitis on study
10    15.  Do you recall that?
11         A.   Yes.  This was one of the
12    tables that was part of the clinical
13    trial report for trial 15.
14              MR. ALLEN:  And then if I
15    recall correctly, Mr. Pennock --
16    okay.  Now, this is the summary.
17    I didn't want the summary.  Let
18    me -- let me -- here.  Clinical
19    trial report, not the clinical
20    trial summary.  The summary was 8.
21    I just want the exhibits used
22    yesterday.  You don't have them?
23    BY MR. ALLEN:
24         Q.   Sir, can you hand me

Page 694

1     Exhibit 7 and 8?  That will solve it.
2          A.   Do you want mine?
3          Q.   Well, yes, sir.  I want the
4     court's, those are actually the court's.
5              Sir, Exhibit 7, this is
6     what -- Scott Exhibit 7 was introduced by
7     Mr. Pennock yesterday.  You recall that?
8          A.   Yes, I do.
9          Q.   And you recall he referred
10    you to the table, tables attached to this
11    dealing with 75 milligram Seroquel.  Do
12    you remember?
13              MR. BROCK:  Let me see if I
14    can get my copy of this because --
15              THE WITNESS:  I'd like to
16    look at it in total as opposed to
17    just --
18    BY MR. ALLEN:
19         Q.   Well, here.  I'm going to do
20    it for the jury and I'll hand it back to
21    you.  Do you recall him asking about 75
22    milligram Seroquel, 300 milligram
23    Seroquel and 600 milligram Seroquel
24    regarding study 15?

95 (Pages 691 to 694)

Confidential - Mark S. Scott, Ph.D.

Page 695

1    A.   I recall that we looked at
2  the changes in glucose across the
3  clinical trial program for all
4  treatments.
5    Q.   Right.  And then do you
6  recall -- I'll hand it back to you,
7  that's all I needed to ask you.
8        On Exhibit 8 was the summary
9  of clinical trial report on study 15 that
10  Mr. Pennock asked you about.  Do you
11  recall that?
12    A.   I recall that we looked at
13  that, but I -- there was other -- yeah,
14  there was other information in the
15  clinical trial report.  So we saw the
16  summary, but I don't think we saw the
17  whole clinical trial report itself.
18    Q.   No, sir, we didn't.  You did
19  later and we're going to talk about that.
20  But do you recall him asking you about
21  the clinical trial report summary in
22  Exhibit 8?
23    A.   Yes.
24    Q.   And he asked you to look in

Page 696

1  the summary and see if you have any
2  reference to the word "glucose" or the
3  elevations in glucose in the clinical
4  trial report summary.  Do you recall
5  that?
6    A.   Yes, I do.
7    Q.   Thank you very much, sir.
8        And I think we determined
9  that there is no mention in the clinical
10  trial report summary.  Do you recall
11  that?
12        MR. BROCK:  Object to the
13    form.
14        THE WITNESS:  I recall we
15    had that discussion and I
16    mentioned that there is reference
17    to other laboratory tests that
18    don't appear here.
19  BY MR. ALLEN:
20    Q.   It just says -- it
21  references other laboratories tests, but
22  it does not use the word "glucose" or
23  reference specifically study 15.
24  Correct?

Page 697

1        MR. BROCK:  That question
2  has been asked and answered, was
3  asked and answered extensively
4  yesterday in Mr. Pennock's exam.
5        MR. ALLEN:  Well, any cross
6  exam, I have to put things in
7  context.  And that's what I'm
8  doing, is cross-examining after
9  long hours of direct.  So I don't
10  think that -- is that a form
11  objection?
12        MR. BROCK:  It is.  It's an
13  objection that I am noting for the
14  record that you are reasking
15  questions that have been covered
16  extensively.
17        MR. ALLEN:  Can you keep to
18  the protocol objection, form?
19        MR. BROCK:  On this one I
20  cannot.
21        MR. ALLEN:  Thank you.
22  Let's move on.
23        MR. BROCK:  No, no.  Don't
24  cut me off, Scott.  I can't on

Page 698

1  this one because if you continue
2  to replow old ground, at some
3  point I'll have to instruct the
4  witness not to answer.
5        So what I'm -- all I'm
6  saying right now is, noting again
7  that you're covering material that
8  was covered yesterday.  You
9  brought up the protocol yesterday
10  for the method of conducting the
11  depositions.  And one of the
12  specific things it said is the
13  same question is not to be
14  answered over and over.  So I'm
15  noting that for the record.
16  Please ask the next question.
17        MR. ALLEN:  No, I will not.
18  And I want to object to your
19  objection.  It misstates the
20  evidence and the facts.  I'm
21  entitled to cross-examine the
22  witness, and try to place
23  testimony in context before asking
24  the next question, and any good

96 (Pages 695 to 698)

Confidential - Mark S. Scott, Ph.D.

Page 699

1    cross-examiner knows it.
2    BY MR. ALLEN:
3        Q.   Now, sir, Exhibit Number 8,
4    as you established with Mr. Pennock
5    yesterday, does not mention the word
6    "glucose" or reference study 15.  Is that
7    correct?
8            MR. BROCK:  Object to the
9        form.  Asked and answered.
10           THE WITNESS:  Again, this is
11       the synopsis for trial 15.  It
12       contains the high level results
13       from study 15, and as I've -- I
14       believe I've said that my
15       expectation of the synopsis should
16       contain the information that was
17       the most important findings from
18       the clinical trial where all
19       information is, in fact, contained
20       in the clinical trial report.
21           MR. ALLEN:  Objection.
22       Nonresponsive.
23    BY MR. ALLEN:
24       Q.   Sir, a simple question was,

Page 700

1    does Exhibit Number 8 mention study 15 or
2    elevations of glucose, yes or no?
3        A.   It does mention study 15 as
4    the trial number, yes.  In the synopsis
5    it doesn't contain glucose, but again the
6    intent is a synopsis and not the complete
7    clinical trial report.
8        Q.   Thank you, sir.
9            Now, if you get out
10    Exhibit 31.  If we need Linda to do that,
11    I would ask --
12       A.   I would rather have her do
13    it than me do it.  Would you do that,
14    please?  I don't --
15           MR. ALLEN:  I'd ask the
16       court reporter to get out Exhibit
17       31.
18    BY MR. ALLEN:
19       Q.   Sir, do you have Exhibit 31
20    in front of you?
21           MR. BROCK:  He does.
22           MR. ALLEN:  I didn't ask
23       you, Mr. Brock.  I need to confirm
24       with the witness.

Page 701

1    BY MR. ALLEN:
2        Q.   Sir, do you have Exhibit 31
3    in front of you?
4        A.   Yes, I do.  It's the
5    "INTEGRATED SUMMARY OF SAFETY."
6        Q.   The integrated summary of
7    safety has appendices, does it not?
8        A.   Yes, it has appendices of
9    the various tables that are referenced in
10    the body of the document.
11       Q.   Now, do you recall Mr.
12    Pennock asking you yesterday if
13    Exhibit 31 contained a reference to study
14    15 and the glucose tables?  Do you recall
15    that question?
16       A.   To be honest with you, I'd
17    have to go back into study 30 -- excuse
18    me, ISS to see the section dealing with
19    glucose, what we agreed with the FDA in
20    terms of trial pools and what information
21    is included.  So I'd have to go back and
22    look because I don't recall that
23    discussion.  It was yesterday and we
24    talked about a lot of things since then,

Page 702

1    so I apologize.
2        Q.   I'm going to help you and
3    see if I can jog your recollection.  Go
4    to the page numbered at the top 202.
5        A.   202, okay.
6        Q.   Are you there with me?
7        A.   Yes.
8        Q.   And this is the page at the
9    top 202.  If we go down, we have Roman
10    numeral III, "Long-term,
11    comparator-controlled trial Trial 0015."
12    Do you see that?
13       A.   Yes, I do.
14       Q.   Now, do you recall Mr.
15    Pennock asking you if the blood glucose
16    results that were contained in the
17    clinical trial report Exhibit 7 were
18    contained in the integrated safety
19    summary?  Do you recall that?
20       A.   Well, I know we had a
21    discussion about the glucose data from
22    the clinical trial report for glucose
23    data from trial 15 -- being in trial 15.
24    I don't recall the conversation, to be

97 (Pages 699 to 702)

Confidential - Mark S. Scott, Ph.D.

Page 703

1  honest with you, about it being in the
2  ISS.
3      Q.   Well, I'm going to go on
4  anyway because the record will reflect
5  what it reflects.
6      Do you recall in answer to
7  Mr. Pennock's question about whether or
8  not the tables concerning the glucose
9  results contained in the clinical trial
10  report, Exhibit 7, were in the ISS and
11  you said, well, yes, if we look at the
12  page 202, continuing on to 203, there is
13  a reference to results for all clinical
14  chemistry tests can be found at Table
15  11.1.3, and said something that you
16  thought there may have even been a
17  hyperlink from the ISS to the appendices.
18  Do you recall that?
19      A.   Yes, I do.
20      Q.   And do you recall agreeing
21  that the blood chemistry results for
22  glucose in study 15 were not actually in
23  Exhibit 31, the ISS, but you said rather
24  they were just referenced by referring

Page 704

1  the reader to Table 11.1.3?
2      A.   Well, I know we had a long
3  conversation about it being in the
4  clinical trial report which is where --
5  if you have the individual clinical
6  trial, I'd like to look there first in
7  terms of those data and then look at the
8  ISS later because the clinical trial
9  report contains all the clinical trial
10  data from it.
11      Q.   Do you recall saying it was
12  not in Exhibit 31 but was referenced in
13  Table 11.1.3 which you thought there may
14  have been a hyperlink to?
15      A.   There was a hyperlink with
16  respect to the clinical trial reports --
17  the clinical data, yes.
18      Q.   Now, then you discussed with
19  Mr. Brock Exhibit -- Defendant's
20  Exhibit 113 concerning the study 15
21  results. Do you recall that?
22      A.   Yes.
23      Q.   If we could pull out
24  Defendant's Exhibit 113. If we need to

Page 705

1  go off the record, it's the defendant's
2  exhibit.
3      A.   This is what the -- what's
4  the title of that, please?
5      Q.   The title of it is
6  "SEROQUELTM INTERNATIONAL APPROVAL FORM"
7  signed by Lisa Arvanitis and Dr. Mark
8  Scott, Defendant's Exhibit 113.
9          MR. SCOTT:  113 is the
10  integrated summary of safety.
11          THE WITNESS:  Same thing.
12          MR. SCOTT:  Yeah, it's the
13  same thing.
14  BY MR. ALLEN:
15      Q.   Do you have 113?
16      A.   If it's the integrated
17  summary of safety, yes, I do.
18      Q.   Now, there's a difference
19  between Exhibit -- Defendant's
20  Exhibit 113 and Exhibit 31, is there not?
21          MR. SCOTT:  I'd have to look
22  at what -- if I've got two stacks
23  that are this high of data, I'd
24  have to look if they're the same

Page 706

1  size. I'd have to look and see
2  what the differences are.
3  BY MR. ALLEN:
4      Q.   Doesn't Defendant's-113 not
5  come from the integrated safety summary,
6  but, in fact, come from the appendix to
7  the integrated safety summary?
8      A.   I know it's -- I'm a little
9  tired, so let me make sure. I don't want
10  to answer anything inappropriately.  Why
11  don't I have the two documents that
12  you're talking about side by side?
13      Q.   They're right there over
14  there.
15      A.   Again, I have a lot of
16  documents in front of me.  I want to make
17  sure that I get right one.
18          MR. GALLAGHER:  I have 113
19  here.  Do you need that one?
20  BY MR. ALLEN:
21      Q.   It's Defendant's Exhibit
22  113, is it not, sir?
23      A.   Yes.  And this is the --
24  again, this is a subset of the data from

98 (Pages 703 to 706)

Confidential - Mark S. Scott, Ph.D.

Page 707

1  the integrated summary of safety, yes.
2      Q.  Exactly.  Defendant's
3  Exhibit 113 which you discussed with Mr.
4  Brock.  Is that correct?
5      A.  I'm trying to remember when
6  I discussed it, but...
7      Q.  Yesterday.
8      A.  Okay.
9      Q.  Do you recall going over
10 tables with Mr. Brock?
11     A.  Yeah.  Well, I do, but
12 again, I'm trying to get a frame of
13 reference.  I do apologize.  I'm a little
14 tired, so I apologize.
15          I want to make sure I get
16 the -- I answer the question knowing what
17 the question is first.  So could you
18 please repeat the question?
19         MR. BROCK:  Why don't we
20     take a short break.
21         MR. ALLEN:  Let me get this
22     from him.
23         MR. BROCK:  You can ask him
24     another question.

Page 708

1  BY MR. ALLEN:
2      Q.  Do you recall discussing
3  Defendant's Exhibit 113 with Mr. Brock
4  yesterday?
5      A.  To be honest with you --
6      Q.  Yes, sir.
7      A.  -- I know we looked at a lot
8  of data.  I'd have to think back on
9  what -- I know that we looked at -- to be
10 honest with you, I'm just trying to -- in
11 the context of discussing trial 15.  I
12 know we discussed it a lot --
13     Q.  It may help you to look at
14 the table at page 227 which is Table
15 11.1.3.
16     A.  From integrated summary of
17 safety.  Okay.
18     Q.  Do you see Table 11.1.3?
19     A.  Yes, I do.
20     Q.  And that's the table that
21 disclosed that the mean change in
22 Seroquel glucose patients was .27.  Is
23 that correct?
24     A.  We had a -- the mean value

Page 709

1  reported was .27 with a standard
2  deviation of 1.75.
3      Q.  That was .27 millimoles per
4  liter.  Correct?
5      A.  Yes, it was.
6      Q.  Which as we discussed
7  yesterday, was 4.86 milligrams per
8  deciliter?
9      A.  That would be the
10 appropriate transformation.
11     Q.  Yes, sir.  And -- but the
12 mean change for the placebo patients was
13 actually .14 millimoles per liter.  Is
14 that correct, sir?
15     A.  No, it was not.
16     Q.  I mean -- excuse me, for the
17 comparator patients, the haloperidol
18 patients was .14 millimoles per liter.
19 Is that correct, sir?
20     A.  It was haloperidol with .14
21 with a standard deviation of 2.45.
22     Q.  And therefore -- and that
23 would be an increase of 2.62 milligrams
24 per deciliter for the haloperidol

Page 710

1  patients.  Correct?
2      A.  If you did the arithmetic,
3  that sounds about right.
4      Q.  And Seroquel, therefore, had
5  a higher elevation of serum blood glucose
6  tested in study 15 than did the
7  comparator haloperidol.  Correct?
8      A.  I would say it's numerically
9  higher.  The significance of it I would
10 call into question.
11     Q.  This was contained in Table
12 11.1.3 which your lawyer attached as part
13 of Defendant's Exhibit 113.  Correct?
14     A.  It's Defendant's Exhibit
15 113.  Yes.
16     Q.  Now, do you remember him
17 asking you whether or not this table was,
18 in fact, included in the integrated
19 summary of safety at the time the NDA was
20 filed in 1996?  Do you recall that line
21 of questions?
22     A.  Yes, I do.
23     Q.  And you testified yesterday
24 it was included with the integrated

99 (Pages 707 to 710)

Confidential - Mark S. Scott, Ph.D.

Page 711

1  summary of safety.  Correct?
2       A.   If it's here and listed as
3  part of the integrated summary of safety,
4  it's my presumption that it's in the
5  integrated summary of safety, yes.
6       Q.   Yes, sir.  And then we saw,
7  as I just showed you a minute ago, in the
8  integrated summary of safety, Exhibit 31,
9  that there was a reference made to that
10 table at the page 202 and 203 which you
11 said there was a hyperlink to.  Do you
12 recall that, sir?
13      A.   Yes.
14      Q.   Now, the table that we just
15 discussed --
16      MR. BROCK:  Scott, I really
17 do want to take a break.
18      MR. ALLEN:  Yes, sir, but I
19 have --
20      MR. BROCK:  I understand.
21 What you're entitled to do is not
22 have a question pending.  I asked
23 for one about ten minutes ago.
24      MR. ALLEN:  Okay.  Well,

Page 712

1  then take a break.
2       MR. BROCK:  The witness said
3  he's tired.  Let's get up and take
4  a break.
5       MR. ALLEN:  Take a break.
6       VIDEOGRAPHER:  We are now
7  going off the record.  This is the
8  end of videotape number five.  The
9  time is 4:04.
10          - - -
11      (A recess occurred.)
12          - - -
13      VIDEOGRAPHER:  We are now
14 back on the record.  This is the
15 beginning of videotape number six.
16 The time is 4:21.
17 BY MR. ALLEN:
18      Q.   Dr. Scott, we're back on the
19 record.  We were talking about
20 Defendant's-113 which Mr. Brock
21 questioned about yesterday and he asked
22 you about the tables in 113.  Do you
23 recall that?
24      A.   Yes, I do.

