# EXHIBIT 2

1

1          UNITED STATES DISTRICT COURT
           MIDDLE DISTRICT OF FLORIDA
2                ORLANDO DIVISION

3        Docket No.6:06-MD-1769-Orl-22DAB
   . . . . . . . . . . . . . . ..
4   IN RE:                    :
    SEROQUEL PRODUCTS LIABILITY  :
5   LITIGATION         :      Orlando, Florida
    MDL DOCKET No. 1769      :      May 22, 2007
6                      :      4:00 p.m.
    ALL CASES             :
7                         :
   . . . . . . . . . . . . . .:
8
           TRANSCRIPT OF PRETRIAL CONFERENCE
9    BEFORE THE HONORABLE DAVID A. BAKER AND ANNE C. CONWAY
            UNITED STATES MAGISTRATE JUDGE
10            UNITED STATES DISTRICT JUDGE

11

12  APPEARANCES:

13  For the Plaintiffs:      Paul Pennock

14                      Larry M. Roth

15                      Scott Allen

16                      Richard Laminack

17                      F. Kenneth Bailey

18  For the Defendant

19  AstraZeneca:              Fred Magaziner

20                      Stephen J. McConnell

21                      James Freebery

22  Court Reporter:  Sandra K. Tremel

23

24  Proceedings recorded by mechanical stenography, transcript

25  produced by computer-aided transcription.

2

1          P R O C E E D I N G S

2          THE COURT:  Can we have appearances, please?

3          MR. ROTH:  If it please the Court, Your Honor,

4     Larry Roth.

5          THE COURT:  Only people who are going to speak

6     because we do have the attendance.  Okay?

7          MR. ROTH:  Larry Roth on behalf of all the

8     plaintiffs.

9          MR. PENNOCK:  Paul Pennock for the plaintiffs.

10          MR. ALLEN:  Scott Allen for the plaintiffs.

11          MR. LAMINACK:  Rick Laminack for the plaintiffs.

12          THE COURT:  We're going to start out with the

13     defendant -- I'm sorry.

14          MR. MAGAZINER:  Fred Magaziner for AstraZeneca,

15     Your Honor.  Good afternoon.

16          MR. MCCONNELL:  Good afternoon, Your Honor.

17     Steve McConnell on behalf the defendant AstraZeneca.

18          MR. FREEBERY:  Your Honor, Jim Freebery, also on

19     behalf of AstraZeneca.

20          THE COURT:  All right.  We're going to start

21     this status conference with an update on the discovery and

22     the discovery motions pending.

23          MR. PENNOCK:  Good afternoon, Your Honor.  Paul

24     Pennock for the plaintiffs.  And unfortunately, I had a

25     PowerPoint that has not yet been hooked up, but I think I

3

1   can proceed without it.

2       THE COURT:  Right.  Let me tell you, we have

3   only got about an hour for this hearing.

4       MR. PENNOCK:  Yes.

5       THE COURT:  And it is a status conference

6   hearing, so, go ahead.

7       MR. PENNOCK:  I would like to address with the

8   Court, if that's acceptable, the issues regarding the

9   defendant discovery that we have been attempting to take

10  to date.  You know, as I'm sure Magistrate Judge Baker --

11      THE COURT:  I've read all of the transcripts of

12  all of the status conferences.

13      MR. PENNOCK:  Okay.  Essentially at this

14  juncture, we have very serious concerns as to whether this

15  discovery can proceed in the manner that --

16      THE COURT:  Why don't you tell us what you have

17  to date and what you expected to date and what you need.

18      MR. PENNOCK:  We have received to date 32 files

19  for witnesses who were identified by the defendants as

20  being important and relevant witnesses in this case.

21      What we have -- we have also taken a number of

22  30(b)(6) depositions which were permitted by the Court.

23  What we learned last week was that there are a large

24  number of witnesses in two foreign -- at least two foreign

25  entities, AstraZeneca UK and AstraZeneca AB in Sweden, who

4

1    those entities possess not only personnel but large

2    volumes of documents that bear directly on all the issues

3    in this case.  And to our understanding, the defendants

4    have not produced any of this.

5        Moreover, to our understanding, not one of these

6    witnesses that we now identified through the 30(b)(6)'s

7    were on this list of 80 witnesses that they themselves

8    created last fall.

9        And if I may give two examples.  One is -- I'm sorry.

10   One example is SET, the senior executive team.  We learned

11   from a 30(b)(6) of their senior counsel here in the States

12   that the SET, the senior executive team, as she put it in

13   her words, controls everything.  That they can do

14   anything.  And they have been running the various drug

15   franchises for this company.

16       And yet these individuals had not previously been

17   identified to us, had not been on this list of 80.  And

18   why is that so important?  Because these -- this list of

19   80 has already comprised six and a half million

20   documents -- sorry, six and a half million pages, and

21   we're supposed to be plowing through all this discovery on

22   these 80 people, whereas there may be 20 or 30 people who

23   we really want that have been withheld from us.

24       Now, in my presentation, which unfortunately I don't

25   have up, you know, I put the word "deliberately" in there

5

1    and then I took it out, and the reason is, I don't want to

2    throw that word around so easily in any courtroom.

3        But it is very, very difficult to understand that

4    these defendants could know that the Swedish entity and

5    the UK entity have no doubt large volumes of documents,

6    e-mails, meeting minutes and so forth, certainly a

7    significant number of people who are running this

8    franchise, this drug franchise, not just since the merger

9    of AstraZeneca in 1999, but even for some -- a UK entity

10   or entities from the 1990s, and this is testimony we now

11   have, that they could sit there knowing all that and not

12   give us any of that discovery and have us plowing through

13   other discovery that we think --

14        THE COURT:  Have you since asked for it?

15        MR. PENNOCK:  This came up at a deposition that

16   I took in Philadelphia last -- I believe it was last

17   Monday.

18        THE COURT:  Okay.

19        MR. PENNOCK:  Last Monday.  We took the

20   deposition in Philadelphia last Monday.  So --

21        THE COURT:  When were you told you would get

22   this information?  I assume you immediately asked for it.

23        MR. PENNOCK:  We had a meet and -- I'm sorry.

24   The deposition was, I think, Tuesday.  I may be mixing

25   the -- the deposition was Monday.  We had a meet and

6

1   confer on Tuesday in Philadelphia, and discussed this

2   concern, and discussed the concerns regarding foreign

3   entity discovery in general.

4       And no, we were not told that we would be getting the

5   discovery.  They wanted to work out a deal that somehow

6   involved us not suing the foreign entities in order to get

7   the discovery over some period of time and what discovery

8   we want.

9       But our position, Your Honor, is they have been

10  ordered by Your Honor and by Magistrate Baker to produce

11  discovery that's relevant to this case or that may lead to

12  relevant evidence.  There is no one that could miss that

13  this was extremely relevant, and we should have had it in

14  December or January, or February or March.

15      We're almost in June and we have to go and kind of

16  pry these doors open to find out things that we think they

17  were under an obligation to this Court and to us to tell

18  us already.

19      So, the foreign entity discovery's a very serious

20  issue that's come up, and I do think that it needs to be

21  addressed and addressed very quickly, and they need to be

22  ordered to produce lists of people who were involved in

23  this from the SET, senior executive team, a list of people

24  who were involved on SERM.

25      They need to produce all of the details with --

7

1    sorry, e-mails with respect to any individuals in those

2    foreign entities, and we need to be able to start taking

3    30(b)(6)'s of individuals from those foreign entities.

4    The witness I took specifically said, you will have to

5    talk to somebody from those companies.

6         So I don't think from the testimony we got last week

7    there is any doubt that these foreign entities are wholly

8    insinuated into this process.  In fact, they're

9    controlling it.  And we have been unwittingly thwarted in

10   getting this discovery over the last several months.

11        The other category of issues -- we have the foreign

12   discovery issue.  The other category that we have been

13   dealing with again and again and again, with some

14   significant measure of frustration, is the nature of the

15   document production that has occurred.

16        And I'm sorry to say there really has not been

17   tremendous improvement.  There has been some improvement

18   through the actions of the Court in terms of making and

19   forcing things along.  Forcing things along.

20        But the fact of the matter is that the documents we

21   have been getting, for example, include, as I put on the

22   agenda, there are thousands and thousands and thousands of

23   blank pages, and yet there seems to be underlying metadata

24   or files that would suggest there is supposed to be data

25   on those pages, but there's nothing there when we go to

8

1    look at it.  That's number one.

2        Number two, there are instances where for each

3    rolling aspect of this production, they change the way

4    they're identifying documents.  So every time we go to

5    upload it and try to match things up, and I do have my

6    director of IT on the phone if you have any questions

7    specifically, or if Magistrate Baker does on these IT

8    issues, but essentially when we try to match this data up,

9    it's not matching up because they change the way they're

10   phrasing the Bates number, literally putting a slash

11   instead of a dash, putting a comma or a semicolon instead

12   of something else.

13       There are different things they're doing with these

14   Bates number, we don't know why they're doing it, but

15   they're being done, and it's creating a lot of difficulty

16   that is completely unnecessary and avoidable in the first

17   instance.

18            MR. ALLEN:  Your Honor, could I just --

19            MR. PENNOCK:  May I just finish outlining the

20   problem.