Page 713

1       Q.   I want to make sure that we
2  put it in context so the jury understands
3  what we were talking about.  Mr. Brock
4  showed you the tables with all the Xs on
5  it where the glucose was measured.  Do
6  you recall that?
7       A.   Yes, I do.
8       Q.   He said that in the Phase I
9  trial.
10          Then we go to the Phase II
11 and III trials.  Do you see that, sir?
12 You discussed it with Mr. Brock
13 yesterday.
14      A.   Yes, I do.  This is page 83.
15      Q.   Yes, sir.  And if you go to
16 page 84, do you see that?
17      A.   Yes.
18      Q.   And, in fact, just for the
19 record, glucose was not tested in all the
20 Phase II and III trials, it was not
21 tested in one, two, three, four, five,
22 six, seven, eight, nine, ten of the
23 trials, it wasn't even tested.  Is that
24 true?

Page 714

1       A.   You're looking at?
2       Q.   Page 83 and 84.
3       A.   We look at page 83 for the
4  Phase II trials.  Page -- the glucose
5  line is about two-thirds of the way down.
6       Q.   It's on the screen, the jury
7  sees it, sir.
8       A.   It was measured in trials 2,
9  5, 6, 7, 8.  It wasn't measured in 12, 13
10 and 14, but it was measured in 15, trial
11 48 as well as in the U.S. centers of the
12 open label extension.
13      Q.   Okay.  So --
14      A.   It was measured in one, two,
15 three, four, five, six, seven, eight of
16 the 11 trials.
17      Q.   Right.  And then we have the
18 next page was Phase III trials?
19      A.   No, that's the urinalysis.
20 That's glucose in the urine.  That is a
21 different measure.
22      Q.   You don't see the next page
23 has glucose on it?
24      A.   It has glucose in the urine.

100 (Pages 711 to 714)

Confidential - Mark S. Scott, Ph.D.

Page 715

1    Q.   The urine.
2    A.   In the urine.
3    Q.   Now, then he also then
4  pointed your attention to which was the
5  Table 11.1.1.  Right?
6    A.   11.1.1 or 11.1.3, I'm sorry.
7    Q.   Well, he pointed -- the
8  record will reflect, but I know he asked
9  you about 11.1.1, so I want to ask you
10  about it, too.  Okay?
11    A.   Okay.  This is the mean and
12  mean change values for the chemistry
13  parameters at baseline at the end of the
14  treatment for the short-term
15  placebo-controlled trials, yes.
16    Q.   Yes, sir.  And it shows a
17  mean change of Seroquel patients which is
18  right there, Seroquel patients, a mean
19  change in glucose of .18 millimoles per
20  liter.  Correct?
21    A.   That's what the mean was
22  calculated as, yes.
23    Q.   And for the placebo patients
24  it was much less, it was .02 millimoles

Page 716

1  per liter.  Is that correct?
2    A.   Well, I wouldn't
3  characterize it again as much less.  The
4  mean change for placebo was .02.
5    Q.   So it was .02.  Correct?
6    A.   Yes.
7    Q.   Which was less than the
8  Seroquel patients.  Correct?
9    A.   There was a numerical
10  difference between those two values, yes.
11    Q.   And then when we get to
12  Table 11.1.3 which is the study 15.  Is
13  that correct?
14    A.   Yes, correct.
15    Q.   And Mr. -- excuse me, Mr.
16  Pennock had asked you whether it was an
17  integrated safety summary, and remember
18  you pointed to page 202 and 203 and you
19  said, well, it referenced Table 11.1.3?
20  Do you recall that?
21    A.   Yes.
22    Q.   And this is the Table 11.1.3
23  that 202 and 203 in the integrated safety
24  summary referenced.  Correct?

Page 717

1    A.   Correct.
2    Q.   That is the table that if
3  you looked to study 15 would show that
4  the mean change in glucose was more than
5  the mean change in the haloperidol
6  patients.  Correct?
7    A.   I would characterize it as
8  yet a mean of .27 on Seroquel with a
9  standard deviation of 1.75 and a mean
10  change on haloperidol of .14 and a
11  value -- a standard deviation of 2.45.
12    Q.   That's certainly not green,
13  is it?
14    A.   Well, I would say it was
15  green because of the variance and the
16  difference in means being small.
17    Q.   Well, back in the time the
18  study was evaluated at AstraZeneca, they
19  didn't consider it green, they considered
20  this study cursed, didn't they?
21    A.   No, not cursed at all.  No.
22    Q.   Okay, sir.  But
23  nevertheless, this table that Mr. Brock
24  referred you to, 11.1.3, was not in the

Page 718

1  integrated safety summary but was in
2  appendix to the integrated safety
3  summary.  Right?
4    A.   It's part of the integrated
5  safety summary.
6    Q.   Is it part of Exhibit 31?
7    A.   Usually a safety summary is
8  a document which has tables and text and
9  it has references to T tables which form
10  part of the appendix.
11      MR. ALLEN:  Objection.
12  Nonresponsive.
13  BY MR. ALLEN:
14    Q.   My question to you is, Table
15  11.1.3, part of Exhibit 31, the
16  integrated safety summary, Exhibit 31 --
17    A.   Again, this is the initial
18  part of the integrated summary of safety.
19  Also there are a lot of T tables of which
20  these are two which are included as part
21  of the appendix to the report.
22    Q.   Part of the appendix?
23    A.   It's part of the integrated
24  summary of safety.

101 (Pages 715 to 718)

Confidential - Mark S. Scott, Ph.D.

Page 719

1     Q.   Didn't you just say it's
2  part of the appendix?  You used that term
3  yourself?
4     A.   The appendix is a core part
5  of the integrated summary of safety.
6     Q.   That table, as you said
7  yourself under oath, was part of the
8  appendix.  Agreed?
9     A.   I've said it under oath it's
10 part of the appendix, but it forms a core
11 part of the integrated summary of safety.
12    Q.   Do you recognize what's
13 there to your left?
14    A.   No, I don't.
15    Q.   Can we pan on this?  We'll
16 have to go ahead and mark it.
17    MR. BROCK:  Move the exhibit
18 over because I don't want it to
19 pan over on him.
20    MR. ALLEN:  Well, you
21 moved -- I had it over.  You moved
22 it over.
23    MR. BROCK:  If you want --
24 if you want to display the

Page 720

1  exhibit --
2     MR. ALLEN:  I do.
3     MR. BROCK:  Hang on just a
4  second, I'll move it over for you.
5     MR. ALLEN:  Sorry, Linda,
6  we're now going to have to mark
7  this.
8     VIDEOGRAPHER:  You're in the
9  way.
10    MR. BROCK:  It can be moved
11 over a little bit more then.
12    MR. ALLEN:  We'll mark --
13    MR. BROCK:  Would you be
14 satisfied with a quick shot?  I'll
15 move out of the way, if you will.
16    MR. ALLEN:  Sure.  Sure, I
17 am.  A quick shot being if --
18    MR. BROCK:  No, no.  I'm
19 saying if you want to show the
20 exhibit, show it, you don't have
21 to move it, I'm going to let you
22 show it and then I'll move back
23 over.  Ask him to -- you can ask
24 him to identify it and then I'll

Page 721

1  move back over.
2     VIDEOGRAPHER:  It's in.  I
3  have it now for the witness.
4        - - -
5     (Exhibit Scott-41,
6  Integrated Summary of Safety,
7  Bates AZSER 10885949, was marked
8  for identification.)
9        - - -
10 BY MR. ALLEN:
11    Q.   Sir, do you recognize what
12 I've marked as Scott Exhibit 41?
13    A.   Well, it's from an
14 integrated summary of safety, and it
15 looks like it is, based on this first
16 table, it is the first table of the
17 integrated summary of safety for
18 Seroquel, yes.
19    Q.   And does it appear to be the
20 one from the new drug application that
21 was submitted in 1996?
22    A.   It appears -- I don't want
23 to go through every table obviously, but
24 I'll trust that the rest of it represents

Page 722

1  the integrated summary of safety for
2  this.
3     Q.   And that's -- I'm sorry,
4  sir.  I'm sorry.  I'm sorry, I didn't
5  mean to --
6     A.   No, I wouldn't -- without
7  going through it, I'll agree that if all
8  tables follow in that way, that forms all
9  of what we call the T tables for the
10 integrated summary of safety.
11    Q.   And when Exhibit 31, the
12 integrated summary of safety, on page 202
13 and 203 referenced Table 11.1.3, it would
14 be contained in the appendix which we've
15 now marked as Exhibit 41.  Correct?
16    A.   It would be contained in the
17 paper appendix if, in fact, the reviewer
18 wanted to review it that way.  But as I
19 said yesterday, we had what were called
20 computer assisted NDAs where we created
21 files that the reviewers at FDA could
22 review, and the T tables were in the
23 documents in terms of a link.  If you
24 clicked on a -- clicked on a number, you

Confidential - Mark S. Scott, Ph.D.

Page 723

1  would go right to that table for ease of
2  review.
3      Q.   Yes, sir.  Of course you
4  know that the FDA has an inadequate
5  infrastructure in regard to its computer
6  analysis of records.  You know that, do
7  you not, sir?
8          MR. BROCK:  Object to the
9      form.
10         THE WITNESS:  No, I don't
11     that.
12 BY MR. ALLEN:
13     Q.   Well, sir, you were -- you
14 said you were involved in regulatory
15 affairs there at AstraZeneca.  Have you
16 ever reviewed the FDA science and mission
17 at risk report of the subcommittee on
18 science and technology report prepared in
19 November of 2007 for the FDA science
20 board, sir?
21     A.   No, I have not.
22     Q.   So, first of all, I'm
23 handing you -- excuse me, and I want to
24 make sure I get the record clear

Page 724

1  because I may have -- never mind.
2          MR. BROCK:  This is
3      Exhibit 41 if you have a question.
4          MR. ALLEN:  Yes, sir, I did.
5      Thank you, Mr. Brock.
6  BY MR. ALLEN:
7      Q.   Dr. Scott --
8      A.   Exhibit 42 or 41?
9          MR. BROCK:  That's 41.  This
10     is 42.
11              - - -
12         (Exhibit Scott-42, FDA
13     Science and Mission at Risk Report
14     of the Subcommittee on Science and
15     Technology, was marked for
16     identification.)
17              - - -
18 BY MR. ALLEN:
19     Q.   Dr. Scott.  That's what I
20 wanted to make sure.  Dr. Scott.
21 I have a question about this
22 document.  Exhibit 41, sir, that's 42 in
23 front of you.  Exhibit 41, the appendix,
24 was Defendant's -- I mean, excuse me, was

Page 725

1  Scott Exhibit 41.  Correct?
2      A.   Correct.
3      Q.   That's where the Table --
4  what was it, 11.1.3 -- 11.1.3 would be
5  found?
6      A.   That table along with all of
7  the other data.  I believe I said
8  yesterday the nature of a new drug
9  application lends itself to having very
10 large documents and one of the reasons
11 for what were called computer assisted
12 NDAs which we filed with this was to
13 allow the reviewers to have -- to
14 navigate the NDA in terms of a paper --
15 instead of a paper document to have an
16 electronic document.
17     Q.   Okay.  Now, you have
18 before you Exhibit 42, the "FDA Science
19 and Mission at Risk" report.  Is that
20 correct, sir?
21     A.   That's what the title of
22 this document reads.
23     Q.   And you have not -- did you
24 know this report was prepared at the

Page 726

1  request of Andrew von Eschenbach, M.D.
2  the FDA commissioner --
3          MR. BROCK:  Object to the
4      form.
5  BY MR. ALLEN:
6      Q.   -- who made the request in
7  December of 2006 that this report be
8  prepared?
9      A.   No, I do not.
10     Q.   And so at the time you
11 answered questions concerning the
12 hyperlink, you were unfamiliar with this
13 FDA science and mission at risk report.
14 Is that true?
15     A.   Well, this report is dated
16 2007, and this review is from 1997, so...
17     Q.   That's exactly right, sir.
18 As a matter of fact, the FDA submission
19 was in 1997, and this report was issued
20 in 2007.  Correct?
21     A.   I can't deny that this
22 report was issued in 2007.
23     Q.   Let me just turn to the
24 second page of Exhibit 42 and we'll move

103 (Pages 723 to 726)

Page 727

1   off of it.  I just wanted to know if you
2   had ever learned that one of the major
3   findings by the FDA science --
4   subcommittee on science and technology
5   prepared for the FDA science board, one
6   of the major findings was the FDA cannot
7   fulfill its mission because its
8   information technology, IT infrastructure
9   is inadequate.  Did you know about that?
10      A.   I can read that that's what
11  this says here, but I'd have to read the
12  whole document to understand the context
13  for it and what it might mean.
14      Q.   Have you ever read of the
15  GAO, Governmental Accounting Office,
16  reports when it has -- who have
17  investigated the FDA and whether it has
18  the ability to -- has the manpower and
19  the money to adequately do its job?  Have
20  you ever read any of those reports?
21      MR. BROCK:  Object to the
22  form.
23      THE WITNESS:  No, I have
24  not.

Page 728

1   BY MR. ALLEN:
2       Q.   So including the fact you
3   hadn't read the FDA -- I mean, excuse me,
4   the GAO report reporting on the fact that
5   the FDA does not have the manpower or
6   capability to adequately police off-label
7   uses or promotion, did you know that?
8       MR. BROCK:  Object to form.
9       THE WITNESS:  Again, I don't
10      know the contents of that report.
11  BY MR. ALLEN:
12      Q.   Have you ever seen that
13  report?
14      A.   No, I haven't.
15      Q.   Now, sir, study 15, did
16  y'all have a policy there at AZ ever
17  since you've been there that you would
18  publish the studies in the clinical trial
19  reports on your Web site within a year
20  after the study was completed?
21      A.   That policy is relatively
22  recent in terms of that being the way
23  that we put information into the public
24  domain.

Page 729

1       Q.   Sir, I want to hand you what
2   has previously been marked as Macfadden
3   Exhibit 21 which we'll mark as Scott
4   Exhibit 43.
5           - - -
6       (Exhibit Scott-43, Seroquel
7       (quetiapine) Clinical Trail report
8       summaries, was marked for
9       identification.)
10          - - -
11  BY MR. ALLEN:
12      Q.   Did you ever have a -- does
13  AZ have a Web site called
14  azclinicaltrials.com?
15      A.   Yes.
16      Q.   Do you see what we've marked
17  as Scott Exhibit 43 and was previously
18  marked as Macfadden-21?  Is that in front
19  of you, sir?
20      A.   Yes.
21      Q.   I would like you to see --
22  by the way, sir, the date on this was
23  AstraZeneca 2005.  Do you see that, sir?
24      A.   Correct.

Page 730

1       Q.   When was study 15 complete?
2       A.   In 1996 I believe is on the
3   sign off on the clinical trial.  Just
4   give me a second there, I'll get it
5   exactly for you if you'd like.  I'm
6   sorry, I don't have the --
7       MR. BROCK:  Dr. Scott, move
8       your microphone up a little bit.
9       THE WITNESS:  I don't
10      have -- can you point me to an
11      exhibit that has a signoff sheet
12      for clinical trial -- were we just
13      looking at that?
14  BY MR. ALLEN:
15      Q.   Well, let me -- let me just
16  save us some time, sir.  Study 15 had to
17  be completed before the NDA submission in
18  1996?
19      A.   Yes, it did.
20      Q.   And then we had the
21  AstraZeneca clinical trial report
22  summaries posted on the Web as of 2005
23  AstraZeneca.  Show me the clinical trial
24  report summary on study 15, where that's

Confidential - Mark S. Scott, Ph.D.