21       In addition to that, Your Honor, we have learned that

22   these documents were all TIF'ed since December, so we're

23   kind of at a loss as to why, if they've had these

24   documents in the electronic TIF format since December, why

25   do we not have them all now?  As the Court, as

9

1    Magistrate Baker said at one of the earlier conferences,

2    this stuff, this is not terrible rocket science.  If you

3    have it and it's electronic, deliver it.

4        Well, we learned only recently in a communication

5    from them that they have actually had it in TIF since

6    December.  So where is it?  Why don't we have it?

7        And a fourth category of problem is the continuing

8    problem of page breaks.  As Your Honor may have gleaned

9    from an earlier conference, we have this issue where,

10   let's say 500 e-mails for a given individual are produced,

11   but it's essentially one rolling page without a break.

12       And if you had page breaks in that, in that big

13   electronic document, it would be 1,000 pages.  In one

14   instance 22,000 pages.

15       So it's this big long rolling document, and when you

16   electronically try to search for terms within that, it's

17   essentially impossible.  I mean the smaller it is, the

18   easier it is to sort through it.  But the larger it is, it

19   becomes effectively impossible.

20       Now, one other thing we learned that has made this

21   even more of a problem, that we just learned, is that the

22   program that AZ has been using -- and by the way, I say we

23   learned, we have been told, I don't know this for a fact.

24       But we have been told that the program AZ used to

25   maintain these documents is called Intracept, I believe.

1     Intracept?  Introspect.

2          And Introspect actually would -- the way it's set up

3     and the way we're told they would actually have these

4     documents already, is that there would be a single file

5     for each page, and even a file for the underlying data for

6     each page.

7          But then we think that they may have gone out, taken

8     that, given it to a third-party vendor that's converted it

9     into the form that we're getting it with these rolling

10    pages with no page breaks.

11         Now, again, this is -- and again, this is hearsay.  I

12    mean, we're being told this by a consultant, that they

13    think this is how it would have been, but it obviously

14    raises serious issues.

15         And in the -- when you look at the problem in total,

16    it's, we keep having these serious issues with why are you

17    giving it to us this way?  Why are you -- why is the

18    timing happening this way?  Why are you certifying

19    document productions to be complete and then giving us

20    18,000 pages three week later?

21         And these issues, as you have seen no doubt from the

22    transcripts, have been ongoing for several months.  And we

23    think that these document production issues for the

24    defendant and the discovery of the defendant, along with

25    the depositions, are the foundation for this MDL, and

1    these are the things that we must take care of.  We must

2    get our arms around all this and get this discovery done

3    in order for this MDL to be concluded within the

4    timeframes that we're all trying to get it concluded

5    within.

6        And certainly this discovery needs to be done before

7    we can even think about moving on to the next phase of a

8    litigation like this, which is the discovery that the

9    defendants are insisting upon foisting upon this

10   litigation.

11       As was -- you know, I'll conclude with this, Your

12   Honor, with respect to the defendant's proposals regarding

13   discovery.  We would suggest to you that it really is,

14   when you look at it, simply a plan that will result in

15   this Court and all of us being thrown into a quicksand of

16   litigation.  It will draw us all into dealing with

17   thousands and thousands of individualized issues to no

18   purpose.  Because the defendants have not agreed to try

19   cases in this courtroom.

20       The defendants understand that they're just -- that

21   they're just taking 300 cases that they suggested doing

22   this massive amount of discovery, much of which may have

23   to be redone when we get to trial to the remand court

24   several years from now.

25       So all it is doing is creating this quicksand, this

12

1   chaos that is going to burden and crush everyone involved,

2   and in particular this Court.  If you can imagine the

3   motion practice, the hearings, the phone calls, the

4   conferences, all involving thousands and thousands of

5   issues for this case-specific discovery.

6       Now, at some point, somebody somewhere, maybe here,

7   needs to -- is going to need to look at that.  But we

8   haven't even dealt with --

9       THE COURT:  We're not going to talk about

10  case-specific discovery right at this moment.

11      I want to hear from the defense now about the points

12  raised by Mr. Pennock.

13      MR. MCCONNELL:  Good afternoon, Your Honor.

14  Steve McConnell.  I will address the main points raised by

15  Mr. Pennock.  Mr. Freebery here can address specific

16  issues regarding the state of the document production.

17  And if we do turn to case-specific discovery,

18  Mr. Magaziner will address that.

19      Let me address Mr. Pennock's points starting in the

20  same order I believe he started with.  First of all, he

21  said that -- I think he said there was something like 38

22  witness files that have been produced.  Actually, as of

23  today, 48 witness files have been produced.  We are

24  actually ahead of the schedule set by Your Honor, which

25  was an extraordinarily ambitious schedule.

13

1       The motion that was actually filed by the plaintiffs

2   was with respect to full production for the first eight

3   witnesses.  There was in motion, as we had correspondence

4   with the other side telling them that it was on the way.

5   There was no meet and confer.  The motion should have been

6   filed.

7       We have produced the materials for those first eight

8   witnesses.  As I said, we are ahead of schedule.  So the

9   document production is underway.  There were glitches.

10  There were problems.  The process has been fixed.

11      More people have been added to the process.  Better

12  people have been added to the process.  We're ahead of the

13  schedule.  We're going to meet the deadline that Your

14  Honor set.

15      With respect to witnesses, Mr. Pennock says that he

16  now wants to look at witnesses beyond the initial list of

17  80.  How was that list of 80 selected?  We picked it

18  because we picked the 80 people at the company who we

19  believe were playing decision-making roles with respect to

20  the drug at issue, which is Seroquel.

21      We still believe the selections we made were correct.

22  Perhaps not perfect.  Perhaps we find out during the

23  course of discovery, such as 30(b)(6) depositions, that

24  there may be other people.  In fact, we've had 30(b)(6)

25  depositions.  Other names have surfaced.

14

1       We have actually sent a letter to the plaintiffs

2   before the 30(b)(6) deposition saying, are there people

3   besides these 80 that you want to add to the list?

4       In fact, under CMO-2, which Your Honor signed, the

5   plaintiffs have had the right since December to add people

6   to that list.  If there are people who properly should be

7   added as witnesses and whose custodial files should be

8   produced, that should happen.  That's all been

9   contemplated by the orders already at stake.  They have to

10  ask.  They have to put in a request and we'll respond to

11  it.

12      With respect to discovery of foreign entities,

13  Seroquel is a drug that was discovered in the United

14  States.  The key decision makers are in the United States.

15  The drug was purchased and prescribed in the United States

16  for all the cases that are at issue here.  We continue to

17  think that the locus is the United States.

18      If there are in fact people who are foreign entities

19  who are relevant, we ask the plaintiffs make a request, a

20  document request, a deposition request, a 30(b)(6)

21  request, fine, and we will respond to it.

22      And we will see exactly whether the 30(b)(6)

23  testimony that was cited Mr. Pennock selectively really

24  supports that or not.  Maybe it does, maybe it doesn't.

25  But the issue isn't teed up.  If they're right, they're

15

1    going to get that discovery.

2       On the issues that Mr. Pennock raised --

3       MAGISTRATE JUDGE BAKER:  Wait a minute.  Is he

4    right?

5       MR. MCCONNELL:  About what?

6       MAGISTRATE JUDGE BAKER:  Whether these foreign

7    entities have some documents that bear on the testing of

8    this drug.

9       MR. MCCONNELL:  I'm not clear because the --

10      MAGISTRATE JUDGE BAKER:  No, no, no.  This is

11   your client.

12      MR. MCCONNELL:  I suspect there probably are

13   some over there, but what Mr. Pennock was citing was a

14   deposition of a corporate secretary, and what she

15   testified to is the overall corporate structure.

16      There's AstraZeneca in the United states --

17      MAGISTRATE JUDGE BAKER:  But your burden prior

18   to this was to have investigated the universe of what's

19   available.  Not to play semantic games with his summary of

20   some deposition that was taken.

21      MR. MCCONNELL:  I'm not playing semantic games.

22   Not even close.

23      MAGISTRATE JUDGE BAKER:  Well, you're not

24   answering my question as to whether there's really some

25   witnesses and some documents out there that we haven't

16

1   seen or heard about until now.

2       MR. MCCONNELL:  I think there are some witnesses

3   that are overseas.  I think there are probably some

4   documents.  But I think that the vast -- not just the

5   majority, the overwhelming majority of materials is in the

6   United States.

7      And we have said all along, and Your Honor's provided

8   in the order, if they want to add witnesses, they want to

9   ask for more documents, they can do that.  And we're ready

10   to respond to that.

11      But right now there's nothing to respond to except a

12   vague complaint.  But we have more than met our

13   obligations, Your Honors.

14      And with respect to the technical issue, Mr. Pennock

15   is right.  I mean that shouldn't be the case.  You

16   shouldn't have blank pages.  You shouldn't have pages

17   without page breaks.

18      And what we have said, and Mr. Freebery can address

19   this, time and time again, we have asked to meet and

20   confer, put the lawyers and the techie people together and

21   let's fix these problems.  These are susceptible to a

22   technological fix, and it shouldn't have taken this long,

23   but we need to be able to get together and do it.

24      In terms of the TIF'ing, as Mr. Freebery can

25   complain, TIF'ing of documents is the first step, it's not

17

1    the last step.  The fact that documents were TIF'ed in

2    December just is the beginning of the process, and there

3    are a lot of things that have to be done that can be

4    explained by Mr. Freebery in terms of review, privileges,

5    Bates stamping, putting them in the format that the

6    plaintiffs themselves said that they wanted in January.