Page 731

1    referenced on the --
2         A.   Well, it wouldn't be on
3    here. And the reason for that is a
4    decision was made given -- between the
5    merger between Astra and Zeneca that we
6    would put what were called hypothesis
7    generated -- hypothesis testing trials on
8    the Web site after a certain date. And
9    so that was decided across the company
10   for all of our products. I think
11   subsequent to that, if you look now, the
12   results for trial 15 are indeed on the
13   Web site which is a more recent edition.
14        Q.   Yes, sir. And I guess so
15   you're agreeing with me, as of 2005, over
16   nine years after the submission of the
17   original NDA, study 15 was still not
18   published on the AstraZeneca Web site.
19   Is that true?
20        A.   As I said, we had the policy
21   that we had in terms of putting the
22   clinical trials up on the Web site,
23   included a rule across all the products,
24   that have hypothesis testing trials after

Page 732

1    a certain date because of the merged
2    company. There are a number of clinical
3    trials with Seroquel which fell within
4    that categorization. But subsequent to
5    that, we've put the clinical trials up on
6    the Web site.
7         Q.   Well, that's -- and we'll
8    look at that.
9              So you're saying subsequent
10   to 2005, you have put the clinical trial
11   report summary for study 15 on the web?
12        A.   I believe it's on the Web
13   site, yes.
14        Q.   Thank you, sir.
15             But as of 2005, it was not.
16   Correct?
17        A.   By this date, again,
18   according to what we -- the decision we
19   made as a company to have what clinical
20   trials would go up, there were a number
21   of clinical trials for Seroquel and
22   indeed other medicines that didn't go up
23   onto the Web site.
24        Q.   Did study 15 go up on the

Page 733

1    Web site after the first Seroquel case
2    was filed against AstraZeneca?
3         A.   To be honest with you, I
4    don't know when the first Seroquel case
5    was filed. The addition of trial 15 is
6    relatively recent.
7         Q.   Who -- do you remember
8    Richard Lawrence?
9         A.   I know the name Richard
10   Lawrence, but I don't know his role.
11        Q.   How about Don Stribling?
12        A.   Yes, I know Don Stribling.
13        Q.   Tell the jury who Don
14   Stribling was in the 1990s related to
15   Seroquel?
16        A.   Well, I can't tell you what
17   his role was in the 1990s. I worked with
18   Don Stribling, he was the global product
19   vice president for a drug called Iressa
20   where I worked with him.
21        Q.   And Athena Ruhl, do you
22   remember working with Athena Ruhl?
23        A.   I didn't work closely with
24   Athena during the mid-'90s. I know who

Page 734

1    Athena is obviously, but I don't -- I
2    didn't work closely with her.
3         Q.   She worked on what in regard
4    to Seroquel? Do you know what she did?
5         A.   She was what was called, I
6    believe, the product manager, but I
7    didn't work very closely with her.
8         Q.   So you believe Athena Ruhl
9    was the Seroquel project manager. Is
10   that correct?
11        A.   No, I think product manager.
12        Q.   Excuse me. I apologize.
13             Athena Ruhl was the product
14   Seroquel manager for Zeneca back at that
15   time in the late '90s?
16        A.   I don't know if it was for
17   Zeneca, but it was for Seroquel.
18        Q.   And Georgia Tugend, for
19   example, she was involved in the
20   publications, was she not?
21        A.   I don't know what Georgia's
22   role was at that time.
23        Q.   Isn't it a fact that
24   AstraZeneca was trying to do a smoke and

105 (Pages 731 to 734)

Confidential - Mark S. Scott, Ph.D.

Page 735

1  mirrors job regarding the reporting of
2  study 15?
3      A.   If you could show me the
4  document?
5      Q.   Yes, sir. I'm going to hand
6  you Plaintiff's 44.
7              - - -
8      (Exhibit Scott-44, 2/17/97
9      Memo, Bates AZSER 10626743, was
10     marked for identification.)
11             - - -
12 BY MR. ALLEN:
13     Q.   Is this one of the documents
14 you reviewed in preparation for your
15 deposition?
16     A.   I've seen this document
17 before, yes.
18     Q.   When did you see this
19 document?
20     A.   It was a while ago.  I don't
21 recall exactly when.
22     Q.   Did you see it as part of
23 your job responsibilities and duties at
24 AstraZeneca regarding Seroquel?

Page 736

1      A.   No.
2      Q.   What did you see it as part
3  of?
4      A.   Excuse me, you asked the
5  question did I see this document as part
6  of my job responsibilities.  I took that
7  to mean did I see it as part of -- in
8  1997, the answer would be no.
9      Q.   You said you -- I apologize
10 for the confusion.  You said you reviewed
11 this document before?
12     A.   I've seen this document
13 before, yes.
14     Q.   Did you review the document
15 I asked you?  I know you've seen it.
16     A.   I've looked at this document
17 and I've read this document before, yes.
18     Q.   And in what role or capacity
19 did you do so?
20     A.   It was in preparation for
21 this deposition.
22     Q.   I asked you that earlier.
23 And so this -- the answer is yes, Mr.
24 Allen, I reviewed this document in

Page 737

1  preparation for my deposition.  Is that
2  correct?
3      A.   That's correct.
4      Q.   Thank you.
5          It says -- it's regarding
6  study 15, is it not?
7      A.   It says, "US/Canada
8  Investigator meeting and Study 15," yes.
9      Q.   It says, "I am not 100%
10 comfortable with this data..."  Now, what
11 did you believe Mr. Lawrence did at the
12 time or Dr. Lawrence did?
13     A.   To be honest with you, I
14 don't know what his role was.
15     Q.   No idea?
16     A.   No idea.
17     Q.   You know he's writing this
18 to Lisa Arvanitis, Dr. -- is it
19 Arvanitis?
20     A.   He's writing it to Don
21 Stribling but copying in Lisa and others.
22     Q.   Did I pronounce it
23 correctly, Arvanitis?
24     A.   Arvanitis or Arvanitis.  To

Page 738

1  be honest with you -- Arvanitis.  I call
2  her Lisa Arvanitis.  It may be Arvanitis,
3  I don't recall.
4      Q.   You pronounce it Arvanitis?
5      A.   That's what I said, yes.
6      Q.   Thank you, sir.
7          And he says, "Lisa has done
8  a great 'smoke-and-mirrors' job."  Do you
9  see that, sir?
10     A.   That's what's written here,
11 yes.
12     Q.   Now, Lisa is the one that
13 signed the NDA including reporting the
14 data of study 15.  Correct?
15     A.   That's correct.
16     Q.   And as we've seen, the
17 report of study 15 is contained in the
18 appendix which we marked as Scott-41.
19 Correct?
20     A.   It's contained in the
21 integrated summary of safety as well as
22 in the clinical trial report form, trial
23 15.
24     Q.   Which is contained in the

106 (Pages 735 to 738)

Confidential - Mark S. Scott, Ph.D.

Page 739

1  appendix, Table 11.1.3 is in that
2  appendix, Scott-41.  Correct?
3      A.  Yes, it is.  It's all part
4  of the integrated summary of safety, yes.
5      Q.  "Adopting the approach Don
6  has outlined should minimize (and dare I
7  venture to suggest) could put a positive
8  spin (in terms of safety) on this cursed
9  study."  Did I read that correctly, sir?
10     A.  You've read that correctly.
11     Q.  Yes, sir.  The results that
12  study 15, at least at the time they were
13  tabulated internally at AstraZeneca in
14  1996 and 1997, AstraZeneca was quite
15  concerned with the safety results of
16  study 15, were they not?
17     A.  No, I wouldn't characterize
18  that.
19     Q.  Do you recall there being a
20  discussion about ditching the data from
21  study 15 prior to an American Psychiatric
22  Association meeting?
23     A.  No, I never recall a
24  conversation like that at all.

Page 740

1      Q.  Who was Diane Davies, and
2  what was her role back in the late '90s
3  concerning Seroquel, if you know?
4      A.  I don't have any idea.
5      Q.  Do you recall who Nick Hough
6  or Hough, H-O-U-G-H, was with regard to
7  Seroquel?
8      A.  No, I don't.
9      Q.  There's one thing you do
10  recall, though, sir, and I'm sure you
11  reviewed in preparation for your
12  deposition, and that would be Scott
13  Exhibit Number 45.
14          - - -
15      (Exhibit Scott-45, 8/13/97
16      Memo, Bates AZSER 10612514 & 2515,
17      was marked for identification.)
18          - - -
19  BY MR. ALLEN:
20      Q.  You recall receiving this
21  and you recall reviewing it for your
22  deposition, do you not?  Here you go.
23      A.  Yes, I do.  I recall seeing
24  this before.  Receiving it, again, it was

Page 741

1  1997, but I saw it more recently and
2  reviewed it prior to today.
3      Q.  And this, of course, was
4  written by Dr. Lisa Arvanitis who signed
5  the new drug application on Seroquel, and
6  submitted it to the FDA, and who was the
7  international project physician.  Is that
8  correct?
9      A.  Yes.
10     Q.  And as you said, she was the
11  international project physician on
12  Seroquel whose responsibility it was to
13  lead the position team and the
14  interpretation of the clinical
15  significance of the clinical trial data
16  on Seroquel.  True?
17     A.  Correct.
18     Q.  She wrote an e-mail back in
19  August of 1997, is this before Seroquel
20  was even approved by the FDA?
21     A.  Excuse me.  Yes, August was
22  prior to the approval.  Yes.
23     Q.  Yes, sir.  Yesterday I
24  believe I heard you testify something

Page 742

1  like this, and correct me if I'm wrong.
2  You said -- I think Mr. Brock asked you
3  what a statistician is.  You said
4  something along these lines:  It's my
5  responsibility to review data, interpret
6  data, and display data with my
7  interpretation.  Do you recall an answer
8  generally along those lines?
9          MR. BROCK:  Object to the
10     form.
11         THE WITNESS:  Again, one of
12     my roles as a statistician is to
13     help a clinician understand the
14     data we've collected, to help
15     understand how it was collected,
16     methods for analysis and
17     presentation, yes.
18  BY MR. ALLEN:
19     Q.  So the answer to my question
20  is yes?
21     A.  If you said that, then I
22  would agree with you, yes.
23     Q.  So part of your job as
24  statistician is to review data, interpret

107 (Pages 739 to 742)

Confidential - Mark S. Scott, Ph.D.

Page 743

1  data and communicate data and display the
2  data in the studies that are conducted?
3      A.   Correct.
4      Q.   And you also said part of
5  the role that what AZ, AstraZeneca, had
6  done concerning the integrated safety
7  summary or a clinical trial report or a
8  synopsis was to interpret the data that
9  they find.  Correct?
10     A.   That role is to -- the
11  integrated summary of safety serves a
12  role of bringing together all the
13  information in one place to be able to
14  look at that from a comprehensive view.
15     Q.   Yes, sir.  And, in fact,
16  prepare a summary of what the data says.
17  Is that correct?
18     A.   Yes.
19     Q.   Correct?
20     A.   Correct, yes.
21     Q.   And to give your summary
22  interpretation of what the data says in
23  the studies that are being reviewed.
24  Correct?

Page 744

1      A.   That is the intent of the
2  ISS, to describe the safety findings that
3  were seen in the clinical trial program,
4  yes.
5      Q.   And AstraZeneca has that job
6  when it reviews and interprets the data
7  from the studies that it submits to the
8  FDA?
9      A.   Yes, we do.
10     Q.   And it's had that job since
11  1996 at the time they submitted the
12  Seroquel?
13     A.   Yes, we do.
14     Q.   First of all, do you know
15  whether or not Dr. Arvanitis', the
16  international project physician's e-mail
17  of August 13, 1997, was submitted as part
18  of the NDA?  Do you recall why that done?
19     A.   Well, I know that all of the
20  data in here which is dealing with
21  changes in weight was provided to the FDA
22  as in trial 15.  As I recall, some of the
23  figures here were submitted as part of
24  trial 15 as well.

Page 745

1      MR. ALLEN:  Objection.
2  Nonresponsive.
3  BY MR. ALLEN:
4      Q.   Sir, my question to you was,
5  was Dr. Arvanitis' e-mail, which we've
6  marked as Scott Exhibit 45, was this
7  e-mail given to the FDA at the time of
8  the new drug application in 1996 or at
9  any time as we -- up to as we sit here
10  today in September of 2009?
11     MR. BROCK:  Object to the
12  form.
13     THE WITNESS:  Well, again,
14  the data from trial 15, all the
15  clinical trial data from 15 are
16  included as part of the NDA.  Now,
17  I'm not exactly sure -- this
18  e-mail is looking for a request to
19  do some additional work, and I
20  know at the end here there's a
21  question about looking up some
22  additional data.  What I don't see
23  here is the actual conclusions
24  that were drawn as a result of all

Page 746

1  of this because right now we have,
2  you know, some comments based on
3  some data, and I don't see this as
4  a formal analysis, I just see this
5  as someone looking at data and
6  asking similar questions.  So
7  there's additional questions that
8  are being addressed here that she
9  would like to have addressed.
10  What I don't see is the -- what's
11  the follow up to this.
12     MR. ALLEN:  Objection.
13  Nonresponsive.
14  BY MR. ALLEN:
15     Q.   Let me see if I can -- you
16  can answer my question.  Was Exhibit 45
17  submitted to the FDA along with the new
18  drug application in 1996?
19     A.   No, it wasn't, but I
20  wouldn't expect it to be because this is
21  an individual who is interested in some
22  aspects of the data and asking some
23  questions of the statistician about
24  what's going on.  And I see here a

108 (Pages 743 to 746)

Confidential - Mark S. Scott, Ph.D.

Page 747

1  request for some more information, but I
2  don't see what happened after that.
3      Q.   By the way, can you get out
4  Plaintiff's Exhibit 8?
5      A.   Could you please get out
6  Plaintiff's Exhibit 8.
7      Q.   Let me see something.  Tell
8  the jury what Plaintiff's Exhibit 8 is?
9      A.   Plaintiff's Exhibit 8 is the
10 clinical trial summary for trial 15,
11 which is the high level summary that sits
12 on top of the entire clinical trial
13 report for trial 15.
14     Q.   Can you hand me, please, the
15 Exhibit Number 8?  Thank you.
16         Does Exhibit Number 8, in
17 fact, report that weight gain in
18 association with Seroquel was dose
19 related?
20     A.   Again, the clinical trial --
21 excuse me, the clinical trial report
22 contains the high level findings from
23 that clinical trial, and then I would
24 expect to find all the data related to

Page 748

1  weight in the clinical trial itself,
2  so...
3         MR. ALLEN:  I just need to
4  object to that as nonresponsive.
5  BY MR. ALLEN:
6      Q.   Does this report that the
7  weight gain in regard to Seroquel was
8  dose related?
9         MR. BROCK:  Do you want to
10 give that back to him?
11        MR. ALLEN:  Yes, sir, I do.
12 I'm going to hand it to you.
13        THE WITNESS:  Yes, at the
14 bottom of page -- the top of page
15 vii, Roman numeral vii states:
16 "There also appeared to be
17 dose-related increase in the
18 proportion of patients with
19 clinically significant weight gain
20 among SEROQUEL groups."
21 BY MR. ALLEN:
22     Q.   Can you -- I want you to
23 read that very slowly for the court
24 reporter and the jury so they can hear

Page 749

1  you, what Exhibit Number 8, is that the
2  clinical trial report summary of study
3  15, sir?
4      A.   It says: "There also
5  appeared to be a dose-related increase in
6  the proportion of patients with
7  clinically significant weight gain among
8  SEROQUEL groups."
9      Q.   Yes, sir.  So it's true, so
10 the jury understands it, that the weight
11 gain associated with Seroquel is, in
12 fact, dose related, is it not?
13        MR. BROCK:  Object to the
14 form.
15        THE WITNESS:  Again, I would
16 say it appears, I think those
17 words were probably chosen with
18 caution given this is one study.
19 And I can't go to the exact
20 conversation that we had, but my
21 interpretation would be it appears
22 it's probably appropriate for the
23 data over there.
24        MR. ALLEN:  Objection.