7        And then finally, I would just say the thing that the

8    plaintiffs talked about in their motion, that they

9    complained about, is that we added extra documents for the

10   first date.

11       Your Honors, as I read Federal Rule of Civil

12   Procedure 26(e), that's what we're supposed to do.  You

13   make the best effort you can to find the documents and to

14   produce them.  If you find more, you're supposed to

15   supplement.  If you need to complete the record, that's

16   what you do.  I think that's what we're supposed to be

17   doing.

18       And the last point, and I'll leave this to

19   Mr. Magaziner to address if Your Honors get to it,

20   Mr. Pennock said we need to get all this discovery done,

21   including all the discovery in Sweden and England, before

22   we can even think about plaintiffs' specific discovery.

23       And I'll just remind Your Honor, Judge Baker, you

24   yourself said discovery is supposed to be a two-way

25   street.  That's what Rule 26(d) says, too.

18

1      Mr. Freebery is here to address the document-specific

2   issues.

3      MR. FREEBERY:  May it please the Court.  Your

4   Honor, a colleague of mine gave me a quote just the other

5   day.  It was from Irish Setter, it's George Bernard Shaw,

6   that stated that you don't learn to hold your own in the

7   world by standing on guard but by attacking and getting

8   well hammered yourself.  I think that's real applicable to

9   the defendants in the document production in this matter.

10      As the Court is well aware, and Your Honor stated

11   that she read the transcripts, at the last hearing the

12   defendants were well hammered by plaintiffs on all these

13   issues regarding document production.

14      And the Court, too, has had its concern about the

15   pace of production and the fact that we hadn't provided

16   them with a complete production as of that date.

17      Your Honor, despite getting hammered, well hammered,

18   we have kept attacking and we have kept at this process.

19   And in the months since we were last before the Court, we

20   have produced four and a half million pages of documents.

21      Your Honor, you read the transcript, and anybody who

22   attended the last hearing would have come away with

23   knowing there were two clear distinct messages that

24   Judge Baker gave us at that hearing.

25      One was that -- was the Court's desire for defendants

19

1    to provide complete productions for these custodians, and

2    to do it on a predictable pace.  We got together with the

3    plaintiffs at that hearing and we provided them with dates

4    in which we would try our best to provide these complete

5    productions.

6         The Court's second mandate at that hearing was the

7    desire for the parties to work out any of these issues

8    without wasting the Court's time and doing it here in open

9    court.

10        Judge Baker, as Your Honor well knows, said over and

11   over again, you know, let me emphasize again, to the

12   extent I haven't made it clear, we're going to have these

13   hearings over and over again, and I want you to work these

14   issues out prior to coming in.

15        To take each of these Court's desires in turn, Your

16   Honor, and to answer your initial question when you took

17   the bench, for the Court's desire for an increased pace

18   and complete productions, we have now provided to the

19   defendants, as of today, 48 complete custodial

20   productions.  Ten of them came today.

21        The predicted rate that we gave to the Court at the

22   last hearing was that we would have 38 by this date, so we

23   are now ahead of schedule.  And we have produced a total

24   of six and a half million pages related to Seroquel

25   throughout -- through the custodial production.

1      We remain on track, Your Honor, to complete this

2   production by June 30th, as laid out in the Court's CMO.

3      As stated to Your Honor last month, we have been

4   working around the clock addressing these issues,

5   troubleshooting any issues that come out, at a constant

6   pace, trying to constantly figure out ways to streamline

7   the process.  And we have been producing documents at a

8   record pace.

9      We're continuing to attack, Your Honor.  48

10   custodians in a month's time, six and a half million

11   pages.

12      With respect to the Court's mandate on the motions --

13   or excuse me, on the meet and confer, the defendants have

14   been doing everything they can to address all these

15   smaller technical issues that have come up.  They may

16   complain -- plaintiffs are complaining regarding the

17   production, but we're attempting to address those issues

18   consistent with the Court's mandate to do it not here in

19   open court for the first time.

20      On the flight down, Your Honor, I took a look at my

21   correspondence binder, and I counted seven separate

22   requests or offers for meet and confers to discuss these

23   very issues between the last hearing and the May 15th

24   actual meet and confer we had with plaintiffs.

25      We did sit down at that date, and we talked about all

21

1    the issues that they brought up here today.  And I thought

2    we had some agreement on a number of them.  Specifically

3    on all these technical issues, about TIF'ing pages and

4    about blank pages and about documents not lining up.

5        I spoke to Mr. Pederson following that call, or

6    following that meeting, and I had correspondence with

7    Mr. Pennock, Mr. Pederson, and Mr. Pyrtle, who is not

8    here.  The agreement was Mr. -- an assistant from

9    Mr. Pyrtle's office is going to call me.

10       We're going to take one of our attorneys and one of

11   our IT people, one of their attorneys and one of their IT

12   people, we're going to get in a room and we'll hammer all

13   this out.

14       We're not trying to withhold anything or be

15   obstructionist in any way.  If there's anything that we

16   can do consistent with our discovery obligations to make

17   the production easier for them to view or to search or

18   anything, we're going to do it.  If there's something we

19   cannot do, we will bring that to the attention of the

20   Court, but we're not there yet.

21       I understand -- and Mr. Pederson can confirm or deny,

22   but he's under the same impression.  He sent me a letter

23   just last night.  I received it.  I got back to him.  I

24   said, how about Thursday?  Can we do something Thursday?

25   He said he would look into it, and we can move forward.

22

1        Some other issues we came close to coming to

2    agreement on.  With Mr. Pennock on the language of the

3    sophistication.  We told them -- they gave us three

4    suggestions to change the language of our noticed

5    completion of custodial productions.

6        And we said, look, I think we're okay with that

7    language.  Let's put it in.  I'll give you another draft.

8    And we went back and forth on that.  It's a ball still in

9    their court, and I haven't heard back from Mr. Pennock on

10   whether they're okay with the language, but we're close

11   and it's not something that needs to be brought up in

12   front of the Court.

13       After the meet and confer that day, Your Honor, I

14   counted six additional separate requests to sit down and

15   discuss these issues.  The defendants instead are

16   attempting to shoehorn this into today's agenda.  I can

17   only surmise that they do not wish to discuss the issue,

18   to divert the Court's attention and not discuss issues

19   about case-specific discovery, but try to keep hammering

20   the defendants on the document production issues.

21       If you look at the issues that they put on the

22   agenda, Your Honor, it's clear to me when you look at

23   those issues, I think it was 2 through 7 on their points

24   they wish to discuss, that 2 through 7 had to deal with

25   discovery production issues.

23

1    Two through 7, they also, or it's clear to me that it

2    shows what an enormous task defendants have agreed to

3    undertake here.  And yes, there are going to be some

4    imperfections in our production.  But we're going to

5    continue to attack, Your Honor, and we're going to

6    continue to produce documents as this record pace, and

7    we're going to continue to work with the plaintiff

8    whenever they want to deal with us, before, during or

9    after we're in front of the Court.

10    If you want me to address any additional specific

11    issues, I'm happy to.  But again, I think a lot of this

12    should be done without the Court's involvement.

13    MR. ALLEN:  Your Honor, Scott Allen from

14    Houston, Texas.  I'll try to do this in a minute.

15    These are not technical issues, and they're not

16    imperfections.  Sometimes we sit here and we talk and we

17    get lost in the words and we forget the reality.

18    I'm responsible for taking a lot of depositions.  I

19    can't get ready.  There is no way when you have -- take it

20    out of computers.  I'm not a computer person.  But here's

21    what it really means, what all these words really mean.

22    If this was on paper, all of these five million

23    documents, and you walked into a room and tried to find

24    Scott Allen's documents, you would go to the index and it

25    was supposed to say Box Number 30.  That's not what we

24

1    have here because there's no page breaks.  So it would say

2    page 1 -- and I'm not making this up -- through page

3    150,000.  And then I have to go to the box to try to find

4    out those documents.

5         So when we say these are technical issues, they're

6    not technical.  They're substantive.  I can't get to the

7    documents.

8         And then we say we have blank pages.  It's not a

9    minor thing.  It says, okay, assume we have page breaks,

10   and this is the only word that the computer people told

11   me.  It's a hook file.  Well, if you had page breaks,

12   which we don't, and we did have Scott Allen's box and we

13   find Scott Allen's box, and you punch on the button, it's

14   blank.

15        And I don't know the technical reasons why.  And it's

16   not our responsibility.  We did meet and confer on this.

17   Mr. Pyrtle talked to me.  He talked to them in

18   Philadelphia.

19        It's their job to give us usable production.  I mean

20   what else can I do?  Please give me the hook files.

21   Please give me page breaks.  Please do it.  I could meet

22   and confer on that all day.  They know what the problem

23   is.  They're supposed to produce it.

24        And so these are substantive issue.  They're not

25   technical.  They're not imperfections.  I can't get to

25

1    working.  I can't get to work.

2       That's all I have to say.

3       MR. PENNOCK:  Your Honor, on the -- another

4    issue that was brought up by Mr. Freebery is that they

5    have given us -- I guess this morning while I was here

6    they gave another ten witnesses -- 48 witnesses.  I don't

7    deny that.  We have gotten volumes and volumes of

8    documents.  We have been through volumes and volumes of

9    documents or attempted to, subject to all the problems

10   that Mr. Allen was just speaking to.

11      But I would suggest this:  To some extent -- and this

12   ties into the foreign discovery issue that we think has

13   kind of been sort of hidden, deliberately or not, from us.