Page 750

1      Nonresponsive.
2  BY MR. ALLEN:
3      Q.   My question to you was,
4  isn't it true that the weight gain
5  associated with Seroquel is dose related?
6         MR. BROCK:  Object to form.
7         THE WITNESS:  It's written
8  here that it appears related, dose
9  related, and I would have an
10 interpretation that factually --
11 not factually, but to make a
12 categorical statement that it is
13 dose related, I think goes beyond
14 the data that are presented here.
15 BY MR. ALLEN:
16     Q.   Is the best evidence that
17 you have as you sit here today in
18 September of 2009 is that the weight gain
19 with Seroquel is dose related?
20        MR. BROCK:  Object to form.
21        THE WITNESS:  I know that we
22 have information in our label
23 about weight gain and it being
24 dose related, so the information I

Confidential - Mark S. Scott, Ph.D.

Page 751

1    think does appear in the label.
2          MR. ALLEN: Objection.
3    Nonresponsive.
4          THE WITNESS: I don't have
5    an opinion of whether it was dose
6    related or not. I haven't looked
7    at that question in detail.
8    BY MR. ALLEN:
9          Q.   So the witness examined by
10   Mr. Brock, the statistician with your
11   background and training and the position
12   you hold as direct -- executive director
13   of Seroquel on the Seroquel U.S.
14   development team and a member of the
15   global brand team on Seroquel does not
16   have an opinion as of September the 24th,
17   2009, as to whether or not Seroquel's
18   weight gain is dose related. Is that
19   true?
20         MR. BROCK: Object to form.
21         THE WITNESS: I can say from
22   this clinical trial there's a
23   statement that it appears to be
24   dose related. But that I think

Page 752

1    you're asking me a very different
2    question in looking across the
3    clinical trial program, and I
4    don't think I have done that or
5    looked at that data.
6    BY MR. ALLEN:
7          Q.   So as we sit here in
8    September of 2009, you cannot give the
9    jury an opinion one way or the other as
10   to what the statistics from the clinical
11   trials at AZ show concerning weight gain
12   and dose?
13         A.   To be honest, I haven't
14   looked at that. I've looked at that
15   clinical trial report, but I also -- we
16   presented some information with respect
17   to the advisory committee in the spring
18   with respect to changes in weight across
19   the clinical trial program, but I have to
20   go back and look at what we said in terms
21   of changes in weight.
22         Q.   What we do know is that in
23   the clinical trial report summary
24   submitted to the FDA, Scott Exhibit 8,

Page 753

1    you said that the study 15 clinical trial
2    data appeared to support a dose-related
3    weight gain from Seroquel. Is that
4    right?
5          MR. BROCK: Object to form.
6          THE WITNESS: The statement
7    in the clinical trial -- the
8    clinical trial summary says:
9    "There also appeared to be a
10   dose-related increase in the
11   proportion of patients with
12   clinically significant weight gain
13   among SEROQUEL groups."
14   BY MR. ALLEN:
15         Q.   By the way, Dr. Arvanitis'
16   e-mail, Exhibit 45, have you ever gone
17   back since the time this e-mail is
18   written up until today and talked to Dr.
19   Arvanitis about this e-mail?
20         A.   I don't recall any
21   conversation with Lisa about this.
22         Q.   Lisa? And by the way --
23         A.   Dr. Arvanitis, I'm sorry.
24         Q.   Well, I heard you call her

Page 754

1    Lisa then. You called her Lisa. You're
2    on a first name basis with Dr. Arvanitis.
3    Is that correct?
4          A.   At the time when I was
5    working with Dr. Arvanitis, we were on a
6    first name basis, yes.
7          Q.   And so all you can tell us
8    -- since you reviewed this back in 1997,
9    you've never spoken to her about this
10   e-mail. Is that true?
11         A.   She's requesting a certain
12   amount of additional analyses here, and I
13   don't see what her thoughts are. This is
14   just some speculation about something
15   she's looking at. I don't know what
16   she's looking at right here. I'd like to
17   see what the follow up is opposite her
18   request.
19         MR. ALLEN: Objection.
20         Nonresponsive.
21   BY MR. ALLEN:
22         Q.   My question to you is:
23   Since the time Dr. Arvanitis wrote you
24   this e-mail, have you ever discussed this

110 (Pages 751 to 754)

Confidential - Mark S. Scott, Ph.D.

Page 755

1    with Dr. Arvanitis?
2         A.   No, I have not discussed
3    this e-mail.
4         Q.   So all you've done is
5    received this e-mail from Dr. Arvanitis
6    and you never went to Dr. Arvanitis and
7    met with her on the e-mail.  Is that
8    correct?
9         A.   The individuals on here,
10   John Monyak, Barbara Kowalcyk, are
11   statisticians that were working on
12   Seroquel at the time and they were doing
13   the work with respect to Lisa on this.
14        Q.   So the answer to my question
15   is, that's correct, Mr. Allen, I never
16   spoke to Dr. Arvanitis about this e-mail?
17        A.   There was -- again, I
18   haven't spoken to her on it.  But again,
19   I look here as a request for some
20   additional information, and I'd like to
21   see what happened as a result of this.
22        MR. ALLEN:  Objection.
23        Nonresponsive.
24   BY MR. ALLEN:

Page 756

1         Q.   Sir, now, we've established
2    you didn't speak to Dr. Arvanitis.  Did
3    you reply to this e-mail that Dr.
4    Arvanitis wrote you?
5         A.   To be honest with you, I
6    don't know.
7         Q.   Okay, sir.  Now, the e-mail
8    was, in fact, written and directed to
9    you, was it not, as one of the
10   recipients?
11        A.   I was one of the recipients,
12   yes.
13        Q.   And the jury would have seen
14   this, but Dr. Arvanitis makes many
15   statements concerning study 15, does she
16   not?
17        MR. BROCK:  Object to the
18        form.
19   BY MR. ALLEN:
20        Q.   Let me ask this:  Doesn't
21   Dr. Arvanitis in Plaintiff's Mark Scott
22   Exhibit 45 make actual statements
23   concerning study 15?
24        A.   She's commenting on it looks

Page 757

1    like the data from trial 15.  I can't
2    be -- well, she's looking at data from
3    all trials, trials 15 alone and all
4    trials without study 15.
5         Q.   Right.  And she records that
6    in here.  She says I looked at weight
7    gain for all trials, 15 all alone, and
8    all trials without 15.  Is that correct?
9         A.   Yes, she has.
10        Q.   And she says that -- there's
11   one thing she says, she says, "We
12   know...," do you see the word "know"?
13        A.   Where is "We know," I'm
14   sorry?
15        Q.   See where she says, "We know
16   we have weight gain"?
17        A.   I'm still on this document
18   here, I'm trying to look for it.
19        Q.   Second full paragraph under
20   "The purpose of this analysis...," do you
21   see where she says this is an analysis?
22        A.   I'm sorry, I'm just going
23   through this line by line.  "...I was
24   really struck by how consistent the data

Page 758

1    was."  Across pools and across cohorts.
2    So where is the "we?"
3         Q.   It says, "We know we have
4    weight gain..."
5         MR. BROCK:  Paragraph 1.
6         THE WITNESS:  Okay, I'm
7         sorry.  Okay.  I've got it, yes.
8    BY MR. ALLEN:
9         Q.   So doesn't she say she is
10   doing an analysis?
11        A.   Well, to be honest with you,
12   I don't know what data she's actually
13   looking at.  So I can't comment on what
14   data are in front of her, what the data
15   were based on and what purpose it was
16   opposite the data that were in the NDA.
17        Q.   I thought we just
18   established that she had in front of her
19   all trials, 15 alone and all trials minus
20   15.  She said it right here, didn't she?
21        A.   You're asking me to comment
22   on a set of data which I don't see.  So I
23   can't offer any sort of comment about
24   what she's saying opposite the -- I can't

111 (Pages 755 to 758)

Confidential - Mark S. Scott, Ph.D.

Page 759

1    comment on it because I just don't know
2    what she's looking at.
3        Q.   So you can't comment on what
4    she's saying?
5        A.   No.  Because if you provide
6    to me what she was looking at and then
7    the follow up, I might have a better
8    idea.
9        Q.   So when she wrote you as a
10   recipient of this in 1997, when she says
11   we know we have weight gain and she tells
12   you "...I was really struck by how
13   consistent the data was," do you see
14   that, sir?
15       A.   I see that, yes.
16       Q.   Is she -- does she look like
17   she's asking a question about the data or
18   is she making a statement about the data?
19   "...I was really struck by how consistent
20   the data was."  Isn't that what she says?
21       A.   I can't comment about what
22   she's inferring from that.  She has a
23   comment about what she's looking at, but
24   without having what she was looking at, I

Page 760

1    can't make any comment.
2        Q.   Well, then the next sentence
3    she tells you, she says, "Across pools
4    (all trials, 15 alone, all trials - 15),
5    across parameters/measures (mean change
6    from baseline, change from baseline,
7    proportion with clinically significant
8    weight gain), and across cohorts (various
9    durations of treatments) the results seem
10   to be consistent and show."  Isn't that
11   what she writes?
12       A.   Again, she's writing that,
13   but she's commenting on the data summary
14   across, I don't know what she's looking
15   at, so it's hard for me to make any
16   comment whatsoever on what she is
17   inferring given that I don't have the
18   data in front of me.
19       Q.   Just to put it all in
20   context, sir, Dr. Arvanitis as of August
21   the 13th, 1997, had reviewed the clinical
22   trials to support the NDA, had signed off
23   and submitted them and had undertaken the
24   role as international project physician

Page 761

1    that you previous discussed.  Correct?
2        A.   Yes, that was her role.
3        Q.   You told us she was
4    competent, she did a good job and you had
5    no problem working with her and she knew
6    what she was doing.  Right?
7        A.   Yes, indeed.
8        Q.   So she's reporting to you on
9    the topic of weight gain in the clinical
10   trials, is she not?
11       A.   She's reporting to me about
12   observations from the data summary from
13   the clinical trials.  I see that she's
14   making some statements here.  She's also
15   making some additional questions, and I
16   don't know how the additional questions
17   were related -- or the answer to the
18   additional questions are related to what
19   she has here.
20            So right now I have a memo
21   with a bunch of observations without any
22   data behind it.  So it's hard for me to
23   make any comment whatsoever about what
24   these actual values are and how she's

Page 762

1    interpreting them.
2        Q.   Well, Dr. Arvanitis was
3    aware of the data at the time in 1997
4    before she signed off on the new drug
5    application, wasn't she?
6        A.   Yes, she was.
7        Q.   And Dr. Arvanitis was not
8    one to draft e-mails making statements
9    about the clinical trial data that she
10   did not feel were accurate, was she?
11       A.   I don't think that this is
12   saying this is inaccurate.  All I'm
13   saying is she has asked -- she's asked to
14   look at some data, some information that
15   had been presented to her.  I don't know
16   what the content of that is.  And she has
17   some follow-up additional questions which
18   she's highlighted here, and I don't see
19   what those are.
20            MR. ALLEN:  Objection.
21       Nonresponsive to the last portion.
22   BY MR. ALLEN:
23       Q.   But let's get us off what
24   she did.  The results, what are results,

112 (Pages 759 to 762)

Confidential - Mark S. Scott, Ph.D.

Page 763

1  sir, what are results of clinical trials?
2  Are those questions or findings?
3      A.   Again, I know what the
4  results of clinical trials are.  And
5  she's talking about data from clinical
6  trials here, but I don't know what
7  results she's referring to because
8  specific questions have been asked, data
9  summaries apparently have been generated
10 and she's commenting on those data
11 summaries.  So, again, I don't know the
12 context for this, what's been asked of
13 her and then what the follow up is with
14 respect to the request.
15     Q.   Doesn't she, in fact, say
16 she was struck how consistent the data
17 was, she describes the data cohort she
18 looks at, she talks about "...the results
19 seem to be consistent and show."  Do you
20 understand the word "show"?
21     A.   I understand that she's
22 written that, but I can't understand -- I
23 don't understand because I don't have the
24 information in front of me, about what

Page 764

1  data she's looking at and what her end --
2  her end beliefs are because she's asking
3  for some more information to help her
4  understand these observations.
5      Q.   Sir, do you remember
6  answering a lot of questions about --
7  from Mr. Brock about what does the data
8  show, what's the data show, what's the
9  data show?
10     A.   Yes.
11         MR. BROCK:  Object to form.
12 BY MR. ALLEN:
13     Q.   Did you -- did you -- did
14 you personally --
15         MR. BROCK:  Whoa, whoa,
16     whoa.  Wait just a second.  Please
17     give just a little pause to let me
18     get my objection in if I need to.
19     Object to the form.
20 BY MR. ALLEN:
21     Q.   Sir, in all those tables
22 that you looked at with the data with Mr.
23 Brock, did you personally perform those
24 studies and calculate the data and the

Page 765

1  table that Mr. Brock used?
2      A.   Some of them I probably
3  would have with respect to the early
4  clinical trials with quetiapine, yes.
5      Q.   Would the -- some of them
6  you said you probably would have.  So
7  just so the jury understands, most of the
8  testimony that you gave to Mr. Brock
9  concerning data and what you think it
10 shows statistically did not come from
11 your own personal work that you did on
12 Seroquel, did it?
13     A.   It did not, but, however, I
14 think I have enough experience that I can
15 offer commentary on those specific values
16 in those specific trials, yes.
17     Q.   So that's what you were
18 doing with Mr. Brock, was offering
19 commentary on trials that you didn't work
20 on primarily.  Is that right?
21         MR. BROCK:  Object to form.
22         THE WITNESS:  I was offering
23     my belief about those results from
24     the statistical perspective for

Page 766

1      each of those placebo-controlled
2      clinical trials.
3  BY MR. ALLEN:
4      Q.   Yes, sir.  And Dr. Arvanitis
5  back in 1997 was actually working on the
6  clinical trials, wasn't she?
7      A.   Yes, she was.
8      Q.   When she says the data show,
9  the first thing she says, "Weight gain is
10 more rapid initially," doesn't she?
11     A.   That's what's written there,
12 yes.
13     Q.   She says, "It doesn't
14 stop...the slope just appears to change."
15 Isn't that true, sir?
16         MR. BROCK:  Object to form.
17         THE WITNESS:  That's what
18     she has written there, yes.
19 BY MR. ALLEN:
20     Q.   She says, "The magnitude of
21 weight gain at 52 weeks (regardless of
22 the pool or cohort) is about 5 kg...,"
23 and then 5 kilograms we know would be
24 12 pounds, would it not, sir?

113 (Pages 763 to 766)

Confidential - Mark S. Scott, Ph.D.

Page 767

1   A.   11 pounds.
2   Q.   11 pounds, that's right.  Is
3  about 11 pounds, "...which is more than
4  the short-term 6 week weight gain."
5  Didn't she say that?
6   A.   She has written that, yes.
7   Q.   So she's saying that the
8  data show from the trials she's
9  reviewing, is that weight gain -- that,
10  first of all, there is weight gain with
11  Seroquel.  Right?
12   MR. BROCK:  Object to form.
13   MR. ALLEN:  Is that an
14  objection to that?
15   MR. BROCK:  Yes, it is.
16   MR. ALLEN:  What was the
17  objection?
18   MR. BROCK:  Because I'm not
19  sure if you're asking him to draw
20  that conclusion or if you're
21  reading from the letter from your
22  question, or the e-mails.
23   MR. ALLEN:  Is that your --
24   MR. BROCK:  That is my

Page 768

1  objection.
2   MR. ALLEN:  Thank you.
3  That's all I ask for.
4  BY MR. ALLEN:
5   Q.   Dr. Arvanitis relayed to you
6  in August 1997 that the data she reviewed
7  showed that, number one, there was weight
8  gain associated with Seroquel.  Right?
9   A.   She has written that, yes.
10   Q.   Number two, the weight gain
11  is more rapid initially.  Correct?
12   A.   She has written that -- she
13  has written that down, yes.
14   Q.   While the weight gain slows,
15  it doesn't stop, the slope just appears
16  to change.  She said that, didn't she?
17   A.   Again, she's saying that.
18  But again, I can't comment on what she is
19  saying because I have no data in front of
20  me.
21   Q.   And Dr. Arvanitis in 1997
22  said that the magnitude of the weight
23  gain at 52 weeks is more than the
24  short-term weight gain.  Correct?