14   To some extent, we have been asking for 35 truckloads of

15   oranges and they're giving us maybe 20 truckloads of

16   oranges and 15 of apples and saying, here you go.  You

17   should be happy, you've got 35 truckloads.

18      We're like, wait a second.  We weren't looking for

19   apples.  We don't really care about the apples.  We want

20   the oranges.

21      We want the people that were in charge.  We want the

22   people making the decisions.  We want the people that --

23   there is no context from the deposition I took.  This

24   woman said the SET team can do anything they want.  It's

25   run from there.

26

1       So, you know, there is no doubt that the defendants

2   are producing large volumes of material, much of which, as

3   we have said, is fairly unusable.  But the question is, is

4   it what we need and what we think we want to prosecute

5   these claims, because we're not just engaging in a

6   document production and review.  We are litigators,

7   lawyers, trial lawyers trying to investigate and discover

8   a case that we could take to trial.

9       MAGISTRATE JUDGE BAKER:  Mr. Pennock, what do

10   you want from me?

11       MR. MAGAZINER:  Your Honor, I would like the

12   opportunity to serve discovery demands on them.

13       MAGISTRATE JUDGE BAKER:  Go ahead.

14       MR. PENNOCK:  I'd like the opportunity to serve

15   discovery notices for these foreign witnesses.

16       MAGISTRATE JUDGE BAKER:  Go ahead.

17       MR. PENNOCK:  And I'd like the opportunity to

18   not be saddled with the 80 witnesses they've picked just

19   yet.

20       MAGISTRATE JUDGE BAKER:  Go ahead.

21       MR. ALLEN:  By the way -- thank you.  And we

22   will do that, and we don't -- we're also prepared, and I

23   think we've got -- I'm prepared to do away with all this

24   custodial production.  They can stop it right now.

25   Because I don't need any more blank pages.  I don't need

27

1    any more --

2         MAGISTRATE JUDGE BAKER:  Do I need to have an

3    evidentiary hearing with your technical people to find out

4    what the problem is with the slashes and the hyphens and

5    the blank pages and the difficulties which you call

6    technical and what Mr. Allen has called making it

7    impossible to read?

8         MR. FREEBERY:  From my perspective, no.  I'm

9    willing to sit down tomorrow.

10        MAGISTRATE JUDGE BAKER:  Why aren't the problems

11   being solved?  I mean I read your papers that you've got

12   the best outfit in the country working on this, and I'm

13   not getting any results, so that says to me, okay, it's

14   impossible.  So what's the solution?

15        MR. FREEBERY:  What our people are telling us,

16   Your Honor, we're putting this all in this TIF format as

17   laid out in the CMO.  We're giving it to them.  It's their

18   system that's not reading it right or doing something

19   incorrectly.  We need their people there as well because

20   they have a different system than we use.

21        We're all playing on the same level field, or we're

22   playing on the same field, a level field, when it comes to

23   page breaks.  Whatever we have is the same thing they

24   have.

25        But the system, when it comes to the way it converts,

28

1    that's where the issues have come up.  We're willing to

2    sit down, put the vendor in the room, our vendor puts it

3    up, and the IT people.  I think Mr. Pederson is in

4    agreement with that.  And we can do it on the quick.

5        We're not holding anything back, and we're not being

6    obstructionist in any way.  It's just a matter of sitting

7    down to do it.

8        You know, maybe at some point if that doesn't work

9    out, the Court needs to get involved, but I think that's

10   way premature, and we will do everything we can to help

11   work it out.

12       MR. PENNOCK:  Your Honor, may I just reply?  I'm

13   sorry.

14       Actually, Your Honor has some unique understanding

15   and abilities with regard to computer technology and so

16   forth that isn't always found in lawyers generally, and

17   I'd suggest even some judiciary.  I would welcome a short

18   hearing such as that to ferret out once and for all what

19   the problems are.

20       If we're missing something, and if we're just kind of

21   looking past each other, I think that the Court may help a

22   great deal in that.  I don't want to burden Your Honor's

23   time, because you have given us a great deal of time in

24   this litigation and continue to, but if we could come down

25   here, I could send my IT people down and their IT people,

29

1    and have some testimony taken as to what's going on here,

2    why is this so absurdly difficult.

3        And I know it's a big project, but we have done a few

4    before and it's not been quite as dismaying as this.  And

5    I would welcome that, and we would be prepared to do that.

6        MR. FREEBERY:  Your Honor, it may not be a big

7    project.  They just haven't -- they have identified three

8    pages.  We told them what was up with those three pages.

9    If it's a systemic issue, let's sit down and talk about it

10   and work it out, but leave that to the Court.

11       MR. MAGAZINER:  Two points, Your Honor, if I

12   may.

13       The more narrow point is this:  I have been kind of

14   distant from this.  I've observed some of these, sat as a

15   bystander in the meeting.  We are saying we need one of

16   your technical people to meet with one of our technical

17   people so we can sort out why when you try to read this,

18   you're not seeing what we're seeing.  It's that kind of

19   thing.

20       One of the other law firms I'm working with in the

21   Seroquel litigation, every time I sent an e-mail to one of

22   my colleagues at that firm, it bounced back.  We couldn't

23   figure out why until we got their IT person on the phone

24   with our IT person and figured out what it was in the

25   interaction of the two systems that caused that problem

30

1    and we eventually figured it out.

2        Mr. Freebery has time and time and time again said to

3    plaintiffs, have your IT person meet with my IT person and

4    we will figure it out.  But they, rather than having their

5    IT person call his IT person, prefer to bring it to court

6    to distract, if I may, to distract the Court's attention

7    from what we think are the real issues, which are when are

8    we going to get around to case-specific discovery.

9        And to that end, we now hear Mr. Pennock asking the

10   Court for permission to take discovery that Your Honor

11   ordered in CMO-2, they have had permission to take for a

12   half a year.

13       CMO-2 provides that in December 23rd, 2006 --

14       MAGISTRATE JUDGE BAKER:  I already dealt with

15   that.

16       MR. MAGAZINER:  Then -- right.  And then they've

17   also had the right to serve a document request on us since

18   March, once they completed their 2500 fact sheets.

19   They've had that right to serve a document request on us

20   since March, but instead they want to come in and explain,

21   to try to take the Court's time by explaining why they

22   haven't served the document requests that they have had

23   the absolute right to serve since March.

24       As Mr. McConnell said, let them serve their requests,

25   whether it's for domestic or foreign, whether it's for

31

1    documents or people, and we will respond, but all we have

2    heard so far is talk, not anything that we can chew on,

3    look at, respond to, tell the Court what our position is.

4        Can I move on to case-specific discovery at this

5    point, Your Honor?

6        MR. ALLEN:  We respectfully disagree.

7        THE COURT:  Go ahead.

8        MR. MAGAZINER:  Thank you, Your Honor.

9    We've prepared a PowerPoint that I hope will come up.

10       Not going to work.  May I approach the bench, Your

11   Honor?

12       THE COURT:  Yes.

13       MR. MAGAZINER:  We have two copies of a

14   PowerPoint we printed out.  Apparently it's not working.

15   And I provided a copy to plaintiffs of course.

16       As Your Honor well knows, we have been seeking to get

17   case-specific discovery underway for a long time, and so

18   far, despite many discussions, the order has not yet come

19   down saying that we can begin case-specific discovery.

20       THE COURT:  What have you gotten so far from the

21   plaintiffs?

22       MR. MAGAZINER:  Fact sheets, and I want to talk

23   about the fact sheets and what we have and don't have in

24   the fact sheets, to illustrate why we need to be able to

25   move into real discovery.

32

1          First I'd like to -- I put in the agenda --

2          THE COURT:  Are all fact sheets coming in as

3     scheduled?

4          MR. MAGAZINER:  No.  And I want to address that.

5          MR. ALLEN:  4,400 something, Your Honor.

6          MR. MAGAZINER:  I'd like to -- pursuant to CMO-2

7     there is a complicated procedure to protect plaintiffs

8     against any prejudice from failing to submit fact sheets,

9     and if plaintiff does not submit a fact sheet by the date

10    on which it is due, the procedure then is, after ten days

11    pass, we send them a letter saying the fact sheet is

12    overdue.  After another 20 days pass, we're then entitled

13    to come to the Court and present an order for dismissal

14    without prejudice.  I'm about to present the Court with

15    three such orders for dismissals without prejudice.

16         There are a number of procedural safeguards for the

17    plaintiffs thereafter.  If within ten days of my

18    presenting the Court with that order the plaintiffs submit

19    a fact sheet, then the Court will never enter the

20    dismissal order.  If they don't submit a fact sheet, the

21    Court will then enter an order dismissing the claims

22    without prejudice.  And thereafter, plaintiffs have 60

23    days under CMO-2 to cure and submit a fact sheet and move

24    to vacate the dismissal without prejudice.

25         So it's only after that additional 60 days has passed

33

1  that that dismissal without prejudice becomes a dismissal

2  with prejudice.  So, in other words, these cases that I'm

3  about to submit the order for pursuant to CMO-2, these

4  plaintiffs will have had 100 days to submit a fact sheet

5  after the date on which it was due, and it's only if they

6  fail over the course of 100 days to submit a fact sheet

7  that their cases would be dismissed with prejudice.

8      So with that background, I would like to hand up to

9  the Court --

10      MR. ALLEN:  We will stipulate he can file these

11  three motions.  I don't know what we're doing here.