Page 769

1   A.   She has written that down,
2  yes.
3   Q.   And that the proportion of
4  patients with clinically significant
5  weight gain at 52 weeks is about
6  45 percent, and this is more than at six
7  weeks.  She says that, doesn't she?
8   A.   She has written that down,
9  yes.
10   Q.   Have you ever said that in a
11  package insert on Seroquel, that over
12  time Seroquel weight gain increases and
13  that over 52 weeks, the clinical trials
14  show that 45 percent of patients will
15  gain clinically significant weight?
16   A.   Well, all of the clinical
17  trial data were summarized and provided
18  to the FDA.  And the labeling was agreed,
19  and it reflects those clinical trial
20  data.  Now, here, these are statements
21  that are made in an e-mail.  They're not
22  a formal document from AstraZeneca
23  regarding this.  So I want to see if
24  something formally was done with this

Page 770

1  that would require us to have any change
2  to our existing labeling as a result of
3  these analyses.
4   So she's made some
5  observations.  She's requesting some
6  additional work to be done, and I see
7  this as an e-mail and not a formal
8  AstraZeneca document, documenting a
9  particular variable.  So right now I have
10  an e-mail in front of me, this is not
11  evidence.
12   MR. ALLEN:  Objection.
13  Nonresponse.
14  BY MR. ALLEN:
15   Q.   Do you remember the question
16  I asked you?
17   A.   Something about information
18  that was in the label.  So my expectation
19  would be --
20   Q.   Sir, is there a question on
21  the table now?
22   MR. BROCK:  Don't cut him
23  off.  There was a question on the
24  table.

114 (Pages 767 to 770)

Confidential - Mark S. Scott, Ph.D.

Page 771

1      THE WITNESS: My expectation
2  would be that information that
3  gets in the label is through
4  formal documents that are
5  submitted to the FDA that review a
6  particular subject. What I have
7  here is an e-mail, that's not a
8  formal document, that is a formal
9  analysis attached to it.
10      MR. ALLEN: Objection.
11  Nonresponsive.
12  BY MR. ALLEN:
13      Q.  Sir, my question to you was:
14  Have you ever, you being AstraZeneca,
15  placed within the label that 45 percent
16  of Seroquel patients will gain clinically
17  significant weight at 52 weeks, and that
18  this will be more weight gain than seen
19  at six weeks? Have you ever said that
20  you, AstraZeneca, in the label?
21      MR. BROCK: Object to form.
22      THE WITNESS: That
23  information -- the information
24  that's in the label reflects the

Page 772

1  clinical trials data for weight
2  gain that was agreed with the FDA.
3  Now here I'd have to look at the
4  data itself and whether that
5  information would be warranted to
6  be part of the label as a result
7  of a formal analysis and a formal
8  presentation. But all of this
9  data including the information
10  about clinically significant
11  weight gain was included with the
12  FDA as part of the integrated
13  summaries and as part of the
14  individual clinical trial report.
15      MR. ALLEN: Objection.
16  Nonresponsive.
17  BY MR. ALLEN:
18      Q.  Do you remember my question?
19      A.  Yes, I do.
20      Q.  The question was, have you
21  ever, AstraZeneca, placed within the
22  label that weight gain for Seroquel
23  patients according to the clinical trials
24  that were submitted in the NDA as of

Page 773

1  August of 1997 showed that 45 percent of
2  Seroquel patients would gain clinically
3  significant weight at 52 weeks which is
4  more than the weight gain at six weeks?
5      MR. BROCK: Object to form.
6      THE WITNESS: But, again,
7  this is a statement in an e-mail.
8  This would have to be looked at in
9  terms of was this based on three
10  patients, was this based on ten
11  patients. And obviously data were
12  there. And I don't see the data
13  upon which this is based, and then
14  the follow-up work that was asked
15  of Lisa to both John and Barbara.
16      MR. ALLEN: Objection.
17  Nonresponsive.
18  BY MR. ALLEN:
19      Q.  But I guess the answer to my
20  question is, Mr. Allen and members of the
21  jury, no, we never said in our label that
22  45 percent of Seroquel patients would
23  gain clinically significant weight within
24  a year. Is that true?

Page 774

1      MR. BROCK: Object to form.
2      THE WITNESS: That
3  information, that specific
4  information does not appear in the
5  label. But the information that
6  is in the label, that was included
7  in the label at the time of
8  initial approval, was agreed with
9  the FDA and they had access to all
10  of this as part of their review
11  to -- for the initial
12  applications.
13      MR. ALLEN: Objection to
14  portion of the answer as
15  nonresponsive.
16  BY MR. ALLEN:
17      Q.  By the way, did I hear you
18  say you don't know if Dr. Arvanitis was
19  looking at just three patients? Did you
20  say something like that?
21      A.  No, you asked me -- all I've
22  done is I've said that I don't know how
23  much weight data are out at 52 weeks from
24  the initial filing that we have. So I

115 (Pages 771 to 774)

Confidential - Mark S. Scott, Ph.D.

Page 775

1  don't know upon what data she's basing
2  this. So, again, I don't have any data
3  in front of me to look at what she has
4  said versus anything else in this memo.
5      Q.   Let's look at page 2 of
6  Exhibit 45, e-mail to Dr. Arvanitis, the
7  international project physician on
8  Seroquel. Are you with me?
9      A.   Yes.
10     Q.   Let me see, you said Dr.
11 Arvanitis had a lot of questions. Is
12 this one of the questions we had, "We
13 know that weight gain is dose related"?
14         MR. BROCK: Object to the
15     form.
16 BY MR. ALLEN:
17     Q.   Do you see that, sir?
18         MR. BROCK: Hang on. It's
19     argumentative. I move to strike
20     the argumentative portion. You
21     may answer the question.
22         THE WITNESS: She's written
23     that down, yes.
24 BY MR. ALLEN:

Page 776

1      Q.   Didn't Dr. Arvanitis, in
2  fact, relay to you in August of 1997,
3  this statement: "We know that weight
4  gain is dose related"?
5      A.   That is in this e-mail so it
6  was related to me by e-mail, but again, I
7  can't speak to all that's going into the
8  statements here.
9      Q.   Does that appear to be a
10 question by Dr. Arvanitis?
11     A.   Again, it's a statement in
12 an e-mail by Dr. Arvanitis.
13     Q.   It's not a question, is it?
14     A.   No, it not a question.
15     Q.   And when Dr. Arvanitis told
16 you and others at AstraZeneca in August
17 of 1997 that we know that weight gain is
18 dose related, did you ever write her an
19 e-mail back suggesting anything to the
20 contrary?
21     A.   No, I did not.
22     Q.   Did you ever indicate with
23 Dr. Arvanitis that you disagreed with
24 this statement "We know that weight gain

Page 777

1  is dose related"?
2      A.   No, I did not.
3      Q.   Did you ever prepare any
4  document, any presentation, any memo, or
5  call any superior and say that is
6  incorrect, Dr. Arvanitis is wrong, weight
7  gain is not dose related?
8          MR. BROCK: Object to the
9      form.
10         THE WITNESS: We provided
11     data as part of the clinical trial
12     reports as well as part of the
13     integrated summaries reflecting a
14     comprehensive analysis of the
15     Seroquel data at that time. And
16     that's what appears in those
17     documents as well as the relevant
18     parts that came as part of the
19     labeling.
20         MR. ALLEN: Objection.
21     Nonresponsive.
22         MR. BROCK: Hang on just one
23     second. This doesn't need to be
24     on the record.

Page 778

1          VIDEOGRAPHER: Shall we go
2      off the record?
3          MR. BROCK: You can go off
4      the record just one second.
5          VIDEOGRAPHER: Off the
6      record. 5:13.
7              - - -
8          (A recess occurred.)
9              - - -
10         VIDEOGRAPHER: Back on the
11     record. 5:14.
12 BY MR. ALLEN:
13     Q.   Sir, we're back to Dr.
14 Arvanitis who you -- I think you and she
15 worked together closely and signed the
16 NDA. Right?
17     A.   Lisa and I worked together
18 on the ISS and the ISE for Seroquel, yes.
19     Q.   Do you know where Dr.
20 Arvanitis is today, where she's working
21 and where she resides?
22     A.   No, I don't.
23     Q.   If I needed to locate her,
24 do you have any -- can you give me a clue

116 (Pages 775 to 778)

Confidential - Mark S. Scott, Ph.D.

Page 779

1  where she might be?
2      A.   I know that she went to
3  another company, but I don't recall if
4  she's there right now.
5      Q.   Have you ever spoken with
6  Dr. Arvanitis about this Seroquel
7  litigation?
8      A.   No, I have not.
9      Q.   Have you ever -- let me go
10 back to Dr. Arvanitis' statement.  Just
11 to put the jury back in context, this is
12 a statement she made to you back in
13 August of 1997.  Right?
14     A.   It's in this e-mail, yes.
15     Q.   Isn't that how you normally
16 communicated, was through e-mail,
17 telephones and meetings, memos?
18         MR. BROCK:  Objection to
19     form.
20         THE WITNESS:  Part of the
21     communication is through e-mails,
22     yes.
23 BY MR. ALLEN:
24     Q.   Meetings?

Page 780

1      A.   Yes, we would meet on
2  occasion as well.
3      Q.   Telephone conversations.
4  Right?
5      A.   Not many of those, but
6  mainly face-to-face meetings.
7      Q.   And writing.  This is in
8  writing, it's written down.  Right?
9      A.   Correct.  But again, this is
10 an e-mail and this isn't a formal summary
11 of a clinical trial document.  It's
12 observations on something which I don't
13 know what it is, and I don't see what the
14 follow up is as well.
15     Q.   You don't know what it is.
16 It's an e-mail and a written document
17 from the project physician who signed the
18 NDA through to project statistician who
19 signed the NDA, and the topic is "Weight
20 gain," isn't it?
21     A.   It is.  But again, it's not
22 a -- this to me is a document which could
23 be a precursor to a more formal document.
24 She's asking for additional information.

Page 781

1  She's asking for additional work to get
2  done.  And so what I would like to see
3  is, what is the conclusion of all of this
4  as it relates to the questions that were
5  there on the table versus what she's
6  asking now.
7      Q.   In fact, Dr. Arvanitis has
8  already given a conclusion on page 2.
9  She says, "We know that weight gain is
10 dose related."  Right?
11         MR. BROCK:  Object to the
12     form.
13         THE WITNESS:  She's making
14     that statement.
15 BY MR. ALLEN:
16     Q.   Does it appear to be a
17 conclusion or a question?
18     A.   Again, this is an e-mail, so
19 I take this as being comments.  I don't
20 take this as the output of a clinical
21 trial report that I would put my name on.
22     Q.   It's not a clinical trial
23 report, is it, sir?
24     A.   No, it definitely is not.

Page 782

1      Q.   No, sir, but there's a
2  clinical trial report summary, Exhibit
3  Number 8 on study 15, that says weight
4  gain appears to be dose related.  Do you
5  recall that?
6      A.   Yes.
7      Q.   And now we have Dr.
8  Arvanitis after that report is prepared,
9  Exhibit Number 8 was prepared at the time
10 of the NDA, wasn't it?
11     A.   Again, I can't comment on
12 what her --
13     Q.   Sir, my question was --
14         MR. BROCK:  Don't cut him
15     off.
16 BY MR. ALLEN:
17     Q.   -- Exhibit 8 was prepared at
18 the time of the NDA.  Correct?
19         MR. BROCK:  Don't cut him
20     off.
21         THE WITNESS:  But I can't
22     comment on what she was saying
23     what we know that weight gain is
24     dose related.  I don't know -- I

117 (Pages 779 to 782)

Confidential - Mark S. Scott, Ph.D.

Page 783

1    mean, I don't know to what -- I
2    know what she's referring to, but
3    I can't say that that is
4    dissimilar to her thinking about
5    weight gain.
6         This -- again, this is an
7    e-mail, this is not part of a
8    formal clinical trial report or a
9    formal summary.  So if I had,
10   again, what she's looking at as
11   well as her follow-up requests for
12   additional analyses, that might
13   help the situation.
14   BY MR. ALLEN:
15       Q.   She says she knows that the
16   weight gain is dose related.  In any
17   form, fashion at all, did you try to
18   correct her or say you disagreed?  That's
19   my question.  In any fashion whatsoever.
20       MR. BROCK:  Object to the
21       form.  It's been asked and
22       answered several times.  You may
23       answer it one more time.
24       THE WITNESS:  I don't recall

Page 784

1    any conversation with Lisa about
2    that particular statement, no.
3    BY MR. ALLEN:
4        Q.   And you have never done a
5    statistical analysis as we sit here today
6    on September 24, 2009, concerning dose
7    and weight gain.  Is that true?
8        A.   I believe it was done as
9    part of the clinical trial report for
10   trial 15.
11       Q.   Other than that, my question
12   to you, you've never done such a
13   statistical analysis as we sit here at
14   5:20 p.m. Eastern Standard Time on
15   September 24, 2009.  Is that correct?
16       A.   I know that we've put data
17   to the FDA looking at changes in weight
18   by dose.  I personally didn't do the
19   analysis.  I reviewed the output and I
20   know we also presented data to the
21   advisory committee in April of this year
22   looking at changes in the weight by dose
23   as well for the MDD and GAD applications.
24   I didn't do those analyses, but they were

Page 785

1    presented to the FDA.
2        Q.   When Mr. Brock asked you
3    about them, you couldn't testify about
4    them.  Is that right?
5        A.   As I said, the focus of the
6    this exercise for me was the changes in
7    glucose, not weight.
8        Q.   So if Mr. Brock asked you
9    about it, you'd have to say I don't know
10   any more than I did back in August of '97
11   about weight gain and the clinicals
12   trials.  Is that right?
13       MR. BROCK:  Object to the
14       form.
15       THE WITNESS:  Well, the
16       weight -- changes in weight
17       appeared in the initial labeling
18       and I -- you know, if someone
19       wanted me to look at weight, I'd
20       be more than happy to look at
21       weight.
22   BY MR. ALLEN:
23       Q.   Have you looked at it as of
24   5:20 p.m. on September 24, 2009?

Page 786

1        A.   As I said, I reviewed
2    information that was submitted to the FDA
3    regarding changes in weight by dose.
4    Also we put together a presentation as
5    part of a safety presentation at FDA
6    regarding weight.  But I don't recall the
7    comments about that.
8        Q.   Sir, do you agree with the
9    fact that weight gain associated with
10   Seroquel is, in fact, dose related?  Do
11   you agree with that?
12       MR. BROCK:  Object to the
13       form.
14       THE WITNESS:  Again, the
15       formal analysis here in this trial
16       says it appears to be dose
17       related.  I don't know if we've
18       done a clinical trial specifically
19       looking at changes in weight by
20       dose.  Weight is part and parcel
21       of every clinical trial that we
22       conduct.  We display those results
23       by dose in any one of -- every one
24       of our clinical trials.  And we

Confidential - Mark S. Scott, Ph.D.

Page 787

1    present that information to the
2    FDA.
3    BY MR. ALLEN:
4        Q.   Why did your company go
5    ahead and tell doctors after 1997 that
6    Seroquel was weight neutral?  Why did
7    they do that?
8        A.   Could you --
9        MR. BROCK:  Object to the
10    form.
11        THE WITNESS:  -- enlighten
12    me, please?
13    BY MR. ALLEN:
14        Q.   Is Seroquel weight neutral,
15    sir?
16        MR. BROCK:  Object to form.
17        THE WITNESS:  I'd have to
18    look into what you're referring
19    to.
20    BY MR. ALLEN:
21        Q.   Let me ask you, as a
22    statistician who works for AstraZeneca
23    and who signed the NDA, is Seroquel
24    weight neutral?

Page 788

1        A.   What happens with
2    individual -- excuse me.  Excuse me.
3        What happens in clinical
4    trials and then translate that into
5    practice, I can't really comment.  We had
6    reported the changes in weight that we've
7    seen in our clinical trials.  I know work
8    has been done looking at changes in
9    weight and based on a lot of different
10    baseline factors.
11        Q.   Did you ever look at Dr.
12    Brecher's paper on weight in 2000?
13        A.   I've looked at it once, I
14    know that.
15        Q.   How do you know that?
16        A.   Just I recall reviewing a
17    lot of different articles in the review
18    of data prior to the advisory committees
19    and part of getting up to speed in terms
20    of what happened since I left.
21        Q.   So you reviewed Dr.
22    Brecher's 2000 article on weight gain,
23    did you find it to be inaccurate and
24    misleading?