12      MR. MAGAZINER:  Because we're supposed to --

13      MR. PENNOCK:  Three cases.

14      MR. MAGAZINER:  They're not three cases.  What

15  they are, Your Honor, are three separate orders, and I

16  want to describe them, if I may.

17      One of the orders concerns two cases for which no

18  fact sheet was ever filed.  There was never a date given

19  by plaintiffs' lawyers on when it would be filed, contrary

20  to Judge Baker's order, and no fact sheet was ever filed.

21  That's the order involving those two cases called Ross and

22  Mosley.

23      The next order concerns 31 cases in which Mr. Bailey

24  told us that he was moving the plaintiffs from the March

25  date to the April date, which he doesn't have the right to

34

1    do under the order, but the fact sheets were submitted

2    neither in March nor April, so we're now submitting an

3    order as to those.

4         THE COURT:  These don't need to be handed to us.

5    They need to be filed electronically with a notice or a

6    motion or something.  If you want the Court to act on

7    them, you need to file a motion.

8         MR. MAGAZINER:  The procedure contemplated by

9    CMO-2 doesn't call for a motion at this point, but if Your

10   Honor would direct --

11        THE COURT:  Well, you need to have something

12   to -- we didn't put it specifically in there, but

13   something has got to trigger an action by the Court, and

14   in this district that's usually a motion.

15        MR. MAGAZINER:  I understand.  It said, "Orders

16   of dismissal shall be submitted to the Court," so --

17        THE COURT:  Well, that's how you submit orders

18   of dismissal, is file a motion.

19        MR. MAGAZINER:  In any event, we will submit a

20   motion.

21        The next group, the third one that we will motion and

22   that we will file then, has to deal with fact sheets for

23   which there are no verification.  And if I can direct the

24   Court's attention to page 2 of our slide show, which

25   unfortunately I cannot project for you, but showing you a

35

1    hard-copy form.

2         This is a record of fact sheets as they have come in

3    to date.  You will see that what is beginning to happen is

4    each month we're getting fewer actual completed fact

5    sheets and more fact sheets that are coming in without

6    verifications.

7         The last page of the fact sheet is a verification or

8    acknowledgment that says, "The facts stated herein are

9    true to the best of my knowledge," et cetera.  And we're

10   seeing more and more fact sheets without verifications,

11   and you see that on page 2 of the presentation that I've

12   handed up to the Court.

13        Then we're seeing an increasing number of fact sheets

14   that are not served at all.  What we are not seeing is any

15   dismissals.  Rather than dismissing cases which they don't

16   have verifications, plaintiffs' counsel are submitting

17   fact sheets unverified.

18        The fact sheets do not provide much of the crucial

19   information.  I'm looking at page 3 of our presentation.

20   62 percent of the fact sheets are missing dates of

21   Seroquel use.  34 percent are missing the dates of the

22   diabetes diagnosis, which is a basis for the claim.

23        I'm looking at page 4.  248 of the fact sheets the

24   plaintiffs say that they were plaintiffs in a Zyprexa

25   lawsuit but they also have answered that they never took

36

1    Zyprexa.

2        Another 88 of them said they settled there Zyprexa

3    claim, but then said that they never took Zyprexa.

4        I'm not faulting the plaintiffs for this.  The

5    plaintiffs are confused.  They have trouble filling out

6    the fact sheets.  All I'm saying is, we're not getting

7    crucial fundamental information from the fact sheets.

8    We're getting spotty, inconclusive, inconsistent,

9    unverified information from the fact sheets.

10       If you turn to page 5 --

11       MR. ROTH:  Isn't this sort of a meet and confer

12   type of issue?

13       THE COURT:  Yes.  That's what I was thinking,

14   Mr. Roth.

15       MR. MAGAZINER:  Well, Your Honor asked, if I

16   may, what sort of information or discovery we're getting,

17   and I was explaining that all we're getting are fact

18   sheets and they're not very informative.

19       What I have presented to the Court -- by the way,

20   meet and confer is a very interesting question.  We have

21   repeatedly written to plaintiffs' counsel and said, we

22   need supplementation, we need verification.  They have

23   given us some verifications recently, not most of them,

24   but some, and as they have written us letters, which I'll

25   be happy to provide the Court, saying, we're not going to

37

1    supplement.  We're not going to provide more information.

2    We think we've given you enough.

3        Because of concerns about confidentiality in open

4    court, I'm not going to refer to any plaintiffs by name,

5    but if you look behind the tabs here, you will see A, B,

6    C, D, E, F, G.  These are plaintiffs' fact sheets.

7        We have a plaintiff who -- plaintiff A -- checked

8    both yes and no, the 28 questions.  That doesn't provide

9    us discovery.  That tells us that we need to take

10   discovery to figure out what's going on with this

11   plaintiff.

12       We have plaintiff B who gave us 60 do not recalls and

13   blank answers, including, are you using Seroquel still,

14   because that's a very crucial part of any case, whether

15   the plaintiff is still using Seroquel.

16       Plaintiff C, this fact sheet is unverified.  That

17   would be tab C of the book that I have given you.  35 do

18   not recalls.

19       This is an executor we asked for the Court, which

20   appointed this person as executor, and she says -- Bailey,

21   Perrin & Bailey, the law firm -- "what we're seeing is

22   fact sheets where it seems clear to us that plaintiffs'

23   counsel have not reviewed the fact sheets to see whether

24   even on their face they begin to make sense."

25       If you look at plaintiff D, plaintiff says that she

38

1   has been the chief executive officer of Procter & Gamble

2   since the age of two.  I'm not faulting plaintiff.

3   Plaintiff has a serious issue obviously.

4       What I'm saying is, the fact sheet isn't providing us

5   useful information when the lawyers simply submit to us a

6   fact sheet in which the plaintiff says she's been CEO of

7   Procter & Gamble.

8       We have plaintiff E.  She doesn't know when she used

9   Seroquel.  She doesn't know the date of her diabetes.  She

10  claims in one line the diabetes as an injury.  On the next

11  page she says she's never been diagnosed with diabetes.

12  And it's unverified.

13      We have plaintiffs who were born --

14          MR. ALLEN:  We're not doubting --

15          MR. MAGAZINER:  Hold on.

16      So what -- all of this is designed for one purpose,

17  Your Honor.  It's not to say we fault these plaintiffs,

18  that we think they have done something wrong.  We do

19  question how a lawyer can submit a fact sheet that says a

20  plaintiff was born and died on the same day or why they

21  have a fact sheet that says a plaintiff was diagnosed with

22  diabetes in 1975 and the person first used Seroquel in

23  2000, why that's a lawsuit in this court.

24      All we're saying is, the fact sheet discovery that

25  we've had to date is so inadequate, so incomplete, much of

39

1    it unverified, so inconsistent, so unreliable, that we

2    need to take discovery.

3        We have -- Your Honor has said several times, Your

4    Honor Judge Baker, that discovery is a two-way street.

5    What we have here, if you will excuse the analogy, is we

6    have a bunch of semis coming down I4 carrying AstraZeneca

7    documents, AstraZeneca 30(b)(6) witnesses, et cetera, and

8    we have a moped that goes the other direction every now

9    and again carrying some unverified fact sheets with

10   incomplete, inconsistent and unreliable information.  So

11   we don't have a two-way street going.  We have a one-way

12   highway with almost nothing coming the other direction.

13       I hope that answers Your Honor's question about what

14   sort of information --

15       MAGISTRATE JUDGE BAKER:  Mr. Magaziner, aren't

16   most of the defects you're talking about going to be

17   self-curing?  I mean if there's an unverified fact sheet,

18   that's the same as no fact sheet.

19       MR. MAGAZINER:  I agree.

20       MAGISTRATE JUDGE BAKER:  And you've got your

21   remedy.

22       MR. MAGAZINER:  If the Court --

23       MAGISTRATE JUDGE BAKER:  You call that to the

24   plaintiff's attention.  They cure it or they don't cure

25   it.  If they don't cure it, they're out of court.

40

1          MR. MAGAZINER:  If the unverified fact sheet

2    cases are dismissed, then we no longer care about

3    discovery in those cases.  I'm saying we have not only

4    unverified fact sheets --

5          MAGISTRATE JUDGE BAKER:  I understand.  If

6    you've got nonsense in there, you call it to their

7    attention.  If they don't cure it, it's going to get

8    dismissed.  They can't -- they're bound by their answers

9    and their responses on this round, just as you are.

10       If you've got problems with mopeds with wheels

11   falling off and semis that are locked with wheels falling

12   off, we'll deal with that, but both sides are going to be

13   bound by what they produce here.

14       It sounds to me -- I mean, I haven't looked at your

15   material here, from what you're describing, those things

16   are not adequate, and plaintiffs will lose cases because

17   of that.

18         MR. MAGAZINER:  The other point I want to make

19   is this:  I will -- we will file appropriate motions and

20   we will see how the plaintiffs respond.  My guess is that

21   they are going to then want to supplement and start trying

22   to cure the deficiencies.

23         MAGISTRATE JUDGE BAKER:  They have got time.  If

24   you file a motion --

25         MR. MAGAZINER:  So they have had time to cure,

41

1    and they have in many cases just refused in an unqualified

2    way to supplement the fact sheets, so we will have to see

3    how that plays out.