Page 789

1        A.   Well, to be honest with you,
2    I recall reading it, but I don't recall
3    having any comment on it.
4        Q.   Let me hand you Scott
5    Exhibit 47.  Excuse me, sir.  I'll give
6    it to your lawyer to maintain it.
7        MR. ALLEN:  I'll be with you
8    in a minute, Mr. Brock.  Oh, here
9    it is.
10        - - -
11        (Exhibit Scott-47, The
12    long-term effect of quetiapine
13    (SeroquelTM) monotherapy on weight
14    in patients with schizophrenia,
15    was marked for identification.)
16        - - -
17    BY MR. ALLEN:
18        Q.   Now, this Exhibit 47 was
19    written, or at least published, some
20    three years after Dr. Arvanitis' e-mail
21    to you of August of '97 saying that
22    weight gain is dose related, that it
23    increases over time, and we know we have
24    weight gain.  Is that right?

Page 790

1        MR. BROCK:  Object to form.
2        THE WITNESS:  This article
3    was published in 2000, so it was
4    after the NDA was approved, yes.
5    BY MR. ALLEN:
6        Q.   Let me rephrase the question
7    if I need be.  This is Dr. Brecher's
8    article of 2000, it's Exhibit 47.
9    Correct?
10        A.   Yes, it is.
11        Q.   And this was written or at
12    least published some three years after
13    Dr. Arvanitis' e-mail concerning weight
14    gain that we just reviewed with the jury.
15    Correct?
16        A.   It's three -- excuse me,
17    1997, that's three years, yes.
18        Q.   Do you see that Dr.
19    Brecher -- now, Dr. Brecher at this time
20    worked for AstraZeneca.  Correct?
21        A.   Yes, he did.
22        Q.   Do you see "The long-term
23    effect of quetiapine (SeroquelTM)
24    monotherapy on weight in patients with

Confidential - Mark S. Scott, Ph.D.

Page 791

1  schizophrenia"?  Is that the title of
2  this article?
3      A.   Yes.
4      Q.   And he wrote that along with
5  Dr. Rak, is that Mr. Melvin or Dr.
6  Melvin?
7      A.   I don't have any idea who
8  Melvin is.
9      Q.   And is AM Jones, is that --
10  who is that?
11      A.   I would believe that's
12  Martin Jones.
13      Q.   That's the man that you
14  talked about earlier?
15      A.   That was Martin's role as a
16  statistician assigned to that project.
17      Q.   Who is still there at
18  AstraZeneca.  Correct?
19      A.   Yes, he is.
20      Q.   He works one floor above
21  you.  Right?
22      A.   Yes, he does.
23      Q.   Dr. Brecher and Dr. Jones,
24  Dr. Rak report "In these patients, there

Page 792

1  was no overall effect on weight across
2  the body mass index...spectrum."  The
3  conclusion is that "These results
4  indicate that long-term weight changes
5  with quetiapine monotherapy are minimal
6  and potentially beneficial, and do not
7  appear to raise the medical concerns
8  associated with some other atypical
9  agents."
10      Did I read that correctly?
11      A.   Those are the words that
12  I've are written there.
13      Q.   That's not true, is it?
14      MR. BROCK:  Object to form.
15      THE WITNESS:  Well, again, I
16  have to look at -- I have to
17  refresh myself with respect to
18  what data they're looking at and
19  the observations on this
20  particular dataset.  So I would
21  always want to do it in the
22  context of the dataset being
23  looked at.  So it might be
24  entirely consistent with this

Page 793

1      particular dataset.
2  BY MR. ALLEN:
3      Q.   Oh, okay.  Well, did you see
4  that Dr. Brecher and Dr. Jones and Dr.
5  Rak, in fact, prepared the little shaded
6  key points to their -- it's on page 290
7  of the article?  Do you see it?  Do you
8  see bullet point number two?
9      A.   Yes, I do.
10      Q.   Dr. -- these doctors from AZ
11  who published this article say in bullet
12  point number two, in 2000, that
13  "Long-term quetiapine monotherapy showed
14  no overall effect on weight across the
15  BMI spectrum..."  Did I read that
16  correctly?
17      A.   Again, I'd have to -- read
18  that correctly, but again, that could be
19  entirely consistent with the dataset
20  that's here.
21      Q.   That's not a true statement,
22  is it, sir, that "Long-term quetiapine
23  monotherapy showed no overall effect on
24  weight across the BMI spectrum"?  That's

Page 794

1  just not true, is it?
2      A.   I would have to refer to the
3  results in this clinical trial report.
4  And my belief is that they're faithfully
5  reporting the results from this dataset,
6  and they can make that statement.
7      Q.   And then they go on bullet
8  point number three, "Long-term
9  monotherapy with quetiapine is associated
10  with a potentially 'normalizing' effect
11  on weight, with a tendency towards weight
12  gain in underweight patients and weight
13  loss in severely obese patients."
14      Did I read that correctly?
15      A.   Yes, you did.
16      Q.   And then the last bullet
17  point, "The combination of efficacy, good
18  tolerability and an overall neutral
19  long-term effect on weight suggests that
20  quetiapine should be considered a
21  first-choice antipsychotic in the
22  long-term treatment of schizophrenia."
23      Did I read that correctly?
24      A.   You read that correctly,

120 (Pages 791 to 794)

Confidential - Mark S. Scott, Ph.D.

Page 795

1    yes.
2        Q.   So it true, according to
3    your own statistics as in your position
4    and in the positions that you've held
5    previously, that several as used in the
6    treatment of schizophrenia over the long
7    term has an overall neutral effect on
8    weight?  Is that true?
9        A.   Again, these are key points
10   or key findings from this analysis of
11   these data which are a faithful
12   representation of these data.
13       Now, again, this is written
14   in 2007 based on that data.  Additional
15   data since then have come in.  We've put
16   those into clinical trial reports, put
17   them as part of submissions to the FDA,
18   so to be honest with you, I would say
19   that this is a faithful representation of
20   the dataset that was presented in front
21   of them, yes.
22       Q.   You said several times "to
23   be honest with you."  Do you recall using
24   that phrase several times in your answer?

Page 796

1        A.   Yeah, I'm tired, I
2    apologize.
3        Q.   So every time we hear "to be
4    honest with you," that means you're
5    tired?
6        A.   Allow me, I'm sorry, I
7    apologize.
8        Q.   Sir, when you said the
9    combination of -- excuse me, I want to
10   make sure we're clear.  You're not
11   testifying to this jury here -- let me
12   rephrase it.
13       You would agree with me on
14   behalf of AstraZeneca in the position
15   that you hold now based upon your own
16   knowledge of the statistics of Seroquel,
17   that the over long-term use of Seroquel
18   is not weight neutral.  Isn't that true?
19       MR. BROCK:  Object to form.
20       THE WITNESS:  Again, I
21   wouldn't want to make a comment on
22   weight neutral, weight -- you
23   know, weight anything.  I would
24   like to report on the weight of

Page 797

1    patients receiving Seroquel in our
2    clinical trials, and I would let
3    clinicians drive any decision
4    about how to describe that weight.
5    BY MR. ALLEN:
6        Q.   Have you ever found out that
7    -- let me ask you this:  Have you ever in
8    your roles on the business side of
9    things -- and you do have a role on the
10   business side of things at Seroquel,
11   don't you?
12       A.   I have a role on the
13   Seroquel brand team which is related to
14   the clinical development and regulatory
15   affairs portion, which then gets
16   translated to clinical trials, which then
17   gets part of our labeling.  So labeling
18   forms the basis of our being able to talk
19   to doctors.
20       Q.   One of the things you know
21   in this role is the sales representatives
22   are not allowed, under the regulatory
23   requirements, to go out and promote
24   outside of the label, are they?

Page 798

1        A.   The information that they
2    can talk about has to be consistent with
3    the approved labeling, yes.
4        Q.   Why?
5        A.   I believe those are the --
6    that's the regulations that we're under.
7            - - -
8        (Exhibit Scott-48, Exhibit
9        B, was marked for identification.)
10           - - -
11   BY MR. ALLEN:
12       Q.   Last week or the week
13   before -- last week or the week before
14   your attorneys, AstraZeneca's attorneys
15   filed in the courts some call notes
16   concerning the promotion of Seroquel.  I
17   will hand you Exhibit B of these notes
18   which I've marked as Scott Exhibit Number
19   48 that were filed in Orlando, Florida.
20   And I ask you first to look at those.
21       MR. ALLEN:  I'm sorry, Mr.
22   Brock, is that 48 that I marked
23   it?
24       MR. BROCK:  I'm not sure.

121 (Pages 795 to 798)

Confidential - Mark S. Scott, Ph.D.

Page 799

1    48, yes.
2          MR. ALLEN:  Thanks.  Thank
3    you very much.
4    BY MR. ALLEN:
5          Q.   Have you ever seen call
6    notes before, sir?
7          A.   Very rarely have I seen call
8    notes.
9          Q.   You have, so the answer is
10   yes, Mr. Allen, I have seen call notes
11   before.  Right?
12         A.   I have seen call notes
13   before, yes.
14         Q.   In what role have you seen
15   call notes before?
16         A.   To be honest with you, I
17   don't recall.
18         Q.   But it would be in your role
19   at AstraZeneca.  Right?
20         A.   In my role at AstraZeneca,
21   yes.
22         Q.   Exhibit 48 are some call
23   notes from a sales representative in
24   April of 2004, which would have been

Page 800

1    what, seven years after Dr. Arvanitis'
2    e-mail on weight gain?
3          A.   Well, if this is in 2004, it
4    was seven years from 2007, yes.
5          Q.   And it would have been eight
6    years after the filing of the NDA.  Is
7    that correct?
8          A.   Yes.
9          Q.   And it would have been at a
10   time following the filing of Plaintiff's
11   Exhibit Number 8 which said it appeared
12   that Seroquel was dose related.  Do you
13   recall that?
14         MR. BROCK:  Object to form.
15   BY MR. ALLEN:
16         Q.   It would be eight years
17   after that filing?
18         A.   It was eight years after the
19   filing of the NDA, yes.
20         Q.   And a sales rep has messages
21   that they record that they take to
22   doctors.  You're familiar with the
23   message column in the call notes, are you
24   not?

Page 801

1          A.   Call notes are -- to be
2    honest with you, I don't know what sales
3    representatives are instructed to do with
4    respect to what information is in there,
5    so I can just take it as they're writing
6    things in those boxes.
7          Q.   Well, sir, I think you --
8    and maybe I'm miscommunicating.  I
9    apologize if I am.  I thought you told us
10   you did know what sales reps were
11   supposed to do, and they're not supposed
12   to promote outside the label and
13   inconsistent with the label.  You've
14   already told us that.  Right?
15         MR. BROCK:  Object to form.
16         THE WITNESS:  Our --
17   BY MR. ALLEN:
18         Q.   You told us that?
19         A.   Our policies are that we're
20   not allowed to promote off labels,
21   correct.
22         Q.   Well, not only are you not
23   allowed to promote off label, didn't you
24   testify within the last five minutes that

Page 802

1    you knew in your role that sales reps are
2    not allowed to promote in a way that is
3    inconsistent with the Seroquel label?
4    True?
5          A.   That is true.  That's our
6    policy.
7          Q.   You knew that prior to the
8    time I gave you Exhibit 48 and the call
9    notes that were filed last week in
10   Florida on behalf of AstraZeneca, you've
11   known that before today.  Right?
12         MR. BROCK:  Object to form.
13         THE WITNESS:  Yes, I've
14   known of that policy.
15   BY MR. ALLEN:
16         Q.   This sales rep says Seroquel
17   has a favorable weight profile.  She said
18   that in a note of April 20, 2004.  She
19   says it again in her note of August 31,
20   2004.  Do you see that?  Seroquel has a
21   favorable weight profile?
22         MR. BROCK:  Object to the
23   form.
24         THE WITNESS:  I see that's

122 (Pages 799 to 802)

Confidential - Mark S. Scott, Ph.D.

Page 803

1    what's written there.
2    BY MR. ALLEN:
3       Q.   Okay, sir.  And then in her
4    description, she says -- of April of
5    2004, she says, "dr still hasn't tried
6    higher doses yet, zero efficacy at higher
7    doses, wt neutral."
8            Do you see that, sir, WT
9    neutral?  Excuse me, let me rephrase
10   that, I misread that, sir.
11      A.   What date is that, please?
12      Q.   It's April 20, 2004.  It
13   says, "dr still hasn't tried higher doses
14   yet, Seroquel efficacy at higher doses,
15   wt neutral, trusted tolerability."
16           Do you see that, sir?
17      A.   I see that's what's written
18   there, yes.
19      Q.   Is it consistent with the
20   Seroquel label for sales reps to tell
21   doctors that as of 2004, that Seroquel is
22   weight neutral?
23           MR. BROCK:  Object to form.
24           THE WITNESS:  Again, I'd

Page 804

1    have to look back at what the
2    promotion -- the agreed
3    promotional messages were in 2004.
4    The promotional messages have to
5    be all done consistent with the
6    label.  I wasn't involved with the
7    promotional messages at that time,
8    so I have no basis for comment on
9    this.
10   BY MR. ALLEN:
11      Q.   Well, sir, you commented a
12   lot with Mr. Brock about the label.
13   Didn't you talk about the label with Mr.
14   Brock and when weight gain appeared in
15   the label?
16      A.   Yes, I did.
17      Q.   And didn't you, in fact, in
18   the Exhibit 35 and 36, didn't y'all talk
19   about -- let me see if I can get 35 or
20   36.
21           MR. BROCK:  I'm asking for
22   30 minutes.
23           MR. ALLEN:  Thank you, sir.
24           In the PowerPoint that y'all

Page 805

1    used with your own lawyers, you
2    said label, weight gain.  You have
3    that in your own PowerPoint, don't
4    you.
5            THE WITNESS:  Yes.
6    BY MR. ALLEN:
7       Q.   So you brought it up in your
8    exam with Mr. Brock, did you not, the
9    issue of weight gain being in the label,
10   didn't you?
11      A.   Weight gain information was
12   in the label, yes.
13      Q.   My question to you is, is it
14   accurate for -- and consistent with the
15   label for Seroquel sales reps or anybody
16   from AstraZeneca to represent that
17   Seroquel is weight neutral?
18           MR. BROCK:  Object to the
19   form.
20           THE WITNESS:  Again, this
21   is -- weight neutral is something
22   which is a descriptor.  I don't
23   know upon what promotional piece
24   that was being used at the time.

Page 806

1    Any promotional pieces would have
2    been agreed with part of the
3    labeling.  So again, I can't
4    comment on that.
5    BY MR. ALLEN:
6       Q.   By the way, sir, did you
7    also testify yesterday that you had
8    responsibilities regarding the integrated
9    summary of efficacy?
10      A.   Yes, I did.
11      Q.   Did you, as part of your
12   role at any time at AstraZeneca, submit
13   technical document number 4 or technical
14   document number 5 to the FDA concerning
15   efficacy in Seroquel?
16      A.   I'd have to understand what
17   technical document number 4 were and
18   technical document number 5 were.  I have
19   no idea what they are.
20      Q.   You have no idea what they
21   are?
22      A.   No.
23      Q.   Is that correct?
24      A.   That's correct.

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Mark S. Scott, Ph.D.