4        The other thing that I know Your Honor is very

5    interested in, and I assume you are as well, Judge Conway,

6    is ADR.  We cannot get into an ADR program based on this

7    kind of information.  In order for to us get into an ADR

8    program, at the very least we're going to need to depose

9    the plaintiffs, we're going to need to depose other people

10   in their family who can give us information about the

11   plaintiff that the plaintiff is not able to do so herself.

12       Very importantly, we're going to have to depose the

13   treaters, and most importantly the prescribers, because,

14   as I've explained to the Court before, but it's worth

15   mentioning again I think, the crucial piece of the puzzle

16   in many of these cases is going to be what would the

17   prescriber say when asked under oath, "Would you still

18   prescribe Seroquel to this patient, this plaintiff, even

19   if you knew all about the diabetes risk that the

20   plaintiffs say we have withheld information about from the

21   medical community?"

22       Most of these doctors we believe are going to say,

23   "Yes, I would still prescribe Seroquel."  The reason we

24   believe they're going to say that is because they are

25   still prescribing Seroquel even in the face of a warning

42

1   label that's been on it since 2004 that says there's a

2   diabetes risk.

3      These doctors understand that these patients have

4   conditions which if not treated, for many cases or for

5   many plaintiffs, means they cannot function in society,

6   and that doctors have decided that the risk of diabetes is

7   well worth running in order to obtain the benefit of

8   controlling their mental disorders.

9      The law in most states is that if a doctor says,

10  "Yes, I would still have prescribed Seroquel even if I

11  knew then everything I know now," that that case has no

12  value.

13     Now, if we're going to have a meaningful ADR program,

14  we have to have this kind of information about the

15  plaintiffs in order to be capable of engaging in any kind

16  of ADR that's going to be meaningful.  Otherwise, we're

17  left saying we have no idea what we're dealing with, we

18  can't begin to value these cases and talk about whether

19  ADR would be useful.  So if we're going to have an ADR

20  program, we need to start case-specific discovery.

21     As Steve McConnell said a few minutes ago, there is

22  no basis under the Federal Rules for saying that because

23  they want to take a lot of discovery of AstraZeneca, we

24  should somehow be precluded from taking discovery of

25  plaintiffs.  To the contrary, the rule says that neither

43

1    party is to be given priority.

2        And I just want to make one final point on this, if I

3    may, Your Honors.  We all know that if there were one

4    plaintiff or ten plaintiffs suing AstraZeneca, if

5    plaintiffs' counsel come in -- came into the Court and

6    said, "Don't let AstraZeneca take discovery of us until we

7    have completed all our discovery of AstraZeneca," Your

8    Honors would both say, "No, that's not the way it works.

9    They can take discovery of you and you can take discovery

10   of them simultaneously."

11       Somehow, because they have signed up 7,000 or 8,000

12   plaintiffs, they now believe that the rule should be they

13   get to take discovery of us and we get no discovery of

14   them.  I do not believe there is any support in the case

15   law for that proposition.  No support in the rules, no

16   support anywhere.

17       That's basic fairness, and it's also the only way to

18   get this litigation to the point where Your Honors want

19   it, where there can be some meaningful motion practice and

20   meaningful ADR.

21       Thank Your, Honor.

22       MR. BAILEY:  Your Honor, Ken Bailey.  You know,

23   I heard the defendants earlier, they were talking about

24   the best efforts, attack, obligations.  I do not take the

25   obligation to mean to give them complete fact sheets

44

1   quietly.  I'm doing the best I can.  I'm going to continue

2   to do the best I can, and I welcome them to show me where

3   there are problems.

4       I also appreciate the fact that he called this to the

5   Court's attention, the answers that these people gave to

6   us whenever we responded or asked them the questions.  The

7   fact is, we are dealing with sick people here.  There's

8   nothing I can do about that.  I can't make up answers for

9   them.  I can't supplement answers for them.  I have to do

10  what the people tell me to do.

11      So if this Court says that because the answers are

12  not what they think they ought to be, that the people get

13  their cases dismissed, then I will accept that and

14  understand that.  I don't think it's right.  But we're

15  doing -- we take our obligation very seriously, and we're

16  going to supplement it where necessary.

17          THE COURT:  Well, certainly it's your

18  responsibility to make sure they're verified before they

19  leave your office.

20          MR. BAILEY:  Yes, ma'am, that's true.  And we

21  have been sending them verification.  Just like they say

22  the deficiencies they've had on their discovery, they're

23  getting rolling, and that's an obligation that I have.

24      I've hired investigators, I've hired call people.

25  Everybody in our office are calling these people.  We're

45

1    talking to the people.

2        These people are just not all here.  And if what they

3    claim their drug is intended for, which is schizophrenic

4    people, they ought to understand the problem with trying

5    to communicate with these people.

6        MR. PENNOCK:  In any event, as the Court has

7    pointed out, there's mechanisms in place for dealing with

8    this issue that -- and we're willing to work within them

9    and are working within them with respect to the

10   verification issue and these other issues.

11       THE COURT:  Well, the reason that the plaintiff

12   fact sheet asks for as much detail as it did was to give

13   the defense an opportunity to have some information, so

14   they can get their information.

15       MR. ALLEN:  Fact sheets or interrogatories or

16   depositions, when you ask somebody a question, they give

17   their answer.  I had a hiatal hernia.  I don't remember

18   exactly what year it was.  I can tell you my doctor's name

19   is Jim Lawhorn.  You have to go get the records.

20       So to suggest all of what he suggested, quite

21   frankly, isn't fair.  Do you have -- what's the date of

22   diagnosis of diabetes?  I don't know what diseases people

23   have in this courtroom, but tell me the date of the

24   diagnosis.  People don't know.

25       And so to make -- no, let me finish -- to make these

46

1    suggestions, there's a procedure in place, but I didn't

2    want to leave this courtroom with the understanding that

3    if a person says in a fact sheet, I don't know the date,

4    that's somehow sanctionable or wrong.  Because that's just

5    not the case.

6        Where did you get your prescription filled?  I have

7    had many prescription filled.  I don't know.  "I don't

8    know" is a good answer.

9        We prepare people for deposition, this is what

10   lawyers are taught, if you don't know the answer, you just

11   say you don't know, so when you don't know you're not a

12   liar, and you're not a cheat.

13       And if you don't remember all the information, that

14   doesn't make you wrong.  And if you say yes and no to

15   questions --

16       THE COURT:  Counsel, this isn't closing

17   argument.  This isn't being very productive.

18       MR. ALLEN:  All right.

19       MR. MAGAZINER:  Your Honor, the reason I raise

20   the issue is not -- and I'll say this again, it is not

21   because I fault any of the plaintiffs.  I don't fault

22   them.  I don't blame them.

23       I'm saying merely that the fact sheet process is not

24   providing to us the kind of information that the Court

25   thought it would provide to us when the Court ordered the

47

1    fact sheet process.  The information we're getting is not

2    adequate for us to understand the nature of the claims

3    against us.

4         And I'm certainly not faulting Mr. Allen or

5    Mr. Bailey for the fact that their clients are difficult

6    to deal with, difficult to find sometimes.  All I'm saying

7    is the fact sheet process was intended to give us some

8    fundamental information and we're not getting even that

9    fundamental information.

10        The fact sheet process was never intended, nor could

11   it have been, to give us some of the most important

12   information that's not in the plaintiff's possession, such

13   as what would their prescribing physicians have done if

14   they hadn't -- if they had had the warnings that

15   plaintiffs say they should have had about Seroquel.  That

16   couldn't be in the fact sheets.

17        It's not going to give us the information that a

18   treating physician can give us about when did the

19   plaintiff -- what is the reason the plaintiff's diabetes

20   developed?  Was it because of Seroquel or was it because

21   of something else?  Those are pieces of information which

22   are not within the possession of the plaintiffs, so even

23   if the fact sheets were perfect, we would still need

24   discovery to go beyond the fact sheets.

25        But the fact sheets are just not proving to be as

48

1    good a vehicle as Your Honors contemplated in providing us

2    with sort of the fundamental information to get us

3    started.  That's my point.

4        And again, I wish to reiterate I am not blaming the

5    plaintiffs.  By no means am I faulting someone, or

6    Mr. Allen said I was calling people liars or cheats, and

7    that is not certainly not my intention.  I'm just saying

8    it doesn't provide us with the information that we need.

9        THE COURT:  If it doesn't give you the

10   information you need, send it back to them.  The process

11   is there.

12       MR. MAGAZINER:  As Mr. Bailey --

13       THE COURT:  It's my -- and I haven't practiced

14   law in 15 years, but I wouldn't answered one of those fact

15   sheets without supplementing it with the information I had

16   at the time that I filed the complaint, and under Rule 11

17   decided that this person was suitable for this litigation.

18   So I'm assuming counsel's doing that.

19       MR. MAGAZINER:  Well, we're not getting

20   supplements.

21       THE COURT:  Send it back.

22       MR. MAGAZINER:  But one of the problems, Your

23   Honor, is, as Mr. Bailey said, when we -- when Mr. Bailey

24   goes back to his client and says, give me some of this

25   information, his client sometimes can't get it.

49

1      The way we're going to be able to get that

2   information is by getting the medical records, seeing what

3   other providers are listed in the medical records.  For

4   example, plaintiff I in that -- or J in that book we gave

5   you, the fact sheet lists two doctors.  We got records

6   from those doctors.  We see the names in those records of

7   other doctors who are not listed.  When we get records

8   from them, we'll discover the names of more doctors.

9         MAGISTRATE JUDGE BAKER:  What's keeping you from

10   getting the medical records?  I thought that was part of

11   the process.