Page 807

1      Q.   Do you know that there had
2   been meta-analyses done by AstraZeneca
3   internally concerning the efficacy of
4   Seroquel?
5          MR. BROCK:  Object to the
6      form.
7          THE WITNESS:  I know that
8      additional analyses have been done
9      on various endpoints in clinical
10     trials that didn't form particle
11     of the original NDA, yes.
12  BY MR. ALLEN:
13     Q.   Have you ever seen technical
14  document number 4 for the -- of the
15  commercial support team on Seroquel
16  concerning a meta-analysis of the
17  Seroquel trials on efficacy?
18     A.   Could I see it, please?
19     Q.   Sure.  I guess that would be
20  best.  Yes.
21         MR. ALLEN:  What number am I
22     on, 50?  Is that right?
23              - - -
24         (Exhibit Scott-49,

Page 808

1      Commercial Support Team -
2      Technical Document (TD004), Bates
3      AZSER 0747285 - 302, was marked
4      for identification.)
5              - - -
6   BY MR. ALLEN:
7      Q.   Sir, I'm going to hand you
8   what's been previously marked at least
9   one time as Birkett-47, will now be
10  marked as Scott-49.  And this is Seroquel
11  quetiapine technical document number 4.
12         Have you ever seen this
13  document before, sir?
14     A.   Yes, I have.
15     Q.   When did you see it, in
16  preparation for this deposition?
17     A.   Yes, I did.
18     Q.   Prior to the preparation for
19  this deposition, have you ever seen this?
20     A.   No, I did not.
21     Q.   So other than in preparation
22  for the deposition with your lawyer,
23  you've never reviewed technical document
24  number 4 which we marked as Scott-49.  Is

Page 809

1   that correct?
2      A.   That is correct.
3      Q.   So you don't know whether
4   this document -- well, let me ask this:
5   Do you know whether this document has
6   ever been submitted to the FDA regarding
7   Seroquel efficacy?
8      A.   No, I do not.
9      Q.   Thank you, sir.
10         Sir, do you remember -- we
11  have to wrap up our time here and
12  questions.  Do you remember talking about
13  trial 49 and this hypothesis that -- with
14  AstraZeneca that it is not fasting?  Do
15  you remember talking about trial 49 with
16  Mr. Brock?
17     A.   Yes, I do.
18     Q.   And y'all hypothesized,
19  wasn't it your hypothesis that the blood
20  glucose data in that study was not
21  fasting?  Isn't that just a hypothesis?
22     A.   It was an observation that
23  the -- from the clinical perspective that
24  the likelihood a lot of values occurred

Page 810

1   after noon were probably not fasting so
2   we analyzed the data in both ways.
3      Q.   Well, first of all, you
4   testified to Mr. Brock study 49 and 135
5   had the identical protocols.  Right?
6      A.   Yes, the identical protocols
7   in terms of design.
8      Q.   You didn't run study 49, did
9   you?
10     A.   I was not involved in
11  running study 49, no.
12     Q.   And the protocols directing
13  the doctors, physicians and allied
14  healthcare professionals who ran study
15  49, directed them to take fasting blood
16  glucose, didn't it?
17     A.   Yes, it -- I would have to
18  go back to the protocol, but I would
19  believe if we wanted fasting, we were
20  asking for fasting, yes.
21     Q.   And didn't the doctor that
22  was working on study 49, in fact, publish
23  a paper on study 49?
24     A.   Study 49 was, in fact,

124  (Pages 807 to 810)

Confidential - Mark S. Scott, Ph.D.

Page 811

1  published, yes.
2      Q.  By Dr. Calabrese and Keck
3  and Wayne Macfadden.  Right?
4      A.  Yes.
5      Q.  Now Wayne Macfadden worked
6  for AstraZeneca, did he not?
7      A.  Yes, he did.
8      Q.  And, in fact, Dr. Macfadden
9  was the very doctor who was a U.S.
10  medical director on Seroquel, was he not?
11      A.  He was the Seroquel -- I
12  think it's called Seroquel brand
13  physician.
14      Q.  Have you seen his signature
15  line on the letters he wrote doctors and
16  whether or not it was a U.S. medical
17  director or do you not recall?
18      A.  I know he was the medical
19  director, but -- he might have the title
20  the medical director, but I knew him as
21  the brand physician for Seroquel.
22      Q.  Sir, I will now show you
23  what I -- I think I skipped 46.
24      MR. ALLEN:  Had I not,

Page 812

1  Linda?
2      Well, on the off chance I
3  didn't, I'm going to mark it as
4  50.
5           - - -
6      (Exhibit Scott-50, A
7  Randomized, Double-Blind,
8  Placebo-Controlled Trial of
9  Quetiapine in the Treatment of
10  Bipolar I or II Depression
11  article, was marked for
12  identification.)
13           - - -
14  BY MR. ALLEN:
15      Q.  Sir, I'm going to hand you
16  what I've marked as Scott Exhibit Number
17  50.  This is the publication of the study
18  49, is it not?
19      A.  Yes, it is.
20      Q.  Sir, these doctors who were
21  the authors, some of them and the other
22  authors, in fact, worked for AstraZeneca.
23  Right?
24      A.  There are authors here who

Page 813

1  are employees of AstraZeneca, yes.
2      Q.  And the other author is Dr.
3  Keck.  Is Dr. Keck and Calabrese, in
4  fact, consultants for AstraZeneca?
5      A.  I know Dr. Calabrese has had
6  consulting arrangements with AstraZeneca.
7  I don't know about the relationship with
8  Dr. Keck.
9      Q.  Well, they report the serum
10  glucose results in their paper, do they
11  not?
12      A.  Yes, they do.
13      Q.  And they report them on page
14  1358, do they not?
15      A.  Correct.
16      Q.  And do they say whether the
17  results are from fasting or nonfasting
18  blood glucose?
19      A.  They say mean fasting serum
20  glucose levels.
21      Q.  So the doctors and authors
22  of the paper who were consultants to
23  AstraZeneca as well as AstraZeneca
24  employees, when they published the

Page 814

1  results in July 2005, do they say
2  anything about some supposed nonfasting
3  results, sir?
4      MR. BROCK:  Object to form.
5      THE WITNESS:  Again, the
6  purpose of a clinical trial
7  publication is to highlight the
8  results of the clinical trial.  We
9  do submit additional analyses to
10  the FDA to better help explain
11  observations in the clinical
12  trial.  I can't speak to this data
13  here, I'd have to go back to trial
14  49 and look at those results.
15      MR. ALLEN:  Objection.
16      THE WITNESS:  So my
17  expectation would be to have
18  results from the publication that
19  don't -- not all things in the
20  clinical trial report appear as
21  part of the publication.
22      MR. ALLEN:  Objection.
23  Nonresponse.
24  BY MR. ALLEN:

125 (Pages 811 to 814)

Confidential - Mark S. Scott, Ph.D.

Page 815

1      Q.   My question to you was, did
2  the authors of this paper on study 49,
3  including Dr. Calabrese and Dr. Wayne
4  Macfadden, report that blood glucose
5  levels were fasting or nonfasting?
6          MR. BROCK:  Object to form.
7          THE WITNESS:  They report
8      fasting plasma glucose.
9  BY MR. ALLEN:
10     Q.   Yes, sir.
11         Do they ever report that we
12 believe there's been an error and, in
13 fact, the blood glucose measurements were
14 not, in fact, fasting?
15     A.   It's not written here, but
16 I'd have to go back to if there are any
17 discussions about that in the drafting of
18 this report and have any investigators
19 believing if it was important to include
20 or not.  It's not here, but that doesn't
21 mean it wasn't considered.
22     Q.   Sir, I have a very few
23 minutes left.
24         Yesterday you were talking

Page 816

1  about some studies including study --
2          MR. BROCK:  Let's take a
3      break, because he's going to need
4      to make arrangements to have his
5      brother picked up.  You didn't do
6      what you said you would do.
7          MR. ALLEN:  It's 15, I'm
8      going to give him to you.  I was
9      going ask one last question,
10     that's what I'm doing.  I'm going
11     to pass him to you.
12         MR. BROCK:  Go.
13 BY MR. ALLEN:
14     Q.   Yesterday, sir --
15         MR. ALLEN:  Now, have we
16     used up tape on that?  That's what
17     we did.
18 BY MR. ALLEN:
19     Q.   Yesterday, sir, you were
20 talking to Mr. Brock about reports
21 including report number -- marked as
22 Defendant's-1061 on study 99.  Do you
23 recall that generally?  This is my last
24 question.  Let me get it up in the --

Page 817

1  there it is.  On study 99, do you recall
2  that?
3          MR. ALLEN:  Let's go off the
4      record while he looks for it.
5          MR. BROCK:  What number is
6      it?
7          VIDEOGRAPHER:  Off tape.
8      5:44.
9              - - -
10         (Exhibit Scott-51, 12/2/02
11     Clinical Study Report, was marked
12     for identification.)
13             - - -
14         VIDEOGRAPHER:  Back on tape.
15     5:47.
16 BY MR. ALLEN:
17     Q.   Sir, do you remember
18 discussing 1061 and some other studies
19 with Mr. Brock yesterday and talking
20 about clinically significant weight
21 shifts -- I mean, excuse me, I'm sorry,
22 clinically significant laboratory shifts
23 concerning blood glucose?
24     A.   Yes, I do.

Page 818

1      Q.   Now, in order -- have you
2  answered the questions based upon the
3  data that Mr. Brock presented to you in
4  1061, for example?  Is that correct?
5      A.   That was the data from the
6  clinical trial report for the trial so I
7  looked at each of the clinical trial
8  reports.
9      Q.   Yes, sir.  And, for example,
10 what Mr. Brock did not give you was Scott
11 Exhibit 51 which is the definitional
12 section for study 99 which Mr. Brock
13 discussed with you.  Is that correct?  He
14 did not provide this?
15     A.   No, I relied on the data
16 from the clinical trial report saying at
17 the time what individuals, based on the
18 information that they had, that were
19 clinically significant.
20     Q.   You relied upon what was
21 reported in the report itself.  Is that
22 right?
23     A.   Yes, I did.
24     Q.   So, therefore, in order to

Confidential - Mark S. Scott, Ph.D.

Page 819

```
 1   rely upon what the report reported, you
 2   would have to know what the definitions
 3   contained in the report meant.  Correct?
 4        A.   Not necessarily.  The
 5   exercise was to look at -- looking at
 6   clinical trial through time and looking
 7   at definitions of shift to high.  Now,
 8   shifts to high can change based on
 9   available information.  So at the time
10   that this clinical trial was report was
11   generated, it was believed that this is
12   what should be looked at in the clinical
13   trial program.  So I had no reason to
14   doubt that that wasn't the case.
15             MR. ALLEN:  She needs to go
16   off.
17             VIDEOGRAPHER:  Off the
18   record at 5:49.  This is the end
19   of videotape number six.
20             - - -
21        (A recess occurred.)
22             - - -
23             VIDEOGRAPHER:  Stand by.  We
24   are now back on the record.  This
```

Page 820

```
 1        is the beginning of videotape
 2        number seven.  The time is 5:50.
 3   BY MR. ALLEN:
 4        Q.   Sir, Exhibit 51 contains the
 5   definitions of potentially clinically
 6   significant clinical laboratory values
 7   for glucose, does it not, sir?
 8        A.   Yes, it does.
 9        Q.   And for something to be
10   potentially clinically significant
11   regarding glucose in a shift to high
12   under the definition used by AstraZeneca
13   in trial 99, the glucose would have to
14   shift to greater than 230 milligrams per
15   deciliter.  Correct?
16        A.   Correct.
17        Q.   And that's the definition
18   that was used by the study authors in the
19   reports as required by the definitional
20   section for study 49 -- 99?
21        A.   Yes.  That's correct.
22        Q.   And that was the same
23   definition that was used in all of the
24   other shift to high reports that you
```

Page 821

```
 1   discussed with Mr. Brock, was it not?
 2        A.   No, not necessarily.  I know
 3   that there were some that required a
 4   value above 126.
 5        Q.   Thank you, sir.
 6             It was the same definition
 7   that was used for shifts to high for the
 8   bipolar mania trials, was it not?
 9        A.   I'd have to look back and
10   see.
11             MR. ALLEN:  Thank you, sir.
12   I'll pass you back to Mr. Brock.
13             MR. BROCK:  Take about a
14   five-minute break.  We'll be right
15   back.
16             VIDEOGRAPHER:  Off the
17   record.  5:51.
18             - - -
19        (A recess occurred.)
20             - - -
21             VIDEOGRAPHER:  Back on the
22   record.  6:09.
23
24
```

Page 822

```
 1             - - -
 2             FURTHER EXAMINATION
 3             - - -
 4   BY MR. BROCK:
 5        Q.   Dr. Scott, just a few more
 6   minutes today.  Are you ready to proceed?
 7        A.   Yes, I am.
 8        Q.   One question that I haven't
 9   asked you, and I don't think the lawyers
10   for the plaintiffs asked this question
11   either.  Is Seroquel still on the market?
12        A.   Yes, it is.  It's still on
13   the market now.
14        Q.   Up here on the screen, have
15   we laid out the approvals for Seroquel
16   over time?
17        A.   Yes, you have.
18        Q.   And was Seroquel approved
19   for a new indication as a medicine that
20   was safe -- that is safe and effective as
21   recently as October of 2008?
22             MR. ALLEN:  Objection.
23   Form.  Leading.
24             THE WITNESS:  Seroquel has
```

127 (Pages 819 to 822)

Confidential - Mark S. Scott, Ph.D.

Page 823

1    been approved over the years for a
2    variety of indications and the
3    latest indication was approved in
4    2008.
5    BY MR. BROCK:
6        Q.   And recently has AstraZeneca
7    presented information to FDA advisory
8    committees for MDD and GAD approvals?
9        A.   Yes, we have.  We did that
10   in April of this year.
11           MR. ALLEN:  I'm not getting
12   time to object.  So if you want me
13   to, Mike, for this last part, I
14   will agree to not state my
15   objections so I won't have to
16   interrupt you and I can have any
17   objection at the time of trial, or
18   do you want me to interrupt you?
19           MR. BROCK:  Either way is
20   fine with me.
21           MR. ALLEN:  So if I don't
22   object, I preserve it for the time
23   of trial?
24           MR. BROCK:  Yes.

Page 824

1            MR. ALLEN:  I want the
2    record to reflect that agreement.
3    So I will not interrupt.  And let
4    me say I anticipate many of these
5    questions will be leading.  And I
6    do not want to interrupt, but my
7    objections are noted and I can
8    make them at the time of trial.
9    Thank you.
10           MR. BROCK:  That took longer
11   than it would have taken to make
12   the objections.
13           MR. ALLEN:  No, it didn't.
14   BY MR. BROCK:
15       Q.   Now, I want to talk to you a
16   little bit, Dr. Scott, about trial 15.
17   And specifically look with you at the
18   material that was presented to the FDA in
19   comparison to the e-mail that you were
20   shown that was authored by Dr. Lisa
21   Arvanitis.  And I want to direct your
22   attention first to the integrated summary
23   of safety.  Do you have there
24   Exhibit 113?

Page 825

1        A.   Yes, I do.
2        Q.   If you would turn to page
3    298 of that document?
4        A.   That would be 298 in the
5    lower right-hand corner?
6        Q.   Actually, let me do a little
7    better.  It would be page 4709 or 252 at
8    the top.
9        A.   Right.  Okay.
10       Q.   Do you see that there is a
11   section in the integrated summary of
12   safety, there at the bottom that says,
13   "For Trial 0015"?
14       A.   Yes, I do.
15       Q.   Would you read to the
16   members of the jury what AstraZeneca
17   reported about trial 15 in the integrated
18   summary of safety that was signed by you
19   on July 3, 1996?
20       A.   For Trial 15,
21   quetiapine-treated subjects had a greater
22   weight increase (1.6 kilograms plus or
23   minus 6.6 kilograms) compared with the
24   haloperidol-treated group which is minus

Page 826

1    1.4 kilograms plus or minus
2    6.1 kilograms.
3        Q.   Stop right here.  So when we
4    talk about quetiapine weight
5    weight increases than haloperidol and the
6    ranges being from 1.6 kilograms to
7    6.6 kilograms, what range of weights is
8    that in terms of pounds?
9        A.   You multiply that 2.2
10   times -- or 6.6 kilograms times 2.2 in
11   terms of the standard deviation would be
12   something on the order of maybe -- do the
13   arithmetic in my head.
14       Q.   Just quickly.
15       A.   Hold on.
16           VIDEOGRAPHER:  Can we go off
17   the record for a moment?  Off the
18   record.  6:13.
19               - - -
20           (A recess occurred.)
21               - - -
22           VIDEOGRAPHER:  Back on the
23   record.  6:15.
24   BY MR. BROCK:

128 (Pages 823 to 826)

Confidential - Mark S. Scott, Ph.D.