12         MR. MAGAZINER:  No.  Your Honor, what happens

13   is, the fact sheet lists the names of doctors.  We

14   immediately send out requests for those doctors to get

15   their records.  When we get those records back, what we're

16   beginning to find -- and this happens in every mass tort

17   litigation, not just litigation of this nature where we're

18   dealing with people with mental disorders -- what happens

19   is, when we get the records, we see in the records the

20   names of other doctors that the plaintiffs didn't give us

21   on their fact sheets.  So we then request records from

22   those additional doctors whose names should have been

23   disclosed.

24         MAGISTRATE JUDGE BAKER:  What do you want from

25   the Court about those?  You got your process.  You're

50

1    doing your review.  You're getting the records.

2          THE COURT:  Do you have the releases that you

3    need to get those additional records?

4          MR. MAGAZINER:  No.  The fact sheets are not

5    complete.

6          MAGISTRATE JUDGE BAKER:  I understand.  If you

7    want sanctions for that, move for sanctions.

8          MR. MAGAZINER:  No, we don't want sanctions.

9    I'm saying that in order for us to piece this puzzle

10   together, we need to figure out who the doctors are.

11         MAGISTRATE JUDGE BAKER:  And you will be doing

12   that before you're taking depositions anyway.  Again, I

13   don't know how that supports your argument you need to

14   take immediate depositions.

15         MR. MAGAZINER:  Sometimes, Your Honor, the best

16   way to find out who the doctors are, since the fact sheets

17   are inadequate, and since when we send them back

18   Mr. Bailey may well say, these are the only names my

19   client is able to give me, is for us to depose someone,

20   maybe the plaintiff, maybe the plaintiff's spouse, maybe

21   the plaintiff's child or parent and find out more.

22         An interrogatory -- and I know Your Honors must have

23   experienced this when you were practicing lawyers -- an

24   interrogatory is a good vehicle to get information.  But

25   there is much, more information that can be gotten by

1    depositions than by interrogatories, because sometimes a

2    well meaning litigant says in response to --

3        MAGISTRATE JUDGE BAKER:  You're not going to

4    want to take these plaintiffs' depositions until you've

5    reviewed every medical record that you can find.

6        MR. MAGAZINER:  Sometimes, Your Honor, we need

7    to take plaintiffs' deposition or depositions of family

8    members to find the names of the doctors.

9        MAGISTRATE JUDGE BAKER:  I understand that.  If

10   the PDF isn't enough to get down that trail, you know --

11   it sounds to me like they said the PDF is the best

12   information they have available to them about the medical

13   treatment, and they have identified their providers.

14      If they can't identify any providers, I don't know

15   where their case is going.  And I don't know how a

16   deposition of somebody you can't answer the PDF is going

17   to make it any more clear.

18       MR. MAGAZINER:  For example, Your Honor, take a

19   different litigation.

20       MAGISTRATE JUDGE BAKER:  We're not dealing with

21   other litigation.  We're dealing with this litigation.

22       MR. MAGAZINER:  Okay.  In this litigation, fine.

23   We haven't taken any depositions of any plaintiffs here,

24   as you know.  I imagine if we depose the responsible

25   member of a family of one of these plaintiffs, if the

52

1    plaintiff himself is schizophrenic and says things that

2    make it look like the plaintiff is not really competent to

3    answer our questions, we will depose a spouse or a family

4    member, and we will say what other doctors has that person

5    seen, when did this person first begin taking

6    antipsychotic drugs?

7        Do you know whether your father is diabetic?  When

8    did your father first -- was he first diagnosed with

9    diabetes?  The son may say, my father was first diagnosed

10   with diabetes in 1975.

11       Well, we're not going to get that from the plaintiff.

12   We're not going to get it from the fact sheet.  But we may

13   get it from the plaintiff's son.  We may get it from the

14   plaintiff's spouse.  We may get it from the plaintiff's

15   child.

16       We're entitled to take this discovery to try to piece

17   this together and see whether there is a case or is not.

18   Some of these fact sheets, I agree.  If Your Honor means

19   that these -- the plaintiffs are going to be bound by

20   these facts sheets, then we have fact sheets where the

21   plaintiffs have said that they were diagnosed with

22   diabetes in 1975 and first used Seroquel in 2001, I assume

23   that case goes away.

24       My guess, however, is that as soon as we file that

25   motion, Mr. Bailey will say, well, wait a minute, let us

53

1    dig deeper into this.  I think the fact sheet was wrong

2    when he said was diagnosed in 1975.  Don't hold this

3    against my client who has a mental disorder and who

4    answered the fact sheet by saying he was diagnosed in

5    1975.  I think he should be given a chance to prove that

6    he was diagnosed with diabetes after the use of Seroquel,

7    not 25 years before it.

8        I wouldn't blame Mr. Bailey for saying that.  That's

9    what I would say if I were representing someone who's

10   incompetent.

11       But we need to be able to go beyond the fact sheet to

12   try to figure this stuff out.  We need to depose doctors.

13   We need to depose treaters and prescribers.  We need to

14   depose family members if the plaintiff himself can't

15   answer our questions.

16       But being stuck with a set of interrogatory answers

17   and that's it, that's not two-way street discovery.

18   That's one-way discovery with a moped coming along the

19   other way.

20       Mr. Pennock talked about the trucks full of oranges,

21   and we're throwing some apples in.  I don't think his

22   analogy is apt.  I don't think we're throwing in any

23   apples.  We're just giving them oranges in the

24   semi-trailers that are coming down I4.

25       But what we're getting back the other way are not

54

1    oranges, not apples, we're getting a bunch of unusable

2    unreliable information.

3        Thank you, Your Honor.

4        MR. ROTH:  Judge, if I might real briefly.  I

5    don't think any of this is moving the ball forward.  You

6    have already indicated that there is procedures -- if the

7    PFSs they're getting are so bad, there are procedures for

8    them to protect them to go move forward to get them

9    dismissed.

10       I understand that they have like 50,000 medical

11   records that they have been given, and that's where

12   they're going to find the information, if they care to

13   look at it.

14       But the point is that, as they have always contended

15   in this court, if they want to beat down the numbers of

16   the plaintiffs in this case, and they have always

17   maintained from the beginning that the fact sheets are the

18   way to do it, so I don't understand what they're really

19   wanting this Court to do, to ask for individual discovery.

20       Their remedy, if it's so bad, is to file their

21   motions to dismiss the case, just like Mr. Bailey just

22   said, if that -- that's what the issue is.  Not going to

23   go to individual doctors and then putting the cart before

24   the horse to go try to get a prescribing doctor to become

25   their expert to testify, when we haven't gotten the

55

1    documents from them about all the information that they

2    knew about this drug that they never disclosed to the

3    public, that the FDA as late as November 2006 said they

4    were misleading the doctors and the public about this

5    drug.

6        That's the problem with what they're talking about.

7    It's not -- the plaintiffs from the very beginning, from

8    our first hearing have always been talking about a small

9    bellwether group of case-specific discovery, and that's

10   what we still maintain needs to be done.

11       But what they're asking for is, I think, irrelevant

12   to what the issue is, is to try to move the ball forward,

13   and they're trying to compare apples to oranges, to use

14   that analogy, between the fact sheets and the production

15   they're making and whether or not -- what type of

16   case-specific discovery will be done in this case.

17       THE COURT:  Mr. Roth, what is the plaintiffs'

18   position on bellwether cases and having some number of

19   cases that are --

20       MR. ROTH:  As you've read from the transcripts

21   from the very beginning, when Mr. Pennock put up

22   approximately 20 cases, selected cases that takes in

23   different categories or profiles of what the types of

24   plaintiffs, the types of diseases that you have, whether

25   it's a child, whether an adult or a certain type of

56

1    diabetes, the question has always been just what the

2    selection process has been.

3        Whether we pick ten and they pick ten, from a

4    practical standpoint -- I mean, they're talking about, you

5    know, let's say half of the plaintiffs went away.  I mean,

6    you're still talking about the 3500 depositions of family

7    members.  I mean that just makes no sense.

8        And the only consistent position has been ours, which

9    has always been a small group consistent with what's

10   occurred in other MDLs of 20 people, what we have been

11   suggesting.  They suggested 100, 300, 600, 1800.  They're

12   all over the map on this.

13       What we would want to do, if the Court wants to do

14   case-specific discovery, is limit it to a confined group

15   of 20 cases to be selected, either ten from each side or

16   getting together and coming up with a profile, because

17   that's what we're talking about.

18       And that's what this Court has always said.  If we

19   want to give some guidance to those other federal judges

20   who are going to have these case-specific cases remanded

21   back to them, you know, that's the way to do it, is with a

22   small isolated group that meets a certain profile.

23       They know, as Judge Baker has told them, you know,

24   what the issues are from your side, and you've told us,

25   you know what the issues are.  It's not going to be any

57

1   great task to come up with the select number of cases to

2   do that.

3        MAGISTRATE JUDGE BAKER:  What are we going to do

4   with those, whether it's 20 or 200 or 2,000?  I mean, they

5   fall into some groups, and then Judge Conway makes some

6   rulings on issues, and Mr. Magaziner finally before the

7   last hearing outlined some of the issues he contemplates

8   now, a long list.

9        Judge Conway does that and then sends the cases back

10   to a judge someplace else, who I guess is bound by what

11   Judge Conway does, although it's not entirely obvious to

12   me, putting it still on a trial level.  It's a long case.