Page 827

1      Q.   We're back on the record
2   now.  Dr. Scott, are you ready to
3   proceed?
4      A.   Yes, I am.
5      Q.   The range of weight gain
6   that's being reported there is what?
7      A.   Well, 6.6 kilograms
8   translates into about 15 pounds.
9   6.1 kilograms would be slightly less than
10  15 pounds.
11     Q.   Is the other calculation
12  1.6 kilograms?
13     A.   Yes, it is.  1.6 kilograms
14  is the mean weight increase reported on
15  Seroquel.
16     Q.   Then what's the second
17  figure, plus or minus 6.6 kilograms, what
18  is that --
19     A.   That would be the standard
20  deviation of that range.
21     Q.   So it's 1.6 that's being
22  reported there, standard deviation 6.6?
23     A.   Correct.
24     Q.   It says in the next

Page 828

1   sentence, In general, mean weight
2   increases from baseline for
3   quetiapine-treated subjects were greater
4   at Week 52 for subjects completing the
5   trial (ranging from 2.05 to 8.52 kg)
6   compared with the increases seen at final
7   evaluation (52 Week or withdraw)...
8        Do you see that?
9      A.   Yes, I do.
10     Q.   Does it follow, then,
11  suggesting a trend for subjects to
12  continue gaining weight over time?
13     A.   That's what's written here,
14  yes.
15     Q.   And was that reported to the
16  FDA?
17     A.   Yes, it was reported to the
18  FDA as part of the integrated summary of
19  safety.
20     Q.   Now, if you look at the
21  Arvanitis e-mail, do you see if you come
22  down to about the fifth paragraph, there
23  is a statement: "While weight gain slows
24  over the longer term, there still is

Page 829

1   weight gain.  It doesn't stop...the slope
2   just appears to change"?
3      A.   Yes, I see that.
4      Q.   Did AstraZeneca report to
5   the FDA in the integrated summary of
6   safety that the data suggested a trend
7   for subjects to continue gaining weight
8   over time?
9      A.   Yes, we did.
10     Q.   Did you tell the FDA that
11  mean weight increases from baseline were
12  greater at 52 weeks for subjects
13  completing the trial?
14     A.   We reported that the -- yes,
15  the mean weight increases were larger at
16  52 weeks compared with those seen at the
17  final evaluation.
18         MR. ALLEN:  Let me just
19  restate, I'm objecting to all
20  these questions as leading and I
21  preserve my objection.  I won't
22  interrupt, but I'm not acquiescing
23  that this is a proper exam.  It's
24  leading.

Page 830

1          MR. BROCK:  It's
2   cross-examination.
3   BY MR. BROCK:
4      Q.   Do you see the weight that
5   are --
6          MR. ALLEN:  It's your
7   contention it's cross-examination
8   you're conducting now?
9          MR. BROCK:  At this point it
10  is, sure.
11         MR. ALLEN:  So the witness
12  is adverse to you?
13         MR. BROCK:  Just -- I'll
14  tell you what, just start stating
15  your objections.  We'll call our
16  agreement off.  State your
17  objections.
18         MR. ALLEN:  As of now we'll
19  call it off?
20         MR. BROCK:  Yes.
21  BY MR. BROCK:
22     Q.   Now, do you see that there
23  is a statement there of weight ranging
24  from 2.05 to 8.52 kilograms?

129 (Pages 827 to 830)

Confidential - Mark S. Scott, Ph.D.

Page 831

1    A.   Yes, I do.
2    Q.   What is that conveying to
3  the FDA?
4    A.   The ranges of weights that
5  were seen, the changes in weight among
6  those completing the trial in the
7  Seroquel group.
8    Q.   Do you see the second
9  statement that we've put on the screen
10  that's a pull out from the Lisa Arvanitis
11  e-mail, the magnitude of weight gain at
12  52 weeks regardless of pool or cohort is
13  about 5 kilograms which is more than the
14  short-term six-week weight gain?
15    A.   Yes, I do.
16    Q.   Now, there's also a
17  statement here that refers to 45 percent.
18  Correct?
19         MR. ALLEN:  Objection to
20  form.
21         THE WITNESS:  45 percent.
22  BY MR. BROCK:
23    Q.   Proportion of patients?
24    A.   Yes, the proportion of

Page 832

1  patients with a clinically significant
2  weight gain at 52 weeks (regardless of
3  pool or cohort) is about 45 percent, and
4  this is more than at the greater increase
5  in the six-week time form -- time frame.
6              - - -
7       (Exhibit Defendant's-128,
8       Clinical Trial Report
9       International Approval Form, Bates
10       AZSER 16794723, 4724, 4743 - 4748,
11       4868, 7022 - 7043, was marked for
12       identification.)
13              - - -
14  BY MR. BROCK:
15    Q.   Now, let me ask you to go to
16  Exhibit 128.
17    A.   Exhibit 128.  Okay.
18    Q.   I'll direct your attention
19  to Table 19.3.
20    A.   Okay.
21    Q.   Do you see that that is a
22  table on the "PROPORTION OF PATIENTS WITH
23  CLINICALLY SIGNIFICANT VALUES FOR VITAL
24  SIGNS BY WEEK"?

Page 833

1    A.   Yes, it is.
2    Q.   And what is conveyed by
3  AstraZeneca to the FDA with regard to the
4  proportion of patients with clinically
5  significant values for vital signs by
6  week?
7         MR. ALLEN:  Objection.
8  Form.
9         MR. SCOTT:  I now have 128
10  here on screen.
11  BY MR. BROCK:
12    Q.   Do you see that Table 19.3
13  is now brought up on the screen, Dr.
14  Scott?
15    A.   Yes, I do.
16    Q.   And then is there a
17  percentage of weight gain listed there at
18  52 weeks for the Seroquel arms?
19    A.   Well, in this table it
20  contains the 75 milligram dose group of
21  the Seroquel arm and the 300 milligram
22  dose group.  And if I just look across --
23  well, set for across, whether it was
24  three times a day or twice a day for 52

Page 834

1  weeks, there was one of five patients
2  with clinically significant weight gain
3  at 75 milligrams, that's 20 percent, and
4  on total for 300 milligrams there were
5  seven of nine patients which represent
6  78 percent.
7    Q.   So Dr. Arvanitis' e-mail
8  refers to 45 percent of weight gain at 52
9  weeks in her e-mail.  Correct?
10    A.   It looks like she's saying
11  the proportion of patients with
12  clinically significant weight gain at 52
13  weeks regardless of pool or cohort is
14  about 45 percent.  So again, I can't --
15  I'd have to look at whether the averages
16  of the -- all the Seroquel doses amount
17  to 45 percent, but certainly 45 percent
18  is between the 10 percent for 75 and --
19  or 20 percent for 75 and 78 percent for
20  300.
21    Q.   So AstraZeneca gave data to
22  the FDA that is actually broken down by
23  dose.  Correct?
24    A.   Correct.

Confidential - Mark S. Scott, Ph.D.

Page 835

1    MR. ALLEN: Objection. I
2  need to get my objection. I don't
3  want to interrupt you, Doctor. So
4  I'm going to object and then you
5  get to answer.
6    I need to object to form,
7  and I ask that the question be
8  asked again so I'm not speaking
9  over his answer. Objection.
10  Form.
11 BY MR. BROCK:
12   Q.  Do you see that AstraZeneca
13 has set out there that there are -- that
14 there is weight gain in 20 percent of the
15 patients at 75 milligrams and 78 percent
16 of the patients at 300 milligrams?
17   A.  Yes.
18    MR. ALLEN: Objection.
19  Form.
20 BY MR. BROCK:
21   Q.  You may answer.
22   A.  That's true. And as well if
23 you look at the very last table in here,
24 you have the results for 800 milligrams

Page 836

1  of Seroquel. The very last table, 2295
2  at the top.
3    So for the largest dose that
4  Seroquel was used in this clinical trial
5  across the dose regimens of three times a
6  day or twice a day, the total number were
7  eight of 14 patients or 57 percent of
8  patients at that dose at 52 weeks.
9    Q.  Can you tell the jury
10 whether or not AstraZeneca reported
11 clinically significant weight gain in the
12 three doses of Seroquel that were taken
13 by patients in trial 15?
14   A.  All of these data were
15 provided to the FDA as part of the
16 clinical trial summary for trial 15.
17   Q.  And did the FDA receive
18 information about weight gain at 52
19 weeks?
20   A.  Yes, they did.
21   Q.  Will you describe for the
22 members of the jury what was reported to
23 the FDA with regard to weight gain at 52
24 weeks in the three doses that were

Page 837

1  utilized in trial 15?
2    A.  There was an -- overall for
3  the low dose of Seroquel, there were
4  20 percent of patients. If I go back to
5  the -- sorry, I jumped ahead. For the
6  300 milligram dose of Seroquel, the
7  proportion of patients with significant
8  weight gain was 78 percent, and that was
9  seven of nine patients. And then for the
10 high dose across all regimens there
11 were -- for Seroquel there were eight of
12 14 patients or 57 percent.
13   Q.  Now, can you tell the
14 members of the jury what is on the screen
15 at the present time?
16   A.  Those are the extracts of
17 the tables dealing with vital signs
18 through time from the clinical study
19 report of trial 15. And highlighted are
20 the percent of subjects having clinically
21 significant weight gain at week 52 for
22 all three Seroquel dose groups.
23    MR. ALLEN: Mr. Brock, is
24  this document in evidence?

Page 838

1    MR. BROCK: It is.
2    MR. ALLEN: Which exhibit
3  number?
4    MR. SCOTT: 128.
5    MR. ALLEN: Thank you.
6  BY MR. BROCK:
7    Q.  At the time of the initial
8  approval of Seroquel for sale in the
9  United States, did the FDA have this
10 information?
11   A.  Yes, they did. At the time
12 of the initial approval as part of the
13 review leading to approval.
14    MR. BROCK: Thank you, Dr.
15  Scott.
16    THE WITNESS: Thank you.
17     - - -
18    FURTHER EXAMINATION
19     - - -
20 BY MR. ALLEN:
21   Q.  One question in response to
22 Mr. Brock's examination.
23    Therefore, in 2000, when Dr.
24 Brecher wrote his article, it would have

131 (Pages 835 to 838)

Confidential - Mark S. Scott, Ph.D.

Page 839

1  been inaccurate for him to convey or for
2  AZ to convey to doctors that the weight
3  gain associated with quetiapine was
4  normalizing, and that it was neutral and
5  that there was minimal weight change.
6  That would be inaccurate, would it not?
7      A.   Again, Dr. Brecher's page
8  commented on a specific dataset.  And I
9  believe the comments that were made in
10 that dataset that he looked at were
11 consistent with that dataset.  So -- and
12 I can't comment anything more than that.
13     Q.   And do you know when the
14 SERM meeting took place which indicated
15 that weight gain associated with Seroquel
16 was not limited?  Do you know when that
17 took place?
18     A.   I don't.  I know that there
19 was a SERM meeting dealing with weight
20 gain.  I don't know when any were.  I
21 don't know the exact outcome of them.
22     Q.   Do you know when the
23 justification document was prepared
24 recommending a change in the core data

Page 840

1  sheet?
2      A.   No, I do not.
3      MR. ALLEN:  Thank you, sir.
4      THE WITNESS:  Thank you.
5      VIDEOGRAPHER:  That
6  concludes this videotape
7  deposition.  The time is 6:30.
8          - - -
9      (A recess occurred.)
10         - - -
11     MR. ALLEN:  Scott Allen
12 present for the plaintiffs and
13 present is Sean Gallagher.
14 Talking about Scott Exhibit 41
15 which was the appendix to the
16 integrated safety summary for the
17 NDA that was filed in 1996.  I'm
18 not measuring it, but it appears
19 to be over a foot high and
20 thousands and thousands of pages
21 and my associates tell me it's
22 over 4,200 individual pages.
23     In order to save the court
24 reporter the time and the effort

Page 841

1  and the expense and the ability to
2  cart this material out of here, I
3  have agreed with counsel for the
4  defense, AstraZeneca, Sean
5  Gallagher, who is present, that
6  we -- that this Exhibit 41 which
7  was on the camera can be produced
8  as an exhibit electronically by
9  the court reporter.  And the
10 exhibit will be the control number
11 SQ1P01422710.  Is that right, Mr.
12 Gallagher?
13     MR. GALLAGHER:  That's
14 correct.  And I'm just trusting
15 you that that's the number that
16 will correspond to that.  But I
17 certainly agree that we don't want
18 that big stack, you know, lugged
19 around.
20     MR. ALLEN:  Mr. Gallagher,
21 if that's not the right control
22 number --
23     MR. GALLAGHER:  You'll fix
24 it?

Page 842

1      MR. ALLEN:  We'll fix it.
2  And with that, then, we're just
3  going to let the court reporter
4  not to have to lug 41 out, and it
5  will be produced electronically.
6  Thank you.
7      Thank you, Mr. Gallagher.
8      MR. GALLAGHER:  Sure thing.
9      (Witness excused.)
10     (Deposition concluded at
11 approximately 6:35 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24

132  (Pages 839 to 842)

Confidential - Mark S. Scott, Ph.D.

Page 843

```
 1
 2                CERTIFICATE
 3
 4
 5        I HEREBY CERTIFY that the
     witness was duly sworn by me and that the
 6   deposition is a true record of the
     testimony given by the witness.
 7
             It was requested before
 8   completion of the deposition that the
     witness, MARK S. SCOTT, Ph.D., have the
 9   opportunity to read and sign the
     deposition transcript.
10
11
     _____
12       LINDA ROSSI RIOS, RPR, CCR and
         Notary Public
13       Dated:  September 24, 2009
14
15
16       (The foregoing certification
17   of this transcript does not apply to any
18   reproduction of the same by any means,
19   unless under the direct control and/or
20   supervision of the certifying reporter.)
21
22
23
24
```

Page 845

```
 1        - - - - - -
 2         E R R A T A
 2        - - - - - -
 3
 4   PAGE  LINE  CHANGE
 5   ____  ____  _____
 6        REASON:  _____
 7   ____  ____  _____
 8        REASON:  _____
 9   ____  ____  _____
10        REASON:  _____
11   ____  ____  _____
12        REASON:  _____
13   ____  ____  _____
14        REASON:  _____
15   ____  ____  _____
16        REASON:  _____
17   ____  ____  _____
18        REASON:  _____
19   ____  ____  _____
20        REASON:  _____
21   ____  ____  _____
22        REASON:  _____
23   ____  ____  _____
24        REASON:  _____
```

Page 844

```
 1     INSTRUCTIONS TO WITNESS
 2
 3          Please read your deposition
 4   over carefully and make any necessary
 5   corrections.  You should state the reason
 6   in the appropriate space on the errata
 7   sheet for any corrections that are made.
 8          After doing so, please sign
 9   the errata sheet and date it.
10          You are signing same subject
11   to the changes you have noted on the
12   errata sheet, which will be attached to
13   your deposition.
14          It is imperative that you
15   return the original errata sheet to the
16   deposing attorney within thirty (30) days
17   of receipt of the deposition transcript
18   by you.  If you fail to do so, the
19   deposition transcript may be deemed to be
20   accurate and may be used in court.
21
22
23
24
```

Page 846

```
 1
 2      ACKNOWLEDGMENT OF DEPONENT
 3
 4        I,_____, do
 5   hereby certify that I have read the
 6   foregoing pages, 318 - 842 and that the
 7   same is a correct transcription of the
 8   answers given by me to the questions
 9   therein propounded, except for the
10   corrections or changes in form or
11   substance, if any, noted in the attached
12   Errata Sheet.
13
14
15   _____
16   MARK S. SCOTT, Ph.D.        DATE
17
18
19   Subscribed and sworn
     to before me this
20   _____ day of _____, 20____.
21   My commission expires:_____
22
     _____
23   Notary Public
24
```

133 (Pages 843 to 846)

Confidential - Mark S. Scott, Ph.D.

Page 847

1         LAWYER'S NOTES
2    PAGE LINE
3    ____ ____  _____
4    ____ ____  _____
5    ____ ____  _____
6    ____ ____  _____
7    ____ ____  _____
8    ____ ____  _____
9    ____ ____  _____
10   ____ ____  _____
11   ____ ____  _____
12   ____ ____  _____
13   ____ ____  _____
14   ____ ____  _____
15   ____ ____  _____
16   ____ ____  _____
17   ____ ____  _____
18   ____ ____  _____
19   ____ ____  _____
20   ____ ____  _____
21   ____ ____  _____
22   ____ ____  _____
23   ____ ____  _____
24   ____ ____  _____

Golkow Technologies, Inc. - 1.877.370.DEPS