13        But then figures out whether that particular case

14   gets into one of the pigeonholes that Judge Conway's

15   defined?

16        MR. ROTH:  Well, I think that is part of

17   benefitting them, too, in terms of testing whether or not

18   what cases have validity or not.

19        Our preference would be not to have case-specific

20   discovery because that should be in the individual cases

21   where they're filed once they're remanded.  I mean I don't

22   think it's this Court's job to, you know, to look at 7200

23   individual cases.

24        MAGISTRATE JUDGE BAKER:  It's this Court's job

25   to get the cases ready for remand for trial.

58

1          MR. ROTH:  And that could be done by the

2    discovery issues we've talked about today, and doctor --

3    you know, Daubert hearings and motions for summary

4    judgment, and those types of issues, Your Honor, at least

5    as I understand the MDL process.  I don't profess to be an

6    expert in it.  I only know what I read about it.

7          MAGISTRATE JUDGE BAKER:  There's more than one

8    approach on MDL.

9          MR. MAGAZINER:  Your Honor, may I --

10          MR. PENNOCK:  We're going to -- I'm sorry,

11    Mr. Magaziner.

12          We're going to proceed to undertake the discovery

13    that you have permitted us today against the defendants.

14    We're going to continue our efforts.  We're setting up

15    depositions of defendants.  We're moving ahead to build

16    what we see is our case in this litigation.

17          And I'm sure there's no doubt in our mind that at

18    some point in the future, and probably not too distant,

19    this entire issue of what cases need to be discovered and

20    where is going to be ripe.  We're going to make it ripe,

21    because that's what we're doing by litigating against the

22    defendant.

23          And right now it's just that the massive amount of

24    fact sheet discovery, which thankfully the defendants have

25    put on this chart that's already taken place, thousands of

59

1    fact sheets.  I mean, I'm sure there are some

2    deficiencies, as there always are.  There's thousands of

3    non-deficient answers to thousands of fact sheets that

4    they have.  Thousands of records.

5         And we're going to proceed with the discovery that

6    Magistrate Baker has been guiding and directing, and at

7    some point, we will get to the point in the road, to the

8    bridge of what, if any, discovery needs to be done here,

9    should it be done -- unlike other MDLs, should it be done

10   here, should it go back to these other districts, how is

11   it going to happen.

12        There's so much that will transpire between now and

13   then to make those issues ripe at that time.

14            MR. MAGAZINER:  Can I be heard on that, Your

15   Honor, please?

16            THE COURT:  Go ahead.

17            MR. MAGAZINER:  Thank you, Your Honor.

18        Your Honor asked Mr. Pennock what he wanted.  I'll

19   tell you what we want.  What we want is an order saying

20   that in some number of cases, and the Court has heard

21   different proposals and different arguments about the

22   right number, but in some number of cases we can begin to

23   notice depositions when we're ready to do it and begin

24   putting together the pictures of what kind of cases we're

25   dealing with.

60

1       Your Honor asked what will we do with that

2    information, whether it's 20 case or 200 or whatever

3    number it may be.  We will bring to the Court a motion,

4    perhaps in one case or in five cases, that say in all

5    these cases, these doctors have said they would still

6    prescribe Seroquel today to these patients.  We will ask

7    Judge Conway to write an opinion, if she agrees with us,

8    that says, under the law of these jurisdictions, if a

9    plaintiff's doctor testifies he would still prescribe the

10   drug knowing now everything plaintiff says he should have

11   known before, that case has no value under the learned

12   intermediary doctrine.

13       MR. PENNOCK:  Judge, I'm sorry.  I cannot

14   tolerate that misstatement of the law one more time today.

15   That is just an outrageous misstatement of the law.

16       MR. MAGAZINER:  Please don't interrupt.

17       THE COURT:  Mr. Pennock.

18       MR. PENNOCK:  Whether --

19       MAGISTRATE JUDGE BAKER:  Mr. Pennock, sit down.

20       THE COURT:  Judge Baker speaks louder than I do.

21       MR. PENNOCK:  I'm sorry, Your Honor.  I didn't

22   hear you.

23       MR. MAGAZINER:  If Mr. Pennock doesn't think

24   that's the law, he of course can respond to our motion by

25   briefing what he thinks the law is.  I'm confident that

61

1   our perception of the law is correct.

2       In any event, Your Honor, Judge Conway will then rule

3   whether we're right or whether we're wrong.  If Your Honor

4   says we're wrong, then when we have similar cases in other

5   courts after remand, we would expect that those courts are

6   not going to be very persuaded by any motion that we file

7   making the same argument that Your Honor has already

8   rejected.

9       On the other hand, if Your Honor says Mr. Pennock is

10  wrong and we're right, we would expect that most courts

11  when we tee up these other cases with the same issue,

12  these other courts would say, it seems to us Judge Conway

13  was correct and that the defendant is entitled to judgment

14  here.

15      That's what happens in MDLs.  That's how an MDL judge

16  can create law of the case or precedent that guides other

17  judges after remand.

18      If we tee up a -- if the plaintiffs have an expert

19  who says that I can tell that a plaintiff's diabetes was

20  caused by Seroquel rather than by other risk factors, and

21  Your Honor rules that this expert testimony is not Daubert

22  worthy because there's no real science to back up this

23  expert's opinion that a person with a particular profile

24  has diabetes caused by Seroquel or diabetes caused by

25  other risk factors, then other courts presumably are going

62

1    to say that kind of opinion is not Daubert worthy.

2        If Your Honor says that we're wrong and that that

3    kind of opinion is Daubert worthy, then presumably other

4    courts will be guided.  That is what has happened in other

5    MDLs.  That is what happens here.

6        Mr. Pennock says again and again, sometime down the

7    road there will be discovery.  We have submitted to the

8    Court order after order after order in a thick binder that

9    we gave the Court two years go other MDL Courts' orders

10   allowing case-specific discovery.

11       Mr. Pennock acts like it's never happened.  It

12   happens routinely.  It's the only way in which a

13   plaintiff -- in which a defendant can be allowed to defend

14   itself, is by taking discovery, just like the plaintiffs

15   are entitled to take discovery of us.

16       We're entitled to defend ourselves.  We're entitled

17   to find out what these cases are.  We're entitled to be in

18   a position to move for summary judgment in some of these

19   cases, and we're entitled to have this information before

20   we go into the ADR program that Your Honors are

21   encouraging.

22       MR. PENNOCK:  Your Honor, I apologize.  I just

23   apologize to the Court for that interruption.

24       The fact of the matter is that in a prescription drug

25   case, it's not entirely up to the prescribing doctor.  The

63

1   patient plays a role in the decision, and a prescribing

2   doctor can say all day long, I would prescribe it anyway,

3   but if a patient says, and we may have as many as

4   two-thirds of these cases off label, that hey, if he had

5   told me that information, I wouldn't have taken it even

6   though he was prescribing it, they don't win on the case.

7   And there are other aspects to that liability.

8         MR. ALLEN:  Let me answer the Court's question.

9   And the Court's question is, what do we want.  And the

10   answer to the Court's question is not what Mr. Magaziner

11   said.

12       We can't go out now and take doctors' depositions

13   under the question that Mr. Magaziner wanted to ask, and

14   that is, would you have prescribed it anyway.  A doctor

15   can't even begin to give a fair answer now, because the

16   process of discovery, if I ask you, did you give a fair

17   warning, I have to know what you knew first.  And if when

18   we get the files and find out they have information about

19   the drug that they didn't convey to the doctors, that's

20   when they can answer the question.

21       So any deposition you take of a physician, who I've

22   represented in every MDL -- not every -- many MDLs across

23   this country, I'm a doctors' defense lawyer, a doctor

24   can't answer the question about fair warning until the

25   defense's documents are discovered.

64

1    So what we want, and what we have said we wanted the

2    entire time since every hearing that we have addressed

3    this issue, is a group of cases, Your Honor, that we can

4    discover that is a guidepost, just like our sister

5    litigation on Zyprexa.  Just like Celebrex I think is an

6    MDL right now, they have assigned 45 cases.  Fosamax is

7    another MDL, they have 25 cases.

8    Zyprexa, which I was involved in, they had 24,000

9    lawsuits settle without any case-specific discovery.  And

10   once the settlement took place, they put a trial group

11   together, and I think the number's 24.

12   So we're not here asking for something that's

13   different or odd or strange.  We're asking for what

14   happened in the past that's worked in other jurisdictions.

15   And that's what we're asking for.

16          MR. MAGAZINER:  Your Honor said that you had

17   until 5:00, so I fear that this repartee back and forth,

18   we could go much longer than -- we're already 15 minutes

19   or 18 minutes past the allotted time.

20   But if you would like to hear response to that, I'd

21   be happy to give it to you, Your Honor.

22          THE COURT:  I think what we're going to do is

23   just enter an order on the pending motions.  We will

24   schedule -- apparently the server is down so my calendar

25   isn't open.  But I would be incline to send -- set a

65

1    further status conference in July after the June 30

2    deadline, and I would expect at that time to hear none of

3    the same complaints that we have been hearing for the last

4    eight months.

5              (Concluded at 5:20 p.m.)

6              C E R T I F I C A T E

7

8         I certify that the foregoing is a correct

9    transcript from the record of proceedings in the

10   above-entitled matter.

11

12

13

14

15   _____            _____

16   Sandra K. Tremel

17

18

19

20

21

22

23

24

25